SR001

To be argued by:
Randall D. Unger
(15 minutes)

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION : SECOND DEPARTMENT
-----------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

                    Respondent,                    A.D. No. 2015-01907

          -against-                                Ind. No. 2228/2012
                                                   Queens County

RAYMOND BALL,                                      TO BE HEARD ON THE
                                                   ORIGINAL RECORD
                    Defendant-Appellant.
-----------------------------------------------------------------x

**BRIEF FOR DEFENDANT-APPELLANT**
**RAYMOND BALL**

APPEALS BUREAU
QUEENS COUNTY D.A.
2016 AUG 15  A 10: 32

                              RANDALL D. UNGER
                              Attorney for Defendant-Appellant
                              Raymond Ball
                              42-40 Bell Boulevard, Suite 302
                              Bayside, New York 11361
                              (718) 279-4500

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................   1

QUESTIONS PRESENTED.....................................................................   2

STATEMENT OF FACTS........................................................................   3
    The Suppression Hearing..................................................................   3
    The Hearing Court Decisions............................................................   5
    The Trial.........................................................................................   6
    The People's Case............................................................................   6
    The Defense Case.............................................................................   11
    The Verdict & Sentencing.................................................................   11

ARGUMENT:

POINT I

          THE HEARING COURT ERRONEOUSLY DENIED THE
          APPELLANT'S MOTION TO SUPPRESS PHYSICAL
          EVIDENCE, STATEMENTS AND THE PRIOR
          IDENTIFICATION EVIDENCE..........................................   12

POINT II

          THE APPELLANT WAS DENIED HIS DUE PROCESS
          RIGHT TO A FAIR TRIAL WHEN THE PEOPLE
          ELICITED THIRD-PARTY TESTIMONY FROM A
          POLICE OFFICER THAT HE WAS IDENTIFIED IN A
          SHOWUP PROCEDURE BY THE COMPLAINING
          WITNESS...............................................................................   18

POINT III

          THE APPELLANT'S DECISION TO PROCEED TO
          TRIAL *PRO SE* WAS NOT MADE KNOWINGLY AND
          VOLUNTARILY. ACCORDINGLY, HIS WAIVER OF
          HIS RIGHT TO COUNSEL WAS INEFFECTIVE AND A
          NEW TRIAL IS REQUIRED...............................................   26

## POINT IV

THE IMPOSITION OF A 10 YEAR SENTENCE OF
IMPRISONMENT WAS UNDULY HARSH AND
EXCESSIVE AND SHOULD, IN THE INTEREST OF
JUSTICE, BE REDUCED...................................................... 32

CONCLUSION............................................................................... 35

CERTIFICATE OF COMPLIANCE

**SR004**

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION : SECOND DEPARTMENT
-------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

                    Respondent,

    -against-

RAYMOND BALL,

                    Defendant-Appellant.

-------------------------------------------------------------------x

## PRELIMINARY STATEMENT

        This is an appeal from a judgment rendered March 4, 2015, by the

Supreme Court, Queens County, convicting the appellant, after a jury trial, of two

counts of robbery in the second degree in violation of Penal Law § 160.10 (1) and

Penal Law § 160.10 (2) (a), assault in the third degree in violation of Penal Law §

120.00 (1) and criminal possession of stolen property in the fifth degree in violation

of Penal Law § 165.40, and sentencing him to concurrent determinate terms of

imprisonment of 10 years for the robbery counts and definite terms of imprisonment

of one year for the assault and stolen property count (Barry A. Schwartz, J., at trial

and sentencing).

        Timely notice of appeal was filed.  On January 7, 2016, this Court

granted the appellant's motion for poor person's relief, and on April 14, 2016,

1

assigned Randall Unger as counsel on appeal. No stay of execution has been sought and the appellant is presently incarcerated pursuant to the judgment of conviction entered herein.

## QUESTIONS PRESENTED

### POINT I

Whether the hearing court erroneously denied the appellant's motion to suppress physical evidence, statements and prior identification evidence.

### POINT II

Whether the appellant was denied his due process right to a fair trial when the People elicited third-party testimony from a police officer that he was identified in a showup procedure by the complaining witness.

### POINT III

Whether the appellant's decision to proceed to trial *pro se* was made knowingly and voluntarily and whether his waiver of his right to counsel was ineffective, requiring that a new trial be ordered.

### POINT IV

Whether the imposition of a 10 year sentence of imprisonment for the appellant's conviction of robbery in the second degree was unduly harsh and excessive and should, in the interest of justice, be reduced.

2

**SR006**

## STATEMENT OF FACTS

The Suppression Hearing

P.O. Daniel Lanning, assigned to the 115th Pct., was in plainclothes on patrol in an unmarked vehicle on the night of July 3, 2012. At about 9:00 p.m., he received a radio call of a male being robbed at knifepoint at the corner of 105th Street and Northern Boulevard by three black males, one of whom was dressed in a white shirt and black pants. When he proceeded to that location, he observed a man named El Turkey who was bleeding from his head and mouth and looked as if he had been beaten up. El Turkey told P.O. Lanning that he'd been robbed and pointed southbound on 105th Street, indicating that the perpetrators had fled in that direction. He did not describe the attack or the perpetrators at that time (HA4-HA7, HA10-HA13, HA17-HA21, HB15-HB16).[1]

P.O. Lanning had El Turkey sit in the back seat of his car and then drove southbound on 105th Street. Within seconds, P.O. Lanning observed two men, one of whom was later identified as Elijah Brooks, who was wearing a white shirt, black pants and a baseball cap. El Turkey pointed at Brooks and stated "that's the guy

_____

[1]Numerical references preceded by "HA" are to the minutes of the suppression hearing conducted on May 21, 2013. Those preceded by "HB" are to the minutes of the reopened suppression hearing conducted on January 8, 2014. Those with no prefix are to the minutes of the trial. Those preceded by an "S" are to the minutes of the sentencing.

3

**SR007**

there". P.O. Lanning then exited his car and stopped both men. However, he only arrested Brooks and then placed a radio call stating that "we had a male stopped" (HA7-HA9, HA12-HA17, HA19, HB16-H23).

P.O. Angelo Pampena, also assigned to the 115th Pct., was in uniform on patrol in an unmarked car when he heard a radio call of a robbery in progress at 105th Street and Northern Boulevard on July 3, 2012 at about 9:00 p.m. The description of the perpetrators in that call was "male Blacks, wearing a white shirt, black pants". However, he could not recall if the call described how many perpetrators there were or the heights, weights or ages of any of the perpetrators. As he drove southbound on 105th Street, he observed a black male, later identified as the appellant, wearing a white T-shirt and black pants and holding an iPhone as he was running northbound on 105th Street. As P.O. Pampena exited his car to stop him, the appellant, who had no injuries or blood on him, stated either that he had purchased or gotten the phone from 105th Street and Northern Boulevard. P.O. Pampena then handcuffed the appellant. When he searched him, he found a hundred dollar bill, seven twenty dollar bills and a ten dollar bill in his pocket (HA22-HA27, HA35-HA43, HA55-HA56, HB30-HB31).

When P.O. Pampena transported the appellant to 105th Street and Northern Boulevard, he observed El Turkey sitting in the back of an ambulance. He

4

**SR008**

also observed that El Turkey had blood on his head, face and mouth, a black and blue eye that was swollen shut and clothing that was ripped, disheveled and bloody. As El Turkey was being cleaned by EMS personnel, he identified the iPhone that P.O. Pampena had taken from the appellant and identified the appellant as the perpetrator who took his wallet and phone from his pocket. He also stated that he was robbed of the same denominations of U.S. currency that P.O. Pampena had recovered from the appellant (HA27-HA33, HA44-HA48, HB31-HB39, HB46-HB48).

After the identification was made, El Turkey refused to be taken to a hospital for medical treatment. P.O. Pampena then placed the appellant in the back of his car. When the appellant asked why he was being arrested, P.O. Pampena replied that it was for a robbery. The appellant then stated "that if the guy said it was his then I guess it was his" (HA33-HA34, HA49-H50, HB41-H45).

## The Hearing Court Decisions

At the conclusion of the initial suppression hearing, the court denied the motions to suppress, concluding that the police had probable cause to arrest the appellant (HA61-HA64). A decision and order reflecting that decision was issued on May 22, 2013. After the re-opened hearing was concluded, the court issued a decision and order dated January 14, 2014 which adhered to its earlier decision denying the motions to suppress in their entirety.

5

The Trial

The People's Case

      Tarek El Turkey, a cab driver who was born in Egypt, shared a basement apartment with a roommate on 105th Street between Northern Boulevard and 32nd Avenue in the Corona section of Queens. On July 3, 2012, at about 8:30 p.m., he left his apartment to purchase a pack of cigarettes. First, he walked to an ATM machine in a check cashing store at the corner of 106th Street and Northern Boulevard and withdrew $260.00 in cash. He then walked one block to a deli which he frequented to purchase the cigarettes. Outside the deli was a group of individuals. One of those individuals was a homeless black man whom El Turkey had seen begging in the area three or four times previously and "always [would] give him [a] dollar or coffee or something". When asked if that man was in the courtroom, El Turkey replied, "He is not here" (336-346, 392-393).

      After he purchased a pack of cigarettes in the deli, he left the store, lit a cigarette and phoned someone as he walked along 105th Street towards 34th Avenue. Though he had testified before the grand jury that he became aware that two black men began following him at that time, he insisted that he was followed by one black man whom he described as weighing between 250 and 300 pounds, and wearing a white shirt and dark jeans. As his apprehension grew, El Turkey walked into the

6

**SR010**

street to walk in the direction of the deli. After he heard the man who was following him tell someone to punch him, the man pushed him to the ground between two parked cars. He then observed that the homeless man whom he had seen earlier was behind him on the ground. While the heavyset man punched him in the face, the homeless man ripped his pants pocket and removed his cell phone and wallet which contained $250 in cash. The heavyset man then slammed his head against the curb two or three times, cursed him and threatened to kill him. As a result, El Turkey's eye became swollen, one of his teeth was loosened and he felt pain in his face (347-370, 393-402).

When the attack ended, El Turkey observed the heavyset man proceed up Northern Boulevard towards 34th Street. However, he did not observe where the homeless man went. After about a minute, he stood up and went back inside the deli and told the manager that he'd been mugged and asked him to call the police. While inside the deli, the heavyset man returned to the front of the store and threatened and cursed at him again. He claimed he recognized this man because he was wearing the same clothing that he wore during the attack – a red shirt and black pants (370-372, 402-409).

About 15 seconds later, El Turkey exited the deli and approached two plainclothes police officers in an unmarked car. He rode with those officers for

7

**SR011**

approximately 60 to 80 feet when he observed the heavyset man and another taller

man in the street. El Turkey identified the heavyset man as the one who had punched

him. However, he did not identify that man when asked if he recognized him in the

courtroom (373-378, 409-414).

After El Turkey exited the police car, he was treated in an ambulance

that had arrived at the scene. When additional police officers arrived, one of them

showed El Turkey a Blackberry phone that did not belong to him and an iPhone that

he identified as his. A police officer also told him that "he going to bring the guy

they find the money with him and from far away, and I can recognize him I say yes

or no ... so I tell him, yes, this guy". The man he identified as the "homeless guy" was

someone he knew "very well" and who "[s]ometimes ... acted like a gay" and dressed

"like a woman". When asked if he recognized that man in the courtroom, El Turkey

twice replied "No" (378-385, 418-427).

After the paramedics cleaned him up, El Turkey was asked if he wanted

to go to a hospital but declined to go because he didn't want to miss time from work.

Instead, he was driven to a police station where an officer gave him his wallet and

$250 in cash (381-384, 427-431).

Det. Daniel Lanning, a field intelligence officer assigned to the 115th

Pct., responded to a radio call of a "male being robbed at knifepoint" by three male

8

blacks at the corner of 105th Street and Northern Boulevard on July 3, 2012, shortly before 9:00 p.m. When he arrived at that location, he observed Tarek El Turkey, bleeding from his face and mouth, waving at him. After a brief conversation with El Turkey, he placed him in the rear seat of his car and proceeded southbound on 105th Street. Within five seconds, Det. Lanning observed two black males walking northbound in his direction, When El Turkey stated "that's him", Det. Lanning exited his car and approached the two men with his gun drawn. El Turkey then identified the taller of the two men, Elijah Brooks, as "the individual that robbed him". Det. Lanning handcuffed Brooks and placed him under arrest (433-481).

P.O. Angelo Pampena, assigned to the anti-crime unit of the 115th Pct., responded to a radio call describing a knifepoint robbery in progress by three male blacks at 105th Street and Northern Boulevard on July 3, 2012 at about 8:55 p.m. As he approached 32nd Avenue, he observed a male black, later identified as the appellant, wearing a white T-shirt and black jeans, running northbound on 105th Street. He did not observe any blood or dirt on the appellant's clothing. When he stopped his car, the appellant, who was holding an iPhone, stopped, raised his hands and stated that "he bought a phone at 105 and Northern Boulevard". The officer then took the iPhone out of his hand, handcuffed and frisked him and found $250 in cash in his right front pants pocket (497-511, 542-543, 550-552, 559, 568-570).

9

The appellant was driven to 105th Street and Northern Boulevard where an ambulance that was recorded as arriving at the scene at 9:11 p.m., was parked at the corner. P.O. Pampena entered the rear of the ambulance and spoke with Tarek El Turkey whose face was bloody and swollen and whose clothes were torn. P.O. Pampena then asked El Turkey if he recognized the appellant who was standing in front of a police car. El Turkey identified the appellant and stated that he "was the one that started to assault him, and then he was the one that took his pocket, he rifled through his pockets and took out the phone and the money". He also stated that he had seen the appellant on many previous occasions in the vicinity of 105th Street and Northern Boulevard. P.O. Pampena then showed El Turkey the iPhone he had recovered but denied showing him a Blackberry phone. After unlocking the iPhone, he saw photographs of El Turkey and gave the phone to him (511-515, 552-567, 580).

After speaking with El Turkey, P.O. Pampena canvassed the area to see if he could find any other evidence. In the course of that canvas, he found El Turkey's wallet, which contained a Social Security card and some other identification documents, on a sewer grate at 105th Street and Northern Boulevard (572-574).

As the appellant was being driven to the police station, he asked what he was being charged with. When P.O. Pampena replied, "robbery", the appellant responded, "well, if he says it's his, I guess it's his" (575).

10

**SR014**

P.O. Pampena later photographed the iPhone and cash he had recovered and vouchered those items. He also took photographs of El Turkey and vouchered those as well (515-525).

## The Defense Case

Adi Gonzalez, an emergency medical technician employed by the New York City Fire Department, responded to a call at 9:07 p.m. on July 3, 2012 and proceeded to 106th Street and Northern Boulevard. He arrived at that location at 9:11 p.m. His first contact with Tarek El Turkey, who had pain in his face and swelling and soft tissue injury on his forehead, was at 9:21 p.m. In his report documenting the incident, Gonzalez did not indicate that El Turkey was bleeding. His report did indicate that he attempted to convince El Turkey to seek medical attention but that El Turkey had refused treatment, stating, "In my country we believe in God whatever happens, happens". However, he could not say whether El Turkey was ever inside his ambulance (612-645).

## The Verdict & Sentencing

The appellant was found guilty of two counts of robbery in the second degree, assault in the third degree and criminal possession of a weapon in the fourth degree (726). Based on his prior conviction of burglary in the third degree, he was adjudicated a second felony offender (S2-S4). Thereafter, he was sentenced to

11

concurrent determinate terms of imprisonment of 10 years for the robbery counts, and

concurrent definite terms of imprisonment of one year for the assault and weapon

counts (S24).

## ARGUMENT

## POINT I

### THE HEARING COURT ERRONEOUSLY DENIED THE APPELLANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE, STATEMENTS AND PRIOR IDENTIFICATION EVIDENCE.

At the suppression hearing, the evidence presented by the People

established that on the night of July 3, 2012, P.O. Pampena responded to a radio call

describing a robbery in progress. In that same call, the only descriptions of the

perpetrators were "male Blacks, wearing a white shirt, black pants". Based on that

information, P.O. Pampena forcibly stopped, handcuffed and searched the appellant

and then transported him to the location where Tarek El Turkey was being treated by

emergency medical technicians and where El Turkey identified the appellant as one

of the perpetrators. Though the hearing court concluded that the appellant's arrest

was supported by probable cause, it is clear that no such predicate existed. Because

P.O. Pampena's forcible detention of the appellant was unlawful, his statements to the

police, as well as the cell phone and U.S. currency seized from his person should have

12

been suppressed. And since the showup identification made by El Turkey was the direct product of the police officer's unlawful conduct, the prior identification evidence should have been suppressed as well. A reversal of the appellant's conviction is therefore required.

Section 140.10 (1) (b) of the Criminal Procedure Law provides that a police officer may arrest a person for any crime "when he has reasonable cause to believe that such person has committed such crime, whether in his presence or otherwise." The term "reasonable cause" is synonymous with "probable cause", *People v. Maldonado*, 86, 631, 635 (1995) and is defined in Section 70.10 (2) of the Criminal Procedure Law as follows:

> Reasonable cause to believe that a person committed an offense exists when evidence or information which appears reliable discloses facts or circumstances which are collectively of such weight and persuasiveness as to convince a person of ordinary intelligence, judgment and experience that it is reasonably likely that such offense was committed and that such person committed it.

In determining whether probable cause has been established, it is not necessary that all possibility of the suspect's innocence be excluded or that there be absolute certainty that the suspect has committed a crime. *People v. Bigelow*, 66 N.Y.2d 417, 423 (1985). However, the standard does require that it appear "more probable than not that a crime has taken place and that the one arrested is its

13

perpetrator, for conduct equally compatible with guilt or innocence will not suffice." *People v. Carrasquillo*, 54 N.Y.2d 248, 254 (1981), *citing People v. De Bour*, 40 N.Y.2d 210, 216 (1976). Thus, a police officer's hunch or gut reaction that a person has participated in a crime will not suffice. *People v. Delmonico*, 94 A.D.2d 773, 774 (2d Dept. 1983), *citing People v. Sobotker*, 43 N.Y.2d 559, 564 (1978).

Moreover, where the police are acting on a description of a perpetrator which is general and lacking in specificity, this Court has held that such information is insufficient to establish reasonable suspicion, let alone probable cause to arrest. *See People v. Hargroves*, 296 A.D.2d 581, 582 (2d Dept. 2002) (description of "group of male blacks" one of whom was wearing an orange jacket insufficient); *People v. Riddick*, 269 A.D.2d 471 (2d Dept. 2000) description of four black men, one of whom was wearing a black jacket on a corner insufficient); *People v. Choy*, 173 A.D.2d 883 (2d Dept. 1991) (four young male Orientals dressed in dark clothing insufficient); *People v. Wisdom*, 125 A.D.2d 512, 513 (2d Dept. 1986) (black man dressed in beige insufficient); *People v. Perez*, 125 A.D.2d 419, 420 (2d Dept. 1986) (male Hispanic wearing black thigh-length coat insufficient). And the mere presence of an individual in the vicinity of a crime scene does not establish probable cause. *People v. Sanchez*, 276 A.D.2d 723, 724 (2d Dept. 2000); *People v. Bradshaw*, 76 A.D.3d 566, 571 (2d Dept. 2010). Judged by the foregoing standards, it is clear that

14

P.O. Pampena did not have probable cause to arrest the appellant when he apprehended him.

According to P.O. Pampena, the only information contained in the radio call to which he responded was that a robbery was being committed at 105th Street and Northern Boulevard and that the perpetrators were "male Blacks, wearing a white shirt, black pants" (HA25). The call did not describe the approximate age, height or weight of any of the perpetrators, or any of their distinctive facial features. Moreover, other than the colors indicated, the call did not specify what type of shirt or pants any of the perpetrators were wearing. Thus, while the appellant may have matched the vague and generalized description that P.O. Pampena heard, it could not be concluded that the information furnished by the radio call established the existence of probable cause to arrest him. *People v. Gunter*, 158 A.D.2d 541, 542 (2d Dept. 1990); *People v. Hargroves, supra.*

Nor was probable cause established by the assertion that the appellant was holding a cell phone when P.O. Pampena observed him. While his holding of an iPhone attained significance retrospectively when Tarek El Turkey later identified it, at the time it was observed in the appellant's hand by P.O. Pampena, it was of no significance at all since the radio call did not indicate that a cell phone had been taken during the reported robbery. And while the appellant's statement that he had

15

SR019

purchased or gotten the phone in the area might have aroused P.O. Pampena's curiosity, and provided him with a basis for making some inquiry, it certainly did not furnish him with probable cause to arrest the appellant. *See People v. Howard*, 50 N.Y.2d 583, 590 (1980) ("[t]here was, therefore, basis for questioning defendant, but there was nothing that made permissible any greater level of intrusion").

Nor did P.O. Pampena's assertion that the appellant was running when he first observed him warrant a finding that there was probable cause to believe that he had committed the robbery then being investigated. This was not a case where the suspect fled or attempted to flee after being confronted by the police, a circumstance that might have contributed to a finding of reasonable suspicion that he was engaging in some unlawful activity. *People v. Holmes*, 81 N.Y.2d 1056, 1058 (1993). On the contrary, the record discloses that the appellant stopped running as soon as P.O. Pampena approached him and made no attempt to flee thereafter. Nor did the appellant exhibit any evasive or furtive behavior that might have raised the officer's level of suspicion. *People v. Benjamin*, 51 N.Y.2d 267 (1980). And P.O. Pampena never asserted that anything the appellant had done caused him to fear for his safety. *People v. Salaman*, 71 N.Y.2d 869, 870 (1988). In short, under all of the circumstances that existed at the time of the encounter, there was insufficient evidence to support a finding that there was reasonable cause to believe that the

16

appellant had committed a crime, let alone that there was probable cause to justify his

arrest. *People v. Clermont*, 133 A.D.3d 612, 614 (2d Dept. 2015).

In sum, since it was unreasonable for P.O. Pampena to arrest and search

the appellant, the cell phone and U.S. currency recovered from his person should have

been suppressed since those items were not seized incident to a lawful arrest. *People*

*v. Baker*, 20 N.Y.3d 354, 363-64 (2013). Moreover, although the appellant's initial

statement to P.O. Pampena that he had purchased or gotten the cell phone at 105th

Street and Northern Boulevard was made prior to his actual arrest, and was alleged

to have been spontaneously made, it was nevertheless uttered in response to the

officer blocking his path by driving and stopping his vehicle directly in front of him,

an act that amounted to an unlawful seizure since it significantly interrupted the

appellant's "liberty of movement". *People v. De Bour*, 40 N.Y.2d at 216. As such,

it cannot be concluded that the statement was truly spontaneous and not the result of

P.O. Pampena's unlawful provocation. *People v. Stoesser*, 53 N.Y.2d 648, 650

(1981). And since the appellant's detention was unjustified, the identification by El

Turkey, and the appellant's subsequent statement, both of which were the direct result

of the unlawful police activity, should have been suppressed as well. *People v. Dodt*,

61 N.Y.2d 408, 417 (1984). For these reasons, the appellant's conviction must be

reversed. Moreover, since El Turkey did not make an in-court identification of the

17

SR021

appellant at trial, and since suppression of the physical evidence, showup identification and statements would leave the People with no evidence with which to prosecute the appellant, the indictment should be dismissed. *People v. Dickerson*, 153 A.D.2d 897 (2d Dept. 1989).

## POINT II

THE APPELLANT WAS DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL WHEN THE PEOPLE ELICITED THIRD-PARTY TESTIMONY FROM A POLICE OFFICER THAT HE WAS IDENTIFIED IN A SHOWUP PROCEDURE BY THE COMPLAINING WITNESS.

A review of the trial record clearly discloses that Tarek El Turkey was the only eyewitness to the robbery in which the appellant allegedly participated. It is equally clear that El Turkey did not identify the appellant as one of the perpetrators of that crime at trial. However, the People did elicit testimony from P.O. Pampena that El Turkey had identified the appellant during a showup procedure that he had arranged after transporting the appellant to the location where El Turkey was being treated by medical technicians. It is submitted that this third-party identification testimony was erroneously admitted and that the error was not harmless because it deprived the appellant of his due process right to a fair trial. The judgment of conviction must therefore be reversed.

18

The eliciting of an identification by an eyewitness through the testimony of a police officer has been repeatedly held to be so prejudicial as to require the reversal of a resulting conviction. *People v. Trowbridge*, 305 N.Y. 471 (1953); *People v. Caserta*, 19 N.Y.2d 18 (1966); *People v. Holt*, 67 N.Y.2d 819 (1986). The prohibition against such testimony avoids the danger that a jury might endow an identification "with an undeserved aura of trustworthiness" as a result of a police officer's official confirmation of another's identification. *Trowbridge, supra* at 477; *People v. Veal*, 158 A.D.2d 633, 634 (2d Dept. 1990); *People v. Rankins*, 81 A.D.3d 857, 858 (2d Dept. 2011).

An exception to the so-called bolstering prohibition is codified in Section 60.25 of the Criminal Procedure Law which provides, in pertinent part, as follows:

> 1. In any criminal proceeding in which the defendant's commission of an offense is in issue, testimony as provided in subdivision two may be given by a witness when:
>
> (a) Such witness testifies that:
>
> (i) He observed the person claimed by the people to be the defendant either at the time and place of the commission of the offense or upon some other occasion relevant to the case; and (ii) On a subsequent occasion he observed, under circumstances consistent with such rights as an accused person may derive under the constitution of this state or of the United States, a person whom he had observed on the

19

**SR023**

first or incriminating occasion; and (iii) He is unable at the
proceeding to state, on the basis of present recollection,
whether or not the defendant is the person in question; and

(b) It is established that the defendant is in fact the person
whom the witness observed and recognized on the second
occasion. Such fact may be established by testimony of
another person or persons to whom the witness promptly
declared his recognition on such occasion.

To invoke the use of Section 60.25, and elicit a past identification by
another person, the prosecution must lay a detailed evidentiary foundation since the
authorization contained in the statute is specific and limited. *People v. Patterson*, 93
N.Y.2d 80, 82 (1999) (holding that the statute cannot be invoked to admit a prior
identification of a witness who died prior to trial); *People v. Quevas*, 81 N.Y.2d 41,
45 (1993) (ambiguity as to whether a witness can make an in-court identification is
not a sufficient foundation); *People v. Bayron*, 66 N.Y.2d 77, 82 (1985) (holding that
the statute does not apply where a witness fails to identify the defendant due to fear).
In any event, before third-party identification testimony will be permitted, the
prosecution must establish that the witness is unable to identify the perpetrator of the
offense because he lacks present recollection. *People v. Victor*, 271 A.D.2d 556, 557
(2d Dept. 2000); *People v. Kopliku*, 37 A.D.3d 496 (2d Dept. 2007); *People v.
Hudson*, 201 A.D.2d 503 (2d Dept. 1994); *People v. Polite*, 228 A.D.2d 705 (2d Dept.
1996). Based upon the foregoing, it cannot be concluded that the testimony of P.O.

**SR024**

Pampena, which confirmed El Turkey's prior identification of the appellant, was properly admitted.

A review of the trial record reveals that when the prosecutor questioned El Turkey regarding his prior identification of the appellant, and whether he recognized the appellant as one of the perpetrators, the following exchange took place:

Q. Who did the police officers bring to show you?

A. He bring the homeless.

Q. Did you recognize the person?

A. He bring the homeless – you want me –

THE COURT: They brought the homeless guy to you?

THE WITNESS: Yes.

THE COURT: Okay.

Q. Who was that person, what did he do to you?

A. The homeless?

Q. Yes.

A. He was the one behind me and the one he took the money and phone.

Q. That was the person the police had in custody?

21

**SR025**

A. Yes.

Q. I'm going to ask you to take a look around the courtroom and see if you recognize the person they had in custody?

THE DEFENDANT BALL: Asked and answered, your Honor.

Q. Overruled. You can look around.

A. You mean the homeless guy?

Q. Yes.

A. No. I know him very well. No.

Q. Are you sure the person police had there the homeless guy was the person that assaulted you –

MR. SHORTT: Withdrawn.

Q. Are you sure the person the police arrested was the person who took your property?

A. Yes.

Q. Can you remember what that person looked like today?

A. The homeless or the heavy guy?

MR. GIBBONS: Objection.

THE COURT: Overruled. What did he look like?

A. Sometimes he acted like a gay, act like a woman sometime, this is the homeless guy.

22

SR026

Q.  Okay.  Do you recall what the homeless guy was wearing the day he assaulted you?

A.  I guess jeans and white shirt.

MR. SHORTT: No further questions, your Honor.

(384-386).

It is clear from the preceding exchange that El Turkey was sure that he had accurately identified the individual he described as the homeless man, whom the People contended was the appellant, when the police exhibited him to El Turkey on the night of the charged offense.  Thus, it appears that the People satisfied the first and second foundational prongs in Section 60.25 which require proof that the witness observed the perpetrator during the charged offense, and that he subsequently recognized the person whom he had observed "on the first or incriminating occasion". *People v. Patterson*, 93 N.Y.2d at 82.  However, it is equally clear that the People failed to establish that El Turkey lacked present recollection to identify the appellant as the perpetrator, the third foundational prong required for invoking Section 60.25.

For one thing, El Turkey never testified that he was unable to identify the perpetrator he described as the homeless man due to his lack of present recollection.  Indeed, the prosecutor never even asked El Turkey directly if he was unable to identify that individual in court because his memory of the event had

23

**SR027**

dimmed due to the passage of time. And the fact that the prosecutor had asked that question when he sought unsuccessfully an in-court identification of the perpetrator he described as the heavyset man, whom it was contended was co-defendant Elijah Brooks, did not relieve the People of the duty to lay the same foundation with respect to his lack of recognition of the second perpetrator, particularly since El Turkey claimed that he had a prior acquaintance with that man but no such prior acquaintance with the heavyset man.

Moreover, the record discloses that when he was asked by the trial judge if he saw "the homeless guy" in the courtroom, El Turkey responded, "No. I know him very well. No" (385). This response was not an assertion that El Turkey could not identify the homeless man as one of the two perpetrators because he lacked present recollection to do so. Instead, it was an unambiguous assertion by El Turkey that the man who had stolen his wallet and cell phone was not seated in the courtroom and that therefore, the appellant was not one of the perpetrators of the crime in question. In any case, it cannot be concluded that the People laid an adequate foundation to allow P.O. Pampena to testify to El Turkey's showup identification of the appellant.

While it must be conceded that the appellant did not make a contemporaneous objection to P.O. Pampena's testimony regarding El Turkey's prior

24

identification, this Court should nevertheless consider the error in the interest of justice pursuant to Section 470.15 (3) of the Criminal Procedure Law. *See People v. Hall*, 82 A.D.2d 838, 839 (2d Dept. 1981). Allowing P.O. Pampena to testify to El Turkey's prior identification of the appellant was a truly monumental error in this case. Without this testimony, the People would have been unable to present direct evidence of the appellant's participation in the robbery of El Turkey.[2] And the People would have surely been hard pressed to persuade the jury that the evidence established the appellant's guilt of robbery in the second degree beyond a reasonable doubt.

For many of the same reasons, the error in permitting P.O. Pampena's identification testimony cannot be deemed harmless. *People v. Crimmins*, 36 N.Y.2d 230, 243 (1975). At the very least, there is a significant probability that the appellant would have been acquitted of robbery if the officer's testimony were excluded. Under the circumstances, it cannot be said that the erroneously admitted testimony did not contribute to the verdict. Accordingly, the appellant's conviction should be reversed and a new trial ordered.

---

[2]Though the appellant was found in possession of El Turkey's iPhone and denominations of U.S. currency that matched what had been taken from El Turkey, his recent and exclusive possession of such items provided circumstantial evidence of guilt, but did not furnish the jury with direct evidence of his culpability. *See People v. Schillaci*, 68 A.D.2d 124, 128 (2d Dept. 1979).

**SR029**

## POINT III

THE APPELLANT'S DECISION TO PROCEED TO
TRIAL *PRO SE* WAS NOT MADE KNOWINGLY AND
VOLUNTARILY. ACCORDINGLY, HIS WAIVER OF
HIS RIGHT TO COUNSEL WAS INEFFECTIVE AND A
NEW TRIAL IS REQUIRED.

Long before the trial began, it appears that the appellant had expressed

dissatisfaction with his assigned counsel. Indeed, he expressed that dissatisfaction

throughout the suppression hearing. And although the hearing court reminded the

appellant that his request to relieve assigned counsel and either proceed *pro se* or

have new counsel assigned had been denied prior to the reopening of the suppression

hearing (HB2-HB3), the appellant was permitted to question a witness at that hearing

after his assigned counsel had completed her questioning (HB39-HB45). As the trial

was about to commence, the trial court engaged in a colloquy with the appellant

regarding his purported desire to proceed *pro se*. In the course of that colloquy, the

appellant again expressed his dissatisfaction with his assigned counsel, stating, "it's

hard for a black man to get the proper representation here in the judicial system, you

know, what is it that it provides for, it really puts us in, how do you say, awkward

position. Sometimes we really don't have a choice in the matter in the case that we

want to be represented" and that he had explained to another judge who had presided

over the case that "it was ... [assigned counsel's] inadequacy as a representation that

26

**SR030**

played a big role in making this choice [to proceed *pro se*]" (4-5). After further colloquy was conducted, the trial court concluded that the appellant had knowingly, intelligently and voluntarily waived his right to counsel and permitted him to represent himself at trial (5-16). This conclusion was erroneous. A new trial is therefore required.

"The constitutional right to counsel is fundamental to our system of justice". *People v. Arroyo*, 98 N.Y.2d 101, 103 (2002), *citing* U.S. Const., Amend. VI; N.Y. Const., art. I, § 6. Indeed, the Supreme Court has stated that the right to counsel "is one of the safeguards ... deemed necessary to insure fundamental human rights of life and liberty". *Johnson v. Zerbst*, 304 U.S. 458, 462 (1938). Thus, the right to counsel is considered so fundamental to our adversarial system that its deprivation can never be deemed harmless. *Chapman v. California*, 386 U.S. 18, 23 & n.8 (1967).

Of course, a criminal defendant's right to be represented by counsel may be waived since the right to the assistance of counsel "implicitly embodies a 'correlative right to dispense with a lawyer's help'". *Faretta v. California*, 422 U.S. 806, 814 (1975), *quoting Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942). In recognition of this principle, our State Constitution provides, "In any trial in any court whatever the party accused shall be allowed to appear and defend in

27

person or with counsel". *See People v. McIntyre*, 36 N.Y.2d 10, 14 (1974) (holding that the right of self-representation embodies the right of an individual to determine his own fate). However, before a defendant may proceed *pro se*, he must make a knowing, voluntary and intelligent waiver of the right to counsel. *People v. Slaughter*, 78 N.Y.2d 485, 491 (1991); *People v. Vivienzo*, 62 N.Y.2d 775, 776 (1984).

To determine whether a defendant's decision to waive his right to counsel is truly knowing, voluntary and intelligent, a trial court must undertake a "searching inquiry" of the defendant. *People v. Slaughter*, 78 N.Y.2d at 491, *citing Faretta v. California*, 422 U.S. at 835. A defendant need not be versed in criminal procedure to exercise his right of self-representation. *People v. McIntyre*, 36 N.Y.2d at 17-18. Otherwise, the right of self-representation would be rendered meaningless. *People v. Davis*, 49 N.Y.2d 114, 120 (1979). And the fact that such a decision may be imprudent, or that he would be better served with counsel is of no consequence since a defendant "is entitled to be master of his own fate" and 'respect for individual autonomy requires that he be allowed to go to jail under his own banner if he so desires and if he makes the choice with eyes open'". *People v. Vivienzio*, 62 N.Y.2d at 776, *quoting United States ex rel. Maldonado v. Denno*, 348 F.2d 12, 15 (2d Cir. 1965).

28

The Court of Appeals has enunciated three criteria for determining a defendant's application to proceed *pro se*. First, the request must be unequivocal and timely asserted. Second, the record must demonstrate that there has been a knowing and intelligent waiver of the right to counsel. And third, it must be demonstrated that the defendant "has not engaged in conduct which would prevent the fair and orderly exposition of the issues." *People v. McIntyre*, 36 N.Y.2d at 17. A defendant's request to proceed *pro se* is not unequivocal where he does not assertively state that he wants to represent himself or states that he sees self-representation as a "last resort" due to his disagreement with his counsel. *People v. LaValle*, 3 N.Y.3d 88, 106 (2004). *See also People v. Gillian*, 8 N.Y.3d 85, 88 (2006) (request to proceed *pro se* not unequivocal where request made only because court refused to replace assigned counsel who displeased defendant); *People v. Ested*, 129 A.D.3d 858, 859 (2d Dept. 2015) (same).

Here, the appellant's request to proceed *pro se* was not unequivocal. It is apparent that throughout the pre-trial proceedings, the appellant experienced fundamental differences with his assigned counsel and that he repeatedly expressed his dissatisfaction with counsel to the various judges who were presiding over the case. At the commencement of the re-opened suppression hearing, he reminded the hearing court, "[the] last time I was in front of you I asked you to allow me to go pro

29

se or have another lawyer represent me in the case. I don't feel ... [defense counsel] will properly represent me. And she has been negligent, you know, in her duties in defending me" (HB2). After this exchange continued, the hearing court stated, "As far as changing counsel, at this point the application is denied" (HB3). In the same vein, when the trial was about to commence and the trial court questioned him as to whether he'd been threatened or coerced into proceeding *pro se*, the appellant stated, "No, no one threatened or coerced me in that way, but – you know for a black man to get the proper representation here in the judicial system, you know, what is it that it provides for, it really puts us in, how do you say, awkward position. Sometimes we really don't have a choice in the matter in the case that we want to be represented" (4) (emphasis supplied).

The foregoing statements by the appellant did not express an unequivocal request to proceed *pro se*, particularly the one where he indicated that he felt that he didn't "have a choice in the matter". Rather, the appellant's statements actually reflected dissatisfaction with his present assigned counsel and a desire to have new counsel assigned. Under the circumstances, the hearing court and the trial court should have conducted further inquiries into the sources of the appellant's dissatisfaction with his counsel as part of their continuing duty to ensure that his rights were protected throughout the course of the proceedings. *See People v.*

30

*Medina*, 44 N.Y.2d 199, 207 (1978). And the trial court certainly should not have treated the appellant's complaints about his assigned counsel as an unequivocal request to proceed *pro se. See People v. Littlejohn*, 92 A.D.3d 898 (2d Dept. 2012).

Moreover, the record does not support the conclusion that the appellant's waiver of his right to counsel was knowing, voluntary and intelligent. While the trial court did ask the appellant basic questions regarding his educational background and his understanding of the legal process, it did not fully inform him of the hardships he would face or the fundamental rights he would be waiving by proceeding without counsel. *People v. Mitchell*, 61 N.Y.2d 580, 585 (1984). Nor did the trial court impress upon the appellant the seriousness of the charges against him or advise him of the punishment he was facing if convicted of those charges.[3] Under the circumstances, it cannot be concluded that his waiver of his right to counsel was either knowing, intelligent or voluntary. *People v. Arroyo*, 98 N.Y.2d 101, 104 (2002).

In sum, the record does not support the conclusion that the appellant's waiver of his right to counsel was effective. His conviction must therefore be reversed and a new trial ordered.

_____

[3]As a second felony offender, the appellant faced a maximum term of imprisonment of 15 years upon his conviction of robbery in the second degree.

## POINT IV

THE IMPOSITION OF A 10 YEAR SENTENCE OF IMPRISONMENT WAS UNDULY HARSH AND EXCESSIVE AND SHOULD, IN THE INTEREST OF JUSTICE, BE REDUCED.

Upon his conviction of two counts of robbery in the second degree, the appellant was sentenced to concurrent determinate terms of imprisonment of 10 years, to be run concurrently with a definite term of imprisonment of one year on the criminal possession of stolen property in the fifth degree count. In the event this Court declines to reverse the appellant's conviction for the reasons set forth in Points I, II and III herein, it should, nevertheless, order that his sentence be reduced in the interest of justice.

It is well settled that sentencing determinations are generally left to the sound discretion of the trial court. *People v. Notey*, 72 A.D.2d 279, 282 (2d Dept. 1980). However, that discretion is not without limits. *People v. Naranjo*, 89 N.Y.2d 1047, 1049 (1997). Section 470.15 (6) (b) empowers this Court to modify a sentence of imprisonment that it deems unduly harsh even where the sentence falls within the statutory guidelines. *People v. Thompson*, 60 N.Y.2d 513 (1983). Moreover, in exercising this power, this Court need not defer to the finding of the sentencing court. *People v. Delgado*, 80 N.Y.2d 780, 783 (1992) (holding that an intermediate appellate

32

SR036

court has "broad plenary power to modify a sentence that is unduly harsh or severe" and may exercise such power "if the interest of justice warrants"). In this case, while the 10 year prison sentence was certainly not illegal as a matter of law, it was unnecessarily harsh and severe and should therefore be reduced.

It cannot be disputed that the offense committed against Tarek El Turkey was a serious one and that substantial punishment was warranted for any individual who participated in that offense. However, the record discloses that the appellant did not initiate the attack on El Turkey. Nor did he personally cause any injury to El Turkey. Moreover, while El Turkey's injuries were certainly substantial, they were not as serious as what is frequently seen in a second degree robbery. And while the appellant's theft of El Turkey's wallet and cell phone certainly provided evidence of his culpability as an accomplice, his role in the offense was somewhat more limited and less blameworthy than his co-defendant who stalked, assaulted and repeatedly threatened El Turkey. When it is further considered that the appellant was described as a homeless man , it is fair to conclude that he was not the prime mover in the charged offense and that his participation in the offense was induced by his far more violent co-defendant.

The appellant's decision to proceed to trial *pro se* was certainly not a prudent one. Indeed, as discussed in Point III herein, his purported waiver of his right

**SR037**

to counsel should not have been accepted. However, in attempting to defend himself, the appellant displayed a remarkable degree of courtesy and respect for the judicial process. At no time during the trial did he behave in a contemptuous manner. On the contrary, he accepted the trial court's adverse rulings with more grace than some attorneys show, on occasion. In short, while it certainly cannot be said that the appellant has led an exemplary life, the manner in which he comported himself at trial suggests that he is an intelligent and respectful man who can achieve rehabilitation and can become a productive member of society under the right circumstances.

In sum, there is ample reason to conclude that a lesser term of imprisonment would serve as adequate punishment for the appellant's offense, while maintaining the goals of deterrence and societal protection. *People v. Farrar*, 52 N.Y.2d 302, 305 (1981). Accordingly, the judgment of conviction should be modified and the sentences for the second degree robbery counts reduced to concurrent determinate terms of imprisonment of five years.

**SR038**

## CONCLUSION

For the reasons stated in Point I herein, the appellant's conviction should be reversed and the indictment dismissed. In the alternative, for the reasons stated in Points II and III herein, the appellant's conviction should be reversed and a new trial ordered. In the alternative, for the reasons stated in Point IV herein, the appellant's sentence should be reduced.

Dated:     Bayside, New York
           August, 2016

Respectfully submitted,

RANDALL D. UNGER
Attorney for Defendant-Appellant
Raymond Ball
42-40 Bell Boulevard, Suite 302
Bayside, New York 11361
(718) 279-4500

35

**SR039**

## CERTIFICATE OF COMPLIANCE
## PURSUANT TO 22 NYCRR § 670.10.3(f)

The foregoing reply brief was prepared on a computer. A proportionally spaced typeface was used, as follows:

Name of typeface: Times New Roman
Point size:        14
Line spacing:      Double

The total number of words in the reply brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules or regulations is 7,874.

**SR040**

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION : SECOND DEPARTMENT
-------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

-against-                                    AD No. 2015-01907

RAYMOND BALL,

Defendant-Appellant.
-------------------------------------------------------------------x

## STATEMENT PURSUANT TO CPLR 5531

1. The indictment number in the lower court was 2228/2012.

2. The full names of the original parties were People of the State of New York against Raymond Ball and Elijah Brooks. Only Raymond Ball brings the instant appeal.

3. The action was commenced in the Supreme Court, Queens County.

4. The action was commenced by the filing of an indictment.

5. The appeal is from a March 4, 2015 judgment convicting the appellant of robbery in the second degree (two counts), assault in the third degree and criminal possession of stolen property in the fifth degree, and sentencing him to concurrent terms of imprisonment of 10 years on the first two counts and definite terms of imprisonment of one year on the third and fourth count (Barry A. Schwartz, J.).

6. The appeal is being perfected on the original record.

To be argued by
MEREDITH D'ANGELO
(TIME REQUESTED: 15 MINUTES)

# New York Supreme Court

**Appellate Division--Second Department**

AD No. 15-01907

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

against

RAYMOND BALL,

Defendant-Appellant.

## BRIEF FOR RESPONDENT

RICHARD A. BROWN
District Attorney
Queens County
*Attorney for Respondent*
125-01 Queens Boulevard
Kew Gardens, New York  11415
(718) 286-5984

JOHN M. CASTELLANO
JOHNNETTE TRAILL
RONI C. PIPLANI
MEREDITH D'ANGELO
  Assistant District Attorneys
  *Of Counsel*

OCTOBER 14, 2016

Queens County
Indictment Number 2228/12

**SR042**

# TABLE OF CONTENTS

**Page No.**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

THE *DUNAWAY/HUNTLEY/MAPP/WADE* HEARING . . . . . . . . . . . . . . 4

    The People's Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Defendant's Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    The Court's Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

THE RE-OPENED *DUNAWAY/HUNTLEY/MAPP/WADE* HEARING . . . 8

    The People's Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    The Defendant's Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    The Court's Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

THE TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    The People's Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    The Defendant's Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

REQUEST TO PROCEED *PRO SE* AND FOR A NEW ATTORNEY . . 18

POINT ONE

        THE HEARING COURT PROPERLY DENIED
        DEFENDANT'S MOTION TO SUPPRESS
        PHYSICAL EVIDENCE, STATEMENTS AND
        IDENTIFICATION EVIDENCE . . . . . . . . . . . . . . . . . . . . . . 24

POINT TWO

OFFICER PAMPENA PROPERLY TESTIFIED
THAT THE VICTIM IDENTIFIED DEFENDANT
IN A SHOWUP, AND DEFENDANT'S CLAIM TO
THE CONTRARY IS MERITLESS AND
UNPRESERVED ................................. 32

POINT THREE

DEFENDANT'S WAIVER OF HIS RIGHT TO
COUNSEL WAS UNEQUIVOCAL, KNOWING,
INTELLIGENT, AND VOLUNTARY ................ 44

POINT FOUR

DEFENDANT'S SENTENCE WAS NEITHER
EXCESSIVE NOR UNDULY HARSH, AND
SHOULD NOT BE DISTURBED ON APPEAL .......... 53

CONCLUSION ............................................ 60

**SR044**

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

--------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,　　　　：

　　　　　　　　　Respondent,　　　　　　　：

　　　　　　　　　-against-　　　　　　　　：

RAYMOND BALL,　　　　　　　　　　　　：

　　　　　　　　　Defendant-Appellant.　　　：

-------------------------------------------------------------------- x

## **BRIEF FOR RESPONDENT**

## **PRELIMINARY STATEMENT**

　　　　　　Defendant Raymond Ball appeals from a March 4, 2015, judgment

of the Supreme Court, Queens County (Schwartz, J.). By that judgment,

defendant was convicted, after a jury trial, of two counts of Robbery in the

Second Degree (Penal Law §§ 160.10[1], [2][a]), one count of Assault in the

Third Degree (Penal Law § 120.00[1]), and one count of Criminal Possession

of Stolen Property in the Fifth Degree (Penal Law § 165.40).

　　　　　　Defendant was sentenced to determinate terms of imprisonment

of ten years with five years post release supervision on the second degree

robbery convictions, to run concurrently, one year on the third degree assault

conviction, and one year on the fifth degree possession of stolen property

**SR045**

conviction, both of which merged with the sentences on the robbery convictions. Defendant is currently incarcerated pursuant to this judgment of conviction.

## **INTRODUCTION**

On July 3, 2012, defendant and co-defendant, Elijah Brooks, robbed Tarek Elturkey.[1] They followed Elturkey as he left a deli, and co-defendant pushed Elturkey to the ground. While defendant held Elturkey's hands down, co-defendant repeatedly punched Elturkey in the face and repeatedly slammed his head against the curb. Defendant then reached into Elturkey's pockets and stole his iPhone and his wallet, which contained $250. Defendant and co-defendant then ran away. Elturkey sustained a laceration and bleeding to his forehead, the back of his head, and mouth; scratches to his back; a swollen, black and blue eye; and he lost a tooth. Minutes later, defendant was apprehended one block from the robbery with $250 and the stolen iPhone in his possession. Elturkey identified defendant in a showup, and defendant stated, "if the guys said it was his then I guess it was his."

---

[1] On March 4, 2015, co-defendant Elijah Brooks was convicted, after a joint jury trial with defendant, of two counts of Robbery in the Second Degree (Penal Law §§ 160.10[1], [2][a]), and one count of Assault in the Third Degree (Penal Law § 120.00[1]), and sentenced to determinate terms of imprisonment of ten years with five years post release supervision on the two second degree robbery convictions, to run concurrently, and one year on the third degree assault conviction, which merged with his other sentences (Schwartz, J.).

2

Defendant was arrested and was charged with two counts of second degree robbery, one count of third degree assault, and one count of fifth degree criminal possession of stolen property (Queens County Indictment No. 2228/12).

On January 20, 2015, defendant proceeded to trial before Justice Schwartz, of the Supreme Court, Queens County and a jury. At the conclusion of the trial, defendant was convicted of all four counts and was sentenced on March 4, 2015, as noted above (Schwartz, J., at trial and sentence).

On appeal, defendant raises four claims. First, he argues that the hearing court erred in denying his motion to suppress physical evidence, statements, and identification evidence. Second, he claims that he was denied his right to a fair trial when the People elicited third party testimony from a police officer that defendant was identified by the victim in a show up procedure. Third, he claims that his waiver of the right to counsel was not unequivocal and was not made knowingly, intelligently, and voluntarily. Fourth, he argues that his sentence was excessive. Defendant's second claim is unpreserved, and all of his claims lack merit.

3

**SR047**

## STATEMENT OF FACTS

### THE *DUNAWAY/HUNTLEY/MAPP/WADE* HEARING

#### The People's Case

On July 3, 2012, at approximately 9:00 p.m., Police Officer DANIEL LANNING received a radio run while on patrol in an unmarked car with Sergeant Rosenberg for a male being robbed at knifepoint at 104-22 Northern Boulevard by three black men, and one of the robbers was dressed in a white shirt and black pants (Lanning: 5, 7, 11).[2]  With Lanning seated in the passenger seat, Rosenberg drove two blocks to that location.  Lanning was not in uniform (Lanning: 6).

The victim, Tareek Elturkey, was standing on the corner of 105th Street and Northern Boulevard.  He was bleeding from the head and mouth and looked like he had been "beaten up" (Lanning: 7).  Elturkey told Lanning that he had been robbed and then pointed southbound on 105th Street and said the perpetrators went in that direction (Lanning: 7, 12).  Elturkey got into Lanning's car and they drove southbound on 105th Street (Lanning: 7).  After traveling only halfway down the very next block, Elturkey pointed at co-

---

[2] Citations with last names refer to minutes from the hearing that took place on May 21, 2013.  Citations with last names followed by "RH" refer to minutes from the re-opened hearing that took place on January 8, 2014.

4

SR048

defendant, who was in the street, and identified him as one of the perpetrators (Lanning: 8, 16). Lanning got out of his car and handcuffed and detained co-defendant.

On July 3, 2012, at approximately 8:59 p.m., Police Officer ANGELO PAMPENA received a radio run while on patrol in a "plain police car" for a robbery in progress at 104-22 Northern Boulevard, which was only three blocks away from him (Pampena: 23, 34). Pampena was in uniform (Pampena: 23). The perpetrators were described as male blacks, wearing "white shirt and black pants" (Pampena: 25). As he was driving to that location, Pampena saw a black male wearing a white shirt and black pants, running towards Pampena's car on 105th Street, only one or one and a half blocks from the crime scene (Pampena: 25, 36, 39). Pampena stopped his car and got out. Before Pampena said anything, defendant, who was holding an iPhone, spontaneously said, "I bought this phone from 105 Street and Northern Boulevard" (Pampena: 26). Pampena then handcuffed and detained defendant, searched him for weapons, and found $250 in his pocket, in the denominations of one $100 bill, seven $20 bills, and one $10 bill (Pampena: 27). Defendant had no blood, cuts, or bruises, but his clothes were disheveled (Pampena: 42).

Pampena drove to the robbery location with defendant in his back seat (Pampena: 27).

When Pampena arrived at the corner of 105th Street and Northern Boulevard at 9:03 p.m., Emergency Medical Technicians ("EMT") were treating Elturkey inside an ambulance (Pampena: 27, 34). Elturkey was bleeding from his mouth. His clothes were ripped, disheveled, and covered in blood, and he had blood on his face and head, a large laceration on his head, and a swollen shut, black-and-blue eye (Pampena: 28). Elturkey told Pampena that after he left a "check cashing place," co-defendant, a "big black guy" with a bald or shaved head, started the "beating" and defendant, "a smaller black guy," "ensued with the beating" (Pampena: 27, 29, 52-53). He explained that co-defendant punched and kicked his face and body and that defendant took his iPhone and wallet, which contained $250, from his pockets during the attack (Pampena: 27-29, 51, 52). Elturkey was able to tell Pampena the exact denominations of the bills – one $100 bill, seven $20 bills, and one $10 bill – because he had just taken the money out of an ATM (Pampena: 27).

Elturkey looked out the open back doors of the ambulance he was in and identified defendant, who was facing the ambulance and standing approximately three car lengths away, as the person who took his iPhone and

6

**SR050**

wallet (Pampena: 28, 31-32, 46-47). Defendant was handcuffed with his hands behind his back and was standing in front of Pampena's car, with one uniformed police officer next to him (Pampena: 44-45, 47). Pampena, who was also in the ambulance, could not see defendant's hands (Pampena: 48). Pampena brought the iPhone to Elturkey but did not tell him where he recovered it, and Elturkey gave him the correct password to unlock the phone (Pampena: 32, 49). Pampena then placed defendant in his car (Pampena: 33). Defendant asked what he was being charged with and, when Pampena responded, "robbery," defendant replied, "if the guy said it was his then I guess it was his" (Pampena: 33).

## Defendant's Case

Defendant did not call any witnesses or present any evidence.

## The Court's Decision

In an oral decision dated May 21, 2013, the court denied defendant's motion to suppress the recovered cash and iPhone, defendant's statements, and the identification evidence (Decision: 63-64). First, the court fully credited Lanning's and Pampena's testimony (Decision: 59). Then, the court held that there was probable cause to arrest defendant based on the facts that he matched the description given over the radio run; he volunteered that

7

he just came from the scene of the robbery; the victim told Pampena what

defendant had done and that an iPhone and $250, made up of one $100 bill,

seven $20 bills, and one $10 bill, were stolen from him; the iPhone and $250

cash, made up of the same denominations, were found on defendant; the victim

knew the password for the iPhone; and based on defendant's statement

(Decision: 62). Next, the court found that the identification procedure lacked

suggestiveness because it happened quickly after the robbery and took place

a very short distance from the robbery (Decision: 63). Further, the court held

that the property was lawfully recovered as a result of a search incident to a

lawful arrest (Decision: 63). Last, the court held that defendant's statements

were voluntary because they were not made in response to any questions

(Decision: 63-64).

### THE RE-OPENED *DUNAWAY/HUNTLEY/MAPP/WADE* HEARING

On January 8, 2014, the court permitted defendant to re-open the

hearing in order to question the witnesses about an Emergency Medical

Services ("EMS") report that was not available earlier.

### The People's Case

The People did not present any additional witnesses or evidence.

8

## The Defendant's Case

Using the previously unavailable EMS report, defense counsel asked Lanning and Pampena several questions. In response, Lanning testified that the victim was "a little swollen in the face" and was bleeding from his mouth and the top of his face, but he was not squinting or wiping his eyes when he identified co-defendant (Lanning RH: 16, 19-20). The victim was sitting in the rear passenger seat of Lanning's car when he initially identified co-defendant, who was with another man and was walking quickly towards their car, on the same side as the passenger side (Lanning RH: 17-18). Co-defendant was about nine to ten feet from the car at that point and, although it was dark outside, the sidewalk was well lit (Lanning RH: 18). Lanning and the victim got out of the car and the victim, who was about two to three feet from co-defendant, pointed at co-defendant and again said, "That's him" (Lanning RH: 22-23). Although Lanning stopped and detained co-defendant, Pampena made the arrest (Lanning RH: 28).

Pampena testified that he stopped defendant at approximately 9:00 p.m. and he arrived at the scene of the robbery at approximately 9:05 p.m. (Pampena RH: 32-33). Pampena placed both defendant and co-defendant under arrest at 9:13 p.m. (Pampena RH: 31). Elturkey had one swollen black

9

eye, and a laceration on his head; his clothes were ripped and bloodied; and it looked like "he just got jumped, beat up, mugged" (Pampena RH: 34, 36). As Pampena was sitting "shoulder to shoulder" with Elturkey and talking to him, as EMT's cleaned blood off of Elturkey's head with gauze (Pampena RH: 34-35). He did not see the EMT's clean blood from around Elturkey's eyes, and Elturkey was not slurring his speech (Pampena RH: 46, 48). Pampena had an independent of recollection of Elturkey's physical condition; it was not based on any aided reports (Pampena RH: 38). After being treated by EMT's, Elturkey refused further treatment at a hospital (Pampena RH: 41).

## The Court's Decision

In a written decision dated January 14, 2014, the court denied defendant's motion to suppress the recovered cash and iPhone, defendant's statements, and the identification evidence (Decision: 63-64). The court did not give any additional bases for its decision other than those in its prior decision dated May 21, 2013.

## THE TRIAL

## The People's Case

On July 3, 2012, TAREK ELTURKEY left his house at 8:30 p.m., walked to an ATM on 106th Street and Northern Boulevard, which was

SR054

one block from his home, and withdrew $260 (Elturkey: 341-42, 357). The

$260 was comprised of all $20 bills (Elturkey: 357). After leaving the ATM,

he visited his friend at a deli located at 105th Street and Northern Boulevard

(Elturkey: 341-42). Before entering the deli, Elturkey saw defendant, who he

described as a black homeless man whom he had seen three or four other times

over the course of a month to a month and a half prior to that night, and he was

always begging outside of that deli (Elturkey: 344-45). Elturkey also described

defendant as a skinny man who had short, tight curly hair that looked like

dread locks and who was shorter than five foot six inches (Elturkey: 421).

Elturkey had "always" given defendant a "dollar or coffee or something"

(Elturkey: 344). On this night, Elturkey saw defendant standing with a "bunch

of guys" on the corner of 105th Street and Northern Boulevard (Elturkey: 345).

Elturkey bought a $10 pack of cigarettes with one of his $20 bills, leaving him

with $250 made up of twelve $20 bills and one $10 bill (Elturkey: 358-59).

Elturkey then exchanged five of his $20 bills with another customer for one

$100 bill, which left him with one $100 bill, seven $20 bills, and one $10 bill

(Elturkey: 258).

As Elturkey left the deli and started to walk down 105th Street, he

noticed co-defendant following him (Elturkey: 347). Co-defendant had short

hair and was "taller than me and maybe heavy. . . like 300 pounds. . . like 250 pounds, black guy wearing like white shirt and dark jeans. . . short hair" (Elturkey: 349). While still on 105th Street, Elturkey turned around to walk back toward the deli because he felt unsafe. At that point, co-defendant, who was standing in front of Elturkey, yelled to defendant to punch or attack Elturkey. Co-defendant then pushed Elturkey in between two parked cars (Elturkey: 352-53, 363). Defendant was standing behind Elturkey at that point, and Elturkey fell down, into defendant (Elturkey: 363-64). Defendant grabbed Elturkey's hands and stood up, causing Elturkey's head to fall backwards and hit the sidewalk (Elturkey: 364). Defendant placed his knees over Elturkey's hands, pinning him down, and co-defendant repeatedly punched Elturkey in the face and slammed his head against the sidewalk multiple times (Elturkey: 364-66, 400-01). Co-defendant told Elturkey, "I'll kill you, motherfucker" (Elturkey: 368, 401). Defendant then took Elturkey's iPhone and wallet, which contained his $250, from Elturkey's pants pocket (Elturkey: 367). As a result, Elturkey sustained severe pain, bleeding, a black-and-blue eye, and he lost a tooth (Elturkey: 369). When defendant and co-defendant left, Elturkey went into his friend's deli and told him to call 911 (Elturkey: 371). Approximately

12

ninety seconds later, police arrived, and Elturkey got into their car (Elturkey: 373).

When the prosecutor asked Elturkey if he saw defendant in the courtroom, Elturkey stated, "He is not here" (Elturkey: 346). Elturkey was also asked if he saw co-defendant in the courtroom, and he replied, "Okay, been long time. No" (Elturkey: 353). Notably, when the prosecutor asked Elturkey what he meant by that, Elturkey replied, "I'm a person like I don't know if I see the person twenty times, I don't know what he was wearing. I mean like I always look for basic things, *but I'm not remember faces* or [sic]" (Elturkey: 353) (emphasis added). When the prosecutor again asked Elturkey to clarify what he meant, Elturkey stated that it was "like two or three years ago" (Elturkey: 354). And when the prosecutor asked Elturkey, "Are you having difficulty remembering?" Elturkey clearly stated, "Yes" (Elturkey: 354). Later, Elturkey testified that he recognized co-defendant on 105th Street as he was being driven by the police, but he did not see that person in the courtroom (Elturkey: 374, 377-78). He also testified that, at the time at trial, he was having difficulty remembering who that person was, but he was certain that the man who was arrested that night was the same person who punched him (Elturkey: 377-78). While Elturkey was being treated in the ambulance, he

13

recognized defendant, who he called the "homeless man" (Elturkey: 384).

When the prosecutor again asked him if he saw that man in the courtroom,

Elturkey said, "No, I know him very well. No" (Elturkey: 385). Elturkey also

testified that he was sure that the man who was arrested was the same person

who took his property and, when asked if he remembered what that person

looked like, he responded: "Sometimes he act like a gay, act like a woman

sometime, this is the homeless guy. . . I guess [he was wearing] jeans and white

shirt" (Elturkey: 385-86). Elturkey later testified again that his memory of the

day was not very good and that he did not know of anyone by defendant's

name (Elturkey: 405, 415). Elturkey then testified that the homeless man who

took his property had hair similar to defendant and he was also heavy like

defendant, but he was not able to identify defendant (Elturkey: 431).

Detective DANIEL LANNING, who was a police officer at the

time of the incident, was on patrol with Sergeant Rosenberg on July 3, 2012,

when they received a radio run at about 9:00 p.m., advising them of a male

being robbed at knifepoint by two black males, one of whom wore a white shirt

and black pants, at the corner of 105th Street and Northern Boulevard

(Lanning: 434, 434-39). When Lanning arrived at that location, Elturkey, who

was bleeding from his face and mouth, waved him down (Lanning: 441). After

14

Elturkey told Lanning that he had been robbed, Elturkey got into Lanning's car. After traveling for about five seconds southbound on 105th Street, Elturkey recognized co-defendant (Lanning: 442-43). Lanning got out of the car and stopped defendant and an unapprehended other (Lanning: 445). Elturkey identified co-defendant as the "guy" and then Lanning handcuffed co-defendant (Lanning: 447). During the trial, Lanning identified co-defendant as the man he apprehended and indicated that, at trial, defendant was wearing a black jacket (Lanning: 445). Although Lanning handcuffed co-defendant, Pampena was the designated arresting officer (Lanning: 456).

Police Officer ANGELO PAMPENA was in uniform and on car patrol in an unmarked car with Officers Troisey and Torres when he received a radio run for a robbery in progress at 105th Street and Northern Boulevard (Pampena: 499-500, 502). The perpetrators were described as three male blacks, with one man wearing a white T-shirt and black jeans (Pampena: 504). Pampena was three or four blocks from the crime scene when he received the call (Pampena: 503). Thirty seconds later, as he was driving towards that location, Pampena saw defendant, who matched the given description, running away from the crime scene (Pampena: 503, 543). As soon as Pampena got out of his car, defendant put his hands up and said that he bought the iPhone he

15

.

**SR059**

was holding from 105th Street and Northern Boulevard (Pampena: 505).

Pampena took the iPhone from defendant, handcuffed him, and searched him,

recovering $250 from defendant's front right pocket (Pampena: 506). The

$250 was comprised of one $100 bill, seven $20 bills, and one $10 bill

(Pampena: 511). Pampena put defendant in his car and then drove one more

block to the crime scene (Pampena: 511).

When Pampena arrived at the crime scene, he went to the

ambulance and spoke to Elturkey, whose face and ears were covered in blood,

his mouth was "busted up," and his clothes were torn up and disheveled

(Pampena: 512). Elturkey told Pampena what had happened and then, when

Pampena pointed at defendant, Elturkey said "yes," that he was the one who

had started to assault him and had stolen his property (Pampena: 512, 514).

Elturkey identified the iPhone that Pampena recovered and told Pampena the

exact denominations of money that had been stolen from him (Pampena: 513).

After speaking with Elturkey, Pampena canvassed the area and found

Elturkey's wallet, identification, and social security card on top of a sewer gate

at 105th Street and Northern Boulevard. He promptly returned the items to

Elturkey (Pampena: 573-74). Elturkey described defendant to Pampena as a

male black wearing a white T-shirt and black pants and said that he was the

16

shorter of the two men who had attacked him (Pampena: 577, 579). Pampena took pictures of the iPhone and Elturkey's injuries, returned the iPhone to Elturkey, and then went to the police precinct, where he vouchered the pictures and made copies of the money before returning it to Elturkey (Pampena: 515-16, 525). While driving defendant to the precinct, defendant asked what he was being charged with. Pampena replied "robbery," and defendant stated, "Well, if he say it's his, I guess it's his" (Pampena: 575).

At trial, Pampena identified defendant as the man he arrested who had stolen the property from Elturkey and indicated that, at trial, defendant was wearing glasses and a black button down dress shirt (Pampena: 505). Significantly, the prosecutor asked Pampena if defendant appeared the same as he did on July 3 of 2012. Pampena answered, "No. . . his hair is a little more grown out, he is a little heavier today, and he was clean cut at the time. . . he gained some weight" (Pampena: 506).

## The Defendant's Case

ADI GONZALEZ was working as an EMT on the evening of July 3, 2012, when he responded to a call at 105th Street and Northern Boulevard (Gonzalez:613-14). The EMS report was computer generated and then "backed up" by Gonzalez (Gonzalez: 616). Gonzalez handwrote commentary

17

**SR061**

about Elturkey and the events that took place that night (Gonzalez: 616, 619). The report indicated that he arrived "on scene" at 9:11 p.m. (Gonzalez: 616). Elturkey refused medical treatment, and Gonzalez could not recall if Elturkey was brought into the ambulance, although he normally would speak with patients inside the ambulance for "street calls," whether they wanted treatment or not (Gonzalez: 621, 623, 630-31, 639). The EMS report also indicated that Gonzalez observed pain, swelling, and soft tissue injury to Elturkey's forehead and face, but it did not indicate that Gonzalez observed bleeding from Elturkey (Gonzalez: 624-25).

## REQUESTS TO PROCEED *PRO SE* AND FOR A NEW ATTORNEY

At a calendar call in part K-20, on December 16, 2013, defendant asked the court to relieve his appointed attorney (December 16 Proceedings: 3). Defendant claimed that his attorney decided that alleged perjured testimony being used against defendant had no relevance to the case (December 16 Proceedings: 7). The court responded that it had known the quality of defendant's counsel's work for many years and that defendant's interpretation of what counsel had said was probably incorrect. Then the court denied defendant's application (December 16 Proceedings: 8). Defendant then made an application to proceed *pro se* "because of the fact [that] . . . I prepared my

18

legal defense for myself thus far" (December 16 Proceedings: 8). The court denied defendant's application based on the fact that the case was not yet at the trial posture and defendant would be in front of a different judge at trial (December 16 Proceedings: 8) (Hollie, J.).

On January 8, 2014, at the re-opened hearing, defendant made a second oral application to relieve his appointed attorney (January 8 Proceedings: 2). Defendant stated that he did not "feel" that his attorney would properly represent him and that she had been "negligent," again referencing Pampena's alleged perjured testimony (January 8 Proceedings: 2). He stated that he addressed this alleged perjured testimony in a motion to dismiss (January 8 Proceedings: 2).[3] The court denied defendant's application, explaining that it had already rejected the same application and that there was no indication that defendant's attorney was negligent (January 8 Proceedings: 3) (Hollie, J.).

---

[3]    In an August 30, 2013, *pro se* Motion to Dismiss the Indictment Pursuant to Section 210.20; 210.35 of the Criminal Procedure Law, defendant argued that Officer Pampena's grand jury testimony was perjured. Specifically, he alleged that Officer Pampena gave a "ficticiouse [sic] account" of Elturkey's identification of defendant, based on the fact that the EMS report indicated that Elturkey had refused medical treatment, but Officer Pampena testified that he had conducted the showup procedure with Elturkey while Elturkey was being treated by EMT's (Defendant's Motion at 5).

19

**SR063**

On January 5, 2015, at a calendar call in part Tap-A, defendant moved to represent himself again (January 5 Proceedings: 3). Defendant explained that he could not go forward with his appointed attorney and that he had previously represented himself at trial on another case (January 5 Proceedings: 3-5). The court asked defendant if he understood that he was charged with a C violent felony and, as a predicate felon, he faced a jail term of from five to fifteen years and five years post-release supervision, if convicted (January 5 Proceedings: 5). The court asked defendant about his education and warned defendant about the dangers of representing himself, as opposed to having his attorney, who had decades of experience as a trial attorney, represent him (January 5 Proceedings: 5-6). Defendant told the court that it was because of his attorney that he had been incarcerated for such a "long extended period of time," and that he had "seen" her only twice since "last year" (January 5 Proceedings: 7). The court responded that it was aware that defendant's attorney had had medical issues and that it had tried to move the case forward as quickly as possible. The court asked defendant how he felt about his attorney acting as his adviser at trial, and defendant responded that he would prefer to have a different adviser (January 5 Proceedings: 7). The court concluded that it was unnecessary to replace his attorney as his adviser

20

**SR064**

and that it would allow defendant to represent himself (January 5 Proceedings: 8) (Kron, J.). Defendant *never* renewed his application to have his attorney relieved.

On January 20, 2015, before jury selection started at trial, the court asked defendant if he still wanted to represent himself, and defendant responded that he did (January 20 Proceedings: 3). The court then asked defendant several questions about the extent of his education, employment background, understanding of the English language, and whether he was receiving treatment for any mental or physical condition (January 20 Proceedings: 3-4). Defendant stated that he could read, write, speak, and understand the English language, that he was not being treated for any mental or physical conditions, that he was "maybe nine credits" short of his Associate's Degree, and that he had worked as an "electricians help. . . different things" (January 20 Proceedings: 3-4). Next, the court discussed defendant's past involvement in the criminal justice system and ascertained that he had been in a courtroom many times before this trial (January 20 Proceedings: 4). The court then asked if anyone had threatened, coerced, or influenced defendant to represent himself against his will . Defendant responded that no one had done so but that, "under the circumstances. . . it's

21

**SR065**

hard for a black man to get the proper representation" in the judicial system. He continued, "what is it that it provides for, it really puts us in. . . awkward position [sic]. . . [and that] [s]ometimes we really don't have a choice in the matter in the case that we want to be represented" (January 20 Proceedings: 4). Next, and critically, the court told defendant that he had a choice: "You can have Miss Povman represent you, that's your choice" – an attorney whom two other judges had found no good cause to relieve (January 20 Proceedings: 4). Defendant responded that he had explained to another judge that it was his attorney's "inadequacy" that played a big role in his choice to represent himself but he would "like to go forward. . . at this stage of the proceeding" (January 20 Proceedings: 4-5).

The court then asked defendant about the prior applications to relieve his attorney, and defendant replied that he had explained all of this to Judge Kron over a period of two and one-half to three years and that Judge Kron had denied his application (January 20 Proceedings: 5).[4] The court then asked defendant if he knew and understood what he was being charged with, what the purpose of that day's court proceedings were, if he knew what a

---

[4] In his brief, defendant does not specify the dates on which he made applications to relieve counsel before Judge Kron. On January 5, 2015, defendant made an application to represent himself, but not to relieve counsel, as discussed above.

22

*Sandoval* hearing was, and what the court's and the jury's functions are January 20(Proceedings: 5-6, 9). Defendant responded that he understood the charges and that he was being charged with second degree robbery and fifth degree possession of stolen property (January 20 Proceedings: 5-6). Defendant also responded that he knew what a *Sandoval* hearing was and that he understood the different functions of the judge and the jury (January 20 Proceedings: 9-10). Defendant then explained that he had once before been permitted to represent himself but that that case had been dismissed before he had an opportunity to select a jury (January 20 Proceedings: 10-12). The court further explained that defendant's attorney had been practicing for many years and had tried hundreds of cases, but that it was defendant's decision how to proceed. The court then confirmed that defendant had discussed this at length with his attorney (January 20 Proceedings: 12). Next, the court asked defendant if he wished to waive the right to be represented, and defendant said, unequivocally, "That's correct, sir" (January 20 Proceedings: 13).

But the court did not stop there. It warned defendant that there was an inherent unfairness to self-representation where defendant was inexperienced because, the court explained, it would hold him to the same legal standards as the prosecutor and his co-defendant's attorney, who were both

23

experienced trial attorneys (January 20 Proceedings: 13-16). Only after that colloquy did the court permit defendant to represent himself (January 20 Proceedings: 16) (B. Schwartz, J.). Significantly, even though defendant expressed dissatisfaction with his attorney, he *never* renewed his application to relieve his attorney.

## POINT ONE

**THE HEARING COURT PROPERLY DENIED DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE, STATEMENTS AND IDENTIFICATION EVIDENCE (Answering Defendant's Brief, Point One).**

The hearing court properly denied defendant's suppression motion because Officer Pampena's conduct in stopping, searching, and arresting defendant was proper at every juncture. Defendant nevertheless challenges the hearing court's ruling, claiming that the stop of defendant was not supported by reasonable suspicion and that there was no probable cause to arrest defendant. He claims that, as a result, the statements, search, and identification that followed should have been suppressed. Defendant is wrong. The court properly held that there was probable cause to make an arrest where defendant was seen almost immediately after the officer received a radio run for a robbery in progress, he was only between one and one and a half blocks from the

24

robbery scene, and he was running away from that location and towards the officer's car. In addition, defendant matched the description given over the radio run, was holding an iPhone, which he spontaneously announced that he had bought from 105th Street and Northern Boulevard – exactly where the robbery had taken place just moments earlier – and where Elturkey identified defendant as one of the robbers and told Officer Pampena that money recovered on defendant was in the exact denominations that had been stolen \from him.

The factual findings of the hearing court, which had the unique opportunity to see and hear the witnesses, are entitled to great deference on appeal. *See People v. McPherson*, 56 N.Y.2d 696, 697 (1982); *People v. Prochilo*, 41 N.Y.2d 759, 761 (1977). This Court will overrule the findings of a hearing court only where they "are manifestly erroneous or so plainly unjustified by the evidence that the interests of justice necessitate their nullification," and will "refuse to credit testimony which has all appearances of having been patently tailored to nullify constitutional objections." *People v. Garafolo*, 44 A.D.2d 86, 88 (2d Dept. 1974); *People v. Spann*, 82 A.D.3d 1013, 1014 (2d Dept. 2011); *People v. Miret-Gonzalez*, 159 A.D.2d 647 (2d Dept. 1990); *People v. Africk*, 107 A.D.2d 700, 701-02 (2d Dept. 1985).

25

**SR069**

Reasonableness is the governing standard in assessing the appropriateness of police conduct in search and seizure cases. *People v. DeBour*, 40 N.Y.2d 210, 218 (1976). To evaluate the appropriateness of police-initiated encounters, the Court of Appeals has devised a four-tier approach. *Id.* at 223. First, the minimal intrusion of approaching and requesting information is permissible when an officer has some objective, credible reason, not necessarily indicative of criminality. Second, the common-law right of inquiry is activated by a founded suspicion that criminality is at hand. Third, when an officer has a reasonable suspicion that a particular individual was involved in a felony or misdemeanor, the officer may forcibly stop and detain that person. C.P.L. § 140.50(1); *People v. Sobotker*, 43 N.Y.2d 559 (1978). Fourth, a police officer may arrest a person when he has probable cause to believe that the individual has committed a crime. *People v. Hollman*, 79 N.Y.2d 181, 184-85 (1992); *People v. DeBour*, 40 N.Y.2d at 223. And a search of defendant is proper where there is reasonable suspicion that defendant is armed or poses a threat to safety. *People v. Caicedo*, 69 A.D.3d 954 (2d Dept. 2010).

A number of factors may support reasonable suspicion in any given case. A defendant's proximity to the crime scene is, of course, an

26

**SR070**

important factor in determining whether reasonable suspicion exists. *See People v. Turner*, 295 A.D. 2d 545 (2d Dept. 2002); *People v. Vaughan*, 293 A.D. 2d 693 (2d Dept. 2002); *People v. Allen*, 278 A.D. 2d 331 (2d Dept. 2000). Similarly, the fact that a defendant was sweating and breathing hard at the time of detention supports a finding of reasonable suspicion. *See People v. Garcia*, 284 A.D.2d 479 (2d Dept. 2001); *People v. Overby*, 251 A.D.2d 163 (1st Dept. 1998); *People v. McLee*, 249 A.D.2d 995 (4th Dept. 1998). A defendant's apprehension in the direction in which he was alleged to have fled also helps support a subsequent stop. *See People v. Applewhite*, 298 A.D. 2d 136 (1st. Dept. 2002); *People v. Lewis*, 277 A.D. 2d 603 (3rd Dept. 2000); *People v. Kyle*, 254 A.D. 2d 134 (1st Dept. 1998).

*People v. Flores*, 88 A.D.3d 902 (2d Dept. Oct. 18, 2011), is particularly instructive here. The court found that police officers appropriately stopped and detained defendant briefly for a show-up identification procedure where the officers responded to a radio run of a robbery committed by three male Hispanics, and spoke to the victim, who indicated that the perpetrators had fled in a particular direction. In *Flores*, the *de*fendant and his co-defendant, both Hispanic males, were the only individuals on the street, and were walking in the indicated direction, less than two blocks from the crime

27

scene. When an officer identified himself and asked them to stop, they changed directions and walked away at a quicker pace with their heads lowered and their hands raised.

Here, the hearing court properly found that Pampena was justified in stopping and exiting his car and approaching defendant where, almost immediately after receiving the radio run for a robbery *in progress*, he saw defendant running only one or one and a half blocks *away* from the scene of the robbery. In addition, defendant matched the given description of a black male wearing a white shirt and black pants (Decision: 2). Based on those facts, Pampena had an objective, credible reason to approach defendant. At that point, he had not yet "seized" defendant, and thus, no reasonable suspicion was required.

Next, Pampena had both reasonable suspicion to detain defendant and probable cause to arrest defendant. As soon as Pampena, who was in uniform, stepped out of his unmarked car, and before he said anything whatsoever, defendant announced that he bought the iPhone, that he was holding, from 105th Street and Northern Boulevard – the exact location of the robbery in progress about which Pampena had just been notified, and which was less than two blocks from where defendant was running. And defendant

**SR072**

knew that he was announcing that to a police officer, based on the fact that
Pampena was in uniform that night, which shows that defendant clearly knew
why the police were there and what he had done. Based on all of these facts,
Pampena not only had reasonable suspicion to believe that defendant was
involved in a crime but he also had probable cause to arrest defendant at this
point. *Flores*, 88 A.D.3d at 903. And there was certainly probable cause to
arrest defendant once Pampena spoke to Elturkey and once Elturkey identified
defendant. *See People v. Hollman*, 79 N.Y.2d 181, 184-85 (1992); *People v.
DeBour*, 40 N.Y.2d at 223.

Moreover, the hearing court properly found that Pampena
searched defendant incident to a contemporaneous, lawful arrest based on the
facts mentioned above (Decision at 2). *See Virginia v. Moore*, 2008 U.S. 3674
(2008); *People v. Gokey*, 60 N.Y.2d 309, 312 (1983). Based on defendant's
statement, Pampena had probable cause to believe that defendant was involved
in the robbery. He was then justified in handcuffing defendant, searching him,
and placing him in his car. And even if defendant was only detained and not
yet arrested at that point, Pampena still properly searched him after
handcuffing him to ensure he was not armed. *See Caicedo*, 69 A.D.3d at 954.

29

**SR073**

Defendant, however, claims that Pampena did not have reasonable suspicion to stop and detain defendant, and that, therefore, the property recovered, identification evidence, and defendant's statements should have been suppressed. Defendant contends that the description of a male black in a white shirt and black pants was not specific enough, on its own, to warrant reasonable suspicion for Pampena to stop defendant. He also claims that defendant running in the vicinity of the crime scene did not warrant seizure of the defendant, and neither did the fact that defendant was holding an iPhone because the radio run did not indicate that an iPhone had been stolen. Defendant also argues that defendant's first statement was not spontaneous because it was the result of an unlawful seizure. Defendant's claims lack merit.

As fully discussed above, Pampena did not need reasonable suspicion to get out of his car and approach defendant. At that point he had the right to approach defendant and make an inquiry based on all of the facts enumerated above. And Pampena did not block defendant's path by stopping his car and certainly did not seize defendant at that point. Pampena testified that he stopped and got out of his car as soon as he saw defendant, but he never testified that he blocked defendant's path when he stopped his car or in any

30

**SR074**

other manner. This does not amount to a seizure, especially where defendant was on foot and simply could have run around Pampena's car or turned around and run the other way. Therefore, because Pampena had not yet detained defendant at that point, reasonable suspicion was not required. But no sooner had Pampena gotten out of his car than defendant stated that he bought the iPhone, that was in his hand, from 105th Street and Northern Boulevard – the scene of the robbery that had *just* taken place. And defendant's statement was an unprovoked, spontaneous, and completely voluntary statement that did not occur as the result of any detention or seizure. Indeed, Pampena had not even spoken to defendant.

Defendant claims that the phone in his hand had no bearing on the court's analysis because the radio run did not indicate that an iPhone had been stolen. This is not so. A robbery necessarily implies that property was taken. So when Pampena saw defendant running with an iPhone in his hand, *combined with* all of the other factors, that certainly added to the reasonable suspicion that defendant was involved in the reported robbery.

Similarly unpersuasive is defendant's argument that the description given over the radio – a male black in a white shirt and black pants – was too general to constitute reasonable suspicion. Although that description

31

SR075

on its own may not have amounted to reasonable suspicion, that was decidedly not the *only* factor Pampena had to consider. Defendant not only matched that description but was also seen running less than two blocks away from the where the robbery had just occurred, was holding an iPhone, *and* admitted that he had just come from the scene of the robbery. All of these factors taken together amount to reasonable suspicion to detain defendant and probable cause to arrest him. *See Hollman*, 79 N.Y.2d at 184-85; *People v. DeBour*, 40 N.Y.2d at 223; *Flores*, 88 A.D.3d at 903.

In sum, the hearing court properly denied defendant's suppression motion when it held that Officer Pampena had both reasonable suspicion to detain defendant and probable cause to arrest him.

## POINT TWO

**OFFICER PAMPENA PROPERLY TESTIFIED THAT THE VICTIM IDENTIFIED DEFENDANT IN A SHOWUP, AND DEFENDANT'S CLAIM TO THE CONTRARY IS MERITLESS AND UNPRESERVED (Answering Defendant's Brief, Point Two).**

The People laid the proper foundation to admit Officer Pampena's testimony about Elturkey's prior showup identification of defendant, as Elturkey testified that he had no recollection of the incident and had trouble remembering the co-defendant's face due to the passage of time.. Defendant,

32

**SR076**

however, claims that the People did not lay the proper foundation because Elturkey's testimony did not establish that he had no present recollection of defendant. Defendant is wrong. Furthermore, his claim is unpreserved because he objected to Officer Pampena's testimony about the showup after both sides had rested *and* after the court denied his motion for a trial order of dismissal. In any event, the People satisfied the requirements to admit the testimony under section 60.25 of the Criminal Procedure Law; including the last requirement, that the reason Elturkey was unable to identify defendant at trial was due to a lack of memory. In the alternative, any error was harmless due to the overwhelming evidence of defendant's guilt.

The Court of Appeals explained that C.P.L. § 60.25 was enacted by the Legislature for a situation where a "witness, due to lapse of time or change in appearance of the Defendant, cannot make an in-court identification, but has on a previous occasion identified the defendant." *People v. Nival*, 33 N.Y.2d 391, 395 (1974). The statute explicitly overrules the prohibition on hearsay identification testimony adopted by *People v. Trowbridge*, 305 N.Y. 471 (1953) "by permitting the fact of the prior identification to be established by the testimony of another person when the identifying witness is unable to make an identification at trial." *People v. Lagana*, 36 N.Y.2d 71, 74 (1975).

33

SR077

Section 60.25 allows a third party, usually a police officer who witnessed the identification, to testify to the witness's identification of the defendant. C.P.L. § 60.25(1)(b). Under these circumstances, "once the witness has testified to a previous identification of the culprit, the fact that the defendant is the person whom the witness previously identified 'may be established by testimony of another person or persons to whom the witness promptly declared his recognition' at the time he made the prior identification." *Nival*, 33 N.Y.2d at 395.

In order to properly admit third party testimony about a past identification, the People must establish three elements: Defendant concedes that the People adequately established the first two elements, that Elturkey observed defendant during the robbery and that Elturkey identified defendant in a showup procedure as the person who robbed him. *See* C.P.L. § 60.25(1)(a)(i),(ii) (*See* Defendant's Brief at 23). The third element requires the People to demonstrate that the witness's inability to identify the defendant at trial is based upon a lack of present recollection due to the passage of time. C.P.L. § 60.25(1)(a)(iii). The People's evidence here amply made that showing, contrary to defendant's claim.

**SR078**

At the outset, defendant's current claim is unpreserved.    Where

a defendant makes a general objection that does not address the specific

requirements of § 60.25 that he challenges on appeal, he fails to preserve his

contention for review.   This Court has repeatedly held that in order to preserve

a claim that third-party identification testimony was admitted ·without the

proper foundation required by § 60.25, a defendant must make that specific

argument at trial. *People v. Jenkins*, 205 A.D.2d 642, 643 (2d Dept. 1994), *lv*

*denied* 84 N.Y.2d 868; *see also People v. Davis*, 139 A.D.3d 966 (2d Dept.

2016); *People v. Giles*, 242 A.D.2d 958, 959 (2d Dept. 1997)(unpreserved

where defendant failed to object to admission of testimony from two officers

concerning prior identification of defendant by complainant).

Here, after Elturkey did not identify defendant at trial, the People

elicited testimony from Pampena regarding Elturkey's prior identification of

defendant.   Defendant never objected to Pampena's testimony during the

challenged testimony (Proceedings: 513-14).   Instead, defendant waited to

object until *after* the People rested and after the court denied his motion for a

trial order of dismissal (Proceedings: 357).   Even then, the sum total of

defendant's untimely objection to the challenged testimony was that "we not

allow that to be presented to the jury. . . because it doesn't apply to us in this

35

**SR079**

case" (Proceedings: 598). The court ruled that defendant's objection was untimely and, in any event, the People laid the proper foundation for the admission of Pampena's testimony (Proceedings: 598). Defendant made no further comment.

Not only was defendant's application untimely, but it was also only a vague general objection. He failed to specify which requirement of § 60.25 the People failed to establish and did not reference the statutory bases for his objection. Therefore, his current claim that the People failed to meet the foundational requirements necessary under C.P.L. § 60.25 is unpreserved.[5]

Nor should this Court review defendant's unpreserved claim in the interest of justice, as the People satisfied the third prong required by section 60.25 in order to lay the foundation for Pampena to testify about Elturkey's prior identification of defendant. The People met that prong by demonstrating that Elturkey's inability to identify defendant in court was due to a lack of present recollection after a passage of two and a half years. *See* C.P.L. § 60.25(1)(a)(iii).

---

[5] Defendant, in his brief, concedes as much, and claims that "this Court should nevertheless consider the error in the interest of justice" (Defendant's Brief: 24-25).

36

In order to meet this third prong of section 60.25, the People must

resent testimony that establishes a lack of present recollection of the defendant

as the perpetrator. *People v. Quevas*, 81 N.Y.2d 41, 45 (1993). A "lack of

present recollection" means that the witness is unable to make the

identification at trial due to the passage of time." *People v. Johnson*, 75 N.Y.2d

856 (1990); *People v. Bayron*, 66 N.Y.2d 77, 81 (1985). The statute is also

satisfied when a witness's inability to recall results from a change in the

defendant's appearance. *People v. Cwikla*, 46 N.Y.2d 434, 444-45 (1979); *see*

*also People v. Robinson*, 39 A.D.3d 772, 772 (2d Dept. 2007); *People v.*

*Marrero*, 183 A.D.2d 728, 729 (2d Dept. 1992); *People v. Hernandez*, 154

A.D.2d 197, 201 (2d Dept. 1990). But courts have declined to extend the

statute to a witness who does not identify the defendant in court for other

reasons, such as a fear of reprisal (*Bayron*, 66 N.Y.2d at 81) or a witness's

inability to identify the defendant because he is physically or mentally

incapable of doing so (*Quevas*, 81 N.Y.2d at 45-46). Significantly, "the basic

decision as to whether a witness lacks sufficient recollection to make an in-

court identification remains a matter for the trial court's discretion" and

"resolution of this question turns upon an evaluation of the totality of evidence

presented." *Hernandez*, 154 A.D.2d at 201 (internal citations omitted).

37

The facts of this case resemble those in *People v. Hernandez*,

The facts of this case resemble those in *People v. Hernandez*, where this Court concluded that the witness's memory was impaired by the passage of time and that the People properly introduced third party identification testimony pursuant to section 60.25. In *Hernandez*, the witness testified that he did not see defendant in the court room, as Elturkey did here. In *Hernandez*, the witness never testified that he did not remember what the defendant looked like, like Elturkey here. Despite that, this Court held in *Hernandez* that the witness's testimony was sufficiently indicative of a lack of present memory where he was asked to make in-court identification one year after the incident and where the defendant's appearance had changed in terms of his weight and hair length. This Court held that a lapse of time and change in appearance of the defendant since the prior identification are "critical factors in determining whether to admit testimony under section 60.25." *Id.* at 201 (internal citations omitted). "Reliance on these factors is especially warranted where the cause of a witness's inability to make a trial identification is unexplained or the testimony which bears upon this issue is vague, nonparticularized, and conclusory in content." *Id.*

Here, although Elturkey stated that he did not see defendant in the courtroom, his inability to make a trial identification was never explained

38

**SR082**

beyond that simple answer. Therefore, like in *Hernandez*, it is crucial to examine critical factors such as how much time elapsed between the prior identification and the trial, and the change in defendant's appearance. *See Hernandez*, 154 A.D.2d at 201. Here, there was evidence that Elturkey was having trouble remembering the identity of his attackers. He testified more than once that he was having trouble remembering co-defendant. He also stated that, "I'm a person like I don't know if I see the person twenty times, I don't know what he was wearing. I mean like I always look for basic things, *but I'm not remember faces* or [sic]" (Elturkey: 353) (emphasis added). And his testimony took place two and a half years *after* Elturkey identified defendant on the night of the robbery. Elturkey also testified that defendant was homeless at the time of the robbery and that he had encountered him only three or four times over the course of only one to one and one half months.

And when the prosecutor asked Pampena if defendant looked the same at trial as he did the day of the robbery, Pampena unequivically said "no" (Pampena: 506). He testified that defendant had gained weight, that his hair was a bit longer, and that he was clean cut at the time of the robbery. Pampena also testified that defendant was wearing a black button down dress shirt and glasses, and Lanning testified that he was wearing a black jacket – as opposed

39

to the white T-shirt and black pants that he was wearing on the night of the robbery. Thus, here, like in *Hernandez,* much time had passed since the wintess had identified defendant at the crime scene, and defendant's hair and weight had changed. *See Hernandez,* 154 A.D.2d at 201.

But the facts here are even stronger than those in *Hernandez.* Here, in addition to the change in defendant's hair and weight, even more time had passed than in *Hernandez.* And here, defendant went from appearing homeless on the night of the robbery to being dressed in a suit and glasses at trial. Clearly, defendant's appearance at the time of the robbery was quite different than his appearance two and a half years later at trial. Such a drastic change in appearance undoubtedly affected Elturkey's memory when he testified – more than once – that he was having trouble remembering. Thus, Elturkey's inability to identify defendant was clearly impaired by the passage of two and a half years and the dramatically changed appearance of defendant. *Id.* Furthermore, after defendant lodged an untimely objection to Officer Pampena's testimony, the trial court explicitly found that the proper foundation for the testimony had been laid. Critically, "a determination by a trial court that a witness does not possess sufficient present recollection to permit an in-court identification of the defendant *must be accorded the same effect* as a

40

**SR084**

statement by the witness that he cannot now identify the defendant."

*Hernandez*, 154 A.D.2d at 200 (citing *Cwikla*, 46 N.Y.2d 434, 444) (emphasis

in original); *see also People v. Mitchell*, 143 A.D.2d 421 (2d Dept. 1988);

*People v. Black*, 130 A.D.2d 353 (1st Dept. 1987). And the trial court's

determination should be given deference here. As stated above, the record

fully supports the trial court's determination that the People properly elicited

C.P.L. § 60.25 testimony. No other reason, such as refusal or fear, is borne out

by the record. Thus, contrary to defendant's claim, the final statutory

requirement was met, and the trial court's decision regarding the challenged

testimony should not now be disturbed.

Even if this Court finds that a proper foundation was not laid, any

error in admitting the testimony was harmless, as the other evidence at trial

overwhelmingly established defendant's guilt. *Trowbridge* errors are harmless

where other evidence of a defendant's guilt is overwhelming and there is no

significant probability of a different verdict. *People v. Crimmins*, 36 N.Y.2d

230 (1975); *see also People v. Rodriguez*, 139 A.D.3d 883 (2d Dept. 2016)(any

improper bolstering would have been harmless error due to overwhelming

guilt); *People v. German*, 45 A.D.3d 861 (2d Dept. 2007)(improper bolstering

was harmless error because evidence of guilt was overwhelming where

41

defendant was apprehended shortly after robbery and found in possession of both exact sum of cash taken from victim and toy gun that matched description of gun used during robbery); *People v. Marrero*, 183 A.D.2d 728 (2d Dept. 1992)(evidence of guilt overwhelming, including defendant's inculpatory statement).

*People v. Jenkins*, 205 A.D.2d at 642, is strikingly similar to the facts here. In *Jenkins*, police officers conducted a showup with the victim shortly after a robbery. The trial court permitted a police officer to testify about the victim's prior identification of defendant, a ruling that the defendant later disputed on appeal. This Court held that the defendant's *Trowbridge* claim was unpreserved but that, in any event, any error was harmless because there was other overwhelming evidence of defendant's guilt. *Id.* at 643. In *Jenkins*, that evidence was the fact that the defendant was apprehended soon after he got out of the getaway car and that he possessed some of the proceeds of the robbery when he was apprehended. *Id.*

Here, too, there is overwhelming evidence of defendant's guilt other than the prior identification of defendant. Similar to *Jenkins*, defendant here was apprehended within minutes of the robbery, and he possessed Elturkey's stolen property when he was apprehended. Here, however, there

42

**SR086**

was even more evidence of his guilt than in *Jenkins*. Not only was defendant apprehended shortly after the robbery, but he was also apprehended only one block away from the robbery and was running away from the scene of the robbery at the time. And without prompting, defendant admitted that he bought the phone from 105th Street and Northern Boulevard – the precise location of the robbery. Moreover, here, defendant also matched the description of the robber that was given in the radio run. Furthermore, he had cash in the *exact* same amount and denominations that was stolen from Elturkey. Still further, defendant did not dispute that the property found on him belonged to Elturkey, and instead, he stated, "If he said it's his, it must be his." (Pampena: 33); *see Marrero*, 183 A.D.2d at 728. Therefore, any *Trowbridge* error was harmless because there was other overwhelming evidence of defendant's guilt.

In sum, defendant failed to preserve his claim that the People did not lay a proper foundation to admit the challenged testimony because he did not properly object to the People's questioning of Officer Pampena in a timely and specific manner, and moreover, the People laid the proper foundation to admit this testimony. In any event, any error was harmless.

43

**SR087**

## POINT THREE

### DEFENDANT'S WAIVER OF HIS RIGHT TO COUNSEL WAS UNEQUIVOCAL, KNOWING, INTELLIGENT, AND VOLUNTARY (Answering Defendant's Brief, Point Three).

Defendant intelligently and voluntarily waived his right to counsel when he unequivocally stated that he was prepared to represent himself. Nevertheless, defendant contends that his request to proceed *pro se* was not unequivocal because he made the request only after the court refused to give him a new attorney. Defendant also argues that his waiver was not voluntary, intelligent, and knowing. Defendant's claims lacks merit and are belied by the record. Although defendant had, in the past, requested that his appointed counsel be relieved, he did not renew that application before trial, when he also asked to proceed *pro se* and made clear to the court that he was ready to proceed to trial *pro se*. He answered all of the court's questions and continued to state, unequivocally, that he wanted to represent himself. And his application to represent himself was not a spur of the moment request – his applications to do so dated as far back as two years before trial.

It is well settled that a defendant has a state and federal constitutional right to forego counsel and represent himself. *Faretta v. California*, 422 U.S. 806 (1975); *People v. McIntyre*, 36 N.Y.2d 10 (1974).

44

And to prevent convicted defendants from perverting the system by subsequently claiming a denial of their right to proceed *pro se*, the request for self-representation must be unequivocal. *Faretta v. California*, 422 U.S. at 835; *People v. LaValle*, 3 N.Y.3d 88, 106 (2004); *McIntyre*, 36 N.Y.2d at 17. To be unequivocal, a request to proceed *pro se* must be "clearly and unconditionally presented to the trial court." *McIntyre*, 36 N.Y.2d at 17. Moreover, if the request for self-representation goes unanswered or is denied, and the defendant subsequently acts in a manner that indicates his satisfaction with counsel, he has abandoned the request. *People v. Gillian*, 8 N.Y.3d 85 (2006); *People v. Diaz,* 83 A.D.3d 958 (2d Dept. 2011); *People v. Scivolette*, 40 A.D.3d 887 (2d Dept. 2007). After an unequivocal request to proceed *pro se*, the court should conduct a searching inquiry to determining whether the defendant is waiving his right to counsel knowingly, voluntarily, and intelligently. *People v. Arroyo*, 98 N.Y.2d 101(2002); *People v. Smith*, 92 N.Y.2d 516 (1998).

The application is not unequivocal, however, if it appears to be made in frustration with the court's refusal to assign new counsel. *See Gillian,* 8 N.Y.2d at 85; *see also People v. Payton*, 45 N.Y.2d 300, 315 (1978); *People v. Littlejohn*, 92 A.D.3d 898 (2d Dept. 2012)*; People v. Carter*, 299 A.D.2d

45

**SR089**

418 (2d Dept. 2002); *People v. Rainey*, 240 A.D.2d 682 (2d Dept. 1997). In *People v. LaValle*, 3 N.Y.2d 88, 106-07 (2004), the Court held that the defendant did not make a sufficient unequivocal request to proceed *pro se.* In *LaValle*, the defendant voiced extreme dissatisfaction with his attorneys, stating that he would have to proceed *pro se* only if he did not get a new attorney and that he regarded self-representation as his last option. Because defendant raised the request to proceed *pro se* only as part of a greater plan to obtain new counsel, his request was not unequivocal and, therefore, the trial court did not have to allow him to proceed *pro se.*

By contrast, here, defendant's waiver of the right to counsel was voluntary, intelligent, and knowing, and his request to represent himself was unequivocal where he requested to represent himself on numerous occasions, in front of three different judges, and where he did not request new counsel during his last two applications to represent himself, which were granted.

Defendant made applications for new counsel twice in front of the same court, on December 16, 2013, and again several months later, on May 20, 2013. Those applications were both denied. Defendant requested new counsel because, according to him, his appointed attorney was negligent, would not represent him properly, and did not believe that Officer Pampena's purportedly

46

**SR090**

perjured testimony about stolen property being recovered from defendant was relevant to his case. The court denied defendant's first request because the case was not yet in a trial posture. It denied the second request because it determined that counsel had not been negligent and that defendant was most likely incorrectly interpreting what she had told him regarding purportedly perjured testimony being irrelevant to his case. Furthermore, immediately after his first request for new counsel was denied on December 16, 2013, defendant followed up that application with an application to represent himself. Defendant made this request to proceed *pro se*, not because his attorney was not relieved, but because, as defendant clearly explained to the court, he had already "prepared [his] legal defense" (December 16 Proceedings: 8). And the second time defendant asked to have counsel relieved, he did not follow that application with a request to represent himself.

Then, on January 5, 2015, in front of a different court, defendant against requested to go *pro se*, indicating that he could not go forward with his attorney. Defendant stated that he had only seen his attorney twice that year. The court stated that it was aware of his attorney's medical issues, explained that defendant's attorney had many years of trial experience, and warned defendant of the dangers of representing himself. But even though defendant

47

SR091

expressed dissatisfaction with his attorney, he did not actually ask for his attorney to be replaced on this date. He did not state that, *if* he could not get a new attorney *then* he wanted to represent himself, unlike the defendant in *LaValle*. *LaValle*, 3 N.Y.2d at 106-07 .

Next, just before trial commenced on January 20, 2015, Judge Barry Schwartz – yet another court – confirmed that defendant still wanted to represent himself. Although, during the colloquy with this court, defendant stated that it was his attorney's "inadequacy" that played a "big role" in his choice to represent himself, he did not request new counsel and instead unambiguously stated that he wanted to proceed to trial (Proceedings: 4-5). Once again, and consistent with his prior requests to proceed *pro se*, defendant *did* not state that he would represent himself only *if* the court did not replace his attorney. Critically, he never requested a new attorney on this date. And when defendant stated that he did not have a choice in the matter because of his attorney, the court informed him that, to the contrary, he *did* have a choice and then told him that he could go forward with his appointed attorney, whom no court had found reason to relieve. In fact, all three courts cited defense counsel's wealth of trial experience, noting that she had tried hundreds of cases over a period of decades.

48

**SR092**

Defendant's request was unequivocal where, on January 5, 2015, and January 20, 2015, defendant requested to proceed *pro se* but did not renew his request to relieve counsel. On both dates, he answered a number of questions from the court and he staunchly repeated his desire to represent himself. And the decision to represent himself was not a spur of the moment decision on the eve of trial. Far from that, defendant had request to represent himself as far back as December 16, 2013, and his reasoning was that he had prepared his own legal defense.

Nonetheless, defendant claims that he requested to proceed *pro se* only because the court refused to assign new counsel. Defendant's claim lacks merit and is belied by the record. As an initial matter, defendant is not entitled to the attorney of his choosing.

> Although an indigent defendant has a right to a court-appointed attorney, he or she does not have the right to choose assigned counsel. The decision to appoint new counsel is within the trial court's discretion upon a showing of good cause. . . . Here, the defendant's conclusory statements that he lacked confidence in his attorney, and his general expression of dissatisfaction with counsel, were insufficient to establish a good cause for a substitution of counsel.

*People v. White*, 60 A.D.3d 877, 875 (2d Dept. 2009)(internal citations omitted). *See also People v. Sawyer*, 57 N.Y.2d 12, 18-19 (1982)(indigent

49

defendant guaranteed right to counsel but not right to choice of assigned counsel).

Here, the trial court's decision not to relieve counsel was a proper exercise of its discretion, as defendant failed to show good cause relieve her. On two different occasions in 2013, the court did not find counsel to be negligent or inadequate in any way, and also did not find that there was good cause to relieve her. Nor did defendant offer any. Defendant unequivocally stated that he wanted to represent himself, demonstrated by him saying that he wanted to proceed with the matter. And the court told defendant that he had an alternative to self-representation: that appointed counsel would represent him. And after each court concluded its litany of questions, defendant unequivocally stated that he wanted to proceed *pro se*, as he said that he wanted to "go forward though at this stage of the proceeding" (Proceedings: 5).

Furthermore, although defendant expressed dissatisfaction with his attorney on January 5, 2015, and January 20, 2015 – the dates that he asked to represent himself without also asking for counsel to be relieved – he never actually explained why he disliked his attorney and, more importantly, never renewed his application to relieve counsel. And the fact that, on prior

50

**SR094**

occasions, he had requested new counsel did not undermine the unequivocal and independent nature of his request to represent himself, as by the time that the trial was about to start, defendant had abandoned his request for new counsel because the only requests he made were to represent himself. Clearly, a court cannot deny or grant an application that has not been made.

The record shows that defendant had already made up his mind on January 20, 2015, the date of trial, that he wanted to represent himself, indicated by him telling the court that, "I would like to go forward though at this stage of the proceeding." (Proceedings: 5). In addition, and critically, defendant informed the court, almost bragging, that he had represented himself in a prior case – further proof that his decision to proceed *pro se* here was one that he had made before and that he intended to make here, independent of his request for a new attorney. Therefore, because defendant did not renew his application to relieve counsel and because he stated that he absolutely wanted to proceed to trial *pro se*, his request was unequivocal. *See People v. Jackson*, 97 A.D.3d 693, 694 (2d Dept. 2012)(defendant abandoned his request to proceed *pro se* where he acted in manner indicating his satisfaction with counsel).

51

Defendant's request was also knowing, voluntary, and intelligent where two different courts asked him a series of questions designed to confirm his intent and capacity to make the decision to proceed *pro se*. Defendant was also warned by the court on January 5, 2015, that he was charged with a class "C" violent felony and was facing between five and fifteen years in jail because of his predicate felon status. The trial court on January 20, 2015, further warned defendant that, as a *pro se* litigant, he was at a disadvantage and that he would be held to the same legal standard as the other attorneys. Defendant, however, claims that defendant's request was not knowing, voluntary, and intelligent because the trial court did not fully inform him of the hardships he would face or the fundamental rights he would be waiving, and it did not impress upon him the seriousness of the charges against him or advise him of the punishment he was facing. Defendant's claim is belied by the record. As is fully discussed above, the court did apprise him of all of those facts on January 5, 2015, and did fully warn him of the disadvantages he faced on January 20, 2015.

In sum, defendant's request to represent himself was unequivocal where he abandoned his request for a new attorney and his waiver of the right to counsel was knowing, voluntary, and intelligent where two different judges

52

informed him of the consequences he faced, if convicted, and the disadvantages and hardships he faced in representing himself.

## POINT FOUR

### DEFENDANT'S SENTENCE WAS NEITHER EXCESSIVE NOR UNDULY HARSH, AND SHOULD NOT BE DISTURBED ON APPEAL (Answering Defendant's Brief, Point Four).

Given the severity of defendant's crime, his status as a predicate felon, and his lengthy criminal record, the sentencing court properly exercised its discretion in imposing two ten-year prison sentences for two counts of second degree robbery, to run concurrently, and two one-year prison sentences for third degree assault and fifth degree possession of stolen property, to merge with his other sentences. The sentence was entirely legal and also warranted. Nevertheless, defendant contends that the court should have imposed a reduced sentence – although he does not propose a sentence – because he did not initiate the attack on the victim, was less culpable than his co-defendant, and conducted himself in a courteous and respectful manner while representing himself at trial, showing that he is an intelligent and respectful man. Defendant is wrong.

Although sentencing is primarily a function of the trial court, *People v. Felix*, 58 N.Y.2d 156, 161 (1983), this Court may modify the

53

sentence "as a matter of discretion in the interest of justice." C.P.L. §

470.15(3). In order to exercise this power, however, the Court must determine

not only that the sentence imposed was harsh and excessive, but also that there

is some demonstrated "need to impose a different view of discretion than that

of the sentencing Judge." *People v. Suitte*, 90 A.D.2d 80, 86 (2d Dept. 1982).

Such a need will generally arise only if, pursuant to the statutory mandate that

governs invocation of this Court's interest of justice jurisdiction, the sentence

imposed was "unduly" harsh and excessive. C.P.L. § 470.15(6)(b); *People v.*

*Thompson,* 60 N.Y.2d 513, 519 (1983). Courts consider the facts and

circumstances of the case when judging whether a sentencing court abused its

discretion in sentencing the defendant. *See, e.g., People v. Sabin,* 73 A.D.3d

1390 (where defendant rubbed seven-year-old girl's vagina underneath her

clothing while babysitting her, no abuse of discretion in sentencing defendant

to seven years prison for first degree sexual abuse given nature of crime, age

of victim, and exploitation of family's trust). Here, defendant's sentence was

not harsh and excessive — and certainly was not "unduly" so — and there is

thus no need for this Court to substitute its discretion for that of the court

below.

54

**SR098**

A review of the record reveals that defendant's sentence was a proper exercise of the court's discretion. During sentencing, the court considered the Probation Department's Pre-Sentence Report and listened to oral arguments by the People and defendant, in which he maintained his innocence – clearly showing no remorse at all (S: 21).

The People asked the court to impose the maximum allowable sentence: a sentence of fifteen years for second degree robbery, based on the serious nature of the crime and the defendant's lengthy criminal record of both felony and misdemeanor convictions, including a burglary conviction in which he broke into a store late at night and stole property, and a coercion conviction in which he lured a woman inside an abandoned building for the purpose of committing a sexual assault (S: 20).

Defendant did not propose a sentence, but did argue that the People never presented any evidence that defendant was caught with the victim's stolen property and that any testimony to the contrary was perjured (S: 21). Defendant also argued that he is not the violent criminal that the People made him out to be and that his criminal history consists of mainly non-violent crimes, such as drug possession convictions and other "minor offenses," such

**SR099**

as trespassing (S: 21-22). Finally, defendant argued that he suffers from a drug problem (S: 22)

The Probation Department's Pre-Sentence Report strongly recommended incarceration due to the nature of the offense and defendant's lengthy criminal history, that dates back to 1985 and consists of twenty-two misdemeanor and two felony convictions, including assault, robbery, and burglary, as well as one probation revocation (PSR: 3-4). In the "Victim's Impact Statement" portion of the report, Elturkey indicated that he had experienced "flash backs" and, as a result of the attack, was generally fearful (PSR: 3). Defendant denied his guilt in his interview (PSR: 3).

In light of these facts, the court properly exercised its discretion in sentencing defendant to ten years of incarceration. Defendant was convicted of two counts of Robbery in the Second Degree, a class C felony, which carries a maximum sentence of fifteen years. P.L. § 70.00(2)(c). Indeed, the imposed ten-year sentence was below the fifteen-year sentence that the People recommended. Thus, despite the length of defendant's sentence, his sentence was fair and below the maximum permitted sentence for his crime.

The factors considered by the court also support the sentence. The court recognized the seriousness of the crime and the callousness of

**SR100**

defendants' actions in which they "had no problem hurting the victim in order to take his money" (S: 22). Critically, the court noted that both defendants were "equally responsible and involved" in the crime where it appeared that they had intentionally targeted the victim (S: 23). The court also noted that the victim's failure to identify defendant during the trial did not change his "belief in the accuracy and justice of the jury's verdict" (S: 23).

The factors offered by defendant as a basis for a lesser sentence do not constitute "extraordinary circumstances" that warrant interference by this Court with the discretion of the lower court, and a substitution of this Court's discretion in the interest of justice. *See, e.g., People v. Sims*, 57 A.D.3d 1106 (3rd Dept. 2008) (ten-year sentence for second degree robbery not unduly harsh or excessive, despite defendant's age of seventeen, failed education, and lack of violent criminal history); *People v. Frary*, 29 A.D.3d 1223, 1226 (3d Dept. 2006) (where defendant was convicted of first degree course of sexual conduct against a child, his lack of criminal record and fact that he was contributing member of community were not extraordinary circumstances given nature of crime and young age of victim); *People v. Roman*, 84 A.D.2d 851 (2d Dept. 1981). The trial judge, who saw and heard all of the witnesses testify and saw the physical evidence, properly exercised his discretionary

57

power to sentence. *See People v. Farrar*, 52 N.Y.2d 305 (1981); *Suitte*, 90 A.D.2d at 86.

Indeed, defendant's crimes here were extremely serious. Defendant and his co-defendant targeted and ganged up on a fifty-two year old man and beat him to the point where he lost a tooth and had multiple head lacerations, and a swollen, black-and-blue eye. They launched a coordinated attack on the victim, where defendant pinned Elturkey down while co-defendant slammed his head against the curb and punched him, incapacitating him so defendant could reach into his pockets and steal his iPhone and wallet – which is precisely what defendant did.

Defendant seeks leniency on the grounds that he did not initiate the attack on the victim, and was, according to defendant, less culpable than his co-defendant, and that he conducted himself in a courteous and respectful manner while representing himself at trial, showing, according to him, that he is an intelligent and respectful man. But the sentencing court was well aware of those factors when it sentenced defendant, and they are deserving of no additional weight on appeal. And these are not extraordinary circumstances that would warrant a reduction in sentence given the nature of the offense, the injuries that the victim sustained, and defendant's lengthy criminal record. *See*

SR102

*People v. Sabin*, 73 A.D.3d 1390, 1391 (3d Dept. 2010); *Sims*, 57 A.D.3d 1106; *Frary*, 29 A.D.3d at 1226.

Defendant's sentence was entirely legal, and the decision of the sentencing court reflects its consideration of the specific factors in this case, including the severity of the crime and defendant's lengthy criminal record, including a burglary conviction in which he stole property, which was his most recent conviction before this one. Therefore, the sentence imposed should be given deference by this Court and left undisturbed.

In sum, because the imposed sentence was within the statutory guidelines and defendant does not establish extraordinary circumstances, his sentence is not excessive. Therefore, defendant's judgment of conviction should be affirmed.

## <u>CONCLUSION</u>

For the reasons set forth above, defendant's judgment of conviction should be affirmed.

Respectfully submitted,

RICHARD A. BROWN
District Attorney
Queens County

JOHN M. CASTELLANO
JOHNNETTE TRAILL
RONI PIPLANI
MEREDITH D'ANGELO
    Assistant District Attorneys
    of Counsel

October 14, 2016

60

## CERTIFICATE OF COMPLIANCE

I certify the following in compliance with section 670.10.3 of the Rules of this Court:

1. The foregoing brief was prepared on a computer.

2. The typeface used is Times New Roman.

3. The point size of the text is 14 point, except for footnotes, which are 12 point.

4. The brief is double spaced, except for the Table of Contents, point headings, footnotes, and block quotes.

5. The brief contains 12,767 words, exclusive of the Table of Contents, proof of service, and the certificate of compliance, based on the word count of the word-processing system used to prepare this brief.

Dated:    Kew Gardens, New York
          October 14, 2016

                                    _____
                                    Assistant District Attorney

**SR105**

Housel / Pipkin

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK
                    RESPONDENT

                              A.D. NO 2015-01907
        -AGAINST-            IND. NO 2228/2012
                              QUEENS COUNTY

RAYMOND BALL,

            DEFENDANT-APPELLANT

        SUPPLEMENTAL BRIEF

    FOR DEFENDANT-APPELLANT

    RAYMOND BALL

Raymond Ball, 15A1060
Mid-State Correctional Facility
P.O. Box 2500
Marcy, NY 13403

APPEALS BUREAU
QUEENS COUNTY D.A.
2017 MAY -1 A 10:

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK
RESPONDENT,

-AGAINST-

RAYMOND BALL,
DEFENDANT-APPELLANT,

PRELIMINARY STATEMENT

THIS IS A SUPPLEMENTAL BRIEF FROM A JUDGMENT RENDERED MARCH 4, 2015, BY THE SUPREME COURT, QUEENS COUNTY, CONVICTING APPELLANT OF PENAL LAW 160.10(1) AND PENAL LAW 160.10(2)(A) ASSULT IN THE THIRD DEGREE IN VIOLATION OF PENAL LAW 120.00(1) AND CRIMINAL POSSESSION OF STOLEN PROPERTY IN THE FITH DEGREE IN VIOLATION OF PENAL LAW 165.40 AND SENTENCING HIM TO CONCURRENT DETERMINATE TERMS OF IMPRISONMENT OF 10 YEARS FOR THE ROBBERY COUNTS AND DEFINITE TERMS OF IMPRISONMENT OF ONE YEAR FOR THE ASSULT AND STOLEN PROPERTY COUNT (BARRY A SCHWARTZ J, AT TRIAL AND SENTENCING).

2

## STATEMENT OF FACTS
## THE SUPPRESSION HEARING

P.O. DANIEL LANNING ASSIGNED TO THE 115TH Pct WAS IN PLAIN CLOTHES ON PATROLE IN AN UNMARKED VEHICLE ON THE NIGHT OF JULY 3, 2012 AT ABOUT 9:00 P.M HE RECEIVED A RADIO CALL OF A MALE BEING ROBBED AT KNIFE POINT ON THE CORNER OF 105 STREET AND NORTHERN BOULEVARD BY THREE BLACK MALES, ONE OF WHOM WAS WEARING A WHITE SHIRT AND BLACK PANTS, WHEN P.O. LANNING PROCEEDED TO THAT LOCATION HE OBSERVED A MAN NAMED EL TURKEY WHO WAS BLEEDING FROM HIS HEAD AND MOUTH AND LOOKED AS IF HE HAD BEEN BEATEN UP. EL TURKEY TOLD P.O. LANNING THAT "HE HAD BEEN ROBBED AND THEY WERE GONE" (TRI 373 - TRI 374)

NUMERICAL REFERENCES PRECEDED BY "AB" ARE TO THE MINUTES OF THE SUPPRESSION HEARING CONDUCTED ON MAY 21, 2013. THOSE PRECEDED BY "BA" ARE TO THE MINUTES OF THE REOPENED SUPPRESSION HEARING CONDUCTED ON JANUARY 8, 2014. THOSE PRECEDED BY "TRI" ARE TO THE MINUTES OF THE TRIAL. THOSE PRECEDED BY "S" ARE TO THE MINUTES OF SENTENCING. THOSE PRECEDED BY "NMA" ARE TO THOSE MINUTES NOT MADE AVAILABLE, AFTER BY COURT ORDER OF APPELLATE DIVISION SECOND DEPARTMENT DATED JANUARY 13, 2017.

3

(A) El TURKEY NEVER DESCRIBED THE ITEMS STOLEN FROM HIM TO P.O. LANNING.

(B) HOW THE ATTACK OCCURED.

(C) DESCRIPTION OF THE PERPETRATORS. "NO WE JUST ASKED HIM TO GET IN THE VEHICLE RIGHT AWAY" (AB12, AB18-AB20, AB5-AB7). DURING THE BRIEF CONVERSATION BETWEEN El TURKEY AND P.O. LANNING WHICH LASTED ONLY SECONDS, THE ONLY WORDS P.O. LANNING RECALLS THAT El TURKEY SAID IN HIS PRESENCE IS "I WAS ROBBED" AND "THEY WENT THAT WAY" POINTING SOUTHBOUND.

(D) NOT THE NUMBER OF MALES INVOLVED.

(E) NOTHING ABOUT A KNIFE.

(F) NOTHING (EMPHASES ADDED) (AB7, AB9, AB12, AB18-AB19)

P.O. LANNING HAD El TURKEY SIT IN THE BACKSEAT OF HIS CAR AND THEN DROVE SOUTHBOUND ON 105 STREET, AND WITHIN SECONDS, P.O. LANNING OBSERVED TWO SUSPECTS ONE WHO LATER WAS IDENTIFIED AS ELIJAH BROOKS, WHOM WAS WEARING A WHITE SHIRT AND BLACK PANTS,

4

ALSO A BASEBALL CAP. EL TURKEY POINTED AT BROOKS AND STATED "THATS THE GUY THERE" P.O. LANNING THEN EXITED HIS CAR AND STOPPED BOTH MEN (BA27-BA28). THE TOTAL TIME THAT ELAPSED BETWEEN WHEN P.O. LANNING CAME IN CONTACT WITH EL TURKEY, STOPPED THE TWO SUSPECTS AND PUT THE HANDCUFFS ON BROOKS WAS BRIEFLY TWO MINUTES. P.O. LANNING STATED AS TO BROOKS ARREST "IT WAS NOT TAKEN BY MYSELF" "BUT THE ARREST WAS TAKEN BY P.O. PAMPENA AT THE TIME." P.O. LANNING REMAINED ON THE SCENE AFTER BROOKS WAS TRANSPORTED AWAY (BA20, BA26-BA28). AT THIS POINT THE RECORD IS CLEAR THAT P.O. PAMPENA IS BROOKS ARRESTING OFFICER.

(8) FROM THE FELONY COMPLAINT P.O. PAMPENA FILED, DATED JULY 4, 2012 WHICH STATES: "DEPONENT FURTHER STATES THAT WHEN HE PLACED THE DEFENDANT IN THE CELL AT 115 PCT IN QUEENS COUNTY AND UNCUFFED THE DEFENDANT, THE DEFENDANT STARTED SWINGING HIS ARMS AND KICKING HIS FEET TOWARDS POLICE OFFICER AND A POLICE SERGEANT WHO WAS RIGHT NEXT TO HIM."

5

(H) P.O. LANNING WROTE IN HIS MEMO BOOK THAT THE TWO INDIVIDUALS WERE STOPPED BY P.O. PAMPENA.

(I) P.O. PAMPENA ACCORDING TO THE SPRINT REPORT WAS THE FIRST RESPONDER TO THE CRIME SCENE, 9:03 P.M.

(J) P.O. LANNING STATED "HE WAS NOT BROOKS ARRESTING OFFICER, BUT HE DID SPEAK BRIEFLY WITH MR ELTURKEY" (BA15-BA16).

P.O. PAMPENA ON JULY 3, 2012 WAS ALSO ASSIGNED TO 115 Pct, HE WAS IN UNIFORM ON PATROL IN AN UNMARKED CAR, AT 9:00 P.M., WHEN HE HEARD A RADIO CALL ABOUT A KNIFE POINT ROBBER IN PROGRESS ON 105 STREET AND NORTHERN BOULEVARD, DESCRIBING THREE BLACK MALES ONE WEARING A WHITE SHIRT, BLACK PANTS (AB23, AB25). P.O. PAMPENA DID NOT RECALL THE RADIO CALL:

(A) DESCRIBING THREE BLACK MALES, JUST BLACK MALES, NOT THE NUMBER (AB25, AB35-AB36, AB56).

(B) INDICATING A KNIFE POINT ROBBERY

(C) WHETHER IT STATED THE AGE, WEIGHT
or HEIGHT OF SUSPECTS (AB31).

(D) FAILED TO WRITE ANYTHING DOWN (AB
35-AB37).

P.O. RamĒENA FIRST HEARD THE CALL AT 9:00
P.m. when HE WAS ON 108 STREET AND ASTORIA
BOULEVARD. THE ROUTE HE TOOK IS UNCLEAR,
However. HE FIRST OBSERVED APPELLANT RUNNING
DOWN THE STREET ALONE WITH AN I-PHONE IN
HIS HAND NORTHBOUND ON 105 STREET AWAY
FROM NORTHERN Boulevard. P.O. RamĒENA
ImmEDIATELY STOPPED HIS CAR IN THE mIDDLE
OF THE STREET ON 105 STREET AND 32ND AVENUE.
WHEN HE GOT OUT THE SITUATION WAS NOT
VOLATILE:

(E) NO GUNS WERE DRAWN.

(F) APPELLANT WAS NOT TACKLED.

(G) P.O. RamĒENA DID NOT SAY ANYTHING,
NOT "STOP POLICE." NOR DID HE MAKE ANY
INQUIRY (AB24-AB25, AB33-AB34, AB35, AB35, AB
40-AB41).

APPELLANT STOPPED RIGHT IN FRONT OF P.O.
RamĒENA AND SAID " I GOT (CAUGHT) THIS PHONE
From 105 STREET AND NORTHERN Boulevard."

However P.O. Pampena did not Recall what if anything was his Response, after appellant made this statement. P.O. Pampena just snatched the Phone, Handcuffed and Searched appellant, no knife was Recovered. Allegedly $250.00 U.S. Currency was Recovered from appellants Front Pocket (AB40-AB42). P.O. Pampena's observation of appellants Physical Condition notes His Clothes were disheveled. However P.O. Pampena was unable to Recall whether appellant had on Him any:

(H) Cuts
(I) Bruises
(J) Blood
(AB42-AB43).

P.O. Pampena never saw appellant on 104 Street and 32nd Avenue where the Sprint Report indicates He was stopped at 9:06 P.M. Note: P.O. Pampena arrived at the Crime Scene at 9:03 P.M. and He stopped appellant before going to 105 Street and Northern Boulevard and P.O. Pampena never saw Elijah Brooks on 105 Street and Northern Boulevard. Because appellant was Brought to the Crime Scene by P.O. Pampena as Brooks was Being Transported away (AB29-AB30, AB32-AB

8

34, AB38-AB39, AB44). P.O. PAMPENA ARRIVED AT THE CRIME SCENE WITH APPELLANT AT 9:03 P.M. WHERE HE FIRST OBSERVED MR EL TURKEY BEING TREATED BY EMS. HE WAS ALREADY SITTING IN THE BACK OF THE AMBULANCE ON THE CORNER OF 105 STREET AND NORTHERN BOULEVARD. NOTE: ACCORDING TO THE EMS SPRINT REPORT THE TRUCK ARRIVED ON 106 STREET AND NORTHERN BOULEVARD AT 9:11 P.M. (AB29, AB44-AB48, BA33-BA48). P.O. PAMPENA'S FIRST OBSERVATION OF MR EL TURKEY'S PHYSICAL CONDITION WAS THAT EL TURKEY HAD A SWOLLEN BLACK EYE AND A LACERATION TO THE HEAD. EL TURKEY LOOKED LIKE HE JUST GOT BEAT UP, JUMPED, MUGGED, HIS CLOTHES WAS DISHEVELED, COVERED IN BLOOD AND RIPPED UP. AT THAT TIME P.O. PAMPENA HAD A CONVERSATION WITH EL TURKEY WHILE SITTING SHOULDER TO SHOULDER AS EL TURKEY WAS BEING TREATED. EL TURKEY STATED:

Ⓐ HE WAS BEAT UP AND ROBBED BY TWO MALE BLACKS ONE BIG, ONE SMALL, OUTSIDE THE CHECK CASHING PLACE ON 106 STREET AND NORTHERN BOULEVARD

Ⓑ HE IDENTIFIED THE I-PHONE THROUGH A PASSWORD.

9

(m) HE DESCRIBED THE ATTACK.

(n) P.O. PAMPENA DID NOT TELL EL TURKEY THAT HE RECOVERED THE PROPERTY FROM THE APPELLANT (BA34, AB27-AB32, AB51-AB53, TRI 512-TRI 517). P.O. PAMPENA CONDUCTED A SHOW UP IDENTIFICATION AT THIS TIME OF APPELLANT WHO WAS HANDCUFFED, FLANKED BY A UNIFORM POLICE OFFICER STANDING NEXT TO A POLICE CAR, THREE CAR LENGTHS AWAY WITHOUT THE USE OF ANY FLASHLIGHT OR ILLUMINATION. THE ONLY THING EL TURKEY SAID WAS "THATS HIM" (AB27-AB32, AB46-AB48, AB51-AB53, BA33-BA36, BA47-BA48, TRI 512-TRI 517, TRI 553-560).

P.O. PAMPENA THEN FILLED OUT AN AIDED CARD, WHILE EL TURKEY REFUSES ALL MEDICAL ATTENTION AND GIVES A STATEMENT THAT HE WAS JUMPED BY A GROUP OF GUYS. THEN P.O. PAMPENA APPROA-CHED APPELLANT AFTER HIS CONVERSATION WITH EL TURKEY TO PLACE HIM BACK INTO THE POLICE CAR, AND APPELLANT WANTED TO KNOW WHAT HE WAS BEING CHARGED WITH. P.O. PAMPENA STATED ROBBERY AND IN RESPONSE APPELLANT SAID "IF THE GUY SAID IT'S HIS, THEN I GUESS IT WAS HIS" (AB33, AB49, BA36-BA38, BA40-BA43, BA49-BA 52, TRI 428-TRI 430, TRI 640-TRI 643).

10

HEARING COURT DECISIONS

ON DECEMBER 17, 2012 THE ATTORNEY FOR
APPELLANT, LINDA POWMAN, SUBMITTED AN OMNIBUS
MOTION TO PART TAP "A" FOR JUDGE CAMACHO, WHO
RETURNED A DECISION/ORDER DATED DECEMBER
19, 2012 GRANTING APPELLANTS MOTION TO THE MAPP,
HUNTLEY, WADE DUNAWAY HEARINGS. THEREAFTER
ON MAY 21, 2013 THE HEARING WAS CONDUCTED AT
PART K-20 BY JUDGE HOLLEE, AND AT THE CONCLUSION
HE DENIED THE DUNAWAY/WADE PORTION OF
THE HEARINGS. SUBSEQUENTLY APPELLANTS
CO-DEFENDANT BY MOTION SOUGHT A NEW
HEARING FOR THE COURT TO CONSIDER
DISCOVERY MATERIAL, SPECIFICALLY THE EMS
REPORT WHICH WAS PROVIDED TO THE DEFENCE
BY THE PEOPLE SUBSEQUENT TO THE HEARING.
THE CO DEFENDANTS MOTION FOR A NEW HEARING
WAS DEEMED TO BE A MOTION TO VACATE THE
DECISION OF THIS COURT DATED OCT 7, 2013.
THE COURT GRANTED THE MOTION TO RE-OPEN
THE HEARING FOR THE INTRODUCTION OF
THE EMS REPORT. DURING THE COURSE OF THAT
HEARING ON JAN 8, 2014, IT WAS DISCOVERED
THAT P.O. PAMPENA HAD FILLED OUT AN AIDED
REPORT THAT WAS NEVER TURNED IN TO THE
DEFENCE AS ROSARIO MATERIAL (AB1, AB61-AB64,

BA36 - BA52). LINDA POVMAN, ATTORNEY FOR
APPELLANT REFUSED TO REST ON THE RECORD
SUBJECT TO THE PRODUCTION OF THE ADDED
CARD, TO WHET JUDGE HOLLIE ORDERED THE
PEOPLE TO TURN OVER BY THE ADJURNED DATE
OF JAN 14, 2014 (BA 36-BA38, BA49-BA52). ON JAN 14,
2014 JUDGE HOLLIE RENDERS A DECISION/ORDER
STATEING: THE REOPENED HEARING WAS CONCLUD
ED AND THE DEFENDANTS MOTION TO SUPPRESS
PURSUANT TO DUNAWAY/WADE WAS AGAIN
DENIED. THEN ON FEBUARY 20, 2014 APPELLANT
APPEARED IN FRONT OF JUDGE KRON PART
TAP-A, AT WHICH TIME APPELLANT ARGUED
VIGOROUSLY IN AN ORAL ARGUMENT FOR
PERMISSION TO SUBMITT A PROSE MOTION
FOR RELIEF TO RE-OPEN THE HEARINGS
ONCE AGAIN FOR THE PRODUCTION OF THE
ADDED CARD, AND TO CROSS EXAMINE P.O.
PAMPENA. JUDGE KRON ADVISED LINDA
POVMAN TO FILE THE APPICATION, WHICH
SHE DID SUBMETT (N.M.A TRANS). ULTIMATELY
ON MARCH 24, 2014 JUDGE HOLL RENDERED
A DECISION/ORDER STATEING: THE
APPELLANTS MOTION TO RE-OPEN THE
HEARING FOR A SECOND TIME IS DENIED.
THE HEARING WAS RE-OPENED ON JAN 4,
2014 UPON THE MOTION OF THE CO DEFENDANT

12



FOR THE COURT TO CONSIDER THE EMS REPORT WHICH WAS PROVIDED SUBSEQUENT TO THE INITIAL HEARING. A DECISION WAS RENDERED ON JAN 14, 2014 DENYING THE MOTION TO SUPRRESS. THE DEFENDANT HAS FAILED TO SET FORTH NEWLY DISCOVERED EVIDENCE WHICH WOULD WARRANT THE RE OPENING OF THE SUPPRESSION HEARING (N.M.A. TRANS).

① NO HEARING WAS EVER RE-OPENED ON JAN 4, 2014 (N.M.A. TRANS).

② THE ADJOURNED DATE JAN 14, 2014 SET FROM JAN 8, 2014 HEARING, NEVER TOOK PLACE FOR THE PRODUCTION OF THE AIDED CARD AND TO CROSS EXAMINE P.O. PAMPENA (BA 36 - BA 52, N.M.A. TRANS).

③ ON JAN 14, 2014 APPELLANT WAS BROUGHT TO COURT AND PUT INTO THE HOLDING CELLS WHERE HE REMAINE ALL DAY UNTIL RETURNED TO RIKERS ISLAND (BA 36 - BA 38, BA 49 - BA 52).

④ ON JAN 4, 2014 APPELLANT WAS NEVER TRANSPORTED FROM RIKERS ISLAND TO COURT.

13

## THE TRIAL

### THE PEOPLE'S CASE

TEREK EL TURKEY A CAB DRIVER WHO WAS BORN IN EGYPT, SHARED A BASEMENT APARTMENT WITH A ROOMMATE ON 105 STREET BETWEEN NORTHERN BOULEVARD AND 32ND AVENUE IN CORONA SECTION OF QUEENS. ON JULY 3, 2012 AT ABOUT 8:30 PM, HE LEFT HIS APARTMENT TO PURCHASE A PACK OF CIGARETTS. FIRST HE WALKED TO AN ATM MACHINE IN A CHECK CASHING STORE AT THE CORNER OF 106 STREET AND NORTHERN BOULEVARD AND WITHDREW $260.00 IN CASH. HE THEN WALKED ONE BLOCK TO A DELI LOCATED ON THE CORNER OF 105 STREET AND NORTHERN BOULEVARD WHICH HE FREQUENTED TO PURCHASE THE CIGARETTS. OUTSIDE THE DELI WAS A GROUP OF INDIV-IDUALS AS WELL AS ON THE ADJACENT CORNER THEY LOOKED LIKE "A UNIFORM" ALL OF THEM WORE WHITE T-SHIRTS AND DARK JEANS". ONE OF THOSE INDIVIDUALS WAS A HOME-LESS BLACK MAN WHOM EL TURKEY HAD SEEN BEGGING IN THE AREA MANY TIMES PREVIOUSLY EL TURKEY "WOULD GIVE HIM A DOLLAR OR COFFEE OR SOMETHING"

14

THREE OR FOUR TIMES OVER THE COURSE OF MONTHS (TRL 345-TRL 347, TRL 359, TRL 398, TRL 405). HOWEVER WHEN ASKED IF THAT MAN IS IN THE COURTROOM, EL TURKEY REPLIED "HE IS NOT HERE" (TRL 336-TRL 346, TRL 392-TRL 393). AFTER EL TURKEY PURCHASED A PACK OF CIGARETTS IN THE DELI, HE LEFT THE STORE, LIT A CIGARETTE AND PHONED SOMEONE AS HE WALKED ALONG 105 STREET TOWARDS 34TH AVENUE. THOUGH HE HAD TESTIFIED BEFORE THE GRAND JURY THAT "HE BECAME AWARE THAT TWO BLACK MEN STARTED FOLLOWING HIM" AT THAT TIME, HE INSISTED THAT HE WAS FOLLOWED BY ONE BLACK MAN WHOM HE DESCRIBED AS WEIGHING BETWEEN 250 AND 300 POUNDS, AND WEARING A WHITE SHIRT AND DARK JEANS. AS HIS APPREHENSION GREW EL TURKEY WALKED INTO THE STREET TO GO BACK IN THE DIRECTION OF THE DELI. AFTER-WARDS HE HEARD THE MAN WHOM WAS FOLLOWING HIM TELL SOMEONE TO PUNCH HIM, THE MAN THEN PUSHED HIM TO THE GROUND BETWEEN TWO PARKED CARS. HE OBSERVED THAT THE HOMELESS MAN WHOM HE HAD SEEN EARLIER WAS BEHIND HIM ON THE GROUND. WHILE THE HEAVYSET MAN THEN SLAMMED AND PUNCHED HIM IN THE FACE, THE HOMELESS MAN RIPPED HIS PANTS POCKETS AND

15.

REMOVED HIS CELL PHONE AND WALLET WHICH
CONTAINED $250 IN CASH (TRC 347-TRI 368).
THE HEAVYSET MAN THEN SLAMMED HIS HEAD
AGAINST THE CURB TWO OR THREE TIMES, CURSED
HIM AND THREATENED TO KILL HIM. AS A RESULT
EL TURKEY'S EYE BECAME SWOLLEN, ONE HIS TEETH
WAS LOOSENED AND HE FELT PAIN IN HIS FACE (TRI
347-TRI 370, TRI 393-TRC 402). WHEN THIS ATTACK
ENDED, EL TURKEY OBSERVED THE HEAVYSET MAN
PROCEED UP 105 STREET TOWARDS 34TH AVENUE.
HOWEVER HE DID NOT OBSERVE WHERE THE
HOMELESS MAN WENT. AFTER ABOUT A MINUTE,
HE STOOD UP AND WENT BACK INSIDE THE
DELI AND TOLD THE MANAGER THAT HE HAD BEEN
MUGGED AND ASKED HIM TO CALL THE POLICE.
WHILE INSIDE THE DELI THE HEAVYSET MAN
RETURNED TO THE FRONT OF THE DELI AND
THREATENED AND CURSED AT EL TURKEY AGAIN.
EL TURKEY CLAIMED HE RECOGNIZED THIS MAN
BECAUSE HE WAS WEARING THE SAME CLOTHING
THAT HE WORE DURING THE ROBBERY A RED
SHIRT AND BLACK PANTS (TRC 370-TRI 372 TRC
402-TRC 409). ABOUT 15 SECONDS LATER EL
TURKEY EXITED THE DELI AND HE APPROACHED
TWO PLAIN CLOTHES POLICE OFFICERS IN AN
UNMARKED CAR. HE GOT IN THE CAR AND
RODE WITH THOSE OFFICERS FOR ABOUT

60 TO 80 FEET, WHEN HE OBSERVED THE HEAVYSET MAN AND ANOTHER TALLER MAN IN THE STREET (TR: 372-TR377). EL TURKEY EXITED THE CAR AND IDENTIFIED THE HEAVYSET MAN AS THE ONE WHO PUNCHED HIM, HOWEVER HE DID NOT IDENTIFY THAT MAN WHEN ASKED IF HE RECOGNIZED HIM IN THE COURTROOM (TR373-TR378, TR409-TR414). AFTER EL TURKEY IDENTIFIED THE INDIVIDUAL HE CLAIMED ROBBED HIM, THE PLAIN CLOTHES OFFICER PROCEEDED TO HANDCUFF THAT INDIVIDUAL WHOM WAS LATER IDENTIFIED AS APPELLANTS CO-DEFENDANT. OF PARTICULAR NOTE HOWEVER, THE ARREST WAS TAKEN BY A UNIFORMED POLICE OFFICER AND ACCORDING TO THE PLAIN CLOTHES OFFICERS MEMO BOOK, PLUS HIS TESTIMONY AT THE SUPPRESSION HEARING THEN AT TRIAL WAS "I ONLY PUT THE HAND-CUFFS ON HIM" AND "THE ARREST WAS TAKEN HOWEVER BY P.O. PAMPENA AT THAT TIME" WHO ARRIVED ON 108 STREET AND STOPPED THE TWO INDIVIDUALS FIRST, HE HAD TO BE THERE TO FILL OUT THE FELONY COMPLAINT. THOUGH THE PLAIN CLOTHES POLICE OFFICER REMAINED AT THE CRIME SCENE FOR ANOTHER 15 MINUTES, HE WAS UNABLE TO TESTIFY TO THE EVENTS THAT UNFOLDED ONCE HE

12

PUT THE CUFFS ON APPELLANT'S CODEFENDANT
(AB8, AB14-AB21, BA15-BA16, BA20, BA24-BA
27, TRE 447, TRE 455-TRE 460, TRE 463-TRE 468
CONTRARY TO THE MEMO BOOK, FELONY COMPLAINT AND
P.O. LANNING'S TESTIMONY, P.O. PAMPENA INSIST
THAT AFTER RECEIVING A RADIO CALL AT 9:00
P.M. OF A KNIFE POINT ROBBERY ON 105 STREET
AND NORTHERN BOULEVARD BEING COMMITTED
BY THREE MALE BLACK SUSPECTS, ONE WEARING
A WHITE SHIRT AND BLACK PANTS, P.O. PAMPENA
CLAIMED HE PROCEEDED FROM THE VICINITY
OF 108 STREET AND ASTORIA BOULEVARD TRAVELING
ONE AVENUE UP AND THREE BLOCKS OVER. WHEN
P.O. PAMPENA APPROACHED 105 STREET AND 32ND
AVENUE HE OBSERVED APPELLANT RUNNING
DOWN 105 STREET NORTHBOUND AWAY FROM
NORTHERN BOULEVARD ALONE. APPELLANT FIT
THE DESCRIPTION MATCHING THAT GIVEN
OVER THE RADIO, OF A BLACK MALE WEARING
A WHITE SHIRT AND DARK PANTS CARRYING
AN I-PHONE. P.O. PAMPENA IMMEDIATELY
STOPPED HIS CAR AND GOT OUT, HE DID NOT
SAY "STOP POLICE" NO GUNS WERE DRAWN; NOR
WAS ANY PHYSICAL FORCE USED. THE SITUATION
WAS NOT VOLATILE, THE APPELLANT STOPPED
RIGHT IN FRONT OF P.O. PAMPENA'S CAR WHERE
HE WAS STANDING AND SAID "I JUST

*18*

BROUGHT THIS PHONE FROM 105 STREET AND NORTHERN" (AB40-AB41, TRI 501-TRI 507).

## APPELLANTS APPREHENSION

P.O. PAMPENA THEN SNATCHED THE E-PHONE FROM APPELLANTS HAND AND WITHOUT INQUIRY CUFFED AND SEARCHED APPELLANT AT WHICH TIME $250.00 U.S. CURRENCY WAS RECOVERED FROM HIS FRONT POCKET. OF PARTICULAR NOTE, THE RADIO CALL DID NOT STATE ANY ITEMS STOLEN FROM EL TURKEY AND NO KNIFE WAS RECOVERED. P.O. PAMPENA DID NOT RECALL THAT THE TRANSMISSION HAD INDICATED "THREE BLACK MALES" NOT THE NUMBER, NOR DID HE RECALL "KNIFE POINT" ROBBERY OR WHETHER THE RADIO CALL STATED THE AGE, WEIGHT, HEIGHT OF SUSPECTS OR WHETHER APPELLANT HAD ANY CUTS, BRUISES OR BLOOD ON HIM ANYWHERE (AB23-AB34, TRI 542-TRI 570). FURTHERMORE ACCORDING TO P.O. PAMPENA'S TESTIMONY AT THE SUPPRESSION HEARINGS AND AT TRIAL, IS THAT APPELLANT WAS TRANSPORTED BY HIM FROM 105 STREET AND 32ND AVENUE, AFTER APPELLANT WAS HANDCUFFED AND SEARCHED. P.O. PAMPENA THEN CALLED IN THE STOP OF APPELLANT TO CENTRAL AT THAT TIME

THEN HE PROCEEDED TO TRANSPORT APPELLANT BACK TO THE CRIME SCENE ON 105 STREET AND NORTHERN BOULEVARD (AB25-AB30, BA30-BA52, TRI 51, TRI 513, TRI 551-TRE 555). THE TOTAL TIME IT TOOK P.O. PAMPENA, AFTER STOPPING APPELLANT AT 9:00 P.M. AND BRINGING HIM BACK TO THE CRIME SCENE ON 105 STREET AND NORTHERN BOULEVARD, TOOK THREE MINUTES. P.O. LANNING'S TESTIMONY BOTH AT THE SUPPRESSION HEARINGS AND AT TRIAL, ALONG WITH HIS MEMO BOOK, CONFIRMS THAT P.O. PAMPENA WAS PRESENT ON 105 STREET AND NOTHERN BOULEVARD AT 9:03 P.M. YET THE SPRINT REPORT HAS APPELLANT ON 104 STREET AND 32ND AVENUE BEING STOPPED BY POLICE AT 9:06 P.M. AND APPELLANTS ARRIVAL AT THE CRIME SCENE AT 9:08 P.M. P.O. LANNING ALSO TESTIFIED THAT HE, P.O. PAMPENA AND BROOKS WERE PRESENT AT THE CRIME SCENE AT 9:03 P.M. HOWEVER THE APPELLANT WAS NOT (TRI 461-TRI 482). P.O. PAMPENA INSIST THAT THE RECOLLECTION OF THE EVENTS ON THE NIGHT OF JULY 3, 2012 AS TESTIFIED TO BY P.O. LANNING, HIS MEMO BOOK, THE 911 SPRINT REPORT, MR. EL TURKEY TRIAL TESTIMONY, THE EMS TECHNICIANS TRIAL TESTIMONY, HIS EMS REPORT

AND THE EMS RELAY SHEET WERE ALL
ALL WRONG. WHEN P.O. PAMPENA WAS ASKED
TO CLARIFY THE DISCREPENCIES IN THE
TIME, HIS RESPONSE WAS "I ARRIVED AT
THE CRIME SCENE AT 9:03 P.M. AND I HAD
STOPPED APPELLANT BEFORE I ARRIVED"
AND WHEN HE WAS ASKED, DID YOU CALL
IN THE STOP OF APPELLANT? HE ANSWERED
" YES" (AB35-AB40, AB56, BA30-BA47, TRI 373
-TRI 379, TRI 455-TRI 468, TRI 548-TRI 570,
TRI 418-TRI 427, TRI 644-TRI 645). DESPITE
P.O. PAMPENA's TESTIMONY THAT AT 9:03 P.M
UPON ARRIVING AT THE CRIME SCENE
APPELLANTS CODEFENDANT WAS BEING TRANS-
PORTED AWAY. HE HOWEVER FILED A FELONY
COMPLAINT REPRESENTING HIMSELF AS BROOKS
ARRESTING OFFICER. THE COMPLAINT READS
IN PART: "DEPONENT FURTHER STATES THAT
WHEN HE PLACED THE DEFENDANT (BROOKS)
INTO THE CELL AT 115 Pct, IN QUEENS
COUNTY, AND UNCUFFED THE DEFENDANT,
THE DEFENDANT STARTED SWINGING HIS
ARMS AND KICKING HIS FEET TOWARDS
POLICE OFFICER AND A POLICE SERGEANT
WHO WERE RIGHT NEXT TO HIM (SEE
ELIJAH BROOKS FELONY COMPLAINT).

21

DEFENCE

## BROOKS ARREST

ON JULY 3, 2012 AT 9:00 P.M, AFTER BEING
ROBBED EL TURKEY WENT INSIDE THE DELI ON
THE CORNER OF 105 STREET AND NORTHERN
BOULEVARD FOR 90 SECONDS BEFORE HE LOOKED
OUTSIDE THE DOOR AND SAW THE HEAVYSET GUY.
THEREAFTER EL TURKEY EXITED THE STORE
AND APPROACHED A BEIGE CHEVY PARKED AT
INTERSECTION OF 105 STREET AND NORTHERN
BOULEVARD GOING THE OPPOSITE WAY, AND
CONFRONTED THE TWO POLICE OFFICERS
WHOM HE TOLD I WAS "MUGGED". EL TURKEY
WAS THEN TOLD TO JUMP IN THE CAR AND
AND THEY TRAVELED 60 TO 80 FEET WHEN
TWO GUYS WAS OBSERVED WALKING, ONE
OF WHOM PUNCHED EL TURKEY. THE TWO POLICE
OFFICERS WERE IN PLAIN CLOTHES ASSISTING EL TURKEY
WHEN THE SUSPECTS WERE SPOTTED. THEY STOPPED
AND EXITED THE VEHICLE WHERE EL TURKEY REMAINED
SITTING AS INSTRUCTED BY THEM. INSTINTANOUSLY
TWO OTHER POLICE OFFICERS ARRIVED WEARING
UNIFORMS IN AN UNMARKED CAR ONE WHITE,
ONE HISPANICK, WHOM APPROACHED EL TURKEY
SITTING IN THE BACK OF THE OTHER POLICE
VEHICLE INQUIREING AS TO "WHAT HAPPENED"?
EL TURKEY THEN EXITED THE VEHICLE PROMPTED
BY THE TWO UNIFORMED POLICE OFFICERS AT
WHICH TIME EL TURKEY IDENTIFIED

22

APPELLANT'S CODEFENDENT AS ONE OF THE
PERPERTRATORS WHO ROBBED HIM. BROOKS WAS
HANDCUFFED BY P.O. LANNING (PLAIN CLOTHES P.O.)
AND THE ARREST OF BROOKS WAS TAKEN BY P.O.
PAMPENA (UNIFORMED P.O.) AT THAT TIME (TRC
371 - TRC 376, TRC 413).

SUPPRESSION HEARING INVESTIGATION/I.D.

APPELLANTS ARREST

ADDRESSED DURING THE SUPPRESSION
HEARING IS AS FOLLOWS: THE COURT: SO IN
DESCRIBING WHAT IT IS THAT THE EL TURKEY
SAID, IF YOU CAN REMEMBER JUST USE THE
WORDS THAT HE USED (EL TURKEY). P.O. PAMPENA
RESPONDED "HE STATED THE BIG BLACK GUY
WITH THE SHAVED HEAD WAS THE ONE THAT
STARTED ASSAULTING HIM WHEN HE CAME OUT
OF THE CHECK CASHING PLACE. THE A SMALLER
BLACK GUY WENT INTO HIS POCKETS AND
TOOK HIS PHONE AND HIS WALLET". P.O. PAMPENA
WAS UNABLE TO RECALL ANY OTHER INFORMATION
PROVIDED HIM FROM EL TURKEY (ABS1-ABS2).
P.O. PAMPENA WAS ASKED SPECIFICALLY ABOUT
THE PRIOR INVESTIGATION CONDUCTED
WHILE INSIDE EMS TRUCK WITH EL TURKEY.
NOW WHEN YOU WERE NEXT TO HIM, DID YOU
HAVE ANY CONVERSATION REGAURDING MR
BALL?

23

PREVIOUSLY TO ME GETTING IN THERE HE
DID GIVE 9-1-1 A DESCRIPTION OF THE PEOPLE
THAT ROBBED HIM, PAMPENA SAID. THE COURT
THEN ASKED "RIGHT BUT AS YOU ARE SITTING
WITH HIM IN THE AMBULANCE AND IF HE IS
LOOKING AT MR BALL IS HE SAYING ANYTHING
OTHER THAN THATS HIM? PAMPENA RESPONDS
"NO", HE ~~SAYED~~ JUST SAID THATS HIM (BA 47-
BA 48). NOTE P.O. PAMPENA FILLED OUT AN
AIDED REPORT AT THIS TIME (BA 26-BA 28).

TRIAL

PRIOR TO SHOW UP

EL TURKEY MAKES IT VERY CLEAR THAT HE
WAS INFORMED BY POLICE THAT APPELLANT WAS
IN FACT THE HOMELESS GUY THEY CAUGHT WITH
HIS PROPERTY, PRIOR TO SHOW UP IDENTIFICATION
AND THE APPELLANT BEING BROUGHT TO THE
CRIME SCENE, EL TURKEY EXPLAINS IN DETAIL:
"THEY TOLD ME THEY THINK THEY CATCH THE
GUY BECAUSE HE ASK ME HOW MUCH MONEY"?
"I SAID, ~~YES~~ $250 DOLLARS "THEY SAID THEY"
FIND $250 DOLLARS EXACTLY. THEY ASK ME
"WHAT KIND OF PHONE? I-PHONE EL TURKEY
REPLIED. THEY SAID THEY FIND I-PHONE,
THEY FIND SOCIAL SECURITY AND MY LICENSE,
SO I'M NOT GOING TO SAY NOTHING (TR1 426).

24

THE JUDGE THEN ASKED EL TURKEY "DID THE COPS TELL YOU THEY CAUGHT THE GUY WITH YOUR CELL PHONE? HE RESPONDED "YES", THEY SAW HIM THROW SOMETHING IN THE FLOOR THE PAPER, SOCIAL THE LICENSE, EVEN BRING TO THE PRECINCT "(NOTE: EL TURKEY'S WALLET, LICENSE, SOCIAL SECURITY CARD WAS RECOVERED AT THE CRIME SCENE (TRE 512 - TRE 514). THE APPELLANT ASKED EL TURKEY "OKAY, NOW YOU SAID HERE RIGHT, THAT YOU KNEW THAT IT WAS THE HOMELESS GUY WHO ROBBED YOU, BECAUSE HE HAD YOUR MONEY AND YOUR I.D, IS THAT CORRECT? EL TURKEY EXPLAINS "NOT ME, THE POLICE KNOWS, WHEN THE POLICE FIND MY WALLET WITH SOMEONE (NOTE: EL TURKEY'S (PROPERTY WAS FOUND IN SEWER GRATE AT CRIME SCENE, TRE 572 - TRE 574), SO RT'S LOGIC, IT'S HIM" (TRE 420). APPELLANT CONTINUES TO CROSS EXAMINE EL TURKEY "YOU ALSO SAID YOU KNEW IT WAS HIM BECAUSE YOU ALREADY KNEW IT WAS HIM THAT HAD THE MONEY, SO YOU KNOW"? EL TURKEY RESPONDS "I DIDN'T ARREST HIM TO FIND HE HAS THE MONEY" (TRE 425), APPELLANT ASKED EL TURKEY "I JUST NEED TO KNOW SPECIFICALLY WHETHER OR NOT YOU WERE INFORMED, THAT'S IT, IS THAT THE FACT THAT THE COPS CAUGHT HIM"? EL TURKEY SAID "YES, THEY SAY THEY GOT THE GUY" AND THAT THEY FOUND THE MONEY PROPERTY? THEY FOUND THE PROPERTY WITH HIM "YES" E) TURKEY REPLIED. (TRE 425 - TRE 42)

25

## IN COURT IDENTIFICATION

ADA SHORT IN HIS OPENING STATEMENT AT TRIAL DECLARED THE FOLLOWING: HE (EL TURKEY) WENT BACK TO 105 STREET TO PICK UP COFFEE AND HAVE A CIGARETTE WITH HIS FRIEND. WHEN TEREK GOT THE CORNER OF 105 AND NORTHERN BOULEVARD, HE SAW AN ALL TO FAMILIAR FACE THE DEFENDANT RAYMOND BALL. DURING THE TRIAL YOU WILL HEAR THAT HE IS A FIXTURE IN THE NIEGHBOORHOOD. YOU WILL ALMOST ALWAYS FIND HIM IN FRONT OF THAT DELI ON THAT CORNER. TEREK WILL TELL YOU HE HAS SEEN HIM A DOZENS, HUNDREDS OF TIME, CAN YOU HELP ME OUT, GIVE ME SOME-THING, DOLLAR, $5. MOST OF THE TIME HE PAYS HIM NO MIND. SOME DAYS HE MAY THROW HIM A BUCK OR TWO TO BE RID OF HIM ON THAT NIGHT TEREK DID NOT KNOW THAT RAYMOND BALL WAS NOT GOING TO TAKE NO FOR AN ANSWER. TEREK WENT INSIDE THE STORE AND HE HAD A COFFEE... HE COULD SEE THE FRONT OF THE DELI WAS CROWDED WITH PEOPLE THAT HE HAD NOT SEEN BEFORE AND ONE HE HAD RAYMOND BALL (TRI 321-322). DURING TRIAL THE MOST CRUCIAL PIECE OF EVIDENCE PRESENTED (ALBEIT FOR THE FIRST TIME) WAS EL TURKE KNOWING APPELL-ANT PRIOR TO ROBBERY.

26

El TURKEY WAS ASKED "BEFORE YOU WALKED
INTO THE DELI DID YOU SEE ANYBODY THAT YOU
HAD SEEN BEFORE? I SEEN ONE GUY HE SAID.
"WHO WAS THAT GUY"? HE IS A BLACK GUY
HOMELESS, I ALWAYS GIVE HIM DOLLAR OR
COFFEE OR SOMETHING. EL TURKEY SAID. FOR
HOW LONG HAVE YOU BEEN SEEING HIM THERE
FOR WEEKS MONTHS. HOW LONG"? YEAH MAYBE
LIKE WEEKS MONTHS AND A HALF HE SAID. "WHAT WAS
HE DOING"? HE WAS STANDING WITH A BUNCH OF
GUYS (EIGHT GUYS WEARING WHITE LIKE UNIFORM
THE 405) EL TURKEY SAID. WHAT DID HE DO TO YOU?
HE WAS THE ONE BEHIND ME AND THE ONE HE TOOK
THE MONEY AND THE PHONE HE SAID. "WHO DID
THE POLICE OFFICERS BRING TO SHOW YOU"?
HE BRING THE HOMELESS. EL TURKEY SAID.
" DID YOU RECOGNIZE THE PERSON"? HE BRING
THE HOMELESS, EL TURKEY SAID. I AM GOING
TO ASK YOU TO TAKE A LOOK AROUND THE
COURTROOM AND SEE IF YOU RECOGNIZE THE
PERSON THAT YOU HAVE TALKED ABOUT JUST
NOW"? HE IS NOT HERE. EL TURKEY SAID.
"LOOK AROUND THE WHOLE COURTROOM SIR,
EL TURKEY WAS INSTRUCTED. NO NOT HERE,
HE SAID. (TR: 371 - TR: 385). ONCE AGAIN
THERE WAS AN ATTEMPT TO GET EL TURKEY
TO CONFIRM THAT APPELLANT WAS IN FACT
THE HOMELESS GUY. (NOTE: APPELLANT
REPRESENTED HIMSELF THROUGHOUT THE
TRIAL AND QUESTIONED EL TURKEY DIRECTLY).

27

So the Judge instructed El Turkey to "see if you see the homeless guy" and he responded with certainty, no I know them very well, no I know them a long time (TRE 384 - TRE 385). ADA Short asked El Turkey, I just want to back up a little bit, going back to when you were at the ambulance, you said "the police officers brought somebody over to you, a person"? The police officers showed you a person? El Turkey replied in the negative, "not the ambulance (as testified to by P.O. Pampena), outside the ambulance (emphasis added). I was in the same spot during the course the undercover arrest the guy (Brooks). ADA Short asked El Turkey "was the ambulance there at the time"? El Turkey responded, "but the ambulance in the corner in Northern Boulevard. So the Judge ask El Turkey what did he look like"? He said sometime he acted like a gay, act like a woman sometime, this is the homeless guy. "Okay do you remember what the homeless guy was wearing the day he assaulted you"? "I guess jeans and white shirt" El Turkey said (TRE 384 - TRE 386).

28

DURING APPELLANTS CROSS EXAMINATION
OF E TURKEY ASKED: "MY NEXT QUESTION IS
THIS MR E TURKEY THE NIGHT OF THE CRIME
THAT THIS TERRIBLE THING HAPPENED TO YOU YOU
KNOW IN THE GRAND JURY TESTIMONY YOU NEVER
IDENTIFIED, I HAVE HERE RIGHT YOU WAS
ASKED OKAY BY THE OFFICER THAT CAME TO
THE CRIME SCENE HOW DID THE PERSON LOOK"?
DID THE POLICE ASK YOU WHAT THE PERSON WHO
ASSAULTED YOU LOOK LIKE? DID HE ASK FOR A
DESCRIPTION"? "YOU KNOW YOUR DESCRIPTION
IS WHAT DO YOU CALL ONLY OF A BLACK GUY, GAY GUY
HOMELESS GUY"? E TURKEY REPLIED, YEAH,
BLACK GUY, SAME TALL LIKE ME, "HOW TALL ARE
YOU"? "DO YOU KNOW HOW TALL YOU ARE"? YES,
LIKE FIVE SIX, BUT HE IS MAYBE A LITTLE
SHORTER (APPELLANT IS 5'9") TO ME, AND
CURL HAIR (APPELLANTS HAIR WAS CUT LOW
TO THE SCALP). "CURL HAIR"? YEAH, LIKE
ALWAYS BLACK GUYS HAIR "CURL"? YES.
"LIKE DREADLOCKS"? YES. "IS IT LIKE JAMAICAN
OR LIKE GERI"? LIKE JAMAICAN BUT SHORT,
SAME LIKE YOUR HAIR. THE JUDGE ASKED:
"DO YOU MEAN LIKE TIGHT CURLS"? YES
(NOTE APPELLANTS HAIR WAS CUT SHORT TO THE
SCALP AT TRIAL). "YOU MENTIONED EARLIER
THAT THE GUY IS GAY IS THAT CORRECT"?
HE ACT GAY, I'M NOT." DID YOU EVER SEE HIM
DRESSED DIFFERENTLY THAN A MAN"? SOME-
TIMES, YEAH SOMETIME HE DRESS LIKE A WOMEN
? YES, HE SAID (TIT HIT TIT HO)

29

ALRIGHT, WELL MY NEXT QUESTION IS THIS
MR. EL TURKEY THANK YOU. YOU ARE BEING VERY
HELPFUL. YOU ARE WELCOME. I KNOW YOUR JOB.
EL TURKEY SAID (TRE 425-TRE 426). THERE
WAS NO DOUBT IN EL TURKEYS MIND AS TO
WHO THE APPELLANT WAS AT TRIAL WHEN HE
DECLARED SIMILAR HAIR LIKE THE LAWYER
(EMPHASIS ADDED).

Conclusion

P.O. PAMPENA GIVES AN ELABORATE STORY OF
HOW AFTER RECEIVING A RADIO CALL OF A KNIFE
POINT ROBBERY AT 9:00 P.M. ON 105 STREET AND
NORTHERN BOULEVARD SPOTS APPELLANT IN
ROUTE WHO FITS THE DESCRIPTION, AND
CARRYING AN I PHONE (BEING PART AND PARCEL
OF CRIME HAD NOT YET BEEN COMMUNICATED).
AT 9:00 P.M. P.O. PAMPENA APPREHENDS
APPELLANT, HANDCUFFS, FINDS $250 DURING
THE SEARCH THEN TRANSPORTS APPELLANT
BACK TO CRIME SCENE WITHIN THREE
MINUTES, ARRIVING AT 9:03 P.M. EL TURKEY
ALLEGEDLY WAS ALREADY INSIDE EMS
TRUCK BEING TREATED. WHILE INSIDE
EMS TRUCK P.O. PAMPENA CONDUCTS AN
INVESTIGATION AND SHOW UP WITH EL
TURKEY OF APPELLANT, AND FILLS OUT AN AIDED
REPORT AT THAT TIME.

30

THE FOLLOWING EVIDENCE AND TESTIMONY
NOT ONLY PROVES P.O. PAMPENA FABRICATED
THE SHOW UP AND EVENTS, BUT THAT THEY TOO
WERE IMPOSSIBLE. P.O. LANNING'S MEMO
BOOK READS: P.O. PAMPENA STOPED TWO
INDIVIDUALS ON 105 STREET, ALSO P.O. LANNING
TESTIFIED "I ONLY PUT THE CUFFS ON BROOKS,
PAMPENA TOOK THE ARREST AT THE TIME (TRT 8-
TRT9, BA27-BA28). APPELLANT WHILE QUESTION-
ING P.O. LANNING DECLARED: HE DID YOUR
HONOR, PERTAINING TO THE ARREST (BROOKS)
THAT AN OFFICER HAS TO BE ON THE SCENE
IN ORDER FOR HIM TO TAKE CREDIT FOR
THE ARREST, IS THAT CORRECT? SO THAT
MEANS THAT OFFICER PAMPENA WAS ON
THE SCENE WHEN MR. BROOK'S WAS ARRESTED
IS THAT CORRECT"? LANNING REPLIED IN
THE POSITIVE "HE WAS THERE". HE WAS
THERE ON THE SCENE? YEAH, HE SAID.
(TRT 462-463). ALSO E. TURKEY TESTIFIED
DURING QUESTIONING, "DID OTHER
POLICE OFFICERS ARRIVE AT THAT LOCATION
? YES HE SAID, "HOW SOON AFTER YOUR OFFICERS
GOT OUT OF THE CAR? MAYBE 20 25 SECONDS. SO
QUICK, INSTANTANEOUS? YES HE SAID (TRT
412-TRT 413). THE JUDGE ASKED E. TURKEY:
"NO WHEN DID YOU GET OUT OF THE POLICE
CAR? WHEN THE OTHER, THE UNIFORM
POLICE COMING, AND THEY ASKED ME WHAT
HAPPENED (TRT 376-TRT 378).

31

MR. EL TURKEY'S TESTIMONY OF THE ABOVE
EVENTS READS AS FOLLOWS: "WHEN THE OTHER
OFFICERS CAME DID THEY BRING ANYBODY WITH
THEM? HE TOLD ME HE GOING TO BRING THE GUY,
THEY FIND THE MONEY WITH HIM AND FROM FAR
AWAY, AND I CAN RECOGNIZE HIM, I SAY YES OR
NO. SO HE BRING HIM LIKE THIS TABLE SO I
TELL HIM YES, THIS GUY. OKAY. WHEN THE
POLICE OFFICERS CAME DID THEY SHOW YOU
ANYTHING? HE SHOWED ME PHONES, EL TURKEY
SAID, "WHAT DO YOU MEAN THEY SHOWED YOU
PHONES? HE TOLD ME THIS YOUR PHONE, FIRST
PHONE I SAID NO, IT WAS NOT MINE, LIKE
BLACKBERRY OLD ONE, SO HE COME BACK WITH
MY PHONE, HAS MY PICTURE AND EVERYTHING
(TR. 379-TR. 381). SO THEY BROUGHT THE
HOMELESS GUY BACK TO THE SCENE OF THE
CRIME . . .? NOT CLOSE FROM ME, EL TURKEY
SAID, "I'M NOT ASKING? DON'T ARGUE,
THE CRIME IS FROM FAR AWAY." OKAY. SO
YOU KNOW HIM FROM FAR AWAY? YES,
THEY BRING HIM NOT TOO CLOSE TO ME, NOT
VERY CLOSE. THEY TOLD ME THEY GOING TO
BRING HIM A LITTLE BIT AND RECOGNIZE
HIM, SO BEFORE I KNOW HIM FROM FAR
WAY (EMPHASIS ADDED). I SAID I KNOW
IT'S THIS GUY. "YOU ALSO SAID YOU KNEW IT
WAS HIM BECAUSE YOU ALREADY KNEW IT WAS
HIM THAT HAD THE MONEY, SO YOU KNOW?

I DIDN'T ARREST HIM TO FIND HE HAS THE
MONEY, SO HE IS THE ONE THAT HAS THE MONEY
(EMPHASIS ADDED, TRI 425).

E/ TURKEY GIVES CLEAR TESTIMONY THAT NOT
ONLY WAS HE INFORMED BY POLICE THAT APPELLANT
WAS CAUGHT WITH HIS PROPERTY BEFORE APPELLANT
WAS BROUGHT TO THE CRIME SCENE FOR SHOW
UP, AND THAT ET NEVER TOOK PLACE WHILE HE
AND P.O. PAMPENA WAS INSIDE EMS TRUCK, BUT
FROM FAIR AWAY (TRI 572-TRI 574). ALSO
APPELLANT WAS IDENTIFIED FIRST BY THE
INFORMATION E/ TURKEY RECEIVED FROM
THE POLICE, THEN SHOWN EVIDENCE (BLACK
BERRY PHONE NEVER TURNED IN) THEN LEFT
OFF AND RETURNED WITH THE L PHONE
AND OTHER PROPERTY RECOVERED FROM A
SEWER GRATE AT THE CRIME SCENE WHILE
APPELLANT WAS BEING IDENTIFIED, P.O.
PAMPENA'S ACCOUNT OF THE EVENTS ON THE
NIGHT OF JULY 3, 2012 BECOMES IMPOSSIBLE
WITH HIS TESTIMONY OF FILLING OUT AN
AIDED CARD WHILE SITTING SHOULDER TO
SHOULDER WITH E (TURKEY INSIDE EMS
TRUCK DURING THE SHOW UP (BA 26-BA 28)
BECAUSE LIKE THE BLACKBERRY PHONE WAS
NEVER TURNED IN BY POLICE. MR GONZALEZ
EMS TECHNICIAN TESTIFIED (TRE 615-TRE 648)
THAT EMS TRUCK DID NOT ARRIVE UNTIL 9:11
P.M (SEE EMS RELAY SHEET TRI 645).

33

ANY DOUBT THAT P.O. PAMPENA AT 9:03 P.M.
ON JULY 3, 2012 WAS PRESENT ALONG WITH
ELIJAH BROOKS, P.O. CANNING AND MR EL TURKEY
IN THE CAPACITY OF BROOKS ARRESTING OFFICER
IS REMOVED BY THE FELONY COMPLAINT P.O.
PAMPENA FILED TO WIT: DEPONENT WHEN HE
PLACED DEFENDANT INTO THE CELL AT 115TH PCT...
(SEE BROOKS FELONY COMPLAINT). HOWEVER P.O.
PAMPENA IS DETERMINE TO DECEIVE EVERYONE
AS TO THE EVENTS OF JULY 3, 2012. APPELLANT
CONTINUES TO QUESTION P.O. PAMPENA: "NOW
WHEN YOU GOT ME BACK TO THE CRIME SCENE
DID YOU EVER TELL THE VICTIM THAT THE PERSON
WHO HAD HIS PROPERTY HAD ALREADY BEEN
ARRESTED? NO HE SAID." YOU NEVER TOLD HIM
THAT? NO: HE INSIST. "DID ANY OTHER POLICE
OFFICER TELL HIM THAT? NO (SEE PRIOR TO TRIAL
SHOW UP). MOREOVER P.O. PAMPENA WAS ASKED
"YOU SAID THAT WHAT YOU CALL RECOVERED AN
I PHONE AND MONEY FROM ME" IS THAT CORRECT
? YES, HE SAID. "DID YOU RECOVER ANYTHING
ELSE FROM ME? NO, HE SAID. NOTHING ELSE?
NO." ARE YOU SURE? YES HE SAID. "OKAY WHEN
YOU GOT BACK TO THE CRIME SCENE AND YOU
EVENTUALLY, YOU SHOWED THE VICTIM, RIGHT, THE
PROPERTY YOU GOT OFF ME" IS THAT CORRECT?
AFTER I ASKED HIM WHAT WAS TAKEN, YES.
"DID YOU EVER SHOW HIM A BLACK BERRY? NO, HE
SAID. OKAY, RIGHT DID YOU EVER SEE ANOTHER
SHOW HIM A BLACKBERRY? NO, HE SAID, I DID
NOT (TRT 550 - TRT 560).

34

P.O. PAMPENA REFUSES TO CONCEDE TO P.O.
LANNING AND EL TURKEY'S TESTIMONY, AND
WHEN HE WAS ASKED: GREAT OFFICER
PAMPENA, DO YOU UNDERSTAND THAT PERJURY
IS A CRIME? RESPONDS ABSOLUTELY.
APPELLANT ASKED P.O. PAMPENA: WE ARE
READING FROM THE FIRST SUPPRESSION
HEARING, MAY 21, 2013 REFERRING TO PAGE
29 LINE 24 ... OR 23 DOWN IT READS: AND
YOU ALSO SAID THAT THERE WAS SOMEONE
ELSE THERE, SOMEONE I THINK THAT YOU
SAID WAS MR BROOKS. DID YOU ACTUALLY SEE
MR BROOKS AT THE SCENE? AND YOUR
RESPONSE WAS: NO, HE WAS ALREADY IN
THE VEHICLE BEING TRANSPORTED AWAY AS
I WAS ARRIVING AT THE SCENE. SO I WOULD
LIKE TO ASK YOU, WHEN YOU ARRIVED AT 105
STREET AND NORTHERN BOULEVARD WITH
ME IN TOW, TWO MINUTES AFTER NINE,
MR BROOKS WAS BEING TRANSPORTED
AWAY, ACCORDING TO YOUR TESTIMONY,
OKAY IN THE VEHICLE ... AND I WOULD
LIKE YOU TO HELP US WITH THIS, WHEN
YOU ARRIVED AT THE CRIME SCENE TWO
MINUTES AFTER, NO OTHER OFFICER WAS
PRESENT; IS THAT CORRECT? PAMPENA
RESPONDS "CORRECT." (TRI 566 - TRI 568
TRI 560). "POLICE OFFICER LANNING WASN'T
THERE? CORRECT HE SAID (TRI 566 - TRI 568,
TRI 560).

35

Also THE FIRST TIME GONZALEZ (EMS TECHNICIAN) CAME IN CONTACT WITH MR EL TURKEY WAS AT 9:21 P.M., AND AT 9:23 APPELLANT AND MR BROOKS WAS AT THE PRECINCT (TRI 541), AND WHEN P.O. PAMPENA WAS ASKED: " DID YOU EVER TAKE MR BROOKS TO THE PRECINCT AND PUT HIM IN THE CELL? HE RESPONDED. "NO" (TRI 579)TRI 576, SEE' BROOKS FELONY COMPLAINT).

36

## POINT ONE

AT THE SUPPRESSION HEARING THE EVIDENCE PRESENTED BY THE PEOPLE FAILED TO ESTABLISH THAT ON THE NIGHT OF JULY 3, 2012, P.O. PAMPENA DID AFTER RECEIVING A RADIO CALL DESCRIBING A ROBBERY IN PROGRESS OF THREE MALE BLACK SUSPECTS, ONE WEARING A WHITE SHIRT AND BLACK PANTS, STOPPED APPELLANT HANDCUFFED, SEARCHED AND THEN TRANSPORTED APPELLANT TO THE LOCATION ON 105 STREET AND NORTHERN BOULEVARD WHERE DEREK B (TURKEY) IDENTIFIED APPELLANT AS ONE OF THE PERPETRATORS THOUGH THE HEARING COURT CONCLUDED THAT THE APPELLANTS ARREST WAS SUPPORTED BY PROBABLE CAUSE, IT IS CLEAR THAT NO SUCH PREDICATE EXISTED. DURING THE JAN 8, 2014 HEARING APPELLANT PROVED THAT P.O. PAMPENA'S TESTIMONY IN THIS CASE WAS PERJURED (BA2). TOO DURING THE HEARING IT WAS DISCOVERD THAT P.O. LANNING WAS NOT (BROOKS) APPELLANTS CODEFENDANT'S ARRESTING OFFICER, BUT HE DID "PLACE HIM IN CUFFS" (BA15-BA16). P.O. LANNING'S MEMO BOOK ALSO EVIDENCED "TWO MALES WAS STOPPED P.O. PAMPENA ON 105 STREET."

37

P.O. LANNING TESTIFIED TO WHAT THAT
ENTRY MEANS IS "I STOPPED THEM IN THE
CORNER, BUT THE ARREST (BROOKS) WAS
TAKEN BY P.O. PAMPENA AT THAT TIME" THEN
E/TURKEY ALSO TESTIFIED TO P.O. PAMPENA BEING
PRESENT DURING BROOK ARREST AND IDENTI-
FICATION. E/TURKEY WAS ASKED BY THE JUDGE
"WHEN DID YOU GET OUT OF THE POLICE CAR"?
(TO I.D. BROOKS) HIS RESPONSE WAS "WHEN
THE OTHER, THE UNIFORMED POLICE COMMING
AND THEY ASKED ME WHAT HAPPENED"? (TRI
371-TRC376, TRC413). Also WHEN P.O. PAMPENA
WAS ASKED "DID YOU EVER TAKE MR BROOKS TO
THIS PRECINCT AND PUT HIM INTO THE CELL?
RESPONDED "NO". DESPITE FILLING OUT A FELONY
COMPLAINT REPRESENTING HIMSELF AS BROOK'S
ARRESTING OFFICER, STATING JUST THAT, P.O.
PAMPENA SUBMITTED THIS WRITTEN INSTRUMENT
FOR WHICH AN OATH IS REQUIRED BY LAW, WAS
USED TO MISLEAD THE COURTS IN THE
PERFORMANCE OF HIS OFFICIAL FUNCTION IN
VIOLATION OF P.L. 210.10, 210.15 (TRC576, TRI579

DURING THE HEARING APPELLANT ASKED
P.O. PAMPENA "DID YOU ARREST ME"? HE REPLIED
"YES". ALSO WHEN THE JUDGE ASKED P.O. PAMPENA
"AND AT THE TIME YOU ARRIVED AT 9:05 THAT
THE AMBULANCE WAS ALREADY THERE"? CORRECT
WAS HIS ANSWER. THEN WHEN BROOKS LAWYER
ASKED P.O. PAMPENA "YOU PREVIOUSLY TESTIFIED
AT THE HEARING THOUGH THAT MR. BROOKS WAS
NO... NOT AT THE SCENE WHEN YOU ARRIVED"?
HE REPLIED AGAIN CORRECT. "I WAS STILL
DOING THE CANVAS WHEN I CAME IN CONTACT
WITH THE OTHER DEFENDANT MR. BALI (BA45-
BA46, AB29-AB30, AB44, AB52). HOWEVER IT
WAS WHEN P.O. PAMPENA DURING THE
SUPPRESSION HEARING FALSELY TESTIFIED,
THAT HE RETURNED WITH APPELLANT TO 105
STREET AND NORTHERN BOULEVARD, WHERE
HE CONDUCTED A SHOW-UP IDENTIFICATION
OF APPELLANT TO EL TURKEY WHO WAS BEING
TREATED, AND FILLED OUT AN AIDED CARD
INSIDE BACK OF EMS TRUCK WHILE SITTING
SHOULDER TO SHOULDER WITH EL TURKEY. THAT
CAUSED JUDGE HOLDER TO ORDER THE PEOPLE TO
ON THE ADJOURNED DATE OF JAN 14, 2014 TO
TURN OVER AIDED CARD (ROSARIO MATERIAL)
BA36-BA52).

39

Furthermore Linda Poliman, Attorney for Appellant refused to Rest on the Record subject to the production of the added card (BA49), which to date was never turned over to defence, in violation of C.P.L. 240.44, 240.45. People v Rosario 9 NY2d 286, People v Ranghelle 69 NY2d 56, People v Martinez 71 NY2d 937, (BA52). There was never an affirmative answer given to the defence as to whether or not it did or did not exist (BA52). The suppression hearing scheduled for Jan 14, 2014 was terminated, and Appellant was deprived of one full hearing. People v Rechette 302 NY 290, People v Lanigan 303 NY 474, People v Bartram 9 NY2d 550, People v Davis 564 NYS2d 320, People v Giles 73 NY2d 666, People v Payton 51 NY2d 169, on Feb 20, 2014 Appellant moved to have the hearing once again re-opened for the production of the added card (Rosario material) and to cross examine P.O. Pampena, People v Havelka 412 NYS2d 345. However on March 24, 2014 Judge Hollie rendered a decission/order denying the motion for the hearing to be re-opened for a second time.

40

AT THE TERMINATION OF THE HEARING, JUDGE HOLLIE, WITH NOTHING BEFORE HIM TO CAST DOUBT ON THE EXISTENCE OF THE AIDED CARD OR P.O. PAMPENA'S UNRELIABILITY NOR ON THE FALSE INFORMATION HE PURPORTEDLY CONVEYED, CONCLUDED THAT PROBABLE CAUSE HAD BEEN SHOWN FOR THE APPELLANTS ARREST AND DENIED THE MOTION TO SUPPRESS, IN CONSEQUENCE OF WHICH THE CHALLENGED EVIDENCE WAS RECEIVED AGAINST APPELLANT UPON THE ENSUING TRIAL.

IT HAS BEEN MADE UNMISTAKABLY CLEAR IN PEOPLE V ROSARIO 9 NY 2D 286, THAT DEFENCE COUNSEL MUST BE PERMITTED TO EXAMINE A WITNESSES PRIOR STATEMENT, WHETHER OR NOT IT DIFFERS FROM HIS TESTIMONY ON THE STAND, AND TO DECIDE FOR THEMSELVES THE USE TO BE MADE OF IT ON CROSS-EXAMINATION PROVIDED ONLY THAT THE STATEMENT "RELATES TO THE SUBJECT MATTER, OF THE WITNESS TESTIMONY AND CONTAINS NOTHING THAT MUST BE KEPT CONFIDENTIAL, AND OBVIOUSLY IT MATTERS NOT WHETHER THE WITNESS IS TESTIFYING UPON A TRIAL OR AT A SUPPRESSION HEARING, IN EIGHTHER EVENT" A RIGHT SENSE OF JUSTICE ENTITLES THE DEFENCE TO ASCERTAIN WHAT THE WITNESS SAID ABOUT THE SUBJECT UNDER

41

CONSIDERATION ON AN EARLIER OCCASION.
PEOPLE V MALENSKY 262 NYS2D 65, PEOPLE V EUGENE 573
NYS2D 64, PEOPLE V LUMPKIN 533 NYS2D 792 PEOPLE
V HOBART 266 NYS2D 110, PEOPLE V SHAINUCK 286 NY
161, PEOPLE V PEREZ 490 NYS2D 747, PEOPLE V ROSARIO
213 NYS2D 448.

ON JAN 14 2014 APPELLANT WAS TRANSPORTED
FROM RIKERS ISLAND TO KEW GARDENS QUEENS
SUPREME COURT AND PLACED IN A HOLDING CELL
WHERE HE REMAINED ALL DAY UNTIL RETURNED
TO RIKERS ISLAND, ACCORDING TO THE DECISION
ORDER RENDERED BY JUDGE HOLDE DATED JAN 14,
2014 WHICH STATES: "ON 1/4/2014 THE RE-OPENED
HEARING WAS CONCLUDED AND THE DEFENDANTS
MOTION TO SUPPRESS PURSUANT TO DUNAWAY
V NEW YORK 442 U.S. 200 AND UNITED STATES
V WADE 388 U.S. 218 WAS AGAIN DENIED"
ON JAN 4, 2014 APPELLANT WAS NOT EVEN
TRANSPORTED FROM RIKERS ISLAND TO
COURT ON THAT DAY. CONSEQUENTLY
APPELLANT WAS DENIED HIS RIGHT TO
BE PRESENT AT THE SUPPRESSION HEARING
WHENEVER IT WAS CONCLUDED. IN
VIOLATION OF APPELLANTS CONFRONTATION
AND DUE PROCESS CLAUSES OF THE FEDERAL

42.

AND STATE CONSTITUTION (SEE U.S. CONST
6TH, 14TH, AMENDS; NY CONST ART 1, § 6) BUT
BY C.P.L. 260.20, WHICH PROVIDES THAT A
DEFENDANT MUST BE PERSONALLY PRESENT
DURING THE TRIAL OF AN INDICTMENT"
IN ADDITION "WHENEVER HIS PRESENCE HAS
A RELATION REASONABLY SUBSTANTIAL TO THE
FULLNESS OF HIS OPPORTUNITY TO DEFEND
AGAINST THE CHARGE" WHICH APPLIES TO BE
PRESENT DURING A PRETRIAL SUPPRESSION
HEARING, DURING WHICH WITNESSES ARE
EXAMINED AND CROSS-EXAMINED. NOTING:
"DEFENDANT ALONE MAY BE ABLE TO INFORM
HIS ATTORNEY OF INCONSISTENCIES, ERRORS
AND TO CONFRONT OFFICER PAMPENA AS TO HIS
FALSE TESTIMONY WHICH HAD A GREAT IMPACT
ON APPELLANT GUILT OR INOCENSE PEOPLE V VELASCO
77 NY2D 469, PEOPLE V SLOAN 79 NY2D 386, PEOPLE V
DOKES 584 NYS2D 761, PEOPLE V MULLEN 44 NY2D 1,
SNYDER V MASSACHUSETTS 291 U.S. 97, PEOPLE
V CIACCEO 47 NY2D 431, PEOPLE V ANDERSON 16
NY2D 282, PEOPLE V TURAINE 79 NY2D 660, PEOPLE
V THORN 156 NY 286, PEOPLE EX REL LUPO V FAY 13
NY2D 253, PEOPLE V ANDERSON 266 NYS2D 110,
KENTUCKY V STINCER 482 U.S. 730.

43.

TOO LINDA ROWMAN ATTORNEY FOR APPELLANT
WAS NOT PRESENT DURING THE AFOREMENTIONED
SUPPRESSION HEARINGS DATED JAN 4, 2014 NOR
ON JAN 14, 2014 IN VIOLATION OF APPELLANTS
CONSTITUTIONAL AND STATUTORY RIGHTS (NY CONST,
ART I, §6, U.S. CONST, CODE CREM PRO § 427) WHEN
THE HEARING COURT ORDERED THAT THE SUPPRESSION
HEARING PROCEED DESPITE THE FACT THAT THE
APPELLANTS ATTORNEY WAS NOT PRESENT IN THE
COURTROOM. THE COURT ACTED IMPROVIDENTLY IN
DENYING DEFENCE COUNSEL'S REQUEST TO RE-
OPEN THE SUPPRESSION HEARING SO AS TO
ENABLE HER TO CROSS EXAMINE P.O. PIMPENA
WHO TESTIFIED IN HER ABSENCE. "LAWYERS
IN CRIMINAL CASES ARE NECESSITIES NOT
LUXURIES" THIER PRESENCE IS ESSENTIAL
BECAUSE THEY ARE THE MEANS THROUGH WHICH
THE OTHER RIGHTS OF PERSONS ON TRIAL ARE
SECURED. WITHOUT COUNSEL THE RIGHT TO A
TRIAL ITSELF WOULD BE "OF LITTLE AVAIL"
MOST OBVIOUS, OF COURSE IS THAT A TRIAL IS
UNFAIR IF THE ACCUSED IS DENIED COUNSEL
AT A CRITICAL STAGE OF HIS TRIAL. PEOPLE V
ARMAS 483 NYS2D 121, U.S. V CRONIC 466 US.
648, HOLLOWAY V ARKANSAS 435 U.S. 475,
UNITED STATES V WADE 388 U.S. 218, GILBERT

V CALIFONIA 388 U.S. 263, DUSKY V UNITED
STATES 362 U.S. 402, UNITED STATES V HURT 543
F2D 162, PEOPLE V SPELLER 520 NYS2D 418,
GIDEON V WAINWRIGHT 372 U.S. 335, ON
JAN 14 2014 THE SUPPRESSION HEARING WAS
TERMINATED AND THE APPELLANT WAS
DEPRIVED OF ONE FULL OPPORTUNITY TO
PRESENT THAT P.O. PAMPENA HAD LIED ABOUT
FILLING OUT AN AIDED CARD DURING THE
SHOW UP IDENTIFICATION OF APPELLANT
BY EL TURKEY WHILE INSIDE EMS TRUCK,
PEOPLE V RECHETTI 302 N.Y. 890, PEOPLE V LANGAN
303 NY 474, PEOPLE V BARTLAM 9 NY2D 550, PEOPLE
V DAVIS 56H NYS2D 820, PEOPLE V GILES 73 NY2D
666, PEOPLE V PAYTON 51 NY2D 169, AND IF AN ERROR
OF LAW IS COMMITTED BY THE HEARING COURT
WHICH DIRECTLY CAUSES THE PEOPLE TO FAIL/
TO OFFER POTENTIALLY CRITICAL EVIDENCE/
A REHEARING SHOULD BE ORDERED, SO THAT /
EVIDENCE MAY BE PRESENTED, PEOPLE V
HAVELIKA 45 NY2D 643, THE MISSING
DOCUMENT IS RELEVENT TO P.O. PAMPENA'S
DESCRIPTION OF EL TURKEY'S INJURIES HE
GAVE ON DIRECT EXAMINATION AT THE HEARING
AS NOTED ON THE AIDED CARD, PEOPLE V
DEAN MORRIS 718 NYS2D 588.

ACCORDING TO P.O. PAMPENA'S TESTIMONY
PERTAINING TO THE SHOW UP IDENTIFICATION
AND EL TURKEY'S INJURIES HE OBSERVED
WHILE FILLING OUT THE AIDED CARD WHILE
INSIDE EMS TRUCK, REQUIRED APPELLANT
TO HAVE AN OPPORTUNITY TO CONFRONT P.O.
PAMPENA AFTER THE ORDER WAS GIVEN BY
JUDGE HOLDER TO TURN OVER THE AIDED CARD
OR GIVE AN AFFIRMATIVE ANSWER TO IT'S
EXISTENCE (BA49-BA52). ESPECIALLY AS
HERE WHERE APPELLANT CONTENDS THAT
P.O. PAMPENA IS LYING ABOUT THE SHOWUP
BEING CONDUCTED WHILE EL TURKEY WAS
INSIDE EMS TRUCK, IT CANNOT BE DOUBTED
THAT APPELLANTS RIGHT TO CROSS-EXAMINE
P.O. PAMPENA INCLUDED THE RIGHT TO CONFRON
THE WITNESS AGAINST HIM "ONE OF THE
SAFEGARDS ESSENTIAL TO A FAIR TRIAL"
WHICH INCLUDES AS A MINIMUM, A RIGHT
THE WITNESS AGAINST HIM, TO OFFER
TESTIMONY AND TO BE REPRESENTED BY
COUNSEL, PEOPLE V PHONVETILE 254 NYS2D
775, KIRBY V UNITED STATES 174 U.S. 47,
ALFORD V U.S. 282 U.S. 687, IN RE OLIVER 333
U.S. 257, POINTER V STATE OF TEXAS
KASTIGAR V U.S. 406 U.S. 441, U.S. VIANNIELLC

Pampena not credible          46

740. F SUPP 171. SIMILARLY P.O. PAMPENA'S
TESTIMONY AT THE HEARING THAT HE FILLED
OUT AN AIDED CARD, WHILE CONDUCTING A SHOW
UP OF APPELLANT TO EL TORCKEY WAS DISPROVED
BY EL TURKEY (TRT 376 - TRT 378, TRT 384 - TRT 385,
TRT 412 - TRT 413), BY THE TESTIMONY OF HIS
COLLEAGUE P.O. LANNING WHO WAS AT THE
CRIME SCENE AND PUT (BROOKS) APPELLANTS
CO-DEFENDANT IN CUFFS (BA 27 - BA 28, TRT 8-
TRT 9, TRT 462 - TRT 463) AND BY HIS OWN
PAPERWORK (SEE BROOKS FELONY COMPLAINT) OR
P.O. LANNING'S MEMO BOOK. DURING THE HEARING
P.O. PAMPENA'S FALSE TESTIMONY WAS HELD TO
BE THE AUTHORITY WHICH MOVED THE COURT,
RATHER THAN APPELLANT'S CONSTITUTIONAL
RIGHTS WHICH GUARANTEES PROTECTION FROM
THE ANCIENT EVIL OF SECRET TRIAL. HENCE
PRODUCTION OF THE AIDED CARD BECAME
AN UNFULFILLABLE OBLIGATION, BECAUSE
ICKE EVERYTHING ELSE WAS FABRICATED
BY P.O. PAMPENA. SO RATHER THAN RESUME
THE HEARING ON THE ADJOURNED DATE OF
JAN 14, 2014 AND TURN OVER THE STATEMENT
FROM P.O. PAMPENA THAT HE HAD COMMITTED
PERJURY, OR DESTROYED THE AIDED CARD,
THE COURT TERMINATED THE HEARING

AND ABANDOND THIER DUTY TO DISCLOSE
WHATEVER STATEMENT P.O. PAMPENA GAVE
(BRADY V MARYLAND 373 U.S. 83) OR THE AIDED
CARD (PEOPLE V ROSAREO 9 NY2D 286) PEOPLE
V MALINSKI 262 NYS2D 65, PEOPLE V KASS 25 NY2
183, PEOPLE V GELLIGAN 39 NY2D 769, PEOPLE V
ALONGE 131 AD2D 767, UNITED STATES V BAGLEY
473 U.S. 667, PEOPLE V CHIN 67 AV2D 22, PEOPLE
V SPRINGER 122 AD2D 87, PEOPLE V FEEN 18 NY2D
162, PEOPLE V ROBINSON 133 AD2D 860. ADDITION
ALLY WHERE THE PEOPLE FAIL TO EXERCISE DUE
CARE IN PRESERVING ROSAREO MATERIAL AND
THE APPELLANT IS PREJUDICED THE COURT MUST
IMPOSE APPROPRIATE SANCTIONS, PEOPLE V
WALLACE 76 NY2D 953, U.S. V AUGARS 427 U.S. 97,
U.S. V BRYANT 439 F2D 642, HELLARD V SPALDING
719 F2D 1446, AREZONA V YOUNGBLOOD 488 US
51, PEOPLE V COLES 62 NY2D 908.

"THE CONSTITUTIONAL REQUIREMENT OF DUE
PROCESS IN SAFEGUARDING THE LIBERTY OF
THE CITIZEN AGAINST DEPRIVATION THROUGH
THE ACTION OF THE STATE EMBODIES THE
FUNDAMENTAL CONCEPTIONS OF JUSTICE
WHICH LIE AT THE BASE OF CIVIL AND POLITICAL
INSTITUTIONS. IT IS A REQUIREMENT THAT

48

CANNOT BE DEEMED TO BE SATISFIED BY
MERE NOTICE AND HEARING IF A STATE HAS
CONTRIVED A CONVICTION THROUGH THE
PRETENCE OF A TRIAL WHICH IN TRUTH IS
BUT USED AS A MEANS OF DEPRIVING A
DEFENDANT OF LIBERTY THROUGH A DELIBER-
ATE DECEPTION OF COURT AND JURY BY THE
PRESENTATION OF TESTIMONY KNOWN TO
BE PERJURED". SUCH A CONTRIVANCE BY A
STATE TO PROCURE THE CONVICTION AND
IMPRESONMENT OF A DEFENDANT IS AS
INCONSISTENT WITH RUDIMENTARY
DEMANDS OF JUSTICE AS IS THE OBTAINING
OF A LIKE RESULT BY INTIMIDATION."
MOONEY V HOLOHAN 294 U.S. 103, HERBERT V
LOUISIANA 272 U.S. 312, NAPUE V ILLENORS
360 U.S. 264, PYLE V KANSAS 317 U.S. 213, ALCOTA
ALCORTA V TEXAS 355 U.S. 28, GIGLIO V UNITED
STATES 405 U.S. 150, PEOPLE V ALFINITO 264
NYS2D 243, UNITED STATE V BASURTO 497 F2D 781,
UNITED STATES V FLAHERTY 668 F2D 566, PEOPLE
V LEARY 305 NY 793, PEOPLE V TYLER 46 NY2D
251, UNITED STATES V DEMARCO 401 FSUPP
505, PEOPLE V FEERICK 692 NYS2D 638. THE
FUNCTION OF A PROSECUTOR IS NOT TO TACK AS
MANY SKINS OF VICTIMS AS POSSIBLE TO THE
WALL. HIS FUNCTION IS TO VINDICATE

49

THE RIGHT OF PEOPLE AS EXPRESSED IN THE LAWS AND GIVE THOSE ACCUSED OF CRIME A FAIR TRIAL, UNITED STATES V KOJAYAN 1993 U.S. APP. LEXIS 23921, PEOPLE V GONZALEZ 2001 U.S. APP. LEXIS 25257, UNITED STATES V VAVAGES 151 F3D 1185. IT IS CLEAR THAT IN THIS CASE THE PROSECUTOR DID NOT THIS CONVICTION SHOULD BE DISMISSED.

POINT TWO

ON OR ABOUT NOVEMBER 21, 2016 APPELLANT FILED A MOTION WITH THE APPELLATE DIVISION SECOND DEPARTMENT CITING AMONG OTHER ISSUES JUDICIARY LAW 290, 292, 295 (PEOPLE V SCHAINUCK 286 NY 161) "THAT THE STATE MUST PROVIDE AN INDIGENT DEFENDANT WITH A TRANSCRIPT OF PRIOR PROCEEDINGS WHEN THAT TRANSCRIPT IS NEEDED FOR AN EFFECTIVE DEFENCE OR APPEAL" (UNITED STATES V YOUNG 472 F2D 628, CITING BRITT V NORTH CAROLINA 404 U.S. 226. APPELLANT ARGUED THE COURTS FAILURE TO PROVIDE HIM WITH THE SUPPRESSION HEARING MINUTES ALLEGEDLY CONDUCTED ON JANUARY 4, 2014 OR JANUARY 14 2014. CITING PEOPLE V HANNIGAN 197 NY820 152, "WHERE AS HERE, THERE ARE NO MINUTE

50

COURT DOCUMENTS OR OTHER INCONTRO-
VERTICIBLE EVIDENCE PRESENTED TO REBUT
THE CLAIM OF THE PETITIONER. THE
PETITION MAY NOT BE DESMISSED WITH-
OUT A HEARING" (PEOPLE V BART 1 AM 9 NY2D
550, PEOPLE V LUPO, FAY 13 NY2D 253). SO THE
COURT APPARENLY TOOK THAT TO BE THE FACT
PARTICUILARLY (196 NE2D 58) SINCE THE TRIAL
MINUTES DID NOT SHOW DEFENDANTS
THERE AT THE TIME.

ON JANUARY 13, 2017 THE APPELLATE
DIVISION SECOND DEPARTMENT GRANTED
APPELLANT MOTION TO FILE THIS
SUPPLEMENTAL BRIEF AND ORDERED THE
COURT TO TURN OVER THE TRANSCRIPTS
OF THE PROCEEDINGS CITED IN MY
MOTION IF ANY EXISTED. FOR THE SAKE
OF BREVITY I WILL OMMIT LEAGAL ARGUE-
MEN AND CASE CITINGS (SEE APPELLANTS
PROSE MOTION). APPELLANT REQUESTED
TRANSCRIPTS FROM THE PROCEEDINGS
IN TAP-A JUDGE KRON FOR 30.20 AND
SIX AMENDMENT PURPOSES. NINE
HUNDRED AND EIGHTY SIX DAYS
ELAPSED BETWEEN APPELLANTS ARREST

51

ON JULY 3, 2012 AND MARCH 4, 2015
APPELLANTS CONVICTION AT TRIAL APPELLANT
DURING THE PRETRIAL CONFERENCE WAS NOT
ALLOWED TO SUBMIT MOTIONS (NOTE
APPELLANT WAS REPRESENTING HIMSELF
PROSE ALREADY GRANTED BY JUDGE KRON IN
TAP-A). TOO APPELLANT SUBMITTED A C.P.L
330.30 MOTION WHICH WAS DENIED BY
JUDGE SCHWARTZ. ALSO APPELLANT IN HIS
MOTION TO THE APPELLATE DIVISION ARGUED
INEFFECTIVE ASSISTANCE OF APPELLANT
COUNSEL FOR SUBMITTING HIS MOTION
WITHOUT HAVING REVIEWED ALL THE
MINUTES AND FAILURE TO RAISE CONSTITUTION
-AL ISSUES, RIGHT TO BE PRESENT, RIGHT
TO PRESENCE OF COUNSEL, CONFRONTATION
EPTCETRA. DESPITE THE APPELLATE COURTS
DECISION/ORDER THE COURT HAS NOT
COMPLIED WITH PROVIDING APPELLANT
THE ABOVE TRANSCRIPTS AS CITED IN
HIS MOTION THEREBY PREJUDICING THIS
APPEAL.

        THE INDICTMENT AND CONVICTION
SHOULD BE DISMISSED IN ITS ENTIRETY

52

POINT THREE

LINDA POYMAN ATTORNEY FOR APPELLANT
SUBMITTED AN OMNIBUS MOTION DATED
OCTOBER 10, 2012 TO PART TAP A FOR JUDGE
CAMACHO, WHO RETURNED A DECISION/
ORDER DATED DECEMBER 19 2012 GRANTING
APPELLANTS MOTION TO THE MAPP HUNTLEY,
WADE DUNAWAY HEARINGS. JUDGE HOLLEE
WHO CONDUCTED THE SUPPRESSION HEARING
TERMINATED THOSE HEARINGS WITHOUT
GIVING A RULEING ON THE HUNTLEY/MAPP
PORTION. HOWEVER IN APPELLANTS MOVING
PAPERS TO SUPPRESS IDENTIFICATION
TESTIMONY ARGUED THAT UPON ENFORMATION
AND BELIEF THE DEFENDANT WAS IDENTIFIED
IN A ONE ON ONE SHOWUP IDENTIFICATION
CONDUCTED ON JULY 3 2012 AT ABOUT 9.10 P.M
IN VICINITY OF NORTHERN BOULEVARD AND
105 STREET IN THE COUNTY OF QUEENS, CPL
710.30 NOTICE AND THE DEMAND FOR A
BILL OF PARTICULARS REQUESTING #7.
WERE ANY DESCRIPTIONS OF THE PERPETRATOR
OF THE ALLEDGED CRIMES GIVEN TO THE
POLICE OR ANY LAW ENFORCEMENT AGENCY ON
OR AFTER THE DATE OF THE ALLEDGED CRIME

53

#10 PROVIDES COUNSEL EX THE MANNER
WITH WHICH THE DEFENDANT WAS IDENTIFIED
AS THE PERPETRATORE OF THE CRIMES ALLEGED
C.P.L 200.95 (6). IN THE PEOPLES RESPONSE TO DEFENDANT
ANTES OMNIBUS MOTION PAGES 7 STATES; UPON
INFORMATION AND BELIEF THE SOURCE BEING,
POLICE OFFICER PAMPENA THE DEFENDANT WAS
IDENTIFIED BY THE COMPLAINANT IN A SHOWUP
ON JULY 3, 2012 AT NOSTRERN BOULEVARD AND 105
STREET. THIS PROCEEDURE WAS CONDUCTED
FAIRLY AND IN A NON-SUGGESTIVE MANNER,
THE PROPRIETY OF THE POLICE CONDUCT IN CONNEC-
TION WITH THE IDENTIFICATION PROCEDURE USED
IN THIS CASE CAN BE AMPLY DEMONSTRATED.
THE PEOPLE HEREWITH CONSENT TO A WADE
HEARING UNDER CONSTRAINT OF SECTION 710.60 OF
THE CRIMINAL PROCEDURE LAW, THE PEOPLE
SHOULD HAVE GIVEN NOTICE TO DEFENDANT THAT
THE ALLEGE FACTS SHOWING THE IDENTIFICATION
THEY INTENDED TO USE AT TRIAL WAS NOT THE
SORT THAT REQUIRES A WADE PRIOR IDENTIFICA-
TION HEARING (U.S. V WADE 388 U.S. 218).
PARTICULARLY THAT EL TURK CLAIMED TO KNOW
APPELLANT VERY WELL (TRO 384-385), BUT BASED
ON A SHOWUP IDENTIFICATION DURING A WADE
HEARING THAT WAS NEVER CONCLUDED (BA36-
BA52), WHERE AT TRIAL EL TURKEY TESTIFIED

54

THAT THE ALLEGES SHOWUP DESCRIBED BY
P.O. PAMPENA, NEVER TOOK PLACE INSIDE EMS
TRUCK (TRI 384) AND TWICE STATED THAT THIS
BLACK GAY HOMELESS MAN HE SAW HUNDREDS
OF TIME OVER THE COURSE OF MONTHS WAS
NOT PRESENT IN THE COURT ROOM (TRI 371-TRI
385.) IF THE WITNESS IS UNABLE TO IDENTIFIE
THE DEFENDANT AT TRIAL THE DEFENDANTS
CONVICTION (440 NYS2D 907) SHOULD NOT REST
SOLELY UPON EVIDENCE OF A PRETRIAL IDENT-
IFICATION MADE UNDER CIRCUMSTANCES
WHICH WERE LIKELY TO PRODUCE AN UNRELIABLE
RESULT (PEOPLE V. TROWBREDGE 305 NY 471).
THE JUNG HING RULE PRECLUDED TESTIMONY
OF A PREVIOUSLY MADE IDENTIFICATION WHETH-
ER IT WAS TENDERED BY THE PERSON WHO HAD
MADE THE IDENTIFICATION OR BY ONE WHO
WAS A WITNESS TO IT (PEOPLE V RAGAZINSKY
195 AD 743). WHILE GREAT WEIGHT MUST BE ACCORDED
THE FINDINGS OF THE HEARING COURT (PEOPLE
V PROCHILO 41 NY2D 759) A REVIEWING COURT
SHOULD NOT "DISCARD COMMON SENSE AND COMMON
KNOWLEDGE" PEOPLE V GARAFOLO 44 AD2D 86, PEOPLE
V LEWIS 600 NYS2D 272, THE TESTIMONY GIVEN
BY P.O. PAMPENA IS A CLASSIC EXAMPLE OF THAT
WHICH HAS BEEN PATENTLY TAILORED TO NULLIFY
CONSTITUTIONAL OBJECTIVES (PEOPLE V MANAYINA

55

381 NYS 2D 254). THROUGHOUT THE WHOLE TIME THE APPELLANT HAS MAINTAINED HIS INNOCENTS AND THAT P.O. PAMPENA'S STORY OF THE EVENTS WERE FABRICATED (S 2L).

IN THE INTREST OF JUSTICE THE INDICTMENT AND CONVICTION SHOULD BE DISMISSED.

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION : SECOND JUDICIAL DEPARTMENT

People of the State of New York,

                                    Respondent,

                                                        AFFIDAVIT OF SERVICE

                    v.                                  App. Div. Docket No.  2015-01907

                                                        Queens County Ind. No.  2228/12

Raymond Ball,

                                    Appellant.

STATE OF NEW YORK  )
COUNTY OF KINGS       )ss:

        Ana Begonja, being duly sworn, deposes and says:

        1.  I am not a party to the above-entitled proceeding.  I am over 18 years of age.  I reside in
Whitestone, New York.

        2.  On April 27, 2017, I served a true copy of the appellant's pro se supplemental brief, via
interoffice messenger, to the following person(s):

        Richard A. Brown
        District Attorney, Queens County
        125-01 Queens Boulevard
        Kew Gardens, N.Y.  11415

                                                        _____
                                                                Ana Begonja

Sworn to before me this
27th day of April, 2017.

_____

KRISTEN BARCELLONA
Notary Public, State of New York
No. 01BA6183514
Qualified in Nassau County
Commission Expires 03/17/20

To be argued by
JOSEPH Z. AMSEL
(TIME REQUESTED: 15 MINUTES)

# New York Supreme Court

## Appellate Division--Second Department

AD No. 2015-01907

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

against

RAYMOND BALL,

Defendant-Appellant.

## SUPPLEMENTAL BRIEF FOR RESPONDENT

RICHARD A. BROWN
District Attorney
Queens County
*Attorney for Respondent*
125-01 Queens Boulevard
Kew Gardens, New York 11415
(718) 286-6649

JOHN M. CASTELLANO
JOHNNETTE TRAILL
JOSEPH N. FERDENZI
JOSEPH Z. AMSEL
  Assistant District Attorneys
    *Of Counsel*

JUNE 27, 2017

Queens County
Indictment Number 2228/2012

# **TABLE OF CONTENTS**

**Page No**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

POINT ONE
     THE HEARING COURT PROPERLY DENIED
     DEFENDANT'S MOTION TO SUPPRESS PHYSICAL
     EVIDENCE, STATEMENTS, AND IDENTIFICATION
     EVIDENCE AND DEFENDANT'S CLAIM THAT THE
     PEOPLE'S EVIDENCE WAS INCREDIBLE IS CONTRARY
     TO THE RECORD AND MERITLESS . . . . . . . . . . . . . . . . . . . . . . 4

POINT TWO

     THE COURT CORRECTLY DECLINED TO ISSUE A
     *ROSARIO* SANCTION BASED ON THE PEOPLE'S
     REPRESENTATION AND THE OFFICER'S TESTIMONY
     THAT NO AIDED REPORT EXISTED AND DEFENDANT
     HAS FAILED TO ARTICULATE A FACTUAL BASIS FOR
     THE CLAIM THAT SUCH DOCUMENT EXISTED . . . . . . . . . . . 5

POINT THREE

     DEFENDANT WAIVED HIS PRESENCE AT THE
     CALENDAR CALL WHERE THE HEARING COURT
     CONCLUDED THE REOPENED HEARING WITHOUT
     FURTHER TESTIMONY AND, IN ANY EVENT, THAT WAS
     A NON-MATERIAL, ANCILLARY PROCEEDING AT WHICH
     DEFENDANT DID NOT HAVE A RIGHT TO BE PRESENT . . . 11

POINT FOUR

     DEFENDANT'S REMAINING CONTENTIONS ARE DEHORS
     THE RECORD AND, IN ANY EVENT, ARE MERITLESS . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: SECOND DEPARTMENT
------------------------------------------------------------------------ x

THE PEOPLE OF THE STATE OF NEW YORK,                :

                      Respondent,                :

                -against-                :

RAYMOND BALL,                :

              Defendant-Appellant.                :

------------------------------------------------------------------------ x

## SUPPLEMENTAL BRIEF FOR RESPONDENT

### PRELIMINARY STATEMENT

By order dated January 13, 2017, the Court granted defendant's application to file a *pro se* supplemental brief. Respondent submits this brief in response to defendant's supplemental brief served on April 27th, 2017.

### INTRODUCTION[1]

In his *pro se* supplemental brief, defendant raises four meritless and unpreserved claims. First, defendant claims that the evidence presented at the suppression hearing, specifically the testimony of Police Officer Pampena, was incredible, as a matter of law, to meet the People's burden of

---

[1]A summary of the trial evidence appears in Respondent's main brief. To the extent necessary, any additional facts are summarized below.

going forward. Defendant further contends that the People proffered Officer Pampena's testimony knowing that it was perjured. However, this claims lacks merit for the reasons set forth more fully in Point One of Respondent's main brief. The evidence was more than sufficient to establish the propriety of the police conduct at issue at the hearing and, under well-established caselaw, the hearing court's findings should be given great deference on appeal.

Second, defendant claims that the People committed a *Rosario* violation when they failed to disclose the "aided report." This claim too is meritless and contrary to the record because the record clearly establishes that this document does not exist. Moreover, defendant articulates no factual basis for his claim that the report does exist and that the People improperly denied its existence. Accordingly, because the People's representation to the court that the aided report does not exist is sufficient to defeat defendant's bare assertion that it does, both the hearing and trial courts correctly declined to issue any sanction for this non-existent *Rosario* violation.

Third, defendant claims that his confrontation right and constitutional and statutory right to be present at all points of the proceedings were violated when the hearing court concluded the reopened suppression hearing without defendant being present. This claim is meritless because,

2

contrary to defendant's suggestion, the record establishes that the date on which the reopened suppression hearing was concluded was a non-material, ancillary proceeding to which defendant could not have meaningfully contributed and thus his right to be present at a material proceeding was not violated.

Fourth, defendant claims that the court improperly denied his *pro se* speedy trial motion, assigned appellate counsel is ineffective for failing to raise the issues defendant raises herein, and that the Supreme Court failed to comply with this Court's order to provide the trial and hearing transcripts to defendant in order to prepare his *pro se* brief. These claims too are meritless. First, defendant raises no issue of law or fact with the court's denial of his *pro se* speedy trial motion and his claim that he did not have all the transcripts of every adjournment in this case are dehors the record. Moreover, defendant had enough information to file a *pro se* speedy trial motion below and he provides no reason why his lack of every record of every adjourn date limited his ability to point out any factual or legal error with the court's disposition of this motion. Second, defendant's claim that current appellate counsel is ineffective for failing to raise a speedy trial issue in this appeal or the various issues defendant raises herein is unfounded because the record does not establish that

3

counsel is either deficient or that defendant suffered any prejudice, and, in any event, this claim is premature insomuch as his appeal has yet to be decided.

In sum, all issues raised in defendant's *pro se* supplemental brief are meritless. For the reasons set forth below and in the People's main brief, defendant's conviction and sentence should be affirmed.

## POINT ONE

**THE HEARING COURT PROPERLY DENIED DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE, STATEMENTS, AND IDENTIFICATION EVIDENCE AND DEFENDANT'S CLAIM THAT THE PEOPLE'S EVIDENCE WAS INCREDIBLE IS CONTRARY TO THE RECORD AND MERITLESS.**

The People hereby rely on the arguments set forth in Point One of their main brief. Nonetheless, defendant claims, throughout his *pro se* supplemental brief, that the suppression hearing testimony was incredible and that, therefore, the People failed to establish that the police conduct was reasonable. Defendant is wrong. As noted in the People's main brief, great deference must be given to the hearing court that had the unique opportunity to see and hear the witnesses (*See* Respondent's Brief at 25 citing cases). Furthermore, defendant fails to identify as single reason for why the evidence

4

was incredible but simply asserts that it is.  Accordingly, defendant's claim

lacks merit and the hearing court's ruling should be affirmed in its entirety.

### POINT TWO

**THE COURT CORRECTLY DECLINED TO ISSUE A *ROSARIO* SANCTION BASED ON THE PEOPLE'S REPRESENTATION AND THE OFFICER'S TESTIMONY THAT NO AIDED REPORT EXISTED AND DEFENDANT HAS FAILED TO ARTICULATE A FACTUAL BASIS FOR THE CLAIM THAT SUCH DOCUMENT EXISTED.**

Defendant claims that the trial court erred in not imposing a

*Rosario* sanction on the People for failing to disclose the aided report allegedly

prepared by Police Officer Pampena (Defendant's *Pro Se* Supplemental Brief

at 38-39).  Defendant's claim is meritless.  The record clearly establishes, and

the People consistently maintained, that no aided report existed in this case and

defendant has articulated no factual basis for his claim that such document

existed.  Accordingly, the court correctly denied defendant's application for

sanctions against the People.

Under section 240.44(1) of the Criminal Procedure Law, at the

conclusion of direct examination of a witness at a hearing, the People are

required to disclose to the defendant any "written or recorded statement . . .

made by such witness other than the defendant which relates to the subject

5

matter of the witness's testimony." *See also, People v. Rosario*, 9 N.Y.2d 286, 289 (1961). Under section 240.45(1), the same rules applies in the context of a trial, although the timing of the disclosure is before opening statements at a jury trial or before the submission of evidence begins in a bench trial. Generally, the prosecutor's statements, as an officer of the court, that no *Rosario* material exists is sufficient to establish that fact. *People v. Poole*, 48 N.Y.2d 144, 149 (1979); *People v. Shaw*, 244 A.D.2d 582, 582 (2d Dept. 1997). However, where the defendant can articulate a factual basis for the assertion that a prosecutor is improperly denying the existence of prior statements or where the prosecutor admits the existence of such statements but contends that they are irrelevant to the testimony of the witness, the court is required to conduct an *in camera* review to determine whether such statements are discloseable. *Id; see also, People v. Caballero*, 137 A.D.3d 929, 930 (2d Dept. 2016), *leave to appeal denied*, 28 N.Y.3d 927, *reconsideration denied*, 28 N.Y.3d 1071 (2016).

Even where a defendant has established that the People have failed to disclose *Rosario* material, a defendant must show prejudice. That is, that there is a "reasonable possibility that the non-disclosure materially contributed to the result of the trial or other proceeding." C.P.L. § 240.75.

6

Nonwillful or negligent loss or destruction of *Rosario* material does not mandate a sanction unless the defendant establishes prejudice. *People v. Martinez*, 22 N.Y.3d 551, 567 (2014). Upon making such a showing, the choice of an appropriate sanction is within the sound discretion of the court. *Id.* Sanctions may include granting the defendant an adjournment to investigate, study, or otherwise prepare for the consequence of the late disclosure, giving an adverse inference to the finder of fact that allows it to infer that the non-disclosed material contains statements that are contrary to what the witness testified to, issuing a protective order, precluding the "introduction of certain evidence or the calling of certain witnesses," or taking "any other appropriate action," which may even include dismissal in rare cases. *See* C.P.L. § 240.70; *see also, People v. Kelly*, 62 N.Y.2d 516, 522 (1984). However, preclusion of evidence and dismissal are "severe" sanctions that are "not to be employed unless any potential prejudice arising from the failure to disclose cannot be cured by a lesser sanction." *People v. Jenkins*, 98 N.Y.2d 280, 284 (2002).

Here, the record clearly establishes that the People affirmatively represented that no aided report existed and defendant has failed to articulate a factual basis for the assertion that the People improperly denied its existence.

7

At the reopened hearing on January 8th, 2014, Officer Pampena testified that he had filled out an aided report in connection with defendant's arrest (H2[2]: 36-37). Defense counsel immediately informed the court that she had not received this document from the People and requested that the court direct the People to disclose it. Officer Pampena then immediately clarified that he had no specific recollection of filling out such a report but that it was his practice to do so in cases such as this (H2: 37-38).

At the conclusion of the hearing, the court ordered the officer and the People to conduct a diligent search of police records to locate the aided report, should it exist. The court informed the parties that it would delay making a decision on the reopened hearing until the People reported on the result of the officer's search. The court adjourned the case to January 14th, 2014, for this purpose. (H2: 50-52).

On January 14, 2014, the parties appeared before the court. Although defendant was produced, his presence in the courtroom was waived by his attorney (H3: 3). The People represented to the court that following Officer Pampena's testimony on January 8th, he returned to his police precinct

---

[2] A number proceeded by "H2" refers to the page number of the record of the reopened suppression hearing conducted on January 8, 2014; "H3" refers to the record of January 14, 2014; and "T" refers to the record of the trial..

8

**SR172**

and searched for the aided report but to no avail. The People further informed the court that after conducting this search, the officer concluded that, as he had suggested during his testimony, he had not prepared an aided report in this case. The court asked the People whether they were satisfied with the officer's representation regarding his search, to which the People responded they were. The court accepted the People's representation that no aided report existed and concluded that, because it did not exist, there was no need for further cross-examination. The court then informed the parties that it would be denying suppression – as it had done before the hearing was reopened – and it would issue a written decision the same day (H3: 2-3). In a decision and order dated January 14th, 2014, the court denied suppression (Decision and Order Dated January 14, 2014).

Before Officer Pampena testified at trial, defendant, who was *pro se* at that point, moved *in limine* to preclude the officer's testimony on the grounds that the People had failed to disclose the aided report (T: 488). The People responded that, as the officer testified at the reopened hearing, it was only his general practice to prepare one but that an aided report was never prepared in this case. The People further argued that the officer clearly had misspoken when he said, at first, that he had filled out an aided report because

9

the People had conducted an "exhaustive search" for the report and no report existed (T: 489).[3] Relying on the People's representation, the trial court denied defendant's motion to preclude Officer Pampena's testimony. Later, Officer Pampena specifically testified that he had not prepared an aided report in this case (T: 543).

It is clear from the record that no aided report existed. Therefore, contrary to defendant's claim, there was no *Rosario* violation here and both the hearing and trial courts correctly declined to issue a sanction. Furthermore, defendant has not articulated now, or in the courts below, any factual basis for the assertion that the People improperly denied the existence of the aided report here.

Furthermore, even assuming *arguendo* that an aided report existed – which the People do not concede – defendant has failed to demonstrate the necessary prejudice. In order to succeed on this claim, defendant is required to demonstrate that there is a reasonable possibility that the non-disclosure of an aided report materially contributed to the result of the trial. *See* C.P.L. § 240.75. Defendant, however, has failed to offer any argument or evidence as

---

[3]The co-defendant also inquired of Officer Lanning on cross-examination whether he had filled out an aided report in this case, to which Officer Lanning responded that he had not (T: 461, 466-67).

10

to what would have possibly been on an aided report that would have materially impacted any of the People's witnesses. Indeed, given the overwhelming evidence of guilt that resulted in defendant's conviction, it is entirely doubtful that he could offer such argument or evidence. Accordingly, defendant's claim lacks merit and should be rejected by this Court.

## POINT THREE

> **DEFENDANT WAIVED HIS PRESENCE AT THE CALENDAR CALL WHERE THE HEARING COURT CONCLUDED THE REOPENED HEARING WITHOUT FURTHER TESTIMONY AND, IN ANY EVENT, THAT WAS A NON-MATERIAL, ANCILLARY PROCEEDING AT WHICH DEFENDANT DID NOT HAVE A RIGHT TO BE PRESENT.**

Next, defendant claims that his right to due process, confrontation, and statutory right to be present at a material proceeding were all violated when the hearing court concluded the reopened suppression hearing on January 14th, 2014, without his presence in court. Defendant points to the hearing court's decision and order dated January 14th, 2014, which states that "on 1/4/14 the re-opened hearing was concluded and the defendant's motion to suppress . . . is again denied" (*See* Decision and Order Dated January 14, 2014, at 1). Defendant claims, without any record basis, that on January 4th, 2014, he

11

was not produced or present before the court. Defendant further claims that on January 14th, 2014 – the date of the decision and order – he was produced by the department of corrections but never appeared in the courtroom for the conclusion of the hearing. Thus, he claims, his statutory and constitutional right to be present and to confront the witnesses against him were violated (*See Pro Se* Supplemental Brief at 41).

Defendant is wrong for several reasons. First, contrary to defendant's claim, the record clearly establishes that the hearing court made a typographical error when it wrote that "1/4/14" was the date that it concluded the reopened hearing and that it really meant to write 1/*14*/14 – the same date of the decision and order. Second, the record also clearly establishes that defendant's attorney waived his appearance on January 14th, 2014. Finally, under well-established caselaw, defendant did not have a right to be present in court on January 14th, 2014 because this was a non-material, ancillary proceeding relating solely to a question of law upon which defendant could not have any meaningful input. Accordingly, defendant's claims are meritless and should be rejected by this Court.

As an initial matter, defendant is correct that he was not produced before the court on January 4th, 2014 because, based on records of the Queens

12

County Supreme Court (of which this Court can take judicial notice), defendant's case was not heard on January 4th, 2014. That this was so could also be gleaned from the fact that at the reopened hearing on January 8th, 2014, the court took testimony from two witnesses and at no point did the court or the attorneys (for the People, defendant, or co-defendant) make any reference to a proceeding on January 4th. Furthermore, as set forth above in Point Two, at the conclusion of the reopened hearing, after the question of whether the aided report existed was raised, the court adjourned the case to January 14th for "control" to give the People an opportunity to search for this alleged document (H2: 50-52). And on this date, after the People represented to the court that no aided report existed, the court concluded the hearing without taking any further testimony (H3: 2-3). Thus, it is clear from the record that no proceedings took place on January 4th and that when the court wrote that it concluded the hearing on "1/4/14" in its decision and order dated January 14th, it clearly meant to write 1/*14*/14, the same date of the decision and order.

With respect to defendant's claim that he had a right to be present on January 14th, this too is meritless. The record for January 14th, 2014 clearly establishes that on this date, defendant was produced by the department of corrections and present in the courthouse but was not brought before the court.

13

However, defense counsel specifically waived defendant's appearance (H3: 3).

Thus, despite defendant's claim, his appearance was waived on this date and

defendant cannot now be heard to complain that the court erred in not having

him brought before it. Moreover, defendant tacitly accepted this waiver

because at no point, especially once he was proceeding *pro se*, did he raise this

issue, despite the probability of him having a copy of the hearing court's

decision and order dated January 14th, 2014.[4]

        Furthermore, even assuming *arguendo* that the waiver was

somehow invalid, defendant did not have a right to be present on January 14th

because this was a non-material, ancillary proceeding at which the court was

resolving a question of law. Under the Fourteenth Amendment's Due Process

Clause of the Federal Constitution, a defendant has a right to be present at any

stage of the criminal proceeding that is critical to its outcome if his presence

would contribute to the fairness of the procedure. *See Kentucky v. Stincer*, 482

U.S. 730, 745 (1987); *see also, Snyder v. Massachusetts*, 291 U.S. 97, 105–06

(1934) (The "defendant has the privilege under the Fourteenth Amendment to

be present in his own person whenever his presence has a relation, reasonably

---

[4]Defendant's extensive involvement in his defense even before he decided to proceed *pro se, (see, e.g.*, H2: 37), suggests that he had a copy of the decision well before this case proceeded to trial and certainly at trial, when he had ample opportunity to raise the claim he raises now.

substantial, to the fullness of his opportunity to defend against the charge.").

In New York, section 260.20 of the Criminal Procedure Law provides that a

defendant has a right to be present "during the trial of an indictment." C.P.L.

§ 260.20. The term "trial" has been expansively construed to include every

"material stage of the trial" as well as "ancillary proceedings" at which a

defendant's presence could have a substantial effect on his or her ability to

defend against the charges. *See People v. Roman*, 88 N.Y.2d 18, 25–26

(1996). However, a defendant does not have a right to present where such

"presence could not have afforded him or her any meaningful opportunity to

affect the outcome." *Id.* at 26.

For example, calendar calls and proceedings at which questions

of law are resolved and where, accordingly, there is no potential of any

meaningful input from the defendant are not "material." *See People v.

DePallo*, 96 N.Y.2d 437, 443 (2001) (defendant does not have a right to be

present during conference in chambers where defense counsel disclosed to the

court defendant's desire to offer perjurious testimony because there was "no

potential for meaningful input" from the defendant); *People v. Morales*, 80

N.Y.2d 450, 457 (1992) (noting that a defendant has a right to be present

during hearing where testimony is taken but does not have such a right when

15

issue before the court is a legal determination); *People v. Husbands*, 303 A.D.2d 227 (1st Dept. 2003) (proceeding at which court dealt with question of law not "material" because no potential for defendant to have meaningful input); *People v. England*, 19 A.D.3d 154, 155 (1st Dept. 2005) ("Defendant did not have a right to be present at the calendar call at which the court denied the motion, since the court was simply placing on the record the decision it had already made on defendant's written submissions.").

Here, the January 14th proceeding was non-material and ancillary and involved the court making a legal determination upon which defendant could not have any meaningful impact. As set forth more fully above in Point Two, the purpose of this proceeding was for the People to report to the court the result of the officer's search for the alleged aided report. The court concluded that, based on the People's representation, no further testimony in the hearing was required because the aided report did "not exist" (H3: 3). This was an entirely legal determination based upon the People's representation upon which defendant's presence would have had no impact.

Indeed, had court taken testimony on this date, for example, defendant's presence would certainly have been necessary to aid his attorney in conducting cross-examination because certain facts needed to confront the

16

**SR180**

witnesses might be exclusively within defendant's knowledge. However, here, defendant's could not have meaningfully contributed to contradicting the People's representation about the existence of the alleged aided report, as is evident from the lack of a factual basis provided that the report actually existed, as discussed fully above in Point Two. Moreover, the determination that necessarily flowed from the court's finding that no aided report existed – that no further testimony was required – was a legal determination to which defendant, by virtue of his lack of legal training, could not have meaningfully contributed (*Cf.* Point Three of Respondent's Main Brief). Finally, defendant's speculative assertion that testimony was taken on January 14th is belied by the record of that proceeding.

In sum, defendant waived his appearance at the proceeding on January 14th. Furthermore, this proceeding was a non-material, ancillary proceeding at which defendant did not have a right to be present. Accordingly, defendant's meritless claim should be rejected by this Court.

## POINT FOUR

### DEFENDANT'S REMAINING CONTENTIONS ARE DEHORS THE RECORD AND, IN ANY EVENT, ARE MERITLESS.

Defendant further claims that the Supreme Court failed to comply

17

with this Court's order that the trial transcripts should be provided to defendant
when it granted his motion to file a *pro se* supplemental brief (*Pro Se*
Supplemental at 51). This claim is meritless because defendant does not point
to which transcripts he lacks and while he asserts that his appeal is prejudiced,
he does not explain how.

Also meritless is defendant's claim that the court improperly
denied his *pro se* motion to dismiss on statutory and constitutional speedy trial
grounds (*Pro Se* Supplemental Brief at 50-51). Defendant raises no issue of
fact or law with regard to this decision and his claim that he could not now
raise any such claims because he did not have the record of every adjournment
in this case is similarly unpersuasive. After all, as defendant acknowledges,
he previously filed a motion to dismiss on speedy trial grounds (*Pro Se*
Supplemental Brief at 51). Thus, defendant clearly had enough information to
make that motion and his failure to identify any error in the court's disposition
of that motion renders his present claim meritless.

Similarly unpersuasive is defendant's claim that his appointed
appellate counsel is ineffective for failing to raise a speedy trial issue and
defendant's non-presence at the calendar call on January 14th, 2014 (*Pro Se*
Supplemental Brief at 51). As discussed more fully above, these claim are

18

entirely meritless and thus appellate counsel's failure to raise this issue in defendant's main brief reflects an entirely reasonable strategy. *See People v. Baldi*, 54 N.Y.2d 137, 146 (1981); *People v. LaValle*, 97 N.Y.2d 721, 722 (2002). Moreover, the record is devoid of any evidence that defendant suffered any prejudice as a result of appellate counsel's failure to raise these issues – as he is required to show. *Id.*; *see also*, *Strickland v. Washington*, 466 U.S. 668, 688 (1984); *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Furthermore, to now raise a claim that appellate counsel is ineffective is premature given that the appeal has yet to be decided and, in any event, defendant's ability to raise these issues in his *pro se* supplemental brief would enable this Court to cure any alleged prejudice. *See LaValle*, 97 N.Y.2d at 722.

Finally, defendant's claim that appellate counsel is ineffective for failing to review all the minutes in this case before filing defendant's main brief is dehors the record. Defendant has no record basis for this claim.

In sum, defendant's remaining contentions are meritless and are unsupported by the record. Accordingly, defendant's claims should be rejected by this court.

**SR183**

## CONCLUSION

For the reasons set forth above, defendant's judgment of conviction should be affirmed.

Respectfully submitted,

RICHARD A. BROWN
District Attorney
Queens County

JOHN M. CASTELLANO
JOHNNETTE TRAILL
JOSEPH N. FERDENZI
JOSEPH Z. AMSEL
    Assistant District Attorneys
    of Counsel

June 27, 2017

20

## CERTIFICATE OF COMPLIANCE

I certify the following in compliance with section 670.10.3 of the Rules of this Court:

1. The foregoing brief was prepared on a computer.

2. The typeface used is Times New Roman.

3. The point size of the text is 14 point.

4. The brief is double spaced, except for the Table of Contents, point headings, footnotes, and block quotes.

5. The brief contains 4,110 words, exclusive of the Table of Contents, proof of service, and the certificate of compliance, based on the word count of the word-processing system used to prepare this brief.

Dated:       Kew Gardens, New York
             June 27, 2017


                                        _____
                                        Assistant District Attorney

$f \cdot 4$

# Supreme Court of the State of New York
# Appellate Division: Second Judicial Department

D55532
G/hu

_____AD3d_____

Submitted - February 8, 2018

WILLIAM F. MASTRO, J.P.
REINALDO E. RIVERA
SYLVIA O. HINDS-RADIX
ANGELA G. IANNACCI, JJ.

2015-01907

DECISION & ORDER

The People, etc., respondent,
v Raymond Ball, appellant.

(Ind. No. 2228/12)

Randall D. Unger, Bayside, NY, for appellant, and appellant pro se.

Richard A. Brown, District Attorney, Kew Gardens, NY (John M. Castellano, Johnnette Traill, Roni C. Piplani, Meredith D'Angelo, Joseph N. Ferdenzi, and Joseph Z. Amsel of counsel), for respondent.

Appeal by the defendant from a judgment of the Supreme Court, Queens County (Barry A. Schwartz, J.), rendered March 4, 2015, convicting him of robbery in the second degree (two counts), assault in the third degree, and criminal possession of stolen property in the fifth degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing (Ronald D. Hollie, J.), of that branch of the defendant's omnibus motion which was to suppress physical evidence, identification testimony, and his statements to law enforcement officials.

ORDERED that the judgment is affirmed.

We agree with the hearing court's determinations that there was probable cause for the defendant's arrest, and accordingly, to deny suppression of physical evidence, identification testimony, and the defendant's statements to law enforcement officials (*see People v Mason,* 119 AD3d 710, 711; *People v Cotsifas,* 100 AD3d 1015, 1015; *People v McNeil,* 47 AD3d 647, 647; *People v Vasquez,* 291 AD2d 465, 465; *People v Jackson,* 282 AD2d 473, 474).

The defendant did not preserve for appellate review his argument that a proper

June 6, 2018

Page 1.

PEOPLE v BALL, RAYMOND

foundation was not laid pursuant to CPL 60.25 to support the admission of testimony regarding the complainant's identification of the defendant at a pretrial showup (*see People v Davis,* 139 AD3d 966, 967; *People v Jenkins,* 205 AD2d 642, 643). In any event, that argument is without merit (*see People v Davis,* 139 AD3d at 967; *People v Rivera,* 308 AD2d 602, 603; *People v Polite,* 228 AD2d 705, 706; *People v Hernandez,* 154 AD2d 197, 202).

Contrary to the defendant's contention, the record, as a whole, demonstrates that the defendant's decision to waive his right to counsel and to proceed pro se was unequivocal, knowing, voluntary, and intelligent (*see People v Paulin,* 140 AD3d 985, 987; *People v Malone,* 119 AD3d 1352, 1354; *People v Lewis,* 114 AD3d 402, 404-405). The trial court's extensive inquiry established the defendant's ability to represent himself and emphasized the dangers and disadvantages of proceeding without counsel (*see People v McCord,* 133 AD3d 689, 690; *People v Zalevsky,* 82 AD3d 1136; *People v Damon,* 78 AD3d 860).

The sentence imposed was not excessive (*see People v Suitte,* 90 AD2d 80).

The defendant's remaining contentions, raised in his pro se supplemental brief, are without merit.

MASTRO, J.P., RIVERA, HINDS-RADIX and IANNACCI, JJ., concur.

ENTER:

Aprilanne Agostino
Clerk of the Court

June 6, 2018

PEOPLE v BALL, RAYMOND

Page 2.

**SR187**

*Randall D. Unger*

Attorney-at-Law

42-40 Bell Boulevard, Suite 302 • Bayside, NY 11361

Tel: (718) 279-4500 • Fax: (718) 281-0850

June 10, 2018

Clerk of the Court of Appeals
20 Eagle Street
Albany, New York 12207

      Re:   People v. Raymond Ball
           Application for Leave to Appeal

Dear Sir/Madam:

        I am counsel for Raymond Ball, the appellant in the above-referenced case. In a decision and order dated June 6, 2018, the Appellate Division, Second Department affirmed the judgment of the Supreme Court, Queens County, convicting Mr. Ball of robbery in the second degree and other related charges.

        By this letter, I am requesting that this Court grant Mr. Ball leave to appeal from the decision entered below. Pursuant to that application, I am enclosing herein copies of the briefs submitted and the decision rendered in the court below. Kindly inform me when a judge is assigned to review the within application.

                        Very truly yours,

                        Randall D. Unger

cc:   Hon. Richard A. Brown
      District Attorney, Queens County
      125-01 Queens Boulevard
      Kew Gardens, New York 11415

**SR188**

*Randall D. Unger*

Attorney-at-Law

42-40 Bell Boulevard, Suite 302 • Bayside, NY 11361        Tel: (718) 279-4500 • Fax: (718) 281-0850

July 16, 2018

Hon. Jenny Rivera
Judge of the Court of Appeals
Court of Appeals Hall
20 Eagle Street
Albany, New York 12207-1095

> Re:   People v. Raymond Ball
>        Application for Leave to Appeal

Dear Judge Rivera:

I am appellate counsel for Raymond Ball, the appellant herein. Mr. Ball was convicted in the Supreme Court, Queens County, of robbery in the second degree, assault in the third degree and criminal possession of stolen property in the fifth degree, following a jury trial. His conviction was affirmed in a decision and order issued by the Appellate Division, Second Department on June 6, 2018. Thereafter, I submitted to this Court copies of all of the briefs previously filed, as well as the decision and order of the Appellate Division. This letter is respectfully submitted in support of Mr. Ball's application for leave to appeal to this Court.

Contrary to the Appellate Division's determination, Mr. Ball's arrest was not supported by probable cause. For one thing, the description upon which the police acted when they confronted Mr. Ball was patently insufficient to establish reasonable cause to believe that he had committed the crime under investigation. The only descriptive information which the police possessed at that time was that the perpetrators were "male Blacks, wearing a white shirt, black pants". The police had no information as to the age, height or weight of the perpetrators, and no information regarding any distinctive facial features. Suffice it to say, descriptions such as those which the police possessed in this case have been found insufficient to establish reasonable suspicion. *People v. Hargroves*, 296 A.D.2d 581, 582 (2d Dept. 2002);

Hon. Jenny Rivera
July 16, 2018
Page 2 of 4

*People v. Riddick*, 269 A.D.2d 471 (2d Dept. 2000). In light of that precedent, it cannot be concluded that the police had probable cause to arrest Mr. Ball, as the lower courts held.

Nor was probable cause established by Mr. Ball's possession of a cell phone, or the fact that he was running at the time of the police confrontation. Significantly, when the police approached Mr. Ball, they had no information as to the nature of the property that had alleged been stolen from the complaining witness. Thus, Mr. Ball's possession of a cell phone was essentially, innocuous and gave the police no greater authority than to question him. *People v. Howard*, 50 N.Y.2d 583, 590 (1980). And since Mr. Ball immediately complied with the officer's command to stop, and exhibited no furtive behavior in response to the officer's command, it cannot be concluded the degree of suspicion during his encounter with the police escalated to the point where it could be said that there was probable cause for his arrest. *People v. Benjamin*, 51 N.Y.2d 267 (1980).

In short, the police lacked probable cause to arrest Mr. Ball. His statements to the police, the cell phone recovered, and his subsequent identification in a showup procedure should therefore have been suppressed. And since without that evidence, the People would have been unable to establish a *prima facie* case against him, his conviction should be reversed and the indictment dismissed.

Mr. Ball's conviction should also be reversed based on the erroneous admission of third-party identification testimony from the arresting officer. At trial, the complaining witness did not identify Mr. Ball as one of the perpetrators, even though he asserted that he had seen him in the area on several occasions prior to the charged crime. Because the complaining witness did not identify Mr. Ball in the courtroom, the People invoked Section 60.25 of the Criminal Procedure Law to introduce testimony from the arresting officer that the complaining witness had identified Mr. Ball in a showup identification procedure. However, the People failed to lay a proper foundation for the introduction of such testimony. *People v. Patterson*, 93 N.Y.2d 80, 82 (1999).

A proper foundation for the admission of third-party identification testimony requires that the People satisfy three conditions: (1) that the witness

Hon. Jenny Rivera
July 16, 2018
Page 3 of 4

observed the perpetrator during the charged offense; (2) that the witness subsequently identified the perpetrator whom he had observed, and (3) that the witness lacks present recollection to identify the defendant as the perpetrator. *Patterson,* at 82.

Here, while the People satisfied the first two conditions for introducing third-party identification testimony, they failed to satisfy the third condition: that the complaining witness could not make an in-court identification of Mr. Ball due to his failed recollection resulting from the passage of time. Because this condition was not satisfied, it cannot be concluded that the arresting officer's testimony regarding the complaining witness's showup identification was properly admitted under C.P.L. § 60.25. And since there was a significant probability that Mr. Ball would not have been convicted in the absence of such testimony, it cannot be concluded that the admission of this testimony was harmless. *People v. Crimmins,* 36 N.Y.2d 230.243 (1975). For this reason, the judgment of conviction must be reversed.

A further ground for reversing Mr. Ball's conviction was the trial court's decision to allow him to proceed *pro se* at his trial. A defendant's decision to waive his right to counsel in a criminal case must be knowing, voluntary and intelligent. *People v. Slaughter,* 78 N.Y.2d 485, 491 (1991). And to determine whether the waiver of such a fundamental right is truly effective, a trial court must undertake a "searching inquiry" of the defendant. *Faretta v. California,* 422 U.S. 806, 835 (1975). Moreover, in reaching the determination that a defendant's waiver of his right to counsel was effective, it must be established that the request to proceed *pro se* was unequivocal. *People v. Gillian,* 8 N.Y.3d 85, 88 (2006).

Here, Mr. Ball's request to proceed *pro se* was not unequivocal. The record reveals that prior to trial, Mr. Ball had repeatedly expressed dissatisfaction with his assigned attorney. And as the trial was about to begin, Mr. Ball informed the court that although he had not been threatened or coerced into proceeding *pro se,* he felt that he was in an "awkward position" and that he really didn't "have a choice in the matter".

While Mr. Ball's statements to the court certainly reflected a very sincere dissatisfaction with the manner in which his trial attorney had been representing him, they did not establish that his desire to proceed *pro se* was unequivocal. Moreover,

Hon. Jenny Rivera
July 16, 2018
Page 4 of 4

since the record is devoid of evidence that the trial court fully informed Mr. Ball of
the hardships he would experience in representing himself, or the fundamental rights
he would be waiving by proceeding without counsel, it cannot be concluded that his
decision to proceed *pro se* was made knowingly, intelligently and voluntarily. *People
v. Mitchell*, 61 N.Y.2d 580, 585 (1984).

   In sum, Mr. Ball was arrested without probable cause. His conviction
was based, in large part, on improperly admitted third-party identification testimony.
And his decision to proceed to trial *pro se* was not made knowingly, intelligently and
voluntarily. For these reasons, as well as the reasons set forth in Mr. Ball's *pro se*
supplemental brief, this Court should grant the instant application and permit an
appeal from the decision of the Appellate Division, Second Department.

          Respectfully submitted,

          Randall D. Unger
          Counsel for Defendant-Appellant
          Raymond Ball

cc: Hon. Richard A. Brown
  District Attorney, Queens County
  125-01 Queens Boulevard
  Kew Gardens, New York 11415



**DISTRICT ATTORNEY
QUEENS COUNTY
125-01 QUEENS BOULEVARD
KEW GARDENS, NEW YORK 11415-1568
(718) 286-6000**

RICHARD A. BROWN
DISTRICT ATTORNEY

August 17, 2018

The Honorable Jenny Rivera
Judge of the Court of Appeals
Court of Appeals Hall
20 Eagle Street
Albany, New York  12207

Re:    *People v. Raymond Ball,*
       Queens County Ind. No. 222/12

Dear Justice Rivera:

This letter is filed in opposition to defendant's application for leave to appeal from an order of the Appellate Division, Second Department, dated June 6, 2018. By that order, the Appellate Division affirmed defendant's conviction of two counts of Robbery in the Second Degree (Penal Law § 160.10[2]), one count of Assault in the Third Degree (Penal Law § 120.00[1]), and one count of Criminal Possession of Stolen Property in the Fifth Degree (Penal Law § 155.35). The issues raised by defendant before the Appellate Division are meritless and involve questions of well-settled law that do not present novel issues of statewide significance.

First,  defendant's challenge to the hearing court's finding that the police had probable cause to arrest defendant is a mixed question of law and fact and, thus, this Court can only review the issue to decide whether the lower court's determination is supported by the record. *See* C.P.L. § 450.90(2)(a); *People v. Shabazz,* 99 N.Y.2d 634 (2003); *People v. Valerio,* 95 N.Y.2d 924 (2000). Here, no further review is required because the decision is

supported by the record. Indeed, the record supports the Appellate Division's finding "that there was probable cause for defendant's arrest. . ." *People v. Ball*, 162 A.D.3d 680 (2d Dept. 2018). As argued more fully in the People's Brief (Point One, 24-32), the hearing court properly held that there was probable cause to make an arrest where defendant was seen almost immediately after Officer Pampena received a radio run for a robbery in progress, defendant was observed less than two blocks from the robbery scene, and he was running away from that location and towards Officer Pampena's car. In addition, defendant matched the description given over the radio run, was holding an iPhone, which he spontaneously announced that he had bought from 105th Street and Northern Boulevard – exactly where the robbery had taken place just moments earlier – and where Mr. Elturkey identified defendant as one of the robbers and told Officer Pampena that money recovered on defendant was in the exact denominations that had been stolen from him. Accordingly, all of the above factual circumstances provided Officer Pampena with probable cause to arrest defendant. *See People v. Hollman*, 79 N.Y.2d 181, 184-85 (1992); *People v. DeBour*, 40 N.Y.2d at 223.

Second, defendant claims that this Court should review the argument that the People failed to lay a proper foundation for the admission of testimony regarding the complainant's identification of defendant at a show-up. Defendant, however, failed to preserve this claim for review as a matter of law. *People v. Ball*, 162 A.D.3d at 680; *see* C.P.L. § 470.05(2); *People v. Gray*, 86 N.Y.2d 10, 18 (1995). In his leave letter, defendant does not claim otherwise, and in fact, he fails to comply with the Court's rule that the appellant must identify and reproduce portions of the record where the issue is raised and preserved. *See* 22 N.Y.C.R.R. §500.20(a)(4). As such, this claim is unreviewable by this Court. In any event, as the Appellate Division further held, and as fully argued in the People's Brief (Point Two, 32-43), defendant's claim was without merit because the People laid the proper foundation to admit Officer Pampena's testimony about Mr. Elturkey's prior showup identification of defendant, as Mr. Elturkey testified that he had no recollection of the incident and had trouble remembering the co-defendant's face due to the passage of time. *People v. Nival*, 33 N.Y.2d 391, 395 (1974).

Third, the Appellate Division correctly found that the record demonstrated that defendant unequivocally, knowingly, voluntarily and intelligently waived his right to counsel and to proceed *pro se.* Indeed, here, defendant requested to represent himself on numerous occasions, in front of three different judges, and he did not request new counsel during his last two applications to represent himself, which were granted. And the decision to represent himself was not a spur of the moment decision on the eve of trial (Proceedings: 3-13). Far from that, defendant had requested to represent himself as far back as December 16, 2013, and his reasoning was that he had prepared his own legal defense and that he had represented himself at trial previously. Indeed, right before trial commenced, defendant responded, "that is correct" in response to the court's extensive questioning and warnings regarding self-

*People v. Raymond Ball*                                                              Page 3
August 17, 2018

representation at trial. Accordingly, the Appellate Division correctly noted that the trial court
inquired extensively into defendant's ability to represent himself and emphasized the dangers
and disadvantages of proceeding to trial without counsel. *People v. Ball*, 162 A.D.3d at 680.

Fourth, defendant's *pro se* claim that appellate counsel is ineffective for failing
to review all the minutes in this case before filing defendant's main brief is dehors the record
and must be raised in a coram nobis. As such, it is unreviewable on direct appeal. *See People
v. Bachert*, 69 N.Y.2d 593 (1987).

Finally, as argued in the People's response to defendant's *pro se* supplemental
brief before the Appellate Division, all of defendant's remaining *pro se* claims were
meritless. Indeed, defendant's claim that Officer Pampena's testimony was incredible as a
matter of law and that the People knowingly allowed Officer Pampena to perjure himself
were entirely baseless and unsupported claims. Defendant's claim that the trial court failed
to sanction the People for a *Rosario* violation because they failed to turnover an "aided
report" was also baseless as the record clearly established that no such report was prepared
in conjunction with the instant case, and thus sanctions were unwarranted. Defendant's claim
that his due process rights to be present during every stage of the proceedings was violated
when he was not present for a court appearance is similarly baseless, as the record indicated
that the court's calendar call was non-material, ancillary to defendant's suppression hearing.
*People v. Ball*, 162 A.D.3d at 680.

Consequently, defendant's claims present no novel issues of state-wide
importance, are, in part, unpreserved, and are meritless. Therefore, defendant's application
for leave should be denied.

                                                    Respectfully,

                                                    *Tina Grillo*

                                                    Tina Grillo
                                                    Assistant District Attorney
                                                    (718) 286-7091

cc:    Randy Unger, Esq.
       42-40 Bell Boulevard, Suite 302
       Bayside, New York 11361

**SR195**

# State of New York
# Court of Appeals

BEFORE:  HON. JENNY RIVERA, Associate Judge

THE PEOPLE OF THE STATE OF NEW YORK,

                                                    Respondent,

                -against-

RAYMOND BALL,

                                                    Appellant.

**ORDER
DENYING
LEAVE**

Appellant having applied for leave to appeal to this Court pursuant to Criminal Procedure Law § 460.20 from an order in the above-captioned case;*

UPON the papers filed and due deliberation, it is

ORDERED that the application is denied.

Dated:  September 13, 2018

_____
Associate Judge

*Description of Order: Order of the Appellate Division, Second Department, entered June 6, 2018, affirming a judgment of the Supreme Court, Queens County, rendered March 4, 2015.