COPY CA#14-15

SUPREME COURT OF THE STATE OF NEW YORK.
COUNTY OF QUEENS: CRIMINAL TERM: PART TAP-A

-----------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

-against-

Indictment No. 2228-12
Calendar Call

RAYMOND BALL,
ELIJAH BROOKS,

Defendants
-----------------------------------x

125-01 Queens Boulevard
Kew Gardens, New York 11415
April 18, 2013

B E F O R E:

THE HONORABLE BARRY KRON
JUSTICE

A P P E A R A N C E S:

HON. RICHARD A. BROWN, ESQ.,
District Attorney, Queens County
BY: DENISE HOWARD, ESQ.,
Assistant District Attorney

LINDA POVMAN, ESQ., (18-B)
Attorney for Defendant Ball

ALEXIS PIMENTEL, ESQ., (PVT)
Attorney for Defendant Brooks

MARIA E. EDMOND, RPR
Senior Court Reporter

THE CLERK: Calendar number 8 and 36, Raymond Ball, Elijah Brooks.

MS. POVMAN: On behalf of Mr. Ball, Linda Povman. Good morning, your Honor. I'll waive his appearance for the purpose of this call.

MR. PIMENTEL: Good morning, your Honor, on behalf of Mr. Brooks, Alexis Pimentel, 37-53 90th Street, Jackson Heights, New York.

THE COURT: In terms of the motion to consolidate, 2228 of '12 and 338 of '13, they're consolidated.

MS. HOWARD: We were expecting hearings. The People were ready on defendant Ball, I'm supplying counsel with the Rosario.

THE COURT: 2228 of 2012, which is now 338 of 2013, as to defendant Brooks, everything is on for hearings as to both defendants; right?

MS. HOWARD: Yeah, and we're ready but --

MR. PIMENTEL: I am not ready.

MS. HOWARD: Counsel, let me turn over the Rosario material to you. You're for Brooks?

(Handing.)

MS. HOWARD: So which number are we going to go by now, the 2012 number?

THE COURT: Well, the only one, the only one, the 2013 indictment is Brooks, so it makes sense to carry them

under, what is the indictment in which they're both on, which is 2228 of '12, in which at this point that's all that's left is 2228 of '12; right?

MS. HOWARD: Right.

THE COURT: And that is on today for hearings, the People have announced ready for the hearings as to both defendants. What is the situation with defense counsel?

MR. PIMENTEL: Your Honor, I wasn't ready for the hearing today, I thought I was only on for decision from last time we were here.

THE COURT: Sir, that is unacceptable.

MR. PIMENTEL: I understand.

THE COURT: I am pellucidly clear in what things are adjourned for and when I endorse things I'm very clear in writing down what the adjournment is for and what this adjournment was on for today was a decision on consolidation and hearings as to both defendants.

MR. PIMENTEL: I'm sorry, your Honor.

THE COURT: I'm sure if you ordered the minutes of February 27th you were so advised on the record. So simply saying I didn't know what it's on for doesn't cut it.

MR. PIMENTEL: Well, your Honor --

THE COURT: Are you otherwise ready for the hearing?

MS. POVMAN: Judge, this morning I advised Mr.

Schneidmill I could do this this morning, but, Judge, we just got a CD of 911 calls and radio runs I'm not sure as to the length of the CD. So I would need to review that.

THE COURT: There is also two hearings waiting to go out and cases that's not open. Just understand in the future don't play that game with me because you're going to lose.

MR. PIMENTEL: Your Honor, I wasn't trying to play a game, I made --

THE COURT: I understand.

MR. PIMENTEL: I made a mistake and I currently have a hearing in the afternoon as well.

THE COURT: I think under the rules of engagement incarcerated defendants on criminal cases take precedence.

MR. PIMENTEL: I understand, your Honor.

THE COURT: What's the new date for the hearing?

MS. HOWARD: May 21st is good.

THE COURT: May 21st, for hearings. Same bail condition, time is excluded. Defense request. They just ain't ready.

(Continued transcript and certification on following page.)

MR. PIMENTEL: Thank you, your Honor.

* * * * * * *

The foregoing is certified to be a true and accurate transcript of the original stenographic minutes taken of this proceeding.

Maria E. Edmond, RPR
Senior Court Reporter

CA14-15

COPY

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS : CRIMINAL TERM : PART K-20

-----------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK

Indictment No. 2228-2012

-against-

HEARING

RAYMOND BALL and ELIJAH BROOKS,

Defendants.

-----------------------------------------X

Supreme Courthouse
125-01 Queens Boulevard
Kew Gardens, New York 11415
May 21, 2013

B E F O R E:

HONORABLE RONALD D. HOLLIE,
Justice of the Supreme Court.

A P P E A R A N C E S:

FOR THE PEOPLE:
RICHARD A. BROWN, ESQ.
District Attorney, Queens County
BY: NAOMI SCHNEIDMILL, ESQ.
Assistant District Attorney

FOR DEFENDANT BALL:
LINDA POVMAN, ESQ., 18-B

FOR DEFENDANT BROOKS
ALEXIS PIMENTEL, ESQ. (Pvt.)

HELEN BOUKAS
Senior Court Reporter

THE CLERK: Calendar number 10. Indictment 2228 of 2012. People versus Raymond Ball and Elijah Brooks. Sent forthwith from Part TAP-A. For hearing.

MS. SCHNEIDMILL: Naomi Schneidmill for the People. Good afternoon, your Honor.

MS. POVMAN: On behalf of Raymond Ball, Linda Povman, 123-35 82nd Road, Kew Gardens.

COURT OFFICER: Coming out.

(Defendant is present.)

MR. PIMENTEL: On behalf of Mr. Brooks, Alexis Pimentel, 37-53 90th Street, office number 10, Jackson Heights. P-I-M-E-N-T-E-L.

THE COURT: Thank you, Mr. Pimentel. Come up, please.

Both defendants are present. Both Mr. Ball and Mr. Brooks.

People, what kind of hearings have been ordered in this case?

MS. SCHNEIDMILL: Your Honor, I believe for defendant Ball, a Mapp Huntley Wade Dunaway. For defendant Brooks, a Mapp Huntley Wade Dunaway was also ordered. Although I believe that's not entirely correct. I believe it is a Wade/Dunaway, as far as defendant Brooks is concerned.

THE COURT: Okay. Counsel approach, please.

(Whereupon, an off-the-record discussion was held at the bench.)

THE COURT: Okay, now, People, just to make sure that I'm clear, you had mentioned that a number of hearings had been ordered, different hearings with the two defendants. As to Brooks, you said a Wade Mapp Huntley and Dunaway?

MS. SCHNEIDMILL: I believe all four of those were ordered, yes.

THE COURT: As to both or as to Brooks?

MS. SCHNEIDMILL: All four were ordered as to both defendants.

THE COURT: All right. Are you ready for hearings, People?

MS. SCHNEIDMILL: People are ready.

THE COURT: Please call your first witness.

MS. SCHNEIDMILL: I am just handing up to the Court a Rosario disclosure as to Rosario. I handed up to both counsels.

THE COURT: Acknowledged by both counsels?

MS. SCHNEIDMILL: It has, first witness that People call is Officer Daniel Lanning.

COURT OFFICER: Ready for the witness?

THE COURT: We are.

COURT OFFICER: Witness entering.

D A N I E L   L A N N I N G, Police Officer, a witness called on behalf of the People, after having been first duly sworn and having stated his shield number as 20636 and his command as the 115th Precinct, New York City Police Department, took the witness stand and testified as follows:

COURT OFFICER: People call Police Officer Daniel Lanning, D-A-N-I-E-L, L-A-N-N-I-N-G, shield number 20636 of the 115th Precinct, NYPD.

THE COURT: Inquire, please.

MS. SCHNEIDMILL: Thank you, your Honor.

DIRECT EXAMINATION

BY MS. SCHNEIDMILL:

Q Good afternoon, Officer Lanning.

A Good afternoon.

Q Who are you currently employed by?

A The NYPD.

Q And how long have you been employed by them?

A A little over seven years now.

Q And how long have you been out of the 115th Precinct?

A Just under seven years.

Q And, Officer, were you working on the evening of July 3rd of 2012?

A I was, yes.

Q What tour were you working that night?

A 1500 by 2335.

Q And who were you working with?

A Sergeant Rosenberg.

Q And what was your assignment that night?

A I believe I was assigned as the F.I.O., Field Intelligence Officer.

Q What does that mean?

A Field Intelligence Officer tracks different things. Gang members, recidivists. We were just performing regular patrol that night.

THE COURT: And an officer, just so I'm clear as to what you mean by I believe --

THE WITNESS: I was. I was.

THE COURT: Okay.

Q You said you were on patrol that night?

A Yes.

Q And what areas were you patrolling?

A I was in the vicinity of 105th Street and Northern Boulevard in Queens.

Q Did there come a time that at approximately around nine p.m. that you received a radio run?

A Yes.

Q And what were you told over the radio run?

A There was a male being robbed at the corner, 105th Street and Northern Boulevard.

Q And when you received this radio run, where were you?

A I was about two blocks away from that area.

Q And once receiving this radio run what did you do?

A I proceeded to that location.

Q How did you proceed to that location? By foot?

A No, in a car. Unmarked vehicle.

Q And in this unmarked vehicle were you in plain clothes that evening or in your uniform?

A Plain clothes.

Q And were you the driver that evening?

A I was the passenger.

Q How long did it take for your vehicle to respond to the location of 105th Street and Northern Boulevard?

A Couple of minutes. Two, three minutes.

Q And over this radio run that you received --

THE COURT: So if you were two blocks away, two minutes in a police car to arrive?

THE WITNESS: It seemed about two minutes, maybe less, could have been less.

THE COURT: Go ahead.

Q Two minutes would be the ceiling, the maximum, that it took you to get there, maybe?

A Sure.

Q And you said, you testified earlier that on the radio run you were told that a male was being robbed?

A Yes.

Q And was there any description given over this radio run who was robbing this male?

A It was male Blacks dressed in white shirt, black pants.

Q When you responded to 105th Street and Northern Boulevard, was there anyone at that location? What is at that location actually?

A It is a bodega, corner store.

Q And was there anyone outside that location?

A Yes. Mr. Elturky was standing on the corner there.

Q Who was Mr. Elturky?

A He was the complainant.

Q The victim of this robbery?

A Yes.

Q And what observations if any did you make about him or his appearance at that time?

A He was bleeding from the head, the mouth. He looked like he had been beaten up.

Q And what did he tell you?

A He told me that he was robbed and that they went south. He pointed southbound on 105th Street, said they went that way.

Q And what did you do at that point?

A We asked him to get into the vehicle. At which point he got into the back seat of our RMP.

Q And where did you go?

A We proceeded southbound on 105th Street.

Q Did there come a point that you stopped?

A About two seconds of him being in the vehicle he said, that's the guy there. We stopped the vehicle.

THE COURT: Okay. Now, as far as time is concerned, you said, two blocks away it took three minutes in the car.

Two seconds relative to the corner of Northern, the bodega. Had you traveled halfway down the block, all the way down the block, a third of the way down the block? How long had you -- how long had you been on that block -- did you drive, before you had seen --

THE WITNESS: I apologize. We got about halfway down the block.

Q And you said at that point you had stopped?

A We did, yes.

Q And what did the complainant say to you?

A He said, that's the guy there.

Q And what did you do at that point?

A We got out of the vehicle, and we placed a man in handcuffs.

Q The person that you placed in handcuffs, do you see that person in Court today?

A Yes, I do.

Q And can you identify that person with an article of clothing that they are wearing?

A Yes, he's wearing a black shirt.

THE COURT: Indicating defendant Brooks.

Q And once you placed the defendant or defendant Brooks in handcuffs, what did you do after that?

A We put over the radio that we had a male stopped. We called over for another sector car.

Q And just to be clear again, when you were in the vehicle what exactly had the victim said to you?

A He just said that he had been robbed and like I said, they went southbound on 101st Street. He didn't say "southbound." He pointed and said they went down that way.

Q You knew it to be southbound?

A Correct.

Q When you -- before stopping your vehicle, what had the complainant said to you?

A He said, that's the guy there.

Q Did you recover anything from the defendant Brooks after his arrest?

A I did not, no.

Q Did defendant Brooks make any statements to you?

A No statements, no.

MS. SCHNEIDMILL: Your Honor, I have no further questions for this witness.

MR. PIMENTEL: Your Honor.

THE COURT: Counsel, please.

CROSS-EXAMINATION

BY MR. PIMENTEL:

Q Good afternoon, Officer Lanning.

A Good afternoon.

Q Officer Lanning, do you recall what the actual radio run was? What was said over the radio run?

A That there was a 30 --

THE COURT: No. You're actually asked about the actual, which can be interpreted as exact words used. Do you recall the exact words used over the radio run?

THE WITNESS: I do not, no, but I do have the paperwork there if you will allow me to refresh my memory.

MR. PIMENTEL: Yes, you can refresh your recollection.

THE COURT: Sure.

THE WITNESS: Okay.

(Witness examining documents.)

THE WITNESS: At 2059 came over -- 2059 came over the radio as a "1030 male robbed."

THE COURT: So, is that -- are you saying that those were the words given to you by the dispatcher? That "male robbed"?

THE WITNESS: Correct, yes.

THE COURT: Okay.

Q What was the description given of the defendants or of

the alleged perpetrators?

MS. POVMAN: Judge, could we have it identified for the record what he's reading from?

THE COURT: Yes. I think he's looking at the Sprint.

THE WITNESS: Yes, I'm reading from the Sprint. It was for three male Blacks, one wearing white shirt and black pants.

Q So it was three male Blacks?

A That's how it came over, yes.

Q Was there any indication of a weapon used during the robbery?

A It doesn't say here and I don't recall that.

MR. PIMENTEL: If I may approach, your Honor?

THE COURT: Yes.

Q You're looking at the same Sprint report I'm looking at, correct?

A I believe so. Yes.

Q If you will see right after 2:20, the entry?

A Sorry, what are you looking? I apologize.

Q Sorry. Just take a look (indicating).

A I am sorry, you're right.

THE COURT: And also, Officer, we are not asking you to let us know what the Sprint says. Only whether or not if you read it, if it refreshes your memory as to what

you heard. Because it is possible that your recollection is different or not as complete as the Sprint. So again, it's important that you understand that we are not asking you to tell us what the Sprint says. But only if it refreshes your memory as to what it is you heard.

THE WITNESS: Okay. Yes, came over as a knifepoint robbery.

THE COURT: And you recall --

THE WITNESS: I do recall that, yes.

THE COURT: -- that being said?

Q Do you recall if a knife was ever recovered?

A No, there was no knife recovered, to my recollection.

Q Did you have a conversation with Mr. Elturky when you first approached him?

A Very brief. He said that he was robbed and that they had gone.

Q Did you inquire of him of the description of the people that allegedly robbed him?

A No, we just asked him to get in the vehicle right away.

Q Did he describe the attack to you as it took place when he was robbed?

A He did not, no.

Q No, he did not. Now, you indicated that it took you three minutes or two minutes to arrive at the location. Were your sirens going? Did you have your lights and sirens on?

A We did not have sirens in that particular vehicle, no.

Q Okay. Where exactly on the street did you approach Mr. Elturky or did Mr. Elturky approach you?

A He approached us.

Q Where exactly on the street, was it in the corner?

A Right on the corner of 105th Street.

Q Did you notice if there were any cameras around in that area?

A No. I did not.

Q Was this in front of a grocery store?

A It was, yes.

Q Did you notice if the grocery store had any cameras?

A Not that I recall, no.

Q You indicated that you drove four blocks in the two minutes -- I mean -- two seconds halfway down the block and you approached Mr. Brooks?

A Yes, that's correct.

Q That was in the middle of the block?

A Around about the middle of the block, yes.

Q On 105th Street or actually on Northern Boulevard?

A On 105th Street.

Q And was this in front of a residential home or in front of a commercial establishment?

THE COURT: If you know.

A I am sorry.

THE COURT: If you know.

A I don't recall.

Q Okay. Was anything recovered from my client or near where my client was arrested?

A I didn't recover anything from your client.

Q Do you know if anything was recovered?

A I believe there was, yes.

Q What do you recall was recovered?

A I believe there was a -- oh, from your client? I really couldn't say honestly what was recovered because, again, I didn't recover it.

Q Do you know if someone else did recover something?

A I believe that it was, yes.

THE COURT: But --

A Again, this is all --

THE COURT: Wait. If you know, let us know. If you don't have the information, let us know that also. But under no circumstances guess.

A I don't have that information to give you.

Q Do you recall what my client was wearing that day?

A White shirt and black pants.

Q Was he wearing anything else, do you recall?

THE COURT: You mean in the way of footwear?

Q Footwear, a hat?

THE COURT: If you know.

A I believe he was wearing a baseball cap.

Q Do you recall what color it was?

A I do not know.

Q Is there anything that would refresh your recollection?

A Maybe.

Q Such as?

A A picture of the hat?

MR. PIMENTEL: Your Honor, may I approach?

THE COURT: Yes.

Q I have a copy of the police report which you filled out. Can you take a look at it and see if that refreshes your recollection (handing)?

A I did not fill this out.

THE COURT: Yes, it doesn't matter if you did. Only whether or not it refreshes your memory as to how the defendant was dressed. And again, it doesn't matter what it says; it matters only if your memory is refreshed.

A It does not refresh my memory, no.

Q Okay. Were there any other individuals at the scene when Mr. Brooks was arrested?

A As far as --

Q Were there any other people standing around or was Mr. Brooks by himself?

A No, there was another individual stopped with Mr. Brooks.

Q There was another individual stopped with Mr. Brooks?

A Yes.

Q Who was that individual?

A I don't have his information because as soon as we stopped the both of them, Mr. Elturky said, that's the guy there. So we never --

Q There were two individuals there when he said, that's the guy there?

A Yes.

Q Did he give any description as to which guy he was referring to?

A He pointed directly to Mr. Brooks.

Q What were the lighting conditions?

A There was a street light, I believe, on that corner. We had our headlights pointed at Mr. Brooks and it was nighttime.

Q Okay. At the corner. But you earlier indicated that you arrested Mr. Brooks in the middle of the block?

A Yes, I am sorry. There was a light pole in the middle of the block and our headlights were directly on Mr. Brooks.

Q What was the description of that other individual, if you recall?

A I don't recall.

Q Do you recall if he was also wearing a white shirt and black pants?

A I couldn't tell you.

Q Now, you indicated that the alleged victim was bleeding.

A Yes.

Q How would you quantify the amount of blood? Was it a lot, a little?

A He seemed to be bleeding a lot especially from the mouth.

Q Did you observe any blood on Mr. Brooks?

A I did not, no.

Q And at any point in time did the victim describe the actual attack to you?

A He did not, no.

Q Officer, did you come to the -- did you fill out the complaint or sign the complaint report?

A No, I did not.

MR. PIMENTEL: No further questions, your Honor.

THE COURT: Miss Povman?

MS. POVMAN: Yes, Judge, thank you.

CROSS-EXAMINATION

BY MS. POVMAN:

Q Good afternoon, Officer.

A Good afternoon.

Q You told us that you met up with the complainant at a bodega -- a deli; is that correct?

A It was a bodega, yes.

Q And do you know the address of the bodega?

A I don't know personally offhand. I have the information here if you need it.

Q Could you look it up? Thank you.

A Sure.

(Witness examines document.)

A It was 104-22 Northern Boulevard.

Q 104-22 Northern Boulevard. Now, is that the location of the alleged robbery?

THE COURT: If you know.

A That's where it came over through Sprint. Over the radio.

Q Okay. So over the radio you received a call to respond to that location?

A To that location, yes, correct.

Q So you don't know whether that was the location of the robbery or not, but that was the location you were directed to?

A Yes.

Q And you said that you had a conversation with the complaining witness in this case; is that correct?

A Yes.

Q But you didn't ask him what had happened?

A I did not, no.

Q So the information you received over the Sprint report

was three male Blacks?

A Yes.

Q And was one of them wearing a white shirt and black pants, or were all of them wearing a black shirt and white pants?

THE COURT: Again, if you know.

A It came over as one of them wearing a white shirt and black pants.

Q Okay. And there was also some description over the radio, a knife being used in this robbery?

A Yes.

Q Now, if I understand correctly, you testified that when you met with the complainant, he just pointed you down 105th Street?

A Well, he said he was robbed. And that they had gone that way. Again, pointing southbound on 105th Street.

THE COURT: And again, just so I'm clear as to your memory as to the description that was on the radio that you responded to. Are you clear in your own mind that what you heard was three male Blacks, one of which was wearing a white shirt and black pants?

THE WITNESS: Yes.

THE COURT: Okay.

Q Okay. And the complainant got in your car; is that correct?

A That's correct.

Q And did you radio anything over the radio about having the complainant in the car or the aided?

A I did not, no, but my supervisor who was driving did, yes.

Q And if I understand your testimony correctly, you stopped Mr. Brooks approximately a half a block later?

A Yes.

Q Now, did you have anything to do with the arrest of Mr. Ball?

A I did not, no.

Q And when you arrived at the bodega on 104th and Northern, it was -- the robbery was completed, right?

A Yes.

Q You didn't observe anyone being assaulted?

A I did not, no.

Q And isn't it a fact that the complainant initially told you that he had been beat up?

A He said that he was robbed.

Q Okay. So he didn't -- he told you that property was taken from him?

A He just said that he was robbed. I thought it was urgent for him to get in the car and try and find who had done this to him.

THE COURT: So the only words that you recall that

he said to you in your presence is, "I was robbed."

THE WITNESS: Yes, and that they went that way.

THE COURT: "And that they went that way" but he didn't give you any information as to where he was robbed, a number of males involved, anything about a knife, nothing?

THE WITNESS: Nothing.

Q You told us that you observed -- withdrawn.

Did you observe blood at the scene of the bodega?

A I did not, no, only blood on his face and head.

MS. POVMAN: I have no further questions of this witness.

THE COURT: People, anything further?

MS. SCHNEIDMILL: No, your Honor.

THE COURT: Thank you, Officer Lanning.

THE WITNESS: Thank you very much.

(Whereupon, the witness was excused from the witness stand.)

THE COURT: People, call your next witness.

MS. SCHNEIDMILL: People call Police Officer Pampena.

THE COURT: Sorry?

MS. SCHNEIDMILL: Officer Pampena.

COURT OFFICER: Ready for the witness?

THE COURT: We are.

COURT OFFICER: Witness entering.

A N G E L O P A M P E N A, Police Officer, a witness called on behalf of the People, after having been first duly sworn and having stated his shield number as 19220 and his command as the 115th Precinct, New York City Police Department, took the witness stand and testified as follows:

COURT OFFICER: People call Police Officer Angelo Pampena, A-N-G-E-L-O, P-A-M-P-E-N-A, shield number 19220, 115th Precinct, NYPD.

THE COURT: Please inquire.

MS. SCHNEIDMILL: Thank you, your Honor.

DIRECT EXAMINATION

BY MS. SCHNEIDMILL:

Q Good afternoon, Officer Pampena.

A Good afternoon.

Q Who are you currently employed by?

A New York City Police Department.

Q How long have you been employed by them?

A Six years.

Q How long have you been at the 115th Precinct?

A Six years.

Q Officer, were you working on the night of July 3rd of 2012?

A Yes.

Q And what were your duties and responsibilities that evening?

A I was the robbery auto.

Q What does that mean?

A In uniform in a plain police car, just driving around, answering to radio runs.

Q Like patrolman?

A Yes.

Q And what area of Queens were you patrolling that evening?

A 108th Street and Astoria Boulevard.

Q You said while you were on patrol you answered radio runs, correct?

A Yes.

Q And did you receive a radio run at approximately nine p.m. that evening?

A Yes.

Q What was the radio run for?

A It was a robbery in progress.

Q And where was this radio run directing you?

A 105th Street and Northern Boulevard.

Q And how far were you from that location when you received this radio run?

A Approximately three blocks.

Q And how long did it take you to -- Did you end up at that location?

A Yes.

THE COURT: Now, you mentioned that at nine p.m., at the time that you received this radio transmission, you were at 108th and Astoria Boulevard?

THE WITNESS: Yes.

THE COURT: And you were directed to 105th and Northern?

THE WITNESS: Yes.

THE COURT: And it only takes you -- That's three blocks away?

THE WITNESS: Yes, sir.

THE COURT: Okay. Because 108th, it's three blocks over to 105th, and then a number of other blocks over to Northern?

THE WITNESS: Yes.

THE COURT: So that's no more than three blocks away?

THE WITNESS: Yes. Yes.

THE COURT: I am just trying to make sure that I understand it exactly. You were asked about a number of blocks and you were on two separate boulevards involved.

THE WITNESS: It's three streets over, one avenue up. One avenue south. It's three streets west. One avenue south.

Q And this radio run that you got was directing you to what location?

A 105th Street and Northern Boulevard.

Q And over this radio run, was there, besides robbery in progress, was there a description given of the people or the -- I am sorry. Was there a description given of the robbers over this radio run?

A Yes, it was male Blacks, wearing a white shirt, black pants.

Q Now, what route did you take to get to 105th Street and Northern Boulevard from where you were?

A I went westbound on Astoria. I made a left on 105th Street, heading southbound. And I was proceeding southbound on 105th Street; I witnessed a male Black with a white tee shirt, black pants, running northbound away from the scene.

THE COURT: Also, Officer, just to make sure that I am clear as to what you were saying that you heard on the radio, when you said male Blacks, was there an indication as to a number of male Blacks?

THE WITNESS: I don't recall.

THE COURT: And when you also mentioned white shirt, black pants, any indication as to whether or not that the radio run said one of them, all of them?

THE WITNESS: Don't recall, sir.

THE COURT: People?

Q And so you said, it's your testimony, you said a male Black in a white tee shirt and black pants running northbound?

A Yes, on 105th Street.

Q And what did you do at that point?

A I stopped the car and I got out of the vehicle. And once I got out of the vehicle, the individual stated, I bought this phone from 105th Street and Northern Boulevard.

Q And this person that you stopped at this point, do you see this person in the Court today, Officer?

A Yes.

Q Can you identify them with an article of clothing that they are wearing?

A A brown sweater.

THE COURT: Indicating the defendant Ball.

Q So, Officer, when you stopped defendant Ball, you said that he said to you --

A He said he just bought the phone from 105th Street and Northern Boulevard.

Q What phone was he talking about?

A He had an iPhone in his hand.

THE COURT: That statement, was it in response to any question that you had asked him?

THE WITNESS: Absolutely not.

THE COURT: And when you first saw him running, I think you said northbound, at the time that you made the observation of him, what if anything did you see in his hands?

THE WITNESS: He had an iPhone in his hand.

THE COURT: People?

Q And what did you do with the defendant Ball at this point?

A I placed him in handcuffs. I proceeded to search him for additional weapons. He had currency in his pocket. It was a hundred-dollar bill, seven twenty-dollar bills and one ten-dollar bill. And I proceeded to go to the location that the crime happened, 105th Street and Northern Boulevard.

Q And who was at that location?

A The complainant.

Q Do you know the complainant's name?

A It's Mr. Elturky.

Q And did you have an opportunity to read speak to Mr. Elturky at that location?

A Yes.

Q And what did he tell you?

A He told me that he was beat up by male Blacks, and he told me the items that were taken from him which was an iPhone, his wallet, and he told me exact currency, in the denominations, because he just left the check cashing place.

Q And what was the exact denominations he told you was taken from him?

A One hundred-dollar bill; seven twenty-dollar bills and one ten-dollar bill, equalling 250 dollars.

Q And this is the exact denominations that you recovered from defendant Ball, correct?

A Yes.

Q And he told you that also his phone was taken?

A Yes.

Q And his wallet?

A Yes.

Q And what did Mr. Elturky look like when you observed him at this location?

THE COURT: And, People, you know, if you can, would you spell Mr. Elturky?

MS. SCHNEIDMILL: E-L-T-U-R-K-Y, I believe.

Q How did Mr. Elturky look when you first saw him at this location?

A He had blood all down his face and his head. He had a large laceration on his head. His mouth was bleeding. His eye was black-and-blue. Swelled shut. And his clothes was all ripped up and disheveled with blood on it.

Q And did he give you more information? I know you told us that he told you that his wallet and money and phone were taken. Did he give you anymore details about this attack?

A Yeah. Whenever he seen the defendant he stated he was the one that took the iPhone and wallet from his pocket.

Q And which defendant are you talking about when you say whenever he saw the defendant?

A Mr. Raymond Ball.

Q So the victim in this case told you that defendant Ball was the person who had taken these items from him?

A Yes.

Q And did the complainant indicate to you what defendant Brooks had done to him?

A He said the defendant Brooks started the beating and Mr. Ball ensued with the beating. And Mr. Ball was the one that took the items from his pockets while he was being attacked.

Q And --

THE COURT: So, Officer, at the time that you arrived back on 105th and Northern, was the complainant literally at that corner at that point, or did you summons him to that corner?

THE WITNESS: He was at 105th and Northern being treated by the EMT when I got there. He was inside the ambulance whenever I arrived at 105th Street and Northern Boulevard.

THE COURT: Okay, so at the time that you arrived, the complainant is in an ambulance and you're speaking with him in the ambulance?

THE WITNESS: Yes.

THE COURT: And you also said that there was someone else there. Someone I think that you said was Mr. Brooks. Did you actually see Mr. Brooks at the scene?

THE WITNESS: No. He was already in a vehicle being transported away as I was arriving at the scene.

THE COURT: So you were making reference earlier to the complainant saying that Ball is the one who had taken his property. And said that there was -- did you say that the complainant said that Brooks is the one that beat him up?

THE WITNESS: He started. He started attacking him first.

THE COURT: So had he identified to you this person who started attacking him first?

THE WITNESS: No.

THE COURT: Okay. So that person, at the time that you're getting this information as to what someone else did --

THE WITNESS: Yes.

THE COURT: -- that person was not at the scene at that point?

THE WITNESS: At the time, no, he was being transported away.

THE COURT: Okay. So the complainant, while the complainant at the scene told you what Ball did --

THE WITNESS: Yes.

THE COURT: -- and said what another individual had done, to your knowledge, that other individual was not

Case 1:19-cv-05310-ERK-LB Document 9-2 Filed 12/13/19 Page 36 of 907 PageID #: 399

at the scene --

THE WITNESS: Correct.

THE COURT: -- at the time that you were interviewing Elturky?

THE WITNESS: Correct.

THE COURT: Okay, People.

Q Officer, when you brought the defendant Ball to Northern Boulevard and 105th Street, at that point you went and had a conversation with Mr. Elturky?

A Yes.

Q And where was the defendant Ball in relation to where Mr. Elturky was at that point?

A Approximately ten yards between 105th and 106th Street, on Northern Boulevard. He was a couple of car lengths away from the ambulance.

Q And when you had this conversation with Mr. Elturky he was inside the ambulance?

A Yes.

Q And what did he tell you at that point?

A He told me that he was attacked by two individuals. He told me that one person was started attacked him. Another individual, Mr. Ball, begin to attack him after that. And Mr. Ball went through his pocket and took his iPhone, his wallet.

Q And at this point at this scene, did he make any

identifications?

A Yes, he looked out of the ambulance to see if Mr. Ball is standing in front of my police car.

Q What did he tell you?

A He said, yes, that's the individual that took his wallet and iPhone.

THE COURT: And you said, you're saying that in the conversation that you had with Elturky, he said that there were two individuals involved in the robbery or three individuals?

THE WITNESS: He told me two.

Q Did you ever receive any information from the complainant that a weapon was used in this robbery?

A No.

Q And you mentioned before that you recovered an iPhone from the defendant Ball, correct?

A Correct.

Q What did you do with that iPhone?

A I brought it to Mr. Elturky, and I asked him if this phone was password protected. He said yes. I asked him for the password and he told me it. I had pushed it into the iPhone, and it was the correct password to unlock the iPhone.

Q And do you know what time you were at the corner of Northern Boulevard and 105th Street with defendant Ball, what time you had brought him to that location?

A Approximately three, four minutes after the call came over.

Q And did Mr. Ball make any other statements to you at that time?

A Yes. We placed him back in the car after the positive ID from the complainant. He wanted to know what he was being charged with.

Q Did you tell him?

A Yes.

Q What did you tell him?

A Told him he was being charged with robbery.

Q And did he say anything in response to that?

A He stated that if the guy said it was his then I guess it was his.

THE COURT: Also, just to see if I'm clear as to the timing that you indicated that it took for you to get back to 105th and Northern, in that trip, back to 105th and Northern, you actually observed defendant Ball, correct?

THE WITNESS: Yes.

THE COURT: How long did you spend on the street with Ball before you placed Ball in your car to then go back to 105th?

THE WITNESS: Approximately two minutes?

THE COURT: Okay. So in total, from the time that you received the radio transmission, begin the process of

responding to 105th and Northern, inclusive of the time that you had stopped Ball, how long approximately had it taken for you to get fully -- to cover the distance from 108th and Astoria, to 105th and Northern?

THE WITNESS: Approximately four, four minutes. If I look at my notes it would tell me exactly when I got --

THE COURT: Sure, sure. So if there's anything in your records that would refresh your memory, please look at those.

THE WITNESS: On the Sprint sheet which is what Central has, the job came over at 2059, which is 8:59. And it shows myself going there at -- I was on scene at 2103, 9:03. So all in all, it was five minutes from when the transmission came over of a robbery in progress to actually got on the scene at 105th Street and Northern Boulevard.

THE COURT: And those records do refresh your memory as to the approximate time it took you to arrive?

THE WITNESS: Yes, five minutes.

THE COURT: People.

MS. SCHNEIDMILL: Thank you, your Honor.

Q And what was defendant Ball wearing when you stopped him, Officer?

A He was wearing a white shirt and black pants.

MS. SCHNEIDMILL: No further questions for this witness.

THE COURT: Miss Povman?

MS. POVMAN: Yes, I'll go first.

CROSS-EXAMINATION

BY MS. POVMAN:

Q Good afternoon. Did you say Officer or Detective?

A Officer.

Q You told us that on July 3rd of 2012, you were working in uniform?

A Yes.

Q But in an unmarked police car?

A Yes.

Q And your assignment was to investigate radio runs that night?

A It's a Robbery Auto.

Q And you told us that you received a radio call at 9:59?

A 8:59.

Q And that was a past robbery or a robbery in progress?

A A robbery in progress.

Q And did they give you the location to respond to?

A Yes.

Q And what was that location?

A I believe from my notes, Central stated 104-22 Northern Boulevard.

Q And you told the Judge that you were on 108th and Astoria Boulevard at the time you received the radio run?

A Yes.

Q And that radio run gave a description of three male Blacks; is that correct?

A I don't recall.

Q And did that radio run give a description of a knifepoint robbery?

A I don't recall.

Q But you do recall that you traveled about four or five blocks?

A Yes.

Q And what route did you take? I am sorry I put in here --

A I was on 106th Street and Astoria Boulevard. I went westbound on Astoria. I made a left on 105th Street, going southbound, and at 105th Street and 32nd Avenue was I seen your defendant Mr. Ball running northbound 105th Street from Northern Boulevard.

Q So when you first saw Mr. Ball, he was on 105th and 32nd Avenue, is that what you're saying?

A He was running towards 32nd Avenue.

Q Towards 32nd Avenue so he was on 105th Street, travelling towards you, you were facing him?

A Yes.

Q He was running towards your automobile?

A Yes.

Q And you were the driver of your automobile?
A I don't recall.
Q You don't recall whether you were driving that night or not?
A Correct.
Q Well, let me ask you this. When you got the radio run, with the description of the three male Blacks, did you write that down at the time you received it?
A No.
Q And this description of three male Blacks, did they have any age?
A I don't recall.
Q Did they have any height?
A I don't recall.
Q Did they have any weight?
A I don't recall.
Q And can you describe the area of 105th Street between -- is it between Northern and 32nd Avenue, is that --
A When I stopped Mr. Ball?
Q Well, the area where the call came in. The area of the robbery. Is that a residential or a commercial area?
A It's a mix of both.
Q Okay. And this was nine p.m. at night, correct?
A Yes.
Q And it was July 3rd, it was a holiday weekend; is that

correct?

A Yes.

Q And there were pedestrians on the street; is that correct?

A Correct.

Q People on the street?

A Sure, it's New York, yes.

Q Exactly. And there were cars on the street.

A Yes.

Q And 105th Street that you were travelling down, is that a one-way street or a two-way street?

A One-way street.

Q And there is cars parked on either side?

A Yes.

Q And when you first observed Mr. Ball, he was coming towards you on --

A 105th.

Q -- 105th Street?

A Yes.

Q Did you ever see Mr. Ball on 104th Street and 32nd Avenue?

A No.

Q How far is 105th Street and 32nd Avenue to 104th and 32nd Avenue? Is one city block?

A Yes..

Q So it is your testimony you never saw Mr. Ball at 104th and 32nd Avenue?

A Correct.

Q Okay and you told us that you responded in about 9:03 p.m. that you had arrived at the scene of the robbery; is that correct?

A Correct, yes.

Q And is it also correct that you stopped Mr. Ball approximately three minutes later, at 9:06 p.m.?

THE COURT: Again, if you know the exact time.

A No. I stopped him before -- I stopped him before I went to 105th Street.

Q Are you familiar with this area?

A Yes.

Q And the bodega at 104-22, how far is that from where you first observed Mr. Ball?

A A block, maybe a block and a half at most.

Q Okay. Not in avenue, a block?

A Going from 32nd to Northern, it would be an avenue, one avenue and a half a block, a quarter of a block. The avenues are very short.

Q The avenues are very short?

A Yes, not like Manhattan. Very, very short avenue.

Q How long would it take you to travel from the bodega to the area that you observed Mr. Ball?

A In car or on foot?

Q On foot.

MS. SCHNEIDMILL: Objection.

THE COURT: Sustained.

Q How long did it take you to get in your automobile -- how long did it take you to travel that block and a half?

A I never -- seconds. In the automobile.

Q So if I understand your testimony correctly, you don't remember whether -- withdrawn.

When you first observed Mr. Ball coming down the street, was he alone or was he with someone?

A He was alone.

Q And did you immediately get out of the car?

A Yes.

Q Did you pull -- was the car stopped in the middle of the street?

A Yes.

Q And when you exited your car, did you have your gun drawn?

A No.

Q And you were in uniform; is that correct?

A Yes.

Q And what was the first thing you said to Mr. Ball?

A Nothing.

Q What was the first thing Mr. Ball said to you?

A I just bought this phone from 105th Street. I just bought this phone from 105th Street and Northern Boulevard.

Q I am sorry, I don't understand. You saw him coming down 105th Street, right?

A He was running northbound on 105th Street from Northern Boulevard.

Q And you got out of your vehicle?

A At 105th Street and 32nd Avenue.

Q Okay. And you waited for him to come to you?

A He was running up the street. We stopped the car. I got out of the vehicle. That's when he stated --

Q He was just there? When you got out of the vehicle he stopped by your vehicle?

A He stopped right in front of our vehicle.

Q Well, did you tackle him?

A Absolutely not.

Q So, I'm sorry. So Mr. Ball saw you get out of your car?

THE COURT: Sustained.

Q Thank you. You got out of your car in uniform?

A Yes.

Q And Mr. Ball stopped right in front of you?

A Yes.

Q So you didn't see -- you didn't tackle Mr. Ball?

A Absolutely not.

Q Did you tell him to: Stop, police?

A No.

Q And what was the first thing he said to you?

A I just bought this phone from 105th Street and Northern Boulevard.

Q He told you that he bought the phone on 105th Street and Northern Boulevard?

A Yes.

Q And what did you say to him? What if anything did you say to him after that?

A I don't recall.

Q Did you handcuff him?

A Yes.

Q Did you search him?

A Yes.

Q Did you find a knife on him?

A No.

Q Did you make any observations of his physical condition at that time?

A Yes.

Q Did he have any blood on him?

A Not that I can recall.

Q And was his clothes disheveled in any way?

A Yes.

Q Do you have the arrest photo with you?

A No, I don't.

THE COURT: And, counsel, what do you mean by the clothes disheveled?

MS. POVMAN: Well, do you have the arrest photo, the original?

THE COURT: Meaning?

MS. POVMAN: I will withdraw the question.

Q Did you observe any cuts on Mr. Ball?

A Not that I can recall.

Q Did you observe any bruises on Mr. Ball?

A No.

Q And did you observe any blood on Mr. Ball?

A No.

Q Thank you. Now, Mr. Ball told you he had just bought the phone or found the phone?

A I believe he said he got the phone from 105th.

Q Got the phone?

A Yes.

THE COURT: So did he say bought it, got it, found it? What word had he used?

THE WITNESS: I believe he said he got the phone from 105th Street and Northern Boulevard. He did not say that he found it.

MS. POVMAN: Okay, he got it.

Q Did you place Mr. Ball in your car at that time?

A Yes.

Q And did you radio that you had a person in your car?

A I believe so.

Q And was Mr. Ball transported to another location?

A Yes.

Q And where was he transported?

A 105th Street and Northern Boulevard.

Q At any time that night -- withdrawn.

At the scene, at any time did you see Mr. Ball and Mr. Brooks together?

A No.

Q If I understood your testimony, you never saw Mr. Brooks at 105th and Northern?

A Correct.

Q And it was -- Mr. Brooks was stopped by another set of officers?

A Yes.

Q And he was transported away before you arrived at 105th and Northern?

A He was transported away as I was arriving, yes.

Q And when you arrived at Northern Boulevard and 105th, Mr. Ball, was he removed from the automobile?

A Yes.

Q And was he placed against the front fender of the car?

A He was standing in front of the car.

Q He was standing?
A Yes.
Q Now, was he handcuffed at that time?
A Yes.
Q And were there -- was there anyone standing with him on the street?
A Yes.
Q And were those uniformed police officers standing next to him?
A Yes.
Q And how many uniformed police officers were standing next to him?
A I believe I was with one other person.
Q Was there one on each side of Mr. Ball?
A I believe one person, so on one side.
Q And he remained handcuffed at the time the complainant made the identification?
A Yes.
Q So, it was Mr. Ball standing with two uniformed police officers?
A No.
THE COURT: One, he said.
Q Just one police officer?
THE COURT: Correct?
A I never said two.

Q I am sorry, I thought you were with another officer?

A I was with another officer.

Q Was he standing with you on the street with Mr. Ball?

A I was in the ambulance whenever the ID process happened.

Q Okay. I am sorry. I misunderstood. So when you arrived at 105th and Northern, the complainant was in the ambulance?

A Yes.

Q And where was your car in reference to the ambulance?

A I was parked behind the ambulance, a couple of car lengths behind the ambulance.

Q Okay. So when you say a couple of car lengths, what is it about, can you estimate?

A Three car lengths?

Q Three car lengths. And 105th and Northern, is that commercial or residential over there?

A Commercial.

Q So did you use a flashlight or something to illuminate Mr. Ball?

A No.

Q So it's your testimony that at the time the identification was made, the complainant was three car lengths away from Mr. Ball?

A Yes.

Q And he was seated in the ambulance?

THE COURT: He who?

A No.

Q The complainant. He was standing outside the ambulance?

A No, he looked out of the ambulance.

Q When you say he looked out the ambulance, out the back door, the back window?

A The back door. It's the barn doors of the ambulance. They are wide open.

Q Was Mr. Ball ever brought over to the ambulance?

A No.

Q And was the complainant ever transported to Mr. Ball?

A No.

THE COURT: And was Mr. Ball front cuffed or rear cuffed?

THE WITNESS: He was rear cuffed.

THE COURT: And as he was standing in front of this car, was he facing toward the rear of the ambulance, or was his back to the rear of the ambulance, or was his profile to the rear of the ambulance?

THE WITNESS: He was facing the rear of the ambulance.

THE COURT: Okay. And from that position, his hands were behind his back?

THE WITNESS: Yes.

THE COURT: From your position inside the ambulance, could you see his hands?

THE WITNESS: No.

THE COURT: Miss Povman?

MS. POVMAN: All right.

Q Now, Officer, you told us that you recovered an iPhone from Mr. Ball; is that correct?

A Yes.

Q And did you show the iPhone to the complainant in this case?

A Yes.

Q And was that before or after the identification?

A It was before.

Q So when you arrived at 105th and Northern, you brought the iPhone over to the complainant first?

A Yes.

Q And I believe you told us that you asked him to --

A I asked him for the password.

Q The code or the password?

A Yes.

Q So did you tell the complainant that you recovered the iPhone from the individual standing by the police car?

A No.

Q Where did you tell the complainant you recovered the

phone?

THE COURT: If you did.

Q If you did.

A I never told him that I recovered the phone from the complainant. I said, is this the phone. He said yes.

I asked him for the password to make sure it was his phone; he gave me the password.

Q Okay. After the complainant identified the telephone, did you go back to Mr. Ball?

A Yes.

Q And did you tell Mr. Ball that the complainant ID'd the phone?

A No.

Q You said that Mr. Ball made a second statement to you?

A Yes.

Q And that statement, I believe, was, if the guy says it's his, it's his?

A It must be his.

Q It must be his?

A Yes.

Q Did you tell Mr. Ball that the guy ID'd the phone?

A No.

Q Mr. Ball just spit that out?

A He asked me what he was being charged with. I said he was being charged with robbery. He goes, it's -- what I stated:

He says it's his, then it must be his.

Q But he never told you that he had robbed the phone; is that correct?

A He never stated that to me.

Q Right. He told you that he had got the phone on 105th and Northern?

A Yes.

MS. POVMAN: Judge, I just need about five minutes to go over some notes. Mr. Pimentel can do his cross.

THE COURT: Sure, if he wants.

MR. PIMENTEL: Sure.

MS. POVMAN: Thank you, Judge.

CROSS-EXAMINATION

BY MR. PIMENTEL:

Q Good afternoon, Officer.

A How are you?

Q Sir, did you observe my client at any point in time on 105th Street?

A Who is your client?

Q Mr. Brooks.

A No.

Q Other than Mr. Brooks, you and Mr. Ball, was anyone else arrested in this case?

A No.

Q Other than Mr. Brooks, was anyone else arrested on

105th Street?

A Mr. Ball.

Q Mr. Ball was arrested on 105th Street?

A Yes.

Q So Mr. Ball and Mr. Brooks were the only two individuals that were arrested on 105th Street?

A At that time and that date, yes.

Q Earlier you indicated you had a conversation with Mr. Elturky?

A Yes.

Q And during that conversation, he described what occurred?

A Yes.

THE COURT: Did he? You know, that's a statement or a question?

Q Did the complainant describe to you what occurred, to you?

A Yes.

Q And what exactly did he state, if you recall?

A He stated that your client Mr. Brooks started the assault on him. He started, attacked him, punched him, kicked him about the face, the body. That's when Mr. Ball jumped in and started to help.

THE COURT: Now, just to make sure that we are clear: At the time that this statement is being made to you

by Elturky, does Elturky have a name of any of these two individuals?

THE WITNESS: No.

THE COURT: So and at this point, Mr. Brooks is not at the scene?

THE WITNESS: Correct.

THE COURT: So in describing what it is that Elturky said, if you can, just use the words that he used.

THE WITNESS: Correct.

THE COURT: Please.

THE WITNESS: He stated the big Black guy with the shaved head was the one that started assaulting him when he came out of the check cashing place. Then a smaller Black guy began to help assault him. The smaller Black guy went into his pockets and took his phone and his wallet.

Q What was the exact description he gave of the bigger Black guy? Did you ask him for height?

A No.

Q Weight?

A No.

Q Any distinguishing features?

A Other than a big Black guy with a bald head.

Q Did he describe -- did he indicate what he was wearing?

THE COURT: Sorry, counsel. And you said "bald head," you said "shaved head." Or --

THE WITNESS: Sorry. I cannot be exact on exactly -- he said shaved or bald head, but there is no hair on the guy's head that started the assault on him.

Q Did he describe whether he had any facial hair?

A Not that I can recall.

Q When he described the assault, were they facing each other?

THE COURT: Who facing?

Q Was the victim face-to-face with the person they were assaulted by?

A I don't recall.

Q You don't recall if he was hit from the front, from behind?

A Don't recall.

Q Do you recall how many times he indicated he was hit?

A No.

Q Was he hit only with the fist or was he also hit with feet?

A He told me he was kicked and punched.

Q Was he punched while he was standing up or was did he indicate he was on the ground?

A Don't recall.

Q Did you go back to the scene of where the actual assault and robbery took place?

A Yes.

Q Did you have an opportunity to inspect the scene?

A Yes.

THE COURT: Well, was the scene the place where the assault had taken place, how far was that scene from this bodega at the corner of 105th and Northern?

THE WITNESS: Within feet. Not a great distance.

THE COURT: So would it be a car length?

THE WITNESS: I would say about a car length. Part of two car lengths.

THE COURT: And was it on the sidewalk or in the streets, the place of this assault?

THE WITNESS: The assault was on the sidewalk and she was on the curb. Whenever I went back, it was on the corner of 105th and Northern, on the south side, and there was blood on the sidewalk and the curb and the gutter.

THE COURT: So is the bodega on the south side of Northern Boulevard?

THE WITNESS: Yes.

THE COURT: And so this assault and the curb, your saying, that is maybe between perhaps two car lengths from the entrance into that bodega?

THE WITNESS: Yes.

THE COURT: And this area that you observed the blood, was it both on the sidewalk and in the gutter?

THE WITNESS: Yes.

THE COURT: Counsel?

Q And you said this occurred in front of a check cashing place?

A Yes. I believe Mr. Elturky went into the bodega to use the phone to call 911. That's the reason why 104-22 Northern Boulevard, that's why he gave us that location, that's where the complainant was at.

The actual assault occurred at the corner. It would be the southwest corner of 105th Street and Northern Boulevard which is directly in front of the check cashing place.

THE COURT: And so then how many storefronts is this check cashing service from the entrance into the bodega?

THE WITNESS: I believe just one place in between it.

THE COURT: Okay. So it was two storefronts from the bodega?

THE WITNESS: No, I believe it's the cash cashing place, the miscellaneous store and the bodega.

THE COURT: Okay.

Q When you spoke to Mr. Elturky, did he describe a third person?

MS. SCHNEIDMILL: Objection. This witness already testified that Mr. Elturky told him there was only two people involved.

THE COURT: Sustained.

Q You recall receiving a radio run that it was three male Blacks?

A No.

Q You don't recall that?

A No.

Q Is there anything that would refresh your recollection to that?

A From the incident, if I remember, I just heard male Blacks. I don't remember the number that it was with or five. I just know male Blacks, white tee shirt, black pants.

MR. PIMENTEL: Nothing further, your Honor.

THE COURT: Counsel? Anything?

MS. POVMAN: Nothing further.

THE COURT: People?

MS. SCHNEIDMILL: Nothing further, Judge.

THE COURT: Thank you, Officer.

(Whereupon, the witness was excused from the witness stand.)

THE COURT: People, any further witnesses?

MS. SCHNEIDMILL: No further witnesses.

THE COURT: You rest?

MS. SCHNEIDMILL: Yes, People rest.

THE COURT: And any defense witnesses?

MS. POVMAN: No, the defendant Ball rests for the

purpose of the hearing.

THE COURT: Would you each care to rest on the record or argue the evidence as you've heard it?

MS. POVMAN: Just I'd like to be heard very briefly. I would move to suppress the arrest of Mr. Ball and all the physical evidence seized from him.

I submit, Judge, that this police officer did not have sufficient information or sufficient specific information to stop Mr. Ball on the street, handcuff him, place him in a radio car and transport him to the identification location.

The radio run said three male Blacks, no height, no weight, no age, and lacked specificity. And there was no probable cause to arrest the defendant and transport him to the identification location, Judge.

The identification itself, I would submit, is suggestive because Mr. Ball was handcuffed and in the presence of one or two uniformed officers.

He was viewed at nighttime from three car lengths away, according to the officer. The victim never even got out of the ambulance to look closely at Mr. Ball.

Further, the fact that the police officer showed the cell phone to the victim just prior to displaying one individual in handcuffs, I submit is highly suggestive.

And I would ask that both the identification and

the physical evidence be suppressed.

THE COURT: Counsel?

MR. PIMENTEL: Your Honor, I would ask that the identification as to Mr. Brooks also be suppressed. There is no particular description with any specificity.

The testimony of Officer Lanning was that Mr. Brooks -- the alleged complainant identifies Mr. Brooks while Mr. Brooks is standing in the street at night next to another individual, while the complainant is still inside the patrol vehicle.

The description that comes over is three male Blacks, white pants -- white shirt, black pants. Nowhere was it mentioned that Mr. Brooks, in the first description, that he had a bald head.

Additionally, when Mr. Brooks was arrested he was wearing a hat, a red hat which Officer Lanning testified to, which calls into question the alleged victim's description of Mr. Brooks to be even correct. There is no way of knowing if he even had a vantage point of being able to correctly identify Mr. Brooks after the incident.

The other piece of evidence is that both officers came in and testified that the alleged victim was bleeding profusely. Mr. Brooks was wearing a white shirt. If Mr. Brooks was the person that had been attacking him, it would surmise that some blood would have fell on him.

Now, with regard to Mr. Ball's first statement, I got the phone from someone at 105th, I ask the Court to suppress that statement pursuant to Rubin and Cruz.

The evidence establishes that the only person arrested on 105th Street, other than Mr. Ball, was Mr. Brooks.

There is no way a jury would not believe that this statement totally incriminates my client. No other person was arrested. So there is no way to allow that to come in on a joint trial and my client not be prejudiced.

THE COURT: People, anything or just rest on the record?

MS. SCHNEIDMILL: People would rely on the record, your Honor.

THE COURT: A suppression hearing was just held by this Court relative to both of these named defendants.

And this Court gives full credence to the testimony of the People's witnesses including the two officers, Police Officer Daniel Lanning and Police Officer Angelo Pampena.

And as they related, and now relative to the Dunaway issue and the Wade issue, at the time that these officers were separately on patrol, each one in the confines of the 115th Precinct, each one on duty approximately nine p.m., on the night of July 3, 2012.

Each had received a radio run of a past robbery and identified where the complainant could be found. The officers had responded separately to that location which is in front of a bodega, which is at the corner of 105th and Northern Boulevard.

At the time that they arrived, certainly now as far as Police Officer Lanning is concerned, while he had reason to recall that the radio run had described three male Blacks, the content of that run was that the male Blacks were wearing a white shirt and black pants.

When the officer, meaning Lanning, arrived, the complainant Mr. Elturky had literally told him he, the complainant, was bleeding, had told him that they had run in that direction, meaning, I believe it was southbound on 105th Street.

The officers had placed the complainant in the car, driven half a block down that street and saw literally a male Black wearing a white shirt, black pants. That male Black was with one other. But the complainant had told that officer that the male Black in the white shirt, black pants is one of the male Blacks involved in his robbery.

Under the circumstances, the officers had sufficient information upon which to stop in this case Mr. Brooks -- yes, to stop Mr. Brooks. The identification of Mr. Brooks by the complainant was immediate. So the

officers had probable cause to stop and arrest the defendant.

It seems to this Court that that stop was based on -- not the stop -- the identification of this defendant was in a short time and distance from the scene of this crime, that the actions of the police had lacked suggestiveness.

And so the motion by Mr. Brooks to suppress both, the theory being that a lack of probable cause and unreasonable police conduct, on both the Dunaway issue and the Wade issue, again, as to Mr. Brooks, is respectfully denied.

And now as to Mr. Ball. The officer testified to the route that he had taken in responding to 105th and Northern Boulevard, that he was driving northbound. He was driving toward Northern Boulevard on 105th, I believe. He was driving toward 105th and Northern.

He sees a male Black wearing black pants and a white shirt literally, running in the direction of the police car. Meaning that the person that he described as defendant Ball was literally running toward the front end of the police officer's car. They were coming closer and closer together.

As the officer had observed Ball, then he saw Ball wearing, again, black pants and a white shirt. He sees him

carrying a cell phone and, without any questions being asked of Ball, Ball volunteered that this cell phone that he had in his hands, he had gotten the phone from 105th and Northern.

So the statement by the defendant -- first he matched the description. He then volunteers that he has just come from the area in which the officers had reason to believe that there was a robbery that was committed. The officers had probable cause to arrest the defendant.

The defendant is at that point brought back to the scene of this crime. But before, at some point in the process, the officers searched Ball and he has cash on him in the denominations of one hundred-dollar bill, seven twenties and one ten -- one ten-dollar bill.

And at the time that the officer actually meets the complainant at the back of the ambulance at 105th and Northern, the complainant tells the officer that what had been taken from him was money in the denominations of a hundred-dollar bill, seven twenties and one ten, that also taken from him was an iPhone.

The officer had in his possession the iPhone that he recovered from this defendant, meaning defendant Ball. There was a password that was associated with that phone that was given to the officer by the complainant, and that password unlocked that phone.

So relative to Ball, the police officer -- the Dunaway issue and Wade issue, again, the police officers had probable cause to arrest the defendant.

The actions of the defendant in setting up the identification of defendant Ball lacked suggestiveness. It happened a very short time after this robbery, a very short distance from this robbery. And the motion to suppress the identification and the arrest is respectfully denied.

As to -- the money and the cell phone was found incident to a lawful arrest of defendant Ball. And so the motion made to suppress the money that had been recovered from Ball and the iPhone that was recovered from Ball, is also denied.

As to the statements made eventually by Ball, each of those statements were made, the first one being, I just got the phone from 105th and Northern, that statement made by Ball was not in response to any statement made by the officer to Ball. And so that statement was voluntarily made. And so the motion to suppress that statement is denied.

As to the second statement, and it was in sum and substance, if the guy says it's his, it must be his; that statement was made in response to the question asked by Ball, what am I being charged with. The officer tells him what he's being charged with, and then the defendant makes

that statement. Again, that statement is not in response to any question asked of Ball by the officer. And so it was voluntarily made.

And the motion made then to suppress both of those statements is denied.

And I believe that that covers all the issues that had been addressed at this hearing. And again, the motions were made by each defendant to suppress, the probable cause to arrest, the identifications of the defendants. And relative to Ball, the motion to suppress the property that was recovered and the statements made by the defendant Ball, the motions are again respectfully denied.

I have to have this matter adjourned for a day certain for trial. Counsel?

MS. POVMAN: Judge, may I order the minutes pursuant to 18-B?

THE COURT: Yes.

MR. PIMENTEL: Your Honor, you didn't address my Bruton portion of the first statements, where it implicates my client. My client will be subject -- won't be allowed to cross-examine the declarant on that statement, and the only person connected to 105th Street is my client.

THE COURT: Well, the only person that was addressed -- he is connected to that street by the complainant who identified him within a half a block. The

application -- the Bruton application is denied.

Anything else, counsel?

MS. SCHNEIDMILL: No, your Honor.

THE COURT: Okay. Day certain for trial?

MS. SCHNEIDMILL: TAP-A.

THE COURT: Yes, back in TAP-A for a day certain. And again, counsel, there was a prehearing offer made to the defendants. People, is that offer still on the table?

MS. SCHNEIDMILL: If they wanted it today, but today is the last day for that offer.

THE COURT: You know, you Mr. Ball and you Mr. Brooks, the way these things normally work is at the earlier point in the proceedings in which these offers are made, then it only gets higher later.

So, you know, the only people that can make a decision to plead and to take the lower offer, are you. If that's something that you want, it's available. If not, then we will have the matter adjourned back to TAP-A, and you will deal with another Judge at that point.

DEFENDANT BALL: I have what you call a medical form here and what happened is, they asked me to have you fill out or give what you call a Court Order in order to subpoena the medical records because, you know, I have medical records that indicates me and my hand being severed, disabled in this hand.

And so the records, they can't give them to me unless you will order them, you know, give me a Court Order for the medical.

THE COURT: Well, I've never -- normally even in Corrections there is some records, medical records that you have had from other hospitals that they need in order to properly care for you.

DEFENDANT BALL: No, I mean, as part of for my defense. Because --

MS. POVMAN: Judge, he handed me a request for release of medical information, but I don't see anywhere on the document where the Court would sign it, it seems to me.

DEFENDANT BALL: That's what they told me.

MS. POVMAN: I know but there is no place here. We will have to prepare a subpoena in TAP-A.

DEFENDANT BALL: Thank you.

THE COURT: A date, counsel, back in TAP-A?

DEFENDANT BALL: Thank you.

MS. POVMAN: It's for you to sign.

THE COURT: What about Tuesday, June 25th?

MS. POVMAN: That's fine.

MR. PIMENTEL: That's fine.

MS. SCHNEIDMILL: That's fine.

THE COURT: Done.

THE CLERK: What date?

THE COURT: Tuesday, June 25th. TAP-A.

***********************************

CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF THE ORIGINAL STENOGRAPHIC MINUTES TAKEN OF THIS PROCEEDING.

HELEN BOUKAS
Senior Court Reporter

INDEX TO WITNESSES

| | | |
|---|---|---|
| D A N I E L L A N N I N G, Police Officer | 4 | 1 |
| DIRECT EXAMINATION BY MS. SCHNEIDMILL | 4 | 11 |
| CROSS-EXAMINATION BY MR. PIMENTEL | 10 | 1 |
| CROSS-EXAMINATION BY MS. POVMAN | 17 | 20 |
| A N G E L O P A M P E N A, Police Officer | 22 | 1 |
| DIRECT EXAMINATION BY MS. SCHNEIDMILL | 22 | 11 |
| CROSS-EXAMINATION BY MS. POVMAN | 35 | 3 |
| CROSS-EXAMINATION BY MR. PIMENTEL | 50 | 13 |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS: CRIMINAL TERM, PART K-20

---------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK, : Ind. No. 2228-12

-against-

RAYMOND BALL and ELIJAH BROOKS, : Calendar Call

Defendants.

---------------------------------------X

December 16, 2013
Queens Supreme Court
125-01 Queens Boulevard
Kew Gardens, New York 11415

B E F O R E : HON. RONALD D. HOLLIE, Justice, Supreme Court

A P P E A R A N C E S :

For the People:

THE HONORABLE RICHARD A. BROWN,
District Attorney, Queens County

BY: MS. SCHNEIDMILL, Atty.
Assistant District Attorney

For the Defendant Ball:

LINDA POVMAN, ATTY.
123-35 82nd Road
Kew Gardens, New York

For the Defendant Brooks:

ALEXIS PIMENTEL, ESQ.
37-53 90th Street
Jackson Heights, New York

Alan H. Kimbarow, RPR
Senior Court Reporter

COURT CLERK: Come to order. Calendar No. 2, indictment No. 2228 of 2012, People versus Raymond Ball and Elijah Brooks.

THE COURT: Appearances, please, counsel.

MR. PIMENTEL: Good afternoon. For Mr. Brooks, Alexis Pimentel, 37-53 90th Street, Jackson Heights, New York, 11372.

THE COURT: Good afternoon, counsel.

MS. POVMAN: On behalf of the Defendant Ball, Linda Povman, 123-35 82nd Road, Kew Gardens, New York. Good morning -- good afternoon, your Honor.

MS. SCHNEIDMILL: Naomi Schneidmill, for the People. Good afternoon, your Honor.

THE COURT: Good afternoon, counsel.

Defendants are produced and being brought into the courtroom now.

COURT OFFICER: Yes, Judge.

COURT OFFICER: One coming out.

THE COURT: How are you, sir?

DEFENDANT BALL: I'm looking forward to seeing you.

COURT OFFICER: Just slide down.

DEFENDANT BALL: I'm looking forward to seeing you.

THE COURT: Okay.

COURT OFFICER: All right. One coming out.

THE COURT: Both defendants are now present.

This matter is still in a hearing posture. And, People, you were ready for that continued hearing today?

MS. SCHNEIDMILL: We were ready, your Honor. I believe I knew that the Court was engaged on trial. My officers had been notified, but once I knew that the trial was continuing I had canceled them for today. But we were ready to proceed.

THE COURT: And, for the record, as counsel has mentioned, this part is on trial. I can't do the continued hearing today. And it is in a stage where it is not a hearing that can be farmed out to any other judge, so it has to be heard by me.

It cannot be heard today, so it will have to be adjourned. Counsel, prior to the matter being adjourned, I understand there's a defense application?

MR. PIMENTEL: Yes. At this point in time we have been on this case several times. My client has been in for 14 months. There's been no forward progress in the case. I would ask if your Honor would consider to reduce his bail. He previously had bail, made bail and was out on bail. He returned to every court date. He's not going to be a flight risk. We would just ask --

THE COURT: If he had been out on bail on this

matter and is now in, what happened that his status was changed?

MR. PIMENTEL: He was subsequently arrested for another matter which was ACD'd in November.

THE DEFENDANT: March.

MR. PIMENTEL: March. So, he's been in for the 14 months. Unfortunately, because of the motions that have gone back and forth, he doesn't have enough time for a 30 -- 30.20 motion.

But I would ask your Honor, in light of all the delays and circumstances of this case to consider reducing his bail so he could come out -- so his family could afford the bail and he could come out.

THE COURT: People, what's your position?

MS. SCHNEIDMILL: Your Honor, at this time there's no reason to reduce his bail. There has been no undo delays in this case. This case stems from an incident July 2012. Both defendants were indicted around September. Defendant Brooks, who Mr. Pimentel represents --

THE COURT: Indicted September of what date?

MS. SCHNEIDMILL: 2012. Defendant Brooks filed a 190.50 motion at some point which had, he had succeeded, had his indictment dismissed.

People re-presented in February 2013, this year, where he was then indicted again. A motion to consolidate

was done. Motions on that indictment were done. The case was quickly moved to hearing stage and, in fact, the People were ready for trial before a motion was made to reopen the hearing.

So, there's been no delay on the part of the People in moving this case. People were ready to do this trial months ago. Once a motion was made to reopen the hearing and granted by this Court, that's the stage we have been at now for a few months.

At this point there's been no reason for the bail to be reduced because there has been no delay on the part of the People as to moving this case to trial.

THE COURT: Unfortunately. Well, fortunately -- well, the reality is that there's been no delay on behalf of the People. This is a matter that's still in the hearing posture because of the appropriate actions taken on the defendant's behalf by his counsel. I just would want and ask that the People be ready for the continued hearing on the adjourn date, and once that date is chosen, I will keep that date aside, you know, to make sure that even if I am on trial then the trial will have to be worked around that hearing.

MS. SCHNEIDMILL: Your Honor --

THE COURT: I just need a firm date, counsel, for each side to be ready.

MS. SCHNEIDMILL: The only thing I would say, in terms of next date for hearing, your Honor, is that we -- the posture in which this hearing is to be re-opened is to admit an ambulance report. And in doing so, I believe both defense counsels want to cross-examine the witness that had testified at this hearing prior, so there's two witnesses, two police officers which were both available for today and, as I indicated to both defense counsels off the record, one of them is available all of January and one of them is not available until after January 22.

So, I have no problem picking an early January date to start it for the one officer, but if they intend to call and cross-examine the other witness, it will have to be continued because that other officer is in training and then he's away for two weeks on vacation.

THE COURT: Counsel, is it possible after an examination of one that you would no longer need the second, or is it your position you'll need to examine both?

MR. PIMENTEL: Probably need to examine both. But until getting testimony from the first one, I couldn't make that determination at this point.

THE COURT: Let's pick a date that we can hear from the one. My understanding is that it's on a limited issue surrounding the ambulance and what the officer saw and did relative to the arrival of that ambulance.

MR. PIMENTEL: And relevant to the time of the incident taking place.

MS. POVMAN: And the identification.

MR. PIMENTEL: And the identification.

THE COURT: What date can we be ready for that first officer?

MS. PIMENTEL: January 8, your Honor.

MR. PIMENTEL: Yes.

MS. POVMAN: Judge, just two things I want to briefly put on the record. Number one. The district attorney has conveyed an offer off the top count of the indictment of a D non-violent felony with 2 to 4 years, which I have conveyed to Mr. Ball, and he's indicated he's not interested in that offer.

And when I spoke to him on Friday, he indicated to me that he wants a new lawyer.

DEFENDANT BALL: Your Honor, may I speak? I apologize.

THE COURT: Very briefly, sir.

DEFENDANT BALL: What happened is my lawyer, she explained to me her position, as far as her experience as a lawyer, has brought her to the conclusion that considering there's perjured testimony being used to prosecute me that it has no relevancy to my case. And for that reason I feel that --

THE COURT: I think that you, I've known your counsel and the quality of her work for many, many years.

DEFENDANT BALL: Right.

THE COURT: So you're interpretation, I know it's one that you firmly have.

DEFENDANT BALL: But --

THE COURT: Hold on. I think you might have taken what she said out of --

DEFENDANT BALL: I'm sure you think so.

THE COURT: The application to relieve her is respectfully denied.

DEFENDANT BALL: Actually I'm asking, would you consider allowing me to go pro se because of the fact what I did is, I prepared my legal defense for myself thus far since I've been arrested. May I continue, please?

THE COURT: No, no, no. At this point we're in a hearing posture. This hearing is going to be adjourned to January 8. I'm setting up a point in that day in the morning that this matter could be heard.

As to that next witness and the application you're making for change of counsel or to represent yourself will have to be made before the trial judge. I'm not going to be the trial judge, I'm only doing the hearing.

And, so, the application to represent yourself in the course of this hearing is denied.

DEFENDANT BALL: Your Honor, I just want you to understand. My lawyer, she has went on the record, you know, indicating that she's not going to be able to defend me considering that, you know, there's perjured testimony being --

THE COURT: Sir. There's nothing more for me to say. She is your lawyer. She will be your lawyer for the balance of this hearing, and that hearing date is January 8 for the first witness, and probably sometime later in that month for the second.

DEFENDANT BALL: Thank you.

MR. PIMENTEL: I similarly want to convey, on the record, I informed my client of the same offer, and he indicated to me he's not interested in any offer at this moment and would like to proceed to trial.

THE COURT: Okay.

MS. POVMAN: Thank you, Judge.

MR. PIMENTEL: Thank you, your Honor.

(The case was adjourned to January 8, 2014.)

CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF THE ABOVE-MENTIONED PROCEEDINGS.

ALAN H. KIMBAROW, RPR
SENIOR COURT REPORTER

CA# 14-15

COPY

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS : CRIMINAL TERM : PART K20

---------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

-against-

RAYMOND BALL and ELIJAH BROOKS,

DEFENDANT.

---------------------------------------X

INDICTMENT NO: 02228/2012

HEARING

Queens Supreme Courthouse
125-01 Queens Boulevard
Kew Gardens, New York 11415
January 8, 2014

B E F O R E:

THE HONORABLE RONALD HOLLIE,
J U S T I C E

A P P E A R A N C E S:

RICHARD BROWN, ESQ.
District Attorney, Queens County
125-01 Queens Boulevard
Kew Gardens, New York 11415
BY: NAOMI SCHNEIDMILL, ESQ.
Assistant District Attorney

LINDA POVMAN, ESQ. (18B)
Attorney for the Defendant
RAYMOND BALL
123-35 82nd Road
Kew Gardens, New York 11415

LAW OFFICES OF ALEXIS PIMENTEL (RETAINED)
Attorney for the Defendant
ELIJAH BROOKS
37-53 90th Street, Suite 10
Jackson Heights, New York 11372
BY: ALEXIS PIMENTEL, ESQ.

Carrie Belmonte
Senior Court Reporter

cbb

THE CLERK: Calendar number 2, indictment 228 of 2012, People versus Raymond Ball and Elijah Brooks.

THE COURT: Appearances, counsel.

MR. PIMENTEL: Alexis Pimentel, 37-53 90th Street, Jackson Heights, New York for Mr. Brooks. Good morning.

MS. POVMAN: On behalf of Mr. Ball, Linda Povman, 123-35 82nd Road, Kew Gardens, New York.

MS. SCHNEIDMILL: Naomi Schneidmill for the People.

MR. BALL: I apologize. I want to go on the record and let the record reflect that, you know, last time I was in front of you I asked you to allow me to go pro se or have another lawyer represent me in the case. I don't feel Miss Povman will properly represent me. And she has been negligent, you know, in her duties in defending me.

So, you know, I just wanted to let the record reflect that, your Honor, we are going forward today with this hearing against, you know, my wishes, you know, of having her represent me and let the Court know I have submitted -- I don't know if you had an opportunity. I submitted a motion for dismissal which reflects, you know, a lot of information, your Honor, that pertains to the perjury testimony of Officer Pampena against me in this case.

THE COURT: Let me just, you know, address the issue as far as you're asking Miss Povman, you know, being

relieved. You had made that application before. The application was denied. We are literally in the middle of a hearing. The matter hasn't been --

MR. BALL: I understand.

THE COURT: The hearing hasn't been finished yet. Everything I have seen from each counsel in this case has been -- you know, you said counsel was negligent and things like that. There are things that -- of the things I have heard from each counsel in the course of this hearing, I haven't seen any indication of that. And so because I have not then there is no reason, absolutely no reason, you know, both on the merits of the case and then also as far as expediency is concerned, there is no reason to address that issue again during the course of this hearing.

Now, at the end of the hearing if there are issues that you believe should have been raised and had not been raised that are appropriate for the hearing, then I will let you -- if you your counsel approves I will let you address those issues you believe are relevant to this hearing.

MR. BALL: Yes, sir.

THE COURT: At the end of this hearing before I make a ruling.

MR. BALL: I will appreciate it.

THE COURT: As far as changing counsel, at this point the application is denied.

MR. BALL: Okay.

THE COURT: Anything further at this point?

MR. BALL: Thank you.

MS. SCHNEIDMILL: Yes, your Honor. I believe that as we discussed on the last date we were reopening this hearing for purposes of readmitting the EMS/EMT report I provided to defense, unless I let Court know I make one of the witnesses available today of the two officers that testified at this hearing. Both officers are here, Officer Pampena and Lanning, outside. At this point after reviewing the minutes from our hearing --

MS. POVMAN: Is that the officer?

MS. SCHNEIDMILL: No.

After reviewing the minutes from the hearing, I don't believe if the issue that we are reopening the hearing for is narrowly addressing the EMS or EMT report and treatment of the victim during which time he made an identification of Defendant Ball, I don't believe that there is any testimony from Officer Lanning that would be helpful at this point because he had no interaction with the victim once the victim was being treated by EMS and he had no interaction with him in regards to Defendant Ball's identification procedure.

Officer Lanning was the one that was present during the ID procedure concerning Defendant Brooks as well

as recovery of property concerning only Defendant Brooks. So at this point I would just ask that --

THE COURT: So I don't have the decision reopening the hearing in front of me, but by the terms of that decision is it reopened as far as Ball is concerned or both defendants?

MS. SCHNEIDMILL: I believe that decision was -- very narrowly stated that it was actually only being reopened to admit the EMT or EMS report. Beyond that, I'm not searching anything beyond oral argument, if necessary, in terms of cross-examining the witnesses or actually defense wants to call these witnesses I would argue that they only need to call one of the two.

THE COURT: Okay. Before I hear from counsel, Al, would you give me a copy of the file so I can see.

(Whereupon, the item was given to the Court.)

THE COURT: Okay. I remember. Okay.

MR. PIMENTEL: Your Honor, if I may, Mr. Pampena's testimony at the hearing was when he arrived at the scene EMS was already there and at that point in time Mr. Brooks had already been removed from the scene. Mr. -- Officer Lanning was the last person with -- that is known now that was with the victim before EMS arrived. There must have been some kind of interaction between Officer Lanning and EMS when they arrived at the scene.

Additionally, the EMS report clearly indicates that the victim's eyes were swollen which goes directly as to the victim's ability to perceive or identify my client when he had a swollen eye. We have no indication of whether he was even able to see Mr. Brooks from the vantage point he was at.

THE COURT: Okay. So you are saying that by looking at the content of the EMS report then you wish to cross-examine Lanning as to Lanning's perception of whether or not the witness was able to see who was being shown to him?

MR. PIMENTEL: Yes. As well as what interaction he had with EMS.

THE COURT: And now why would the -- you know, limiting, I mean, is there any -- other than the condition of the alleged victim in the ambulance that may have affected his ability to identify anyone, you know, to see someone and identify who they are, other than that information that you may not have, that you were not in possession of in arguably a timely manner, other than that, the ability of the victim to see, then what other information is in the report that you did not otherwise have available for the purposes of cross-examination?

MR. PIMENTEL: Well, your Honor seeing any additional statements were made while Officer Lanning was

present with EMS, assuming he was present with EMS when they arrived at the scene by the victim.

THE COURT: Okay. So of the two officers, ideally more concerned with Lanning than the second officer; is that correct?

MR. PIMENTEL: Well both. I'm also interested in finding out what he -- what Officer Pampena observed, the interaction between EMS and the alleged victim.

THE COURT: But that information, an interaction between the officers and the EMS people and the complainant, is there something in the report that you did not have, you know, at the time that the hearing ended?

MR. PIMENTEL: His condition. His condition as it was reported to EMS.

THE COURT: Okay. So you can inquire as reported to EMS so then wouldn't the most appropriate witness be the EMS tech?

MR. PIMENTEL: He could testify as to what he observed the alleged victim's condition was.

THE COURT: The officer can testify as to his observation of the complainant, whether or not his eyes were swollen, whether or not he -- based on the officer's observations whether or not he could see who it was that he was being shown?

MR. PIMENTEL: Yes.

THE COURT: And the distances. Yeah, okay. That is reasonable based on the description in the EMS report as far as the victim's eyes being swollen. But beyond that, what other questions can you ask of the officers that uniquely arose from that EMS report?

MR. PIMENTEL: Your Honor, one second.

MR. BALL: May I?

THE COURT: No, not yet.

MR. PIMENTEL: Your Honor, there is also the issue as to Officer Pampena testifying and notes reflected in his memo book that he stopped -- from Lanning that he stopped them before EMS arrived at the scene and they were transported before EMS arrived at the scene.

THE COURT: You know, as has been mentioned by the assistant, in my view of the decision it really is the hearing has only been opened to issues that are relevant, to issues that flow from -- issues that had not been addressed or issues that defense counsel would have had to question the officers about, the information that you would have if you had the EMS report, then that would have been useful information for you to cross-examine the officers about.

The understanding I'm having is based on that report the only issue that you did not -- that you arguably did not have, on submission, information to inquire of the officers about was the ability of the victim to see because

you were looking at that report and you are saying that the victim had his eyes swollen. So beyond that, you know, the officer's memo book entry as to what happened before EMS arrived, you know, that was all available to the defense and whether or not it had been explored to the extent that you find useful, that goes beyond the scope of the issues to be addressed in this reopened hearing.

MR. PIMENTEL: Your Honor, there is a Sprint report also generated as a result of EMS and some of the times with the EMS report Sprint printout don't necessarily coincide with the Sprint report.

THE COURT: How does it not, you know, coincide? What is there in the EMS report that is contrary to what is in the Sprint report?

MR. PIMENTEL: I'm sorry, your Honor?

THE COURT: What is in the EMS report that's contrary to what was in the Sprint report?

MR. PIMENTEL: Your Honor, the address and time the police arrived and when the EMS arrived at the scene.

THE COURT: Okay. So are you saying that in the Sprint we have already in the report, I guess, that the hearing as to what time it is that the officers said that they arrived we now have an EMS report that will be entered into evidence here that they show what time in their records they arrived. Those are all evidentiary facts that -- I

Case 1:19-cv-05310-ERK-LB Document 9-2 Filed 12/13/19 Page 91 of 907 PageID #: 454

mean, you don't need to have a hearing reopened to the witness if those types are already written on the report. I will accept those times as evidence in this case and then have you make arguments, if you wish, showing, you know, the contrast between the times indicated by the officers and the time indicated by the EMS. But as far as further interviewing a witness, further cross-examination of a witness about an ID procedure that occurred at the back of the ambulance, information that you may well not have had at the time that the hearing was concluded, I don't have any problem with letting you ask the officers about his perception, of the ability of the victim to see, meaning distance from the complainant, was the complainant sitting up or lying down or what direction was the complainant's face positioned, you know. Those are the kinds of questions on the issue of the ID process with eyes swollen I will let you, you know, cross-examine the officer if you chose but anything beyond that I don't see the reason to either look -- examine the memo book or the memo book of an officer or to -- because that does not flow from the EMS report.

MR. PIMENTEL: Understood, your Honor.

THE COURT: People?

MS. SCHNEIDMILL: Also, your Honor, based on that then I would again state that only Officer Pampena then would be of use to testify at this point because there is no

evidence Officer Lanning was in the ambulance with the victim at the time that he made this ID of Ball, of defendant Ball. So if we are then cross-examining the officer as to what the victim looked like at the time he is making this ID, Officer Lanning was only involved in the ID made of defendant Brooks when the complainant was already in his RMP. So it was completely different IDs that were done for these defendants. So the complainant -- the testimony that was elicited from the hearing was that the complainant was in the car with Officer Lanning when they saw defendant Brooks and he pointed him out. Defendant Brooks was removed from the scene. The complainant was treated by EMS. While treated by EMS he identifies defendant Ball and Officer Lanning is no longer there.

THE COURT: Okay. So -- and I guess -- so it is useful to know, because I forget the details that are in this, in the course of this hearing it became clear that there were two separate ID procedures.

MS. SCHNEIDMILL: Yes.

THE COURT: One was an identification of Brooks, the complainant in a car.

MS. SCHNEIDMILL: The complainant was in the car with Officer Lanning when he identified defendant Brooks.

THE COURT: Okay. Presumably his eyes were -- you know. If his eyes were identified by EMS a few minutes

later as being swollen, the ID of Brooks was before.

MS. SCHNEIDMILL: ID Brooks was before he was examined by EMS.

THE COURT: And EMS, in that report it says his eyes were swollen?

MS. SCHNEIDMILL: Doesn't say swollen. It says that they were -- it says that the right parietal region was laceration, superficial and swelling. I mean, that's the most they say about it. I don't know if that means the eye. I don't know what parietal means. But, in any event, the ID Brooks, because it was done before EMT arrived this report would have no bearing on because his injuries were elicited during the hearing already. His injuries were already elicited out there in the minutes.

So I don't believe that Officer Lanning then should now be cross-examined based on this EMS or -- EMS report as to what he looked like when he was identifying defendant Ball. If Officer Lanning -- I understand the idea that this report was made after the ID defendant Brooks but I don't see any reason why he should then have to -- what good it would be to elicit the testimony.

THE COURT: Except now they know that there was a laceration to the -- an eye. As to where that laceration was and if it was observed by the officer, you know, I don't see any reason -- because this report is generated probably

a few minutes on the -- EMS arrives probably within, I'm imagining -- ten minutes of the identification of Brooks, that the condition of the eye would be relevant to both Brooks and --

MS. SCHNEIDMILL: Yes, it would have been irrelevant the first time we examined when he was asked and testified the complainant had cuts on his face and bleeding from his face, at that point defense counsel could have asked blood over the eyes.

THE COURT: He wasn't looking. He didn't have the EMS report. Whether or not the blood was on his cheek, the forehead, the eye, if he knew that then he may have well asked whether or not there was blood.

MR. PIMENTEL: Nor, your Honor, did it have any indication that there was any swelling to the face.

THE COURT: Okay. So I don't have any problem with the officers being able to -- the defense counsel being able to ask either officer about their observation of the complainant's face, whether or not they observed any cuts or, you know, bleeding, specifically to the eye. If so, if they recall, which -- if so, which eye. And if they have any -- did the witness express any difficulty in focusing their vision or identifying a person.

And so those are the kind of questions that the defense counsel can ask of -- again, relative to Brooks and

the other officer relative to Ball, but that the hearing is literally limited to the condition of the eyes, whether or not bleeding or swelling, et cetera. And the officers' impression as to whether or not any of those observations affected the ability of the witness, you know, to see the people that they were being shown. And that could stretch to, again, include the distance that the defendant was from the victim at the time that he was observed from the car and distance, especially where the defendant Ball was from the back of that EMT car, but that's the limited extent of the hearing.

MR. PIMENTEL: Understood, your Honor.

THE COURT: Okay. All right. So who do you want to have called first?

MR. PIMENTEL: Sorry?

THE COURT: Who do you want to have --

MR. PIMENTEL: Officer Lanning.

COURT OFFICER: Witness entering.

Judge, you want him re-sworn?

THE COURT: Yes.

D A N I E L L A N N I N G, a Police Officer, having been called as a witness by the Defendant and having stated his shield number as 2559 and command as 115 Precinct of the New York City Police Department, having been first duly sworn by the Clerk of the Court, was examined and proceeded to testify as

follows:

COURT OFFICER: Defense calls Officer Daniel Lanning, L-A-N-N-I-N-G, shield 2559, 115th Precinct.

THE COURT: Officer, I know that you were here on a hearing relative to those two defendants earlier. And since that hearing ended then there had been an EMS report that had been given to defense counsel, and defense counsel both have been given the opportunity to ask you a few questions relative to your observations of the complainant at the time of the identification of both your observations of the complainant and the circumstances under which the complainant identified each of the defendants.

Mr. Pimentel.

DIRECT EXAMINATION

BY MR. PIMENTEL:

Q. Good morning.

A. Good morning. How are you?

Q. As the Judge explained, you previously testified here. You were Mr. Brook's arresting officer. And after arriving at the scene, you spoke with the alleged victim, Mr. Elturkey; is that correct?

A. No. I am not the arresting officer, but I did briefly speak with Mr. Elturkey, yes.

Q. You weren't the officer that put Mr. Brooks under arrest?

A. I'm sorry. I'm not his arresting officer, but I did place him in handcuffs, yes.

Q. Okay. Prior to placing him in handcuffs, you spoke with the alleged victim, Mr. Elturkey?

A. Yes, briefly.

Q. When you spoke to Mr. Elturkey, what was his condition?

THE COURT: Meaning what, Counsel?

Q. What was his physical condition?

A. He was beaten up. He was bleeding from the head and I believe the mouth, if I recall correctly.

Q. Okay. Did you observe any bruises, swelling on his face?

A. Um, I believe he was a little swollen in the face, yes.

Q. Where exactly on the face?

THE COURT: If you recall.

A. I don't recall exactly.

Q. Do you remember if he had either of his eyes swollen?

A. I don't recall.

Q. You testified previously that after you had that brief conversation with him he was -- you placed him inside your vehicle and you did a quick canvas of the area; is that correct?

A. Yes.

Q. And after driving approximately half a way down the block on 105th Street he pointed out Mr. Brooks?

A. Yes.

Q. Where was he in the vehicle when he pointed out Mr. Brooks?

A. He was in the back of the vehicle.

THE COURT: By "the back" meaning the rear?

THE WITNESS: He was behind the passenger seat. I was sitting in the passenger seat, and he was behind me.

Q. And this was at night, correct?

A. Yes.

Q. The windows were up on the vehicle?

THE COURT: If you recall.

A. I don't recall.

Q. Where was Mr. Brooks at the time?

A. He was walking northbound on the sidewalk.

THE COURT: And so from the position that you were in in your car on the passenger side of your car and you are saying that the complainant was also on the passenger side of your car?

THE WITNESS: Correct, yes.

THE COURT: But a rear passenger?

THE WITNESS: Yes.

THE COURT: This street, was this, as you are driving down the street, was this -- Mr. Brooks walking towards your car or walking in the same direction your car was going?

THE WITNESS: He was walking towards our car and

he was on the same side as the passenger side. Does that make sense?

THE COURT: Yes.

Q. How fast was Mr. Brooks walking, if you recall?

THE COURT: Meaning was he --

Q. What rate of speed was he walking? Was he walking at a brisk pace? Was he walking slowly? Was he running?

A. He was wasn't running. Walking at a brisk pace.

Q. Okay. At what distance would you approximate was Mr. Brooks from the vehicle at that point in time?

THE COURT: At what point in time?

Q. When you first saw Mr. Brooks.

THE COURT: When he first saw Mr. Brooks or the witness first saw Brooks?

MR. PIMENTEL: When the witness first saw Brooks.

A. I couldn't attest to when he saw him. I can only attest to when I saw him.

Q. When you saw him, at what distance was it?

A. He was about nine, ten feet away from me.

Q. And it was dark outside. It was nighttime, correct?

A. It was but the sidewalk is pretty well-lit over there.

Q. Okay. And when Mr. -- when the alleged victim saw Mr. Brooks, was the alleged victim still bleeding?

A. Was he still bleeding?

Q. Yeah. You testified previously he was bleeding from

his face and his mouth.

A. I couldn't tell you if he was still bleeding at the time he pointed out Mr. Brooks.

Q. When -- where exactly was he bleeding from?

A. His mouth.

MS. SCHNEIDMILL: Objection.

A. And the top of his head.

Q. From where on the top of his head? Around the forehead?

THE COURT: If you know.

Q. Over the eyes?

A. From the top of his head.

Q. Do you recall if the blood was going down into his face?

A. Yes, it was.

Q. Do you recall if at any point in time the blood could have got in his eyes?

THE COURT: Could have.

Q. Did get into his eyes.

MS. SCHNEIDMILL: Objection.

THE COURT: Overruled. If you know.

A. No, I couldn't testify to that.

Q. Did you ever observe the alleged victim squinting?

A. No.

Q. Did you observe him wiping out his eyes?

A. No.

Q. Now, officer, why didn't -- you stated earlier you put -- you handcuffed Mr. Brooks?

A. Yes.

Q. After you handcuffed Mr. Brooks, did you remain on the scene?

A. I did, yes.

Q. At any point in time when you were -- remained at the scene, did you observe EMS arrive at the scene?

A. I did not. I left right before they had showed up.

Q. You left right before EMS showed up?

A. Yes.

THE COURT: And how do you know you had left right before?

THE WITNESS: I'm sorry. I left before they showed up.

THE COURT: You don't know?

THE WITNESS: I don't know if they showed up right after or...

Q. Officer, when you -- you testified previously there was another person at the scene with Mr. Brooks?

A. Yes, I did.

Q. How did you know that the person the alleged victim pointed at wasn't that other person?

MS. SCHNEIDMILL: Objection. This has been asked

and answered in the last part of the hearing.

THE COURT: Sustained. It doesn't go to the ability of the --

MR. PIMENTEL: Your Honor, it goes directly to the ability of him to perceive. We don't know if he was able to accurately see who the person he was ID'ing.

THE COURT: It doesn't flow from any added information in the EMS report.

MR. PIMENTEL: Your Honor, it goes directly as to knowing whether or not he was able to see the right person and identified the right person because of his medical condition at the time because of his injuries.

THE COURT: The officer has described to the best of his recollection the physical condition of the complainant.

Officer, are you saying that at the time you are looking at Mr. Brooks Mr. Brooks is about ten feet from you?

THE WITNESS: When I first observe him in the vehicle, yes.

THE COURT: Okay. And you said at that point that the complainant had said to you that Brooks was one of the people involved?

THE WITNESS: Yes.

THE COURT: Objection sustained.

Q. Did he describe Mr. Brooks in any way?

MS. SCHNEIDMILL: Objection. This is beyond --

THE COURT: Hold on. As he is sitting in the back of the car and saying --

MR. PIMENTEL: That's the person.

THE COURT: At the time that you are now looking at Mr. Brooks after the witness says that's him or what are the words the victim uses when he says -- when he looks over at Brooks?

THE WITNESS: That's him.

THE COURT: Okay. At this point is Brooks alone?

THE WITNESS: He is with one other individual.

THE COURT: So how are you able to tell -- do you know the name of the other individual that he was -- that Brooks was with?

THE WITNESS: I don't.

THE COURT: How do you know the witness was identifying Brooks then, not the other person?

THE WITNESS: As soon as we exited the other vehicle --

THE COURT: "We" meaning --

THE WITNESS: Sorry. Me and Sergeant Rosenberg, we exited the vehicle and stopped both vehicles at that time. Mr. Elturkey exited the vehicle at the same time and pointed to Mr. Brooks and said again that's the guy.

THE COURT: So you are saying that initially

Brooks said in looking at -- there were two people walking together -- said that's the guy, you and your sergeant exited your car, you stopped those two. The complainant now is exiting your car and now is -- are those two pointing to Brooks and saying that's the guy?

THE WITNESS: Yes.

THE COURT: At that point how far is Brooks -- the complainant from Brooks?

THE WITNESS: Mr. Elturkey is about two feet, three feet from Mr. Brooks.

THE COURT: And anything further, counsel?

MR. PIMENTEL: One second.

THE COURT: Sure.

(Whereupon, there was a pause in the proceedings.)

MR. PIMENTEL: Nothing further, your Honor.

MS. POVMAN: Judge, one or two -- I'm going to ask Mr. Ball be allowed to --

THE COURT: I will be patient.

MR. BALL: Thank you, your Honor. I mean, it's just that, you know, I have a couple of questions --

THE COURT: Okay. Sure.

MS. POVMAN: That's --

MR. BALL: -- that's important.

THE COURT: Frankly, I would like --

MR. BALL: You said at the end.

THE COURT: Counsel, have you heard the questions?

MS. POVMAN: I haven't, Judge. I didn't want to -- if you want to give us a minute to speak now. I didn't want to talk --

MR. BALL: Your Honor, it's all based on the -- what you call the EMS report. I will not even indicate anything other than issues pertaining to --

THE COURT: So we are focussed literally --

MR. BALL: On the EMS report.

THE COURT: On the physical condition of the complainant.

MR. BALL: Yes, your Honor.

THE COURT: And distance at the time he made those observations.

MR. BALL: Yes. All right.

With the -- Officer Lanning, the concern here is that when you question the EMS, the fact that the victim was supposed to be treated by EMS, was being treated when I was -- what do you call -- transported back --

THE COURT: Now, hold it a second.

Officer, you were not present at the time that Ball was identified; is that correct?

THE WITNESS: That's correct.

THE COURT: So --

MR. BALL: So my point is he was not available

when the EMS technician -- when they were there. So my point is that at what point is it that Mr. Elturkey, to his knowledge, received any assistance from EMS, because he was with Mr. Elturkey.

THE COURT: Okay.

So, officer, I think that I understand the question and that is: At the time that you were with the complainant had he received any medical attention, to your knowledge?

THE WITNESS: No, not while I was there.

MR. BALL: Okay.

THE COURT: And is it your information that based upon your observations of the complainant did you actually call for medical assistance?

THE WITNESS: I had not, no.

THE COURT: So you had made the observations of the complainant, had the complainant in your presence for how long would you think total?

THE WITNESS: Two minutes.

THE COURT: Two minutes. So from the time that the complainant had -- you had seen the complainant, put him in your car, he had seen Brooks, got out of the car, identified Brooks, Brooks is now placed in handcuffs, what's the total span of time between your first leaving the complainant and the identification of Brooks?

THE WITNESS: From the time -- I'm sorry?

THE COURT: From the time that you first saw the complainant until the time --

THE WITNESS: To the identification of Brooks?

THE COURT: Right.

THE WITNESS: It was about 30 seconds, if that.

THE COURT: Okay. So Brooks -- the complainant was in your -- under your supervision for a total from the time of first observation of the complainant until the time that you had the last individual contact with the complainant, was that two to three minutes?

THE WITNESS: It was about two or three minutes.

THE COURT: Okay. And during that time those observations that you described as far as cuts to the head, bleeding, those are observations that you made over the course of those two minutes?

THE WITNESS: Yes.

MR. BALL: Your Honor, I apologize but my question was this: Is the presence of the EMS technicians and whether or not they were available at the scene at that time.

THE COURT: Yeah.

MR. BALL: That's my concern.

THE COURT: And they were not available, right. I'm sorry. They were not present. They were not present at

the time that the officer was involved with the -- this officer was involved with the complainant. They were not present and he did not call for an ambulance in those two minutes.

MR. BALL: Okay, your Honor. I apologize but can I just raise the issue that I have here. Officer Lanning's book, his book.

THE COURT: Okay.

MR. BALL: I have a notation where it says here at a particular time on 105th Street that two males were stopped, right.

THE COURT: Okay.

MR. BALL: And they were stopped by Officer Pampena.

THE COURT: Okay.

MR. BALL: He has it written down here.

THE COURT: Okay.

MR. BALL: So my point is this, is that --

THE COURT: Okay. So, officer, the two males that you, you and the sergeant stopped --

THE WITNESS: Yes.

THE COURT: -- he has made reference to a memo book entry where you said two males were stopped by Officer Pampena, are those the same two males you were involved in stopping or were those two other males?

THE WITNESS: Yes, those were the two males that I had stopped.

THE COURT: Now, you made reference to those males being stopped by Pampena?

THE WITNESS: No.

MR. BALL: I have it here in his memo book. Can I please let the Court reflect that --

THE COURT: People, would you make --

MS. POVMAN: Judge, I think I can clear it up, please.

MR. BALL: Excuse me, your Honor. Can I just please --

THE WITNESS: I can clear it up.

THE COURT: Okay. It's the officer's memo book so he will clear it up. What does that entry mean?

THE WITNESS: It says that the two males were stopped and then it says, if you look at it, 92 Charley by 115 anti-crime, PO Pampena, meaning I stopped them in the corner but the arrest was taken by Pampena at the time. It was not taken by myself.

THE COURT: Perfect. That's it with this officer. Any further questions, People.

MS. SCHNEIDMILL: No.

THE COURT: Okay. Thank you, officer. Thank you very much.

(Whereupon, the witness stepped down from the stand and exited the courtroom.)

THE COURT: Defense, call your next witness.

MS. POVMAN: I guess I'm calling Officer Pampena.

Judge, may I have a moment to consult with the DA. I just have a question.

THE COURT: Sure.

(Whereupon, there was a pause in the proceedings.)

COURT OFFICER: Witness entering.

A N G E L O P A M P E N A, a Police Officer, having been called as a witness by the Defendant and having stated his shield number as 19220 and command as Queens Gang Squad of the New York City Police Department, having been first duly sworn by the Clerk of the Court, was examined and proceeded to testify as follows:

COURT OFFICER: Defense calls Police Officer Angelo Pampena, P-A-M-P-E-N-A, shield 19220, Queens Gang Squad.

THE COURT: Good morning, officer.

THE WITNESS: Good morning.

THE COURT: Officer, the reason that this -- I recall you had been here involved in this hearing on an earlier date and there was an application made by the defense to reopen the hearing because there was certain information they were not privy to at the time the hearing

concluded. That information was the EMS report. So I allowed the defense to ask questions of you and your brother officer relative to your observations of the complainant at the time that they made -- he made the identification, meaning how did he appear or what did he look like or where was he at the time he had made the observation, what was the distance again between Ball and the witness. And so the hearing is limited to literally just that focussed period of time.

THE WITNESS: Yes, sir.

THE COURT: Ms. Povman.

MS. POVMAN: Judge, I will start I guess.

DIRECT EXAMINATION

BY MS. POVMAN:

Q. Good morning, officer.

A. Good morning.

Q. You previously testified that you stopped Mr. Ball on 105th Avenue or 105th Street?

A. 105th Street, yes.

Q. Okay. And you returned to 105th and Northern; is that correct?

A. Correct.

Q. And do you remember what time you returned to 105th and Northern?

A. I can look at my notes, let you know.

THE COURT: Yes, please.

(Whereupon, there was a pause in the proceedings.)

A. In my notes I have 2113 which is 9:13 was the arrest time and the positive ID for them.

Q. Okay. So working backwards, do you have any indication when you stopped Mr. Ball?

(Whereupon, there was a pause in the proceedings.)

MR. BALL: Your Honor, what is he reading from?

MS. POVMAN: I didn't hear what he said.

THE COURT: The officer is looking at certain information in his possession.

Officer, what are you looking at?

THE WITNESS: My arrest paperwork.

THE COURT: Arrest paperwork.

Q. Does that reflect what time you stopped Mr. Ball?

A. I believe so. That's why I'm going to look. Approximately 2100 is when I stopped.

THE COURT: That's about nine o'clock.

THE WITNESS: Yes, sir, nine o'clock.

Q. And how long -- and you stopped him over, I think you testified, on 105th Street, right?

A. 105th and 32nd Avenue.

Q. And how long did it take you to return -- how long did it take you to arrive at 105th and Northern?

MS. SCHNEIDMILL: Your Honor, I object. This was

covered in the first part of the hearing.

THE COURT: Well, the -- you had -- at the time you had stopped Ball you said it was about 9:00 p.m. at 105 and 32nd?

THE WITNESS: Yes.

THE COURT: And how far is 105 and 32nd from 105 and Northern?

THE WITNESS: It's one avenue.

THE COURT: One avenue over?

THE WITNESS: One avenue up. One avenue north.

THE COURT: One avenue north?

THE WITNESS: Yes.

THE COURT: Defense, Miss Povman.

MS. POVMAN: Yes.

Q. So you stopped Mr. Ball at 9:00 p.m. I assume you frisked him on the scene, right? You frisked him before putting him in the car?

A. Yes.

Q. Then you took him by car to 105th and Northern, right?

A. Yes.

Q. And that's approximately one block?

A. Yes.

Q. So my question is just what time did you arrive approximately at 105th and Northern from the time you stopped Mr. Ball until the time you arrived at 105th and Northern?

THE COURT: You mentioned arrest time was 9:13. That's the formal arrest time given you by central?

THE WITNESS: Yes, sir.

THE COURT: So then are you going to have to estimate.

A. To estimate, approximately five minutes.

Q. Okay. So you would have arrived approximately 9:05 p.m. in the vicinity of 105th and Northern. And when you arrived at that location, I believe you told us that you had contact with the complainant in this case, Mr. Elturkey?

A. Yes.

Q. And when you first observed Mr. Elturkey, where was he?

A. In the back of an ambulance.

Q. And was that -- did you make that observation when you arrived at 105th and Northern?

A. Yes.

Q. So that was approximately 9:05 p.m.?

A. Yes.

Q. And when you arrived at that location, did you walk over to the ambulance?

A. Yes.

Q. Okay. And were you able to make observations of your ---of Mr. Elturkey's physical condition?

A. Yes.

Q. What, if anything, did you observe?

Case 1:19-cv-05310-ERK-LB Document 9-2 Filed 12/13/19 Page 115 of 907 PageID #: 478

A. He had a black eye, laceration to his head, his clothes were covered in blood. They were ripped up. They were disheveled. He looked like he just got jumped, beat up, mugged.

Q. Okay. And did you observe any swelling in the eye area?

A. Yes.

Q. Okay. And was it one eye or both eyes?

A. From what I recall, one eye.

Q. And when -- how close to Mr. Elturkey were you when you made these observations?

A. I sat right next to him in the ambulance.

Q. Now, you previously testified that --

MS. POVMAN: Well, withdrawn.

Q. What if -- while in the ambulance with Mr. Elturkey, did you observe him receiving any medical treatment?

A. Yes.

Q. What, if any, medical treatment did you observe him receiving?

A. The medical technicians were taking his blood pressure, the normal statistics of a human being. I don't know exactly what they do, but they were checking his heart rate and his pulse.

Q. Okay. Did -- were they working on his face or head area at the time you were with them?

A. They were trying to clean him up of his blood, yes.

Q. So they were cleaning up his face at the time?

A. Yes.

Q. And this is the time you said he made --

THE COURT: And in cleaning his face up, what is it that you observed them do relative to the face?

THE WITNESS: They have sterile gauze. They were giving it to him just to blot the blood off his face, off his neck, his arms, his hands.

THE COURT: Now, this sterile gauze, at the time that you saw -- so as you are sitting next to him, are you literally observing the techs using this gauze and then --

THE WITNESS: Yes. I sat exactly right next to him shoulder to shoulder as they were working on him.

THE COURT: And parts of his face, do you recall them using the gauze?

THE WITNESS: Most of it was the back. He had a large laceration to the back of his head.

THE COURT: So the gauze and the blood at the back of the head, did you observe how they were using the gauze as far as his face is concerned?

THE WITNESS: No. They were working on him. I wasn't paying detailed -- you know.

THE COURT: Right. So at the time you are sitting next to him and making these observations, do you have -- what part of his face are you able to see as you are sitting

next to him?

THE WITNESS: The front of his face and the side of his face.

THE COURT: Are you able to see literally the full front of his face?

THE WITNESS: Yes.

THE COURT: Now, as to the full front of his face, you described his -- you described a black eye, you described an eye being swollen?

THE WITNESS: Yes.

THE COURT: You also described -- had there been any other bruises you observed on his face?

THE WITNESS: Not that I can recall, no.

THE COURT: You mentioned that a black eye and eye swollen. The eye swollen and black eye, is that the same eye?

THE WITNESS: Yes.

THE COURT: All one eye that was affected?

THE WITNESS: Yes. Yes.

THE COURT: Miss Povman.

Q. Officer, did you prepare an aided report in connection with this case?

A. Yes.

Q. Do you have a copy of that report with you today?

A. I can look to see if I have it.

(Whereupon, there was a pause in the proceedings.)

A. I don't have it with me. I don't have it with me.

MS. POVMAN: Judge, can the DA be directed to provide us with a copy of that aided report. I don't have the original Rosario list with me.

MR. BALL: I have it.

MS. POVMAN: Excuse me.

THE COURT: Sure.

(Whereupon, there was a pause in the proceedings.)

Q. Okay, officer, you just testified that you prepared an aided report in connection with this case?

A. Yes.

Q. Is that based on your memory or your practice or on -- what is the basis for that?

A. Based on practice. We are supposed to fill out an aided card if somebody is injured.

Q. Right. And is there anything in your memo book to indicate that you filled out an aided card in this case?

A. Let me check.

(Whereupon, there was a pause in the proceedings.)

A. No. There is no reference to an aided card being filled out in my memo book.

Q. So that your testimony is based on your practice, what you usually do, correct?

A. Yes.

Q. And is there something at the precinct that you could refer to to find out whether you actually did an aided report in this case or not? Is there any record kept at the precinct?

A. I'm not sure.

THE COURT: And, you know, just to be clear, just so I'm clear as to what you meant by the answer you just gave, your testimony is based on your practice as opposed to -- you just described having arrived at the ambulance, gotten in the ambulance, was literally sitting next to the complainant and the observations you made sitting next to the complainant, is that observation based on practice or based on your actual recollection of what happened in this case?

THE WITNESS: Based on actual recollection of me sitting there shoulder to shoulder next to the complainant is what I observed.

THE COURT: All right, Miss Povman.

MS. POVMAN: One or two more questions and I'm done.

THE COURT: Sure.

Q. And you were next to the complainant when he made his identification, right?

A. Yes.

Q. And Mr. Ball was about three car lengths away at the time, right, I believe you testified?

A. Approximately, yes.

Q. The -- was Mr. Elturkey receiving treatment at the time he made that identification?

THE COURT: Treatment as to what?

MS. POVMAN: He testified to his face being cleaned off and his head being cleaned off.

A. While he was in the ambulance, he looked out of the ambulance and he made a positive ID to myself while I was sitting next to him.

MS. POVMAN: Okay, Judge. Just a moment to consult with my client.

THE COURT: Sure.

(Whereupon, there was a pause in the proceedings.)

MR. BALL: Your Honor.

THE COURT: No. Anything else?

MS. POVMAN: I have one or two more questions.

THE COURT: And counsel, this is based --

MS. POVMAN: On the EMS report.

THE COURT: And based on a discussion with your client and questions he wishes you to ask?

MS. POVMAN: Yes.

MR. BALL: Your Honor, I would apologize but, you know, the questions that I would like to ask I would like to ask them myself, you know, if it's not against the Court.

THE COURT: Are you going to ask your questions

about the observations --

MR. BALL: Yes, sir.

THE COURT: -- this officer made of the complainant at the time he made the identification?

MR. BALL: Yes, sir.

THE COURT: Okay. Ask your question.

MR. BALL: I just want to start by asking Officer Pampena is he the one that arrested me.

MS. SCHNEIDMILL: Objection.

THE COURT: Overruled.

MR. BALL: Did you arrest me?

THE WITNESS: Yes.

MR. BALL: So my next question is: He took me allegedly to 105th Street to this EMS place to be identified. I have -- what you call -- a copy of the EMS report.

THE COURT: Ask your question.

MR. BALL: Okay. The question is -- is: Do you know that according to this EMS report that the victim refused all treatment?

MS. SCHNEIDMILL: Objection.

THE COURT: Well, okay.

MS. SCHNEIDMILL: We are misconstruing what refusing medical attention means here and reading from something not in evidence.

MR. BALL: Your Honor, this is the EMS report.

THE COURT: You can ask him -- you can ask the officer based on his observations whether or not the complainant had refused medical attention.

MR. BALL: Do you know that he refused all medical attention?

THE WITNESS: After he was treated, yes, he refused to go to the hospital.

THE COURT: Wait. Hold on. You asked him a question. Let him answer.

MR. BALL: Yes, sir.

THE WITNESS: Yes. After he was treated, he refused to go to the hospital. That's what refused medical attention means.

THE COURT: So he had received medical attention in the ambulance but he refused any further medical treatment at the hospital?

THE WITNESS: Correct.

THE COURT: Okay. Anything else?

MR. BALL: Yeah.

Do you know that this EMS report reflects that there was no -- what you call -- treatment done whatsoever?

MS. SCHNEIDMILL: Objection.

MR. BALL: As a matter of fact, the EMS report also reflect it never came to 105th Street. It was 106th

Street.

THE COURT: You can ask him whether or not he recalls the ambulance was at 105 or 106 and Northern.

MR. BALL: Yes. 105 --

THE WITNESS: My recollection, it was at 105 Street and Northern Boulevard.

MR. BALL: One more question. You said that you questioned the perpetrator -- I mean, the victim inside the EMS truck. Was the EMS workers with you at the time?

THE WITNESS: Yes.

MR. BALL: Okay. So that means that whatever information that you gave, you had as far as the victim's statement that I and Mr. Brooks were perpetrators, that means that the same information that you -- he gave you, the victim -- the EMS reporters, the technicians, should have that in their testimony --

THE COURT: That's a question -- that's a question that he cannot answer. He can only state what it is that the police officers do relative to their paperwork. He can't state what EMS does relative to theirs.

MR. BALL: Okay.

Did you write down what it is that he said?

THE WITNESS: No.

MR. BALL: Okay. Do you know that the EMS workers, that they wrote down the statement that he gave?

cbb

Case 1:19-cv-05310-ERK-LB Document 9-2 Filed 12/13/19 Page 124 of 907 PageID #: 487

Did you know that?

THE WITNESS: Repeat the question.

MS. SCHNEIDMILL: Objection, your Honor.

MR. BALL: No, your Honor --

MS. SCHNEIDMILL: This is not the correct witness to be asking the witness.

MR. BALL: Did he know that the victim gave a statement to the EMS workers.

THE COURT: Do you know, officer, relative to the complainant, do you know whether or not he had given any statement to anyone other than yourself, if you know?

THE WITNESS: I do not know.

THE COURT: Okay.

MR. BALL: So let me ask you just one more question --

THE COURT: Well, you said that last one was. One more question.

MR. BALL: I apologize.

THE COURT: So one more question.

MR. BALL: Okay. Thank you. Thank you.

My one more question is going to be: Here on this EMS transfer, the times that you are saying that you arrived at this location and the person was being treated, okay, it was how many minutes after is it that you arrived there and --

(Whereupon, there was a pause in the proceedings.)

MR. BALL: Can you --

THE COURT: Okay. It sounds like you are asking you said that you had stopped this defendant and, you know, put him in your car at about 9:00 p.m. and you said that you had arrived at 105 and Northern at approximately 9:05?

THE WITNESS: Yes.

THE COURT: And at the time that you arrived at 9:05 that the ambulance was already there?

MR. BALL: Yeah.

THE WITNESS: Correct.

MR. BALL: Your Honor --

THE COURT: You have a question?

MR. BALL: For the Court, for the record, just let it reflect according to this EMS report the ambulance never even arrived until 11 minutes after.

THE COURT: Okay.

MR. BALL: And that is for 106th Street.

THE COURT: Okay.

MR. BALL: So it is impossible for him to have been there at that time, your Honor.

THE COURT: Then the record -- what was just stated by the defendant Ball is his --

MR. BALL: No --

THE COURT: He bringing to my attention his

understanding as to what that report says and that's noted for the record.

There is nothing further, counsel?

MR. PIMENTEL: I have just two questions.

MS. SCHNEIDMILL: Objection.

THE COURT: What standing, do you know?

MR. PIMENTEL: As to his observation of what Mr. Elturkey's condition was when he first arrived at the scene. He testified that there were --

THE COURT: Okay. Okay.

CROSS-EXAMINATION

BY MR. PIMENTEL:

Q. Good morning, Officer Lanning (sic). You previously --

THE COURT: Actually this is Pampena.

Q. I'm sorry. Officer Pampena. You previously testified they were both arrested at 9:13 p.m.?

A. Yes.

Q. You previously testified at the hearing though that Mr. Brooks was no -- not at the scene when you arrived?

A. Correct.

Q. If you arrived at 9:05 and he was no longer at the scene, how was he arrested at 9:13?

A. It was part of the same -- in the event. Whenever he gave a time, whether the crime happened an hour ago, we go by the time we have all the defendants together and there is

nothing further with the case. Then we ask central for an under time which is an arrest time. So he was away from the scene. Another officer detained him, put him in cuffs, brought him to the precinct. I was still doing the canvas when I came in contact with the other defendant, Mr. Ball.

Q. Okay. Now --

A. There are no two arrest times for one incident. One arrest time for one incident.

Q. Understood. Officer Pampena, you testified previously you were side to side with Mr. Elturkey in the ambulance?

A. Yes.

Q. And you testified that when you arrived they were using sterile gauze to clean Mr. Elturkey?

A. Yes.

Q. Did he -- did you observe if he had any blood around the eyes?

A. He had blood on his face. All about his face.

Q. All about his face. So they had to clean -- you observed them cleaning his eyes?

A. No.

Q. You observed them cleaning around his eyes?

A. They were cleaning his face and the back of his head. There was a laceration in the back of his head.

Q. Okay. But did you observe them clean the front of his face where his eyes were?

A. No.

Q. You did not observe that?

A. No.

Q. Now, when you were next to him, did you have any conversations regarding a description that Mr. Elturkey gave regarding Mr. --

THE COURT: Gave or --

Q. Made.

THE COURT: You can ask him about -- if there was any description that the complainant had given him as he is describing. Well, you shouldn't even be allowed to do this but you could ask him as he is looking at Ball and identifying Ball whether or not he is -- said anything like, you know, Ball, he is the guy that's wearing a brown shirt and blue pants, if that's the question you want to ask.

MR. PIMENTEL: Sure.

Q. Did he give any physical description?

THE COURT: Of the person he was identifying.

Q. Of the person he was identifying?

A. I don't understand the question.

THE COURT: So as the complainant is looking out the back of this ambulance in looking approximately three car lengths forward and at Mr. Ball, beyond saying that's him did he say anything else to you giving you a description of the clothes Ball was wearing at the time or anything like

that?

THE WITNESS: Previously to me getting in there, he did give 9-1-1 a description of the people that robbed him.

THE COURT: Right. But as you are sitting with him in the ambulance and if is he looking at Ball, is he saying anything other than that's him?

THE WITNESS: No. He just said that is him.

THE COURT: Okay.

Q. While you were sitting next to Mr. Elturkey, did you have any conversations with him?

A. Yes.

Q. What were those --

MS. SCHNEIDMILL: Objection.

THE COURT: Sustained.

MR. PIMENTEL: Your Honor, I'm trying to get into --

THE COURT: I understand.

MR. PIMENTEL: No. No, your Honor. I'm trying to get into if there was anything depicting slurred speech.

THE COURT: Ask him.

Q. Was Mr. Elturkey speaking with slurred speech?

A. No.

Q. Was it slurred at all?

A. No.

MR. PIMENTEL: No further questions.

THE COURT: Okay. Thank you all. Thank you, officer.

THE WITNESS: Thank you.

(Whereupon, the witness stepped down from the stand and exited the courtroom.)

THE COURT: To the Court's understanding and I believe the issues that are to be addressed as far as the possible issues that arise out of now the defense having a copy of the EMS report, those issues have been addressed with the questions -- questioning of each of the police officers.

And, you know, counsel, do you rest on the record or do you wish to make argument? As far as I'm concerned, you can rest on the record.

MS. POVMAN: Judge, I'm going to rest on the record, subject to the production of the aided report, if it exists, because that aided report should have been turned over as part of the original Rosario material prior to the hearing. The officer testified he prepared one. It doesn't look like there is one in the Rosario list and I think we should just have a definite answer.

THE COURT: Yeah.

MS. POVMAN: One way or the other.

THE COURT: My understanding of the officer's

response is that that's something that he does as a matter of course, you know. He did not make any memo book entries about him having done it in this case. So, People, would you make a full search of the records to see whether or not that report exists?

MS. SCHNEIDMILL: Of course, your Honor.

THE COURT: It's now Wednesday, January 8th, you know. Can we have this matter then adjourned for a short date, a control date, just so I can make sure that that report is in the hands of the defense, if it exists, and then I will make a decision on that adjourn date.

MS. SCHNEIDMILL: We can, your Honor. The only thing is I believe Officer Pampena is away for the next two weeks so it would have to be --

THE COURT: Except he is there today.

MS. SCHNEIDMILL: No, no. He can check -- I mean, we can -- he can check sometime this week, but I believe this is his last week of work for two weeks.

THE COURT: Right. So I think -- expect that this is his last working day for the next two weeks?

MS. SCHNEIDMILL: I don't know if this is the last working day. I have to ask him. I know this was one of the last days he was around.

THE COURT: That's fine. The only thing that I need to make -- I want to make sure defense has in their

possession, if it exists, is a copy of that aided report. So since he is on duty today, he is working today, he will leave here to go back to the precinct. I need him to make a diligent search of his records to see if there was an aided. There are police department forms. There are places that they keep copies. He has to make a search of all of those areas today and make a statement to you as to whether or not it exists. And if it exists, get a copy of that to you, you know, hopefully today but certainly by the adjourn date. And I don't have to have the matter adjourned for two weeks. It seems to me that any work he needs to do to find that report can be done today.

MS. SCHNEIDMILL: I agree, your Honor.

THE COURT: This case can be adjourned, again, a control date for the production of that report, if it exists. It's the 8th today. Counsel, what short date works for you all?

MR. PIMENTEL: I can do Friday.

MR. BALL: I will do it this Friday.

MS. POVMAN: I can do Friday as well in the morning.

MS. SCHNEIDMILL: I have a hearing on Friday, your Honor. If we can do either next Tuesday -- no. Tuesday, morning of the 14th, can we do that?

MR. PIMENTEL: I can do the 14th.

MS. POVMAN: I can do the 14th.

THE COURT: Then the matter is adjourned to Tuesday morning, 1/14 for control, for the production of that report, if it exists. And if it doesn't, an affirmative statement from the People that it does not exist.

MS. POVMAN: Judge, I'm going to request permission to order the minutes pursuant to 18B.

THE COURT: Absolutely.

MR. BALL: Your Honor, I want to thank you very much.

THE COURT: Sure. See you on the 14th.

**********

CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF THE ORIGINAL STENOGRAPHIC MINUTES TAKEN OF THIS PROCEEDING.

CARRIE BELMONTE
Senior Court Reporter

E X A M I N A T I O N S

| WITNESS | PAGE |
|---|---|
| D A N I E L   L A N N I N G | |
| DIRECT EXAMINATION BY MR. PIMENTEL | 15 |
| A N G E L O   P A M P E N A | |
| DIRECT EXAMINATION BY MS. POVMAN | 30 |
| CROSS-EXAMINATION BY MR. PIMENTEL | 45 |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS: CRIMINAL TERM PART K20

- - - - - - - - - - - - - - - - - - - - - - -X

THE PEOPLE OF THE STATE OF NEW YORK

- against -

RAYMOND BALL, ELIJAH BROOKS, :

Defendants.

- - - - - - - - - - - - - - - - - - - - - - -X

Indictment
No. 2228/2012

Proceedings

January 14, 2014
125-01 Queens Boulevard
Kew Gardens, N.Y.

B E F O R E :

HONORABLE RONALD HOLLIE, JUSTICE

A P P E A R A N C E S :

OFFICE OF RICHARD A. BROWN
DISTRICT ATTORNEY
125-01 Queens Blvd
Kew Gardens, N.Y. 11415
BY: NAOMI SCHNEIDMILL

FOR DEFENDANT BALL
LINDA POVMAN, ESQ.
123-35 82nd Road
Kew Gardens, N.Y. 11415

FOR DEFENDANT BROOKS
ALEXIS PIMENTEL, ESQ.
3753 90th Road
Jackson Heights, N.Y. 11372

MARCIA MARSHALL
SENIOR COURT REPORTER

THE CLERK: Calendar No. Four, Indictment No. 2228 of 2012, People vs. Raymond Ball and Elijah Brooks. Both are produced downstairs.

THE COURT: Appearances, counsel.

MS. POVMAN: On behalf of Mr. Ball, Linda Povman, 123-35 82nd Road.

MR. PIMENTEL: On behalf of Mr. Brooks, Alexis Pimentel, 3753 90th Street, Jackson Heights, New York.

MS. SCHNEIDMILL: Naomi Schneidmill for the People.

Good morning.

THE COURT: Good morning, counsel. The defendants are incarcerated, produced and not in the courtroom. This matter is on the calendar for me to determine whether or not -- in part, for me to determine whether or not there was an aided report that was prepared and whether or not those copies have been provided to defense counsel.

MS. SCHNEIDMILL: Yes, your Honor. The officer went back to the precinct and he called me later that night to tell me there was never an aided report prepared for this case, so he was mistaken when he first said that.

THE COURT: Okay, and you are satisfied that I am giving you this information -- he was giving you this information; that was his conclusion after looking for a report and then thinking back to his activities on that day

and he's made an affirmative statement to you that he had not prepared a report that day?

MS. SCHNEIDMILL: Yes, your Honor.

THE COURT: All right, so there are no further -- the matter was on the calendar for that report to be given to counsel. It does not exist. The reopen hearing issues have been heard, examinations made, and the defendants are not present in court, but I will advise counsel that I will give them -- give the defense written decision, essentially, denying the motions to suppress and having the matter adjourned for a firm trial date -- for a trial date in Tap A.

Counsel, if you can just give me dates that work for you.

MS. POVMAN: Whatever date you want.

THE COURT: For the purposes of this call, counsel, you are waiving the appearance of your client?

MS. POVMAN: Yes.

MR. PIMENTEL: Yes.

MS. POVMAN: February 12th.

THE COURT: 2/12. Tap A.

THE ABOVE IS CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF THE TESTIMONY.

_______________________
MARCIA MARSHALL
SENIOR COURT REPORTER

MAM

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS: CRIMINAL TERM: PART TAP A
------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,

- against - Indictment No. 2228-2012

ELIJAH BROOKS, RAYMOND BALL,
Defendant.
------------------------------------------X

SUPREME COURTHOUSE
125-01 Queens Boulevard
Kew Gardens, New York
January 5, 2015

B E F O R E : HONORABLE BARRY KRON, ESQ.

A P P E A R A N C E S :

FOR THE PEOPLE:
THE HONORABLE RICHARD BROWN, ESQ.
DISTRICT ATTORNEY, QUEENS COUNTY
BY: CHRISTOPHER DOOLEY, ESQ.
ASSISTANT DISTRICT ATTORNEY

FOR THE DEFENDANT BALL:
LINDA POVMAN, ESQ.
123-35 82nd ROAD
KEW GARDENS, NEW YORK

FOR THE DEFENDANT BROOKS:
WYATT GIBBONS, ESQ.
125-10 QUEENS BOULEVARD
KEW GARDENS, NEW YORK 11415

JENNIFER ROSENBLATT
Senior Court Reporter

THE CLERK: This is calendar number 13, 2228 of '12, Raymond Ball, Elijah Brooks.

Appearances, please.

MS. POVMAN: On behalf of Mr. Ball, Linda Povman, 123-35 82nd Road, Kew Gardens, New York.

MR. GIBBONS: Good morning, for Elijah Brooks, by Wyatt Gibbons, 125-10 Queens Boulevard, Kew Gardens.

Good morning, your Honor.

MR. DOOLEY: Chris Dooley for the People.

THE COURT: Are the People ready for trial?

MR. DOOLEY: No, the People request January 14.

THE COURT: Any specific information as to why the D.A. is not ready today?

MR. DOOLEY: I have -- the arresting officer became unexpectedly unavailable this week. I am not sure what exactly happened.

THE COURT: The 14th?

MS. POVMAN: I am available the 14th, Judge.

MR. GIBBONS: For the record, your Honor, we are ready.

THE COURT: It's a 2012 indictment. I would hope this case finally gets tried. Time charged. Same bail conditions.

THE CLERK: 1-14.

THE DEFENDANT: Excuse me, your Honor, how are you

doing today? We was supposed to --

THE COURT: I am actually having an unpleasant day. How are you doing?

THE DEFENDANT: I would like to be understood.

THE COURT: I treat everybody the same. It doesn't matter.

THE DEFENDANT: I wanted to say today we were supposed to go forward with me becoming my own lawyer, as pro se that is.

THE COURT: Once --

THE DEFENDANT: Excuse me, sir.

THE COURT: Once everybody answers they're ready for trial, I can't go through it today. It will take --

THE DEFENDANT: I have been asking for pro se for over three years.

THE COURT: You're preparing to represent yourself?

THE DEFENDANT: I can't go -- continue with -- go forward with her as my lawyer. I have established that this is something that is not new to the judge. We brought this time and time again to your attention. And last time we were here, your Honor, you said that today you would give me the questionnaire and so that I could be --

THE COURT: The questionnaire?

THE DEFENDANT: A litany of questions that you

would be asking me.

THE COURT: There is a litany of questions.

THE DEFENDANT: That's what you said. You would be asking them today. I am looking forward to you --

THE COURT: Okay. Here we go.

THE DEFENDANT: Thank you very much, your Honor.

THE COURT: This is Mr. Ball?

MS. POVMAN: Raymond Ball.

THE COURT: Mr. Ball, in looking at this, I see that this arrest, just numerical, is listed as number 26 in the cycle of cases that you have had through the years.

Have you represented yourself on any of these other prior matters?

THE DEFENDANT: Yes, I have. I represented myself in front of Judge Grosso, like I explained to you previously.

THE COURT: I deal with a lot of cases. I don't remember the specifics of what you told me.

Is that for trial or hearing?

THE DEFENDANT: Trial, sir. What happened, it was from '97 to 2000. I was incarcerated and -- so, yes.

THE COURT: You represented yourself in front of Judge Grosso at trial?

THE DEFENDANT: Yes.

THE COURT: You went through the process of

questioning witnesses, presenting evidence?

THE DEFENDANT: Yes.

THE COURT: Did you have an attorney there to assist you?

THE DEFENDANT: Yes, I did. I have co-counsel.

THE COURT: It's not co-counsel. It's somebody who is formally there to assist you just in case. You understand that on this case you are charged with a C violent felony and that if you're convicted, and because you would be a predicate felon, if you're convicted, the minimum sentence by law that you do receive would be five years, five year's post-release supervision. And the maximum would be 15 years and five year's post-release supervision.

THE DEFENDANT: Yes, sir.

THE COURT: How far along did you get in school? Formal education?

THE DEFENDANT: I was actually going towards my liberal arts degree.

THE COURT: From first grade you can be going for a liberal arts degree.

THE DEFENDANT: I am like shy of maybe nine, ten credits.

THE COURT: You have completed most of your undergraduate credits?

THE DEFENDANT: Yes.

THE COURT: Any particular field? Philosophy?

THE DEFENDANT: Liberal arts. I just told you. You know, actually I favor law. I have serious passion for law now.

THE COURT: I wish I could share that. Be as it may, you understand that I am required to warn you that even though you have a passion for law and even though you think that, based on your prior experience, you think that you're fully capable of representing yourself, Ms. Povman has, it's safe to say, decades of experience and has done many more trials than you.

She has much greater expertise in how to present evidence, how to cross examine witnesses and that, for your own personal benefit, it is generally a much better idea to simply consult with your lawyer and let them use their formal training and experience and expertise in representing you then having you present this yourself.

You understand that that is the warning, the sort of things that the Appellate Court requires that I warn you of before I allow you to represent yourself.

THE DEFENDANT: I would like for you to take into consideration, it is because of Ms. Povman's expertise that you explain to me that has brought me to have to be incarcerated for such a long, extended period of time. I have been incarcerated from July of 2012 and this is now

January of 2015, your Honor.

THE COURT: Every time you come out here -- you have to stop cutting me off. I don't have the patience for that. I don't allow that. You understand? Every time you come out here, I try to move the case forward as quickly as I possibly can.

I know Ms. Povman has had extended medical issues. Today the case is --

THE DEFENDANT: It's been two years. This is the second time I have seen her since last year, your Honor.

THE COURT: You're satisfied that after everything I have told you and warned you about, that you believe it's in your best interest to represent yourself?

THE DEFENDANT: Yes.

THE COURT: Do you have any problem if I make Ms. Povman available during the course of the trial as your adviser? So although you represent yourself in terms of should you need to consult with her about anything, you don't have to, but should you otherwise think it might be an area that you would defer to her experience or one would want her input, she will remain available to speak with and to talk about anything even though you are representing yourself.

THE DEFENDANT: Honestly, I mean, I would really like to have her replaced as assistant. However, in the

case that, you know, it's impossible --

THE COURT: I don't think it's necessary to do that.

Ms. Povman, based on that and your interaction with Mr. Ball, his prior history in representing himself, his ability to express his thoughts, his something of a formal education, his lengthy expertise based on personal history in the Criminal Justice System and my having formally warned him of the potential hazard of doing that, he still wishes to represent himself.

I am satisfied I made the necessary inquiry and he can represent himself.

You would not disagree with that?

MS. POVMAN: I have no problem with that.

THE COURT: At this point, you can represent yourself.

THE DEFENDANT: Can I make one application to the court, please, before I go? Can you help me with this, please?

THE COURT: I am not trying to rush you. I deal with 60 or 70 cases. This is not a trial part. I can't spend as much time as I would --

THE DEFENDANT: I want to read one little excerpt.

THE COURT: I don't think I will allow you to read. What is your point?

THE DEFENDANT: The point is, according to Mooney versus Holohan, it's my obligation, once it is, that it's established that perjury was placed in front of the Court.

THE COURT: At this point I heard enough for now.

The People are not ready for trial. The People are charged until January 14. Same bail conditions. Time is charged --

THE DEFENDANT: I would like to say -- ask you that I could have access to the law library at my facility.

THE COURT: Anything we could endorse to have full access to the law library, please let him know.

THE DEFENDANT: Thank you.

*                    *                    *

Certified to be a true and accurate record of the proceedings herein.

_______________________________
JENNIFER ROSENBLATT
Official Court Reporter

CH 14-B

COPY

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS: CRIMINAL TERM: PART K14

---------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-against-

Indictment No. 2228/12
JURY TRIAL

ELIJAH BROOKS and RAYMOND BALL,
Defendants.

---------------------------------------x

January 20, 21, 22, 23, 26, 28, 29, 30, 2015
125-01 Queens Boulevard
Kew Gardens, New York 11415

B E F O R E:

THE HONORABLE BARRY A. SCHWARTZ

A P P E A R A N C E S:

RICHARD A. BROWN, ESQ.,
District Attorney, Queens County
BY: TIMOTHY SHORTT, ESQ.
Assistant District Attorney

WYATT GIBBONS, ESQ.,
Assigned Counsel for the Defendant BROOKS

RAYMOND BALL, Pro Se Defendant

LINDA POVMAN, ESQ.,
Assigned Counsel, Legal Adviser

Nancy Samms,
Senior Court Reporter

THE COURT CLERK: Number two on the calendar, indictment 2228 of 2012, Raymond Ball and Elijah Brooks. Both defendants are incarcerated, produced and being brought before the Court.

Appearances, please.

MR. SHORTT: For the People, Assistant District Attorney Timothy Shortt. Good morning.

MR. GIBBONS: Wyatt Gibbons, 125-10 Queens Boulevard, Kew Gardens.

THE COURT: Good morning, sir.

MS. POVMAN: As legal advisor to Mr. Ball, Linda Povman, 123-35 82 Road, Kew Gardens, New York. Good morning, Judge.

THE COURT: Good morning to you. I gather we are going pro se on this case?

MS. POVMAN: He is ready to go.

THE COURT: Good.

(Defendant enters the courtroom.)

THE COURT CLERK: Let the record reflect Mr. Brooks is present before the Court.

(Whereupon, there was a brief pause in the proceedings.)

THE COURT CLERK: Let the record reflect Raymond Ball is present before the Court.

THE DEFENDANT BALL: Good morning, your Honor.

How are you doing this morning?

THE COURT: Good morning, sir. Mr. Ball, I understand you want to represent yourself in this case. Does that remain your position having had an opportunity to think about it and continue talking to Miss Povman about this situation, is that what you want to do?

THE DEFENDANT BALL: Yes, your Honor.

THE COURT: Do you read and write and speak and understand the English language?

THE DEFENDANT BALL: Yes, sir.

THE COURT: Have you ever received or are you now receiving any treatment for any mental or physical condition that might have any affect on your ability to understand what's going on here?

THE DEFENDANT BALL: No, sir.

THE COURT: Very good. You have had a sufficient amount of time to reflect upon this decision?

THE DEFENDANT BALL: Yes, sir.

THE COURT: How many years of school have you had, sir?

THE DEFENDANT BALL: Like maybe nine credits away from my associates, your Honor.

THE COURT: Very good. Have you worked in the past?

THE DEFENDANT BALL: Yes, I have.

THE COURT: What have you done?

THE DEFENDANT BALL: I did modifications as an electricians helper, you know, different things.

THE COURT: Right. And I know you have been involved in the criminal justice system in the past; is that correct?

THE DEFENDANT BALL: That is correct.

THE COURT: So you have been in a courtroom before many times, I'm sure that's true?

THE DEFENDANT BALL: Unfortunately.

THE COURT: All right. Has anybody threatened you or coerced you or influenced you against your will to make this decision to represent yourself?

THE DEFENDANT BALL: No, no one threatened or coerced me in that way, but -- you know, under the circumstances, your Honor, it's hard for a black man to get the proper representation here in the judicial system, you know, what is it that it provides for, it really puts us in, how do you say, awkward position. Sometimes we really don't have a choice in the matter in the case that we want to be represented.

THE COURT: Well, you have a choice. You can have Miss Povman represent you, that's your choice.

THE DEFENDANT BALL: Well, actually, your Honor, I had what you call explained to the judge previously that it

was Miss Povman's inadequacy as a representation that played a big role in making this choice.

THE COURT: Right.

THE DEFENDANT BALL: I mean, I would like to go forward though at this stage of the proceeding.

THE COURT: All right. You explained all of this to Judge Kron. When did that happen?

THE DEFENDANT BALL: Well, actually over a period of three years, two and a half years, your Honor.

THE COURT: Okay. And whatever application you made, did you move to have Miss Povman removed from the case?

THE DEFENDANT BALL: Yes, I did.

THE COURT: Judge Kron turned you down.

THE DEFENDANT BALL: Very adamant.

THE COURT: Adamant.

THE DEFENDANT BALL: You like that word?

THE COURT: Well, I met Mr. Justice Kron once or twice, he is capable of being adamant.

THE DEFENDANT BALL: I see that.

THE COURT: All right. Just answer my questions. Do you understand what you are charged with here?

THE DEFENDANT BALL: Yes, sir.

THE COURT: What are you charged with?

THE DEFENDANT BALL: Robbery in the second degree

and possession in the fifth degree of stolen property.

THE COURT: There is an assault count as well.

THE DEFENDANT BALL: It's funny that you mention that because, your Honor, I'm not mentioned in those three charges in the indictment. I'm only named in the indictment on the fourth charge of stolen property so I would like the Court to reflect that.

THE COURT: Do you have a copy?

THE DEFENDANT BALL: I have a copy, but I have not been named in the body of the indictment. It's only in the caption, your Honor, in the fourth count of the indictment they have me named for possession of stolen property, and they don't have Mr. Brooks, what you call, named in the indictment at all.

THE COURT: I do note that each of the counts that I am flipping through indicate that the indictment charges acting in concert.

THE DEFENDANT BALL: But it doesn't name the defendants, your Honor, and it has to name them.

THE COURT: Okay.

THE DEFENDANT BALL: I'm requesting possibly that you can provide one for us.

THE COURT: What's that?

THE DEFENDANT BALL: What you call, an indictment, that we can be able to --

THE COURT: I thought you said that you had it?

THE DEFENDANT BALL: It's not signed by the foreman.

MR. GIBBONS: If I may, your Honor, what I believe co-counsel is referring to, I was given this opinion by my client today, it's People versus Lopez 4 NY3d 686 from 2005, and there is a statement in here where it says that "the allocution when it's planned for the Court realizes that while the defendant's name was in the caption he was not named in the body of the indictment. Although the Grand Jury voted true bill against the defendant only Ramirez was named in the two counts which allege that she acted in concert with another. The Court adjourned the case recognizing the defendant's continued interest in the disposition possibly by way of SCI." It went on to state that the indictment was defective and dismissal was required.

THE COURT: Because what?

MR. GIBBONS: Because they weren't named in the body of the indictment. While they were named in the caption, they were not named in the body of the indictment. There was new to me. He gave it to me just this morning in the pens.

THE DEFENDANT BALL: Your Honor -- I apologize.

MR. GIBBONS: It is a Court of Appeals case from

2005. Whether it's still good law or not again I have not had an opportunity to shepardize it, but I do have the case which I can hand up to the Court.

THE COURT: All right. I will take a look at it, but we will move forward.

Counsel, have you seen it?

MR. SHORTT: I reviewed something about that. There was a case out of the Bronx earlier this year where there was an unsigned indictment, and that was dismissed. The Court has the only copy signed by the foreperson. Counsel and defendant were provided courtesy copy that were unsigned. As to the allegations there was no mention in the body. The caption is limited only to the People of the State of New York versus both defendants. Subsequent after that caption therefore not part of the caption is robbery in the second degree specifically charging Brooks and Ball robbery in the second degree specifically charging Brooks and ball assault in the third degree specifically charging Brooks and Ball and final criminal possession of stolen property in the fifth charging Raymond Ball individually. So the idea they are not mentioned anywhere else except for the caption is incorrect.

THE COURT: All right. I have heard enough. I will reserve decision on the application so that I can have an opportunity to read the case.

THE DEFENDANT BALL: Can you hand up that other case, please? Because he has the controlling case the later case then he wants to read the other case as well. Thank you, your Honor.

THE COURT: All right. Let's continue this. Can you explain to me what the purpose of today's court proceedings are?

THE DEFENDANT BALL: Sure, I can. Your Honor, before we continue --

THE COURT: We are not going to do that. The first rule is for me to decide whether or not it's appropriate for you to represent yourself. That is what I am trying to do. So don't interrupt the process. If you can represent yourself, I will listen.

THE DEFENDANT BALL: I apologize. We are doing the voir dire and the Sandoval.

THE COURT: Do you know what a Sandoval application is?

THE DEFENDANT BALL: Yes, sir, prior criminal cases.

THE COURT: All right. Can you tell me what my function is and what the jury's function is?

THE DEFENDANT BALL: Well, you know, it's funny that you bring that up, your Honor, because you know, I look forward -- I have been waiting now two and a half

years to come and have my day in court. You see, in order to be in front of the jury, which, you know, I understand the jury, you understand is what you call the sole what you call controllers of the trial and you, your Honor, serve as what is called a referee between the actual defendant and the prosecution.

THE COURT: All right. I will make the legal decisions, and the jury will make the factual decisions, fair enough?

THE DEFENDANT BALL: Yes, sir.

THE COURT: You indicated last week that you had done this once before, you represented yourself. Tell me about that. When did that happen?

THE DEFENDANT BALL: I don't want to bring up the case because I don't want to open up the door for the District Attorney to be able to use that later.

THE COURT: You already told us that you tried a case. Mr. Shortt I think was in the room.

THE DEFENDANT BALL: The case is sealed.

THE COURT: I understand that I'm not going into the underlying facts of the case. I just want to understand what you did, when you did it, before whom you did it and what happened.

THE DEFENDANT BALL: I had to represent myself in front of Judge Grosso, your Honor.

THE COURT: When was that?

THE DEFENDANT BALL: Between 2000 -- 1997 and 2000, your Honor.

THE COURT: Did you select a jury in that case?

THE DEFENDANT BALL: No, sir.

THE COURT: You tried non-jury in front of Judge Grosso?

THE DEFENDANT BALL: Actually, your Honor, in my applications I wound up being released, and the case was dismissed prior to trial on that case.

THE COURT: So you never actually tried a case?

THE DEFENDANT BALL: Well, not exactly, your Honor.

THE COURT: Big difference between making a motion and making applications and a jury trial.

THE DEFENDANT BALL: I'm representing myself in the same frame that I did.

THE COURT: Is it fair to say that you have never selected a jury?

THE DEFENDANT BALL: That's fair to say.

THE COURT: Is it fair to say you have never made an opening statement?

THE DEFENDANT BALL: That's fair to say, I have never made an opening statement.

THE COURT: Fair to say that you never questioned

a witness on the witness stand?

THE DEFENDANT BALL: I never questioned a witness.

THE COURT: And never summed up?

THE DEFENDANT BALL: Never summed up.

THE COURT: By the way, Miss Povman, how many cases have you tried?

MS. POVMAN: Hundreds, I think it's 39 years, Judge.

THE DEFENDANT BALL: Very impressive.

THE COURT: Well, it is impressive. Miss Povman has been a professional practitioner in the courts of Queens for she says 39 years. I will take her at her word. I don't really remember Linda not being around.

THE DEFENDANT BALL: It's not whether she has been around for a long time, your Honor. We are talking about her effectiveness of her assistance as counsel representation.

THE COURT: So am I.

THE DEFENDANT BALL: I'm here, and I had to have her as a lawyer so I'm the best judge of that.

THE COURT: I don't think that's true, but the law says at the end of the day, it's your choice so I am sort of bound by that. You have discussed this with Miss Povman, I'm sure, on numerous occasions.

THE DEFENDANT BALL: Yes.

THE COURT: You wish to waive your right to be represented; is that correct?

THE DEFENDANT BALL: That's correct, sir.

THE COURT: Do you understand that I'm going to hold you to the same legal standards at this trial that I would hold any attorney to, and that includes Mr. Gibbons, Mr. Shortt, everybody is going to have a level playing field except for the fact that you have never tried a case in your life and, Mr. Gibbons, by the way, as you probably know, just beat a double homicide in front of me within the last month and a half.

THE DEFENDANT BALL: Congratulations.

MR. GIBBONS: Thank you.

THE COURT: Mr. Shortt himself is an experienced felony trial lawyer; do you understand all of that?

THE DEFENDANT BALL: Yes, sir.

THE COURT: You know I'm going to hold you to the same legal standards as all the other lawyers in the case?

THE DEFENDANT BALL: As long as you are fair, that's it, that's all I ask.

THE COURT: Do you understand that there is an inherent unfairness about this because when I speak to Mr. Gibbons and when I speak to Mr. Shortt and when I speak to Miss Povman, we speak a language that we all understand, you know, because we have all been doing this for years,

and we are all legally trained, and when we use terms like Sandoval, they have a meaning to us that has a lot more depth to be honest than how you explained what Sandoval means. When I say Sandoval to Mr. Shortt or Mr. Gibbons or Miss Povman, they understand the standards, they understand what it means, they understand the balance test and all kinds of stuff that all I have to do is say the word Sandoval, and they all understand all of that.

THE DEFENDANT BALL: Yes, sir.

THE COURT: You will be held to understanding all of that?

THE DEFENDANT BALL: I look forward to it.

THE COURT: All right.

THE DEFENDANT BALL: For the record, I want to indicate, you know, the fairness or the unfairness doesn't what you call, stem from me being a novice here in the courtroom trying to represent myself. However, I believe that, you know, that the unfairness comes in the due process clause prohibiting the government from using false evidence to obtain a conviction including evidence going towards a witness' credibility. Ceno (phonetic) versus Illinois, in the principle that a state may not knowingly use false evidence does not cease to apply merely because of the false testimony goes only to the credibility of the witness.

THE COURT: That is a fine and accurate statement of the law, but the way we handle those things is by cross examining witnesses, something you have never done and something Miss Povman has been doing for 39 years.

THE DEFENDANT BALL: Okay. It goes onto say --

THE COURT: So when we talk about fairness, that's what we talk about.

THE DEFENDANT BALL: It says, your Honor --

THE COURT: I understand all of that.

THE DEFENDANT BALL: -- when false testimony is introduced --

THE COURT: Mr. Ball, I'm going to drive this bus.

THE DEFENDANT BALL: Is it all right that I represent myself and speak in the presence of you? I have to say this --

THE COURT: I'm going to decide when we are going to address certain issues and when we are not. Okay? Right now, right now we are talking about whether or not I am going to permit you to represent yourself. Okay?

THE DEFENDANT BALL: Yes, your Honor.

THE COURT: Do you understand that you run the risk -- off the record.

(Whereupon, an off-the-record discussion was held.)

THE COURT: Do you understand that the District

Attorney is an experienced prosecutor and he is really not -- he is interested in beating you?

THE DEFENDANT BALL: I question his experience, your Honor.

THE COURT: We will find out in the next three or four days. All right. You do believe you are capable of representing yourself in this case?

THE DEFENDANT BALL: Your Honor, I'm here to question his --

THE COURT: I'm talking about you not him.

THE DEFENDANT BALL: I am here to represent myself.

THE COURT: You want to do this? Are you ready to do this?

THE DEFENDANT BALL: Yes, sir.

THE COURT: I will let you do it. I find that you have knowingly and intelligently and voluntarily waived your right to counsel. I am going to ask Miss Povman to stay with us in an advisory capacity if that's okay with you, Miss Povman?

MS. POVMAN: That's fine, your Honor.

THE COURT: Very good. Now, when we try this case, there will be no bench conferences, no one will stand up, and that applies to everybody. You are going to pick a jury from your seat, you are going to question the jurors

from your seat. You are going to open from your seat, and you are going to close from your seat. If there are records to be made, you make a note of it, and when we have a break and the jury is not in front of us, then you can make a record on whatever legal rulings that I make during the course of the trial. Do you understand that?

THE DEFENDANT BALL: Yes, your Honor.

THE COURT: Do you understand that?

MR. GIBBONS: I do, your Honor. That's kind of weird, I'm used to moving around a little bit.

THE COURT: I know that. Have a seat. Be comfortable.

THE COURT: Mr. Shortt?

MR. SHORTT: My chair is pretty comfortable, very good.

MR. GIBBONS: So literally from my seat the voir dire?

THE COURT: That's where you will be.

MR. GIBBONS: Wow, okay. That's a first, but okay. I understand.

THE COURT: The alternative is to allow you to wander around the courtroom and Mr. Ball not to which is unfair to him.

MR. GIBBONS: I understand.

THE COURT: So that's what we are going to do.

MR. GIBBONS: That's not something that we can disclose to the jury while we are sitting here?

THE COURT: I mean they are not experienced people that's way this case is tried. That's it. It's really nothing to explain.

MR. GIBBONS: Though this is not TV, the media, you know, entertainment is inundated --

THE COURT: If Mr. Shortt asks his questions and does not get up and then you ask questions and don't get up, and he asks his questions and doesn't get up, everybody is square.

THE DEFENDANT BALL: I promise I will not get up there.

MR. GIBBON: The only thing I object to is that he has front row seats.

THE COURT: That application is denied. We have a Sandoval application to make here. Do you want to be heard?

MR. SHORTT: Yes, Judge, any preference as to defendants?

MS. POVMAN: Judge, can we have a minute here?

THE COURT: Mr. Brooks is the first named defendant on the indictment.

MR. SHORTT: We will do Mr. Brooks first.

THE COURT: Mr. Gibbons, since Mr. Brooks is the

first named defendant, I'm going to generally as a practice start off with you, and that applies to cross-examination and jury selection anD everything else.

MR. GIBBONS: Fine, your Honor.

THE COURT: Mr. Shortt, I will hear you.

MR. SHORTT: I will start off with, I will go from the most recent cases using the defendant's rap sheet as a guide to earlier cases. There is one case that is not before the Court a subsequent arrest eventually adjourned in contemplation of dismissal which involves a robbery of October 22 of 2012 at about 4:30 P.M. at 103 Street and Northern Boulevard here in the County of Queens.

At that time, Judge, the defendant and an apprehended other Mr. Frances Blackman who also had the same disposition approached the complaining witness pushed him against the wall and pushed him eventually to the ground and repeatedly beat him in the face and body, and they removed a cell phone and a sum of United States currency from the complaining witness's pocket without permission or authority. That was ACD. I don't really intend to ask questions about it unless the defendant were to open the door to that. I am just more or less making the Court and defense counsel aware that I know of this incident. If he were to open the door, Judge, I would reserve the right to make application to discuss it, but

given the fact it was ACD primarily because the complaining witness was not cooperative, I will not seek to cross examine the defendant about those allegations. I just wanted to bring that to the Court's attention.

THE COURT: Very good.

MR. SHORTT: Judge, starting with cycle 17 on the defendant's rap sheet, this was a robbery incident -- attempted robbery on November 17, 2010 at 101 Street and Northern Boulevard here in Queens at about 9:40 in the evening a New York City police officer actually observed the defendant approach a complaining witness Mr. Julio, G-A-L-A-V-I-Z, Mr. Brooks jumped out from behind a fence punched the complaining witness in the face and body several times and forced him to the ground. The officer further observed the defendant actually continue to beat the complainant unconscious and actually observed blood on the defendant's shoes later on. That's how much the complaining witness was bleeding. The officer also observed the defendant reaching into the complaining witness' pocket and removing -- attempting to remove property before being apprehended. When confronted by the police officer, the defendant flailed his arms and refused to be handcuffed or submit to the authority of the police officer. The case was ultimately given a disorderly conduct. I'm not asking about the eventual adjudication.

I would seek to cross examine the defendant about the specific facts concerning that incident as well as not only the fact that he beat the complaining witness unconscious, Judge, but also that he would not submit to the lawful authority of the police officer who observed that crime and confronted the defendant because it goes directly to his ability to listen to the authority of this Court as well.

Moving on as to cycle 16 this is an event -- a robbery, armed robbery. This occurred with a codefendant on September 13, 2008 approximately 1:55 A.M. outside of 104-22 Northern Boulevard in the County of Queens. You may remember the location, that is the exact location of this crime. In that case the defendant and a codefendant displayed what appeared to be a knife while removing several -- taking currency from a customer of the store Mr. Samaroa, S-A-M-A-R-O-A. The complainant stated that he was confronted by Brooks and the codefendant Mr. Anthony Dyson. They surround the complainant and demanded money in English which the complainant did not understand because he is a non-English speaker. The defendant -- there was an unapprehended other who actually displayed what appeared to be a handgun from his waistband. The complaining witness took what they were meaning and gave over the contents of his pockets at that time.

The eyewitness recognized actually both defendants

as people who routinely rob customers directly outside that store and when confronted by the police officers in that case, Judge, the defendant stated the words specifically upon finding out he was being charged with robbery, are you really going to believe that illegal, referring to the complainant.

The defendant ultimately pled guilty to assault in the third degree in Queens Supreme Court on October 27 of 2009 and received the sentence of one year. I would ask to be able to cross examine the defendant first that he was convicted of a crime related to that case, specifically the crime of assault in the third degree, the date of the conviction and sentence. This is obviously a crime of moral turpitude that the defendant specifically shows somebody chose somebody because he believed they would not call the police or report what happened. He or his codefendant displayed what appeared to be a weapon to overcome their will to steal the property, clearly a case of moral turpitude which reflects upon his credibility, and I ask to cross examine him not only on the facts, but the fact that he pled guilty to assault in the third degree in connection with that case. My understanding the reason the case was even though indicted was ultimately disposed is because the complaining witness was uncooperative and could not be located.

Moving onto cycle 15, Judge, the defendant pled guilty on March 26 of 2008 in Queens Criminal Court to the charge of attempted assault in the third degree. On March 18, 2008 the defendant was accused of assaulting Lisa Fernandez by punching her in the mouth and causing her to sustain lacerations and did so in the presence of the complaining witness' daughter who was twelve years old. This happened at 34-12 113 street apartment 1-F.

You may remember this is a witness who the defense intends to call during this trial. I would seek to ask not only this defendant but that witness because it could show coercion on the part of the complaining witness, the witness is coming forward because this defendant has admittedly been violent towards this complainant in the past.

THE COURT: You lost me.

MR. SHORTT: The defense is going to call Lisa Fernandez who is the common law spouse.

THE COURT: The wife?

MR. SHORTT: The common law spouse of the defendant. Speaking to Mr. Gibbons on Wednesday I don't know if this was on the record, she may be called to testify by the defense to state that the defendant was home in the moments prior to the incident that's before this Court. It is my belief, Judge, that given the domestic

violence history in this case, I don't know how much that testimony could be coerced. I would ask to be allowed to ask the defendant and the witness about whatever history is going on between the two of them.

The defendant in this case pled guilty to attempted assault in the third degree specifically assaulting the witness he is now calling. So I would ask to be allow to inquire of the defendant and also the complaining witness in that case who is going to be a witness for the defense Lisa Fernandez about that incident as well as the defendant's underlying convictions.

As to cycle 14, that case was the possession one bag of crack cocaine Northern Boulevard and 104 Street, I don't really intend to ask any questions with regard to that. The same would be for cycle 13, criminal possession of controlled substance in the seventh degree on 32 Avenue, I would not seek to ask the defendant about that or his 2004 intoxicated driving offense.

THE COURT: And nothing previously presumably?

MR. SHORTT: The only thing I would ask for as to the July 19, 2001 the defendant's conviction for criminal facilitation where he attempted or acted in concert with another person to sell cocaine to an undercover police officer at the intersection of 101 Street and Northern Boulevard. I do think that the fact that he is willing to

participate with other people in obvious criminal activity does bear on his credibility.

THE COURT: Mr. Gibbons?

MR. GIBBONS: Thank you, your Honor. I don't care when we are not in front of the jury, but I'm trying to train you.

MR. GIBBONS: I appreciate that. I need to be trained. All my life speak to the judge, stand up, stand up, now you are telling me not to. Okay.

As to the conviction in in October of 2012 that is not contained in the rap sheet. I understand that Mr. Shortt said that -- you said you would not be going into it?

MR. SHORTT: No, unless it's raised.

MR. GIBBONS: It was adjourned in contemplation of dismissal back in 2012 and at this point it is dismissed and sealed so there should be no record, and I request that Mr. Shortt not be allowed to go into it under any circumstances.

As to the June 11 disorderly conduct, despite the fact that Mr. Shortt said exists, I would disagree and state that they were alleged facts but no facts were ever proven. He pled guilty to disorderly conduct. Any witness could have said anything in the complaint or even the indictment, but there was no conviction, and I don't

believe there would have been any facts brought out in the allocution regarding beating somebody unconscious or reaching into their pockets, only that he was disorderly at that time, date and place. I would argue anything I don't understand it that is too prejudicial to be allowed to come out before the jury.

As to the October 27, '09 assault three, again while Mr. Mr. Shortt claims the underlying facts indicate an armed robbery, again my client pled to assault in the third degree, and I don't believe that Mr. Shortt if the Court allows him to go into it, should be allowed to go into anything beyond what the allocution was which was to an assault not to any type of robbery or attempted robbery.

Further I would argue that this would be too prejudicial as there is a charge of assaultive behavior in this indictment, and if that is brought before the jury, the prejudice would outweigh any probative value.

The March 2008 attempted assault, again I believe because it's a crime of alleged violence, I would argue it's too prejudicial to be brought out before the jury again because the fact this crime involves violence as well.

Regarding the questioning of the witness herself, honestly that's a new issue for me, your Honor, and I'm not sure what the case law says about something like that. I

would certainly argue it's prejudicial and would outweigh any type of probative value that the DA may find. So I would ask that the Court rule that he not be allowed to go into any of the underlying facts or should Miss Fernandez or her daughter testify be allowed to inquire about this incident.

As far as the criminal facilitation on July 2001 I would argue initially that is too remote in time, that was almost 14 years ago, your Honor, and I submit to the Court again it's too remote in time, and the DA should not be allowed to go into that conviction or any of the underlying facts thereof.

THE COURT: All right. I am going to preclude the District Attorney from inquiring about the criminal facilitation case. I do find it is too remote. I am going to permit the District Attorney to inquire about the attempted assault in the third degree where the victim is an alleged -- I guess we will call her a semi-alibi witness in this case. I do find that because of who the complainant is, there is a probative value to the inquiry that bears on bias, coercion.

MR. GIBBONS: Is that if my client takes the stand or to the witness herself?

THE COURT: Well, I'm prepared to rule on that. This is not part of a Sandoval application, but since the

subject has been raised, yes, I will allow him to cross examine the witness on this subject, and of course it would be bizarre to allow him to cross examine the witness on this and then allow your client to take the stand and not allow the DA to inquire on the subject.

MR. GIBBONS: I understand.

THE COURT: With respect to the October 27, 2009 assault charge, I will permit the District Attorney to inquire about the underlying facts with the proviso that the location not be inquired into. And of course you can also inquire as to whether the defendant pled guilty to assault in the third degree on that case.

And finally with respect to the June 9, 2011 disorderly conduct case I will preclude the Assistant District Attorney from inquiring about either that plea or the underlying facts that led to that plea. That is the ruling of the court.

MR. GIBBONS: Thank you, your Honor.

THE COURT: With respect to Mr. Ball, I will hear you, Mr. Shortt.

MR. SHORTT: Thank you, Judge. I will do the same sequential order with Mr. Ball starting with the most recent going back into his past. The first cycle number 27 on the defendant's conviction on a plea of guy April 13 of 2012 for the crime of a trespass in the third degree for

which the defendant received a sentence of ten days, the defendant was observed inside of a foreclosed home -- I don't have the address -- by a New York City police officer and arrested for being inside the home that was not his. I ask to be allowed to inquire if the defendant was convicted of a misdemeanor as to that particular charge as to cycle 27.

Moving onto cycle 26 the defendant's conviction on March 19, 2012 in Queens Criminal Court this was an incident that occurred on December 3, 2011 about 6:00 P.M. at 99 Street and Northern Boulevard here in Queens County.

The defendant and a complaining witness who were friends at the time had a dispute over money and the defendant took out a knife and stabbed the complainant in the stomach with a knife. The victim was taken to Elmhurst Hospital after several days of being left unconscious and eventually had to have part of his intestines removed as a result of that case. He ultimately pled guilty to assault in the third degree and received a sentence of time served.

It is my understanding he was then incarcerated from the date of his arrest until the date of the plea on March 19. The complaining witness was a friend of the defendant and not cooperative, Judge. That was why the case eventually ended up being reduced to a misdemeanor plea. I would ask to inquire of the defendant not only the

fact that he pled guilty to this charge on March 19 of 2012, but the fact that it was assault in the third degree specifically a misdemeanor as well as the facts underlying it.

It shows the defendant, when things do not go his way, is willing to revert to particularly egregious conduct. If he is willing to take out a knife and settle a dispute, I don't think it would be anything to put past him that he would lie to the jury and I think the jury should know that. That's what I would ask for as to cycle 26. As to cycle 27, Judge --

THE COURT: 25.

MR. SHORTT: My apologies, you are right. The defendant pled guilty to menacing in the second degree. It was a domestic violence allegedly in New York County, Judge. The only information is the defendant waived a knife at the complaining witness. The defendant eventually pled guilty on February 16 2012 to menacing in the second degree a, class A misdemeanor and sentenced to a term of 30 days in jail.

I would ask to be allowed to inquire of the defendant as to the facts underlying the conviction that was a dispute the defendant decided to settle by taking out a knife. On February 16 2012 he pled guilty to misdemeanor menacing in the second degree and received 30 days in jail.

Cycle 24, Judge, the defendant was arrested in February of 2012 for possession of marijuana and assault. He ultimately pled guilty in April of that year to possession of marijuana and received time served. He also had some sort of about burglar's tool on him. I'm not seeking to ask the defendant about that conviction.

As to cycle 23 the defendant was arrested on June 21, 2011 at the corner of Third Avenue and East 123 Street. The defendant was observed -- the defendant assaulted a New York City police officer by spitting in the officer's face. When the officer attempted to arrest him the officer -- the defendant flailed his arms and refused to be handcuffed. I would ask to be allowed to inquire of the defendant about not only his ultimate conviction on June 28 of 2011 for resisting arrest a class A misdemeanor in New York Criminal Court but also the facts underlying as it demonstrates the defendant's lack of respect of authority, of law enforcement and possibly of this Court.

As to cycle 27 -- cycle 22 the defendant was arrested and convicted for criminal possession of marijuana in New York County, I'm not seeking to ask the defendant any questions about that.

As to cycle 21, October 5th of 2010 the defendant was arrested on the charge of attempted rape in the first degree for an incident that occurred on September 3rd of

2010 about 4:00 A.M. at 32-50 106 Street. The case was investigated by the District Attorney's office and eventually sent to court on the charge of sexual misconduct. The defendant eventually pled guilty to coercion in the second degree, a class A misdemeanor on November 18, 2010.

The facts of that case is the complaining witness, whose name I will not place on the record, went to the defendant in and around the area of 32-50 106 Street, and inquired about purchasing narcotics the defendant directed her to follow him into an abandoned house. When they got inside the abandoned house, the defendant took out a knife and put it against the complaining witness and forced her to perform oral, anal and vaginal sex.

The complaining witness reported the case immediately, but eventually became uncooperative. She was treated at a local area hospital for injuries and lacerations suffered during the assault, Judge.

This case classically goes to the fact that the defendant lured the complaining witness under the false pretense to provide her narcotics. She was very forthright in her admissions to the District Attorney's office that is exactly why she was there, she was a recovering and relapsing narcotics addicted person, and the only reason she had anything to do with the defendant that day was to

seek narcotics. He lured her into the abandoned house and assaulted her in the most heinous ways, so I would ask to inquire about the defendant's actions and the ultimate conviction of coercion in the second degree to show that he is willing to mislead people.

THE COURT: Do you know what he allocuted to?

MR. SHORTT: It was coercion in the second degree, Judge. He forced her -- my understanding speaking to the assigned assistant, I don't have the minutes because he is no longer at the office, he pled guilty to forcing her to perform acts and overcoming her will by threatening her, that was my understanding. It was very pro forma that eventually -- it was not on the criminal court complaint. It was a motion to be added at the time of disposition for purposes of disposition.

THE COURT: We are up to number 20.

MR. SHORTT: Thank you, Judge. As to number 20, it's a conviction on December 26 of 2008 for criminal possession of a controlled substance in the seventh degree. I will not seek to ask any questions about that. The same with cycle 19, October 31 of 2007, criminal possession of controlled substance in the seventh degree.

As to cycle 18, however, the defendant was observed in possession of and attempting to sell counterfeit DVDs. He does not possess any license to sell

them, Judge. This was a street arrest by members of the 25 Precinct anti-crime team, Judge, for selling counterfeit DVDs on the street.

I ask to be allowed to inquire that the defendant was convicted of the crime of trademark counterfeiting in the third degree, a class A misdemeanor. It shows the defendant is willing to disobey the law very clearly out on the street and out in the open, and it goes to his credibility as a witness, Judge.

Moving onto cycle 17 this was an arrest for an event that occurred on September 12, 2006 about 8:00 P.M. at 120, East 119 Street in New York County. The defendant eventually pled guilty on October 17 of 2006 to burglary in the third degree and received a sentence of nine months.

In that case, Judge, the defendant was found inside of a closed hair salon. The complaining witness had been out all night and decided to stop at her store to check things. When she approached she saw the metal roll gate was actually rolled up even though she actually closed it earlier when she left for the day. She observed the defendant walking out carrying a large black garbage bag. She attempted to stop him, but he fled. She called the police who eventually caught the defendant carrying property that was found inside the store. He was found several blocks away with the property, Judge, so I would

ask to be allowed to inquire of the defendant not only of the crime of burglary in the third degree and the sentence of nine months, but also the facts underlying that as burglary in the third degree and possession of stolen property which he did not plead to but was included on the charges, clearly crimes of moral interpret which would bear on his credibility to anything he says to this jury. Judge, cycles 15, 14 --

THE COURT: 16.

MR. SHORTT: I'm sorry, 16, 15, 14 and 13 are all marijuana or controlled substance related counts, I'm not seeking to ask the defendant questions regarding those particular incidents. However, I would seek to cross examine the defendant as to cycle number 12 wherein it is an incident that occurred August 26 of 2004 about eleven A.M. at 101-16 31 Avenue here in Queens County.

The defendant ultimately in that case pled guilty on September 14, 2004 to assault in the third degree and received a sentence of probation of three years which he eventually violated and was sentenced to a term of sixty days. The facts underlying that case were the defendant was in sort of a verbal dispute with the complaining witness Mr. Eric Tait, T-A-I-T, and during the course of that verbal dispute, the defendant took out an electric drill and struck the complaining witness in the shoulder

and arm causing bruising, swelling and substantial pain to the shoulder. The complainant was removed to the local hospital. From what I can see in the file, he was diagnosed with a possible broken shoulder. It shows that when in doubt, the defendant will resort to dishonest means in order to settle things. I would seek to ask the defendant about those events as well as the events of conviction for assault in the third degree and essentially violating probation eventually showing that he will not listen to the orders of the court.

Judge, that would be the sum total of my request on Sandoval for Mr. Ball.

THE COURT: Mr. Ball?

THE DEFENDANT BALL: Yes, sir. Okay. I guess we will start with cycle number 27; is that correct?

THE COURT: All right.

THE DEFENDANT BALL: Regarding the situation with an assault with a knife?

MS. POVMAN: That was a trespass you were in a building.

THE DEFENDANT BALL: Okay. Yeah. I would ask your Honor not for him to allow because that address he gave, it was actually my house, your Honor, and he doesn't have the address and he doesn't have the other information that would fairly represent my situation in that case, your

Honor. So I would ask for him not to be able to use that particular case because the address is not able and available, and he does not have other information that could go forwards, you know, establishing that I was there illegally.

THE COURT: Keep going.

THE DEFENDANT BALL: Okay. The next would be stop with a knife, 26?

THE COURT: That's correct.

THE DEFENDANT BALL: Your Honor, in that case, you see, we pled out to a class A misdemeanor because of the fact that in that case there wasn't enough evidence to establish the allegations in that case so I would ask for you to, you know, not allow that case to be used as well because of the fact that, you know, in the elements of the crime charged, you know, it doesn't constitute an A misdemeanor, and so the court and the District Attorney at that time in the case that they had, what you call, facts to support the allegations in that case then they would have went forward with the prosecution of a felony so that's what I would ask you please do not allow them to use that either. Thank you.

Going onto 25, you know, your Honor, the actual name of that person is domestic violence okay, that was actually a young lady that I was with for twelve years,

your Honor, and that was the reason that I moved back to Queens. There was, you know, very disappointing to me, that sometimes women have a tendency to, you know, tell fibs, your Honor, and so one thing I learned as a man is that in situations with women even if you are wrong sometimes if you are right you still have to say you are wrong and that was the situation with the a young lady at 350 East 124 Street I was with for over twelve years, and I raised her and her two sons, and it was a domestic dispute your Honor, but there was no violence, no knives or anything involved in that case. So I would ask for you to not allow him to use that as well.

You know, your Honor, the next one is dealing with basically another same issue -- okay, the resisting arrest. I apologize. Can you help me out?

MS. POVMAN: Yes. What number is it, 25?

THE DEFENDANT BALL: I apologize, your Honor.

MS. POVMAN: Here is cycle 25.

THE DEFENDANT BALL: What was the circumstances under this, your Honor? We don't have it available so I really can't protest.

MS. POVMAN: The DA is going to tell you.

MR. SHORTT: Which cycle are we talking about?

MS. POVMAN: 25.

THE COURT: The resisting arrest case.

MR. SHORTT: 25 is the domestic violence, 23 is the resisting arrest.

THE COURT: 23.

THE DEFENDANT BALL: Is that with the purchase of the marijuana?

THE COURT: No, that's when you spit in the face of the cop.

THE DEFENDANT BALL: That was actually the purchase of marijuana, and that is actually what that case originated from is me purchasing marijuana, and I was part of what you call an operation where they buy and bust, people after buying coming out of 123 Street where there is a known drug lot. So the assault itself was never, what you call, that was never the issue. The case it was based on a purchase of marijuana which that's what the original case was all about so I would ask for you not to allow him to use that as well, your Honor.

The next one is the coercion, your Honor, you know, I want to just reflect on this. Your Honor, do you see the charges that's here? They are very serious charges, they are charges about sexual rape and things of that nature. Your Honor, the judge that went in front of this she rejected it because she knew it was false. Anna Portrella (phonetic) is a friend of mines, like I said to you, she has issues with getting high because that's what

we do, but she told me she was coerced by her relative, you see, to tell the police that this is what happened, and you know, ultimately this is what is it that the judge decided. The judge decided to have it brought down to a misdemeanor and sent the District Attorney back out because she would not accept it, and it was a woman judge actually so she would not allow them to bring this type of charges because she knew there was no basis to it.

So, you know, when you have the report like the one that he is describing here, when I went to the precinct, your Honor, I already knew who the victim was, who the person was, and I knew the name. The name is Anna Portiella (phonetic), all right, your Honor, so the circumstances that he described is not what happened, your Honor. I believe maybe she missed an appointment and had to give what you call some type of excuse for not being available someplace, so ultimately, you know, and I have seen her since again, so, your Honor, it's the situation that he described is not what happened otherwise I wouldn't be sitting here, your Honor, they would have prosecuted me for that, so I ask that you please not allow that case to be put into evidence or even consider that's the type of individual that I am, your Honor.

The CDs, I sold, your Honor, yes, I did, and if he decides he wants to use that, your Honor, by all means, I

did, and, your Honor, I will say it for the record that anything that I'm guilty of, your Honor, I will cop out to it as you see. So onto the next one.

MS. POVMAN: That's the burglary incident.

THE DEFENDANT BALL: Okay, your Honor, in the case that the District Attorney wants to use the burglary, your Honor, it's okay, I agree with this. I concede to that because, your Honor, what happened is I was -- previously I used crack and actually this is one of the issues that is going to be raised throughout the trial, you know, because I am a substance abuser and not a robber, you understand, your Honor, I don't commit robberies. What happens in this burglary like he said the door was open, and I went in, your Honor, because it was open and I took the stuff. And so that's really what happened. I mean considering that the door was open, you know, that I didn't break-in, I didn't hurt nobody, I would ask that you not use that as well. If you would like to know the circumstances, yes, that is true. I did go in through and open door, your Honor.

THE COURT: All right. Thank you, Mr. Ball.

MS. POVMAN: One more. Go to twelve, it's an assault where you got probation.

THE DEFENDANT BALL: Can you give me the circumstances on that? Assault? Oh --

THE COURT: You had a fight with a friend of yours.

THE DEFENDANT BALL: Right, your Honor. If you look at the record, that was my house where I lived at and the guy -- actually he assaulted me, your Honor, and he worked across the street at a child day care where I was trying to work and have a part-time job, so he came to my residence, your Honor, so the officer -- because he was injured, they said they have to arrest me, because the actual event took place at my house in my residence.

THE COURT: All right.

THE DEFENDANT BALL: So I ask that you not allow him to use that as well.

THE COURT: Very good. Thank you, Mr. Ball.

THE DEFENDANT BALL: Yes, sir.

THE COURT: All right. Working my way up, I will preclude the District Attorney from inquiring about the September 14, '04 assault. I will permit the District Attorney to inquire about both the underlying facts and the conviction for burglary in the third degree. I do find that such a crime demonstrates that the defendant will place his interests above that of society.

I will permit the District Attorney to inquire about the conviction for trademark counterfeiting under the theory that the defendant's engaging in this such conduct

also is indicative of him placing his interests above that of society. I will preclude the District Attorney from inquiring about the underlying facts of the coercion. I will permit the District Attorney to inquire as to whether or not the defendant pled guilty to coercion on November 2010. The same rationale applying. I will permit the District Attorney to inquire about the underlying facts of the resisting arrest as well as his conviction for an A misdemeanor under the same rationale.

I will permit the District Attorney to inquire as to whether or not on February 16, 2012 he was convicted of an A misdemeanor. I will also permit the District Attorney to inquire about his conviction on March 19, 2012 of an A misdemeanor and of his conviction on April 13, 2012. Just the fact that he was convicted of misdemeanors on those last three cases. That is the ruling of the Court.

THE DEFENDANT BALL: Thank you, your Honor.

THE COURT: Very good. It's 20 after twelve. What I will do now, I will direct that we get a panel over, but just so everybody understands, Mr. Gibbons knows my drill, but I will say it for everybody else, I fill the courtroom with close to 60 people is what we can squeeze in here including the jury box. I will then myself make inquiries of the entire panel as to things like illnesses religious beliefs, vacations, whether or not they know any

of us or any of the individuals named on the witness list, although I'm not sure the depth to which I want to inquire about whether there are people in the audience that know someone named Cohen in Queens County, it's kind of hard not to.

THE DEFENDANT BALL: Your Honor --

THE COURT: Mr. Ball.

THE DEFENDANT BALL: Please forgive me.

THE COURT: Let me please finish then I will hear you. Mr. Shortt, I think I can reasonably tell this jury this case is going to be completed at least if not the latest early next week.

MR. SHORTT: I hope so, Judge.

THE COURT: The address.

MR. SHORTT: It's in the Bill of Particulars.

THE COURT: Just sing it out.

MR. SHORTT: The corner of 105 Street and Northern Boulevard.

THE COURT: That's Corona?

MR. SHORTT: Yes.

THE COURT: Also at that stage I will inquire as to any language problems that the witnesses -- the prospective jurors may have. We will then fill the box. I will ask them as a group whether or not they can follow the law from me, whether they agree with it or not. I will

inquire about whether or not they can hold the District Attorney to the burden of proof which is beyond a reasonable doubt not higher, not lower.

Mr. Gibbons and Mr. Ball, do you want me to inquire about whether or not they can follow the directive of should the defendant not testify that they are not to draw any inferences adversely to the defendant; is that what you want, Mr. Gibbons?

MR. GIBBONS: Yes, your Honor.

THE COURT: Mr. Ball?

THE DEFENDANT BALL: Yes, sir.

THE COURT: I will do that.

MR. GIBBONS: That will not preclude me from inquiring myself about it?

THE COURT: No. I will then ask them if they can keep an open mind and not decide the case until they have heard everything including my instructions on the law. I will then inquire individually of the men and women in the box as to what neighborhood they live in, how far they went in school, what they do for a living, single, married widowed, divorced, kids if relevant, prior jury service, whether or not they or a loved one have been convicted of a crime or have been victimized by a crime, friends and family in law enforcement, and whether or not they can be fair.

I will then permit each side 15 minutes to inquire on your own, seated, and that's how we will proceed. We will reconvene at 2:00. Anything before we break?

MR. GIBBONS: Yes, your Honor, my client signed the Antommarchi waiver.

THE COURT: It's kind of academic in this case. For the record, I will note that the defendant has waived Antommarchi, the defendant Brooks has waived Antommarchi. I will sign it, but I don't see under these circumstances how there would be any instance when anything is going to be done in this case other than in open court so it's somewhat academic.

MR. GIBBONS: Understood. I have a subpoena duces tecum for medical records.

THE COURT: All right.

MR. GIBBONS: My client has raised the issue of 30.30 and I guess 30.20 as well. He wants to go forward with the case and does not want me to file the motion which I told him would halt the proceedings, but he wanted me to put on the record that he does not want to waive his right to any 30.30 relief he might have.

THE COURT: Duly noted.

THE DEFENDANT BALL: Yes, your Honor.

MR. GIBBONS: I believe he joins that application.

THE COURT: Very good. The defendant Ball joins

in the application. Okay. I will hear you now.

THE DEFENDANT BALL: I just wanted to ask you, you know, in respect to me putting in the application for you to charge the jury a certain way, would this be a good time to ask you?

THE COURT: No, we will do that at the end of the case because what I instruct the jury and what I don't instruct the jury in large part will be influenced by what the evidence is and what the evidence isn't. So that's when we do it.

THE DEFENDANT BALL: Okay. I will ask Miss Povman. Thank you.

THE COURT: Anything else?

MR. GIBBONS: No, your Honor defendant.

THE DEFENDANT BALL: No, your Honor.

MR. SHORTT: No, your Honor.

THE COURT: 2:00.

MR. GIBBONS: I understand Mr. Ball is a Muslim; is that correct?

MS. POVMAN: You don't come to court on Friday?

THE DEFENDANT BALL: I will come to court. I will not hold up the trial.

THE COURT: Very good.

MR. GIBBONS: I have one scheduling issue. I am closing on the sale of my co-op, and I'm trying to get it

done before the end of the month, so I don't have to make another mortgage and maintenance payment so I might need one day. I will try to schedule around the court's schedule obviously but I want to do it before the end of the month so I just wanted to alert the court to that possibility.

THE COURT: All right. Are you going pro se on that?

MR. GIBBONS: I am.

THE COURT: What a fool.

(Defendants exit the courtroom.)

(Luncheon recess taken.)

A F T E R N O O N S E S S I O N

THE COURT CLERK: Recall of number two on the calendar, indictment 2228 of 2012, Raymond Ball and Elijah Brooks. The defendants are incarcerated and produced being brought before the Court. The appearances are the same.

(Whereupon, there was a brief pause in the proceedings.)

THE COURT CLERK: The defendant Brooks is present before the Court.

(Defendant enters the courtroom.)

THE COURT CLERK: The defendant Raymond Ball is present before the Court.

MR. GIBBONS: Your Honor, just one brief issue, in reviewing my client's rap sheet after the Sandoval, the People had originally filed notice of I believe discretionary persistent when he was first arraigned. I was not the attorney at the time. In reviewing the sheet, it appears he is just a predicate felon, not violent predicate felon and the minimum would be five years, and I don't know if that was ever relayed to him, and I just let him know what it is, and he said he would not be interested anyway.

THE COURT: All right. Duly noted.

MR. GIBBONS: Thank you, your Honor.

THE COURT: Over the lunch break, I had an

Case 1:19-cv-05310-ERK-LB Document 9-2 Filed 12/13/19 Page 196 of 907 PageID #: 559

opportunity to read the Lopez case that was furnished to me as well as the Bennett case, an 1867 Court of Appeals case, even before Gibbons was born.

THE DEFENDANT BALL: Controlling case, your Honor.

THE COURT: I am satisfied that neither of those cases will require me to dismiss this indictment. I do adapt the District Attorney's view that the defendants were not only named in the caption, but in the bottom portion of the caption both defendants' names were mentioned, and all of the counts refer to the defendants acting in concert with each other allowing for no misunderstanding as to who was indicted by this Grand Jury so the motion to dismiss is denied.

MR. GIBBONS: Note our objection, your Honor.

THE COURT: Noted. You have an exception as well.

MR. GIBBONS: Thank you.

THE COURT: Are we ready for the jury?

MR. SHORTT: Judge, because of the pro se defendant, I would make a motion in liminae at this time to preclude the defendant or at least be admonished not to mention the facts of the case or any law of the case during the jury selection process. Specifically the defendant stated he would make his substance abuse history part of this trial, I move to preclude any mention of that as not being relevant to this case and certainly to the first

round of voir dire.

THE COURT: Do you want to be heard?

THE DEFENDANT BALL: Of course. Your Honor, you know, the actual case it all revolves around 105 Street which is a notorious crack block, and this is where is it that this alleged crime took place. So, you know, I think this would be a very important aspect of our case because this is where if you look at my criminal background, that is a place where what you call was caught previously with possession of crack, possession of marijuana at that same location so I think that if you don't allow us to bring that into evidence, it would prejudice my case.

THE COURT: That's not what he is asking. He is simply asking that you, and I will expand this from you to everybody, be precluded from addressing the facts of the case during the voir dire portion of the trial. I am going to grant that motion, and that ruling will apply to you and apply to Mr. Gibbons and Mr. Shortt, the District Attorney. Anything else before we bring in the jury?

THE DEFENDANT BALL: No, Judge.

MR. SHORTT: That's it, Judge.

MR. GIBBONS: Nothing, your Honor.

THE COURT: Very good. Bring them in.

THE COURT OFFICER: Are you ready, Judge?

THE COURT: Ready.

THE COURT OFFICER: Jury entering.

(Whereupon, the prospective jurors enter the courtroom.)

THE COURT: Mr. Shortt, will you move the case to trial?

MR. SHORTT: The People so move, your Honor.

THE COURT: Thank you. Good afternoon, ladies and gentlemen. My name is Justice Barry A. Schwartz. I want to welcome you to K-14, an American court of law. We are here to try the case of the People of the State of New York against Elijah Brooks, who is the gentleman in the black sweater, and Raymond Ball, who is the gentleman seated next to him.

This trial will begin with the selection of a jury from amongst you people. We are all very fortunate to live in a free and democratic society. Our system of justice is a key component to our freedom and at the heart of our system of justice is the right to a fair trial by a jury of our peers. That is the purpose of today's procedure, to help ensure that both sides get a fair trial. For this process to continue to work as it has for more than 200 years, you men and women are being asked to make this small sacrifice of time from your daily lives. By serving as jurors you are serving your country, you are helping to make our system of justice a fair one, and for your service

and for your cooperation, I do thank you.

In this case, the defendants have been indicted for committing the crimes of robbery in the second degree and related counts. You will note that there are two defendants in this case. We are trying this case together, but it is your obligation to evaluate the evidence as it applies or fails to apply to each defendant separately. Every instruction on the law must be considered by you as referring to each defendant separately.

You must at the end of the case, and we will talk about this more, you must return separate verdicts for each defendant, and these verdicts may be but need not be the same. As I said, it will be your sworn duty to give separate consideration to the case of each individual defendant.

Now, bear in mind that the charges set forth in the indictment are allegations only, it is simply a device to bring defendants to court. An indictment is proof of nothing. The defendants are presumed innocent, and their presumption of innocence rides with them as they sit here now and continues throughout the trial unless and until they are proven guilty separately beyond a reasonable doubt. That burden of proof never shifts to the defendants. Should either or both defendants choose not to testify on their own behalf, you may draw no inference of

guilt from that decision.

Now, at this point I want to take the opportunity to introduce the attorneys. The People are represented by District Attorney Richard A. Brown, Assistant District Attorney Timothy Shortt will prosecute this case on his behalf. He is seated to my right.

MR. SHORTT: Good afternoon, ladies and gentlemen.

THE COURT: The defendant Brooks who I already named is represented by Mr. Wyatt Gibbons.

MR. GIBBONS: Hello, everyone. Good afternoon.

THE COURT: Mr. Ball has elected to represent himself at this trial as is his right. Under our law every defendant has a right to have a lawyer represent him and to have the court appoint a lawyer if he cannot afford one. At the same time, every defendant has a right to represent himself if he so chooses. The defendant here has chosen to exercise that right. Again you are not to draw any inference unfavorable to the defendant from his exercise of his right to represent himself.

Seated next to Mr. Ball is Miss Linda Povman, who will serve in an advisory capacity for him.

MS. POVMAN: Good afternoon.

THE DEFENDANT BALL: Good afternoon.

THE COURT: It is your function to apply the questions of fact and from the meshing of the law and the

facts, you, the jury, will make the ultimate determination as to whether any or both of these defendants are guilty or not guilty of the crimes charged.

We select a jury by asking questions of the prospective jurors questions. Those of you who are called to the jury box will be asked questions by me, by the prosecutor, and by the defense lawyers. The purpose of this questioning is to select a fair and impartial jury, fair to the prosecution and fair to the defense.

I want all of you who are not called initially to the jury box to listen to the questions asked of those in the jury box because before this process is over, many, if not all of you, will be called to the jury box, and you will be asked similar questions. Again I want to thank you for your willingness to serve as jurors.

The clerk will now swear the panel.

THE COURT CLERK: Please stand and raise your right hands.

(Panel sworn.)

THE COURT: Ladies and gentlemen, we are going to begin this process by me asking a series of questions to everybody in the room. Number one, is there anyone here who has a religious belief that will prevent you or prohibit you from sitting in judgment of a person and voting guilty or not guilty?

The crimes that are charged allegedly took place on 105 Street and Northern Boulevard which is in Corona. Jurors will be prohibited from going to the scene during the course of your service. Is there anyone here who lives so close to that particular intersection, that it would be impossible for you to obey my directive not to go to that area for the next couple of days? Very good.

Is there anybody here who has a medical condition, that's not a cold, that's not the flu, but a medical condition that would interfere with your ability to serve as a juror? Very good.

Is there anybody here who knows me or any of the three lawyers or the two defendants, or any of the following individuals: Tarek El Turkey, Detective Daniel Lanning, Police Officer Angelo Pampena, Michael Cohen or Janet Cohen, Lisa Fernandez, Aja Brooks? Thank you.

Now, this trial should be concluded hopefully by the end of this week, but certainly by the first day or two into next week. It will, of course, interfere with everybody's personal life, everybody's work, everybody's social life, but that is not a justification for shirking your duty as a citizen to serve as a juror.

Having said that, is there anyone who has an obligation that is so critically important that it would create an exceptional hardship for you to serve?

Sir, state your name.

JUROR: Singh.

THE COURT: What's the problem?

JUROR: I'm a medical solo practitioner and I have nobody to take care of my patients.

THE COURT: You are a doctor?

JUROR: Yes.

THE COURT: You have your own practice?

JUROR: Yes.

THE COURT: Do you have office hours today?

JUROR: Yes.

THE COURT: Who is covering for you today?

JUROR: Just for today, my secretary is there, but nobody is there.

THE COURT: Are they postponing those appointments and putting them over to next week?

JUROR: Only for today.

THE COURT: If you go out of town, there is no doctor that can cover an emergency for you?

JUROR: Yes, but that's planned before, I plan like six to two months.

THE COURT: You did not plan on being on jury duty? You got a notice in the mail like everybody else in the room.

JUROR: At the same time I'm leaving the country

next week for four or five days.

THE COURT: Do you have anything else in your back pocket that would persuade me that you shouldn't be a juror in this case?

JUROR: I have the ticket, and reservation.

THE COURT: You have tickets that you bought?

JUROR: Yes.

THE COURT: You have them with you?

JUROR: I have it on line.

THE COURT: You have it with you?

JUROR: Yes.

THE COURT: Where are you going?

JUROR: Bermuda.

THE COURT: When?

JUROR: On the 29th.

THE COURT: We will be done by then. Have a seat. Anybody else? Yes, sir? Your name.

JUROR: Do you think we will be done by the 27th?

THE COURT: Yes.

JUROR: All right.

THE COURT: Yes, sir?

JUROR: I am a full-time student, I live and study in Philadelphia, but my permanent residence is here.

THE COURT: Everybody here is going to miss work, everybody who is not working, who is in school is going to

miss school. That's it. Anybody else?

Finally, is there anybody here who does not understand what I am saying? Anyone that has such a problem with the English language that you believe it would be impossible for you to understand what is being said by the witnesses, what is being said by the lawyers, and what is said by me?

Fill the box.

THE COURT CLERK: When your name is called, please gather all your belongings and follow the directions of the court officer. I apologize now for anybody's name I mispronounce.

Number one, Kimberly Matthias, K-I-M-B-E-R-L-Y, last name, M-A-T-T-H-I-A-S. Number two, Yuda Matatov, Y-U-D-A, last name, M-A-T-A-T-O-V. Number three, Claude Masse, C-L-A-U-D-E, last name, M-A-S-S-E. Number four, Joshua Hyde, J-O-S-H-U-A, last name, H-Y-D-E.

THE DEFENDANT BALL: Can you repeat that, please?

THE COURT CLERK: Joshua Hyde, H-Y-D-E.

THE DEFENDANT BALL: Thank you.

THE COURT CLERK: Number five, Leopoldo Hinds, L-E-O-P-O-L-D-O, last name, H-I-N-D-S. Number six, Andrew Hilbert, H-I-L-B-E-R-T. Number seven, Randy Ramdyal, R-A-N-D-Y, last name, R-A-M-D-Y-A-L. Number eight, Jean Barrett, first name, J-E-A-N, B-A-R-R-E-T-T. Number nine,

Patricia Bacchi, P-A-T-R-I-C-I-A, B-A-C-C-H-I. Number ten, Nicholas Altomerianos, A-L-T-O-M-E-R-I-A-N-O-S. Number eleven, Greg Goldstein, G-O-L-D-S-T-E-I-N. Number twelve, Hasina Poly, H-A-S-I-N-A, last name, P-O-L-Y. Number 13, Robert Persico, P-E-R-S-I-C-O. 14, Sofia Almeida, S-O-F-I-A, last name, A-L-M-E-I-D-A. 15, Wandali Perez, first name W-A-N-D-A-L-I, P-E-R-E-Z. Number 16, Lai Ha Ng, L-A-I, H-A, last name N-G.

THE COURT: Ladies and gentlemen, I'm going to begin by asking a series of questions to all 16 of you that are in the box. You will be the sole judges of the facts. I am the sole judge of the law, and you must apply the law as I give it to you whether you agree with me or not. Can everybody here promise me that you will do that?

One law that I mentioned already, I will repeat it, the defendant is presumed innocent. He is required to prove nothing. The burden of proof is on the District Attorney. He must prove beyond a reasonable doubt that the defendants committed the crimes they are charged with. Can everybody promise to hold the District Attorney to that burden of proof?

I said beyond a reasonable doubt. I did not say beyond all doubt. That is virtually impossible. Can all of you promise not to hold the District Attorney to a higher burden than beyond a reasonable doubt?

THE JURORS: Yes.

THE COURT: On the flip side of that, of course, is can everybody promise not to hold the District Attorney to a lesser burden than beyond a reasonable doubt? Can everybody do that?

I told you that the defendants do not have to testify on their own behalf, that is a cornerstone of our American system of justice, and I tell you that you cannot draw an adverse inference against the defendants should either of them choose not to testify. Can all of you promise to follow that law?

THE JURORS: Yes.

THE COURT: Finally, can all of you promise to keep an open mind, that is not decide this case until you have heard all of the evidence, all of the arguments of the attorneys and my final instructions to you on the law; can all of you promise to do that?

THE JURORS: Yes.

THE COURT: Thank you very much. I will now ask a series of questions to you individually. I'm not prying. I will forget what you tell me very quickly, but it is an important part of the jury selection process. We will begin -- and again as our clerk said, please, if I mispronounce your name, please call me on it. I don't like my name being mispronounced. You all deserve the same

respect.

Miss Matthias, what neighbor do you live in?

JUROR: Cambria Heights.

THE COURT: How far did you go in school?

JUROR: College.

THE COURT: Are you a college graduate?

JUROR: Yes.

THE COURT: What do you do for a living?

JUROR: Medical assistant.

THE COURT: Single, married, widow, divorced?

JUROR: Single.

THE COURT: Have you ever served as a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved ever been the victim of a crime?

JUROR: No.

THE COURT: Do you have friends or family in law enforcement, that means assistant district attorneys, cops, court officers, correction officers, anybody like that, FBI agents?

JUROR: Friends. Yes.

THE COURT: Tell us about that?

JUROR: I have a few friends that are cops.

THE COURT: There are about 35,000 cops I think in New York City. I think the District Attorney is planning calling two of them. Can you promise me that you will evaluate the police officer testimony in the same way you evaluate any other witness, can you do that?

JUROR: Yeah.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Thank you very much.

Mr. Matatov, where do you live, sir, what neighborhood?

JUROR: Fresh Meadows.

THE COURT: How far did you go in school?

JUROR: I no go to school.

THE COURT: How far did you go when you went, high school?

JUROR: I finished in Russia, not here, my country.

THE COURT: How far did you go in Russia, high school?

JUROR: Yes.

THE COURT: Did you do any college?

JUROR: No, just high school.

THE COURT: What do you do for a living, sir?

JUROR: Yellow cab driver.

THE COURT: Single, married, widowed, divorced?

JUROR: Married.

THE COURT: What does your wife do?

JUROR: Social worker.

THE COURT: Do you have kids?

JUROR: Three.

THE COURT: Are they adults?

JUROR: And a grandchild, too.

THE COURT: I am assuming the grandchild does not work. I am asking about the kids to find out what they do for a living.

JUROR: One finished the college just looking for job. The other one is working for real estate business.

THE COURT: Have you ever served as a juror before, sir?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: No.

THE COURT: Do you have friends or family in law

enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Yeah.

THE COURT: Good.

Mr. Masse, where do you live?

JUROR: Fresh Meadows.

THE COURT: How far did you go in school?

JUROR: College.

THE COURT: What do you do for a living?

JUROR: Chemist.

THE COURT: Single, married, widowed, divorced?

JUROR: Married.

THE COURT: What does your wife do?

JUROR: She is home.

THE COURT: Taking care of kids too young to work?

JUROR: Yes.

THE COURT: Have you ever been a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: No.

THE COURT: Do you have friends or family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Sure, yes.

THE COURT: Thank you very much.

Mr. Hyde, where do you live, sir?

JUROR: Jamaica.

THE COURT: How far did you go in school?

JUROR: College, but I didn't graduate.

THE COURT: What do you do for a living?

JUROR: Security.

THE COURT: What kind of security?

JUROR: JFK.

THE COURT: Are you a police officer, or a peace officer?

JUROR: Just a security.

THE COURT: Anything about that job that you think would cause you not to give a fair shake to either side in this case?

JUROR: No.

THE COURT: Can you evaluate the police officer testimony fairly?

JUROR: Yes.

THE COURT: Good. Single, married, widowed,

divorced?

JUROR: Single.

THE COURT: Have you ever been a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: No.

THE COURT: Do you have friends or family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Thank you very much.

Mr. Hinds, how are you, sir?

JUROR: Okay, fine.

THE COURT: Where do you live.

JUROR: Springfield Gardens.

THE COURT: How far did you go in school?

JUROR: I finished high school.

THE COURT: What do you do for a living?

JUROR: Retired.

THE COURT: From what?

JUROR: Pattern making.

THE COURT: Single, married, widowed, divorced?

JUROR: Married.

THE COURT: What does your wife do?

JUROR: She is also retired.

THE COURT: From what?

JUROR: She was working in insurance.

THE COURT: Do have kids?

JUROR: No.

THE COURT: Have you ever been a juror before?

JUROR: Yes.

THE COURT: Tell us about that, civil or criminal?

JUROR: Civil.

THE COURT: Okay. You will appreciate that the rules in a criminal case are different than they are on the civil side, okay? You will take the law as I give it to you?

JUROR: Yes.

THE COURT: Anything about that experience being a juror that would cause you not to be a fair juror in this case?

JUROR: No.

THE COURT: Good. Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: No, sir.

THE COURT: Do you have friends or family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Good. Thank you, sir.

Mr. Hilbert, where do you live, sir?

JUROR: Howard Beach.

THE COURT: How far did you go in school?

JUROR: Associates degree now, and I am going for my bachelors full-time.

THE COURT: So you are not working?

JUROR: I am working.

THE COURT: What do you do?

JUROR: Registered nurse.

THE COURT: Single, married, widowed, divorced?

JUROR: Single.

THE COURT: Have you ever served as a juror before?

JUROR: No.

THE COURT: Have you or loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Victim of a crime?

JUROR: No.

THE COURT: Friends or family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Very good. Thank you.

Mr. Ramdyal, where do you live, sir?

JUROR: Woodhaven.

THE COURT: How far did you go in school?

JUROR: High school.

THE COURT: What do you do for a living?

JUROR: Warehouse supervisor.

THE COURT: Single, married, widowed, divorced?

JUROR: Married, three children.

THE COURT: What does your wife do?

JUROR: She is home taking care of the kids.

THE COURT: Have you ever served as a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: I don't think so.

THE COURT: Have you or a loved one -- you would

would have probable noticed. Have you or a loved one ever been the victim of a crime?

JUROR: No.

THE COURT: Friends or family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: I think so.

THE COURT: Good. You know, this is an important case, and I know that somewhere during this process, somebody is going to say, you know, think so doesn't really cut it. Do you think you are a fair person, sir?

JUROR: Yes, I do.

THE COURT: Can you be fair in this case?

JUROR: Yes.

THE COURT: Thank you very much.

Miss Barrett, how are you?

JUROR: Okay.

THE COURT: Where do you live?

JUROR: Queens Village.

THE COURT: How far did you go in school?

JUROR: High school.

THE COURT: What do you do for a living?

JUROR: I'm a nurse.

THE COURT: Single, married, widowed, divorced?

JUROR: Married.

THE COURT: What does your husband do?

JUROR: Mechanic.

THE COURT: Do you have kids?

JUROR: Three big ones.

THE COURT: What do they do?

JUROR: One is a supervisor at a bank; one just resigned from correction officer, and the other one goes to school.

THE COURT: Does the fact that one of your children is a correction officer, would that prevent you from evaluating the two cops that we are going to see on the stand?

JUROR: No.

THE COURT: Have you ever served as a juror before?

JUROR: Yes.

THE COURT: Civil or criminal?

JUROR: Civil.

THE COURT: The rules are different. Will you follow the law as I give it to you?

JUROR: Yes, sir.

THE COURT: The main rule that's different is the burden of proof.

JUROR: Yes.

THE COURT: In a civil case it's like 51-49. Here

it's beyond a reasonable doubt. It's a big difference. Anything about your experience as a juror that would cause you not to be a fair juror here?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: No.

THE COURT: Do you have friends or family in law enforcement?

JUROR: No, only my son resigned.

THE COURT: Can you be fair?

JUROR: Sure.

THE COURT: Thank you very much.

Miss Bacchi, where do you live?

JUROR: Maspeth.

THE COURT: How far did you go in school?

JUROR: I graduated high school.

THE COURT: What do you do for a living?

JUROR: Retired correction officer.

THE COURT: So you have many, many, many, many friends in corrections?

JUROR: Oh, yes.

THE COURT: Is it fair to say since you know so many of them that there are honorable, mostly in the middle, and some not so good; is that a fair statement?

JUROR: They are all good.

THE COURT: All right. How about the 35,000 cops, would you say the same thing about them?

JUROR: I have family that are cops, they are all good.

THE COURT: So the question becomes are you going to balance the scales for one side in this case or not? Can you give both sides a fair trial?

JUROR: I don't think so.

THE COURT: Because of your background?

JUROR: Yes.

THE COURT: I appreciate that. Somewhere along the line somebody going to tell you, and it is true, there are no wrong answers. If that's the way you feel, that's okay, and that's why or part of reason why we are doing this. Thank you.

Mr. Altomerianos, where do you live?

JUROR: East Elmhurst.

THE COURT: How far did go in school?

JUROR: NYU Law School.

THE COURT: Are you a practicing attorney?

JUROR: Unfortunately, no.

THE COURT: Have you ever practiced law?

JUROR: Yes.

THE COURT: What type of law did you practice?

JUROR: Immigration.

THE COURT: Did you ever practice criminal law?

JUROR: In the beginning when I was under the tutelage of the gentleman that I worked for.

THE COURT: Was that in Queens?

JUROR: Yes, many years ago.

THE COURT: Tell me who he is.

JUROR: He is now a federal international college Nicholas Tucalas (phonetic).

THE COURT: I know him well. Will you take the law as I give it to you, sir?

JUROR: It's not a question of that. My stepdaughter is a federal special agent in ICE. My closest other friend is a lieutenant in the New York City hostage negotiation team. It puts me in a tough spot. I feel you need the proper answers.

THE COURT: So your answer will be?

JUROR: It would be tough.

THE COURT: Thank you sir. Fair enough. Mr. Goldstein, where do you live?

JUROR: Jamaica.

THE COURT: How far did you go in school?

JUROR: College.

THE COURT: What do you do for a living?

JUROR: I own a plumbing and heating company.

THE COURT: Married?

JUROR: Single.

THE COURT: Have you ever served as a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: No.

THE COURT: Do you have friends or family in law enforcement?

JUROR: Yes.

THE COURT: Tell us about that?

JUROR: I have a couple of friends that work for detectives.

THE COURT: NYPD?

JUROR: Yes.

THE COURT: Same question to you, 35,000 cops, all different kinds, Mr. Shortt plans on calling two of them. Can you evaluate their testimony fairly like any other

witness, can you do that?

JUROR: Yes.

THE COURT: Thank you very much. Can you be fair?

JUROR: Yes.

THE COURT: Thank you very much.

Miss Poly, where do you live?

JUROR: Jamaica.

THE COURT: How far did you go in school?

JUROR: In my country college.

THE COURT: What do you do for a living, do you work?

JUROR: Yeah.

THE COURT: What do you do?

JUROR: School lunch helper.

THE COURT: Are you single, married, widowed, divorced?

JUROR: Married.

THE COURT: What does your husband do?

JUROR: MTA.

THE COURT: Do you have kids?

JUROR: Yes, three.

THE COURT: Big or little ones?

JUROR: 13, 15 and 18, one in college, one in 11th grade and one ninth grade.

THE COURT: Have you ever been a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: No.

THE COURT: Friends or family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Sure.

THE COURT: Thank you.

Mr. Persico, where do you live?

JUROR: Little Neck.

THE COURT: How far did you go in school?

JUROR: Graduated high school.

THE COURT: What do you do for a living?

JUROR: I fix tug boats.

THE COURT: Single, married, widowed, divorced?

JUROR: Divorced.

THE COURT: Do you do that for a private company?

JUROR: I work for myself.

THE COURT: Do you have kids?

JUROR: No.

THE COURT: Have you ever served as a juror

before?

JUROR: Yes, alternate juror in a criminal case in Long Island City.

THE COURT: That is a long time ago. There haven't been criminal cases in Long Island City for a long time. Is it fair to say you forgot all of the law the judge told you?

JUROR: Yes.

THE COURT: Will you take the law as I give it to you?

JUROR: Yes.

THE COURT: Thank you. Anything about that experience that would cause you not to be fair in this case?

JUROR: No, not at all.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: I have had my house broken into.

THE COURT: Did they find the person that did it?

JUROR: No.

THE COURT: You are not going to blame Mr. Shortt for that, are you?

JUROR: No.

THE COURT: That's not going to impact your ability in this case to be fair, is it?

JUROR: I don't think so.

THE COURT: Do you have friends or family in law enforcement?

JUROR: Quite a few friends that are in law enforcement.

THE COURT: You are going to hear from two officers in this case. Can you evaluate their testimony fairly?

JUROR: I will do my best.

THE COURT: Maybe three?

MR. SHORTT: Possibly.

THE COURT: All right. Can you be fair?

JUROR: I will do my best.

THE COURT: Thank you very much. Miss Almeida, where do you live?

JUROR: Ozone Park.

THE COURT: How far did you go in school?

JUROR: I'm in college right now, second year.

THE COURT: Are you working too?

JUROR: Yes, I work as a file clerk in a law office.

THE COURT: What kind of law do they practice?

JUROR: Personal injury.

THE COURT: Any criminal law?

JUROR: No.

THE COURT: The rules are different here. You can appreciate that?

JUROR: Yes.

THE COURT: If you are selected as a juror, do you promise not to talk about this case to your bosses?

JUROR: Yes, sir.

THE COURT: You will take the law as I give it to you, right?

JUROR: Yes.

THE COURT: Are you single, married, widowed, divorced?

JUROR: Single.

THE COURT: Have you ever served as a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Ever been the victim of a crime?

JUROR: Yes.

THE COURT: Tell us about that.

JUROR: I was robbed before when I was younger in

elementary school, but they never found the person.

THE COURT: Can you put that aside and evaluate the facts in this case fairly?

JUROR: Yes.

THE COURT: Do you have friends or family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: I can try, yes.

THE COURT: Again, the lawyers they hate that because it's an important matter. Do you think you are as fair as the gentleman next to you?

JUROR: Yes.

THE COURT: And the woman next to you?

JUROR: Yes.

THE COURT: You can be fair?

JUROR: Yes.

THE COURT: Speaking of the woman next to you, Miss Perez, where do you live?

JUROR: Jackson Heights.

THE COURT: How far did you go in school?

JUROR: College.

THE COURT: Are you in college?

JUROR: I graduated.

THE COURT: What do you do for a living?

JUROR: I work in payroll.

THE COURT: Single, married, widowed, divorced?

JUROR: Single.

THE COURT: Have you ever served as a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or loved one ever been the victim of a crime?

JUROR: Yes.

THE COURT: Tell us about that.

JUROR: When I was young, my parents' home broken into.

THE COURT: Can you put that aside? This case has nothing to do with that. Can you do that?

JUROR: Yes.

THE COURT: Friends or family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Thank you very much.

Miss Ng, where do you live?

JUROR: Astoria, Woodside.

THE COURT: How far did you go in school?

JUROR: Graduate school.

THE COURT: What do you do for a living?

JUROR: Database administrator in computers.

THE COURT: Are you married?

JUROR: Married, my husband is the owner of a point of sale systems.

THE COURT: I'm not sure I know what that is.

JUROR: They sell point of sale, the whole inventory control system to stores.

THE COURT: Do you have kids?

JUROR: Yes, two big ones.

THE COURT: Are they working?

JUROR: Yes, thank God. The older one is a buyer for Anthropology, her husband is a lawyer. The younger one is a teacher.

THE COURT: Does the lawyer practice criminal law, do you know?

JUROR: No, patent law.

THE COURT: All right. You will not talk to him about this case for the next couple of days if you are selected; is that fair?

JUROR: No, he lives in Philadelphia.

THE COURT: Have you ever served as a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: Yes, several times I was mugged at gunpoint and my car.

THE COURT: Can you put those incidents aside and evaluate the facts in this case fairly?

JUROR: I will try my best.

THE COURT: Can you do better than that for me, can you give me a commitment that you will be a fair juror in this case?

JUROR: Yes.

THE COURT: Friends or family in law enforcement?

JUROR: No.

THE COURT: Mr. Shortt.

MR. SHORTT: In light of the hour, the concern I brought up earlier, I don't know if you want to break?

THE COURT: All right. We will break at this point. Do not discuss this case amongst yourselves, do not speak to the attorneys, the parties, the witnesses or anybody in connection with this case. Do not go to the scene of the alleged incident. Do not research this case

in any way whether on the Internet or Google, Facebook, the library or anything like that. Should anybody contact you about this case, notify the officer immediately. We will reconvene tomorrow at 10 A.M.

Thank you for your service today. The lawyers are instructed not even to say hello to you. So when I say don't talk to them, I mean do not even say hello, do not nod to them. They have been instructed not to do it to you. As I will say to you at a later point in this trial, I do this to protect your integrity so nobody thinks that anything is going on. Thank you again for your service. 10:00 tomorrow morning.

Officers, take charge.

(Jurors exit the courtroom.)

THE COURT: Gentlemen, 10:00 tomorrow, Miss Povman, 10:00.

(Defendants exit the courtroom.)

(Trial adjourned to January 21, 2015.)

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF QUEENS: CRIMINAL TERM: PART K14

---------------------------------------x Indictment No.

THE PEOPLE OF THE STATE OF NEW YORK 2228/12

-against-

ELIJAH BROOKS and RAYMOND BALL,

Defendants.

---------------------------------------x

125-01 Queens Boulevard

Kew Gardens, New York

January 21, 2015

****************************

THE COURT CLERK: Number one, 2228 of 2012, Raymond Ball and Elijah Brooks.

MR. SHORTT: For the People, Assistant District Attorney Timothy Shortt.

Good morning, your Honor.

THE COURT: Good morning, sir.

MS. POVMAN: On behalf of Mr. Ball, Linda Povman, 123-35 82 Road, Kew Gardens, New York.

Good morning, your Honor.

THE COURT: Good morning.

MR. GIBBONS: For Mr. Brooks, Wyatt Gibbons, 125-10 Queens Boulevard.

Good morning, your Honor. Firmly seated.

THE COURT: Good morning.

MR. GIBBONS: Would it be possible to give the jurors some instruction saying because the courtroom is so small, you have a policy for everybody to remain seated? It seems unnatural and maybe disrespectful to the jury that I am sitting here instead of standing up to address them.

THE COURT: I don't want to do it because I don't want them to think that we are doing something differently here.

MR. GIBBONS: Okay.

(Defendants enter the courtroom.)

THE DEFENDANT BALL: Good morning, your Honor. Good morning, everyone.

THE COURT: Good morning, sir. Before we bring the jury in, jurors number nine and ten have declared rather vociferously that they cannot be fair in this case. I'm going to recommend that you not ask those jurors two individuals any questions since they are likely going to be challenged for cause and no good can come from allowing them a platform to speak.

Anything before the jury?

MR. GIBBONS: Do you want to cause them out now and fill them with two more?

THE COURT: No, then I have to redo them again.

THE DEFENDANT BALL: You said nine and ten?

MS. POVMAN: Nine and ten will be challenged for cause so don't waste your 15 minutes on them and don't ask them anything.

MR. GIBBONS: Don't ask them anything.

THE COURT: That's right. Are we ready for the jury?

MR. SHORTT: Yes, Judge.

THE COURT: Mr. Gibbons?

MR. GIBBONS: Yes, your Honor.

THE COURT: Mr. Ball, are you ready for the jury?

THE DEFENDANT BALL: Yes, sir.

(Whereupon, there was a brief pause in the proceedings.)

THE COURT OFFICER: Are you ready for the panel, Judge.

THE COURT: Ready.

THE COURT OFFICER: Jury panel entering.

(Prospective jurors enter the courtroom.)

THE COURT: Good morning, ladies and gentlemen. This morning we are going to continue the process of selecting a jury, and at this point in the proceedings we will call on Assistant District Attorney Shortt to inquire of the panel.

Mr. Shortt, you have 15 minutes.

MR. SHORTT: Thank you, your Honor. Good morning,

ladies and gentlemen. I know it's jury service, but one of the biggest requirements is that you be alive and awake so, good morning, ladies and gentlemen.

Very important question: Who is the perfect juror for this case? I don't see a single hand. That's the right answer. You don't know and we don't know, and that's what we will be talking about this morning. Not every juror is right for every case, that's okay, there is no wrong answers here, but it's very important that we find a fair and impartial jury for this case. That is the most important goal of what we are doing here this morning and hopefully by the end of today.

Is there anyone here for any reason, religious, moral, ethical or otherwise that just knows that you cannot sit in judgment as a juror in a criminal trial? Anyone who would just feel uncomfortable, it's heavy weight, anybody that just knows they cannot do it? Thank you, ladies and gentlemen.

The job we are going to ask you to do is to be jurors. If I were to put an ad in the paper, I don't suspect we would get many people calling us. What we ask you to do is be fact finders, not detectives. There is no mystery. Jurors find facts. If you are picked, you will listen to testimony, view evidence and be asked to make a decision about what happened on a certain date at a certain

time here in Queens County, to decide what happened, then to use that, what you find as fact, and apply the law as the judge gives it to you.

Mr. Hilbert, would you promise me if you were selected that you would limit yourself only to the evidence as you hear it here and with the law as the judge gives it to you?

JUROR: Yes.

MR. SHORTT: Would you promise not to speculate on what might have happened if people could go back and do things differently?

JUROR: Yes.

MR. SHORTT: We can't change the past, right?

JUROR: Yes.

MR. SHORTT: Would you promise to only focus on what happened and make a decision based on only that?

JUROR: Yes.

MR. SHORTT: Mr. Masse, you are a chemist?

JUROR: Yes, sir.

MR. SHORTT: Never my strongest subject, that's why I became a lawyer. You deal with formulas?

JUROR: Yes.

MR. SHORTT: As a juror, you will be asked to go back into the jury room and take the facts as you find them as a juror, take the law as the judge gives it to you and

render a verdict; do you understand?

JUROR: Yes.

MR. SHORTT: If I had to reduce it to a formula, would you agree it's the facts as you find them and the law as the judge gives it to you equals a verdict?

JUROR: Right.

MR. SHORTT: Certain things are not in that formula like sympathy. Do you think sympathy should play a role on the part of a juror?

JUROR: No, because it's not facts, it's not part of the formula.

MR. SHORTT: Mr. Hinds, did you hear that?

JUROR: Yes.

MR. SHORTT: Do you think sympathy should play any role in the role of a juror?

JUROR: No.

MR. SHORTT: Why not?

JUROR: Because like he said, you present the facts, and that's what I have to work with, the facts, that's it.

MR. SHORTT: Sympathy for anybody does not help you decide what happened on the streets of Queens one night?

JUROR: Yes.

MR. SHORTT: Do you promise to exclude that if you

are picked as a juror?

JUROR: Yes.

MR. SHORTT: Ladies and gentlemen, while your duty is to ultimately come up with a verdict, the first thing is to apply the law to the facts and render a verdict. You have an important preliminary duty to find the facts to figure out what is credible, what is believable, what is the evidence and what it shows by listening to all of the evidence presented to you from the witness stand. The most important thing, the most important tools that you have as jurors are your common sense and life experience. A lot of people think when you come into a courtroom, this is unfamiliar that you should leave that at the door. We are asking you to bring those qualities to the courtroom.

Miss Matthias, if I was walking down Jamaica Avenue -- you are from Cambria Heights?

JUROR: Yes.

MR. SHORTT: I'm sure you have been shopping along Jamaica Avenue sometimes?

JUROR: Used to.

MR. SHORTT: If a guy came up to you, I have a 60 inch plasma TV for $50, but I have to go to my car to get it, are you going to give him the $50?

JUROR: No, where did he get it from?

MR. SHORTT: Too good to be true.

JUROR: Yes.

MR. SHORTT: Do you promise to apply the same common sense here in the courtroom listening to the evidence?

JUROR: Yes.

MR. SHORTT: You are New Yorkers, you have more politicians and more salesman trying to get your votes and trying to sell you things than anybody else. One of the most important things is judging whether or not people are telling the truth. I will call witnesses to the stand and ask you to listen very carefully to what they have to say.

Mr. Matatov, what are some things to look for in determining whether or not you think a witness is telling the truth?

JUROR: If somebody rob me can I be juror or not?

MR. SHORTT: I'm sorry?

JUROR: If somebody rob me.

MR. SHORTT: Were you ever the victim of a crime?

JUROR: Last time we got robbery of a pawn shop with my son.

MR. SHORTT: Is your son okay?

JUROR: Okay, but now the customer sue us.

MR. SHORTT: Can you promise to put that aside and promise to be fair in this case, or do you think that may weigh on your mind?

JUROR: I try.

MR. SHORTT: Do you understand these defendants did not commit that robbery?

JUROR: Yes, but I been robbery two times, usually guilty I say what I say.

MR. SHORTT: Do you think those experiences would weigh on your mind so maybe a criminal case is not right for you?

JUROR: Yeah.

MR. SHORTT: Thank you. I appreciate your honesty. The evidence will mostly take the form of testimony people taking the witness stand and telling you what happened.

Mr. Ramdyal, one of the witnesses is an eyewitness somebody that was there, and you will be asked to rely on that person in making your ultimate decision. What are some qualities or some things that you want to hear from the eyewitnesses to decide whether or not you would believe them?

JUROR: Depends on what he saw.

MR. SHORTT: What do you mean?

JUROR: When you get eyewitness, sometimes it's not the right eyewitness or they try to --

MR. SHORTT: Would you consider how close the witness came to the person?

JUROR: Yes.

MR. SHORTT: Why is that important?

JUROR: Because you can't see far away, and if it's dark --

MR. SHORTT: Are the lighting conditions important?

JUROR: Yes, a lot of light, and it depends on the distance.

MR. SHORTT: Miss Perez, did you hear what he had to say?

JUROR: Yes.

MR. SHORTT: Who are some qualities that you would look for in terms of an eyewitness?

JUROR: The kind of information they provide, how much information.

MR. SHORTT: What do you mean by that?

JUROR: How specific they can be in what they saw and what they heard.

MR. SHORTT: Would you consider, for instance, how close the person got to the person they are identifying?

JUROR: Yes.

MR. SHORTT: Would you consider the lighting conditions?

JUROR: Yes.

MR. SHORTT: Would you consider whether or not

they have seen this person before?

JUROR: Yes.

MR. SHORTT: Why is that important?

JUROR: Because if they are familiar to that person, it looks like them?

MR. SHORTT: Miss Ng, what do you think? What are some of the qualities that you would look for?

JUROR: Pretty much what they said. It's just to say how accurately they can identify that person, if I can pick them out from the lineup, if they seen him before, very close.

MR. SHORTT: Would you agree it's the qualities, not necessarily the quantities of witnesses that matters in a case?

JUROR: It all depends.

MR. SHORTT: Well, if I call ten witnesses who saw an event, but none of them were paying attention, they were on phones, iPods, every kind of distraction, or reading the paper or just talking in a conversation, they did not really see anything, but I call ten witnesses, would that be helpful in determining anything?

JUROR: Quantity does not necessarily make up for quality.

MR. SHORTT: Mr. Persico, would you agree that quality matters more than quantity?

JUROR: Yeah, but if you have a quantity of people that have a similar story, it kind of all winds up.

MR. SHORTT: So would you compare to what one witness has to say with other witnesses?

JUROR: Of course, if they all have the same story, it probably leads to the truth.

MR. SHORTT: Any time multiple people view the same event, you may have differences?

JUROR: Yes.

MR. SHORTT: Did you watch the Seehawks versus Greenbay Packers game?

JUROR: No, I missed it.

MR. SHORTT: Are you a sports fan?

JUROR: No.

MR. SHORTT: Did you watch the State of the Union?

JUROR: A little bit.

MR. SHORTT: Did you read the papers? You probably hear about 15 different versions of what the most important line of the speech was, right?

JUROR: Of course.

MR. SHORTT: Does not mean they viewed a different event, right?

JUROR: Yes.

MR. SHORTT: People can have a difference of opinion and different perspectives?

JUROR: Yes.

MR. SHORTT: Miss Poly, if you hear differences in witness testimony, will you consider the differences?

JUROR: Yes.

MR. SHORTT: Would you think it's good or bad that there are differences in witness stories?

THE COURT: Everybody has to speak up. We all have to hear you, including the folks in the audience. As I said earlier people in the audience will be in the box sooner or later, and you will hear the same questions.

MR. SHORTT: Witnesses may testify and have different versions, would you consider that as a juror in determining whether or not you think they are believable if the two witnesses tell different stories?

THE COURT: You have to speak up so everybody is able to hear you.

JUROR: My English is poor so I can't explain.

MR. SHORTT: Thank you. Mr. Goldstein, if you were to hear two different versions of the same event, would you automatically disbelieve them?

JUROR: No.

MR. SHORTT: Why not?

JUROR: You would have to hear the facts.

MR. SHORTT: Would you agree with me there are important facts and less important facts in any story,

right?

JUROR: Yes.

MR. SHORTT: My favorite TV show that I watched with my grandfather was The Honeymooners. Did you ever watch that show?

JUROR: Sure.

MR. SHORTT: What did Ralph Kramden do for a living?

JUROR: Bus driver.

MR. SHORTT: There is actually a statue in front of Port Authority. Ralph is driving his bus and two sets of twins get on the bus and then two more. The second set get off and the third set goat on, and then a none priest and rabbi get on the bus. Who is driving the bus? Ralph Kramden, right?

JUROR: Yes.

MR. SHORTT: There are important facts and like that scenario, it's easy to get lost in small facts versus big facts. Would you promise me if you are picked as a juror to keep yourself focused on what the big question is in the case and if there are differences and inconsistencies to weigh those against what's important in the case?

JUROR: Yes.

MR. SHORTT: Ladies and gentlemen, during this

case you are going to hear testimony coming from the witness stand and the judge will instruct you that evidence can come from the witness stand in a very specific form, it has to be a question and answer.

Miss Matthias, isn't it true that you came here today in a helicopter with Mr. Matatov, but before you came, you stopped at Dunkin' Donuts?

JUROR: No.

MR. SHORTT: Ladies and gentlemen, the question and the answer together are what matters not what I as the lawyers say or try to imply, it is the question and the answer together.

Miss Matthews, would you promise to listen and only consider the evidence, that is the question and the answer together?

JUROR: Yes.

MR. SHORTT: Mr. Matatov, do you understand that I as a lawyer, Mr. Gibbons or Mr. Ball, when acting as his own lawyer, we are not on the witness stand, what we say is not evidence; can you accept that?

JUROR: Yes.

MR. SHORTT: Mr. Masse, Mr. Ball is going to be representing himself during this trial. Do you understand that's his choice and right?

JUROR: Yes.

MR. SHORTT: Would you promise me to treat him as you would either me or Mr. Gibbons in terms of how we conduct ourselves in this case?

JUROR: Yes.

MR. SHORTT: Do you think he is entitled to any sort of benefit because he is representing himself?

JUROR: No.

MR. SHORTT: Does anybody feel that way or feel that he is unfairly burdened because he decided to represent himself? Can you promise me to treat him like any other attorney? Can you promise to take the oath seriously that only testimony that comes from the witness stand is what matters in this case, can you promise that?

THE JURORS: Yes.

MR. SHORTT: Thank you, Judge.

THE COURT: Thank you, Mr. Shortt.

We will hear now from Mr. Gibbons. You have 15 minutes.

MR. GIBBONS: Good morning, ladies and gentlemen. To just reiterate what Mr. Shortt said initially this is a very important duty and this is not a science, Mr. Masse, we are trying to pick the best jurors for this case. So I apologize in advance, I'm not looking to pry or delve into your personal life, but it's very important that we try to find the best jurors suited for this case. So my apologies

in advance.

Now, one of the things that you are asked to do, maybe the most important thing is to utilize your common sense, you are picked as a jury of my client's peers, and we rely on the fact that you can look into your life experiences and bring them to the table, and as Mr. Shortt pointed out to Miss Matthias, hey, I have a 60 inch plasma for 50 bucks. You are automatically New Yorker BS detective, it raises an alarm, and you use that everyday. Everyday on the subway someone a little sketchy, your alarm goes off, you maybe going to the other side.

If somebody tells you a story, it does not sound right, the alarm goes off, we utilize it everyday without even thinking about it. It's second nature.

Can you promise me, Miss Perez, that you will bring that to the table and utilize your common sense?

JUROR: Yes.

MS. POVMAN: Mr. Persico, can you promise me that?

JUROR: Yes.

MR. GIBBONS: You will utilize that when you listen to the evidence from the stand?

JUROR: Yes.

MR. GIBBONS: One of the things that Mr. Shortt discussed was what you would listen for when you are listening to a witness, what would make a good witness and

what they would tell you, how close they were and the lighting conditions, but would you agree that apart from those issues, the chaos of a certain situation might have some bearing on someone's ability to recall, Mr. Hilbert?

JUROR: Yes.

MR. GIBBONS: If it was calm and we are sitting here quitely and something drew your attention to the clerk, and you can see what she is doing, you would say she is reading through paper papers, no problem, but if I knocked over my notebook and the chaos of a situation has an impact; is that correct?

JUROR: Yes.

MR. GIBBONS: Mr. Hinds, correct?

JUROR: Yes.

MR. GIBBONS: Also someone mentioned I think you Miss Ng, that the specificity, was that you, or maybe Miss Perez, how specific someone is, it's the details, the truth is in the details. Anybody can say that I walked through the door but walking through the door is reaching out your hand, grabbing the knob, stepping forward with your left foot and right foot and pulling the door closed with your right hand that is walking through the door and the truth is in the details, correct? Would you agree, Mr. Matatov?

JUROR: Yes.

MR. GIBBONS: One of the things that the judge

spoke to you about is police officer testimony. I know that some of you have police officers either friends or family.

Mr. Goldstein, you said you have detective friends in the NYPD. Can you promise me to treat the police officer testimony just the same as you would anyone else?

JUROR: Yes.

MR. GIBBONS: Not give it any greater weight just because they are a police officer?

JUROR: Yes.

MR. GIBBONS: They are the same as you and me, as anybody, they could take the stand, they could tell the truth, they could lie or be mistaken, correct?

JUROR: Yes.

MR. GIBBONS: Just like you and me like any other witness, they could be telling the truth or lying or simply be mistaken, correct?

JUROR: Yes.

MR. GIBBONS: Mr. Ramdyal, do you agree?

JUROR: Yes.

MR. GIBBONS: Treat the cop just like anyone else, and any witness on that stand again could lie, tell the truth or simply be mistaken?

JUROR: Yes.

MR. GIBBONS: Miss Almeida, have you ever had the

situation where you are walking down the street, and you see someone that you think you recognize?

JUROR: Yes.

MR. GIBBONS: You may go up to them and tap them on the shoulder, and it's not the person, you are embarrassed, oh, my God, I could have sworn that was my friend Joe who I have known 30 jurors, you don't look that old, I'm so sorry I thought you were somebody else. Has that ever happened to you?

JUROR: Yes.

MR. GIBBONS: It occurs, I could have bet my life if it was Joe but if you had, you would be dead because you were wrong?

JUROR: Yes.

MR. GIBBONS: That illustrates the difference between certainty and accuracy, you were wrong, I would have bet my life, but I was wrong, we all agree that happens not just in that situation, but other situations. I thought I knew the answer I was watching Jeopardy, I swore that was it, but you were wrong certainty versus accuracy, we have all had that experience.

JUROR: Yes.

MR. GIBBONS: Mr. Hinds?

JUROR: Yes.

MR. GIBBONS: Mr. Masse?

JUROR: Yes.

MR. GIBBONS: One of the most important rights that we all have is the right to remain silent. Now, my client may or may not testify. He may take the stand, he may not. If he does not take the stand, you will not hear his side of the story. Mr. Hinds, is that a problem for you?

JUROR: Not hearing his side of the story?

MR. GIBBONS: Yes, him not testifying.

JUROR: Maybe because we have to hear both sides of the story.

MR. GIBBONS: But do you understand that he and all of us have a constitutional right, a constitutional right, indelible, to remain silent, to not be a witness against yourself. So he exercises that right, can you promise me that you are not going to hold that against him?

JUROR: No.

MR. GIBBONS: That's fine.

THE COURT: I'm sorry. What do you mean no?

JUROR: No, I mean I promise that.

MR. GIBBONS: Okay. Understand there is no wrong answer, but I need to know the honest answer, and it's 100 percent okay because human nature dictates I want to know the other side, what's on the other side of that door. That's why we come as far as we have because of our

curiosity so it's okay to want that story. But if it's going to affect you, if you don't get it, if you are going to hold it against my client, I need to know, I need to know.

Miss Matthias, will that bother you if you don't hear my side of the story?

JUROR: Yes.

THE COURT: And if I tell, and I did tell you earlier yesterday that under our law, you must not hold it against a defendant if he chooses not to take the stand, if he invokes his right not to testify, if he says to the government you locked me up, prove it, prove it. Can you do that?

JUROR: I can.

MR. GIBBONS: You can?

THE COURT: So can you promise me that you will not hold it against either Mr. Ball or Mr. Gibbons's client if they choose not to testify, if they simply stand there and say prove it?

JUROR: I can, yeah.

THE COURT: Okay. Good.

MR. GIBBONS: You still seem like you are a little unsure. Mr. Matatov, could you promise me not to hold it against my client?

JUROR: Yes.

MR. GIBBONS: Mr. Masse?

JUROR: Yes.

MR. GIBBONS: Mr. Hinds?

JUROR: Yes.

MR. GIBBONS: Anybody here that would not be able to give this Court and me that assurance that if he does not testify, you would not hold it against him? Anybody? Miss Ng and Mr. Persico? Mr. Persico.

JUROR: I'm a little on the fence. I think if you really, you should be able to tell your story regardless. I understand it's the law that you don't have to, but --

MR. GIBBONS: It would create a problem for you?

JUROR: It might.

MR. GIBBONS: Okay. How about this: You are about to get on a plane to go on vacation, you walk past the pilot, you say do you think you might be to land this I might, are you getting on the plane?

JUROR: Probably, sense of adventure.

MR. GIBBONS: I can't run that same risk. I need you to be a little more unequivocal.

JUROR: I am being honest.

MR. GIBBONS: I appreciate that you are not sure, but there is a possibility it will affect you?

JUROR: Yes.

MR. GIBBONS: Miss Ng?

JUROR: I feel the same way.

JUROR: It is your constitutional right, you can hold the Fifth, but it's still if you telling the truth, tell it.

MR. GIBBONS: Okay. Anybody else feel that way? Okay.

THE COURT: You have a few minutes.

MR. GIBBONS: Another important issue, my client is on trial with a codefendant, Raymond Ball. They are being charged with more or less the same crimes, but they are being tried, though at the same time, individually. The facts, as you hear them you have to apply to them separately.

Do you understand what I mean by that, Mr. Hinds?

JUROR: Yes.

MR. GIBBONS: Can you all promise me that you will not lump them together, and that you will listen to the facts and apply them separately and individually to each of these defendants, Mr. Persico?

JUROR: Yes.

MR. GIBBONS: Miss Almeida?

JUROR: Yes.

MR. GIBBONS: Can everyone promise that? Miss Barrett, can you promise that?

JUROR: Yes.

MR. GIBBONS: Great. Say we have been on trial for three weeks, God forbid --

THE COURT: We are not going to be on trial for three weeks. This is a pretend scenario. That's not going to happen here.

MR. GIBBONS: If some horrible thing happens now it's three weeks later, and you are deliberating. You see the finish line almost there and whatever the vote is, it's eleven to one, one way or the other way.

Mr. Hilbert, you are the last hold out, whether you are saying guilty or not guilty. It's 5:30 Friday you have been here three weeks everyone is hired and want to go home, come on, Mr. Hilbert, we are all saying this, just change your vote, but you have been voting the other way, this is what you feel. Would you succumb to the pressure?

JUROR: No.

MR. GIBBONS: If they gave you a reason look at this again, this and this, you say, okay, I didn't think of it like that, that's a reason to change your vote?

JUROR: Yes, if it's the facts.

MR. GIBBONS: Right, but if it's 5:30, three weeks, we have to get out of here, would you change your vote?

JUROR: No.

MR. GIBBONS: Stick to your guns because that's

what's correct. Can you promise not to succumb to pressure because you want to go home, Mr. Persico?

JUROR: Yes.

MR. GIBBONS: Mr. Hinds?

JUROR: Yes.

MR. GIBBONS: Everybody yes?

THE JURORS: Yes.

MR. GIBBONS: My client, all of us are presumed until proven guilty. That's a term that you hear on TV, in the movies and papers, and everybody throws it around. I always find that it's not something people really think about it. They just hear it and it's not analyzed what it means.

My client and Mr. Ball as they sit here now are presumed innocent.

Mr. Ramdyal, if Mr. Shortt decides to put on his case, and he does not call one witness, and he sits down and says the People rest, now you are called to give us a verdict, what would your verdict be?

JUROR: Depends on the situation.

MR. GIBBONS: Listen to me, you did not hear one shred of evidence, nothing. He stood up and rested. I have no witnesses. He sits down, what would you vote?

JUROR: I have to talk to the rest of the jury.

MR. GIBBONS: That's the issue. My client is

innocent as he sits here. If you did not hear any evidence, what's there to debate?

THE COURT: He is presumed innocent.

MR. GIBBONS: If you did not hear any evidence, what would the verdict have to be?

JUROR: Not guilty.

MR. GIBBONS: Do you all understand that? There has to be credible evidence that you believe beyond a reasonable doubt which the judge will explain to find my client guilty. If the burden to do that to show you that evidence is always on the prosecutor, and if he does not meet that burden, the verdict has to be not guilty. That's an extreme circumstance. He is not going to go through all of this and not --

THE COURT: Wrap it up.

MR. GIBBONS: Just to finish this up, there will be evidence, but he still has a burden of proving every element of this case beyond a reasonable doubt.

Mr. Masse, you are a chemist --

THE COURT: Mr. Gibbons, you are done.

MR. GIBBONS: Thank you.

THE COURT: Mr. Ball, you have 15 minutes, sir.

THE DEFENDANT BALL: Good morning, ladies and gentlemen. You know, I think that it would be good for me to use this opportunity to familiarize myself with everyone

and introduce myself. That's the first thing that I would like to do.

My name is Raymond Ball, and I'm 50 years old. I'm here representing myself only because of the fact that I have a substantial element of education and the judge feels I am psychologically competent and educated enough to proceed, you know, as my own lawyer. I wanted to just to try to familiarize myself with the names of the jurors so that I can, you know, what do you call, confront you properly with the proper names.

Miss Kimberly Matthias. Yuda Matatov. Claude Masse. Joshua Hyde. Leo Hinds -- how do you spell that?

JUROR: L-E-O-P-O-L-D-O.

THE DEFENDANT BALL: Andrew Hilbert, nice to meet you. Randy Ramdyal. Can you spell it for me?

JUROR: R-A-M-D-Y-A-L.

THE DEFENDANT BALL: Thank you. Jean Barrett. Patricia Bacchi. Nicholas Altomerianos. Greg Goldstein. Hasina Poly. Robert Persico. Sofia Almeida. Wandali Perez. Lai Ha Ng. The thing that I just want to reflect on is that the District Attorney, he gave a clear implication of a scenario where tricks are being played on a person's perception in his analogy, and you know, I wanted to give an analogy of my own.

There was a man in a boat, and he was fishing and

along comes a fly and the fly badgers him so he swats the fly and wind up falling into the water, thereby retrieving himself, got into the boat and decided to, you know, finish the day on the shore contemplating the events of the day, and so while he was there contemplating the events that took place that day, he thought to himself he said, well, you know, here we have the water to him was a liquid. The water to the fish was a gas, and to the fly the water was a solid so in that scenario you have a perception that gives you three different truths, and I wanted to raise that issue to the ladies and gentlemen of the jury, that, you know, sometimes when we deal with our perceptions, we might not come at the same truth when we deal with our perceptions.

And what happens is the judge used the word called presumption, and, Miss Matthias, I would like to ask you a question pertaining to the scenario that was given. In the case that you have a person on the corner of 34 Street with a suit on with the logo of a well known electronics for during the holidays, and he has TVs that he is selling for $50. Would you buy from him a TV? And he is in the vicinity with the logo on the suit, would you buy the TV for $50?

JUROR: No.

THE DEFENDANT BALL: Is there anyone else, would

you buy the TV?

JUROR: No.

THE DEFENDANT BALL: Would you buy the TV, sir?

JUROR: No.

THE DEFENDANT BALL: So no one would buy the TV? Okay.

My next question is, you know, there is another scenario that was given about the facts in a case, some of the jurors were saying that you need certain things in order to come to a particular conclusion, and the first thing that came to my mind, you know, the dots, you know, you have to follow the dots. Anybody ever followed the dots as a child? You know, like the one, two, three, four? So, you know, in that following the dots program, you know, you don't really need certain things to get at the picture. All you really need is just to follow the dots. And so I wanted to just raise that issue, you know, as to how is it that some people, you know, the process that you can come to, to get a particular picture like the one that we described of determining whether or not the person got on the plane in order to get the picture, and so there is other processes that we could use to get at the picture. I want to also say that, you know, there is a presumption that attaches to a lot of things, you know, naturally, you know. Like right now when I ask the

question, I ask well, you know, would you buy the television from the person who has the suit on.

Now, I would think to myself that in order for you not to be willing to buy the TV for $50 is because you attached the presumption on that to that person, you see, without any facts. You automatically came to some conclusion that the person has to be up to something illegal, and you know, I just wanted to raise these issues about presumption. Presumption is a very serious tool, you know, and it can be, how do you say, it can be a hindrance to us being able to make clear decisions in our life and come to an understanding about things that we really have no real understanding because you don't want to take things on face value, and you don't want to attach presumptions to things, you know, until you have all of the evidence to establish what it is that you want to come to the conclusion of.

And so, you know, I ask the jurors, you know, in the case that you do wind up being one of the jurors to use a different method of coming to a conclusion than attaching presumption to a situation. Like, I'm not a lawyer, however, I would like for you guys, you know, to be open-minded and not, you know, attach a presumption to me because I'm not a lawyer in order to be able to, you know, allow me to get across to you my side of the story and to

present maybe facts because the District Attorney is going to present to you facts that are available.

Then there are some facts that's not available, and you know, I would like for you as the jurors you have the authority to make sure, you know, to ascertain the facts that's not available, and not be swayed to make decisions or conclusions based on facts that is available and add a presumption to those facts. And so that's my only real concern. That's it.

THE COURT: Is that it?

THE DEFENDANT BALL: Yes, sir.

THE COURT: All right. At this point, I will ask the jurors to step out of the room. Can we put the people in the box in the jury room, and we will ask the audience to step out. We will take a few minutes break.

(Jurors exit the courtroom.)

(Whereupon, there was a brief pause in the proceedings.)

THE COURT: Ready?

MR. SHORTT: Yes.

THE DEFENDANT BALL: Yes.

MR. GIBBONS: Yes.

THE COURT: Jurors one through twelve, People challenge for cause?

MR. SHORTT: We made clear numbers nine and ten

for cause, also Miss Poly number twelve for language reasons. So nine Bacchi, ten Altomerianos and twelve, Miss Poly.

THE COURT: Mr. Ball, Mr. Gibbons?

MR. GIBBONS: I consent to those. I have some additional --

THE COURT: Do you consent to those as well?

THE DEFENDANT BALL: Yes.

THE COURT: All right.

Defense, one through twelve challenges for cause?

MR. GIBBONS: Miss Matthias and Mr. Matatov. Miss Matthias even though I know she tried to rehabilitate her, she never seemed unequivocal about your ability to follow your rule and not hold anything against the defendant if he decides not to testify.

MR. SHORTT: I will consent.

THE COURT: All right. Mr. Matatov, I don't think he was clear or he understood when he was asked the question if he or anyone in the family were the victim of a crime then he notified us here that he was the victim of two robberies and I think he acknowledged that this may not be a good jury for him to sit on.

MR. SHORTT: Well, I don't think he was the victim, my understanding it was his son at the pawn shop.

MR. GIBBONS: Right, well, I think he said two

robberies, his son at the pawn shop and himself.

THE COURT: Do you want to be heard, Mr. Ball?

THE DEFENDANT BALL: He indicated that he was in the process of being sued.

THE COURT: All right. I will grant that challenge.

THE DEFENDANT BALL: Thank you, your Honor.

MR. GIBBONS: Thank you.

THE COURT: That's it for cause?

MR. GIBBONS: Yes, one through twelve.

THE COURT: People, peremptory challenges, one through twelve?

MR. SHORTT: Number four, Mr. Hyde; number six, Mr. Hilbert; number seven, Mr. Ramdyal; and eight, Miss Barrett.

MS. POVMAN: Just one moment, Judge.

(Defendants and counsel confer.)

MR. GIBBONS: Number eleven is our perempt on the defense.

THE COURT: That's it one through twelve?

MR. GIBBONS: That is it, your Honor.

THE COURT: People, jurors 13 through 16, challenge for cause?

MR. SHORTT: None for cause.

THE COURT: Defense, challenges for cause?

MR. GIBBONS: Yes, 13, Mr. Persico. He was pretty clear one he said that he had friends in law enforcement, he would do his best to not have it affect him, but then he had a clear issue with the fact that my client may not testify, and he said that he would want to hear from him, and he feels that he should give his side of the story.

THE COURT: Mr. Shortt?

MR. SHORTT: Mr. Persico has been a juror in the past. I understand counsel's version that he is unequivocal, but he said he could be fair.

THE COURT: I will grant the challenge.

MR. GIBBONS: Also number 16, Miss Ng. She was the victim of a gun point robbery. She said she would try to be fair. She did not seem like she wanted to be here in the first place, and she was very adamant if you want to tell the truth then you get up and tell the truth, and I want to challenge her for cause.

THE COURT: Mr. Shortt?

MR. SHORTT: I consent, Judge.

THE COURT: That challenge is granted. Is that it for cause?

MR. GIBBONS: Yes.

THE COURT: People perempt?

MR. SHORTT: No.

THE COURT: Defense perempt?

(Defendant and counsel confer.)

MR. GIBBONS: Number 14, Almeida defense perempt.

THE COURT: That's it?

MR. GIBBONS: That is it, your Honor.

THE DEFENDANT BALL: Thank you, your Honor.

THE COURT: Let's take a couple of minutes.

(Whereupon, a brief recess was taken.)

THE COURT: Let's get the jury in.

(Panel enters the courtroom.)

THE COURT CLERK: Jurors, if I call your name, please remain seated. If you do not hear your name, please take all your belongings and step outside into the hallway and await further instructions from the court officer: Claude Masse, please remain seated. Leopoldo Hinds, please remain seated. Wandali Perez, please remain seated. Everybody else, please take all your belongings and exit the courtroom at this time.

Are the remaining jurors satisfactory to the People?

MR. SHORTT: Yes.

THE COURT CLERK: Satisfactory to the defense?

MR. GIBBONS: Yes.

THE DEFENDANT BALL: Yes.

(Jurors sworn.)

THE COURT: Gentlemen and Miss Perez, we are going

to spend the balance of the day continuing the process of selecting a jury. There is no purpose to you continuing to hang around today while we engage in that, so I am going to excuse the three of you and direct you to report back tomorrow morning at 10 A.M.

In the meantime, do not discuss this case amongst yourselves or with anybody else. Do not speak to the attorneys, the parties, the witnesses or anybody involved in this case. Do not go to the scene of the alleged incident. Do not research this case in any way. Should anybody speak to you about this case report it to the officer immediately. I thank you for your service today. I will see you tomorrow morning at 10:00. Safe home.

(Jurors exit the courtroom.)

THE COURT: Fill the box.

THE COURT CLERK: Yes, sir.

If I call your name, please step up with all your belongings and take the seat indicated by the court officer.

Seat number one, Sergey Ermolov, sorry if I mispronounce your name. First name, S-E-R-G-E-Y, last name, E-R-M-O-L-O-V. Seat number two, Ravi Beepath, R-A-V-I, last name, B-E-E-P-A-T-H. Seat number three, Kathy Farduchi, F-A-R-D-U-C-H-I. No answer. Seat three Eric Sutton, E-R-I-C, last name S-U-T-T-O-N. Seat four,

Christine Ruggieri, C-H-R-I-S-T-I-N-E, last name, R-U-G-G-I-E-R-I.

THE COURT OFFICER: Kathy Farduchi is here, your Honor.

THE COURT: Make her number five.

THE COURT CLERK: Seat number five, Kathy with a K, K-A-T-H-Y, last name, F-A-R-D-U-C-H-I. Seat six, Michael Brennan, B-R-E-N-N-A-N. Seat number seven, Eva Marie Bougdanos, E-V-A first name, middle M-A-R-I-A, last name B-O-U-G-D-A-N-O-S. Seat eight, David Delaney, D-E-L-A-N-E-Y. Seat nine, Van Vo, V-A-N, last name V-O. Seat number ten, Jeanette Olivares, J-E-A-N-E-T-T-E. Last name, O-L-I-V-A-R-E-S. Seat eleven, Pritam Singh, P-R-I-T-A-M, last name, S-I-N-G-H. Seat twelve, Violet Li, V-I-O-L-E-T. Last name, L-I. Seat 13, Arvind Manik, A-R-V-I-N-D, M-A-N-I-K. Seat 14, Michael Clark, C-L-A-R-K. Seat 15, Jacquetta Wright, J-A-C-Q-U-E-T-T-A, last name, W-R-I-G-H-T. Number 16, Carol Taylor, T-A-Y-L-O-R.

THE COURT: Good afternoon, ladies and gentlemen. Once again, I'm going to begin by asking a series of questions to all 16 of you at once.

You will be the sole judges of the facts. I am the sole judge of the law, and you must apply the law as I give it to you whether or not you agree with it. Can all of you promise me that you will do that?

THE JURORS: Yes.

THE COURT: The defendant is presumed -- the defendants are presumed innocent. They are required to prove nothing. The burden of proof is on the District Attorney. He must prove beyond a reasonable doubt that the defendants committed the crimes they are charged with. Can all of you promise to hold the District Attorney to that burden of proof?

THE JURORS: Yes.

THE COURT: I said beyond a reasonable doubt, I did not say beyond all doubt. That is virtually impossible, so can all of you promise me that you will not hold the District Attorney to a higher burden than beyond a reasonable doubt?

THE JURORS: Yes.

THE COURT: The flip side of course is can you all promise me that you will not hold the District Attorney to a lesser burden than beyond a reasonable doubt?

THE JURORS: Yes.

THE COURT: The defendants do not have to testify on their own behalf. That is their right under the American system of law, and the law says that should a defendant choose not to testify, you were not to draw any adverse inference from that fact. Can all of you promise me that you will follow that law?

THE JURORS: Yes.

THE COURT: Finally, can all of you promise me that you will keep an open mind and not decide this case until you have heard all of the evidence, all of the arguments from the attorneys, and my instructions to you on the law, can you all of you promise to do that?

THE JURORS: Yes.

THE COURT: Very good. Again, if I mispronounce any names, please let me know.

Mr. Ermolov, where do you live?

JUROR: Rockaway Beach.

THE COURT: How far did you go in school?

JUROR: College.

THE COURT: What do you do for a living?

JUROR: Digital design.

THE COURT: Single, married, widow, divorced?

JUROR: Single.

THE COURT: Ever served as a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: Yes.

THE COURT: Tell us about that.

JUROR: House broken in a couple of times.

THE COURT: Do you appreciate that the facts that you will hear in this case have nothing to do with that? Can you put that incident aside and judge the facts in this case fairly?

JUROR: Yes.

THE COURT: Why is that a struggle for you to say? You do appreciate that what happened to you has nothing to do with this case, right?

JUROR: Yes, I understand.

THE COURT: Is there a problem with you putting that aside and judging the facts in this case fairly, giving both sides a fair shake in the case?

JUROR: Perhaps, yes.

THE COURT: Why is that?

JUROR: Because, you know, when something bad happens to you, it kind of traumatize you psychologically.

THE COURT: So you don't think you can give both sides fair trial in this case?

JUROR: I would like to say yes, but, again, you know --

THE COURT: You are not sure?

JUROR: When something happens to you, you would judge things differently, you will be more cautious.

THE COURT: All right. That's honest. I appreciate that. I will take that.

Mr. Beepath, where do you live?

JUROR: Richmond Hill.

THE COURT: How far did you go in school?

JUROR: High school.

THE COURT: What do you do for a living?

JUROR: Machinist.

THE COURT: Single, married, widowed, divorced?

JUROR: Married.

THE COURT: What does your wife do?

JUROR: She is a stay at home mom.

THE COURT: So you have kids?

JUROR: Yes.

THE COURT: Little ones?

JUROR: Grown up.

THE COURT: Grown up?

JUROR: Yes.

THE COURT: What do they do?

JUROR: My daughter is in Europe, and my son going to school.

THE COURT: Have you ever been a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Do you have friends or family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Mr. Sutton, where do you live?

JUROR: Floral Park.

THE COURT: Education?

JUROR: High school.

THE COURT: Your occupation?

JUROR: New York City fireman. My wife also works for the fire department.

THE COURT: As a firefighter?

JUROR: Yes.

THE COURT: Are you a firefighter?

JUROR: Yes.

THE COURT: Any kids?

JUROR: No.

THE COURT: Have you ever served as a juror before?

JUROR: No.

THE COURT: Have you or loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Victim of a crime?

JUROR: Yes.

THE COURT: Tell us about that.

JUROR: My wife was mugged years ago, and my house was robbed.

THE COURT: Can you put those incidents aside and give both sides a fair trial here?

JUROR: Yes.

THE COURT: Good. Do you have friends or family in law enforcement?

JUROR: Yes.

THE COURT: Tell us about that.

JUROR: My brother is a police officer, and my uncle is also a police officer.

THE COURT: Out of 35,000 cops, the DA is going to call two, maybe three, I don't know. Can you evaluate their testimony just like anybody else?

JUROR: I would tend to believe what they are saying.

THE COURT: Okay. So do you think -- let me try this. 35,000 cops, is it fair to say that some of them are heroes, most of them are just guys making a living doing

their job, some of them not so much; is that a fair statement?

JUROR: Yes, that's fair.

THE COURT: So you don't know where these two or three cops fall into that; is that fair?

JUROR: Yes.

THE COURT: So when I talk about one or two cops, can you evaluate them and give them a clean slate?

JUROR: Yes.

THE COURT: All right. Thank you, sir. Can you be a fair juror, sir?

JUROR: Yeah.

THE COURT: Thank you very much.

Miss Ruggieri, how are you?

JUROR: Just fine, thank you.

THE COURT: Where do you live?

JUROR: Glen Oaks.

THE COURT: How far in school?

JUROR: College.

THE COURT: What do you do for a living?

JUROR: Retired from the post office.

THE COURT: Single, married, widowed, divorced?

JUROR: Widowed.

THE COURT: What did your husband do?

JUROR: Also worked for the post office.

THE COURT: Do you have kids?

JUROR: Yes.

THE COURT: What do they do?

JUROR: My daughter is an organist in the church, and my son has his own business.

THE COURT: Have you ever been a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Victim of a crime?

JUROR: Yes.

THE COURT: Tell us about that.

JUROR: My daughter's house was broken into, my husband was mugged on the street, and my daughter-in-law was mugged on the street.

THE COURT: Can you put those experiences aside and give both sides a fair shake in this case?

JUROR: I would do my best.

THE COURT: They like to hear more than that because it's important for both sides.

JUROR: Yes.

THE COURT: Friends or family in law enforcement?

JUROR: Yes. I have my cousins are cops, my cousin's sons are cops, my friend's sons are cops.

THE COURT: Same question to you.

JUROR: I will say the same thing that Mr. Sutton did, I would believe what the cops said.

THE COURT: No matter what?

JUROR: Not no matter what, it depends on the evidence, but my first initial feeling is to believe what the cop says.

THE COURT: How about what I said about 35,000 cops, they run the gamut?

JUROR: Yes, I heard you.

THE COURT: Just like 35,000 of any of us, there is nothing special about that.

JUROR: Yes, I am just trying to be honest.

THE COURT: I appreciate that. Do you think you can be fair?

JUROR: I would do my best.

THE COURT: All right.

Miss Farduchi, where do you live?

JUROR: Jamaica.

THE COURT: How far did you go in school?

JUROR: High school.

THE COURT: What do you do for a living?

JUROR: At this time I'm unemployed.

THE COURT: What have you done in the past?

JUROR: I was a certified home health aide.

THE COURT: Single, married, widowed, divorced?

JUROR: Single.

THE COURT: Have you ever been a juror before?

JUROR: Yes.

THE COURT: Civil or criminal?

JUROR: Civil.

THE COURT: Do you appreciate the rules are different on the criminal side than the civil side?

JUROR: Yes.

THE COURT: The rules of law I mean. You will take the law as I give it to you? When I tell you what the law is you will accept it as the law?

JUROR: Yes.

THE COURT: Was there anything about jury service before that would make you uncomfortable sitting as a juror in this case?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: No.

THE COURT: Do you have friends or family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Good. Thank you very much. Mr. Brennan, how are you, sir?

JUROR: Well, thanks. How are you?

THE COURT: Good. Where do you live?

JUROR: Jackson Heights, I am working on a masters right now.

THE COURT: What do you do for a living?

JUROR: Actor and stunt double for a TV show.

THE COURT: What show?

JUROR: The Black List.

THE COURT: I love that show.

JUROR: Keep watching. It's moving to Thursdays.

THE COURT: Are you single, married, widowed, divorced?

JUROR: Married.

THE COURT: What does your wife do?

JUROR: She is a gemologist.

THE COURT: What is that?

JUROR: She manages a diamonds boutique in the city.

THE COURT: Do you have kids?

JUROR: No.

THE COURT: Served as a juror before?

JUROR: Negative.

THE COURT: Have you or loved one ever been the victim of a crime?

JUROR: No.

THE COURT: Convicted?

JUROR: No.

THE COURT: Do you have friends or family in law enforcement?

JUROR: Multiple, FBI, ATF, ESU, bomb squad from my time in the service.

THE COURT: Can you evaluate the testimony of the two or three cops in this case fairly, no better, no worse?

JUROR: Yes, sir.

THE COURT: Can you be fair?

JUROR: Yes, sir.

THE COURT: Goods. Thank you very much.

Miss Bougdanos, where do you live?

JUROR: Astoria.

THE COURT: How far did you go in school?

JUROR: College.

THE COURT: What do you do for a living?

JUROR: Student and bartender.

THE COURT: Single, married, widowed, divorced?

JUROR: Single.

THE COURT: Have you ever served as a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Victim?

JUROR: No.

THE COURT: Friends and family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Thank you.

Mr. Delaney, where do you live?

JUROR: Hollis.

THE COURT: How far did you go in school?

JUROR: College.

THE COURT: What do you do for a living.

JUROR: Currently unemployed.

THE COURT: What have you done in the past?

JUROR: Interned at Downstate Medical School.

THE COURT: What do you hope to do?

JUROR: Veterinarian.

THE COURT: Are you single, married, widowed, divorced?

JUROR: Single.

THE COURT: Ever served as a juror before?

JUROR: No.

THE COURT: You or anyone you know ever convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: No.

THE COURT: Friends or family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Thank you, sir.

Miss Vo, where do you live?

JUROR: In Queens.

THE COURT: What neighborhood in Queens do you live in?

JUROR: Neighborhood?

THE COURT: What neighborhood?

JUROR: I don't know.

THE COURT: Do you live in Flushing?

JUROR: Yeah, Woodside.

THE COURT: Okay. How far did you go in school?

JUROR: High school in my country.

THE COURT: Where are you from?

JUROR: Vietnam.

THE COURT: Are you working?

JUROR: Yeah.

THE COURT: What do you do?

JUROR: I do nails.

THE COURT: Single, married, widowed, divorced?

JUROR: Yeah, I'm married.

THE COURT: What does your husband do?

JUROR: My husband work in the school.

THE COURT: Okay.

JUROR: Clean.

THE COURT: He cleans?

JUROR: Yeah.

THE COURT: Okay. Do you have kids?

JUROR: Yes.

THE COURT: Big ones or little ones?

JUROR: She eight years old, and five years old. I ask her what you want, she say she want like you.

THE COURT: It's a good job. Have you ever served as a juror before?

JUROR: I never.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: I don't speak good, just little bit.

THE COURT: Are you having trouble understanding me?

JUROR: Just little bit, very simple.

THE COURT: All right. Thank you.

Miss Olivares, where do you live?

JUROR: Ozone Park.

THE COURT: How far did you go in school?

JUROR: Bachelor's degree.

THE COURT: What do you do for a living?

JUROR: Program assistant.

THE COURT: Single, married, widowed, divorced?

JUROR: Married.

THE COURT: What does your husband do?

JUROR: Unemployed.

THE COURT: What has he done in the past?

JUROR: Construction.

THE COURT: Do you have any children?

JUROR: Yes, little ones.

THE COURT: Ever been a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or loved one ever been the victim of a crime?

JUROR: No.

THE COURT: Friends or family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Thank you very much.

Dr. Singh, where do you live?

JUROR: Bayside.

THE COURT: How far did you go in school?

JUROR: College.

THE COURT: Medical school I assume?

JUROR: Medical school.

THE COURT: What kind of doctor are you?

JUROR: Internal medicine.

THE COURT: Single, married?

JUROR: Married.

THE COURT: What does your wife do?

JUROR: Retired from real estate.

THE COURT: Any kids?

JUROR: Yes.

THE COURT: Adults?

JUROR: Yes, adults.

THE COURT: What do they do?

JUROR: One is college advisor, one is disabled.

THE COURT: Have you ever been a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: No.

THE COURT: Friends or family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Thank you very much.

Miss Li, where do you live?

JUROR: Queens, Flushing.

THE COURT: How far did you go in school?

JUROR: High school.

THE COURT: What do you do for a living.

JUROR: Bookkeeper.

THE COURT: Single, married, widowed, divorced?

JUROR: Married.

THE COURT: What does your husband do?

JUROR: He was a police officer.

THE COURT: In New York?

JUROR: New York City.

THE COURT: Is he still a police officer?

JUROR: He retired.

THE COURT: Where did he work?

JUROR: Now he works at the courthouse as a court officer in Manhattan.

THE COURT: He is a court officer?

JUROR: Yes.

THE COURT: I will ask you the question, can you judge the testimony of the police officers in this case fairly?

JUROR: Yes.

THE COURT: Good. Do you have kids?

JUROR: Yes.

THE COURT: Big ones or little ones?

JUROR: Big, two.

THE COURT: What do they do?

JUROR: One is registered nurse, and one is a secretary.

THE COURT: Have you ever been a juror before?

JUROR: No.

THE COURT: Have you or any loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: I was a victim.

THE COURT: Can you put that incident aside and judge the facts in this case fairly?

JUROR: I try.

THE COURT: Well, I think they need more than try. Do you think you are as fair as the gentleman sitting to the right of you and the gentleman sitting to the left of you, are you a fair person?

JUROR: Yes.

THE COURT: So you know what happened to you has nothing to do with what you are going to learn in the next couple of days, right?

JUROR: Yes.

THE COURT: So my question is can you put that aside and judge the facts fairly and render a fair verdict, can you do it?

JUROR: Yes.

THE COURT: Thank you. Your husband is a court officer, so you must know many of them?

JUROR: Yes.

THE COURT: Thank you. Mr. Manik, where do you live?

JUROR: Forest Hills.

THE COURT: How far did you go in school?

JUROR: Medical school.

THE COURT: What do you do for a living?

JUROR: Physician, family medicine.

THE COURT: Single, married, widowed, divorced?

JUROR: Divorced.

THE COURT: Any children?

JUROR: Yes, big ones.

THE COURT: What do they do?

JUROR: My daughter is a physician too.

THE COURT: Have you ever been a juror before?

JUROR: Yes, sir.

THE COURT: Civil or criminal?

JUROR: Civil.

THE COURT: Do you appreciate that the laws are different on the criminal side than the civil side?

JUROR: Yes.

THE COURT: Primarily in a civil case the burden of proof is like 51-49. Here the DA has to prove it beyond a reasonable doubt, okay?

Anything about serving as a juror that would make you not comfortable serving as a juror in this case?

JUROR: Not really.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: How about the victim of a crime?

JUROR: No.

THE COURT: Friends or family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Sure.

THE COURT: Good. Thank you very much.

Mr. Clarke, where do you live?

JUROR: Belle Harbor.

THE COURT: How far did you go in school?

JUROR: I went to college.

THE COURT: What do you do for a living?

JUROR: Retail salesman at a hunting store on Long Island.

THE COURT: Single, married, widowed, divorced?

JUROR: Single.

THE COURT: Ever served as a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: No.

THE COURT: Friends or family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: I'm not 100 percent on that one. I can't say I won't get hung up on one certain detail on one side and go with that one. I will try.

THE COURT: Well, is there a particular detail you are talking about?

JUROR: It's -- detail like if somebody was hurt, that might weigh on me.

THE COURT: Well, we don't know what the evidence is going to be yet, I don't know certainly. I know about as little about this case as you do at this point.

JUROR: I guess I can be fair then.

THE COURT: All right. Good. Thank you very much.

Miss Wright, where do you live?

JUROR: Queens Village.

THE COURT: How far did you go in school?

JUROR: College.

THE COURT: What do you do for a living?

JUROR: Data entry clerk.

THE COURT: Single, married, widowed, divorced?

JUROR: Married.

THE COURT: What does your husband do?

JUROR: Construction.

THE COURT: Kids?

JUROR: No.

THE COURT: Ever served as a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: No.

THE COURT: Friends or family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Good.

Miss Taylor, where do you live?

JUROR: Laurelton.

THE COURT: How far did you go in school?

JUROR: College.

THE COURT: What do you do for a living?

JUROR: Case manager.

THE COURT: Single, married, widowed, divorced?

JUROR: Married, he is a pharmaceutical rep.

THE COURT: Kids?

JUROR: Yes.

THE COURT: Big or little?

JUROR: Combination.

THE COURT: You know what I want to know. Adult kids what do they do for a living?

JUROR: My son was in the military, he just came out, and I have a son who is a home health aide, and my daughter is a nurse.

THE COURT: Ever been a juror before?

JUROR: No.

THE COURT: Have you or loved one ever been convicted of a crime?

JUROR: My uncle was locked up for selling marijuana.

THE COURT: Anything about that experience that would cause you not to be fair in this case?

JUROR: Absolutely not.

THE COURT: How about the victim of a crime?

JUROR: No.

THE COURT: Friends or family in law enforcement?

JUROR: My sister in law's husband is a detective.

THE COURT: Can you judge the testimony of the police in this case fairly?

JUROR: Definitely.

THE COURT: Can you be fair?

JUROR: Yes, I can.

THE COURT: Thank you very much.

Mr. Shortt, 15 minutes.

MR. GIBBONS: Your Honor, you want to keep going?

THE COURT: Yes. You got someplace to go?

MR. GIBBONS: All right.

MR. SHORTT: Everyone here, you will give me the same promises that I asked the first group not to let sympathy come into play here?

Mr. Sutton, you heard me speak to Mr. Masse before. Would you agree with me that your job is take the evidence from the witness stand and combine it with what the judge gives you and come up with a verdict?

JUROR: Yes.

MR. SHORTT: Do you think sympathy should play any factor at all?

JUROR: No, it has nothing to do with whether or not something happened?

MR. SHORTT: Miss Taylor, would you agree with that, do you think sympathy should play a role?

JUROR: Definitely not, base it on the facts.

MR. SHORTT: Would you agree sympathy could be a two way street, you will hear from a victim and you may the judge told you that there may be allegations of injuries in this case, can you promise not to have sympathy?

JUROR: Still can't mix the facts with sympathy. Being fair, sympathy, I can't put that into the equation of being fair. I have to listen and make a decision.

MR. SHORTT: You will listen to the testimony of an eyewitness. You may only hear testimony from one eyewitness. Is that troubling to you at all? Would you be able to make a decision based on one eyewitness?

JUROR: I would be.

MR. SHORTT: What are you looking for in terms of an eyewitness if you want to believe them?

JUROR: An eyewitness would have to be able to identify who they saw, how close, it there is a certain body pierce or mark or whatever that stands out to make them say what happened.

MR. SHORTT: Mr. Clarke, if you were listening to the testimony of an eyewitness, what would you want to hear or consider?

JUROR: Pretty much the same thing, could he identify them clearly, any distinguishing markings, how close he was, if he heard anything specific, just you know, as detailed as possible.

MR. SHORTT: Would you consider what his observations were with the other evidence in the case?

JUROR: I'm sorry?

MR. SHORTT: Would you consider what that eyewitness what they observed would you compare it to other facts in the case?

JUROR: Yes.

MR. SHORTT: Would you consider where a suspect was caught, do you think that could be important?

JUROR: Could be.

MR. SHORTT: How?

JUROR: If he was close to the scene when it happened, if he fits the description that the eyewitness said while he was maybe trying to get away, that could play a role.

MR. SHORTT: Mr. Manik, do you think where a person is caught would play a role in your decision?

JUROR: It depends on the witness, how far he was and how close he was to the witness.

MR. SHORTT: What do you mean by that?

JUROR: What I mean is that if there was some clear identification.

MR. SHORTT: I'm sorry?

JUROR: Whether the witness identified the person clearly.

MR. SHORTT: Okay. Miss Bougdanos, do you think it would be important for you to in your decision making process to consider where the suspect was caught compared to the crime?

JUROR: No.

MR. SHORTT: Why not?

JUROR: I think that you have to balance

everything out very fairly. I think you need to see things as they are. I think where they are needs to be weighed out in comparison to what the crime was, I think it all matters in order to see the bigger picture of things.

MR. SHORTT: So would you consider where the person was caught?

JUROR: Yes.

MR. SHORTT: Why would that be important?

JUROR: I guess it all has to do with where they are, how far they got away, who else was involved, the locations of things, it just falls into place.

MR. SHORTT: I appreciate that.

Miss Ruggieri, do you agree with that, that where a person is caught matters in terms of deciding whether or not the police have caught the right person?

JUROR: Well, if he is in the vicinity of the crime, it's very shortly thereafter it would have to have some kind of affect on what the facts are.

MR. SHORTT: As opposed to he is caught five hours later 40 blocks away?

JUROR: That would not have any bearing on it, but if he was caught right outside the store right after it happened.

MR. SHORTT: You would consider that?

JUROR: Yes.

MR. SHORTT: Ermolov, would you consider whether or not anything is recovered from a suspect in deciding whether or not you think the eyewitness is making an accurate identification?

JUROR: I'm sorry, I didn't get it.

MR. SHORTT: If the police recover something from the pockets of a suspect relevant to the case, would you consider in deciding whether or not you believe the witness is accurate in their identification?

JUROR: Yes, perhaps.

MR. SHORTT: Why would you do that?

JUROR: Because it's additional evidence that was taken from the pockets, is that what you said?

MR. SHORTT: Yes, so you would consider that in deciding whether or not that eyewitness is making a correct identification, right?

JUROR: I'm sorry, I'm not too sure.

MR. SHORTT: Would you consider that additional evidence in deciding whether or not you think an eyewitness is being accurate?

JUROR: Yes, additional evidence but it depends on the case. If it's a robbery, it depends.

MR. SHORTT: In terms of deciding whether or not you believe an eyewitness is being accurate will you promise that besides the testimony of the eyewitness, you

will consider it in light of all the testimony and all the evidence given at this trial?

JUROR: Yes.

MR. SHORTT: Thank you, sir. Ladies and gentlemen.

Mr. Beepath, do you understand as the defendants sit here they are innocent until proven guilty?

JUROR: Yes.

MR. SHORTT: Do you understand that I don't fight that, as the prosecution, they are innocent, if I do not call a single witness to the stand at any point what is your verdict going to be?

JUROR: Not guilty.

MR. SHORTT: Because they are innocent as it stands right now.

JUROR: Yes, there is no evidence.

MR. SHORTT: However, if I bring witnesses here and I bring eyewitnesses here that will testify that they committed a crime, and I prove to your satisfaction beyond a reasonable doubt that they are guilty as charged in the indictment, would you have any hesitation removing that presumption of innocence and finding them guilty?

JUROR: I would have to see more evidence.

MR. SHORTT: What do you mean by that?

JUROR: Like more testimony.

MR. SHORTT: You would want more than beyond a reasonable doubt?

JUROR: Yes, beyond the eyewitness account.

MR. SHORTT: Anyone else who feels as Mr. Beepath that you would need more than an eyewitness testimony? Anybody else you would need more than that?

JUROR: Sure, I would need to see some corroborating evidence. Like you mentioned earlier, if the person saw the individual with a red cup in their hand and the red cup was found in the pockets, that's more evidence. An eyewitness account is probably the least accurate and least reliable bit of evidence. We all see things differently.

MR. SHORTT: The judge will instruct you that it's the quality of the evidence not the quantity of the evidence that's presented that matters in a case, and there is no required form that evidence be presented, but you are telling me you would consider an eyewitness testimony if there was additional evidence as well?

JUROR: Sure.

MR. SHORTT: If I call one eyewitness and you believe that eyewitness beyond a reasonable doubt, would you still hesitate finding the defendants guilty or would you need a little more?

JUROR: If it's solely based on an eyewitness

saying I saw that individual do said act would I be able to convict that person?

MR. SHORTT: Yes.

JUROR: It would depend on the believability how far was the witness, how old is the person, the lighting, angle they were standing at, how old they are, do they wear glass, etcetera, etcetera. If all of those things line up and that person seems believable, that person seems logical and intelligent and they say this is what I saw, then, yes, I can do that.

MR. SHORTT: Thank you, sir.

Mr. Delaney, how do you feel?

JUROR: I agree wholeheartedly with what the last gentleman just said.

MR. SHORTT: Why do you think that way?

JUROR: Because that places an important factor in a case such as this because these are gentlemen's lives in our hands basically and if we just find them guilty off of oh, all right we don't have any other evidence aside from an eyewitness and if he was standing three blocks away, and he just saw them running away, it's like 12:00 at night and there is no street light and they just happen to see a figure run away and they just happen to see these two gentlemen, that's not enough evidence.

MR. SHORTT: That would be troubling for you,

right?

JUROR: Yes.

MR. SHORTT: For me, too. Would you consider if the suspect got closer to the witness is that important to you?

JUROR: Yes, that plays a factor too.

MR. SHORTT: Why?

JUROR: Because that would give me a proper description that would tell me okay this person is where I am in relation to you, I can give a full description of what I saw and what he was wearing and everything else.

MR. SHORTT: Okay. Mr. Singh, do you watch TV?

JUROR: Sometimes.

MR. SHORTT: Do you watch Law and Order?

JUROR: No.

MR. SHORTT: I know there is competition. Mr. Clarke, what is the biggest difference between Law and Order and this courtroom?

JUROR: Nicer courtroom.

THE COURT: Me too.

MR. SHORTT: A lot more waiting around here, right?

JUROR: Yes.

MR. SHORTT: If you are picked as a juror, you don't get to see the crime, right?

JUROR: Yes.

MR. SHORTT: As the judge just told you, you can't go to the crime scene. If you are picked as a juror, what do you think is the biggest differences between the witnesses that will testify here and the witnesses that testify on the TV show?

JUROR: These are real people. They have no real reason to lie, I think. I don't really know what the big difference is except they are not paid actors just real people recounting what they believe they saw.

MR. SHORTT: Not reading a script?

JUROR: No.

MR. SHORTT: No multiple takes, take two, take ten, take 20?

JUROR: Right.

MR. SHORTT: Just trying to tell us what happened?

JUROR: Yes.

MR. SHORTT: Can you promise us not to hold them to the standards of TV or a super human standard?

JUROR: Yes.

MR. SHORTT: Miss Wright, would you agree with that?

JUROR: Yes, I understand that.

MR. SHORTT: I know this is not fun to spend the day here, the lighting is a little weird, but do you

promise -- do you understand that witnesses may be a little nervous coming into a courtroom and speaking in front of a group of people?

JUROR: Yes.

MR. SHORTT: I am a little nervous too. Do you promise that you will consider that but that's not the only factor that you will consider?

JUROR: Correct.

MR. SHORTT: Miss Taylor, do you watch sports?

JUROR: Just Miami Heat.

MR. SHORTT: So do you read the papers about the games?

JUROR: Once in a while.

MR. SHORTT: Any time there is a game, do you read multiple sports writers?

JUROR: No, not really. I really just watch the game. I don't read anything.

MR. SHORTT: If I ask you about a game two months ago, do you think you would remember every detail about the game?

JUROR: Definitely not.

MR. SHORTT: If I replayed the game you would have more of a memory?

JUROR: Yes.

MR. SHORTT: If I ask you six months from now to

give me the same story about the game would you probably tell it a little differently?

JUROR: Yes.

MR. SHORTT: That's natural, tell the same story a little differently each time?

JUROR: Yes.

MR. SHORTT: You may hear that in this case. Would you consider that in deciding whether or not you believe them?

JUROR: Yes, because the facts won't change. You can tell it different ways but still have the same information different ways.

MR. SHORTT: If there is a small difference, could you chalk that up maybe they said it a little differently?

JUROR: Yes.

MR. SHORTT: But if there is a major difference you will consider that as well?

JUROR: Definitely.

THE COURT: One minute.

MR. SHORTT: Thank you. Ladies and gentlemen, do you understand that we have had some light hearted moments here, but this is a serious case. Do you understand at the end of the case, I will come to you, and I will ask you after all the evidence is presented to find the defendants guilty. Anybody here if I prove my case beyond a

reasonable doubt would have any hesitation because of moral, religious, ethical reasons that could not find the defendants guilty if I have proven my case? Sir? You might have a little problem?

JUROR: I will hear everything, and I will try to listen to everything clearly and try to understand it all, but you always hear about some poor guy spending 22 years in jail for a crime he did not commit.

MR. SHORTT: I appreciate that. Ladies and gentlemen, there are wrong answers here. Anybody else feel that way? Thank you for your time.

THE COURT: Thank you, Mr. Shortt.

At this point we will break for lunch. Do not discuss this case amongst yourselves or with anybody else. Do not speak to the attorneys, the parties, the witnesses. Do not go -- I don't expect you to run to Corona over lunch, but do not go to the scene. Do not research this case in any fashion. Should anybody speak to you about this case, report it to the officer immediately. Thank you. We will reconvene at 2:15. Have a good lunch.

Officer, take charge.

(Jurors exit the courtroom.)

THE COURT: 2:15.

MR. SHORTT: Thank you.

MR. GIBBONS: Thank you.

(Jurors exit the courtroom.)

(Luncheon recess taken.)

A F T E R N O O N   S E S S I O N

(Defendants enter the courtroom.)

THE COURT CLERK: Case on trial continues. All parties are present. All appearances remain the same.

THE COURT: Ready for the jury?

MR. SHORTT: Yes, Judge.

MR. GIBBONS: Yes.

THE COURT OFFICER: Ready, Judge?

THE COURT: Yes.

(Jurors enter the courtroom.)

THE COURT: Good afternoon, ladies and gentlemen. We will continue the process of selecting a jury. We are now going to hear from Mr. Gibbons.

Sir, you have 15 minutes.

MR. GIBBONS: Thank you. A lot of this will be repetitive, but I will try and make it a little more interesting as well. I thank you all for being here, it's very important. I know this is taking time out of your lives so you have the thanks of myself and my client and Mr. Ball as well. It's not a science, no right or wrong. We are trying to pick jurors that are good for this case so my apologies if I pry and make you feel uncomfortable, not my intention, but I am just looking for honest answers.

I want to pick up on something that Mr. Shortt was asking, and I believe he was speaking to you, Miss Taylor,

and maybe you, Miss Wright, as well about when you tell a story and over time, you may tell stories a different way.

If I ask you today, you may tell it one way, and if I ask you five months from now, you tell it a different way. I think, Miss Taylor, you said something that the facts don't change, though, you may tell the story differently, and can we all agree to that, that you may have emphasis on what a person was wearing the first time, then you might have emphasis on what the person did, they fell down or something or what the person smelled like, he had on a nice cologne, but despite the fact there may be a different way to tell the story, the facts of the story remain the same because the truth is the truth is the truth.

If I ask you today, are you wearing lemon yellow pants, are you?

JUROR: I am.

THE COURT: If I ask you 20 years from now were you wearing lemon yellow pants that day assuming you remember you were wearing them, correct? Because the truth is the truth is the truth and regardless of how you tell the story, the facts are the same. Do we all agree to that?

THE JURORS: Yes.

MR. GIBBONS: Mr. Sutton, do you agree?

JUROR: Yes.

MR. GIBBONS: Mr. Brennan and Mr. Delaney, you were asked about whether or not an eyewitness alone would be enough or would you need more. I think it was common consensus some people said it might be enough, but you would want to determine how a person testified and different circumstances surrounding what they were telling you, what the lighting condition was, how close they were to the person, things of that nature, correct? It is okay that you don't want to just rely on one thing, you can, but it's human nature to want to know more about what the circumstances were, and we call it the gestalt, the whole package, what was going on, was it raining, water in your eyes, had you fallen down, was your head hurt, was it dark out, were you blinded, all of these things go toward not so much the credibility but the -- I don't want to say the believability because the person testifying, this might be what they really believe, but how accurate are they and again that brings me back to the certainty versus accuracy. I talked about it in the first round.

Miss Bougdanos, have you ever had the situation where you see someone on the street, and you think you know them, maybe you tap them on the shoulder, hey, Joe, it's me, and it's not him?

JUROR: Yes.

MR. GIBBONS: Common occurrence we have all shared that, right? I bet my life on it, it was him, but you were wrong, but you were certain. Does not mean you are right and that happens in your everyday life, it can happen here in court, right?

JUROR: Yes.

MR. GIBBONS: Some of the things that add to that situation the chaos of the situation, we are standing here quitely, you can see the court reporter is taking notes on everything, but if I threw the table over, and I knock the phone over and all hell breaks loose, your attention might be distracted from what was there or here or what was happening right in front of me, do you all agree that the chaos of the situation can alter your ability to perceive what happens in that situation, yes?

JUROR: Yes.

MR. GIBBONS: Mr. Clark?

JUROR: Yes.

MR. GIBBONS: Okay. Miss Ruggieri, you have cousins that are cops and friends?

JUROR: Yes.

MR. GIBBONS: You said you tend to believe the cops, and, Mr. Sutton, you are the same way?

JUROR: Yes.

MR. GIBBONS: Can you promise us when you hear the

testimony of the police officer, you are not going to automatically give him or more her more credibility than anybody else, you listen to what they have to say and use common sense to discern the believability of that witness despite the fact that he is a police officer just like everyone else; can you promise me that?

JUROR: Yeah, I guess so.

MR. GIBBONS: You guess so. Same thing with the airplane, you see the pilot, can you land this plane, I guess so, do you understand we need a little bit more assurance?

JUROR: I would certainly do my best to not be biased, absolutely.

MR. GIBBONS: I'm not saying the police officers are lying. We hear more stories about that in the papers. I'm not saying they are lying, but they could be mistaken just like anybody else, they could see somebody in the street, hey, Joe, I'm a trained police officer, should he have been any better than picking out anybody? I'm infallible, I'm a police officer, that's not correct, right?

JUROR: No.

MR. GIBBONS: Maybe a police officer is your best friend, they are human beings, all the foibles. They can mistakes, tell the truth or tell a lie. Can you agree with

that?

JUROR: Yes.

MR. GIBBONS: Can you hold them to being a witness like anyone else, no greater or lesser credibility, you will make the determination by what you see and hear on that stand, can you agree to that, Miss Ruggieri?

JUROR: Yes.

MR. GIBBONS: Mr. Sutton?

JUROR: I will try.

MR. GIBBONS: That's fair. That's all I ask. Everybody else, can you agree to hold them like anybody else?

THE JURORS: Yes.

MR. GIBBONS: Thank you. One of the things Mr. Shortt was talking about things that would be important for believability of a witness was where a person was caught, and I think it was a common consensus someone caught near the scene maybe lends more credibility.

Isn't it possible someone just happens to be near the scene, you come out of the subway station out of the bowels of the Earth, and there is a commotion going on, that's him, what are you talking about, I just came out of the subway, but it happened right next door to the subway entrance. You walked out, he said it's you, you could get stopped, correct, that could happen? So mere proximity to

the crime scene just in and of itself does not mean it's more likely that the person did it, correct? It's a factor, but again you would weigh that in the entire package to see if it really made a difference, correct?

JUROR: Yes.

MR. GIBBONS: If proceeds of a robbery were found, that's a factor. Again, if proceeds were not found, that would be a factor too, correct?

JUROR: Yes.

MR. GIBBONS: All right. I had spoken before about the right to remain silent, it bears repeating. I always find somebody has an issue with it, and that's perfectly okay. We all as Americans have a constitutional right to remain silent to not bear witness against ourselves. Do we all agree that exists?

THE JURORS: Yes.

MR. GIBBONS: Now, to put that into practice because again you hear it all the time, but you do not really analyze it, if my client chooses to remain silent and not take the stand, would you hold that against him, Mr. Manik?

JUROR: No.

MR. GIBBONS: I really want to hear what he has to say and if he did not, he must be hiding something?

JUROR: No, no problem.

MR. GIBBONS: Miss Farduchi, would that be a problem if you did not hear from him?

JUROR: No.

MR. GIBBONS: Miss Olivares, any problem with that?

JUROR: No.

MR. GIBBONS: Can everybody promise me if he does not take the stand, you would not draw any negative inference from that and presume he was guilty because he did not testify? Yes, everybody, yes?

THE JURORS: Yes.

MR. GIBBONS: Yes, Mr. Clark?

JUROR: For me to make the right judgment, it would be helpful if I heard what he had to say.

MR. GIBBONS: Of course it would be, but he has a right to not take the stand.

JUROR: I understand that.

MR. GIBBONS: Assuming that he exercises that right, a right that we all enjoy as citizens, is that going to create a problem for you, one, in making a decision and, two, holding it against him swaying your decision against him?

JUROR: It might.

MR. GIBBONS: It might sway your decision against him?

JUROR: It might just make it hard to make any type of decision.

MR. GIBBONS: Anybody else feel similarly? This is the time to tell me now and if you are not communicating with me, I'm failing in my task, and I don't like that. Please be honest and tell me. It's not a wrong answer. It's perfectly understandable. We want to know but you may not get that opportunity. Miss Ruggieri?

JUROR: You know you are saying he does not have to testify against him testify, that's the Fifth Amendment you can remain silent because you don't have to testify against yourself. It's very hard to say, well, he doesn't want to testify against himself and not take that negatively.

MR. GIBBONS: Why is that?

JUROR: Because he does not want to testify against himself.

MR. GIBBONS: What if he is not the most educated person and he knows this is a sharp ADA that may kind of spin some of the things he says and he may be subject to blistering cross-examination. He says I have an attorney seems like he knows what he is doing, I will let him speak for me. That's understandable?

JUROR: Yes.

MR. GIBBONS: But you automatically shoot him

down you figure that he is hiding something.

JUROR: That's what the Fifth Amendment says.

MR. GIBBONS: You don't have to testify against yourself, you remain silent. Will you afford him the constitutional right that we all have and not hold it against him for whatever his reasoning might be because as I pointed out, there may be a good reason he doesn't want to take the stand. Do you think you can promise not to hold it against him?

JUROR: I would certainly try.

MR. GIBBONS: Mr. Sutton, the same?

JUROR: Yes.

MR. GIBBONS: Anybody else feel that way? Mr. Clarke, I got you. Anybody else. Tell me now. Mr. Beepath?

JUROR: No.

MR. GIBBONS: You can keep an open mind about that?

JUROR: Yes.

MR. GIBBONS: Can all of you agree that you will keep the evidence separate as far as both of these clients are concerned, that you will look at the evidence and treat one separately from the other and not lump them together say, well, if I think this guy did it that guy probably did it too, can you promise me to keep them separate?

Mr. Delaney?

JUROR: Yes.

MR. GIBBONS: Mr. Ermolov?

JUROR: Yes.

MR. GIBBONS: Everybody can promise me that?

THE COURT: You have about two minutes.

MR. GIBBONS: All right. I gave the scenario before three week trial, and it's 5:30 on a Friday. You have been deliberating two days, everyone wants to go home, and it's eleven to one. Dr. Singh, you are the one hold out, whether guilty or not guilty, everyone says come on, doc, we want to go home, it's eleven to one, you are the only hold out change, your vote, what do you do?

JUROR: I would not change.

MR. GIBBONS: If they convince you based on the facts look at it this way, and you say that's a valid reason to change your opinion, do you change your verdict?

JUROR: Yes.

MR. GIBBONS: Just because we are tired I want to go home, that's not a good reason, Miss Li, would you agree with that?

JUROR: Yes.

MR. GIBBONS: Everyone will stick to their guns? The burden of proof, my client is presumed innocent. We discussed that. Mr. Short discussed it. He did a very

good job. As he sits there, innocent, correct? If you hear no evidence in this case, and you go back to deliberate, what does your verdict have to be?

THE JURORS: Not guilty.

MR. GIBBONS: Will you promise to hold Mr. Shortt to his burden of proving each and every element of this case beyond a reasonable doubt?

THE JURORS: Yes.

MR. GIBBONS: The elements if you are making tea, hot water, tea bag, cup, maybe a slice of lemon. If he leaves out the water, has he proven the cup of tea? No.

Identity, just because he proves someone was robbed, their property was taken, they were assaulted, he has to prove that the right person that was arrested is the one that did it, that the person that was arrested is the right one. Do you all follow that's an element, too?

THE JURORS: Yes.

MR. GIBBONS: Will you hold him to the burden of proving that element as well beyond a reasonable doubt?

THE JURORS: Yes.

MR. GIBBONS: Thank you very much.

THE COURT: Thank you, Mr. Gibbons.

MR. GIBBONS: Thank you, your Honor.

THE COURT: Mr. Ball, you have 15 minutes.

THE DEFENDANT BALL: Okay. Thank you. Ladies and

gentlemen of the jury, my name is Raymond Ball, and I would like to start by asking you, now, he, similarly in vein what we have been talking about thus far concerning the issue of sequence of events, you know, in the case that, you know, you have a situation that unfolds, and the sequence of events in how it unfolds does not add up to the testimony, would you still accept the testimony as being valid?

I will give you an example. You know, in the process of us watching TV, movies and so on and so forth, you have a lot of times on the show where you have the guy that is the karate expert, he goes into the room, and he kills everybody, he cuts the heads off, does certain things, chops them up and beats them up, and he walks out, but on the way out, you don't see any blood on him. Now you seen him kill them, you see, however, on the way out, there is no evidence that he ever committed any type of violence.

My question to you is in situation like that, how would you rule. I would like to ask you particularly, Mr. Brennan, because I think that I would like to hear what you have to say with respect to that?

JUROR: How would I rule based on the fact that we saw him supposedly commit this crime, and he walks out with no blood?

THE DEFENDANT BALL: You literally seen him in the movies, we watch all the time, you are in the movie business.

JUROR: I would find it rather odd after such a melee would take place that he would have no physical evidence on him that would be strange.

THE DEFENDANT BALL: But it represents a reality in what we see and what's being relayed to us. Would you, would you be able to separate what's being relayed to you, what is being projected to you and be able to decipher for yourself the reality in the equation in what is available?

JUROR: I guess I am confused. I understand you are saying there is a fight scene, all the people are killed and the person walks out, but there is no blood or there is no --

THE DEFENDANT BALL: Evidence that would point --

JUROR: That scenario I would say that's rather odd, how could somebody do that?

THE DEFENDANT BALL: I'm asking you in a situation, would you in your judgment call if you had to say that person committed that crime that you seen him commit in that room on that television, would you commit him and say he was guilty of committing that crime?

JUROR: If I saw him do it, yes.

THE DEFENDANT BALL: Okay. But you didn't have no

evidence to indicate that he did.

THE COURT: I'm going to sustain that. Ask another question, sir.

THE DEFENDANT BALL: The next question in the same vein, let's say that there is a sequence of events that takes place in time, and I say to you or you have to tell with the issue that I was arrested at 9:00, and the person was treated by an ambulance, you see, that arrived at the crime scene five minutes after, but the ambulance report says --

MR. SHORTT: Objection, your Honor.

THE COURT: Sustained.

THE DEFENDANT BALL: Okay. But there is a different time --

THE COURT: Sustained.

THE DEFENDANT BALL: -- that is indicated.

THE COURT: Sir, move on.

THE DEFENDANT BALL: I would like to know whether or not we can use an analysis in being able to come to an understanding about things when you deal with the issue of sequence of events and times. That's my concern. In the case that someone says to you that they got something off you, you know, some property, would you be able to accept that they took the property in the case because it's similar I would think to not having to take the stand and

you know speak out in the case that a person doesn't have to account for --

THE COURT: I will sustain that as well.

THE DEFENDANT BALL: Okay. My next question is going to be, you know, do you take -- would you take and hold a person responsible, right, in a situation where they take themselves into a situation and the situation that they take themselves into, you know, like sometimes you have affairs with men and women, and you know, in the process of you having an affair with another woman, and a lot of times people say well, you know, that was a mistake.

I would like to know, you know, would you see a person's willful act of what they did, would it be justifiable as a mistake in the case that someone did it?

JUROR: Is this still directed at me? I'm sorry.

THE DEFENDANT BALL: Well, it's at the panel, but you can answer.

JUROR: Well, a person is responsible for his or her own actions. If there is regret, there is regret. They have to suffer the consequences whether they have or have not.

THE DEFENDANT BALL: Okay. My next question is Bougdanos, is that how you pronounce your name?

JUROR: Yes.

THE DEFENDANT BALL: I would like to know in the

case that you have a situation where the person is being held responsible for his actions, do you think that the person should have to get on the stand and justify what was his action? Do you think that in order for you to be able to like have a better understanding?

JUROR: Is the question what we have been talking about?

THE DEFENDANT BALL: Yes, it is.

JUROR: I believe that for whatever the reason is whether they would like to testify or not, that is totally up to them. I don't think it should swing in either way for whatever reason. I think that if you for whatever reason believe that you can't get your words out correctly or express what it is that you want to say properly, you have that right to stay silent, and in my opinion it does not change my viewpoint. I will take the facts into consideration, I think that's the most important thing, putting the story together as a whole and coming to a conclusion through that.

THE DEFENDANT BALL: Thank you. You know, I would like to ask another question, in the case in the process of, you know, going over the evidence, and we come to a conclusion that there was evidence available but it's not available -- they are not able to account for the evidence where it came from, how did it get there, you know, would

you accept it on face value that this evidence is you know without any chain of custody, it is a part of the crime, and would you take it for face value and believe what is it that they say and how it came into play or would you require them to show you a chain of custody and a way --

THE COURT: I will sustain that. I will ask you to rephrase it a little more clearly.

THE DEFENDANT BALL: Would you expect for them to have to give you an account for who, what, when, where and how the evidence came into play? I would like to direct the question to you, sir. I apologize. Your name is?

JUROR: Mr. Beepath.

THE COURT: The young man in the back?

JUROR: Delaney.

THE DEFENDANT BALL: I apologize. Please be patient. I'm new at this. Would you like to help me out with that question?

JUROR: Well, with that type of evidence -- can you repeat it one more time?

THE DEFENDANT BALL: In the case that you are presented with a particular evidence, you know, with the evidence, you know, it doesn't have a history, they give you the evidence but don't tell you who it came from, who, what, when, where and how, but it's a part of the evidence like that, but there is no account for where it came from,

how it got there, so on and so forth, would you accept it for the value that it's being presented to you?

JUROR: That evidence would then have no credibility.

THE DEFENDANT BALL: Thank you. I appreciate that. You know, I'm really concerned about contradictions and inconsistencies, you know. Like the scenario that I gave you earlier, Mr. Brennan, where you have a situation where a person walks into the room, and, you know, he commits this act, he fights, and there is no blood, there is no evidence, you know, that would indicate any realism to what it is that's being portrayed, you see. How would you, you know, deal with that kind of a predicament, how would you go forward in being able to analyze or come up with a conclusion?

THE COURT: I will sustain that again. Rephrase that.

THE DEFENDANT BALL: Okay. I'm going to go with this question here: How many of you think it was appropriate for the police officers to turn their back on the mayor?

MR. SHORTT: Objection, your Honor.

THE COURT: I will allow it.

THE DEFENDANT BALL: Thank you, your Honor.

Did everyone hear my question? Is there anyone

that is in objection to the fact that the police officers turned their back on the mayor? Is there anyone that was against it, what they did? Just by show of your hands who was it against?

JUROR: Both ways. I think it's disrespectful to the mayor and to the uniform, but at the same time police officers don't have much of an option to voice their concerns because they are in uniform. I come from a similar background. You don't disrespect your superiors, you just -- sometimes you just have to suck it up. It's not great, but if you don't like it, you can put in your resume and find another job, but at the same time you don't have an avenue to voice your concerns, and they have a hard job.

THE DEFENDANT BALL: With that in mind would you hold officers to that high level of responsibility in the case that you had to pass judgment on their actions and conduct, would you hold that same level?

JUROR: I'm torn because I understand both sides of it. It's very difficult for me because of my background. I wouldn't do that personally.

THE DEFENDANT BALL: Not that with the mayor, I'm talking about would you hold another police officer with his conduct on other issue?

JUROR: Yes, I hold it to a higher standard,

absolutely.

THE DEFENDANT BALL: Thank you.

THE COURT: All set?

THE DEFENDANT BALL: Thank you.

THE COURT: Very good. Can we take the jurors out for a few minutes, please. If you will excuse us.

(Jurors exit the courtroom.)

THE COURT: Ready?

MR. SHORTT: Yes.

MR. GIBBONS: Yes.

THE DEFENDANT BALL: Yes.

THE COURT: People, jurors one through nine, challenge for cause?

MR. SHORTT: For cause, I think we discussed this number one, Mr. Ermolov, and number nine, Miss Vo for language reasons.

MR. GIBBONS: Consent.

THE COURT: Mr. Ball?

THE DEFENDANT BALL: Yes, sir, I consent.

THE COURT: Very good.

MR. SHORTT: That would be it for cause one through nine.

THE COURT: Defense?

MR. GIBBONS: Three and four, Mr. Sutton started out he tends to believe the P.O.s, I don't think he ever

really rehabilitated himself. The same thing with Miss Ruggieri about her not taking a negative inference about not testifying.

THE COURT: Mr. Shortt?

MR. SHORTT: Mr. Sutton specifically he said yes I can be fair and treat police officers the same so as to Mr. Sutton I believe he can be fair. As to Miss Ruggieri I don't think Mr. Gibbons gave her the opportunity to clarify her position. It seems like -- she said I will follow the instruction and listen to the Court.

THE COURT: Those challenges are both granted. Is that it for cause?

MR. GIBBONS: Yes.

THE COURT: People, one through nine, perempt?

MR. SHORTT: Number five, Farduchi, six, seven and eight.

THE COURT: So as to juror two, defense?

MR. GIBBONS: No challenges.

THE COURT: So we have four. Jurors ten through 16, People, challenge for cause?

MR. SHORTT: Mr. Clark, Judge, he said even if I prove my case beyond a reasonable doubt, he could not be fair. He also said he could not be fair because the complaining witness was hurt in this case. I believe he expressed doubt whether or not he could be fair if the

defendant did not testify. I can't read my handwriting. I would challenge Mr. Clark.

THE COURT: Do you want to be heard, Mr. Ball or Mr. Gibbons?

MR. GIBBONS: I consent, your Honor.

THE COURT: Challenge granted on consent. Defense, challenge for cause, ten through 16?

MR. GIBBONS: None, your Honor.

THE COURT: People, peremptory challenges ten through 16?

MR. SHORTT: Numbers 15 and 16.

MR. GIBBONS: Can I confer with co-counsel?

(Defendant and counsel confer.)

MR. GIBBONS: We challenge ten through 13, your Honor.

THE COURT: All right. We have one juror.

(Prospective jurors enter the courtroom.)

THE COURT CLERK: Folks, if you hear your name, please remain seated. If you do not hear your name, please gather up all your belongings and exit the courtroom and step outside into the hallway and listen to further instructions from the court officer. Ravi Beepath, please remain seated. Everybody else may exit the courtroom. Thank you very much for your service.

Is the remaining juror acceptable to the People?

MR. SHORTT: Yes.

MR. GIBBONS: Yes.

THE DEFENDANT BALL: Yes.

(Juror sworn.)

THE COURT: Mr. Beepath, I will excuse you for the remaining of the day, and I ask you to come back at 10:00 tomorrow morning. Do not discuss this case with anyone. Do not speak to the attorneys, the parties, the witnesses or anybody connected with this case. Do not go to the scene of the alleged incident. Do not research this case in any way. Should anybody speak to you about this case, report it to the officer immediately. Thank you for today. We will see you 10:00 tomorrow morning. Have a good night.

Fill the box.

THE COURT CLERK: If you hear your name, please take the seat indicated by the court officer.

Seat number one, Debra Moschitto, M-O-S-C-H-I-T-T-O, D-E-B-O-R-A-H. Seat two, Timothy Derum, last name, D-E-R-U-M. Seat number three, Jennifer Williams, common spelling. Seat number four, Dustin Chang, D-U-S-T-I-N, last name, C-H-A-N-G. Seat number five, first name J-A-Y-A-N-T, last name, S-O-O-R-Y-A. Seat six Tyler Ward, T-Y-L-E-R, W-A-R-D. Seat number seven, Dexter Eversley, D-E-X-T-E-R, E-V-E-R-S-L-E-Y. Number eight, Christopher Fernandez, usually spelling. Seat nine, Paula

Gonzalez, usual spelling. Seat ten, Constance Brown, usual spelling. Seat number eleven, Farida Ahmed, F-A-R-I-D-A, last name, A-H-M-E-D. Seat number twelve, Serhat Akkoc, S-E-R-H-A-T, last name, A-K-K-O-C. Seat number 13, first name, Y-A-S-S-I-N-E, last name, S-A-M-O-R-A-H. Seat 14, Gissell Cardenas, G-I-S-S-E-L-L, C-A-R-D-E-N-A-S. Seat 15, Harrykissoon Ramdeo, H-A-R-R-Y-K-I-S-S-O-O-N. Last name, R-A-M-D-E-O. Number 16, James Jaskiewicz, J-A-S-K-I-E-W-I-C-Z.

Does either side need the board?

MR. SHORTT: No, thank you.

MR. GIBBONS: No, thank you, ma'am.

THE COURT: Ladies and gentlemen, once again I will begin by asking a series of questions to the entire panel. You will be the sole judges of the facts. I am the sole judge of the law, and you must apply the law as I give it to you whether or not you agree with it. Can everybody promise to do that?

THE JURORS: Yes.

THE COURT: The defendants are presumed innocent, they are required to prove nothing. The burden of proof is on the District Attorney. He must prove beyond a reasonable doubt that the defendants committed the crimes they are charged with. Can everybody promise to hold the District Attorney to that burden of proof beyond a

reasonable doubt?

THE JURORS: Yes.

THE COURT: I said beyond a reasonable doubt, I did not say beyond all doubt, that is virtually impossible. Can all of you promise me that you will not hold the District Attorney to a burden higher than beyond a reasonable doubt?

THE JURORS: Yes.

THE COURT: And conversely, can everybody promise that you will not hold the District Attorney to a lesser burden than beyond a reasonable doubt?

THE JURORS: Yes.

THE COURT: The defendants do not have to testify, that is their right in an American courtroom, and the law is that you are not permitted to draw any adverse inference from that decision should they choose not to testify. Can all of you promise to follow that law?

THE JURORS: Yes.

THE COURT: Finally, can everybody promise to keep an open mind, not to decide this case until you have heard all the evidence, the arguments of the attorneys and my instructions to you on the law?

JURORS: Yes.

THE COURT: Very good. Again, if I mispronounce your name, please call me on it.

JUROR: Moschitto.

THE COURT: Thank you. Miss Moschitto, where do you live?

JUROR: Howard Beach.

THE COURT: How far did you go in school?

JUROR: Associates degree.

THE COURT: What do you do for a living?

JUROR: Freelance court reporter.

THE COURT: How is she doing?

JUROR: She is good.

THE COURT: Single, married, widow, divorced?

JUROR: Married.

THE COURT: What does your husband do?

JUROR: He is an insurance broker, health insurance.

THE COURT: Kids?

JUROR: Two kids, one is older working as a lab tech.

THE COURT: Have you ever served as a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the

victim of a crime?

JUROR: Yes, I was mugged on the train, and I had my car robbed.

THE COURT: All right. Can you take those incidents, put them aside, judge the facts in this case fairly and give both sides a fair shake?

JUROR: Yes.

THE COURT: Good. Do you have friends or family in law enforcement?

JUROR: Yes.

THE COURT: Tell us about that.

JUROR: My brother is a cop.

THE COURT: Okay. NYPD?

JUROR: Not anymore, he is retired from NYPD. He is in Monroe.

THE COURT: Same question you heard all day, there will be two cops that will testify in this case, two out of 35,000. Can you give their testimony the same evaluation that you will give anyone else's?

JUROR: Yes.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Thank you very much.

Mr. Derum, where do you live?

JUROR: Bayside.

THE COURT: How far did you go in school?

JUROR: College.

THE COURT: What do you do for a living?

JUROR: Retired from New York State tax department civil enforcement.

THE COURT: Single, married, widowed, divorced?

JUROR: Married.

THE COURT: What does your wife do?

JUROR: Retired from Wall Street.

THE COURT: Kids?

JUROR: Two cats.

THE COURT: Cats? Are they working?

JUROR: No.

THE COURT: Okay. Have you ever been a juror before?

JUROR: Federal Grand Jury in Brooklyn.

THE COURT: All right.

JUROR: 18 months.

THE COURT: You appreciate that a Grand Jury is very different than what we call a petit jury which is what we are selecting here? Here you have a trial, you have defense lawyers, totally different thing?

JUROR: Yes.

THE COURT: All right.

JUROR: Yes.

THE COURT: Okay. Anything about that experience that will cause you not to be a fair juror in this case?

JUROR: No.

THE COURT: All right. Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: How about the victim of a crime?

JUROR: Prior to our marriage, my wife's apartment was robbed.

THE COURT: Same question, can you put that aside?

JUROR: Yes.

THE COURT: And be fair?

JUROR: Yes.

THE COURT: Friends and family in law enforcement?

JUROR: Based on my work with the tax department, we came in contact with --

THE COURT: Some of the men and women are peace officers or police officers in that agency.

JUROR: Not the civil enforcement but whatever, our police officers.

THE COURT: All right. But you know where I'm going with this, can you evaluate the two cops that Mr. Shortt is going to call fairly?

JUROR: Yes.

THE COURT: You can be fair, sir?

JUROR: Absolutely.

THE COURT: Good. Thank you very much. Miss Williams, how are you?

JUROR: All right.

THE COURT: Where do you live?

JUROR: Jamaica.

THE COURT: How far did you go in school?

JUROR: College.

THE COURT: What do you do for a living?

JUROR: 9-1-1 operator.

THE COURT: So you work with lots of cops?

JUROR: Yes, sir.

THE COURT: Can you evaluate the testimony of a police officer in this case fairly?

JUROR: You want yes or no answers?

THE COURT: There is no wrong answer.

JUROR: Yes.

THE COURT: All right. Single, married, widowed, divorced?

JUROR: Single.

THE COURT: Have you ever served as a juror before?

JUROR: No.

THE COURT: You or a loved one ever been convicted of a crime?

JUROR: Yes.

THE COURT: Tell us about that.

JUROR: I don't know the details of it.

THE COURT: Will it impact you one way or another in this case? That's the bottom line.

JUROR: Probably yes.

THE COURT: It probably will impact you or it won't?

JUROR: No, it won't.

THE COURT: How about the victim of a crime?

JUROR: Yes.

THE COURT: Tell us about that.

JUROR: My sister was mugged and punched in the face, my cousin was mugged, shot and killed, and my mother's house was robbed.

THE COURT: Well --

JUROR: And they never caught the people who did any of this.

THE COURT: The homicide was in Queens County?

JUROR: No, it was in Maryland -- Pennsylvania, I'm sorry.

THE COURT: All right. Can you put those incidents aside and evaluate the facts and the witnesses in this case fairly?

JUROR: No.

THE COURT: No, okay. That's a fair answer. Mr. Chang, where do you live, sir?

JUROR: Philadelphia.

THE COURT: But are a resident of Queens County?

JUROR: Yes, resident of Long Island City.

THE COURT: Are you a full-time student in Philadelphia?

JUROR: Yes, I am.

THE COURT: All right. But your residency is definitely in Queens?

JUROR: Yes.

THE COURT: All right. Do you vote in Queens?

JUROR: I do, yes, sir.

THE COURT: All right. Because you have to be a Queens resident to serve, that's why I'm pressing the question. All right. Are you in college how far?

JUROR: Pursuing a masters degree.

THE COURT: Do you work as well?

JUROR: I did before leaving for school.

THE COURT: What did you do?

JUROR: I worked in finance.

THE COURT: Single, married, widowed, divorced?

JUROR: Single.

THE COURT: Ever served as a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Victim of a crime?

JUROR: No.

THE COURT: Do you have friends or family in law enforcement?

JUROR: No, I do not.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Thank you very much.

Mr. Soorya, where do you live?

JUROR: Flushing.

THE COURT: How far did you go in school?

JUROR: I have masters.

THE COURT: What do you do for a living?

JUROR: I'm in operation risk management for Bank of America.

THE COURT: Single, married, widowed, divorced?

JUROR: Married.

THE COURT: What does your wife do?

JUROR: She is a homemaker.

THE COURT: Do you have kids?

JUROR: Yes.

THE COURT: Big or little ones?

JUROR: One is big, the other is ready for college.

THE COURT: Have you ever been a juror before?

JUROR: Yes, criminal case 2006.

THE COURT: Anything about that experience that would cause you not to be a fair juror in this case?

JUROR: No.

THE COURT: Good. Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you ora loved one ever been the victim of a crime?

JUROR: Yes.

THE COURT: Tell us about that.

JUROR: Our house was broken into many years ago.

THE COURT: Didn't catch that.

JUROR: Our house broken into.

THE COURT: Okay. Anything about that experience that would cause you not to be fair in this case?

JUROR: No.

THE COURT: Do you have friends or family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Good. Thank you very much. Mr. Ward, where do you live, sir?

JUROR: Astoria.

THE COURT: How far did you go in school?

JUROR: College, restaurant consulting.

THE COURT: Single, married, widowed, divorced?

JUROR: Single.

THE COURT: Ever served as a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Victim?

JUROR: Yes.

THE COURT: Tell us about that.

JUROR: I was assaulted two and a half years ago.

THE COURT: Anything about that experience that would cause you not to be a fair juror in this case?

JUROR: No.

THE COURT: Can you give both sides a fair shake?

JUROR: Yes.

THE COURT: Friends and family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Thank you. Mr. Eversley, how are you?

JUROR: Not bad.

THE COURT: Where do you live?

JUROR: Corona.

THE COURT: How far in school?

JUROR: College surveyor.

THE COURT: Single, married, widowed, divorced?

JUROR: Married.

THE COURT: What do you do for a living?

JUROR: Stay home mom, two big ones, one small one.

THE COURT: Tell us about the big ones.

JUROR: One is a saleswoman, one is a nurse.

THE COURT: Ever been a juror before?

JUROR: No, sir.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No, sir.

THE COURT: Victim of a crime?

JUROR: Yes, sir. I was mugged, my second daughter was mugged on the way from school.

THE COURT: Can you put that aside and evaluate the facts in this case fairly?

JUROR: I think so.

THE COURT: Good. Do you have friends or family in law enforcement?

JUROR: Yes, sir.

THE COURT: Tell us about that.

JUROR: My cousin is a police officer.

THE COURT: Same question, can you evaluate the cop testimony in this case fairly?

JUROR: Yes, sir.

THE COURT: You can be fair?

JUROR: Yes, sir.

THE COURT: Great. Thank you very much. Mr. Fernandez, how are you?

JUROR: Okay.

THE COURT: Where do you live?

JUROR: Woodside.

THE COURT: How far did you go in school?

JUROR: Currently in college.

THE COURT: Are you working as well?

JUROR: No, full-time college.

THE COURT: Single, married, widowed, divorced?

JUROR: Single.

THE COURT: Ever served as a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the

victim of a crime?

JUROR: No.

THE COURT: Do you have friends or family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Thank you very much.

Miss Gonzalez, how are you?

JUROR: Good and you?

THE COURT: Good. Where do you live?

JUROR: Ozone Park.

THE COURT: How far did you go in school?

JUROR: I'm in college right now.

THE COURT: Full-time?

JUROR: Yes, full-time.

THE COURT: Are you working at all?

JUROR: Yes, I work at a gym.

THE COURT: Single, married, widowed, divorced?

JUROR: Single.

THE COURT: Ever served as a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: No.

THE COURT: Do you have friends or family in law enforcement?

JUROR: Yes, a lot because I go to a criminal justice school.

THE COURT: John Jay?

JUROR: Right.

THE COURT: Can you evaluate the testimony of the police officers in this case fairly?

JUROR: I can try my best, yes.

THE COURT: Well, you know they hate that word. The reason they hate it is because this is a very important matter for them, and they need a commitment not just from you, but from everybody to be fair and to follow the law as I give it to you. So I will press the question, can you evaluate the testimony of a police officer fairly?

JUROR: Yes.

THE COURT: Good. Miss Brown, how are you?

JUROR: Fine, thank you.

THE COURT: Where do you live, ma'am?

JUROR: Jamaica.

THE COURT: How far did you go in school?

JUROR: Graduate school. I completed grad school.

THE COURT: What do you do for a living?

JUROR: Educational director in an early childhood education center.

THE COURT: Single, married, widowed, divorced?

JUROR: Widowed, he was an electrician.

THE COURT: Do you have kids?

JUROR: One son.

THE COURT: Big?

JUROR: Old, yes.

THE COURT: Old?

JUROR: Yes.

THE COURT: Old? I'm oldest not as old as me.

JUROR: 47.

THE COURT: Okay. What is he doing?

JUROR: He just retired last month from Corrections.

THE COURT: Same question I asked all day, can you evaluate the testimony of police officers in this case fairly?

JUROR: Absolutely.

THE COURT: Okay. Very good. Have you ever been a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: No.

THE COURT: You have lots of friends and family in law enforcement I would think?

JUROR: Plethora.

THE COURT: Can you be fair?

JUROR: Absolutely.

THE COURT: Thank you very much.

Miss Ahmed, how you are you?

JUROR: Fine, thank you.

THE COURT: Where do you live?

JUROR: Jamaica, Queens.

THE COURT: How far did you go in school?

JUROR: College.

THE COURT: What do you for a living?

JUROR: Special ed teaching assistant.

THE COURT: Single, married, widowed, divorced?

JUROR: Married.

THE COURT: What does your husband do?

JUROR: He works in the Department of Correction.

THE COURT: Is he a correction officer?

JUROR: No, civilian.

THE COURT: Same question I have asked all day,

can you evaluate the testimony of the two cops that are going to testify in this case fairly?

JUROR: Yes.

THE COURT: Good. Have you ever been a juror before?

JUROR: No.

THE COURT: Did I ask you whether you had children?

JUROR: No, you skipped that. I have one son and one daughter.

THE COURT: Are they old enough to work?

JUROR: One is ten going in fifth grade, and one is four going into pre-K.

THE COURT: Have you ever been a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: No.

THE COURT: You have lots of friends in law enforcement, right, you can be fair, ma'am?

JUROR: Yes.

THE COURT: Good. Thank you very much.

Mr. Akkoc, where do you live?

JUROR: Woodside.

THE COURT: How far did you go in school?

JUROR: I graduated from college.

THE COURT: What do you do for a living?

JUROR: I'm an accountant and single.

THE COURT: Have you ever served as a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Victim?

JUROR: Yes, unfair parking ticket by police officer.

THE COURT: Unfair parking ticket from a police officer?

JUROR: I can explain what happened.

THE COURT: Okay.

JUROR: Me and my girlfriend parked at the grocery store so we got the ticket, it was like 9:40 so we just got it for 10 A.M., we get in the car, we went and shopped and we come out, I saw the cop was writing me a ticket and I went there, I was like what's going on, I was like it's past 10 A.M. I look at my watch it's 9:58 it's not past ten

yet, then he looked at his watch all right, yeah, you are right, then he didn't give me the ticket, but he started writing it so he just scrambling it and put it in his pocket. I was like, okay, so we drive away, and two weeks later I received a ticket, and I paid so I believe that's a crime, stealing.

THE COURT: There is one police officer in this town that you hate is that a fair statement?

JUROR: Oh, I have had bad experience with cops in the United States and in my hometown. I am from Turkey.

THE COURT: Okay. Do you think that you can evaluate the testimony of the police officers?

JUROR: No, because I don't believe them, I think they are lying.

THE COURT: Okay. All 35,000 of them?

JUROR: No, I don't want to generalize but --

THE COURT: All right. I understand. Thank you very much.

JUROR: There were people in the first jury, the seconds have family or friends of cops they said I said tends to believe the cops, I don't tend to believe the cops.

THE COURT: Fair enough. We have been saying all day there are no wrong answers, and that's an honest answer I appreciate that.

Mr. Samovah, where do you live?

JUROR: East Elmhurst.

THE COURT: How far did you go in school?

JUROR: College.

THE COURT: What do you do for a living?

JUROR: Letter carrier, assistant mailman, not regular mailman.

THE COURT: Where do you deliver the mail?

JUROR: My primary station is Jackson Heights, but I am assigned to other station Corona, Elmhurst, Woodside, East Elmhurst.

THE COURT: There is no potential in the next couple of days that you will be assigned to deliver mail in Corona?

JUROR: Probably packages on Sunday.

THE COURT: In Corona?

JUROR: Yeah, I don't know, just Saturday the day before we assigned to a station.

THE COURT: So you don't know whether you will be assigned?

JUROR: Not yet.

THE COURT: What happens if you become a juror, and you tell your boss I can't work that area, will he assign you somewhere else?

JUROR: I don't know.

THE COURT: Single, married, widowed, divorced?

JUROR: Married, she is a bartender.

THE COURT: Kids?

JUROR: Not yet.

THE COURT: Ever served as a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: No.

THE COURT: Do you have friends or family in law enforcement?

JUROR: Yes.

THE COURT: Tell us about that?

JUROR: My best friend is NYPD, his wife is NYPD, too, and I know a lot of police officers.

THE COURT: So you know what the next question is. Can you evaluate the testimony of the two cops in this case fairly?

JUROR: I probably know them, so I don't know. I don't know the names, but I deliver mail for the 92 street precinct, so I'm sure that they belong to that station.

THE COURT: All right. Miss Cardenas, where do

you live?

JUROR: Corona.

THE COURT: You know what the address is in this area, 105?

MR. SHORTT: 105 Street and Northern Boulevard, your Honor.

THE COURT: You know where that is I'm sure?

JUROR: Yes.

THE COURT: If you are selected as a juror, you cannot go to that area. Can you obey that directive?

JUROR: Yes.

THE COURT: Very good. How far did you go in school?

JUROR: I'm in college right now.

THE COURT: Are you working as well?

JUROR: Yes.

THE COURT: What do you do?

JUROR: Library office.

THE COURT: Single, married, widowed, divorced?

JUROR: Single.

THE COURT: Have you ever served as a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: You or a loved one ever been the victim of a crime?

JUROR: No.

THE COURT: Do you have friends and family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Thank you very much. Mr. Ramdeo, where do you live?

JUROR: Ridgewood.

THE COURT: How far did you go in school?

JUROR: High school.

THE COURT: What do you do for a living?

JUROR: Building maintenance.

THE COURT: Single, married, widowed, divorced?

JUROR: Married.

THE COURT: What does your wife do?

JUROR: Home health aide.

THE COURT: Do you have kids?

JUROR: One daughter.

THE COURT: Big or little?

JUROR: Big.

THE COURT: What does she do?

Case 1:19-cv-05310-ERK-LB Document 9-2 Filed 12/13/19 Page 359 of 907 PageID #: 722

JUROR: Citibank.

THE COURT: Have you ever served as a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: No.

THE COURT: Do you have friends or family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Yes, your Honor.

THE COURT: Mr. Jaskiewicz, where do you live?

JUROR: Rockaway.

THE COURT: How far did you go in school?

JUROR: High school.

THE COURT: What do you do for a living?

JUROR: Operating engineer.

THE COURT: Single, married, widowed, divorced?

JUROR: Married.

THE COURT: What does your wife do?

JUROR: She is in advertising.

THE COURT: Kids?

JUROR: Two.

THE COURT: Big ones, little ones?

JUROR: Older.

THE COURT: What do they do?

JUROR: One just graduated college and is travelling, the other one is a tattoo artist.

THE COURT: All right. Have you ever served as a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: You or a loved one ever been the victim of a crime?

JUROR: No.

THE COURT: Do you have friends or family in law enforcement?

JUROR: I have relatives and a lot of friends who are cops.

THE COURT: Same question, can you evaluate the testimony of the cops in this case fairly?

JUROR: If everything else is equal, I would always come down on the side of the cops.

THE COURT: Do you think you can be a fair juror

in this case because of that or not?

JUROR: Yes, I do.

THE COURT: Thank you very much. Can we do this in ten minutes, gentlemen? We are in the third round. We have all heard it all day long. I'm glad you agree.

Mr. Shortt, I'm glad you agree.

MR. SHORTT: Of course, your Honor. This is number three, I know you are bored by now but hopefully only a little longer. I want to talk to you about some of the small issues. As you have all seen, Mr. Ball has elected to represent himself.

Mr. Moschitto, do you understand that's Mr. Ball's choice that he represent himself?

JUROR: Yes.

MR. SHORTT: Do you understand when he sits at that table just like me or Mr. Gibbons, he is bound by the same rules.

JUROR: Yes.

MR. SHORTT: That's again his choice.

JUROR: Yes.

MR. SHORTT: Can you promise me that you will not give him any benefit of the doubt because he has elected to exercise his right.

JUROR: Yes.

MR. SHORTT: Anyone that feels sympathy for

Mr. Ball because he decided to do this or think it's not fair because he is not trained as an attorney.

JUROR: I feel sympathy. I don't know if I feel like it's unfair because he elected to make that choice, but I can't disguise sympathy.

MR. SHORTT: Okay. Is that something that would factor into your decision making process.

JUROR: No.

MR. SHORTT: Anyone else here who thinks that may factor into your decision making process or gives you any feelings in general? Thank you very much.

As I told you ladies and gentlemen, you will hear from several police officers in this case. Anybody here besides Mr. Akkoc that had a bad experience with police officers? I have gotten tickets I don't like, not as bad as yours, I didn't have to pay for it, anybody had a bad experience with the police? Anybody?

Does anybody have strong feelings or disapprove of the fact that the police officers turned their back on Mayor DeBlasio? You thought that was inappropriate by show of hands? Miss Brown?

JUROR: Again it's a show of disrespect for his position, and for the uniform, and they were at someone's funeral, so it's just disrespect.

MR. SHORTT: I appreciate that. Mr. Jaskiewicz,

what were your feelings on that.

JUROR: I don't think they should have done it at the funeral. When they did it at the hospital I was fine.

MR. SHORTT: Okay. Thank you. You will hear from an eyewitness in this case, and I want to hear from you what you would like to hear in terms of believing an eyewitness.

Mr. Mr. Derum, you have heard me say before I'm sure it's round number three, quality matters more than quantity; would you agree with that?

JUROR: Yes.

MR. SHORTT: Why would you agree with that.

JUROR: As long as you are presenting the facts, whatever the facts may be, you don't have to have a whole lot of them as long as there is a straight path to whatever you are trying to prove to us.

MR. SHORTT: Okay. Could that path be through just one particular witness if you believe that witness.

JUROR: Sure.

MR. SHORTT: Mr. Soorya, what about you, if I called ten witnesses here, all of whom were on that street but were not paying attention, either on the phones talking to other people, weren't paying attention to the event, would that help you make a decision about what happened on that street if they couldn't give you any information.

JUROR: Any information I question if you are conveying to me they were not paying attention, and I know they conveyed this to me they were not paying attention, that would be a factor?

MR. SHORTT: How about some people give you a lot of information, but you did not believe, would that happen help you.

JUROR: It's credibility, the numbers, no.

MR. SHORTT: If I brought you one witness who was paying attention before, during and after the crime, and was able to stand up not only to my questioning but the questioning of defense counsel and Mr. Ball, and at the end of that you believed him, would you have any hesitation of convicting the defendant based on his testimony alone?

JUROR: I don't know the side of the law, just one factor that needs to be considered in that?

MR. SHORTT: If you believed an eyewitness or just listening to the witness, what are some of the things you would want to consider.

JUROR: Basically the credibility of the witness.

MR. SHORTT: How would you test that.

JUROR: The credibility of the witness, basically how the witness stands to cross-examination, and do the things add up what the witness is conveying, is he contradicting himself during cross-examination, I would

consider those factors.

MR. SHORTT: Thank you. Mr. Eversley, what would you consider in determining the credibility of an eyewitness.

JUROR: Like I said the truth don't ever change, it may differ but it won't change. On cross-examination he might answer the question different but it all boils down to one point.

MR. SHORTT: Thank you. Mr. Fernandez, would you agree that quality matters over quantity.

JUROR: Yeah.

MR. SHORTT: You had to think about that. Anything that troubles you about that.

JUROR: No, I was just processing the question.

MR. SHORTT: Okay. What are some of the things that you would look for in evaluating whether or not you believe a witness.

JUROR: I'm not sure. I need evidence on that, like I need to see.

MR. SHORTT: Do you watch CSI, Law and Order, are you a fan? Raise your hand. I'm as guilty as the next person, okay, I watch them too. I have them programmed on my TiVo.

Miss Gonzalez, I will tell you right now, you will not hear about fingerprints or DNA or any of that, no video

camera.

JUROR: Of course.

MR. SHORTT: Despite that do you still think you can view the evidence in this case from a witness I bring in front of you just based on eyewitness testimony, would that be enough for you or would you need more.

JUROR: Whatever the eyewitness says depending on how close they were, the lighting, how it was mentioned before that plays a big role in the eyewitness testimony, so I believe whatever if it sounds like it's very possible, if there was a lot of lighting, if they were there the entire time, you know, during and after, then that would play a big role in my decision.

MR. SHORTT: Miss Brown, what do you think about that?

JUROR: In addition to their testimony, you would have to put that in conjunction with everything else that has been presented, and it's basically the scene, and what happened, does it make sense, is it logical, and did they really have a clear picture of what was going on, because sometimes we see things that we are interpreting as something else, so I would have to not base solely on what that eyewitness is saying, but what is surrounding and what compliments that testimony.

MR. SHORTT: If the case depended on the accuracy

of one eyewitness, you are saying you wouldn't be able to convict somebody; is that right.

JUROR: I'm not saying that.

MR. SHORTT: Tell me a little more.

JUROR: Like you said the circumstances, the type of pressure that particular person is under, and how they explain what's occurring, and is it consistent once it's being repeated, and all of that comes into play.

MR. SHORTT: You bring up an interesting point about pressure. Mr. Gibbons talked about flipping over the table, I hope he does not do it. He keeps talking about it.

Mr. Ramdeo, would you agree when adrenaline is pumping, sometimes your ability to perceive and remember things is actually heightened? If it's an excited situation the first time you are experiencing something, do you remember things more clearly?

JUROR: No.

MR. SHORTT: Anybody here ever been in a car accident? Do you remember that day.

JUROR: Yes.

MR. SHORTT: Will you ever forget that day?

JUROR: No.

MR. SHORTT: Why not.

JUROR: It was scary, different and unexpected.

MR. SHORTT: Miss Williams, you were the victim of a mugging?

JUROR: No, my sister.

MR. SHORTT: I'm sorry.

Mr. Eversley, you were mugged. Will you ever forget that?

JUROR: No, sir.

MR. SHORTT: What was your attention like when that was going on? Where were you focused.

JUROR: The person right on the side of me and I was focused on the front. I will never forget.

MR. SHORTT: Would you agree pressure can actually heighten your awareness.

JUROR: Speak for me I always try to be aware of my surroundings.

THE COURT: You have about a minute.

JUROR: It would not affect me.

MR. SHORTT: Ladies and gentlemen, I will ask for the same promise, we have had a few laughs and talked about some serious things, but if I prove my case at the end of this trial, if you believe the witnesses that I put forward, if you believe beyond a reasonable doubt the defendant has committed the crime as charged in the indictment, anybody here for reasons outside the evidence for personal, religious, any reason that you just know it's

not within you to do this, tell me now. But if I prove my case beyond a reasonable doubt, anybody here that would hesitate to strip these defendants of their presumption of innocence and convict them?

JUROR: I have something to say. I don't know the law, I'm not a lawyer, and either the defendant's lawyer or you can influence my decision and because of that, I don't want to come up with guilty or not guilty for these two gentlemen.

MR. SHORTT: I appreciate that.

JUROR: I don't want to take that responsibility.

MR. SHORTT: I appreciate that. Thank you. Anybody else? Mr. Fernandez.

JUROR: I feel the same way.

MR. SHORTT: Thank you. Anyone else? Thank you, ladies and gentlemen.

THE COURT: Mr. Gibbons?

MR. GIBBONS: Just one second?

THE COURT: Sure.

(Whereupon, there was a brief pause in the proceedings.)

MR. GIBBONS: Good afternoon, everybody.

THE COURT: Ten minutes, sir.

MR. GIBBONS: Thank you again for your patience putting up with this. The same thank yous and apologies

for me prying into your lives. I wanted to pick up on something ADA Shortt said as I have been doing.

Mr. Eversley, he asked you when you were robbed did it kind of heighten your awareness.

JUROR: Yes.

MR. GIBBONS: Would you agree when you were being robbed, were you thinking the guy is five nine, brown hair and tan slacks and red shirt, or, gee, hope I don't get killed or what's going on or were you kind of blanking?

JUROR: I was not afraid.

MR. GIBBONS: You were not?

JUROR: No, sir.

MR. GIBBONS: Were you making a mental inventory about your surroundings?

JUROR: Yes, sir.

MR. GIBBONS: Would you say that's common, or is it possible someone in a similar situation might totally blank out?

JUROR: I can only speak for myself.

MR. GIBBONS: Would it be as possible somebody else might not be as calm as you?

JUROR: Probably.

MR. GIBBONS: Would it possible the person was not taking inventory or not 100 percent accurate in the inventor because of the situation?

JUROR: Probably, but I can only speak for me.

MR. GIBBONS: Mr. Ward, when the car accident happened, it was a terrifying thing. Did you immediately make note it was a blue Pinto, the street light was on and a red light and stop sign and pot hole; did you gather all that information?

JUROR: Not those details.

MR. GIBBONS: So there were some things that you latched onto in the accident?

JUROR: Um-hum.

MR. GIBBONS: But you did not take full inventory?

JUROR: No.

MR. GIBBONS: It's possible you might have been mistaken in the chaos, correct?

JUROR: I suppose so. Also those kind of things don't seem to matter that much as opposed to what was right in front of me.

MR. GIBBONS: That was a decision that you made as to what mattered?

JUROR: Yes.

MR. GIBBONS: In that split second you picked up on a couple of things?

JUROR: Yes.

MR. GIBBONS: There could have been 500 other things some might have been unimportant, some could have

Case 1:19-cv-05310-ERK-LB Document 9-2 Filed 12/13/19 Page 372 of 907 PageID #: 735

been important?

JUROR: Um-hum.

MR. GIBBONS: Mr. Soorya, Mr. Shortt asked you about what would you want to hear from an eyewitness and how you would determine his credibility, and you were very strong about that on the credibility of the witness. One of the things you said was during cross-examination would he be contradicting himself, correct?

JUROR: What?

MR. GIBBONS: If the witness would contradict that would weigh into your judgment of his credibility.

JUROR: Correct, sure.

MR. GIBBONS: It could be that he remains constant saying the same thing from the first time it happened to when he testified again here at trial. But we talked about this, the fact that he is certain about his story, doesn't necessarily mean that he is accurate about his story, correct? He could have been incorrect as we say, ab initio, from the first instant, he was incorrect. He said the guy was seven foot two, he was four foot nine, but he said seven foot two the day the crime happened. He said seven foot two when he spoke in the Grand Jury and to the police officers and to Mr. Shortt right, then you see the defendant and he is four foot nine, so he remained constant in his story, but he was inaccurate.

JUROR: When I say credibility, I did not mean constancy.

MR. GIBBONS: I understand, but that's part of it how you determine a person's credibility, again not credibility whether he is telling the truth necessarily because he could think in his head that this is the truth, this is what my perception was but he could be wrong.

JUROR: I meant primarily credibility and cross-examination so that's part, yes.

MR. GIBBONS: You understand my point, you can be certain about something and be incorrect?

JUROR: Yes.

MR. GIBBONS: Mr. Chang, do you agree?

JUROR: Certainly, I always continued to believe someone is wrong or I don't trust them that they are lying.

MR. GIBBONS: You default I don't believe you.

JUROR: I do, that's my nature and my nature of my job I always assume someone is wrong unless proved otherwise.

MR. GIBBONS: I touched on that. Miss Brown, you see someone you think you know, you tap them on the shoulder, hey, Sylvia, how are you doing, it's me and they don't know you, and you realize you don't know them. That ever happen to you?

JUROR: Quite a few times.

MR. GIBBONS: Universal thing, you made a mistake, I could have sworn it was that person, it's not. That could happen. Okay.

My client's right to remain silent. Again I know I said it, but it bears repeating because it is so important. That is a fundamental constitutional right that each and every one of us as citizens of the United States has. My client may employ that right.

Miss Moschitto, would that bother you if we go through this case and my client does not testify on his behalf?

JUROR: It wouldn't bother me, no.

MR. GIBBONS: Would you draw any negative inference from that?

JUROR: No.

MR. GIBBONS: Would you think that he is hiding something, he must be guilty?

JUROR: I always think that way, but I would not do that. I feel like if you are not guilty, that you would say something.

MR. GIBBONS: But you would respect his right not to testify?

JUROR: Yes.

MR. GIBBONS: The fact that he might not will not influence you negatively?

JUROR: No.

MR. GIBBONS: Mr. Derum, any problem with that?

JUROR: No, no problem.

MR. GIBBONS: Anybody have an issue if my client decided not to take the stand, and you did not hear his side of the story, Mr. Chang?

JUROR: I would do my best to ignore it, it would give me a little pause, and I would think about that. A lot of things when I was working was what was not said. It's hard for me to separate that especially if there is something that should have been said that is not said what is the implication so it would concern me if someone is innocent, and they don't try to back up their story.

MR. GIBBONS: Miss Williams, do you feel that way?

JUROR: I actual agree what you said, maybe he did not want to incriminate himself so you are being his voice displaying the facts.

MR. GIBBONS: Okay. Anybody else have a problem besides, Mr. Chang? I appreciate the honesty.

How am I doing, Judge?

THE COURT: You have a few minutes.

MR. GIBBONS: One of the things that Mr. Shortt talked about again in deciding whether or not someone is guilty is where a person was caught, and I had asked it's possible even if they are caught at the scene that maybe

the wrong person was stopped.

Is that possible, Mr. Ramdeo, possible someone was caught close to the scene, and they caught the wrong person?

JUROR: Yes, it could be possible.

MR. GIBBONS: This is a big city, this is New York City. People are out on the street all the time. There is only a limited amount of things that you can wear. If a description is vague, black jacket, grayish hair, or a blacktop and grayish hair or slightly balding, that could be you or it could be you, correct?

So it's possible that there is a description that might kind of fit but still be the wrong person; is that correct? Can we agree to that? Can you all promise me that you will listen to the evidence and treat each of these clients separately, that you will apply the facts to each one individually and not lump them together, Miss Gonzalez, can you promise me to do that?

JUROR: Yes.

MR. GIBBONS: You will separate the evidence for both of the defendants?

JUROR: Yes.

MR. GIBBONS: Mr. Fernandez, you can promise me the same?

JUROR: Yeah.

MR. GIBBONS: You are a little equivocal there on me? Are you having an issue with being on a jury to start with sitting in judgment with someone? It seems like you have been hesitant throughout this.

JUROR: No, I have no problem.

MR. GIBBONS: I don't want to put you on the spot but I need to know are you okay listening to the evidence and making a decision?

JUROR: Yes.

MR. GIBBONS: Can everybody promise me to hold the District Attorney to his burden of proof beyond a reasonable doubt, and you all recognize my client and Mr. Ball as they sit there now are presumed innocent, so if Mr. Shortt gave you no evidence, what would your verdict have to be, Mr. Ward?

JUROR: Not guilty.

MR. GIBBONS: Miss Ahmed, what would your verdict have to be if you didn't hear any evidence from the District Attorney?

JUROR: Actually, the things I understand, but I cannot explain you perfectly.

MR. GIBBONS: All right. No problem.

Miss Cardenas, if you heard no evidence from the District Attorney, what would your verdict have to be?

JUROR: Not guilty.

MR. GIBBONS: All right. He has to prove each and every element. I talked about the tea. If he doesn't give you water, is it tea? Every element, the tea bag, the water, the cup, slice of lemon. All of that, each and every element beyond a reasonable doubt. Identity is also something that needs to be proven, correct, do we agree, Mr. Jaskiewicz?

JUROR: Yes.

MR. GIBBONS: The last thing, 5:30 you have been on trial three weeks, it's Friday you all want to go home. Mr. Ward, you are the one hold out. Come on, come on, change your vote, let's get out of there.

JUROR: If that's all that's there, I would not change my vote if they convince me with facts but not just it's 5:30 and we should leave.

MR. GIBBONS: You can change your mind if you are swayed by the facts but do you promise me if it's time to go, you will stick to your guns?

THE JURORS: Yes.

THE COURT: Thank you.

Mr. Ball, you have ten minutes, sir.

THE DEFENDANT BALL: Thank you, your Honor.

Hello, again, ladies and gentlemen of the jury, I guess you heard me try to articulate in my own little way how is it that I would like to know if the people that is

going to represent the jury pool will take in consideration like in the same vein that people look forward to the testimonies of the defendants. You know, I would like for you to also keep in mind that there is a requirement that I would like to see a challenge in the way of holding the District Attorney and the people that testify against us, hold them accountable for what it is that they say has happened, and to bring forth the evidence, you know, that would indicate a guilt of a crime being committed.

You know, that's my main concern, you know, in the way of like the sequence of events, time factors. I heard the District Attorney say, you that you know in this case you won't see fingerprints and things of that nature which I think, you know, I would like to know how do you guys feel, you know, knowing that the technology that we have today is easy to get fingerprints, you know, how do you feel about the fact that, you know, that he is going to bring forth evidence and don't, what you call, represent the evidence with fingerprints, you know? I apologize.

Is that Eversley, Mr. Eversley?

JUROR: Yes, sir.

THE DEFENDANT BALL: How would you feel about that knowing that today with the technology that's available to have the Assistant District Attorney allow him to bring forth evidence where there is no fingerprints?

JUROR: Once it's consists of evidence, it's supposed to have everything with technology or without technology because we have been doing it for the past years, you are supposed to have everything, that's why it's called evidence.

THE DEFENDANT BALL: Okay. Mr. Ward, how would you feel in the case that they brought forth evidence with no DNA?

JUROR: We managed fine without -- maybe not fine, but we managed without DNA evidence for a long time. It depends on what they bring, I guess is my honest answer.

THE DEFENDANT BALL: Even in the case if there was a violent issue where there was a lot of blood?

JUROR: Yes, I think so.

THE DEFENDANT BALL: You would hold them responsible?

JUROR: No, it would depend on the evidence brought, and I wouldn't hold the lack of DNA against him if the rest of the evidence proved it beyond a reasonable doubt.

THE DEFENDANT BALL: Okay. How about in the case that the testimony doesn't coincide with the physical evidence, would you rule in that case?

JUROR: If the physical evidence seems certain, that would make me discount the testimony.

THE DEFENDANT BALL: Okay. I apologize. Is it Jaskiewicz?

JUROR: Yes.

THE DEFENDANT BALL: I apologize, what is it that you said you do?

JUROR: Operating engineer.

THE DEFENDANT BALL: Okay. And you know, my concern is this, you said that you know police officers; is that correct?

JUROR: Yes, I do.

THE DEFENDANT BALL: Do you hold police officers at a high standard, do you have like a high expectation of police officers in their diets, you know, in other words, you know, if you seen a police officer negligent in his duties, would you call them on that?

JUROR: Would I actually call up their boss? No.

THE DEFENDANT BALL: Would you hold him accountable for his negligence in the case that you seen him or would you say, you know, cover for him? Sometimes we have a tendency if we see negligence, we have an alliance to things sometimes.

JUROR: I'm not going to cover for him.

THE DEFENDANT BALL: Would you overlook it or would you call a person on it if you see negligence?

JUROR: I will not overlook it, but what would you

like me to do? That's the part I don't understand what you are asking me.

THE DEFENDANT BALL: I mean, you know, would you bring it to the light is what I'm asking you, or would you cover it up that's what I'm asking you.

THE COURT: I will sustain that. Ask another question.

THE DEFENDANT BALL: In the case, Miss Brown, Raymond Ball is my name. In the case that you seen that because it appears to me like you was able to get a grasp of what I was trying to articulate throughout the day in respect to perception, and you know, the need for certain information to be uncovered in order for us to get a better understanding of what is it that we are looking at. And my concern is would, in the case, that there was an officer who testified to a particular situation and the evidence does not coincide with the testimony of the evidence, you know, would you stand with the officer in his testimony in light of the fact that the officer doesn't support the testimony? Or would you, you know, reject the testimony of the officer?

JUROR: Are you asking me again?

THE DEFENDANT BALL: Miss Brown.

JUROR: Would I reject the evidence if the testimony does not support the evidence?

THE DEFENDANT BALL: Yes, ma'am.

JUROR: Then there is a true conflict there, so something else or another testimony or more evidence would have to be presented because you are in direct conflict if you have evidence and the testimony that's being given is not related to or does not support that evidence that's presented, that's a problem. It would be a problem for me.

THE DEFENDANT BALL: Is there anyone else in the jury that would like to maybe express their views concerning that particular issue? I apologize. Mr. Chang, how are you doing today?

JUROR: Okay. What's your specific question?

THE DEFENDANT BALL: I wanted to know because what happens is sometimes, you know, certain evidence is presented, and the testimony that's presented along with the case is conflicting with the evidence that's being presented. And so, you know, sometimes we have a tendency to give value to testimony without having the necessary physical evidence to corroborate the actual testimony.

JUROR: I got the question. Basically I look at the whole picture, the whole piece, not one piece only.

THE COURT: Would the sequence of events play a part in how you decide these things?

JUROR: If they apply to the specific situation, those would have a certain weight.

THE DEFENDANT BALL: Mr. Chang, how about you, would time play a factor in how you analyze, you know, the evidence that's being brought before you, Mr. Chang?

THE COURT: You have about a minute, Mr. Ball.

THE DEFENDANT BALL: Mr. Chang?

JUROR: You would have to be a little more specific with that question.

THE DEFENDANT BALL: In other words, you have the testimony, you have the evidence, you have sequence of events and then you have time factors. Would you use time factor in your being able to evaluate the totality of the circumstances as the case is presented to you?

JUROR: I'm still not sure I understand what you are asking. Are you asking about the order in which something is presented or the length of time that --

THE DEFENDANT BALL: The length of time.

JUROR: Of what, when evidence was discovered or --

THE DEFENDANT BALL: Like the judge, said things, time periods have elapsed between different testimonies, you know, this is indication of a time factor, you know, would you use that time factor as an issue in you being able to come to a clear decision on what is it that you are --

JUROR: I would have to see. I mean without a

specific example --

THE COURT: Thank you, Mr. Ball.

THE DEFENDANT BALL: Thank you. Thank you, ladies and gentlemen.

THE COURT: All right. Can we take the jury out?

(Jurors exit the courtroom.)

(Whereupon, there was a brief pause in the proceedings.)

THE COURT: Are you all ready?

MR. SHORTT: Yes.

MR. GIBBONS: Yes.

THE DEFENDANT BALL: Yes, sir.

THE COURT: All right. We have four jurors. One through eight, People, challenge for cause?

MR. SHORTT: As to cause number three, Jennifer Williams she emphatically stated she could not be fair. Number four, Mr. Chang, he said first of all he assumes all info presented to him is wrong, it has to be proven true, he had difficulty when defense asked him questions about needing to hear both sides, and number eight --

THE COURT: Let's stick with those two. Any objection to Miss Williams?

MR. GIBBONS: None.

THE DEFENDANT BALL: No, sir.

THE COURT: Mr. Chang?

THE DEFENDANT BALL: No, sir.

MR. GIBBONS: No objection, your Honor.

THE COURT: Next?

MR. SHORTT: Mr. Fernandez wholeheartedly joined with Mr. Akkoc on the last question that whatever it's not proved he would have difficulty rendering a verdict of guilty. There was another issue, but most importantly he said no matter what evidence I provided, he would not be able to find the defendant guilty.

MR. GIBBONS: I join that, he said it was almost like burdened with a verdict.

THE COURT: All right. Without objection, Mr. Ball?

THE DEFENDANT BALL: No objection.

THE COURT: That's it?

MR. SHORTT: Yes.

THE COURT: Defense, one through eight for cause?

MR. GIBBONS: No.

THE COURT: People peremptory challenges one through eight.

(Defendant and counsel confer.)

THE COURT: Peremptory challenges one through eight, People?

MR. SHORTT: None, Judge.

THE COURT: Defense.

MR. GIBBONS: If I could confer?

(Whereupon, an off-the-record discussion was held.)

MR. GIBBONS: Your Honor, number two, the defense perempt.

THE COURT: Anybody else?

MR. GIBBONS: No, your Honor.

THE DEFENDANT BALL: Thank you.

THE COURT: So we now have eight jurors; is that correct?

MS. POVMAN: Yes.

MR. GIBBONS: Yes, your Honor.

THE COURT: Jurors nine through twelve, People, challenge for cause?

MR. SHORTT: Number twelve, Mr. Akkoc.

THE COURT: Any objection?

MR. GIBBONS: No objection.

THE COURT: No objection, Mr. Ball?

THE DEFENDANT BALL: No, sir.

THE COURT: Anybody else?

MR. SHORTT: Miss Ahmed, number eleven, she obviously had difficulty understanding questions, I think Mr. Gibbon's one question.

MR. GIBBONS: She said she could not express herself because of language.

THE COURT: All right. No objection?

MR. SHORTT: No objection.

MR. GIBBONS: No objection.

THE COURT: Is that it for the People cause?

MR. SHORTT: Yes.

THE COURT: Defense, nine and ten for cause?

MR. GIBBONS: Nothing for cause.

THE COURT: People, peremptory?

MR. SHORTT: Miss Brown, number ten.

THE COURT: Is that it, Mr. Shortt?

MR. SHORTT: Yes.

THE COURT: Juror nine, defense? Peremptory.

MR. GIBBONS: Yes, number nine, your Honor.

THE COURT: People, 13 through 16?

MR. SHORTT: None for cause.

THE COURT: Defense.

MR. GIBBONS: None for cause for me.

MR. SHORTT: We spoke about Mr. Soorya in the beginning, but he gave you answers that he could not be fair or -- this is the mailman, some college bartender. I am thinking of somebody else.

THE COURT: Defense, challenge for cause?

THE DEFENDANT BALL: 16 for cause, your Honor.

THE COURT: I will hear you.

THE DEFENDANT BALL: He said, you know, that he is

what you call tied to -- he has close ties to the police, and he won't be able to fairly pass judgment.

MR. GIBBONS: I think that the language that he used was all things being equal he always comes down on the side of the cops, your Honor, and I don't believe that would represent someone that would give us a fair shot.

THE COURT: Mr. Shortt?

MR. SHORTT: I wrote specifically I won't cover it up, I won't overlook, I will hold them. Whatever equivocation he had in the beginning the defense solved for me in terms of not overlooking any negligence, he would not overlook it or cover it up.

THE COURT: All right. That application is denied. People peremptory?

MR. SHORTT: No peremptories.

THE COURT: Defense?

MR. GIBBONS: 13, 15, and 16.

THE COURT: Bring in the jury.

(Jurors enter the courtroom.)

THE COURT CLERK: Case on trial continues, all parties are present, all prospective jurors are present. Again, same instructions. If you hear your name, please remain seated. If you do not hear your name, please step outside in the hallway and wait for further instructions from the court officer.

Debra Moschitto, please remain seated. Jayant Soorya, please remain seated. Tyler Ward, please remain seated. Dexter Eversley, please remain seated. Gissell Cardenas, please remain seated.

Everyone else, please step outside and await further instructions. Thank you for your service. Are the remaining jurors satisfactory to the People?

MR. SHORTT: Yes.

THE COURT CLERK: Defense?

MR. GIBBONS: Yes.

THE DEFENDANT BALL: Yes, very much too.

(Jurors sworn.)

THE COURT CLERK: Thank you. Have a seat, please.

THE COURT: All right. Folks, that is it for the evening. These instructions apply both to the five men and women in the box, and the remaining panel out in the audience: Do not discuss this case amongst yourselves or with anybody else. Do not speak to the attorneys, the parties, the witnesses, anybody in connection with this case. Do not go to the scene of the alleged incident. Do not research this case in any way. Should anybody speak to you about this case, report it to the officers immediately. We will reconvene tomorrow at 10 A.M. I thank you all for your service. Have a good evening. Officers, take charge.

(Jurors exit the courtroom.)

THE COURT: All right. 10:00 tomorrow, gentlemen and Miss Povman. The lawyers, hang around for a little bit and let the jurors take the elevators.

(Defendants exit the courtroom.)

(Trial adjourned to January 22, 2015.)

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF QUEENS: CRIMINAL TERM: PART K14

-----------------------------------------x Indictment No.

THE PEOPLE OF THE STATE OF NEW YORK 2228/12

-against-

ELIJAH BROOKS and RAYMOND BALL,

Defendants.

-----------------------------------------x

125-01 Queens Boulevard

Kew Gardens, New York

January 22, 2015

***********************************

THE COURT CLERK: Number one, case on trial, indictment 2228 of 12, People versus Raymond Ball and Elijah Brooks from the pens.

Appearances, please.

MR. SHORTT: For the People, Assistant District Attorney Timothy Shortt.

MS. POVMAN: Linda Povman on behalf of Mr. Ball.

MR. GIBBONS: For Mr. Brooks, Wyatt Gibbons, 125-10 Queens Boulevard, Kew Gardens.

THE COURT: Good morning to all of you.

(Defendant enters the courtroom.)

THE COURT CLERK: The defendants are produced before the Court.

THE DEFENDANT BALL: Good morning, your Honor.

THE COURT: Good morning, sir.

MS. POVMAN: Can the defendant address the Court?

THE COURT: Sure.

THE DEFENDANT BALL: I would like to just ask I haven't completed my witness list. I wanted to request -- I wanted to make sure that I put the EMS workers as part -- put them down on the list that I look forward to using as part of the defense.

THE COURT: Sure.

THE DEFENDANT BALL: Okay.

THE COURT: Do you have their names?

THE DEFENDANT BALL: I can have them for you, your Honor, if it's okay. I don't have them readily available. I wanted to make sure I put in the request so you know ahead of time before. And there is one other thing that I wanted to ask you in respect to the discovery, I would like for you to not allow the District Attorney to bring, introduce any discovery that was never a part of the disclosure, and any discovery that was not turned over to the defense, that you don't forget the sanctions that are required under the failure of the District Attorney.

THE COURT: Well, I mean, if we get to a point where you are more specific, then I will entertain your application, listen to what Mr. Shortt has to say in

response and make a ruling, but that kind of broad brush request, I'm not going to entertain.

THE DEFENDANT BALL: Well, I mean we have a list of the disclosure already.

THE COURT: Right.

THE DEFENDANT BALL: So I wanted to make sure the District Attorney doesn't try to introduce into evidence anything that's --

THE COURT: When and if that happens, you will make an application.

THE DEFENDANT BALL: Yes, sir. Thank you.

THE COURT: And I will rule on it. Are we ready for the jury?

THE DEFENDANT BALL: Yes, sir.

MR. GIBBONS: Yes, Judge.

MR. SHORTT: Yes.

THE COURT: You are advised that there are -- there were twelve left.

THE COURT CLERK: We have all twelve.

THE COURT: All right. Good. Bring them in.

(Jurors enter the courtroom).

THE COURT CLERK: When you hear your name called, step forward and take your belongings and take the seat indicated by the court officer.

Seat number one, Mohamed, M-O-H-A-M-A-D. Last

name, A-D-I-B-Z-A-D-E-H. Seat number two, first name, W-O-J-C-I-E-C-H, last name, I-J-N-A-T-O-W-I-C-Z, seat number two. Seat three, T-O-M-I-C-Q-U-A, Smith, S-M-I-T-H. Seat four, L-O-M-A-S-H, S-O-M-W-A-R-U, seat four. Seat five, Hary, H-A-R-Y, D-O-C-T-E-U-R, seat five. Seat six, Ngaryung Chang, N-G-A-R-Y-U-N-G, last name, C-H-E-N-G. Seat seven, Vivek Surve, first name, V-I-V-E-K, last name, S-U-R-V-E, seat seven. Seat eight, Maksim Ivanchenko, M-A-K-S-I-M, last name, I-V-A-N-C-H-E-N-K-O, seat eight. Seat nine, Brandon Palmieri, B-R-A-N-D-O-N, P-A-L-M-I-E-R-I, seat nine. Seat ten, Karen Cho, C-H-O, seat ten. Seat eleven James, C-I-A-C-C-I-A. Seat number twelve, Alexander Apter, A-P-T-E-R.

THE COURT: Good morning, ladies and gentlemen. Once again I will begin by asking a series of questions to all twelve of you at once. You are the sole judge of the facts, I am the sole judge of the law, and you must apply the law as I give it to you whether you agree with me or not. Can all of you promise to do that?

THE JURORS: Yes.

THE COURT: Very good. The defendants are presumed innocent. They are required to prove nothing. The burden of proof is on the District Attorney. He must prove beyond a reasonable doubt that the defendants committed the crimes they are charged with.

Can all of you promise to hold the District Attorney to that burden of proof beyond a reasonable doubt?

THE JURORS: Yes.

THE COURT: I said beyond a reasonable doubt, I did not say beyond all doubt. That is virtually impossible. Can all of you promise me not to hold the District Attorney to a higher burden than beyond a reasonable doubt?

THE JURORS: Yes.

THE COURT: And the flip side of that is can all of you promise not to hold the District Attorney to a lesser burden than beyond a reasonable doubt?

THE JURORS: Yes.

THE COURT: Once again, the defendants have a constitutional right to choose not to testify on their own behalf. I don't know what they are going to do, but if they choose not to testify in this case, the law requires that you not draw any adverse inference from that decision. Can all of you promise to obey that law?

THE JURORS: Yes.

THE COURT: Very good. Finally can all of you promise to keep an open mind, not to decide this case until you have heard all of the testimony, all of the evidence, all the arguments of the attorneys and my final instructions to you on the law? Can all of you do that?

THE JURORS: Yes.

THE COURT: Very good. We will begin with -- again if I mispronounce names, call me on it, please.

Mr. Adibzadeh, where do you live, sir?

JUROR: Rego Park.

THE COURT: How far did you go in school?

JUROR: College.

THE COURT: What do you do for a living?

JUROR: Salesman.

THE COURT: Single, married, widowed, divorced?

JUROR: Married.

THE COURT: What does your wife do?

JUROR: She is a department manager in a logistic company.

THE COURT: Kids?

JUROR: Yes, two.

THE COURT: Big or little?

JUROR: Big, one is in construction, and one social worker in Jersey.

THE COURT: Have you ever served as a juror before?

JUROR: No, sir.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: Yes.

THE COURT: Tell us about that.

JUROR: My son was convicted of possession.

THE COURT: Anything about that experience that would cause you not to give both sides a fair shake in this case?

JUROR: I don't think so. I should be okay.

THE COURT: Good. All right. Have you or a loved one ever been the victim of a crime?

JUROR: Yes.

THE COURT: Tell us about that.

JUROR: Myself I was hold up many years ago at gunpoint and my daughter at her ex-job, she was held up at her job.

THE COURT: Can you put those aside -- I mean it's fair to say that whatever the testimony is in this case it's got nothing to do with those lousy things that happened to you?

JUROR: Yes.

THE COURT: Is that a fair statement?

JUROR: Yes.

THE COURT: Can you put those experiences aside and give both sides a fair shake?

JUROR: I would say almost 100 percent.

THE COURT: Well, all right. Applying my theory that nothing is perfect in life, I will take that. Thank

you. Do you have friends and family in law enforcement, sir?

JUROR: Yes, my wife's cousin is a lieutenant in New York City.

THE COURT: You know the next question, can you evaluate the testimony of the couple of cops that will testify in this case fairly?

JUROR: Yes.

THE COURT: Good. You can be fair, sir?

JUROR: I think so.

THE COURT: Thank you. Mr. Ijnatowicz, where do you live?

JUROR: Maspeth.

THE COURT: How far did you go in school?

JUROR: College now.

THE COURT: Are you a full-time student?

JUROR: Part time.

THE COURT: What do you do for a living?

JUROR: Salesman.

THE COURT: Single, married, widowed, divorced?

JUROR: Married, she is a student.

THE COURT: Full-time?

JUROR: Yes.

THE COURT: Kids?

JUROR: No.

THE COURT: Ever been a juror before?

JUROR: No, first time.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Victim of a crime?

JUROR: Yes.

THE COURT: Tell us about that.

JUROR: My car was stolen, and my garage was broken into sometime ago.

THE COURT: Sounds like two cases that didn't get solved; is that right? Did they catch anybody?

JUROR: No, I don't think so, no.

THE COURT: Anything about those experiences that would cause you not to be a fair juror in this case?

JUROR: No, I will do my best.

THE COURT: Do you have friends or family in law enforcement?

JUROR: No, not really.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Good. Thank you very much. Miss Smith, where do you live?

JUROR: Far Rockaway.

THE COURT: How far did you go in school?

JUROR: High school.

THE COURT: What do you do for a living?

JUROR: Medical assistant.

THE COURT: Single, married, widowed, divorced?

JUROR: Single.

THE COURT: Ever served as a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime.

JUROR: Yes, I don't know the details, but I have two brothers that were incarcerated and two cousins incarcerated, and currently my father is incarcerated.

THE COURT: Anything about those facts that would cause you not to be a fair juror in this case?

JUROR: Not really.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: Yes.

THE COURT: Tell us about that.

JUROR: My apartment has been robbed twice.

THE COURT: Did they catch anybody?

JUROR: No.

THE COURT: Anything about that that would cause you not to be fair in this case?

JUROR: I would say yes.

THE COURT: What's that?

JUROR: I felt very violated by that.

THE COURT: As you should have. Certainly that's right. The question is whether or not you can put that aside and evaluate the facts in this case, the witnesses in this case --

JUROR: I can evaluate the facts of the case, yes.

THE COURT: That's what we need. I don't expect anybody to forget things that happened to them, bad things that happened to them, relationships that you have with people, but part of judging the facts, taking the law as I give it to you is to say all right, I feel this way, but the judge says this, I will put this aside, and follow the law. Can you do that and be fair?

JUROR: I guess I can.

THE COURT: All right, good. Thank you, Miss Smith.

Mr. Somwaru, where do you live?

JUROR: Jamaica.

THE COURT: How far did you go in school?

JUROR: College.

THE COURT: What do you do for a living?

JUROR: Electrical engineer.

THE COURT: Single, married, widowed, divorced?

JUROR: Married, she is a homemaker.

THE COURT: Do you have kids?

JUROR: Three kids, big ones. Two in college and one graduated as an accountant.

THE COURT: Have you ever served as a juror before?

JUROR: Multiple times.

THE COURT: Civil, criminal?

JUROR: Two civil, one criminal.

THE COURT: Anything about those experiences that would cause you not to be fair in this case?

JUROR: Absolutely not.

THE COURT: Very good. Have you or a loved one ever been convicted of a crime?

JUROR: No, sir.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: Yes.

THE COURT: Tell us about that.

JUROR: My car was stolen once.

THE COURT: Anything about that experience that would cause you not to be a fair juror in this case?

JUROR: No, sir.

THE COURT: Do you have friends or family in law enforcement?

JUROR: No, sir.

THE COURT: Can you be fair?

JUROR: Absolutely.

THE COURT: Mr. Docteur, where do you live?

JUROR: Cambria Heights.

THE COURT: How far did you go in school?

JUROR: College.

THE COURT: What do you do for a living?

JUROR: Service coordinator.

THE COURT: Are you married?

JUROR: Yes.

THE COURT: What does your wife do?

JUROR: Technologist.

THE COURT: Kids?

JUROR: The big one is in college, the little one is in high school.

THE COURT: Ever been a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: Yes, my niece's apartment was broken into and vandalized.

THE COURT: Anything about that experience that

would cause you not to be able to evaluate the facts in this case fairly?

JUROR: No.

THE COURT: Good. Friends and family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Thank you. Miss Chang, where do you live?

JUROR: Rego Park.

THE COURT: How far did you go in school?

JUROR: College.

THE COURT: What do you do for a living?

JUROR: Stay home mom.

THE COURT: What does your husband do?

JUROR: Software programmer.

THE COURT: If you are staying at home, I am assuming you have kids?

JUROR: One just turned one and the older one is three.

THE COURT: Have you ever been a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Victim of a crime?

JUROR: Yes. My family house -- I mean my mom house was robbed like two years ago.

THE COURT: Anything about that experience that would cause you not to be able to evaluate the facts in this case fairly?

JUROR: I try my best.

THE COURT: Friends or family in law enforcement?

JUROR: I have a couple of friends who are police officers in New York.

THE COURT: You know what the next question is, can you evaluate the testimony of the cops that testify in this case fairly?

JUROR: Yes, I will.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Good. Thank you very much. Mr. Surve, where do you live?

JUROR: Woodside.

THE COURT: How far did you go in school?

JUROR: College.

THE COURT: What do you do for a living?

JUROR: Tutor and a student mentor at City University of New York.

THE COURT: Are you married?

JUROR: Single.

THE COURT: Ever serve as a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: Yes.

THE COURT: Tell us about that.

JUROR: Years ago our house was broken into.

THE COURT: Can you put that aside and evaluate the facts in this case fairly?

JUROR: Yes.

THE COURT: Good. Do you have friends or family in law enforcement?

JUROR: I know a neighbor who is in law enforcement.

THE COURT: Same question, can you evaluate the testimony of the police officers in this case fairly?

JUROR: Yes.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Good. Thank you very much.

Mr. Ivanchenko, where do you live?

JUROR: Rockaway Beach.

THE COURT: How far did you go in school?

JUROR: College.

THE COURT: What do you do for a living?

JUROR: United States Postal Service mail handler.

THE COURT: Are you married?

JUROR: Married.

THE COURT: What does your wife do?

JUROR: She is a full time student.

THE COURT: Do you have kids?

JUROR: Yes.

THE COURT: They are not old enough to work are they?

JUROR: No, little.

THE COURT: Have you ever served as a juror before?

JUROR: I wasn't picked.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Victim of a crime?

JUROR: No.

THE COURT: Do you have friends or family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Thank you, sir. Mr. Palmieri, where do you live?

JUROR: Forest Hills.

THE COURT: How far did you go in school?

JUROR: I'm a junior in college.

THE COURT: Do you work as well?

JUROR: No.

THE COURT: Single, married, widowed, divorced?

JUROR: Single.

THE COURT: You ever serve as a juror before?

JUROR: No.

THE COURT: Convicted of a crime?

JUROR: No.

THE COURT: Victim?

JUROR: Nope.

THE COURT: Do you have friends or family in law enforcement?

JUROR: My dad is a deputy lieutenant.

THE COURT: Same question to you, can you evaluate the cop testimony in this case fairly?

JUROR: Sure.

THE COURT: Can you be fair?

JUROR: Of course.

THE COURT: Thank you. Miss Cho, where do you live?

JUROR: Bayside.

THE COURT: How far did you go in school?

JUROR: College.

THE COURT: What do you do for a living?

JUROR: Designer.

THE COURT: Single, married, widowed, divorced?

JUROR: Single.

THE COURT: Ever served as a juror before?

JUROR: No.

THE COURT: You or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Victim of a crime?

JUROR: Yes, multiple hold ups and robbery.

THE COURT: Multiple hold ups?

JUROR: Well, not hold ups, sorry, like robbery? Like robbed the store, no guns, sorry.

THE COURT: Can you put those incidents aside and evaluate the facts in this case fairly?

JUROR: Yes.

THE COURT: Very good. Do you have friends or family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Thank you. Mr. Ciaccia, where do you live?

JUROR: Rockaway.

THE COURT: How far did you go in school?

JUROR: High school.

THE COURT: What do you do for a living?

JUROR: Electrician.

THE COURT: Are you married?

JUROR: Yes, my wife is a stay home mom.

THE COURT: Do you have kids?

JUROR: Yes, little ones.

THE COURT: Ever been a juror before?

JUROR: No, sir.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Victim of a crime?

JUROR: Yes, sir.

THE COURT: Tell us about that.

JUROR: Our home was broken into.

THE COURT: Same question, can you put that incident aside and evaluate the facts in this case fairly?

JUROR: I will do my best, yes. Yes, sir.

THE COURT: Yes?

JUROR: Yes.

THE COURT: All right. Do you have friends or family in law enforcement?

JUROR: My dad is a retired cop. My uncle is a retired court officer.

THE COURT: In this building?

JUROR: Federal, Brooklyn.

THE COURT: Can you evaluate the testimony of the police officers in this case fairly?

JUROR: Yes.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Mr. Apter, where do you live?

JUROR: Forest Hills.

THE COURT: How far did you go in school?

JUROR: College.

THE COURT: What do you for a living?

JUROR: Analyst for a bank.

THE COURT: Are you married?

JUROR: Divorced.

THE COURT: Are you in contact with your ex at all?

JUROR: Yes.

THE COURT: What does she do?

JUROR: Paralegal.

THE COURT: Does she work in a law firm?

JUROR: Yes, she currently does actually.

THE COURT: Do you know if they practice criminal law at all?

JUROR: I think she is more into like patents.

THE COURT: Do you have kids?

JUROR: Two.

THE COURT: Little?

JUROR: Elementary school.

THE COURT: Have you ever served as a juror before?

JUROR: No.

THE COURT: Have you or a loved one ever been convicted of a crime?

JUROR: No.

THE COURT: Have you or a loved one ever been the victim of a crime?

JUROR: Yes, I was mugged on the street once.

THE COURT: Anything about that incident that would cause you not to be fair in this case?

JUROR: No.

THE COURT: Friends and family in law enforcement?

JUROR: No.

THE COURT: Can you be fair?

JUROR: Yes.

THE COURT: Mr. Shortt, I will give you 15.

MR. SHORTT: Thank you. Good morning, everybody. This is day three, you have heard all my same stories and jokes so I will try to be a little fast.

Mr. Adibzadeh, number one, I'm going to call an eyewitness to this case, what kind of quality do you want to hear?

JUROR: Authenticity to be convincing be able to give the information correctly based on the evidence.

MR. SHORTT: What are some of the things that you would consider to be sure they are being accurate?

JUROR: I guess body movement, facials, or you know, the way they represent themselves and everything else.

MR. SHORTT: Miss Smith, what are you going to be looking for?

JUROR: More or less body language.

MR. SHORTT: Now, this is the first time you are speaking in a roomful of people like this. Do you understand a witness may be nervous?

JUROR: Yes.

MR. SHORTT: You can tell I get nervous even when I speak in front of a group. Are you only to look at that

one factor?

JUROR: No, also the evidence that's given.

THE DEFENDANT BALL: I apologize. Can you speak up?

THE COURT: Yes, please.

JUROR: Basically the evidence that's given, whether they coincide with what the witnesses say.

MR. SHORTT: Okay. Mr. Somwaru, you have been on a jury before?

JUROR: Yes.

MR. SHORTT: How many times before?

JUROR: Three.

MR. SHORTT: Were they criminal cases?

JUROR: One criminal case.

MR. SHORTT: Without telling me the verdict, did you reach a verdict?

JUROR: Yes.

MR. SHORTT: Without telling me the verdict, could you tell me a little about the case that you sat on?

JUROR: It was an accident, and the car operator, the driver had a motorcycle, and the motorcycle was taking him up with the law who has the right of way.

MR. SHORTT: Anything about that trial that gave you any feelings towards the criminal justice system.

JUROR: Absolutely not.

MR. SHORTT: Did you feel it was a valuable experience?

JUROR: Yes.

MR. SHORTT: You were also on a civil trial?

JUROR: Yes.

MR. SHORTT: Kind of trial was that?

JUROR: It was a minor infraction where a student had a fall, and they were claiming negligence.

MR. SHORTT: Do you understand the judge will give you different standards in this trial than that one?

JUROR: Yes.

MR. SHORTT: Do you promise to uphold those?

JUROR: Yes.

MR. SHORTT: Thank you. Mr. Docteur, do you understand during this trial I will call police officers to the witness stand, and your niece was burglarized?

JUROR: Yes.

MR. SHORTT: Did she call the police?

JUROR: Yes.

MR. SHORTT: Do you know did the police respond?

JUROR: I know the police came and get the facts, whatever, get the name and check make a quick check in the house to see what was stolen.

MR. SHORTT: Did they follow up, did she ever hear anything from them after that?

JUROR: I think so because the credit card also was stolen so the police make sure they call the credit card company but they never found.

MR. SHORTT: Do you understand the police officers that dealt with her are different than here?

JUROR: Yes.

MR. SHORTT: Do you promise to give the officers a fair shot despite the fact that the officers in that case were unable to find the perpetrator of that crime?

JUROR: Yes, definitely.

MR. SHORTT: Miss Chang, what are some things that you would look for in terms of an eyewitness?

JUROR: Details and also accuracy.

MR. SHORTT: What would help you make you believe someone was being accurate?

JUROR: First, there shouldn't be any contradiction, and then for the detail part like the appearance and also like the sequence of the thing.

MR. SHORTT: Let's talk about that. You said there shouldn't be any discrepancy.

JUROR: It depends because sometimes when you are calm -- I mean when you are the victim or something happen you get nervous and then maybe they miss something, I'm not sure about that.

MR. SHORTT: Okay. Mr. Surve, how do you feel

about that, do you think a witness shouldn't have any discrepancies in their testimony?

JUROR: Well, it's possible that they could be off or may not remember something exactly as it happened.

MR. SHORTT: Would you consider that in determining whether or not they are being accurate in the testimony?

JUROR: I mean everything should be weighed with a lot of accuracy. Everything should be taken into consideration.

MR. SHORTT: Would you weigh say a small difference versus a big difference?

JUROR: It is possible that they could maybe have those differences when they describe what happened, but it doesn't necessarily mean that it's not what they saw at that time and what they remembered.

MR. SHORTT: Okay. You were all here on day one of the trial when the judge gave some initial instructions and gave you some initial ideas about our laws in our state, we all remember that, right? Mr. Surve, do you think if I asked everybody here to take out pen and paper and write down word for word everything the judge said, do you think I would get twelve different versions of the exact same thing?

JUROR: I don't believe so but it's possible.

MR. SHORTT: Is it like lying?

JUROR: No.

MR. SHORTT: Twelve different people with twelve different minds, right?

THE COURT: I don't think I could do it.

MR. SHORTT: And you have the book.

THE COURT: If I had the book I could do it.

MR. SHORTT: Mr. Ijnatowicz, how do you feel about that, if I gave all twelve people here a pen and paper asked them to rewrite the instructions of the judge from day one, do you think we would have the same result?

JUROR: Not the same but maybe similar not exactly the same because everyone do things a little differently.

MR. SHORTT: Mr. Adibzadeh, if six months from now I recall all of you back to the same courtroom, relax, this is only a hypothetical, ladies and gentlemen, if I call you back to the same courtroom to sit in the same seats, and I will ask you to do it again, write down the same thing that the judge told you on day one of the trial, do you think you would be able to do it?

JUROR: I'm not sure. I might forget.

MR. SHORTT: It is okay. It happened two or three days ago but does it change the fact that you were here in the courtroom?

JUROR: Yes, I remember the environment slightly

and who was in the room.

MR. SHORTT: You may remember Judge Schwartz but maybe forget some of the things he said, right?

JUROR: Yes.

MR. SHORTT: So there are big and little details.

JUROR: Yes.

MR. SHORTT: If you were picked as a juror, would you look at big differences versus little differences?

JUROR: Bigger difference is better, people forget.

MR. SHORTT: I am telling you to consider those, I ask you not to throw up your hands and say we can't figure this out. Would you promise to weigh the differences and try to work it out and resolve them?

JUROR: Yes.

MR. SHORTT: Sir, would you make the same promise?

JUROR: Yes.

MR. SHORTT: Would you agree if someone is asked to come back six months --

JUROR: People live busy lives, it would be difficult to recall everything exactly. You might get like the main idea of what the judge said, but fine details you lose them over time.

MR. SHORTT: Okay. Miss Cho, how do you feel?

JUROR: I think it's details could be lost, and

things that my might not be true could be added.

MR. SHORTT: Okay. The judge will instruct you about something called acting in concert. That's for the judge to talk about. Mr. Apter, you work for the post office?

JUROR: Yes.

MR. SHORTT: What do you do at the post office?

JUROR: Handle the mail.

MR. SHORTT: Are you a letter carrier?

JUROR: No, I work in the distribution center where they process the sale sequence for the letter carriers and post offices and facilities.

MR. SHORTT: So you get the mail from one truck and send it to out for the letter carriers?

JUROR: Yes, mostly the machines do it, processing the mail.

MR. SHORTT: You are all working together on that?

JUROR: Yes.

MR. SHORTT: If you don't do your job, the mail does not get through, right?

JUROR: Yes.

MR. SHORTT: If the letter carrier does not do their part, no mail?

JUROR: Exactly.

MR. SHORTT: Everybody working under the same goal

to get the mail where it's going?

JUROR: Yes.

MR. SHORTT: Can you appreciate the law recognizes that people can work together in a crime, not just to get the mail where it's supposed to go, can you appreciate that?

JUROR: Yes.

MR. SHORTT: Can you appreciate just as you are part of getting the mail to the mailbox even though you don't put it in the mailbox, the law recognizes that you don't have to commit every part of the crime in order to be guilty?

JUROR: Excuse me?

MR. SHORTT: You don't have to do every part of the crime to be guilty if you are playing an active role?

JUROR: Probably.

MR. SHORTT: We are not talking about a bank robbery, but the get away driver is just as guilty as the guy that goes in with the gun?

THE COURT: That would require him understanding what the law of accomplice is, and I'm going to do that.

MR. SHORTT: Okay.

THE COURT: Let's not dance on this.

MR. SHORTT: I will move on.

Mr. Apter, do you understand that as the

defendants sit here today, they are presumed innocent?

JUROR: That's correct.

MR. SHORTT: If I were not to call any witnesses, what would your verdict be?

JUROR: Not guilty.

MR. SHORTT: On the other hand when I prove my case to you beyond a reasonable doubt when I bring witnesses here and you believe them, will you have any hesitation to remove that presumption of innocence and find them guilty?

JUROR: If it's proven beyond a reasonable doubt to me, yes.

MR. SHORTT: Would you consider when you are coming up with the verdict you heard me say in the first round if you are picked as a juror coming up with a verdict is basically the facts as you find them plus the law the judge gives you and that equals the verdict?

JUROR: Yes.

MR. SHORTT: Can you promise me to exclude things like sympathy?

JUROR: Yes, I can put that aside.

MR. SHORTT: Do you think sympathy has any role in deciding what happened on a certain night in Queens?

JUROR: It shouldn't be a part of it, no.

MR. SHORTT: Mr. Ciaccia, can you exclude

sympathy for either of the defendants or the victim in coming to a decision?

JUROR: Absolutely.

MR. SHORTT: Ladies and gentlemen, you know that Mr. Ball decided to represent himself. Anybody here just based on that has a problem with that, Miss Cho?

JUROR: It's not a problem, but I think I will not be able to put sympathy aside. I don't think I would be fair.

MR. SHORTT: Anybody else that has that feeling? You think you might be sympathetic to Mr. Ball?

JUROR: Not really sympathetic. In my opinion personally he has a right to defend himself. Everyone has that right but to me personally I feel more or less sorry because he doesn't have really that much advice with the law personally. That's me.

MR. SHORTT: Okay. So we have other trials, maybe you would be better on a case only lawyers presenting the evidence.

JUROR: Yes.

MR. SHORTT: Okay. Understandable. Yes, sir?

JUROR: I just feel it looks a little better that he decided to do that, I don't know if it's good or bad, but it's just in my opinion.

MR. SHORTT: What do you mean by that, it looks

better, what -- I'm not following.

JUROR: I don't know, he is trying to prove his own case.

MR. SHORTT: Okay. I appreciate that. Anybody else have a strong feeling one way or the other?

JUROR: Same thing. I think he is at a disadvantage at this point because he is not represented by proper advice, no insult to you, sir, but it should be lawyers.

MR. SHORTT: Do you think you would be able to put that aside?

JUROR: It would be tough. I have been listening for the past two or three days. I feel it's tough but I feel he needs to be -- even though he might not be guilty or guilty but he has to have a proper lawyer to represent him because he is not coming across properly.

MR. SHORTT: Okay. Anyone else. Thank you. As I said, ladies and gentlemen, this is not like TV.

Mr. Ijnatowicz, do you watch Law and Order, any crime shows?

JUROR: Not so much.

MR. SHORTT: You have seen Court TV, things like that?

JUROR: Yes.

MR. SHORTT: Do you understand the witnesses are

not paid actors on a script?

JUROR: Yes.

MR. SHORTT: Do you understand that the witnesses I will call are not robots, they may have lapses in memory, can you promise to try to resolve the differences?

JUROR: Yes.

MR. SHORTT: Thank you, Judge.

THE COURT: I want to ask you a couple of questions, to you, sir. If the People prove their case beyond a reasonable doubt, will you have any hesitancy to convict because the defendant is representing himself?

JUROR: Not really, no, as long as the facts is there, and the proof is there.

THE COURT: And if fits with the law as I give it to you?

JUROR: Right.

THE COURT: Will you have any hesitancy to vote guilty in the case?

JUROR: No.

THE COURT: Anybody who feels differently? You expressed some concern.

JUROR: It's a combination of things, not just one thing.

THE COURT: Well, the issue is if the People prove their case beyond a reasonable doubt, and you apply the law

as I give it to you, will the fact that he is representing himself cause you to hesitate to convict?

JUROR: No, the answer is no.

THE COURT: Anybody who feels differently?

JUROR: I think I said that I would be unfair, that I would feel sympathy.

THE COURT: Do you understand what I am trying to say to you, all I'm trying to find out from you is given the fact that he has chosen to represent himself with all of the pluses and minuses that that might entail, it was a choice that he made. My question to you is given that fact, if you find that the People have proven their case beyond a reasonable doubt, and you apply those facts to the law as I give it to you, would you hesitate to convict?

JUROR: I would, because actually I root for the underdog so I think I would have a hard time.

THE COURT: Okay. Fair enough.

Mr. Gibbons, you have 15 minutes.

MR. GIBBONS: Thank you, your Honor.

Good morning, ladies and gentlemen. My thanks and my apologies for prying. I wanted to pick up as usual on some things Mr. Shortt went through. He asked you if you each wrote out a version of what you originally heard from the judge, would you expect they would all be the same. I think rightfully so you said no. But what if individually

shouldn't each individual's be the same? If you write it down now and then you write it down six months from now, individually you, Mr. Docteur, shouldn't what you remember pretty much be the same?

JUROR: Not really. I think the big picture can be the same, but not the details.

MR. GIBBONS: But your individual recollection should more or less be the same, it might be different from Mr. Palmieri's?

JUROR: Of course.

MR. GIBBONS: But your individual recollection should be the same?

JUROR: Yes.

MR. GIBBONS: If you did not know that you were being quizzed on it, no one told you there was a quiz so now he is asking to write down the recollection of what you heard four days ago, you might not remember everything, correct? Right?

JUROR: Yes.

MR. GIBBONS: If you knew from the beginning you will be asked and there will be a test, you will be paying more attention?

JUROR: Yes.

MR. GIBBONS: If you knew you would be quizzed again and again and maybe again and it was important like a

trial, you would be sure to have the facts down, correct?

JUROR: Yes.

MR. GIBBONS: Mr. Somwaru, do you agree?

JUROR: Yes, people's choice of words and vocabulary and grammar is different.

MR. GIBBONS: But what you are describing is still the same. Mr. Ignatowicz, your jacket might be described as red, maybe described as black or maybe described as dark red, but it's still a red and black jacket, correct?

JUROR: Yes.

MR. GIBBONS: So knowing that you will be asked about it later you would expect to have a little more accuracy in the details, correct?

JUROR: Yes.

MR. GIBBONS: As I said before, the truth is the truth is the truth. Miss Cho, you are wearing a burgundy scarf, maybe plum. If I asked you ten years from now were you wearing that plum scarf, it would be true, correct?

JUROR: Yes, it would.

MR. GIBBONS: That wouldn't change, the truth is the truth is the truth. Mr. Shortt also asked you about what would be important when you hear an eyewitness testimony to help you discern credibility.

Would you agree that one of the issues you would look at would be the person's ability to observe if I am

watching you right now Miss Chang, and I am trying to describe what you are doing, suddenly the lights go off pitch black and the lights come back on and you switched seats. I was watching everything, and I am gathering that you switched seats with Mr. Surve because now you are in a different seat, but I didn't really see because the lights were off so I was an eyewitness to most of this, then my ability to observe was blocked or maybe it's not as dramatic as the lights went out maybe Mr. Shortt raised his book and I missed something.

I watched pretty much everything, there were a few moments where my ability to observe was hindered, would you consider something like that in listening to the testimony, how well did this person have an opportunity to observe, that's important, right?

JUROR: Yes.

MR. GIBBONS: Maybe you have something in your eye and you flinched for a second. Somebody ever watch a ball game Mr. Apter, sometimes you are watching a game it's great, and then your wife calls you, yeah, then there was a -- the screen goes nuts and you turned and missed it. You watched every minute up to that point and for the split second you were distracted, you missed the big play, right?

JUROR: Yes.

MR. GIBBONS: So you may be a great eyewitness,

but there was a moment when your ability to observe was hindered and that's a factor. Do you all agree to that?

THE JURORS: Yes.

MR. GIBBONS: Okay. I had talked about, and it's very important, certainty versus accuracy. Mr. Apter, have you ever had that situation where you think you see somebody you know, maybe tap them on the shoulder?

JUROR: Yes.

MR. GIBBONS: Even if it hasn't happened, we are all aware of that situation where you thought you knew somebody or you knew something was right, and you were wrong. You are playing Jeopardy you think you know the answer you could have sworn, you were right, bet your life and you were wrong. That's the difference between certainty and accuracy. So even if a witness comes on the stand and he testifies a certain way, and he is consistent throughout the whole thing seven foot two tells the police, the DA and tells you, you see my client and he is four foot nine, yes, he was consistent, but was he accurate? Probably not. That's a factor to consider, correct? Mr. Ciaccia?

JUROR: Yes.

MR. GIBBONS: Not the only factor, but a defining factor?

JUROR: I agree.

MR. GIBBONS: Can you all promise me, Miss Smith, can you promise me that you will look at the evidence and apply it separately and individually to the two clients here?

JUROR: Yes.

MR. GIBBONS: What you see and hear, you will look towards my client and make a determination as to his guilt or innocence and then to Mr. Ball and make a determination as to his guilt or innocence, promise not to lump them together if they didn't do it or if I think this guy did do this, you would not lump them together?

JUROR: Yes.

MR. GIBBONS: Mr. Ivanchenko?

JUROR: Yes.

MR. GIBBONS: Mr. Palmieri?

JUROR: Sure.

MR. GIBBONS: Can everybody give me that promise not to lump this together, look at each one individually and separately? The right to remain silent, you have heard me talk about this, the judge asked you about this, and I always go into it because it's always important. That's a term you throw around. You hear it on TV, in the movies, inundated. Each panel I have asked someone has had an issue, and it is always happens.

If my client exercises that constitutional right

that we all have not to testify is that going to affect the way you look at my client and the way that you perceive the evidence, Miss Cho?

JUROR: I would have sympathy because I understand that so I think I would put something on that.

MR. GIBBONS: Good or bad?

JUROR: I'm saying good and it's not fair.

MR. GIBBONS: So it would have an impact on you, you may not take a negative inference, maybe as positive?

JUROR: Yes, it would affect me.

MR. GIBBONS: Anybody else have similar feelings, Mr. Ciaccia, how would it affect you?

JUROR: Well, if you are innocent, you should prove it and speak for your own self. I know the rights, and I know your right is to be silent, but --

THE COURT: And you have all committed to me as jurors or potential jurors that you will obey the law and this is precisely the area --

JUROR: I'm sorry, your Honor, but I was grown up in a home where honesty at the table --

THE COURT: We are not in a home. We are in an American court of law.

JUROR: That's my gut feeling. You want me to be honest and I'm an honest guy. I'm telling you how I feel.

THE COURT: Can you put those feelings aside?

JUROR: It's hard because when you are brought up in 44 years in that type of household.

THE COURT: If your answer is no, if your answer is no, that's fine.

MR. GIBBONS: We appreciate the honesty. I need to know now. I can't find out later because then I'm in trouble. Mr. Apter?

JUROR: I kind of tend to agree. I understand the defendants' right not to say anything, but it would be good to hear both sides of the story, not just one.

MR. GIBBONS: Well, you are hearing his side, he is saying not guilty, I didn't do it. You will hear my arguments why, but we don't have to prove anything. He has to prove that this happened.

JUROR: I understand that.

MR. GIBBONS: The judge will give you the instructions. You will have to swear that you can do that, but I need the honest answer, but you are not a child. You are a grown man. You have developed your feelings and ideas and moral compass throughout your life so it's being called on now and I need the honest answer. If that situation occurs where he does not testify, are you going to draw a negative inference?

JUROR: It would be a tiny red flag in my head.

THE COURT: Say that again.

JUROR: Small red flag in my head if the defendants don't testify.

THE COURT: Do you think that would cause you to lessen your view of what the burden of proof is or would you still hold the DA to his burden of proving this case beyond a reasonable doubt based on the evidence that he presents to you?

JUROR: I would still try to do my best to do my best.

MR. GIBBONS: But it would raise a flag?

JUROR: In my head, yes.

MR. GIBBONS: Anybody else feel that way?

JUROR: Same thing.

MR. GIBBONS: Anyone else?

JUROR: Same thing. I just feel like if he is not guilty, he should speak up, but I know it's his right not to say anything, so I will try to be fair.

MR. GIBBONS: If he did not testify, you might feel that he is hiding something?

JUROR: Yeah.

MR. GIBBONS: All right. Mr. Surve, do you feel the same way?

JUROR: It would probably depend on a lot of things, but I understand he has a right to remain silent and that would be something that you respect that person's

right to remain silent.

MR. GIBBONS: You might all respect the right, but still want to hear what he has to say and maybe he is hiding something?

THE COURT: You know what, I would disagree with that.

MR. GIBBONS: I am asking if they feel that way.

THE COURT: The way you phrase it, either you honor and respect this right or you don't, then you don't. If you say you don't then you don't. Mr. Ciaccia said he doesn't. The issue is whether or not you respect the right and whether or not you will obey the law. If you say you can't do it, it is fine. I get that.

MR. GIBBONS: Mr. Apter, I know what you said. Mr. Ijnatowicz, can you respect that right and honor that right?

JUROR: Yes.

MR. GIBBONS: Miss Smith?

JUROR: I respect his rights.

MR. GIBBONS: Mr. Somwaru?

JUROR: Yes.

MR. GIBBONS: Mr. Docteur?

JUROR: Yes.

MR. GIBBONS: Miss Chang?

JUROR: Yes.

MR. GIBBONS: Mr. Surve?

JUROR: Yes.

MR. GIBBONS: Mr. Ivanchenko, any problem with that?

JUROR: No problem.

MR. GIBBONS: You are sure if he does not testify, you will not draw a negative inference?

JUROR: No.

MR. GIBBONS: Mr. Palmieri?

JUROR: I don't think it will hinder him. I don't think it would help him.

MR. GIBBONS: When you say that, you don't think I would be able to do a sufficient job.

JUROR: I bet you would do a quite sufficient job.

THE COURT: One minute.

MR. GIBBONS: The fact that your father was a sheriff --

JUROR: No.

MR. GIBBONS: The rest I know what you all said, Miss Cho and Mr. Ciaccia and Mr. Apter.

THE COURT: Wind it down.

MR. GIBBONS: 5:30 at night on Friday, three weeks now you want to go home, can you all promise to stick to your guns and remain true to the verdict unless you are swayed by competent evidence shown to you by your fellow

jurors, do you promise not to be swayed because it's late, and you want to go home, everyone?

THE JURORS: Yes.

MR. GIBBONS: Thank you.

THE COURT: Mr. Ball, you have 15 minutes.

THE DEFENDANT BALL: Good morning, everyone. My name is Raymond Ball, and it's good to have an opportunity to, you know, have my day in court. And you know, I'm listening to some of the things that the jurors, what you guys are saying in respect to different issues as to me not having any experience as being a lawyer which is correct. I'm not a lawyer, and I don't want to profess myself to be a lawyer. However, I do have a right to, you know, to be able to represent myself because of the fact I feel I can represent the truth for myself better than someone else might be able to represent the truth and to also be present to bring the information to the attention of whoever it is that's going to be jurors, certain information that might be able to help them articulate what the truth is.

Like, since I'm here right now this morning, I was able to just point out, come up with one particular thing. You know, when the issue of the guilt or innocence was raised by Mr. Shortt, he used the term when he proves that we are guilty. And when the judge presented the issue of our innocence or guilt to you guys, he said if Mr. Shortt

proves it, so I'm here merely because I want to bring out issues to the jurors to be mindful of these things because sometimes things like this can get past us, you know, because some things can, you know, impose, things can be imposed on our judgment, on our minds.

I will give you another example. You know, there is a lot of scenarios being given out here, and you know what came to my mind was you have things called abstract scenarios then you have things that's more concrete. You guys, they have been asking like hey, you know, would you remember what the weather was like, you know, at a certain point further back in your lives. And no, we won't be able to know about whether the weather was hot, cold or maybe in between. However, there are some concrete things that goes on in our lives, such as learning how to ride a bike. These things I think become more personal, these things are more part of us, and I would think that that is what I would like for you guys to look at. I would like for you to be able to discern --

THE COURT: Mr. Ball, this an opportunity for you to ask questions, not to make a speech.

THE DEFENDANT BALL: Yes, sir. Mr. -- I appreciate your patience. Okay. Is it all right that I say your first name, Mohamed?

JUROR: Yes.

THE DEFENDANT BALL: I apologize. Can you tell me how to pronounce your last name.

JUROR: Adibzadeh.

THE DEFENDANT BALL: Would you agree with me it's not hard for you to remember who your first girlfriend was?

JUROR: It's hard or not hard?

THE DEFENDANT BALL: Would you agree that's something that you would be able to know?

JUROR: I would say, yeah, I agree with you, okay.

THE DEFENDANT BALL: Because that's more personal?

JUROR: Yes, not that I know, but that's all right.

THE DEFENDANT BALL: Okay. I apologize. My point is this, that you know, sir, I apologize for not being able to pronounce your name correctly, but I would like to ask you, would you be able to accept me as being innocent, you see, until, you know, not when, however, if Mr. Shortt and all the other people who are presented before you are able to bring enough evidence to meet the standard of being guilty beyond a reasonable doubt?

JUROR: I agree.

THE DEFENDANT BALL: That's what I'm asking. And I look forward to that, okay, whoever it is that finally do decide to be here. You know, honestly, I'm not really going to keep you guys much longer. I just wanted to like

kind of introduce myself, and try to get to know you a little better and hopefully you will accept me and what is it that I represent, you know, accept me for what it is that I want to achieve, and be able to consider the facts in the case, which I think, you know, you guys are very, very, you know, intuitive, you know. You seem like a very intuitive group so I don't feel that I have any need to really ask a lot of questions. I think you guys will be able to ascertain the truth. So I will close with that.

THE COURT: Thank you, Mr. Ball. Can you please take the jury out for a few minutes?

(Jurors exit the courtroom.)

THE COURT: Ready?

MR. SHORTT: Yes, sure, Judge.

THE COURT: Ready?

MR. GIBBONS: Yes.

THE DEFENDANT BALL: Yes.

THE COURT: All right. We have nine, jurors one through three, People, challenge for cause.

MR. SHORTT: One and three, both said they could not be fair because of Mr. Ball's going pro se. Also number one said he would have trouble respecting the right to remain silent.

MR. GIBBONS: I concur, your Honor, to both.

THE COURT: On both?

THE DEFENDANT BALL: I mean, I have my own opinion, your Honor. I think --

THE COURT: Well, state it.

THE DEFENDANT BALL: I think that Mr. Mohamed -- Mr. Apter, I think he said that he would in spite of all the things he would be able to put aside those issues and go forward.

THE COURT: How about Miss Smith?

THE DEFENDANT BALL: Same, you know, I will concur with Miss Smith. I will agree with Miss Smith but number one, I mean, you know, I think she came around but I will concur with Miss Smith but number one I think in all due respect your Honor, I think he has been very active in his participation in the whole process so far.

THE COURT: Very good. The challenge for cause is denied with respect to juror one and granted on consent with respect to juror three. Defense, challenge for cause?

MR. GIBBONS: Well, again I challenge number one. I don't think that he rehabilitated himself, your Honor. I think he was fairly clear it would create a problem. While it might not be a problem if Mr. Ball decides to testify my client is in all likelihood not going to testify, I think he was pretty adamant it would be a problem, and he may not be able to put your ruling aside and come to a clear mind if my client does not testify.

THE DEFENDANT BALL: In sight of the fact that my codefendant's lawyer insist, I will concede.

THE COURT: Consent?

THE DEFENDANT BALL: Yes, sir.

MR. GIBBONS: Thank you.

THE COURT: People, number two, peremptory challenge?

MR. SHORTT: No peremptory.

THE COURT: Defense?

(Defendant and counsel confer.)

MR. GIBBONS: We are good with him.

THE COURT: All right. Jurors four and five, People, challenge for cause?

MR. SHORTT: None for cause.

THE COURT: Defense?

MR. GIBBONS: None for cause, your Honor.

THE COURT: People perempt?

MR. SHORTT: Number four, Mr. Somwaru. That's it.

THE COURT: Defense, juror five, perempt?

MR. GIBBONS: We are good with number five, your Honor.

THE COURT: All right. So we have eleven jurors now. Juror six, People challenge, for cause?

MR. SHORTT: Yes, she said she could not be fair

to the pro se defendant. Also she had trouble with the right to remain silent.

THE COURT: Defense?

MR. GIBBONS: I agree, your Honor, I concur.

THE COURT: Mr. Ball?

THE DEFENDANT BALL: Okay, I consent.

THE COURT: All right. On consent. Juror seven, People, challenge for cause?

MR. SHORTT: None for cause?

THE COURT: Defense challenge for cause.

MR. GIBBONS: No.

THE DEFENDANT BALL: None for cause.

THE COURT: People, perempt?

MR. SHORTT: Perempt.

THE COURT: Juror eight, People challenge for cause?

MR. SHORTT: None.

THE COURT: Defense?

MR. GIBBONS: No, your Honor.

THE COURT: People perempt?

MR. SHORTT: No perempt.

THE COURT: Defense, perempt?

MR. GIBBONS: No, your Honor.

THE COURT: Mr. Ball, are you on board?

THE DEFENDANT BALL: I'm on board.

THE COURT: All right. We have a jury. We will try for two alternates here. Juror number nine, People, challenge for cause?

MR. SHORTT: None for cause?

THE COURT: Defense challenge for cause as to Mr. Palmieri?

MR. GIBBONS: Not for cause.

THE COURT: People, perempt?

MR. SHORTT: Perempt.

THE COURT: Juror number ten, Miss Cho, People?

MR. SHORTT: Cause, she stated very clearly she could not be clear to the pro se defendant and root for the underdog, she could not be fair.

MR. GIBBONS: Consent, your Honor.

THE COURT: Jurors eleven and twelve?

MR. SHORTT: There is no question.

MR. GIBBONS: Can we go back and try and agree on two alternates?

THE COURT: Can the three of you agree? Let's go off the record.

(Whereupon, an off-the-record discussion was held.)

THE COURT: Palmieri is one, Surve is two?

MR. GIBBONS: All right.

THE DEFENDANT BALL: Your Honor --

THE COURT: There has been an offer of record conversation with Mr. Ball, with the participation of Miss Povman and Mr. Gibbons and Mr. Shortt, and we have come to an agreement that juror number nine, Mr. Palmieri will be alternate one, and juror seven Mr. Surve will be alternate number two; is that correct?

MR. GIBBONS: Yes, your Honor.

THE COURT: Isn't that correct, Mr. Ball?

THE DEFENDANT BALL: Yes, sir.

THE COURT: Mr. Shortt?

MR. SHORTT: Yes.

THE COURT: All right. Bring in the jurors.

We will have a full day tomorrow.

MR. GIBBONS: My witness has a meeting Monday, I don't think her testimony will be more than an hour, hour and change. I know we are not working Monday afternoon. She said she could be here Monday by 11:30.

THE COURT: Obviously it depends.

MR. GIBBONS: Assuming we finish the People's case tomorrow.

THE COURT: Do you think that will happen?

MR. SHORTT: It's fairly short, Judge. It's pretty simple. At the end of the day, this is a simple case. I am thinking we may run a little over on the third witness until Monday morning.

THE COURT: Let's figure this out tomorrow.

THE DEFENDANT BALL: I just wanted to make sure that we supposed to put in application to get an investigator to be able to contact some of the witnesses.

MS. POVMAN: Judge, I was going to raise the issue later after the jury is sworn.

THE COURT: All right. Let's wait until the jury is sworn. Bring in the jury.

THE COURT OFFICER: Are you ready, Judge?

THE COURT: Ready.

THE COURT OFFICER: Jury entering.

(Whereupon, the panel enters the courtroom.)

THE COURT CLERK: Jurors, if you hear your name please remain seated. If your name was not called, please report back to Central Jury. Wojciech Ijnatowicz, Hary Docteur, Maksim Ivanchenko, Brandon Palmieri, Vivek Surve.

If your name was not called, you may step out and report back to Central Jury. Are the remaining jurors satisfactory to the People?

MR. SHORTT: Yes.

THE COURT CLERK: Satisfactory to the defense?

THE DEFENDANT BALL: Yes.

MR. GIBBONS: Yes.

(Jurors sworn.)

THE COURT: Gentlemen, this concludes this portion

of the trial. With the selection of you, we have completed the selection of the jury. We will begin hearing the opening statements and the evidence in the case tomorrow morning, so you are all excused for the balance of the day.

Once again, do not discuss this case amongst yourselves or with anybody else. Do not speak to any of the attorneys, the parties, the witnesses or anybody involved in this case. Do not go to the scene of the alleged incident. Do not research this case in any way. Should anybody speak to you about this case, notify the court officer immediately. I thank you for your service and your attention. 10:00 tomorrow morning. Have a good day. Take charge.

(Jurors exit the courtroom.)

THE COURT: Do you want to be heard before we break?

MS. POVMAN: Judge, I have never been a legal advisor before, Mr. Ball has instructed me that there are certain things he wants me to do. I'm not sure if I'm his legal assistant or legal advisor.

THE COURT: You are his legal advisor. You are the lawyer in the case.

THE DEFENDANT BALL: Yes, sir.

THE COURT: You don't have an assistant, you have an advisor.

THE DEFENDANT BALL: Yes, sir.

MS. POVMAN: Mr. Ball wants an investigator assigned this to this case.

THE COURT: Let him make the application.

THE DEFENDANT BALL: I was in the process. Your Honor, I would like to make the application that you provide for us an investigator because what happens is we was able to provide the names of some of the witnesses, and there is some information that we are still seeking to get.

THE COURT: Well, are you looking for police officers or civilians?

THE DEFENDANT BALL: No, actually, what it is there is information pertaining to witnesses actually.

THE COURT: Civilian witnesses?

THE DEFENDANT BALL: Yes.

THE COURT: Do you have names of these people that somebody can go look for? I mean we are on trial now, and this case is now how old, two and a half years old?

THE DEFENDANT BALL: Your Honor, please forgive me, but I have been asking this for a long time and this is the first opportunity that I have had to be in front of a judge that was like yourself, and I'm really, I beg you please allow us to have it because it's a necessity in our defense. I wouldn't ask unless -- this is not like the first time. I understand it's not a good time, the best

time, but every other time, it wasn't been entertained, and when we did it at that appropriate time, your Honor, so I would ask you knowing that it's an intricate of our defense to provide for us, please.

THE COURT: You are looking for civilian witnesses?

THE DEFENDANT BALL: Just not civilians.

THE COURT: Witnesses to what, who saw the incident?

THE DEFENDANT BALL: Yes, sir. Not alibi, eyewitnesses your Honor, because they were there after the crime took place during the actual arrest.

THE COURT: Do you know who they are?

THE DEFENDANT BALL: Well, yes I do. I gave the name of the Cohen family and the address, but I wasn't able to provide a phone number, and, you know, a direct contact so that's going to be one of the issues. There is also the issue --

THE COURT: Do you know anything about the Cohen family, Mr. Shortt?

MR. SHORTT: I have heard nothing, Judge. I asked the officers and every person associated with this case, no one has ever heard of a Cohen family at any point.

THE DEFENDANT BALL: Your Honor, like I said, there is also the issue of the check cashing place where

this robbery allegedly took place. There is information there, I have an account there, I have been with that checking place for maybe 15, 20 years. There is information pertaining to whether or not surveillance, things of that nature, that the investigator could provide for me. I need, what you call, documents.

THE COURT: Do you know anything about a surveillance where this happened in front a check cashing place?

MR. SHORTT: The complaining witness went to a check cashing place shortly before the robbery, that's why he had so much money on him. I am fairly new in the case, it was twelve, there is no video in terms of record. I don't see --

THE COURT: Let me understand something. It did not happen in front of check cashing place?

MR. SHORTT: In front of a bodega.

THE DEFENDANT BALL: No, your Honor.

THE COURT: How far?

MR. SHORTT: One block.

THE COURT: You can't talk at the same time, and number two is respect for our court reporter who cannot take everything down when everybody is talking which you are doing.

THE DEFENDANT BALL: I'm sorry. Forgive me.

THE COURT: Okay. Do you know whether there is any surveillance either at the check cashing place or in front of the bodega?

MR. SHORTT: None in my possession, and it was deleted long before I ever got on the case because I inquired when I went on the scene.

THE COURT: So there is no surveillance.

THE DEFENDANT BALL: It's not just a matter of the surveillance. It's the location. First of all, Mr. Shortt, according to the testimony of the police officer, your Honor, me and Mr. Brooks are robbing the guy coming out of the check cashing place actually. So what Mr. Shortt is saying that he was there prior --

THE COURT: Well, it sounds like you guys are a block apart?

THE DEFENDANT BALL: I apologize.

THE COURT: It sounds like you are talking about a block away from where Mr. Shortt --

THE DEFENDANT BALL: I can read it off to you. It's in the testimony. It's in the testimony. He went and actually the officer did an investigation and he said that the bodega -- the check cashing place is next to the bodega there. Is a miscellaneous store and the bodega is next to the door so this is the reason we need an investigator.

THE COURT: You say it's a block away?

THE DEFENDANT BALL: It's actually a lengthy block away, and we don't have pictures or anything like that, we ask you to please provide these things for us along with the other issue, simple things like the logbook. When we were originally arrested, we were never given the logbook.

THE COURT: Well, these are not things that an investigator can find out about. If there are --

THE DEFENDANT BALL: Well, let's stick with the issues at hand.

THE COURT: Yes. You say the Cohens were where?

THE DEFENDANT BALL: Well, actually, they own a home on the same block, well, actually on the avenue where I was.

THE COURT: You say they saw what?

THE DEFENDANT BALL: I was with them talking with him before I left off and I was arrested on the next corner not running away from the crime scene.

THE COURT: After the incident?

THE DEFENDANT BALL: Exactly.

THE COURT: So you have a home address for the Cohens?

THE DEFENDANT BALL: Yes, but like you say the time factor and you know the application went unheard.

THE COURT: Do you have a home address for the Cohens?

THE DEFENDANT BALL: Yes, sir.

THE COURT: All right. I will appoint an investigator, but I am telling you that I will not delay this case.

THE DEFENDANT BALL: I understand, your Honor.

THE COURT: We are on trial. We spent two and a half days picking a jury, and we will proceed with this case.

THE DEFENDANT BALL: I apologize. May I talk?

THE COURT: Yes.

THE DEFENDANT BALL: There is also my concern about the EMS workers coming in because there is information inside the EMS report that other people can't testify to.

THE COURT: If you want the EMS people, Mr. Shortt, can you arrange that?

THE DEFENDANT BALL: Thank you.

MR. SHORTT: I don't know if they are available. I didn't line them up.

THE DEFENDANT BALL: This is the reason that I would like the investigator, to make sure.

THE COURT: I understand that but you said you were ready to try this case and we are going to try it. Within those parameters, I said I would point an investigator and I will, but --

THE DEFENDANT BALL: If he gets the witnesses in, you will allow them in is that correct?

THE COURT: Yes, if they are relevant, if they are relevant.

THE DEFENDANT BALL: Thank you.

THE COURT: Anything else?

THE DEFENDANT BALL: Thank you.

MR. GIBBONS: I just want to turn over some documents to my client. I don't know if it the court officer needs to look through them. I am turning them over, there is no staples or anything. I took all the clips off.

THE COURT: Okay. 10:00.

MR. GIBBONS: Thank you, your Honor.

MR. SHORTT: Thank you.

(Trial adjourned to January 23, 2015.)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS: CRIMINAL TERM: PART K14
-----------------------------------------x Indictment No.
THE PEOPLE OF THE STATE OF NEW YORK 2228/12

-against-

ELIJAH BROOKS and RAYMOND BALL,

Defendants.
-----------------------------------------x

125-01 Queens Boulevard
Kew Gardens, New York
January 23, 2015

THE COURT CLERK: Number two, case on trial, indictment 2228 of 12, Raymond Ball and Elijah Brooks. Both defendants are incarcerated and produced being brought before the Court.

Appearances, please.

MR. SHORTT: For the People, Assistant District Attorney Timothy Shortt.

Good morning, your Honor.

THE COURT: Good morning, sir.

MS. POVMAN: As legal advisor to Mr. Ball, Linda Povman, 123-35 82 Road, Kew Gardens, New York.

THE COURT: Good morning.

MR. GIBBONS: For Mr. Brooks, Wyatt Gibbons. Good morning, your Honor.

THE COURT: Mr. Gibbons.

(Defendant enters courtroom.)

THE COURT CLERK: Let the record reflect defendant Brooks is present before the Court.

(Defendant enters the courtroom.)

THE COURT CLERK: Let the record reflect the defendant Ball is present before the Court.

MR. GIBBONS: Your Honor, if my client could have a pen that he could use, he was not allowed to bring his pen out.

THE COURT: All right. Are we ready for the jury, gentlemen?

THE DEFENDANT BALL: Your Honor, I just have a couple of things that I would like to ask before we call the jurors out.

MS. POVMAN: Judge, number one, Mr. Ball wants to know if he can have daily copy of the testimony of the witnesses, because it will be difficult for him to question the witnesses and take notes at the same time. His second application --

THE COURT: Well, before we get to that, do we have a chance of finishing the testimony today?

MR. SHORTT: Everyone is here, Judge. I wouldn't mind it. I don't know how long it will take.

THE DEFENDANT BALL: I apologize. I was going to

ask you also we needed the subpoena approval for the investigator as well as I was going to ask if we do, what you call, the witness testimony today that we could do, can we put off the two officers for Monday?

THE COURT: No. Anything else?

THE DEFENDANT BALL: Because there is information, your Honor, just until Monday, we could do the witness today and the victim --

THE COURT: No. I told you that we are not going to delay this trial, and we are not. Anything else?

MR. SHORTT: No, Judge.

THE COURT: Well, I have something.

THE DEFENDANT BALL: You never answered about for the investigator.

THE COURT: The investigator has been assigned.

MS. POVMAN: The order has been signed.

THE DEFENDANT BALL: Not for the investigator, he needs to get the EMS worker, and he needs the subpoena.

THE COURT: Prepare a subpoena, and I will be happy to consider it.

(Whereupon, an off-the-record discussion was held.)

THE DEFENDANT BALL: A so ordered subpoena?

THE COURT: Prepare one and I will consider it.

THE DEFENDANT BALL: Thank you.

(Whereupon, an off-the-record discussion was held.)

THE COURT: I just want to caution both sides with respect to opening statements that the purpose of opening statements is to state for the jury what you intend to prove, and I know, Mr. Gibbons understands that, and Mr. Shortt understands that, I want you to understand that as well.

THE DEFENDANT BALL: I apologize, your Honor?

THE COURT: There are limitations on what you can say during opening statement.

THE DEFENDANT BALL: Can you go over --

THE COURT: Look --

THE DEFENDANT BALL: You said there are limitations. I want to be sure I stay within --

THE COURT: The purpose of the opening statement is to tell the jury what you expect to prove.

MR. GIBBONS: Your Honor, we don't have to prove anything though really.

THE COURT: Well, then don't open.

MR. GIBBONS: I know. It's a comment on what we believe the evidence will show, not what we have to prove.

THE COURT: That's fine, I just want to make sure everybody stays within the parameters of what an opening statement is and what it is not. Ready for the jury?

Case 1:19-cv-05310-ERK-LB Document 9-2 Filed 12/13/19 Page 460 of 907 PageID #: 823

THE DEFENDANT BALL: Any water available?

THE COURT: Let's go. Bring in the jury.

(Whereupon, there was a brief pause in the proceedings.)

THE COURT OFFICER: Are you ready, Judge?

THE COURT: Ready.

THE COURT OFFICER: Jury entering.

(Whereupon, the sworn jury enters the courtroom.)

THE COURT CLERK: Are the remaining jurors satisfactory to all sides?

MR. SHORTT: Yes.

MR. GIBBONS: Yes.

THE DEFENDANT BALL: Yes. Good morning.

(Jurors sworn.)

THE COURT: Good morning, ladies and gentlemen.

JURORS: Good morning.

THE COURT: Members of the jury, at this point I'm required by law to instruct you generally concerning your basic functions, duties, and conduct as jurors. I will acquaint you in a general way with the trial procedure and certain rules which apply to every jury.

The defendants have been indicted for two counts of robbery in the second degree, one count of assault in the third degree, and one count of criminal possession of stolen property in the fifth degree. I remind you that

this indictment is simply an accusation, and it is not in any way evidence of the allegations it contains. It is merely a device used by law to bring the charges against the accused to trial. The People have the burden of proving beyond a reasonable doubt each element of the crimes charged in the indictment. The defendants do not have to prove anything and are presumed to be innocent of the charges.

Now, this trial has already commenced with the selection of you folks as the jury. The next step in the trial will be an opening statement by Assistant District Attorney Shortt during which he is required by law to indicate to you what he intends to prove by way of evidence to support the charges set forth against the defendants. Then defense counsel, if they desire, may also make opening statements. What counsel for either party says in an opening statement is not evidence.

As you are aware, the defendant Raymond Ball has elected to represent himself. Under our law, every defendant has a right to have a lawyer represent him and to have the court appoint a lawyer if he cannot afford one. The defendant Ball has waived his right to counsel and has chosen to represent himself, and as you know, Miss Povman, who is an attorney, has been made available to him to advise him should he so desire. You are not to draw any

inference favorable or unfavorable to the defendant from the exercising of his right to represent himself.

After the opening statements, the District Attorney will present a witness or witnesses who will be questioned by him. We call this direct examination. After the DA completes his questions, defense counsel will be given an opportunity to question the witness. We call this, as I'm sure most of you know, cross-examination.

After the People have concluded calling their witnesses and the introduction of any exhibits which are admissible into evidence, either defendant, may if they choose to do so, offer evidence in their defense, but again they are not required to do so.

After you have heard all of the evidence, the defendants may make a closing argument following which the People will make a closing argument. What a lawyer says in summation is also not evidence. The summations do provide the lawyers with an opportunity to review the evidence presented and submit for your consideration the facts, inferences and conclusions which they contend may be properly drawn from the evidence presented. I will then charge you on the law, and you will retire to deliberate for the purpose of reaching a verdict.

That is a general outline of the trial procedure. For the most part evidence consists of testimony of

witnesses under oath and exhibits which are introduced into evidence. Questions in and of themselves are not evidence. Therefore, you cannot infer any fact from the mere asking of a question. It is the answer coupled with the question that constitutes evidence.

Now, during the course of the trial, either attorney, the District Attorney or defense counsel may object to a question or an answer on the grounds that it is somehow legally improper or inadmissible. If I sustain the objection, this means that I have determined that the question or answer was in some manner improper, and you are to disregard it.

If I overrule the objection, then it means the question is proper, and I will permit it to be answered. Please do not resent the fact that either attorney makes or any of the attorneys make objections. That is their right and their duty. Please do not hold it against any of the attorneys if I rule against them. That's my job.

As I will explain to you in detail in my final charge, as jurors in the case, you are the sole judges of the facts, and I am the sole judge of the law, and you must accept the law as I give it to you without hesitation or reservation even if you privately disagree with me. It is my function to make rulings and to charge you on the law. You must neither offer nor express an opinion as to the

guilt or lack of guilt of the defendants until you have heard all of the evidence, all the arguments of the attorneys and my instructions to you on the law.

Do not attempt to research any fact, issue or law related to this case whether by discussion with others, by research in a library or on the Internet or any other means. You must not visit or view the premises or place where the crimes charged were allegedly committed or any other premise or place involved in this case.

Keep in mind that the lawyers have been directed not to speak to you even if they come across you in the elevator or see you in the hallway or on the boulevard, please do not talk to them, not even to pass the time of day. I impose these rules so that no one can question your impartiality.

You must promptly report to the Court any incident within your knowledge involving an attempt by any person improperly to influence any members of the jury. You are not to take notes during the course of the trial. Note taking will distract you from what is being said in the courtroom, and I want all of you to be concentrating on what is being said in the courtroom. Bear in mind that at any time during your deliberations, you have a right to request the testimony be read back to you and that any exhibits received and marked in evidence be delivered to

you.

Under our law, only twelve jurors will deliberate on this case when it is submitted to you to render a verdict. We have selected two additional jurors. Alternate jurors are selected to serve because a regular juror may be prevented from continuing to serve by some serious emergency. Therefore, the alternates are required to pay the same careful attention to the trial as the regular jurors.

Again, I want to thank you for assuming the important responsibility of serving as jurors in this criminal case.

We will now hear the opening statements beginning with the Assistant District Attorney, Mr. Shortt.

You may proceed.

MR. SHORTT: Thank you, your Honor.

Good morning, ladies and gentlemen. On the night of July 3 of 2012, Tarek El Turkey left his home to go for a walk, have a cigarette and clear his head. What ended up happening to him was he had his pocket slit open, his money stolen and his head bashed against the sidewalk. Ladies and gentlemen, these defendants are the men that did it. To these men Tarek El Turkey was nothing more than a walking, breathing ATM machine, unable to communicate or to speak to the police.

In a few moments you will hear from the man that was left bleeding on the sidewalk that night. He came to this country from Egypt 25 years ago. For the past eleven years he works everyday as a New York City cab driver. Everyday six days a week twelve hours a day Tarek El Turkey is proud to go to work driving a New York City cab here in New York City. Gas prices, weather, insurance all are factors whether or not he makes the rent every week but still he goes out everyday happy and proud to have a job in this city.

You will hear in July of 2012 Mr. El Turkey lived in a basement apartment on 105 Street just a few doors away from Northern Boulevard in Queens. He lived with a friend of his who worked at the deli a few blocks away. On that night he had come home from a long day driving the cab. He took a shower, watched a movie.

The land lady who lived upstairs had two very simple rules, the rent has to be paid in cash, and there is no smoking. The first rule Tarek never had a problem with. You will learn though that he is a life long pack a day smoker, and the second one got on his nerves a little bit, but the rules of the house are the rules of the house. He understood that the woman upstairs had children, so 8:30 that evening he felt the urge to go outside and have a walk and have a cigarette. He stepped out of the house and went

down to Northern Boulevard and to the deli on the corner of 105 on Northern Boulevard. It was a regular haunt for Tarek. His friends worked there. They came from the same region of the world. The manager was from Yemen, and he was from Egypt.

That night before Tarek went to the store, he had to pick up cash. He crossed Northern Boulevard, saw some people in front of the deli which was nothing new, but before he went in, he made a left turn and went to the check cashing place that he went to regularly. He went there instead of the ATM because it was two dollars cheaper. Not thinking of it, but his detour did not go unnoticed. He took out $260 from the check cashing place exactly. It was his share of the rent. The rent was coming due and again it had to be paid in cash.

He went back to 105 Street to pick up coffee and have a cigarette with his friend. When Tarek got to the corner of 105 and Northern Boulevard, he saw an all too familiar face, the defendant Raymond Ball. During the trial, you will hear that he is a fixture in the neighborhood. You will almost always find him in front of that deli on that corner. Tarek will tell you he has seen him dozens, hundreds of time, can you help me out, give me something, dollar, $5. Most of time he pays him no mind. Some days he may throw him a buck or two to be rid of him.

On that night Tarek did not think anything of it then, but he did not know that Raymond Ball was not going to take no for an answer. Tarek went inside the store, and he had a coffee. It was night before the 4th of July in the bodega. People were stocking up for parties that night so his friend did not have time to chat.

He took the hint, but before he left, he asked the friend for a pack of cigarettes, $10 exactly. He gave over one of the brand new you crisp $20 that he had just taken out from the cash machine. He asked to change five twenties for hundred dollar bill to make it easier for him to carry and the landlady prefers it. The business owners are always happy to get rid of big bills, and he made the change no problem.

Tarek walked out of the store, not the victim of a crime and not knowing what laid in store for him. He could see the front of the deli was crowded with people that he had not seen before and one he had Raymond Ball. He took out his cell phone, and he made a phone call to a friend in Jersey. Not wanting to make a call in front of a crowd of people, he made the right down 105 Street as he had hundreds of times before when he went for a cigarette. It was then that he realized something was wrong, someone was behind him as he walked down 105 Street, someone he had not seen before, the defendant, Elijah Brooks.

Case 1:19-cv-05310-ERK-LB Document 9-2 Filed 12/13/19 Page 469 of 907 PageID #: 832

Following close five or ten feet away, Mr. El Turkey kept looking back and seeing the face of Elijah Brooks following him down the street, this empty street. He started walking faster, and Mr. Brooks started walking faster. Every time Mr. El Turkey looked back, he saw the face of that man Elijah Brooks following him.

Realizing he was that getting away from the crowds and the lights of Northern Boulevard, he realized he was in trouble. Tarek immediately started walking faster and so did he. As they got about 100 feet off the block of Northern Boulevard, Tarek chose that moment to make a run for it. He hopped into the middle of the street thinking the man would not be so brazen to follow me or rob me in the middle of the street on a well lit street.

That's exactly what he did. He followed him, and as Tarek turned around to make a break towards Northern Boulevard, that's when these defendants struck. He made about halfway up the block when this defendant called out to his crony, Raymond Ball, push him, get him. That's when this defendant shoved Tarek El Turkey between two parked cars, shoved him with such force that he actually launched Mr. El Turkey on top of Raymond Ball forcing them both to fall onto the ground between two parked cars.

Raymond Ball then proceeded to hold down Mr. El Turkey while Elijah Brooks beat him to within an inch of

his life, punching him in the face, taking his head slamming it against the is sidewalk. Tarek tried to fight back but he couldn't because Raymond Ball dropped his knees onto Tarek's hands and all he could do was take the beating after Brooks landed blow after blow on to his head and face. As he tried to fight it off, Mr. Ball with his knees on top of his hands went through his pockets ripping open his pants to get his cell phone and wallet. When that was not enough, he ripped open even more pockets, but there was nothing more than the cell phone and wallet.

Raymond Ball took it and ran but Mr. Brooks was not done. He was not happy with small haul he got yelling out, you motherfucker, and repeatedly slamming his skull on the curb of the sidewalk. Then Elijah Brooks left.

Mr. El Turkey never lost consciousness. He staggered into his friend's store and told him what happened. He saw his friend covered in blood and immediately called the police.

As this was going on you will hear that police Officers Pampena and Detective Lanning, two members of the New York City Police Department, were individually on routine patrol. At the same time they both got the call and ran to the location of 105 Street and Northern Boulevard.

Officer Lanning will tell you that he was driving

around as the field intelligence officer doing his normal rounds, and he was the first one on scene, and he arrived to see Tarek standing on the corner of 105 Street bleeding from the head and mouth. He did not need to be told too much. Tarek waved him down and pointed and he said he went that way, I saw him. Officer Lanning did not need much more than that, he said, hop in, let's go get him. They drove down 105 Street and within about one hundred feet saw Elijah Brooks standing there with another individual. Tarek said stop, there he is, that's the man that did this to me.

You will hear Officer Lanning say he saw two people and did not know which one to stop. He hopped out, drew his weapon and told them both to stop. Tarek was clear not that one, that one, Elijah Brooks is the man that robbed me.

While this was going on Officer Pampena was making his way from the opposite direction of 105 Street. He came across the defendant Raymond Ball running, running at a full sprint up the opposite way of 105 Street away from Northern Boulevard with a cell phone in his hand, the cell phone you will eventually learn was Tarek El Turkey's.

Officer Pampena stopped the defendant eventually opened up the phone and saw pictures of Tarek El Turkey inside. The defendant said, I got it from somebody down on

Northern Boulevard, the most honest thing he probably ever said, I got it from a guy on Northern Boulevard. The officer says let's go find out who that guy was, he did, it was Tarek El Turkey as he was being treated in the ambulance.

These are the allegations -- these are the facts that lead a Grand Jury of the County of Queens to vote the indictment that you will consider. I would like to read that indictment to you now.

The Grand Jury of the County of Queens by this indictment accuses the defendants of robbery in the second degree as committed as follows: The defendants each aiding the other on or about July 3 in the County of Queens each actually being present forcibly stole certain property, to wit: Personal property from Tarek El Turkey.

The Grand Jury of the County of Queens by this indictment accuses the defendants of robbery in the second degree committed as follows: The defendants each aiding the other on or about July 3 of 2012 in the County of Queens forcibly stole property, to wit: Personal property from Tarek El Turkey and in the course of the commission of the crime or immediate flight therefrom caused physical injury to Tarek El Turkey who was not a participant in the crime.

The Grand Jury of the County of Queens by this

indictment accuses the defendants of assault in the third degree committed as follows: The defendants each aiding the other on or about July 3, 2012 in the County of Queens with intent to cause physical injury to another person caused such injury to Tarek El Turkey.

Finally, the Grand Jury of the County of Queens by this indictment accuses the defendant Raymond Ball of criminal possession of stolen property in the fifth degree committed as follows: The defendant on or about July 3 of 2012 in the County of Queens with intent to benefit himself or a person other than the owner thereof or to impede the recovery by an owner thereof knowingly possessed stolen property, to wit: Stolen property taken from Tarek El Turkey.

It is on these facts and on this indictment that you will ultimately judge these defendants. It is on their actions that day that you will judge these defendants. As the Court told you, this is only a legal tool to bring the defendants before the Court. More importantly it is a road map to this case. It is my obligation to prove the elements contained in this indictment, nothing more, nothing less. Hold me to the burden of proving this road map to you of showing you what happened on that night of proving the accusation of the charges contained in this indictment, not beyond all possible doubt or beyond all

possibility of a doubt, nor is it my obligation to prove them beyond a shadow of a doubt as the Court said, that is impossible. My obligation is to prove it beyond a reasonable doubt, a doubt based on reason.

As you listen to the evidence, consider what is reasonable and not reasonable, what is credible and not credible. I implore you to use the most valuable assets you brought to the courtroom, common sense and life experience. These are the qualities that you walked in here with on day one of jury selection and they make you the person you are today. Do not hesitate to use them in this setting. You were picked because of your common sense and life experience that you demonstrated during jury selection. There is no sign in the courtroom that says leave common sense at the door. Use the qualities of listening to the evidence in evaluating what is the credible evidence in this case. Remember the ultimate goal is to render a fair verdict based upon the credible evidence presented to you.

I ask you to remember trial is not seeking some great moral truth or answering or speculating on what ifs, what if things were different. There are no mysteries to be solved, only accusations to be proven. At the end of the trial I will come back to you and speak to you about what the evidence has shown, and I will ask you to render a

verdict consistent with the credible evidence presented in the courtroom.

Before I do that, the evidence will speak far louder or clear than my words. I ask you to pay attention the evidence, consider what is credible and use your common sense, and at the end of this trial, I am confident there will be no verdict you can reach but guilty. Thank you.

THE COURT: Thank you.

Mr. Gibbons, do you wish to open?

MR. GIBBONS: Yes, your Honor.

THE COURT: You may proceed.

MR. GIBBONS: Thank you.

Good morning, ladies and gentlemen. Thank you for your service. The indictment that was read by Mr. Shortt, his opening statement, my opening statement, the opening statement of Mr. Ball should he choose to make one, is not evidence. It's not evidence. This opening statement is merely an overview, road map of what we believe the evidence is going to show you, what the testimony will tell you what the evidence will show you, to help you determine what the facts actually are.

What's not in dispute is whether Mr. El Turkey was robbed. Common sense, the same common sense that Mr. Shortt talked about clearly will tell you he was robbed and viciously beaten. What's in dispute is whether or not

my client, Elijah Brooks was one of those assailants. At the end of this trial, when you have heard all of the evidence, common sense will tell you that he couldn't have been, that he was not. You will hear about the assault from Mr. El Turkey, the fact that he knew one of the robbers, he had seen him before, but he had never seen the other one, that the attack happened suddenly, and it was violent with punches to the face, with his head slammed to the street, that Mr. El Turkey goes into a nearby deli and the clerk calls 911, a vague description is put over, three male blacks and that one of them was wearing a white shirt and black pants.

Mr. El Turkey is going to tell you that he saw this assailant the stranger again moments later outside the deli just a few seconds later after the first call and he goes back into the deli, Mr. El Turkey goes back into the deli. The cops are called again, Mr. El Turkey goes outside a few seconds, a minute later, and he sees an unmarked car. He goes over to it and speaks to the officer inside, and he gets in to canvass the area and while travelling southbound on 105 Street. You will figure out the directions, traveling southbound on 105 Street, just a few feet from the intersection of 105th and Northern.

Mr. El Turkey sees my client Elijah Brooks walking towards them, walking towards them, towards the crime

scene, not running away from the crime scene, towards the crime scene, walking and chatting with another individual. Mr. Brooks is arrested, he is searched right then and there, a couple of minutes after this all happened. Nothing is found on him, no proceeds from this robbery. He is wearing a white shirt but he is wearing black shorts and wearing a red baseball cap, and he is missing a bunch of teeth.

Then you will hear a few moments later another police car stops Raymond Ball who is running down 105 Street away from the crime scene. When he stops he blurts out absolutely unprompted something to the effect he just bought this phone on the boulevard. When he was arrested he is found to have the victim's phone, money in the exact amount and denominations taken from the victim, he is identified by the victim and he is wearing a white shirt, black pants and his description was his clothes were disheveled.

There will be other evidence, that's the heart of the allegations here. I need you to keep an open mind while the case is being presented to you. Do not prejudge. Wait until you hear all the evidence, seen all the evidence. Hold Mr. Shortt to his burden of proof beyond a reasonable doubt.

Once you do and the judge has instructed you on

the law to apply to the facts, and you go back and deliberate, I'm sure that you will be -- you will have to come back with the only verdict possible for Mr. Brooks which is not guilty on all counts. Thank you.

THE COURT: Thank you, Mr. Gibbons.

Mr. Ball, do you wish to open?

THE DEFENDANT BALL: Yes.

THE COURT: You may proceed.

THE DEFENDANT BALL: Good morning, ladies and gentlemen of the jury. How are you doing today? I have been looking for this moment for a long time.

You know, on the date when this crime allegedly took place is 2012, July 3 of 2012, and, you know, this is -- today is what, 2015, so the length of time between the time that I have waited to come here has been a long time, and I'm looking forward to it, and I'm glad that I have you guys as jurors to help me through this. I appreciate it. Thank you.

THE COURT: Anything else? That's it?

THE DEFENDANT BALL: No.

THE COURT: Okay.

THE DEFENDANT BALL: I want to start out by reading what you call Justice Lewis Brandeis, one of the greatest Supreme Court judges, he lived during the time of 1856 to 1941 --

THE COURT: Mr. Ball?

THE DEFENDANT BALL: The greatest thing --

THE COURT: Mr. Ball?

THE DEFENDANT: -- to lurk --

THE COURT: Mr. Ball.

THE DEFENDANT BALL: Yes, sir, is there a problem?

THE COURT: Yes.

THE DEFENDANT BALL: What's the problem?

THE COURT: The problem is that's improper for an opening statement.

THE DEFENDANT BALL: The United States wins its point when justice is done as citizens in this court.

THE COURT: You are ignoring what I just said to you, aren't you?

THE DEFENDANT BALL: Ladies and gentlemen of the jury, the District Attorney Shortt has checked his ethical responsibilities --

THE COURT: Mr. Ball.

THE DEFENDANT BALL: -- at the door.

THE COURT: Mr. Ball, address yourself to what you think the evidence is going to show.

THE DEFENDANT BALL: This trial will reveal itself as a dark bloom, a terrible flower and the root cause of the dark bloom is that this cause has fundamentally poorly prosecuted from the outset.

MR. SHORTT: Objection, your Honor.

THE COURT: Sustained.

THE DEFENDANT BALL: Mr. Shortt --

THE COURT: Sustained. Again, Mr. Ball, address yourself to what you think the evidence will show or will not show.

THE DEFENDANT BALL: Ladies and gentlemen of the jury, I will prove that the District Attorney has flagrantly violated my constitutional rights --

MR. SHORTT: Objection.

THE COURT: Sustained.

THE DEFENDANT BALL: Ladies and gentlemen of the jury, the evidence and the situation that he described to you guys is not what happened. What happened is I was walking from a friend of mine's house on 32 Avenue, and I was stopped by some police officers, car 242, like they said, I'm a person who is known in the neighborhood. I was walking, I had slippers on, shorts and a white shirt, and I had just came from my friend's house. The officers stopped me, brought me back to the crime scene because they wanted to question me.

When I got back to the crime scene with the officers, they took me out the car, and they surrounded me. The next thing, I know they put me back in the car and took me to the precinct. What happens is in the testimony that

was presented is that I was running away from the crime scene with the victim's phone in my hand, and that I voluntarily just went to the police without no provocation at all, I just ran up to them and voluntarily turned myself in and told them that I have a phone that I got from 105 Street. What happens is in the testimony that was presented to me in like the testimony of the officers, they testified in the Grand Jury --

MR. SHORTT: Objection.

THE COURT: Well, just tell us what you think the evidence is going to show at the trial.

THE DEFENDANT BALL: Okay. The evidence, in other words, is going to show that it was impossible for me to have committed the crime. This is a crime where there was a lot of blood, and, you see, Mr. Shortt already has explained to you guys that I was allegedly the person who held Mr. El Turkey down on the ground, and later on you will see evidence of me after I was, you know, arrested with a white shirt and no indications of blood or anything.

This trial, you know, is lacking a lot of evidence that I need to show and prove my innocence, but the truth, the truth is something that I know, that's the reason I'm here, because I know that the truth. It can't last forever, it has to be uncovered so I think that throughout the process of this trial I think that if we take our time,

ladies and gentlemen of the jury, I'm confident that you guys will, you know, help me uncover the truth of the matter.

This is my first time doing this, but I appreciate everything, and I'm not going to hold you. I want to get straight into the trial and possibly, hear, you know, more of the testimony that's being presented against me so that we could probably evaluate the testimony along with the evidence that's being presented, and I will have an opportunity to confront my accusers. Thank you.

THE COURT: Thank you, Mr. Ball.

Mr. Shortt, call your first witness.

MR. SHORTT: Your Honor, the People call Tarek El Turkey.

THE COURT OFFICER: Witness entering.

T-A-R-E-K E-L T-U-R-K-E-Y, having been duly sworn, was examined and testified as follows:

THE COURT CLERK: Please be seated and answer all questions in a loud clear voice.

THE COURT OFFICER: The People call Tarek El Turkey, T-A-R-E-K, last name, E-L-T-U-R-K-E-Y, resident of Queens County.

THE COURT: Mr. Shortt, you may inquire.

MR. SHORTT: Thank you, Judge.

DIRECT EXAMINATION

BY MR. SHORTT:

Q Good morning, Mr. El Turkey.

A Good morning.

Q How are you today, sir?

A I'm fine. Thank you.

Q How old are you?

A 55.

Q Where were you born?

A Egypt, Alexandria.

Q When did you come to this country?

A 1988.

Q How did you come to this country?

A By airplane.

Q Why did you come?

A To get a better life.

Q Did any of your family come with you?

A No.

Q Just you?

A Yes.

Q Where did you first come when you arrived in America?

A New York.

Q And what did you do when you first arrived in New York?

A I work restaurant for four years, then I moved to Texas.

Q Where in Texas did you move?
A Houston.
Q How long were you there for?
A Six years.
Q What did you do down there?
A I used to have gas station.
Q Then what happened?
A My brother took it.
Q Okay. When did you come back to New York?
A '03.
Q What do you do for work, sir?
A Yellow cab taxi driver.
Q How long have you done that?
A Like around ten or eleven years.
Q Do you have your own cab?
A No, I lease it.
Q Do you lease it with other people?
A Yes, sir.
Q How many days a week do you drive your cab?
A Six, sometimes seven.
Q What's the average shift for you, how long?
A Twelve hours.
Q I'm sorry?
A Twelve hours.
Q I would like to talk to you a little about what you

were doing in July of 2012. Were you still living in New York City at that time?

A Yes, sir.

Q Where in New York City were you living?

A Corona.

Q Where in Corona?

A 105 between Northern Boulevard and 32 Avenue.

Q How far off Northern Boulevard was your house?

A Like 40 feet.

Q How many houses is that?

A Third house from Northern Boulevard.

MR. GIBBONS: I'm sorry?

THE COURT: Third house, 40 feet.

Q What type of building was that?

A Family house, two floors.

Q Where in the house did you live?

A The basement.

Q Did you live there alone?

A No, I have roommate.

Q Who was your roommate?

A From same country, his name is Hany.

Q How long had you been living at that place for?

A Four years.

Q Had Hany always lived with you at that time?

A Yes, sir.

NS

Q What was your rent when you lived there?

A 1200.

Q Who else lived in that building?

A The owner.

Q Who was she?

A Her name is Carmen.

Q Did Carmen have any rules about the house?

A Yes, no smoking in the house. She has a daughter, she had asthma.

Q Okay. Do you smoke?

A I smoke outside, yes.

Q How much do you smoke?

A Like pack and a half.

Q How long have you been doing that for?

A 25 years.

Q Are you planning on quitting any time soon?

A Yeah.

Q I want to talk to you specifically now about the day of July 3 of 2012, okay?

A Yes.

Q Were you working on that day?

A Yes, day shift, yes.

Q What is the day shift for taxicab driver?

A From five to five.

Q 5:00 A.M. to 5 P.M.?

A Yes.

Q Where do you usually drive your cab?

A In Manhattan or airport.

Q When did you go -- when did you finish work that day?

A 5:00.

Q What did you do after work?

A I went home, eat, take a shower, stay on the laptop.

Q What do you do on the laptop?

A Facebook, I always watch 48 Hour Mystery.

Q Is that the show you usually watch?

A Yes.

Q I want to talk to you a little about around like 8:30 in the evening, okay?

A Yes.

Q Did you stay in the house all night?

A No, I always go outside for a smoke.

Q Let's talk about 8:30 at night, did you go out at that time?

A Yes, sir.

Q Where did you go when you left the house?

A I went to the ATM machine.

Q Where is the ATM machine?

A On corner of 106 and Northern Boulevard.

Q If I were to walk out the front of the door of your house at the time, how would I get to that check cashing place?

A Just to cross the street to Northern Boulevard as I said and take a left, it's one block.

Q So it's across the street from your house?

A Yes.

Q On the other side of Northern Boulevard?

A Yes.

Q How long did it take you to go from your house to the check cashing place that day?

A Two minutes.

Q Are there any stores in that area that you like to go to?

A Yes. The deli.

Q Where is that deli located?

A On the corner same of my house 105 and Northern Boulevard.

Q Where is that deli located compared to your house?

A Just across the street.

Q Is it across 105 or across Northern Boulevard?

A 105.

Q Is it on your side of Northern Boulevard?

A No, the other side.

Q Where is that deli compared to the check cashing place?

A The opposite 105 corner and 106, it's one corner.

Q When you went to the check cashing place, did you

pass the deli?

A No.

Q How did you get there?

A I went -- I took the money and then I went to the deli.

Q Okay. How did you get from your house to the check cashing place?

A Walking.

Q What route did you take?

A I just cross the street, take a left one block, that's the check cashing, then I come back one block, and I be in the deli.

Q Do you know anybody that works in the deli?

A What, sir?

Q Do you know anybody that works at the deli?

A Yes, my friend is the owner, I know him since I live in this area.

Q How often did you go into that deli?

A I go all the time, maybe ten times a day.

Q Ten times a day?

A Yes, to buy coffee and cigarettes, and I stay with the guy because he is from Middle East.

Q Where is he from?

A From Yemen.

Q What do you guys talk about?

A The revolution and politics, woman, normal, we are friends.

Q Okay. Was he there when you went to the deli on July 3?

A Yes.

Q Was -- did you get to talk to him?

A Yes.

Q What did you talk to him about?

A Before the accident?

Q When you first walked into the deli that day?

A We was talking about he was planning to get married so I give him advice about marriage, we talk about woman.

Q Okay. Were there other people in the deli that day?

A Yes, it was busy rush hour.

Q About how many people in the deli at that time?

A Maybe like six or seven people.

Q Before you walked into the deli, did you see anybody that you had seen before?

A Yeah, I saw one guy.

Q Who was that?

A He is a black guy, homeless, I always give him dollar or coffee or something.

Q How often had you seen that person before?

A I see him like three or four times.

Q And when was the last time before that day that you

had seen him?

A Maybe like three or four days.

Q What happened three or four days before, how did you see him? What was he doing at that time?

A He always begging for dollar.

Q Where does he do that?

A In the same, in the corner 105 and Northern Boulevard.

Q Okay. What time of day did you see him that first time?

A It's after I finish work I always when I got off from the bus, sometimes I always see him in the corner of 105 and Northern Boulevard.

Q For how long had you been seeing him there, weeks, months, how long?

A Yeah, maybe like months, month and a half.

Q Where was he the first time that you saw him on the night of July 3rd, 2012?

A It was in the corner of 105, outside the deli.

Q Where outside the deli?

A Corner of 105 and Northern Boulevard.

Q What was he doing?

A He was standing with bunch of guys.

Q I'm going to ask you to take a look around the courtroom and see if you recognize the person that you have

talked about just now.

A He is not here.

Q Look around the whole courtroom, sir.

A No, not here.

Q After you saw this person, what did you do after you saw him for the first time?

A I went inside the deli to buy cigarette.

Q How long were you in the deli for?

A Stay like couple, three minutes because it was busy time.

Q And when you went -- when did you leave the deli?

A I spend like three or four minute, and then I went outside like 8:30.

Q Where were you going when you left the deli?

A Just around the corner walking 105 to smoke a cigarette and talk on the phone.

Q Who were you going to call?

A A friend of mine in New Jersey.

Q What were you going to talk about?

A She is a girlfriend, yeah.

Q When you left the store, was there anybody outside of the store?

A Yeah, it was a lot of guys.

Q Can you describe what those people looked like?

A It was one side has like four or five guys and the

other side had four or five or six guys.

Q What did you do when you walked outside of the deli?

A Just light my cigarette and I dial the number and I walk.

Q I'm sorry?

A I light my cigarette and I dial the number, and I just walk on the sidewalk.

Q What direction did you go after you walked out of the front of the deli?

A Sorry?

Q Where did you go as soon as you walked out of the deli?

A I walk on the sidewalk like to the other way like going 34 Avenue.

Q What street were you taking to get to 34 Avenue?

A Same, 105, but I didn't catch 34 Avenue, I just walk like maybe hundred feet.

Q Okay. Were you walking away from or towards Northern Boulevard?

A Opposite from Northern Boulevard.

Q And you were on 105 Street?

A Yes, sir.

Q What happened when you walked along 105 Street?

A I find someone following me.

Q What do you mean by that?

A Like I catch the phone and it's dark, and I'm not strong enough, I always sneak like look like this I find someone and so I moved and someone moved also and I said better for me safe to go outside so I leave the sidewalk and I turn in the street to be the car -- visible to the car so he is also look at me and I hear to say someone push him, or punch him, so I look and the other guy, homeless guy is behind me so I turn, wherever I turn to talk to the heavy guy what you want, he push me, the guy behind me we both go down on the floor, and my head was in his lap, and his legs, the other guy so he stand up to search my clothes, he cut my pants, he took my phone and when -- when he got off to search me, my head touch the base so the heavy guy he is -- his legs, he is jump -- he is in front of me, on top of me, and he took my head, and he push it in the sidewalk two times, and then he punch me in the eye and the teeth, I lose this one, this teeth (indicating) and he say a lot of bad word like I kill you MF bad word, and the guy was talking to the other guy, take it, take it, fast, fast, then before the guy, the homeless guy, he took the phone and the wallet and the money and then the guy, he push me again to make me dizzy, and he push me again in the sidewalk like three times, it was blood, and he run.

Q I want to back up a little bit. You said that you saw somebody following you?

A Yes.

Q How close did that person get to you while they were following you?

A Seven feet.

Q Could you point to something in the courtroom what you mean by that?

A Like me and this lady.

Q That's how close that person who followed you was?

A Yes.

THE COURT: This lady meaning the clerk?

THE WITNESS: Yes.

Q Had you ever seen that person before?

A No.

Q Could you describe for the jury what that person looked like?

A Yeah, he is heavy, taller than me and maybe heavy, maybe weigh like 300 pounds, I don't know, like 250 pounds, black guy wearing like white shirt and dark jeans.

Q Could you see what kind of hair he had, long hair?

A No, short hair.

Q Did you notice anything else about him?

A What?

Q Did you notice anything else about him?

A No.

Q What happened when --

MR. SHORTT: Withdrawn.

Q How far down 105 Street did you walk?

A Like 80 feet, I pass like five or six houses.

Q How close was this person while you were walking?

A He was close to me like same like lady, like seven feet.

Q Did you ever get closer?

A No, because I moved also.

Q What do you mean that you moved?

A I mean I walk like this, I catch the phone, I hang up, but I act like I'm not scared, just walk, walk, walk, and I get down the street.

Q And what happened then?

A Yeah, I find him, he start talk to someone like make a deal push him, push him.

MR. GIBBONS: Objection, your Honor, to what he thinks they were making a deal or something.

THE COURT: Sustained as to that. Just tell us what you heard them say, okay?

A I mean -- okay.

Q Mr. El Turkey, how many times did you look back and see the person who was following you?

A Not time, all the time.

Q What do you mean by that?

A Like I'm walking if I feel someone behind me, I always look, not one time or three times, just look my eye like

this.

Q So were you looking at that person's face while you were walking?

A Not face, just the view, I like feel he is behind me.

Q Okay. Could you see his face at that time?

A When I turn, yes.

Q When did you turn?

A When I get off in the street.

Q Let me back up a little bit before we get there, okay?

A Um-hum.

Q Had you seen that person outside the deli?

A I didn't recognize him because I don't know him. It was a lot of guys outside.

Q When you were walking down the street and the person was following you, could you tell us were the deli lights on at that time?

A Yes.

Q Were the street lights on at that time?

A Yes.

Q Were there any other lights on at that time?

A Few store, three store on this side and dancing club on the other side.

Q What do you mean, what dance club?

A Dance club is open to midnight, take classes, tango

classes.

Q Where is that compared to the deli?

A In front of him, the other corner of 105.

Q How far down the block of 105 Street between these two stores did you get, about how far?

A What?

Q How far did you go down 105 Street between these two stores on 105 Street?

A I just pass the store like three or four houses.

Q What happened when you got down to the third or fourth house?

A He was too close to me.

Q So what did you do?

A That's when I got out in the street.

Q Why did you do that?

A To come back.

Q Go back where?

A To the store.

Q Why were you doing that?

A Why?

Q Yes.

A Why I go to the store?

Q Yes.

A To my friend, to have protection, to have safe to walk to him to come back to the store to my friend.

Q Did you ever get back to the store?

A After took all the money, yes.

Q What happened when you started walking back 105 Street up towards Northern Boulevard?

A The guy, yes, the guy he talk to the other guy he told him, punch him, punch him so I look to him, what like wonder what you want to the time between two cars he push me, and I fell down.

Q The person that you have told us that was following you was the same guy as the homeless guy?

A No.

Q Would you recognize that person if you saw them again?

A Yeah, maybe, yeah.

Q I ask you to take a look around the courtroom and see if you recognize that person?

A Okay, been long time. No.

Q You said it's been a long time, what do you mean by that?

A It was like you know, I'm not -- I mean, I didn't give attention, I'm a person like I don't know if I see the person 20 times, I don't know what he was wearing. I mean like I always look for basic things, but I'm not remember faces or --

Q Okay. You said it was a long time, what do you mean by that specifically?

Case 1:19-cv-05310-ERK-LB Document 9-2 Filed 12/13/19 Page 500 of 907 PageID #: 863

A It was like two or three years ago.

Q Are you having difficulty remembering?

A Yes.

Q I want to speak specifically about the guy that was following you. When you walked towards 105 Street what happened, what did he do?

A When I walk?

Q When you walked -- when you were on 105 Street walking back towards Northern Boulevard, what did that person do, the guy that had been following you?

A He pushed me.

Q Pushed you where?

A In my chest.

Q What hand did he use to push you?

A Two hands.

Q And what direction was he pushing you in?

A The guy was behind me, I don't know, it was between two cars on 105 Northern Boulevard.

Q Where were those cars parked?

A On the left side.

Q Of what?

A Of 105.

Q And was there anyone else there when he was pushing you?

A The homeless guy.

Q Who was that -- I mean where was he?

A He was behind me.

Q What do you mean he was behind you?

A I was in the street and maybe he was between the cars, the two cars.

MR. SHORTT: I would like to have this marked as People's Exhibit 1 for identification and 2.

THE COURT: Have you seen this?

MR. GIBBONS: Yes.

THE DEFENDANT BALL: No.

THE COURT: Show it to the defense.

(Handing.)

(People's Exhibits 1 and 2, photographs, marked for identification.)

THE COURT OFFICER: So marked for identification being shown to the witness.

Q Mr. El Turkey, do you recognize what's being shown in front of you?

A Yes.

Q What is that?

A This is the deli, and this is the check cashier here this corner, and I got hit here between these two cars.

Q Is that the location where those events happened?

A Yes.

Q Do those pictures fairly and accurately depict what

the streets and the buildings looked like?

A Yes.

Q On July 3 of 2012?

A Yes.

MR. SHORTT: Your Honor, with that foundation I move these into evidence as People's Exhibits 1 and 2 into evidence.

THE COURT: Mr. Gibbons?

MR. GIBBONS: No objection, your Honor.

THE COURT: Mr. Ball?

THE DEFENDANT BALL: No.

THE COURT: Mark it as People's Exhibit 1 and 2.

(People's Exhibits 1 and 2, marked and received into evidence.)

MR. SHORTT: Do we have an easel to display for the jury while the witness testifies?

THE COURT OFFICER: Do you want to show it to the jury?

MR. SHORTT: Show it to the jury first, please.

THE COURT: Show it.

(Exhibits shown to the jury.)

THE COURT OFFICER: The exhibits have been published to the jury.

THE COURT: Officer, maybe you can just hold the photos.

Q Mr. El Turkey, just to go back a bit in your story. When you said you were going to a deli, is that deli displayed in this photograph?

A Yes, this one.

Q Where is the check cashing place that you went to the ATM machine?

A Here in this block, end of this block.

Q Which end of the block?

A This 105 so the next block is 106.

Q Could you show us the direction that you were walking when you came back from the check cashing place?

A Yes. I live in the same side for 105 so I just cross 105, and I take a left one block to went to the check cashier.

Q I want to talk to you about what happened at the check cashing place. How much money did you take out?

A 260.

Q Why did you take out so much money?

A I always because we didn't -- yellow cab we didn't take cash, the garage take money and debit card and they post three hours after sheet so everyday I leave my money, I don't leave it in account.

Q What kind of bills came out of the ATM machine?

A All twenties.

Q How long were you at the check cashing place?

A Just three minutes.

Q Where did you go after the check cashing place?

A The deli.

Q Can we show People's Exhibits 1 and 2 to the witness again? Could you show the jury the route that you took from the check cashing place to the deli?

A Yes, just got off from the deli like two store like this, cross the street and go to the deli.

Q How long were you in the deli for?

A I stay like three or four or five minutes max.

Q Did you buy anything at the deli?

A I buy cigarettes.

Q How many packs of cigarettes did you buy?

A I buy one.

Q How much did that pack of cigarettes cost?

A He gave give it to me $10.

Q What kind of bill did you give him?

A I give him 20, and he gave me ten.

Q Did you give him any other money that night?

A I guess I broke one, I change $100 for some customer because always the deli take the money step by step, they don't leave the money in the register so I take 100 dollar and I change for someone.

Q What bill did you get in return?

A Hundred.

Q So how much money did you have in your pocket when

you walked out of the deli?

A 250.

Q When you walked out of the deli --

MR. SHORTT: Can we keep holding up one and two for the witness, please? Thank you.

Q Mr. El Turkey, you said there was a crowd of people on the street that night. Using the picture on the left side could you point to where you saw the crowd of people?

A Here like five six, here, this is ice machine, outside is here, also both corner a lot of guys.

Q I want to talk to you specifically about the homeless guy that you have told us you have seen in the past. Where was he the first time that you saw him on July 3 of 2012.

A Outside the deli.

Q What was he doing?

A He always begging people as they going inside or outside, ask for quarter, dollar or something, like any homeless.

Q What was he doing that night specifically?

A Same.

Q When you walked out of the deli where was he?

A Same place outside the deli.

Q When you walked out of the deli, could you show us using the picture on the left where you went?

A Where I went or --

Q Where did you walk after you left the deli?

A Me.

Q Yes.

A Yeah, I walked this way. I got out of the deli and walked this way opposite of the car.

Q I want you to look at the picture on the right-hand side of the photograph. Do you recognize that?

A Yeah.

Q What is that?

A This is the street I walk, I walk like up to here, then I went, I go out in the street, and I come back and between the two cars he start punch.

Q Let me stop you for a second and back up a little bit. Is this the street that you walked down after you left the deli?

A Yes.

Q Where were you when you first realized that somebody was following you?

A Maybe like in the second store.

Q Okay. And Mr. El Turkey, had you ever been to those stores before?

A This stores?

Q Yes.

A No, I never go this bar and salon.

Q Were they open at that time?

A The bar, yes.

Q Were the lights on in this area?

A No. Bar, no lights.

Q How far were you walking along the street with the person following you?

A Yeah, like to third house, hundred feet from the beginning.

Q How many times did you look back to see this person?

MR. GIBBONS: Your Honor, I think that was asked and answered.

A I didn't full turn to look to make sure, I'm scared.

THE COURT: I will allow it.

MR. SHORTT: Thank you, Judge.

Q What caused you to go into the street?

A Me?

Q Yes.

A What what?

Q What caused you to walk from the sidewalk into the street?

A Normal smoke cigarette and talk on the phone.

Q Where on the block did you go from the sidewalk on to the street?

A Yeah, like in the third house here.

Q Then what did you do once you reached the street?

A I come back, but I come back not in the sidewalk in

the street walking close to the middle of the street like to let the cars see me because I feel like something wrong is going to happen.

Q The person that was following you was not the homeless guy, right?

A No.

Q The person that was following you, what did he do when you walked onto the street?

A Yeah, I didn't give him attention, like he is passing me like wait or something, I'm scared so I'm not -- I just move, come back like this, and then he talk to someone, push him, punch him so I look, I find someone behind me so he hit -- beat -- talking like punch him, push him, then I just close the phone, and I look at him, and then just take second, he just pushed me, and I find myself in the floor.

Q Okay. You say that somebody yelled something out?

A What?

Q Somebody yelled something out?

THE DEFENDANT BALL: Objection, he is leading the witness, your Honor.

A No.

THE COURT: Well, I will allow it.

Q Mr. El Turkey, somebody yelled something out; is that correct?

A Yell?

Q Yes, or said something?

A Yes, he said something.

Q Can you show us in the photograph, where were you standing when you heard him say something?

A Like here in the street before the cars.

Q What did you hear them say?

A Punch him or attack him, something like that, attack him, punch him.

Q Who said that?

A The heavy guy.

Q Was that the person that was following you?

A Yes.

Q And could you see anybody else in the street at that time?

A Yeah, it's still some people in this corner, in the other corner.

Q Where was the homeless guy when you heard the person behind you say that?

A He was behind me, like five feet behind me.

Q Which way were you facing at this time?

A Northern Boulevard.

Q Where was the person that was following you when he yelled that out?

A Front of me like same like the lady.

Q What happened when the person in front of you pushed

you?

A I fell down on the floor.

Q Could you show us on the picture on the right where you fell on the floor?

A Yes, like between two cars because after I stand up, I find the girl from the bar she is standing up.

Q Where was the homeless guy when you found yourself on the floor?

A I was in his lap, my head was in his lap.

Q So were you on the ground?

A Yes.

Q What position was he in, the homeless guy what position was he in?

A His legs, in my shoulder, like if someone behind you, and I push you both of you, you are going to fell down, but you going to fell down in the guy behind you so I fell down the guy behind me.

Q Okay. And what happened next?

A And then he got my hand and the other guy he start to push me, so the guy stand up because he can't take my wallet and I'm -- he is down so he get up, so when he stand up, but he still catch my hand so my head catch the base.

Q Let me stop you for a second. Mr. El Turkey, where were your hands while you were getting punched?

A Like behind me.

Q Was anything holding them?

A Yes, the guy.

Q How was he holding your hands?

A By his legs.

Q What do you mean by that?

A Because as soon we both got up so he get his feet because there is one in the top, he got his feet, and he put it on my hand.

Q What do you mean?

A You want me to show here?

MR. SHORTT: With the Court's permission.

THE COURT: What part of his leg was on you his knee, his leg--

THE WITNESS: Yes.

THE COURT: His knee?

JUROR: No, his two legs.

THE COURT: His legs extended out?

THE WITNESS: No, no.

MR. SHORTT: I think the witness --

THE WITNESS: Like we both fell down.

THE COURT: Right.

THE WITNESS: But he get his feet and he put it like this.

THE COURT: Foot over your arms?

THE WITNESS: Yes.

THE COURT: All right.

Q Mr. El Turkey, where was your back, were you seated, or were you laying on the ground while this person was holding your hands?

A Yeah, behind me, I'm in the first sidewalk, like behind me is the store.

Q Okay. Were you seated or were you laying down?

A Me?

Q Yes.

A No, I'm not sitting, I'm lay down.

Q Was this person on his feet or was he on his knees?

A The one behind me.

Q Yes.

A No, his knees.

Q Where were his knees resting?

A On my hand.

Q What happened as you were on the ground with that person resting his knees on your hands?

A The guy on top of me, he took my head, and he push it like three times in the sidewalk in the curb.

Q Who did that?

A The heavy guy.

Q Was that the person that was following you?

A Yes.

Q What was the homeless guy doing during all this?

A Search my pocket.

Q What do you mean stretch your pocket?

A Because I'm on the floor my wallet in the pants so I'm on the floor so he have to bring me over to take my wallet so he cut the whole pants.

Q How did he cut your pants?

A From one on top of me and the other guy he try to get it.

Q Did he use a tool to cut your pants?

A No.

Q How did he do that?

A He tried three or four times so it's easy to get cut.

Q What was in your pants pocket at that time?

A Phone, iPhone and my wallet.

Q What was in your wallet?

A The money, $250, my I.D., my Social Security everything.

Q Was there anything else in your wallet?

A The phone.

Q What type of phone did you have?

A iPhone.

Q How long had you had that phone for?

A I used to have it like one year.

Q What happened to your iPhone during all of this?

A He took it.

Q Who did?

A The homeless guy.

Q And did you see him take it?

A I'm in the floor, I have blood, but when I get up I find everything empty.

Q Was it in the pocket that he reached into?

A Yes.

Q What else was in that pocket?

A The phone and the wallet, that's it.

Q How many times were you hit while you were on the ground?

A By hand?

Q By either of them?

A My head two times and after few seconds before he leave also two times, and before he leaves he say bad word, I will kill you, he call my mom and one here, my eye and one here.

Q What did he hit you with?

A No, his hand.

Q How many times did he hit you with his hand not hitting your head against the sidewalk?

A Two times.

Q Where did he punch you?

A One in eye, one in teeth here.

Q Describe to the jury what kind of pain you were in after he punched you in the face?

A I would say like -- I would say I'm dying just my imagination, I'm done.

Q What kind of injuries did you suffer when you got punched?

A My eye it was getting bigger fast and I have like three eyes, one here one here and one here and here was blood and here was blood, and at this time I didn't feel any pain even I didn't went to the hospital. I feel after I went home and took a shower, I can't sleep but in the same time maybe hot blood make me -- even I don't know after I touch I find I have blood.

Q You said something about your teeth?

A Yes.

Q What happened to your teeth?

A I pull it next day because it was just -- you can't do crazy glue, it was half out, half --

Q What tooth are you talking about, where?

A This one.

Q Is that still missing?

A Yes.

THE DEFENDANT BALL: Your Honor, I object that he is testifying to his injuries.

THE COURT: Overruled.

Q What happened to your tooth immediately after -- how did your tooth feel immediately after being punched?

A It hurt.

Q Was it loose before you were punched?

A No.

Q How long were you on the floor for while this person punched you?

A Maybe minute two minute and a half.

Q After that minute to minute and a half, what happened next?

A I went to the deli to call the police.

Q Did you -- what happened to the homeless guy where did he go?

A I was on the floor. I didn't see what direction he went.

Q Who took your phone?

A The homeless guy.

Q Who took your money?

A The homeless guy.

Q Did the person that punched you take anything?

A No.

Q Did you see where the person who punched you went?

A Yes.

Q Where did he go?

A He went from 105 same like going 34 Avenue.

Q Is that towards or away from Northern Boulevard?

A No, opposite from Northern Boulevard.

Q After he left, what did you do?
A I went to the store.
Q At any point did you lose consciousness or black out?
A No.
Q How long did it take you to get up off the ground and go into the store?
A A minute.
Q When you went into the store, what happened?
A It was, myself, I mean myself, I told the guy call the police so he called the police.
Q Was that the person that you had seen earlier that day?
A Yes, my friend.
Q Did you tell him what happened?
A After, after he call the police, I told him I got mugged.
Q And what happened while you were in the store?
A I was looking to the door, the window so look for the police coming so I saw the heavy guy he comes like he make full turn from 34, he saw me in the store, and he repeat I will kill you, MF word, so I told to the guy call the police again because the guy, the suspect is here, so the guy he called the police again, the deli guy.
Q I want to talk to you about where in the store were you when you saw this person.

A Outside the door inside the store but looking in the door, looking the street.

Q The person that you said you saw who was he?

A The heavy guy.

Q Was that the person that followed you?

A Yes.

Q Is that the person that punched you?

A Yes.

Q What was that person doing when you saw them when you were looking outside the door?

A He was like looking for something, he was walking and he took right on 105, he is coming like from Northern Boulevard 104.

Q And what direction was he heading?

A He took a right, the same place where I got punched.

Q And what was that person wearing when you saw him?

A Same clothes.

Q What clothes were those?

A I guess black jeans and red shirt I guess.

Q What color shirt?

A Red.

Q When you left the store -- did you ever leave the store?

A Yes, I was looking outside waiting for the police car, but I can't because the guy I remember already saw the guy

he just turned so I went outside, and I find the car in the middle in the intersection for Northern Boulevard 105 with the light because maybe he saw the blood so I went and I see Chevy car so I know Chevy car is undercover car so I went he say what happened I said a guy mug me here. He told me jump in the car --

Q Let me stop you. How much time passed from the time that you were -- you walk the into the store to when you walked out of the store to meet the police car?

A Maybe less than 90 seconds.

MR. GIBBONS: How much?

THE COURT: 90 seconds, less than 90 seconds.

Q When you walked out of the store, what did you see?

A I saw police car or not marked car stop in the middle of the street.

Q The person that you said you saw the person that attacked you in front of the store before that?

A Yes.

Q How long had time passed --

A Yeah maybe like 15 seconds.

Q And could you see what direction he went in?

A Yeah, the same direction I got punched.

Q When you got out of the store, could you describe the police car that you saw?

A Yeah, it was Chevy beige -- I guess the color or

gray.

Q How did you know they were police officers?

A I know from Chevy and because he is going opposite way 105 is going east, and he is going west so I thought he is undercover car.

Q When the car approached you, could you describe what the people inside the car looked like?

A Yeah, two white guys one wearing shorts.

Q What happened when you approached them?

A I mean, he doesn't know me so when I open he saw the blood so he told me jump in the car, I tell him I got mugged so I told him I know the guy, I know the guy, I saw the guy, the one he punched me so I jumped in the car.

Q What direction did you guys go?

A Opposite cars on 105.

Q What do you mean opposite cars?

A 105 the cars going this way so we went in the car this way.

Q How far down 105 Street did you go?

A Maybe like 80, 60 feet, and I saw the guy. I told him here the guy is here.

Q Who did you see?

A I saw two guys, the one he punched me, and he was staying with a guy I don't know him.

Q What did you do when you saw the guy that punched you

on the street?

A The police told me stay in the car so I told him this guy, so the police go out and they arrest him.

Q Who did they arrest?

A They arrested -- they ask me which one? I say this one, they say only one guy. I hear him say, I didn't do nothing.

Q Could you describe the other person not the person that punched you, but the person he was walking with what did that person look like?

A He was tall, maybe taller than, the one he punched he is more heavy, but the other guy is taller than that guy.

Q What color was the person?

A Black also.

Q Do you remember what he was wearing?

A I guess like maybe white shirt and black jeans also.

Q Was that the same as the person that the police arrested?

A The police arrested the correct one.

MR. GIBBONS: Your Honor, I object to that, his characterization.

THE COURT: I will allow it.

A No, because three times he punched me, and three times --

Q Did you ever -- where were you when you saw the police arrest that person?

A I'm inside the car and like maybe this gentleman, I'm inside the car.

THE COURT: Indicating about six or seven feet.

A Yeah.

Q Was there anything between you and the police officers and that person?

A With what between?

Q Was there any cars in between you?

MR. SHORTT: I will withdraw that question.

A It's car yeah parked on the other side.

THE COURT: All right. Stop for a second. Ask another question.

MR. SHORTT: Thank you, Judge.

Q Did you eventually get out of the police car?

A Yeah.

Q When did that happen?

A I went to the police car?

Q Yes.

A From the intersection I went to the car.

THE COURT: No, when did you get out of the police car?

A When the other the uniform police coming and they asked me what happened.

Q I'm going to ask you to take a second and look around the courtroom. Do you see the person that the police arrested?

Do you see the person in the courtroom that the police arrested that day?

THE DEFENDANT BALL: Asked and answered, your Honor.

THE COURT: I will allow it.

MR. GIBBONS: Which person?

THE COURT: Are you talking about the first person?

Q The first person stopped do you see the person in the courtroom that the police stopped?

A You mean the policeman?

MR. SHORTT: Yes.

THE COURT: Do you see the person that punched you?

A Oh, he punched me.

THE COURT: Do you see that person?

A No.

Q Mr. El Turkey, were you certain that the person the police stopped is the person that assaulted you?

A Sorry?

Q Are you sure the person the police stopped is the person that assaulted you?

A Yes.

Q How long ago was this assault Mr. El Turkey?

A How long?

THE COURT: Sustained.

MR. GIBBONS: Thank you, your Honor.

Q Mr. El Turkey, are you having any trouble remembering who that person was today as you sit here?

A Yes.

Q Why is that?

MR. GIBBONS: Objection, your Honor.

THE COURT: Sustained.

MR. GIBBONS: To the leading and to that question.

THE COURT: Sustained. We have been over this.

Q Mr. El Turkey, after you got out of the police car, were any ambulances ever called to the scene?

A Yes.

Q Were you treated by an ambulance?

A Yes.

Q Mr. El Turkey, were any other police officers brought to the scene?

A Yes.

Q Could you describe what those police officers looked like?

A Two police officers, one little tall and one normal.

Q And --

A One Hispanic, one white American.

Q Were they in uniform or also in plainclothes?

A No, uniform.

Q Were they in a police car with NYPD on it?

A Yes.

Q Or unmarked car?

A Yes.

Q Did any other police officers arrive on scene?

A It was like maybe like three, two police cars and undercover car police.

Q How long after the undercover car came did the other police officers come?

A Seconds.

Q When the other officers came, did they bring anybody with them?

A He told me he going to bring the guy they find the money with him and from far away, and I can recognize him I say yes or no so he bring him like this table so I tell him, yes, this guy.

Q Okay. When the police officers came, did they show you anything?

A He showed me phones.

Q What do you mean they showed you phones?

A He told me this your phone first phone, I said, no, it was not mine like Blackberry old one, so he come back with my phone, it was my phone, has my picture and everything.

Q Was that the phone that was taken from you?

A Yes.

Q How did you recognize that to be your phone?

A It was my photo inside.

Q What do you mean your photos inside?

A My numbers, I know my phone, my numbers, the photos, everything. I opened it, I find it's my phone.

Q Who gave that phone to you?

A The policeman.

Q Was that officer in uniform or plainclothes?

A Uniform.

Q Where were you when he gave you that phone for the first time?

A I was in 105 and Northern Boulevard.

Q Was the ambulance there at that time?

A Yes.

Q Did the police officers give anything else to you?

A No, the money, I took it in the precinct.

Q While you were on the scene, did the police officers show you anything else?

A He showed me the first phone and I said no, and the second phone, yes.

Q They showed you another phone at first?

A Yes.

Q What kind of phone was that?

A I guess Blackberry.

Q Had you ever seen that before?

A No, it's not mine.

Q After they showed you the Blackberry, they show you anything else?

A The iPhone.

Q What kind of phone was that?

A iPhone.

Q That was your phone?

A Yes.

Q Were you treated by the fire department and the ambulance?

A Yes.

Q How long were you in the ambulance for?

A Maybe like 15 minutes.

Q What did the paramedics do for you while you were in the ambulance?

A I always don't like blood so I close my eyes I don't know what they doing, so they put some treatment here, like a cologne like alcoholic something to stop the blood and they gave me some bandage and clean here, the neck.

Q Were there any police officers inside of the ambulance with you?

A Yeah, sure, there was one.

Q Was he in a uniform or plainclothes?

A Uniform.

Q Was he a white guy or black guy?

A White guy.

Q Did you speak to the police officers at that time?

A Yeah, sure.

Q Did you go to the hospital?

A No.

Q Why not?

MR. GIBBONS: Objection, your Honor.

THE COURT: Sustained.

A I don't have --

THE COURT: You don't have to answer that question.

Q Were you ever asked to go to the hospital?

A When what?

Q Were you ever asked by the paramedics to go to the hospital?

A No, I didn't go.

MR. GIBBONS: Leading.

THE COURT: Overruled.

A I didn't ask to go. He asked me to go, but I said no.

THE COURT: All right.

Q What was the reason you didn't want to go to the hospital?

MR. GIBBONS: Objection.

THE COURT: Sustained. You don't have to answer

that.

Q After -- did the ambulance eventually leave?

A I was in the ambulance.

Q Okay. Where did you go after you were in the ambulance?

A I went to the precinct.

Q What precinct did you go to?

A 92 Street.

Q How long after you were in the ambulance did you go to the precinct?

A Maybe 15, ten minutes.

Q How did you get there?

A The deli, he call his friend, he drive me by his car.

Q And when you went to the precinct, did you meet with the police officers again?

A Yes.

Q What happened while you were at the precinct?

A I saw the guy, the one they arrest him, and they took a photo for my phone and my money, and they give me the money back.

Q What money did they give you back?

A The $250.

Q Did you ever get your wallet back?

A Yes.

Q When did they give you your wallet back?

A In the same day.

Q When?

A In the precinct.

Q I just want to back up a little bit going back to when you were at the ambulance. You said the police officers brought somebody over to you, a person? The police officers showed you a person?

THE DEFENDANT BALL: Objection, leading.

THE COURT: Overruled.

A Not the ambulance, outside the ambulance.

Q Where were you when that happened, where were you when the police showed you a person?

A I was in the same spot during the course undercover arrest the guy.

Q Was the ambulance there at that time?

A But the ambulance in the corner in Northern Boulevard.

Q Who did the police officers bring to show you?

A He bring the homeless.

Q Did you recognize the person?

A He bring the homeless -- you want me --

THE COURT: They brought the homeless guy to you?

THE WITNESS: Yes.

THE COURT: Okay.

Q Who was that person, what did he do to you?

A The homeless?

Q Yes.

A He was the one behind me and the one he took the money and the phone.

Q That was the person the police had in custody?

A Yes.

Q I'm going to ask you to take a look around the courtroom and see if you recognize the person they had in custody?

THE DEFENDANT BALL: Asked and answered, your Honor.

THE COURT: Overruled. You can look around.

A You mean the homeless guy?

Q Yes.

THE COURT: See if you see the homeless guy.

A No. I know him very well. No.

Q Are you sure the person police had there the homeless guy was the person that assaulted you --

MR. SHORTT: Withdrawn.

Q Are you the sure the person the police arrested was the person that took your property?

A Yes.

Q Can you remember what that person looked like today?

A The homeless or the heavy guy?

MR. GIBBONS: Objection.

THE COURT: Overruled. What did he look like?

A Sometimes he acted like a gay, act like a woman sometime, this is the homeless guy.

Q Okay. Do you recall what the homeless guy was wearing the day he assaulted you?

A I guess jeans and white shirt.

MR. SHORTT: No further questions, your Honor.

THE COURT: All right. We are going to break for lunch. Once again, ladies and gentlemen, do not discuss this case amongst yourselves, do not speak to the attorneys, the parties, the witnesses. Do not go to the scene of the alleged incident. Do not research this case in any way. Should anybody speak to you about this case, report it to me immediately.

(Jurors exit the courtroom.)

THE COURT: Sir, you can step down.

(Witness excused.)

THE COURT: Officer, take charge. We will reconvene at 2:00 P.M.

(Jurors exit the courtroom.)

THE COURT: Mr. Shortt, your witness is still on the witness stand. I am directing you not to discuss this case with him over the lunch hour.

MR. SHORTT: I will not, Judge.

THE COURT: Very good. 2:00 P.M.

MR. GIBBONS: Thank you.

THE DEFENDANT BALL: Thank you, your Honor. Thank you, Mr. Shortt.

(Defendants exit the courtroom.)

(Luncheon recess taken.)

A F T E R N O O N S E S S I O N.

THE COURT CLERK: Recall of the case on trial, 2228 of 2012, Raymond Ball and Elijah Brooks.

THE COURT OFFICER: Do you want the witness on the stand?

THE COURT: Yes.

(Defendants enter the courtroom.)

THE COURT CLERK: Let the record reflect the defendant Brooks is present before the Court. Let the record reflect the defendant Ball is present before the Court.

THE COURT: Bring in the witness.

MR. SHORTT: Judge, before we bring in the witness and the jury, I have two questions that I neglected to ask before we begin cross.

THE COURT: Two?

MR. SHORTT: Two.

THE COURT: Not three?

MR. SHORTT: Not three, two.

THE COURT: All right.

MR. SHORTT: Thank you, Judge.

(Witness resumes the witness stand.)

THE COURT: Bring in the jury.

(Whereupon, there was a brief pause in the proceedings.)

THE DEFENDANT BALL: Your Honor, I object to allow him to go forward after he did the closing.

THE COURT: Duly noted. The objection is overruled. Ready.

THE COURT OFFICER: Jury entering.

(Whereupon, the sworn jury enters the courtroom.)

THE COURT CLERK: Do both sides stipulate to the present and proper seating of the jury?

MR. SHORTT: Yes.

MR. GIBBONS: Yes.

THE DEFENDANT BALL: Yes.

THE COURT: All right. Admonish the witness, please.

THE COURT CLERK: Sir, you are reminded you are still under oath.

THE WITNESS: I didn't understand.

THE COURT CLERK: You are still under oath, okay?

THE WITNESS: Okay. All right.

THE COURT: Mr. Shortt?

DIRECT EXAMINATION

BY MR. SHORTT: (Cont.)

Q Mr. El Turkey, the cell phone that was taken from you on July 3 of 2012, what cell phone provider did you have for that?

A iPhone.

Q No, who was the carrier, the cell phone carrier for that phone?

A AT&T.

Q I'm sorry?

A AT&T.

Q Mr. El Turkey, at any point on July 3 of 2012 did you give Raymond Ball permission to have your phone or to have your money?

A To give to who?

Q Did you ever give a person by the name of Raymond Ball permission or authority to have your cell phone or your money on the day that you were robbed?

A No.

THE DEFENDANT BALL: Objection, your Honor.

THE COURT: The objection is overruled. The answer will stand.

Mr. Gibbons, would you like to cross examine?

MR. GIBBONS: I certainly would, your Honor. If I could have just one second, actually maybe five seconds?

THE COURT: I will give you ten.

MR. GIBBONS: You are very kind. Thank you. I don't think I will need all of that.

(Brief pause.)

CROSS EXAMINATION

BY MR. GIBBONS:

Q Good afternoon, Mr. El Turkey. How are you?
A Fine, thank you.
Q My name is Wyatt Gibbons. I'm representing Mr. Brooks in this case.
A Okay.
Q I'm sorry that you had to go through that, I'm sure it was terrible.
Let me ask you on July 3, do you remember that day, July 3, that was 2012 when this happened?
A Yes.
Q What time did you get off of work that day?
A Around 8:30.
Q 8:30?
A Yes.
Q In the morning?
A No, P.M.
Q You got up --
THE COURT: Get off.
A I wake up everyday 4:30, 5:00.
Q 4:30?
A Yes.
Q And you take a bus to work?
A Yes.
Q You woke up that day at 4:30 and took a bus to work?
A Yes, I took the bus around 5:15, 5:30.

Q And you worked to 5 P.M.?
A Yes.
Q Then you took a bus back home?
A Yes.
Q You worked all day?
A Yes.
Q You showered and went outside?
A Yes, sir.
Q That was a little before 9:00, maybe 8:30 P.M.?
A Yes.
Q You work very hard?
A Yeah.
Q Okay.
Now, when you went to see your friend at the deli, you said he is from Yemen, correct?
A Yes.
Q You met him from the time you moved back to New York?
A The time I moved, I live in Corona.
Q Okay. And what language do you speak with him?
A Arabic.
Q So there is no problem understanding each other?
A No.
Q He speaks Arabic, that's his native language?
A Yes.
Q And you speak Arabic, that's your native language?

A Yes.

Q So there is no mistaking when you are speaking to each other?

A Different accents from the same country north and south.

Q But you understand each other?

A He understood me more because Egyptian is more public for all the Arabic countries.

Q You speak Egyptian, and that's like dialect of Arabic, type of Arabic?

A No, because the movie, everything is Egyptian so Yemen doesn't have so they know our language. We don't like Moroccan language, is different for us.

Q I see. But he understood your Egyptian language, correct?

A Yes, that's correct.

Q But no problem communicating with him?

A No.

Q All right. Now, after you went to the check cashing place and you went to the deli, you walked out to smoke a cigarette and call your girlfriend you testified, correct?

A Yes.

Q And you said that two people came up from behind you?

A One.

Q One person came up behind you?

A Yes.

Q It wasn't two?

A No.

Q You are sure about that?

A Yes.

Q Okay. Now, do you remember testifying before about this case?

A Yeah.

Q Do you remember you went to the Grand Jury and you testified two times?

A Yes.

Q Okay. Mr. El Turkey, do you remember testifying in the Grand Jury the first time page four line 17 you were asked this question and you gave this answer:

(Reading:) And you say two guys came up behind you?

(Reading:) Answer: Right.

Do you remember being asked that question and giving that answer?

A Yes.

Q Okay. And then again you testified in the second Grand Jury page four line 16:

(Reading:) Question, and did anything unusual happen as you were outside that evening?

(Reading:) Answer: Yes two it was two black guys

walking behind me and started to be too close?

MR. SHORTT: Objection. Counsel is not reading the full quotation.

A No --

THE COURT: Wait. Let him rephrase the question.

MR. GIBBONS: There is a lot. I can read the whole thing, but that's the pertinent part, whether it was one guy or two guys, that's all.

MR. SHORTT: Objection, Judge. If we are going to impeach the witness with the statement, it should be the entire statement.

THE COURT: Read the entire statement.

Q (Reading:) Yes, two. It was two black guys walking behind me and started to be too close but I didn't give them attention so I -- fine going to away from Northern Boulevard. I was at main street so I come back and he is walking behind me so I walk in the middle of the street towards anybody help me like, like, like, I feel dangerous. I walk in the middle of the street to come back to come back to go home to Northern Boulevard so the black guy I don't know him he go behind me he show me something I talking to you show me something he push me right away in the car. It was a car parking in the other side, it was other guy behind me. He grab my hand and I me and him I fall down on the sidewalk and then the black guy farther to beat in my eye and my teeth, I lost one teeth and the other one told

me take his money, take his money, then he I don't know what he took now I was still in the sidewalk and then the guy he took something, take one minute when he stand up one behind me so it was the other guy over me so he took me my, my, my head in the sidewalk he comes three times. He punch me again in the eyes it was a lot of bruises here and then he told me I -- I -- I kill you so I, I and he run oh, he walk I don't know I stand up I find my whole waist from the cut from the back, from the back, I have no wallet he took iPhone, I went.

Do you remember being asked that question and giving that answer?

A Yeah.

Q The important part was at that time you said it was two guys behind you?

A No, if in the speech you said he, he not there, so it's one the first, but when I come back it's two guys.

Q Okay. I wanted to clarify. You sensed that something was wrong, you felt dangerous, you felt there was danger?

A Yeah, sure.

Q All right. And you testified that you glanced over your shoulder, you kind of made a motion just turning your head a little bit to see that someone was behind you?

A Yes.

MR. GIBBONS: For the record showing that he

turned his head slightly to the side.

THE COURT: The record will so reflect.

Q You testified that you never turned around fully?

A No.

Q At first to look at him in the face, correct?

A No.

Q Okay. But you knew that you hadn't seen him before?

A No.

Q Okay. You said that you weren't looking at his face, correct? When you were glancing over your shoulder, you said you were not looking at his face?

A But I saw his face the time I go out from the store.

Q Okay. All right. Let me get back to that. Now, actually, I'm back at that.

You said that you hadn't seen him at the deli or at the corner where the dance school was, correct, you had never seen him before?

A Yes.

Q It wasn't until you were walking up the block you sensed someone behind you?

A Yes.

Q Okay. But you never seen this person before, correct?

A No.

Q Okay. And you testified that you didn't fully --

A I didn't see him. I don't know him, not see him.

But --

Q You didn't know him?

A Yeah.

THE COURT: But you had seen him before?

A I seen him in the store outside the store but not recognize him, you know, not -- lot of guys not dealing with him.

THE COURT: When did you see him outside the store?

THE WITNESS: The third time I come back from the store.

THE COURT: After the incident?

THE WITNESS: Yes.

Q After the incident?

A No, before I go to the store after the check cash when I go to the store, it was all the guys outside the store.

Q You noticed all the people?

A I don't know him.

Q But you didn't know him?

A No, I know one of them only.

Q All right.

You testified that you didn't fully see him until you turned around, correct?

A Yes.

Q When you turned around, you testified that you were

immediately pushed very hard on to the ground?

A Yeah, but my face I saw him.

Q Okay.

A Yes, not --

Q You turned fully around and you saw him?

A Yes.

Q Right away you were pushed to the ground?

A Yes.

Q And you fell to the ground, correct, okay? You testified that took just seconds, right, you turned around, boom, pushed you to the floor, correct?

A Um-hm.

Q He pushed you hard?

A Yes.

Q Your head snapped back, you fell to the ground?

A Not my head didn't touch the ground.

Q But your head flew back, and you flew back, correct?

A Yes.

Q Now you said that the guy that you hadn't seen before he was the heavy guy you called him, correct?

A Um-hum.

Q Okay.

When you fell, the heavy guy was immediately on top of you and started punching you?

A No, no. He just to control because I move, move,

move, move, I move a lot.

Q Okay.

A Even my hand is behind me, I tried my legs, everything.

Q You are trying to get away?

A Yes.

Q So you are moving forward, your body?

A Sure, so he didn't punch me until the guy, he stand up, until my head it was clear in the floor.

Q On the floor?

A So he start to push me.

Q Did he punch you first or grab your head and slam you on the ground, what did he do first?

A No, slam my head first.

Q Slammed your head on the ground?

A Yes.

Q How many times did he do that, twice?

A Two to three times.

Q He grabbed it bang, bang, bang?

A Yes, first two then he did it again twice.

Q So the first time that you got your head slammed to the ground, it was twice in a row, correct?

A I didn't count it exactly because --

Q Because you were scared and disoriented, correct, you did not know what was happening?

A Suddenly I know I'm dying so I'm not going to count, I'm not remember two or three maybe sure.

Q Is this person slammed your head twice on the floor?

A Yes.

Q And then he started punching you in the face?

A Yes.

Q He punched you in the eye?

A Yes.

Q And in the mouth?

A Yes.

Q In the head also?

A No.

Q Then he slammed your head one more time?

A Yes.

Q You said your eye swelled up very quickly, right?

A Yes.

Q You said he was talking to you, correct?

A Talking to me?

Q Yes, saying something to you?

A No, he is talking to the other guy, the homeless guy, take his money.

Q Didn't he say I kill you?

A Yes, he say a bad word.

Q He said, I will kill you, motherfucker?

A Yes.

Q Yelling at you, scaring you?

A Um-hum.

Q As he slammed your head, he said I will kill you motherfucker, right?

A Yes.

Q He was close to you, right?

A Yes.

Q You said he had short hair, correct?

A Yes.

Q You saw short hair?

A Yes.

Q What color was the hair?

A Black.

Q Like an afro or something?

A No, like black, very short.

Q Okay. All right.

Now, when they got off you and they let you go you said the heavy guy went down 105 street towards 34 Avenue, correct?

A Yes.

Q And that's away from Northern Boulevard?

A Correct.

Q Away from the deli?

A Yes.

Q That's the same direction that you were walking?

A Yes.

Q And he went that way?

A Yes.

Q Where did the other guy go?

A I was on the floor. I didn't see him go because I was still bleeding.

Q Okay, then you went into the deli, correct?

A Yes.

Q And you asked your friend to call the police, correct? And then you testified that you saw the heavy guy again, right?

A Yes.

Q Now, were you inside the deli when you saw him again?

A Yes.

Q You hadn't stepped out, you were inside the deli?

A Yeah.

Q And you are looking out the door?

A Yes.

MR. GIBBONS: Do we have People's Exhibit 1?

(Handing).

Q Mr. El Turkey, could you please look at People's Exhibit 1, that's the picture on the left, and you see where the deli is, can you point to the door?

A This is the door.

Q The door there that's in the middle of the store,

correct?

A Yes.

Q All right. Thank you. And you said you are looking out of that door, correct?

A Yes.

Q And then you see the heavy guy come outside?

A Yes.

Q You said he came from your left, right?

A Yes, from like 104.

Q From like 104 Street?

A Yes.

Q So he would have gone possibly up 105 go around and come back?

A Yes.

Q You saw him again?

A Yes.

Q You were inside, not outside?

A Yes.

Q He said something to you again?

A Yes.

Q And you recognized it was the same guy?

A Yes.

Q He even cursed you the same way, I will kill you motherfucker?

A Yes.

Q You are sure it's the same heavy guy, right?

A Yes.

Q And you testified that he was wearing black jeans and a red shirt, correct?

A Yes.

Q Red shirt?

A Yes.

Q That's the same clothes that the heavy guy who pushed you down and punched you was wearing, correct?

A I try to remember because it was one red and one white so one wearing -- I'm going to try to remember which one.

Q Well --

THE COURT: Let him finish.

A I'm not good memory.

Q Take a moment.

THE COURT: Mr. Gibbons, slow down. Let him answer.

A I see maybe red or white because it was like uniform, eight guys outside wearing white but this guy maybe red, red shirt.

Q Red shirt?

A Red shirt black jeans.

Q That's what you saw coming back?

A Yes.

Q And he cursed at you again, right?

A Yes.

Q Now, did you ever leave the deli -- withdrawn?

After you came into the deli after the incident, your friend called the police, did you step out of the deli and see the other person -- coming from the left?

A Yes.

Q You were outside or inside to be clear?

A Like I open the door and close, I'm hyper.

Q Okay. So you are kind of peeking your head out?

A Yes.

Q And you see him coming from the left?

A Yes.

Q And you have the confrontation and close the door again?

A Yes.

Q You were scared?

A Sure.

MR. GIBBONS: Could I have these marked please Defendant's Exhibits A1 and 2?

THE COURT: Mr. Shortt, can have you seen those?

MR. SHORTT: Yes.

THE COURT: Mr. Ball, have you seen those as well?

MR. GIBBONS: I turned them over this morning, your Honor.

THE COURT: All right.

(Defendants' Exhibits A-1, A-2, photographs, marked for identification.)

Q Mr. El Turkey, could you look at what's been marked Defendants' Exhibits A1 and 2.

A Yes.

Q Do you recognize those pictures?

A Sure.

Q What are they?

A This is the deli, and this is deli and you can see the other corner which is ambulance, it was in this corner.

Q Okay. Do those pictures fairly and accurately represent the deli and that area?

A Yes.

Q That's what the place looks like, correct?

A Yes.

MR. GIBBONS: Your Honor, I move those in as Defendants' Exhibits A1 and 2.

THE COURT: Mr. Shortt?

MR. SHORTT: No objection if I can see which one is A and B.

THE COURT: Mr. Ball, do you have any objection to the pictures going into evidence?

THE DEFENDANT BALL: No, your Honor.

(Defendants' Exhibits A1 and A2, marked and received into evidence.)

THE COURT: Mark them in evidence without objection.

(Defendants' Exhibits A-1 and A-2, marked and received into evidence.)

Q If you can look at Defendant's Exhibit A-1, that's just a bit more of a closer picture of the door of the deli?

A Yes.

Q And you were standing behind that door?

A Yes.

Q As you are facing the door the counter where your friend is the clerk where you go to pay for something if you are facing the door is it's on your right-hand side, correct?

A Yes.

Q If you walk into the deli, it's on the left?

A Yes.

Q So as you are facing out the door your friend the clerk is on the right-hand side?

A Yes.

Q And you testified that you saw Mr. -- you saw the other person come from the left side?

A Yes.

Q And then you had words with him and you closed the door and you turned to your friend and said call the police again?

A Yes.

Q Did you go back outside after that?

A Again?

Q Only when you saw the police car, correct?

A Yes.

Q Now can you look Defendants' Exhibit A-2, do you see that ice stand there, that ice container, was that there back on July 3; do you remember?

A It was little bit inside the store.

Q Closer to the store?

A Yes, closer inside, closer to the street little bit.

Q Now, you testified that 15 seconds after you saw the heavy guy again, you saw a police car out front?

A Undercover car, yes.

Q Like 15 seconds, it was quick, maybe 30 seconds, very quick?

A Yes.

Q And you walked out to the car thinking it was a police car?

A Yes.

Q And you spoke to the people inside?

A Yes.

Q He said okay, get in the car?

A Yes.

Q You got in the car?

A Yes.

Q Again very quick?

A Uh-huh.

Q Was the car facing down Northern Boulevard or was it facing --

A Facing 105 opposite way.

Q Against traffic?

A Against car, yes, against traffic.

Q So was he like near where the ice machine is?

A The car.

Q On 105 was he in the street alongside the ice machine?

A The car?

Q Yes.

A The car in the intersection.

Q That's how you can see him because you were still in the car?

A Yes.

Q So you saw the car?

A Yes.

Q And you go out and talk to him?

A Yes.

Q You get in the car and go up 105 against traffic?

A Yes.

Q Did he turn on the lights and sirens?

A The lights?

Q Yes.

A I don't know, I'm inside the car, I didn't see outside.

Q You didn't see the reflection of lights?

A No, because we didn't drive, drive two seconds.

Q Okay. It was dark out, too?

A Dark, but the traffic light, and the store still open.

Q So you drove just a couple of seconds, I think you testified about 60 feet, correct?

A Maybe little less. I'm not good with destination by feet because we use meter.

Q How many meters?

A It's just like -- we didn't drive like maybe 60 feet, less.

Q All right. You saw the same guy again?

A Yeah.

Q And he is walking towards you, correct?

A No, he is staying with his friends.

Q He was with his friends?

A Yes.

Q Is he walking towards you or did he have his back to you?

A No, he was facing to me.

Q Facing to you?

A Yes.

Q Okay. You said he is with another man, correct?

A Yes.

Q And they are talking?

A I'm not -- I just told the police this guy, that's it, I finished my job, I mean yes.

Q I understand. I understand. I'm just trying to find out what you observed when you were in the car and going down the block.

So you observed the guy that you said you had seen before that assaulted you?

A Yes.

Q He is standing there with another person facing you, did you see them walking?

A No.

Q Did you see them talking?

A Yes.

Q Okay. So they are talking and standing there, they are facing you, correct?

A Yes.

Q Now, you had said that the cops got out of their car with their guns drawn, correct?

A Yes.

Q How many police officers were in your car?

A Two.

Q And they both got out with their guns drawn?

A Yes.

Q Were there other police officers at the scene?

A This moment not yet.

Q Okay. Did other police officers arrive at that location?

A Yes.

Q How soon after your officers got out of the car?

A Maybe 20, 25 seconds.

Q So quick, instantaneous?

A Yes.

Q They got out and the other car came and other policemen got out?

A Yes.

Q Did that car come the same direction that you went or did they come in the other direction?

A The one with the police?

Q Yes.

A No, he stayed in the corner. He didn't go in the street, stayed Northern Boulevard. I didn't see -- I was sitting in the car behind the traffic. I didn't see the police car.

Q So you just saw the other police officers come up?

A Yes.

Q Okay. How many cops were there in total?

A Maybe like two police car, like two or three cops.

Q They had, they all had their guns drawn?

A No, I mean they have gun, but it's not outside.

Q You testified that the cops got out?

A The undercover to arrest the guy, yes.

Q You said you heard the guy that they stopped say he didn't do anything?

A Yes.

Q Did you ever see if the cops hit him or put him on the ground?

A No, no.

Q Okay.

(Defendant and counsel confer.)

MR. GIBBONS: Nothing further, your Honor.

THE COURT: Mr. Ball, would you like to cross examine?

THE DEFENDANT BALL: Yes, sir.

CROSS EXAMINATION

BY THE DEFENDANT BALL:

Q Hello, Mr. El Turkey.

A How are you?

Q Not bad. I'm sorry that you had to go through this horrible experience, but, you know, I just want to ask you a couple of questions. Is that all right?

A Yes, sure.

Q You feel comfortable with that?

A Yeah.

Q First I just want to ask you do you understand like what they said to you as far as oath is concerned, you know when you come into a courtroom, when they say to you oath that you are taking an oath, that means that you know it's against the law for you to tell the lie. Do you understand that?

A Yes, sure.

Q Do you understand it's a crime?

A To lie.

Q To lie in court, do you understand that?

A Yes, sure.

Q Okay. Good. I want to ask you a question, how long did you know Mr. Ball?

A Who is Mr. Ball?

Q I'm just asking you. You just testified that you didn't give him permission to have your phone; is that correct? You just told the District Attorney that you never gave him permission, Mr. Ball --

A I don't know who Mr. Ball.

Q But you just testified that you never gave him permission.

A He ask me did I give permission to anyone.

Q He didn't say anyone, he said Mr. Ball.

THE COURT: Don't argue with the witness.

Q So you don't know who Mr. Ball is?

A I didn't give permission.

Q You can't testify whether or not you gave Mr. Ball --

MR. SHORTT: Objection.

THE COURT: Mr. Ball, one of the rules when the witness is speaking, you cannot speak. You cannot interrupt the witness. If the witness wants to give a full answer, then he can give it, then you can ask another question or object to the answer.

THE DEFENDANT BALL: I apologize. I will go on to the next question.

Q I think you have satisfied my answer, okay, because you don't know Mr. Ball; is that correct?

A I didn't know Ball or anyone given permission to get my phone or my money.

Q That's good. I'm satisfied with that.

You know what I am concerned about is I heard you testify earlier to the fact that when you arrived at the precinct in order to get the rest of your property or whatever it is, you said that you seen the perpetrator while he was in the precinct; is that correct?

A I think I was sitting, I saw him, yeah, he is passing far away.

Q Did you see him when he was handcuffed?

A Yes, I guess.

Q Of course you did, yes?

A Handcuffed or going to hospital.

Q You seen him in the precinct, yes?

A Yes.

Q And he was handcuffed in the precinct; is that correct?

A Yes.

Q Okay.

My next question is this, Mr. El Turkey, the night of the crime that this terrible thing happened to you, you know, in the Grand Jury testimony you never identified --

MR. SHORTT: Objection.

THE COURT: Sustained.

Miss Povman, do you want to help him?

THE DEFENDANT BALL: No, please, I have it.

THE COURT: Ask the question the right way.

THE DEFENDANT BALL: Yes, sir.

Q I have here, right, you was asked, okay, by the officer that came to the crime scene how did the person look?

MR. SHORTT: Objection.

Q -- who assaulted you?

THE COURT: I will allow it.

THE DEFENDANT BALL: Thank you.

Q And he asked you how did the other guy look, and as far as your testimony --

THE COURT: Now you are making a speech. Ask one question at a time.

Did the police ask you what the person who assaulted you looked like? Did he ask you for a description?

THE WITNESS: The police?

THE COURT: Yes.

THE WITNESS: He is already handcuffed, they already arrest him so how can I describe someone?

THE COURT: So the answer is no.

Q No, you never gave the description?

A I told him the heavy black --

Q Do you understand that I got it --

THE COURT: Sir, do not interrupt the witness when he is answering a question.

Q That was going to be my next question, Mr. El Turkey.

A Yeah.

Q You know, your description is, what do you call, only of a black guy, gay guy, homeless guy?

A Yeah.

Q And you also said, right, that the police officer said that he caught the guy?

A He --

Q You said in your testimony that the police officer told you, and you heard over the radio that they caught the guy

who had your stuff?

A No radio, they bring the homeless.

Q Okay.

I'm asking you did you know that they had caught the guy the homeless guy with your property before they brought him back to the crime scene, that's what I'm asking. Because you testified --

MR. SHORTT: Objection.

THE COURT: Did the cops tell you that they caught the guy with your cell phone?

THE WITNESS: Yes, they saw him throw something in the floor, the paper, social, the license, even bring to the precinct.

Q Thank you very much. Now, you said here in your testimony --

THE DEFENDANT BALL: I apologize. Just give me a second, please.

Q That when the officers did what you call, bring the person to you, is that before or after they had brought the Blackberry to you, did they bring the Blackberry to you before the homeless guy?

A No, they got the guy first from far away and said yes and then start to bring my stuff.

Q Your stuff?

A Yes.

Q But you just testified that they brought you a Blackberry that didn't belong to you?

A Yes, after I said the guy.

Q Okay. After you said the guy?

A Yeah.

Q Okay. Now, you said here, right, that you knew that it was the homeless guy who robbed you because he had your money and your I.D.; is that correct?

A Not me, the police knows, when the police find my wallet with someone so it's logic it's him.

Q Yes.

A Yes.

Q So that is how you know --

A No, I know because he is the guy. He is the one I saw him, I tried to get up from the heavy guy and the homeless guy, I'm not blind, he is the one who took, the other one he came push and took the money at the same time.

Q Okay. Now, I would like to ask you speaking of not being blind, can you give us a description of the homeless guy?

A Yeah.

Q Today?

A Today, yeah.

Q Can you give us a description of him?

A Yes.

Q Can you please tell us a description of him?

A Yeah, black guy, same tall, skinny.

Q How tall?

A Same tall like me. You want me to stand up?

THE COURT: How tall are you? Do you know how tall you are?

A Yes, like five six. But he is maybe a little shorter to me and curl hair.

Q Curl hair?

THE COURT: Curl.

A Yeah, like the always black guys hair.

Q Curl?

A Yes.

Q Is it dredlocks?

A Yes.

Q Is it like dreds, like Jamaican or like a girl?

A Like Jamaican but short, same like your hair.

THE COURT: Do you mean tight curls?

A Yes.

Q You mentioned earlier that the guy is gay; is that correct?

A He act gay, I'm not --

Q Did you ever see him dress differently than a man?

A Sometimes yeah.

Q Sometimes he dresses like a woman?

A Yes.

Q Have you ever had a relationship with him?

A Never.

MR. SHORTT: Objection.

THE COURT: Sustained. Sustained. The jury will disregard that. I will remind you that the questions are not evidence. It is the question coupled with the answer that is evidence.

Q Okay. My next question is this: You said that you identified the homeless guy; is that correct?

A Yeah.

Q You identified him while you was outside, is that correct, when you were on the street; is that correct?

A I know him long time.

Q I'm not asking whether you know him a long time, I'm asking at what point they brought him to you, they brought him to you and you identified him when you were on the street; is that correct?

A Yes.

Q Not in the ambulance?

A Not in the ambulance.

Q You never identified the man when he was in the ambulance?

A I identified him one time only.

Q I didn't ask you that. I asked you --

THE COURT: He answered your question. He said he

identified him one time.

Q So you were not in the ambulance when you identified the homeless guy; is that correct?

A No.

Q Okay. Thank you. You said, right, Mr. El Turkey, that you was in the ambulance for 15 minutes; is that correct?

A Um-hum.

Q How did you get in the ambulance, did you walk?

A Yes.

Q Was you brought in by a stretcher?

A No, I walk.

Q You walked?

A Yeah.

Q Let me ask you a question, Mr. El Turkey, you walked into the ambulance, and you received treatment?

A Um-hum.

Q Okay. How long was it before the time that this incident took place, you know, that the unfortunate occurrence happened, between that time and the time that you literally went into the ambulance, how long was that period of time?

A Maybe six minutes.

Q I apologize?

A Maybe six minutes.

Q Between the time this happened?

A The time that I got punched.

Q And the time that you went into the ambulance?

A Before I called the police?

Q Yes.

A Like seven or ten minutes.

Q So between the time--

A Between I got robbed and I go ambulance.

Q Yes.

A All take ten minutes. The police come right away and my friend call right away so couple of minutes couple minutes like six or seven minutes.

Q So how long would you say that it was that they brought the homeless guy back to you to identify him while you was in the street?

A I don't know what you trying --

Q You don't --

A I understand the question but I'm not -- I'm in a situation not counting seconds and minutes, just hurry call the police, I stand up to go to the ambulance, they bring the guy to recognize him, so I'm not counting minutes time.

Q So you have no idea --

A I have idea everything but I'm not counting.

Q I'm not asking you whether you are counting or not. I would like you to give us, you know, an answer --

THE COURT: Your best estimate.

Q How long?

THE COURT: As to how long it was between the time you were robbed and the time you identified the homeless guy.

A Maybe like seven or eight minutes.

Q So they brought the homeless guy back to the scene of the crime --

A Not close from me.

Q I'm not asking --

THE COURT: Don't argue.

A The crime is from far away.

THE COURT: Don't argue with each other. He asks questions, you answer questions.

A I know him from far away.

THE COURT: Okay.

Q So you know him from far away?

A Yes. They bring him not too close to me, not very close. They told me they going to bring him little bit and recognize him, so before I know him from far way I said I know it's this guy.

Q You also said you knew it was him because you already knew it was him that had the money so you know --

A I didn't arrest him to find he has the money so he is the one that has the money.

Q All right. Well, the next question is this, Mr. El Turkey, thank you. You are being very helpful.

A You are welcome.

Q What we are doing here --

THE COURT: Don't lecture the witness. Just ask him questions.

A I know your job.

Q Now, you have the homeless guy at the crime scene, the officers bring you the Blackberry; is that correct?

A They bring me phone, that's yours, I said no, so they bring me another phone.

Q How long before they went and found the other phone and brought it back to you; do you know?

A Yes, just the way he go and come back.

Q How long, where did he go?

A Where? I'm not looking because I'm still talking to the other cop to explain what happened because like two cops with me and the other cop bring the homeless, he bring the phone, I said, no, so he go back, and he bring after one minute is that your phone I said, yes, mine.

Q Did he tell you or did anybody tell you that they had gotten that phone off the homeless guy?

A They told me they think they catch the guy because he ask me how much money I said, yes, 250, they said they find 250 exactly. They asked me what kind of phone, iPhone, they said they find iPhone, they find the Social Security and my license so I'm not going to say nothing.

Q I just need to know specifically whether or not you were informed, that's it, is that the fact that the cops caught him?

A Yes, they say they got the guy.

Q And that they found the property?

A They found the property with him, yes.

Q That's what I'm asking.

A Yeah.

Q Okay. My next question to you is do you remember that night while you was with the EMS workers that you was asked to fill out a form, do you remember that?

A Remember what? Your question --

THE COURT: The EMS guys, did they ask you to fill out a piece of paper?

THE WITNESS: The cops?

THE COURT: The ambulance guys.

THE WITNESS: Yes, to sign like I'm not going to go to the hospital, yes, sure.

Q That you are not going to go to the hospital?

A Yes, I sign, sure.

Q But you didn't refuse all treatment at the crime scene?

A I didn't refuse. I refuse to go to the hospital because I didn't want to stay four or five days because I want to work.

Q Okay. But do you remember that you made a statement, do you remember that you wrote a statement?

A What statement?

THE DEFENDANT BALL: Is it all right that we hand it up?

THE COURT: Show it to the witness.

(Handing.)

A Yes, I sign this.

Q Yeah?

A What's wrong?

Q No, nothing is wrong. We just need to get some information from you.

THE COURT: Don't make a speech. Ask questions.

Q There is a statement that's made there by you that you were assaulted?

A Um-hum.

Q By a group of guys?

MR. SHORTT: Objection, your Honor.

A Group guys?

THE COURT: I will allow it.

Q It says there that's your statement that you stated?

A Group?

Q That's what it says?

A I don't know.

Q You don't remember making that statement?

A No, I never say group.

Q You never said group?

A Yes.

Q So that is a mistake?

A Yes.

THE COURT: Did you write that or did the ambulance guy write it?

A No, I didn't write anything.

Q Did you say that you was okay?

A This is my signature.

Q I didn't ask you that.

THE COURT: Did you write out the rest of it or did the ambulance guy?

A It's not my handwriting.

Q Did you say to the ambulance that you were okay because it also says that you said I'm okay?

A Yeah, I said that.

Q You said that to the EMS?

A I'm okay not go to the hospital.

Q I'm just asking you because that's what's in the paper?

MR. SHORTT: Objection.

THE COURT: That's what he said that he said he was okay.

Q So you did say you was okay?

A Yeah.

Q Okay. All right.

THE COURT: You said that because you did not want to go to the hospital?

A Yes.

Q Okay. Thank you very much.

THE COURT: Is that it?

THE DEFENDANT BALL: That's it, your Honor.

THE COURT: Thank you.

MR. GIBBONS: I have one more question to ask.

THE COURT: One more but we are not dancing around here.

RECROSS EXAMINATION.

BY MR. GIBBONS:

Q Mr. El Turkey, as you sit here today do you remember what these two individuals looked like, if you close your eyes, do you know what they look like?

A I know it is I know the homeless guy because I saw him three, four, five times, I always see him, but the other guy I'm not recognize him.

THE COURT: Any redirect?

MR. SHORTT: Yes, your Honor.

REDIRECT EXAMINATION

BY MR. SHORTT:

Q Mr. El Turkey, you talked about the length of the

hair of the homeless guy. Do you remember talking about that during cross-examination?

A Who?

Q You talked during cross-examination about the length of the hair in the homeless guy?

A Yes.

Q You said someone in the courtroom has similar style hair, could you point to that person?

A Yes.

Q Who is that?

A Similar hair like this guy like the lawyer.

Q The gentleman sitting across from you?

A Yes.

Q That's the same style of hair?

A Yes.

Q Anything else similar about him?

A Same heavy like him.

Q Okay. The form that you were shown by the EMS worker, did you fill that out?

A How come I'm bloody and writing?

Q Did you read it before you signed it?

A No.

Q Why did you sign it?

A I sign because I don't want to go to the hospital. I'm not going to cheat him.

MR. SHORTT: No further questions, your Honor.

THE COURT: Anything else, gentlemen?

MR. GIBBONS: No redirect.

THE DEFENDANT BALL: I do.

THE COURT: All right.

RECROSS EXAMINATION

BY THE DEFENDANT BALL:

Q Mr. El Turkey, I need to know it's very important for us, you said that you was assaulted --

THE COURT: All right.

Q -- and the homeless guy was on the back of you?

A Um-hum.

THE COURT: I'm going to sustain this line of questioning.

Q Okay. At what point --

THE COURT: Mr. Ball, you want to limit your questions to what Mr. Shortt just brought out on redirect. That's the limitation to what you can ask. So if you don't have any questions about what Mr. Shortt just asked, then I can't permit you to ask these questions.

THE DEFENDANT BALL: Thank you, your Honor.

THE COURT: Is that it?

Mr. El Turkey, you may step down. Thank you very much.

THE WITNESS: Thank you.

(Witness excused.)

THE COURT: Call your next witness.

MR. SHORTT: The People call Detective Daniel Lanning.

THE COURT OFFICER: Witness entering.

D E T. D A N I E L L A N N I N G, having been duly sworn, was examined and testified as follows:

THE COURT OFFICER: The People call Detective Daniel Lanning, L-A-N-N-I-N-G, shield 2559 of the 115 Precinct New York City Police Department.

THE COURT: Mr. Shortt, you may inquire.

DIRECT EXAMINATION

BY MR. SHORTT:

Q Good afternoon, Detective.

A Good afternoon.

Q How long have you worked for the New York City Police Department?

A Approximately nine years now.

Q What is your -- what precinct are you currently assigned to?

A 115 precinct in Jackson Heights, Queens.

Q What areas of Queens County?

A Jackson Heights, Corona, East Elmhurst.

Q How long have you been assigned to the 115 police precinct?

A About eight and a half years now.

Q Have you ever been anywhere else?

A Just the police academy.

Q What is your current assignment at the 115 Precinct?

A I work as a field intelligence officer.

Q What does it mean to be a field intelligence officer in the NYPD?

A As the field intelligence officer, I keep track of recidivists, gang members and parolees meaning we kind of keep tabs on people who have been arrested numerous times for the same thing, what they are doing, if they have been arrested in the past, things of that nature.

Q How long have you held that position for?

A Approximately four years now.

Q What did you do at the 115 before that?

A Prior to that I worked on patrol, I worked doing four to twelve which is 3 P.M. to 11:30 P.M.

Q Were you assigned to any particular area of the 115 during that time?

A Well, being assigned to patrol, you can be sent out to any -- they call it a sector so I was sent out to different sectors on different days depending on where they needed me.

Q I want to talk to you specifically about the day of July 3 of 2012. Were you working as an officer that day?

A I was, yes.

Q What time did you report to work?

A I was doing a four to twelve that day again 3 P.M. to 11:30 P.M. at night.

Q What was your current assignment at that time?

A I was assigned as the field intelligence officer that day.

Q What was -- did you have any plans as a police officer that day?

A Well, as a field intelligence officer, some days we go out in the field, some days we stay in tracking recidivists, gang members, parolees --

THE COURT: The question is what plan if any did you have?

A I'm sorry I was trying to get to that. I apologize. We had no plans that day, no.

Q At any point did you leave the precinct?

A We did, yes.

Q Around what time did you leave the precinct?

A I left around 3:30 P.M.

Q And where were you going?

A I believe we were going to get a cup of coffee.

Q After you got a cup of coffee, where else did you go that day?

A We had gone to College Point to drop off some paperwork, and then we headed back to the confines of the 115

Precinct.

Q When you left the precinct that day were you in uniform?

A No, I was not. I was in plainclothes.

Q Did you go by foot or by vehicle when you left?

A By vehicle.

Q What type of vehicle did you take?

A It was an unmarked vehicle, it was actually RMP number 1227.

Q What kind of car is that?

A That is a Chevy Impala.

Q When you left, did you go by yourself or with any other police officers?

A I went out with my sergeant, Sergeant Jeff Rosenberg.

Q Had you worked with Sergeant Rosenberg before?

A Yes, I had.

Q How long have you worked with Sergeant Rosenberg?

A Approximately three years.

Q When you left who was driving the vehicle?

A He was, Sergeant Rosenberg.

Q When you left, did you alert any of the police officers that you were going to be out on the street that day?

A We usually let the desk sergeants know when you leave the precinct that you will be out there just in case something happens, they know you are in the street, but that was the only

person we had spoke to before we left.

Q Are you familiar with Police Officer Angelo Pampena?

A Yes.

Q Was he working that day as well?

A Yes, he was.

Q Had you told Officer Pampena that you were going to be out in the street that day?

A No.

Q When you left, did you have a police radio with you?

A I did, yes.

Q I want to talk to you a little about what you were doing around 8:30 in the evening on July 3 of 2012. Do you recall where you were around that time?

A I was in the vicinity of 107 Street and Northern Boulevard.

Q Is that in the confines of your precinct?

A Yes, it is.

Q What type of area is that?

A It's mainly a commercial area, a lot of store fronts, it's a heavily -- not heavily, it has a lot of car traffic there.

Q I want to fast forward a little bit to just before about 9:00 in the evening. Was your police radio on at that time?

A Yes, it was, yes.

Q Are you familiar with what the term radio run means?

A Yes.

Q What is a radio run?

A A radio run is when central, meaning the person on the other end of that radio, they dispatch a call to a police officer and a police officer as myself responds to that call hence the term radio run.

Q As a field intelligence officer are you in the habit of responding to radio runs?

A I don't normally, but it's a heavy job meaning if it's something like a burglary or a robbery or a rape or something of that nature, I will respond to it, especially if I'm close to the proximity of that radio run.

Q Just before 9:00 that evening, did you receive any radio runs?

A I did, yes.

Q Where were you when you received that call?

A Again around 107 Street and Northern Boulevard heading westbound.

Q Who was driving the vehicle at that time?

A Sergeant Rosenberg was still operating the vehicle.

Q What type of call came over the radio?

A A male being robbed at knifepoint.

Q Was there any further description of the event at that time?

A I don't remember the address exactly, but it came over happening at the corner of 105 Street and Northern Boulevard and a description was two male blacks, one wearing white shirt and black pants.

Q Did you respond to the location of 105 Street and Northern Boulevard?

A I did, yes.

Q Had you ever been to that location before?

A Yes, I have.

Q How often do you pass by that location?

A I pass by that location everyday.

Q How much would you say on a daily basis do you pass by it?

A 20 days a month.

Q Fair to say you are familiar with that area?

A Yes.

Q Could you describe that area of 105 Street and Northern Boulevard for the members of the jury please?

A Sure. All of Northern Boulevard is commercial so on the corner there is a bodega, and as you head southbound on 105 Street, there is another commercial building, then a bar as you get about quarter way down the block it turns into all residential.

Q What about on the other side what's on the other side from the bodega?

A Directly across from the bodega I think it's a Latin dance studio another store behind that, and again it turns into residential so about three quarter of the block is residential, the other quarter of the block is commercial.

Q Are there light posts around that area?

A Yes, there is.

Q Where are there light posts around that intersection?

A There is a light post right in front of the bodega, and then there is one about quarter of the way down the block.

Q Down which block?

A I'm sorry down 105 Street.

Q Were those lights on when you arrived on scene?

A They were, yes.

Q Are you familiar with whether or not there are lights in the bodega?

A There are, there are lights in front of the bodega as well as there is lit signs in front of the bodega as well.

Q What about the Latin dance studio, any signs on the front of that building?

A Yes, there are signs.

Q What type of signs?

A I believe there is a Western Union sign, the name of the dance studio is in neon lights in front, too.

Q Further down 105 Street you said there are other businesses?

A Yes.

MR. GIBBONS: Which direction are we talking about?

Q Southbound on 105 Street, you said there are businesses behind the bodega?

A Yes.

Q Do any of those stores have exterior lights?

A There is a bar I believe it's two stores behind the bodega that has lighting in front of it also with neon lights in the window it's a bar.

Q Were those lights on when you arrived on scene?

A They were, yes.

Q Could you describe what you say -- first of all, when you drove up on the scene, what street were you on when you first arrived?

A I pulled up to the corner, it was actually the southwest corner of 105 street and Northern Boulevard.

Q What did you see when you arrived on scene at that location?

A I saw a male waving us down on the corner at which point I pulled up and rolled down my window.

Q What did that person look like?

A Male Indian, skinny, kind of balding. He had blood on his face and coming from his mouth.

Q What happened when you arrived on scene?

A I engaged in conversation with the individual, and he said that he had been robbed, and he said that they went that way, pointing southbound on 105 Street.

Q How long were you speaking to this individual for?

A A few seconds, because with that type of job --

THE COURT: Just answer the question. Two seconds.

A Few seconds, yes.

Q After that few seconds did you say anything to the individual?

A No, he got right in our car.

Q What happened -- where in the car did he get in?

A He got into the rear vehicle right behind the passenger seat.

Q What did you do after he got in the vehicle?

A We drove southbound on 105 Street.

MR. SHORTT: Can you we show the witness what's been previously introduced as People's Exhibits 1 and 2 in evidence, please?

Q Officer, do you recognize what is being shown to you right now?

A Yes.

Q What is that?

A This is the corner of 105 Street --

THE COURT: Officer, can you tilt that so all the

jurors can see it.

Q I want to focus on the picture on the left-hand side, do you recognize that picture?

A Yes.

Q What is that?

A That's the corner of 105 Street and Northern Boulevard.

Q Is that what the buildings appeared like and the light posts appeared the day you arrived on July 3 of 2012?

A Yes.

Q Officer, where was the individual who was bleeding when you first saw him on July 3 of 2012?

A He was standing right in the crosswalk here, we were coming westbound and pulled in nose first to where the crosswalk was.

Q After the individual got into your car, where did you go?

A We headed southbound on 105 Street.

Q How long were you traveling southbound on 105 Street?

A About a few seconds.

Q Could you estimate in terms of a number?

A Four, five seconds maybe.

Q What happened after four or five seconds?

A Mr. El Turkey, the complainant, stated that's him at which point we stopped the vehicle.

Q How far down the street had you traveled?

A About a quarter of the way down the block.

MR. SHORTT: If we can show the witness again People's Exhibits 1 and 2.

Q Officer, could you point to using the picture on the right-hand side, is where you stopped the vehicle depicted on the right-hand side?

A Yes, right in front of this bar here.

Q And was there anybody in front of the bar at that time?

A Yes, there was two male blacks in front of the bar at that time.

Q What direction were those two individuals facing?

A They were headed northbound on 105 Street.

Q So were they facing towards your vehicle or away from your vehicle?

A They were facing towards my vehicle.

Q How close while in your vehicle did you get to these two individuals?

A Once we stopped them in front of bar here, we were pulled over to the curb so we were about five to seven feet away from them at that time.

Q Using something in the courtroom could you point about the distance you are referring to as the distance between you and the vehicle and the two individuals that you stopped?

A From about here to the wall there approximately, I mean to you.

Q To me sitting here?

A About from here to the wall there, I would say.

THE COURT: Indicating about twelve feet.

MR. SHORTT: Thank you.

Q Officer, where was Mr. El Turkey when you -- where was the individual when you stopped the individual, the person that was bleeding stopped the vehicle?

A He was sitting behind me in the back of the vehicle.

Q Did you eventually learn the name of the person who was in the back of the vehicle?

A Yes, Mr. El Turkey.

Q What did you do when you stopped the vehicle?

A I got out due to the severity of the job, male being robbed at knifepoint so I got out of my vehicle with my gun drown, and I stopped the two individuals that Mr. El Turkey had pointed out.

Q I ask you to look around the courtroom. Do you see any of the individuals that you stopped that night in the courtroom today?

A Yes.

Q Could you point to that person and describe an article of clothing they are wearing?

A Sure, he is wearing a black jacket right there.

THE COURT: Indicating the defendant Brooks.

Q When you first saw Mr. Brooks, the defendant, that night, what was he doing at the very first moment you saw him?

A Like I said, he was walking northbound on 105 Street.

Q Was he closer to the sidewalk or to the building at that time?

A He was closer to the building.

Q And could you describe the other individual that he was standing next to?

A He was another male black a little shorter and a little thinner.

Q Do you recall what Elijah Brooks was wearing that day?

A He was wearing a white shirt and black shorts.

Q Do you recall what the other individual who was standing next to Mr. Brooks was wearing?

A I know he was wearing dark pants, I couldn't recall what kind of shirt he was wearing.

Q Do you recall was the person that was with Mr. Brooks white, Hispanic, black?

A He was a male black as well.

Q Could you tell how old he was?

A Mid to late forties.

Q After you stopped these two individuals, what happens next?

A Mr. El Turkey I.D.'d Mr. Brooks again and said that's the guy, at which point I placed Mr. Brooks under arrest.

Q How did you do that?

A I placed him in handcuffs.

Q What happened to Mr. Brooks after that point?

A He was transported back to the 115 for arrest processing.

THE COURT: By you or by someone else?

THE WITNESS: Not by me, by another officer.

THE COURT: All right.

MR. SHORTT: If we could show the witness People's Exhibits 1 and 2 again, please.

Q Officer, you referenced a light post about quarter of the way down the block, do you see that in the picture number two?

A Yes.

Q Could you point to that, please?

A Sure, it's right there.

Q Officer, do you recall whether or not that light post was on the night that you were on scene?

A It was on, yes.

Q Officer, you described some exterior lights on the side of the building could you point to those using exhibit number one what exterior lights you made reference to before in front of the deli?

A There is lights in the window here as well as underneath the awning.

Q What do you mean there are lights underneath the awning?

A There is lights that kind of shine down on to the sidewalk there.

Q Were those on when you arrived on scene?

A Yes.

Q Were there any lights along 105 Street?

A Yes, there is a light post there as well.

Q Where?

A Right here.

Q Was that light on when you arrived on scene?

A It was, yes.

THE COURT: Detective, can you tell us how far from the light post on 105 Street Mr. Brooks was standing at the time that Mr. El Turkey identified him initially?

THE WITNESS: When I had stopped Mr. Brooks, he was against the wall there right in front of the bar. I had him up against the wall the light post was at the edge of the curb so I'm bad with numbers, so he was the distance from the edge of the curb to where the wall was.

MR. SHORTT: Thank you, Judge. Can we show the witness one and two again?

Q Could you point exactly where Mr. Brooks was standing

the moment Mr. El Turkey identified him?

A This wall right here, this brick wall between that bar and this salon here.

Q Thank you, Detective.

MR. SHORTT: No further questions, your Honor.

THE COURT: Cross-examination?

MR. GIBBONS: Yes, your Honor. Just a quick minute, please.

(Whereupon, there was a brief pause in the proceedings.)

CROSS EXAMINATION

BY MR. GIBBONS:

Q Good afternoon, detective. How are you?

A Good. Yourself?

Q Good. My name is Wyatt Gibbons. I'm representing Mr. Brooks. You testified that the radio run came over as a knife point robbery, correct?

A Yes.

Q And you said that it was two male blacks one wearing white shirt and black pants, correct?

A Actually I believe it was three.

Q It was three male blacks?

A Yes, okay.

Q I was going to ask you that. So if came over as three male blacks?

A Yes, you are correct.

Q And one of them wearing white shirt, black pants?

A Yes.

Q You said you were on the scene in about two minutes, seconds?

A Yes.

Q Now Northern Boulevard and 105 is a relatively busy area?

A Um-hum.

Q You said it was all commercial, but there are actual residential buildings on top of the store front?

A In that particular area I don't believe so.

Q Take a look at People's Exhibit 1. Do you see the buildings on top?

A Okay, yes.

Q And the buildings next and across so on top of the store front there is residences, correct?

A Yes.

Q Okay. And this was about 9:00 on a summer night, right?

A Yes.

Q And the evening before July 4th holiday?

A Yes.

Q And there were people on the street?

A When I pulled up to that corner, the only person that

I kind of honed in on was Mr. El Turkey at the time.

Q So there could have been other people, you don't remember?

A Correct.

Q But the streets certainly were not deserted?

A No.

Q You said Mr. El Turkey was on the corner, and he was bloody, he looked like he had been beaten, correct?

A Yes.

Q He got in the car quickly, and you drove southbound on 105 Street, correct?

A Yes.

Q And that's against traffic?

A Correct.

Q Did you put your lights and sirens on?

A There are no lights and sirens in that particular vehicle.

Q Okay. As you passed the deli, you went about half block you said?

A It was actually a quarter of the way up the block.

Q It wasn't half a block?

A It was about quarter of the way.

Q Do you remember testifying at a hearing in this matter a couple of times actually?

A Yes.

Q Page eight --

MR. SHORTT: Which one?

MR. GIBBONS: Hearing number one.

Q This was on May 21 of 2013; do you recall that, Detective?

A Yes.

Q You swore to tell the truth there?

A Correct, yes, I did.

Q And you told the truth of course, right? Page eight starting at I guess line four:

(Reading:) Okay. Now as far as time is concerned you said two blocks away, it took three minutes in the car two seconds relative to the corner of Northern and bodega. Had you travelled halfway down the block, all the way down the block, third of the way down the block. How long have you been on that block before you had seen the witness?

(Reading:) Answer: I apologize, we got about halfway down the block.

Do you recall being asked those questions and giving that answer?

A Yes, I do.

Q Then again this is hearing two on January 8 of 2014, page 16 line 19:

(Reading:) You testified previously that after you had that brief conversation with him, he was -- you placed

him inside your vehicle and did a quick canvass of the area; is that correct?

(Reading:) Yes.

(Reading:) And after driving approximately half a way down the block on 105 you are talking about Mr. Brooks?

(Reading:) Answer: Yes. Do you remember being asked those questions and giving that answer?

A Yes.

Q Mr. Brooks you stated he was walking northbound on 105 Street, correct?

A Correct.

Q Okay. Towards you?

A Yes.

Q Towards Northern Boulevard?

A Um-hm.

Q When you saw him, you and Sergeant Rosenberg exited the vehicle guns drawn, correct?

A That's correct.

Q Now, when you went up to my client did he say -- did you order him to the ground?

A I ordered him to put his hands up.

Q Did he ask you why? Did he say I didn't do anything?

MR. SHORTT: Objection.

THE COURT: Sustained.

Q Did he comply right away?

A No.

Q Did he ask anything of you?

A I believe he told me to go fuck myself.

Q Now, he was walking with another male, correct?

A He was, yes.

Q They weren't running, correct?

A They were not running, no.

Q They appeared to be talking?

A Yes.

Q His clothes weren't disheveled, correct?

A Not that I recall, no.

Q And he had on a red baseball cap, do you recall that too?

A I do remember the baseball cap. I don't recall the color.

Q Okay, but he did have a baseball cap on?

A Yes.

Q And he was missing front teeth in his mouth; do you recall that?

A Mr. El Turkey?

Q No, no, no, Mr. Brooks, the person that you stopped?

A No, I did not notice that he was missing teeth.

Q At the time?

A At the time.

Q Not at all?

A No.

Q You noticed the hat, though, correct?

A Yes.

Q Now you said that you arrested Mr. Brooks, correct?

A Yes, I placed Mr. Brooks under arrest at that point, yes.

Q Okay. I guess it's a technicality, but the arrest was given to a different officer, correct?

A Correct.

Q So you detained my client, correct, placed him in handcuffs?

A Yes.

Q And he was not free to go anywhere, right?

A Not after Mr. El Turkey pointed him out as the person who had assaulted him.

Q Right. So he was not technically under arrest, but he was detained, would that be fair?

A No, he was under arrest at that point.

Q He was under arrest, so -- this was a little after 9:00?

A This was, yes, that's fair to say.

Q So if there is a police report that says the arrest took place at the precinct about half hour later, would that be a mistake?

A I don't think I understand your question.

Q Well, is it common that even though you might stop somebody and detain them, credit for the arrest would be given to somebody else, does that happen?

A If there is other officers on scene, I don't necessarily have to take the arrest. If someone else another fellow officer is there, they can take the arrest as long as they are there on scene.

Q Okay. Well, do you recall that evening Officer Pampena who Mr. Shortt asked you about he was given credit for both of the arrests, do you recall that?

A He did take both of the arrests, yes.

Q Okay. And now when you arrested Mr. Brooks, you searched him, correct?

A Yes, I did.

Q And there were no proceeds from the robbery found on him?

A Not that I found, no.

Q And he had shorts on, correct?

A He had black shorts on, yes.

Q Now, when Mr. El Turkey got in the car you testified that he was bleeding a lot, correct?

A Um-hum.

Q From the head and the mouth?

A Correct.

Q When you arrested Mr. Brooks, he had a white shirt

on, correct?

A Correct.

Q Did you notice any blood on him?

A I did not notice any blood on him.

Q Did you notice if his hands were cut or bleeding or anything?

A I did not, no.

Q The other person that he was with that was a male black, correct?

A Yes.

Q Did you take that person's name?

A I did not personally. I couldn't tell you if my sergeant at the time had taken it, but I did not.

Q Do you have any contact information for this person?

A No, I do not.

Q He was a potential witness though, correct?

THE COURT: Sustained.

Q Now the total time that you spent with the complainant from your initial encounter on the corner --

MR. GIBBONS: Withdrawn. Withdrawn.

Q After my client was arrested, was he transported --

MR. GIBBONS: Withdrawn. I'm sorry.

Q After my client was arrested, did you take him back to the precinct?

A No, I did not.

Q Do you know who transported him back?

A I'm not sure.

Q From the time of the initial encounter with the complainant to the canvass, the arrest of Mr. Brooks and then leaving the scene, about how much time --

THE COURT: Who leaving the scene?

Q I'm sorry. You leaving the scene about how much time went by?

A I couldn't tell you a definite amount of time it seemed like all of 15 minutes maybe, ten minutes.

Q Would two or three minutes be more accurate?

A No, it was a little longer than that. Maybe --

Q Okay. Hearing number two, page 26 line 7, do you remember being asked this question and giving this answer:

(Reading:) THE COURT: Okay. So Brooks the complainant was in your -- under your supervision for a total -- from the time of first observation of the complainant until the time that you had the last individual, contact with the complainant was that two to three minutes?

(Reading:) THE WITNESS: It was about two or three minutes.

Q Do you remember being asked that --

THE COURT: I'm going to sustain that objection, or I'm going to strike that question.

Q So you don't think it was two or three minutes --

THE COURT: From when to when?

Q From the initial encounter to the time he left the scene?

THE COURT: I don't think that's addresses that question, that question doesn't address it.

MR. GIBBONS: Let me rephrase.

Q When was your last contact with Mr. El Turkey?

A As far as what?

Q On that day?

A That day when I left the scene.

Q When you left the scene?

A Correct.

Q And you didn't transport Mr. El Turkey anywhere because you were pretty much at the scene, correct?

A I think what I was referring to there in that line of questioning is the point of us picking up Mr. El Turkey and him I.D.ing Mr. Brooks and being handed over.

I stayed at the scene for a little bit while my boss put over the radio that there was someone under arrest, that Officer Pampena was taking the arrest, so all of that took 15 minutes. It was about three minutes, two minutes from the points of us picking up Mr. El Turkey and actually placing Mr. Brooks under arrest so that's what it was to clarify it.

Q Were you still at the scene when Officer Pampena

showed up with the other arrestee?

A I was there when Officer Pampena showed up. I couldn't tell you if the other arrestee was there.

Q Okay. Now, after Mr. Brooks was arrested, do you know did you or any of your brother officers ask any of the local shops or commercial establishments --

THE COURT: Sustained. I'm going to sustain that. You can ask if he asked.

Q Did you ask any of the local shops or stores if there was any possible videotapes of the scene?

A I did not, no.

Q So you relied solely on the word of Mr. El Turkey?

MR. SHORTT: Objection.

THE COURT: Sustained.

Q Did you find any other evidence that would tie Mr. Brooks to this crime?

MR. SHORTT: Objection, your Honor.

THE COURT: Sustained.

Q Did you do any further investigation about this case after you arrested Mr. Brooks?

MR. SHORTT: Objection.

THE COURT: I will allow that.

A I did not, no.

Q Now, the complainant's eye was black and swollen and his clothes disheveled, and you testified he was covered in

blood?

A Yes.

Q Can you explain what an aided card is?

A An aided card is done for a victim of a crime when they are injured or sent to the hospital. It's basically a pedigree of what happened and their information.

Q Okay. Now you had testified previously that you prepared an aided card but you didn't; is that correct?

A I never testified to filling out an aided card, no.

Q Okay. Withdrawn, my apologies. Do you know if Mr. Brooks went to the hospital that evening?

A No, I do not.

MR. GIBBONS: Nothing further. Thank you.

THE COURT: Mr. Ball, do you have anything?

THE DEFENDANT BALL: Yes, I do actually.

CROSS EXAMINATION

BY THE DEFENDANT BALL:

Q How you doing, officer?

A Good. How are you, Mr. Ball?

Q Not bad.

A Good.

Q You know, Officer Lanning, I would like to just remind you about --

THE COURT: No, no, no. Ask a question.

Q You are aware that you are under oath and your

responsibility to tell the truth; is that correct?

A Yes.

Q Officer Lanning, you know, in a previous suppression hearing you were asked by the judge specifically, you see, the judge asked you --

MR. SHORTT: Objection.

THE COURT: Sustained.

THE DEFENDANT BALL: I can't ask what the judge asked him in the suppression hearing, your Honor?

THE COURT: Do it right.

Q Officer Lanning, in the time that you arrived at the crime scene and the time that you left, did you ever write anything down?

A Yes, I did.

Q What did you write down?

A Mr. El Turkey's information.

Q Did you --

THE COURT: You mean his pedigree?

THE DEFENDANT BALL: Yeah, because we never received that.

THE COURT: Mr. Ball, we don't make comments in the middle of cross-examination.

THE DEFENDANT BALL: Yes.

Q Are you sure?

A I'm not sure if I recall if I wrote it or Officer

Pampena. His pedigree was written down on a piece of paper. I believe Officer Pampena wrote it.

Q Of course because you testified previously that you didn't write anything down actually?

THE COURT: That's accurate, is that correct?

A Yes.

Q Yes, you did. And my thing is that you just said to us that you have a system that you use --

THE COURT: He didn't say anything like that.

THE DEFENDANT BALL: He did, your Honor, pertaining to the arrest, that an officer has to be on the scene in order for him to take credit for the arrest.

Q Is that correct?

A Correct.

Q So that means that Officer Pampena was on the scene when Mr. Brooks was arrested; is that correct?

A He was there, yes.

Q He was on the scene?

A Yeah.

Q Okay.

THE DEFENDANT BALL: Your Honor, for the record --

THE COURT: No, no, no. Ask questions.

(Defendant and counsel confer.)

Q So my next question is did you ever call for an ambulance, help for the victim?

A I believe my supervisor did, yes.

Q No, not your supervisor, you can't testify for your supervisor.

THE COURT: Don't debate with him.

THE DEFENDANT BALL: He is testifying, your Honor, I object to that.

THE COURT: Mr. Ball.

Q Did you call for medical help for the victim?

THE COURT: You may answer that question.

A Me personally I did not call for medical assistance but when --

THE COURT: No.

Q Very well. So in other words, you are saying you came to the crime scene, you arrested Mr. Brooks, you never wrote anything down and you never served as assisting the victim in no kind of way; is that correct?

MR. SHORTT: Objection, compound question.

THE COURT: Sustained.

Q Did you assist the victim in any kind of way?

A Yes, I did.

Q What type of assistance did you provide for the victim?

A We put him in the vehicle, we did a canvass for the defendant, and he was pointed out. As far as I'm concerned, that's the assistance that I provided to him. As far as medical

assistance, other officers had provided that for him.

Q But can you give us the names of the other officer that provided that?

A Sure, Officer Pampena and Sergeant Rosenberg.

Q So you're saying to us that while you were at the crime scene, Officer Pampena provided help, assistance for the victim --

A What kind of assistance are you referring to?

Q Medical assistance?

A EMS showed up on scene and provided medical assistance.

Q I didn't ask you that.

THE COURT: How long did it take for them to get there?

THE DEFENDANT BALL: I didn't ask that, Judge.

THE COURT: I know but I did.

THE DEFENDANT BALL: Okay.

THE COURT: How long did it take for EMS to get there?

A About seven to ten minutes they were there.

Q Okay.

THE DEFENDANT BALL: May I proceed?

THE COURT: Yes, you may.

THE DEFENDANT BALL: Thank you.

Q So my question is you never assisted the victim in

anything other than just getting him in the car; is that correct?

THE COURT: Sustained asked and answered.

THE WITNESS: Can I answer?

THE COURT: No.

Q My next question is, Officer Lanning, did you fill out an aided report?

A No, I did not.

Q Is that usually the what you call -- did anyone that was there while you were there did they fill out an aided report for the victim that you know of?

MR. SHORTT: Objection.

THE COURT: In your presence did you see anyone fill out an aided report?

A No.

Q Is that the usual procedure that you would follow if you come to a crime scene where a person is injured that you don't fill out an aided report or is it that when you come and you see a person who is injured that you do fill out an aided report?

THE COURT: What is the procedure with respect to an aided report when you have an injured victim?

A Like I said before, if there is someone injured or going to the hospital, there is an aided report prepared.

Q So you have to fill out an aided card?

THE COURT: And who is responsible for filling out that report?

THE WITNESS: The arresting officer.

THE COURT: And when and where is he obligated to fill that report out?

THE WITNESS: Usually he does it back at the precinct depending on the circumstances. Sometimes he can do it in the field if he wanted to.

THE COURT: Okay.

Q Okay. But to your knowledge there was never an aided card, report turned over from you; is that correct?

THE COURT: Sustained. We have been down this road.

Q My next question is, Officer Lanning, you said that you stayed at the crime scene; is that correct?

A Um-hum.

Q Who is it that transported Mr. Brooks back to the precinct do you know?

A I don't recall exactly who transported him back, no.

Q Do you know who you was at the crime scene with the other officer?

A Yes.

Q Can you give us -- do you want to tell us who it was?

THE COURT: Sustained.

THE DEFENDANT BALL: He can't tell us the name of

the officer?

MR. SHORTT: Objection.

THE COURT: That's what I said. Sustained.

Q How many officers was at the crime scene?

THE COURT: Sustained.

THE DEFENDANT BALL: No?

THE COURT: No.

Q Officer Lanning, so you're saying that when you were at the crime scene, you was there while the EMS truck was there; is that correct?

A Yes, I was there.

Q Okay. Now, I would like to ask you when the EMS truck was there, were you there when I was there brought back to the crime scene?

A I don't remember if you were there or not.

Q You don't remember but you -- so how long is it that you stayed around the crime scene from the time that you arrived to the time that you left?

A Approximately 15 minutes, ten or 15 minutes.

Q Ten or 15 minutes. Now, you talked about your radio run, and, you know, your communications. Does the officers have more than one communication system that you use, I mean, other than like the 911, is that the sole communication that you have or is it another device of communication that you use, can you tell us that?

A There is.

THE COURT: Sustained as to relevance.

THE DEFENDANT BALL: We need to know if they used the communication of the 9-1-1.

THE COURT: I ruled.

Q Did you communicate any of your activity over the 9-1-1 call?

MR. SHORTT: Objection.

THE COURT: Sustained.

Q Okay. You said that you had RMP number what was that number that you said you drove that night?

A 1227.

Q RMP 1227. Did you ever call in that you were going to come to the crime scene?

A Yes.

Q So should that have been in the 9-1-1?

MR. SHORTT: Objection.

THE COURT: I will sustain it. You don't have to answer that.

Q Does a call -- the SPRINT report, the calls that you made does it go out into the SPRINT report?

A Yes.

THE COURT: What call are you talking about?

MR. GIBBONS: The calls that he made does it go out to the SPRINT report?

THE COURT: You can answer that.

A I'm not really sure I understand. You are asking --

THE COURT: When you respond on your radio telling central that you are responding to a call, is it recorded anywhere?

THE WITNESS: Is that what you meant?

Q Of course?

A Yes.

Q It does, okay. The reason I'm asking is --

THE COURT: No, no, no. Just ask the question.

THE DEFENDANT BALL: Okay, your Honor --

THE COURT: Just ask questions. That's what you are on now.

THE DEFENDANT BALL: Your Honor, is it possible --

THE COURT: No.

THE DEFENDANT BALL: I haven't asked what I want to ask.

THE COURT: Ask a question.

THE DEFENDANT BALL: I want to ask you a question.

THE COURT: No.

THE DEFENDANT BALL: I want to ask whether or not --

THE COURT: Mr. Ball, ask a question.

(Defendant and counsel confer.)

THE COURT: Mr. Shortt, do you have any objection

to him putting the SPRINT report in?

MR. SHORTT: Yes, I object, Judge.

THE COURT: You do?

MR. SHORTT: Yes.

THE COURT: You want to put it into evidence?

THE DEFENDANT BALL: Yes.

THE COURT: Good. Over the DA's objection, mark it in evidence.

THE DEFENDANT BALL: Thank you.

(Defendant and counsel confer.)

(Defendants' Exhibit B, SPRINT report, marked for identification.)

THE DEFENDANT BALL: I'm asking that this be marked Defendant's Exhibit B in evidence.

THE COURT: Very good. Over the District Attorney's objection.

THE DEFENDANT BALL: Thank you very much.

THE COURT: Do you have a position, Mr. Gibbons?

MR. GIBBONS: No objection.

THE COURT OFFICER: So marked and received into evidence being shown to the witness.

(Handing.)

(Defendants' Exhibit B, marked and received into evidence.)

A Okay.

THE COURT: You have a question, Mr. Ball?

Q Other than do you identify anywhere on that 9-1-1 call where --

THE COURT: Is that a 9-1-1 call?

Q I apologize. SPRINT report where the RMP is your call is listed on that, are you able to identify anywhere on there?

A I'm sorry. What is the question?

Q On the SPRINT report that you have in front of you, are you able to identify any of the calls that was made from RMP --

THE COURT: As coming from you?

A Yes.

Q You know, you see there it says --

MR. SHORTT: Objection. Could the witness be allowed to answer the question?

THE COURT: Is there anything on the SPRINT report that reflects your response?

THE WITNESS: Yes.

THE COURT: The answer is yes.

Q Okay. Can you for the Court can you tell let us know, indicate where is it?

THE COURT: Do you want to read it?

THE DEFENDANT BALL: Please.

THE COURT: Read it.

A At 21:03, FIO on scene.

THE COURT: You are the FIO, correct?

THE WITNESS: That is correct.

THE COURT: All right.

Q Okay. It's not under RMP. Okay. Just for the question, do you know because there is another RMP 242, are you aware of that who is the officers of 242, R M P, 242 because they were the first respond --

MR. SHORTT: Objection.

THE COURT: Sustained.

Q Okay. Do you see here that on the SPRINT report it says that 21:00 RMP 242 responded on that SPRINT sheet?

THE COURT: Is that correct? Is that what it says?

A Yes. Yes.

MR. SHORTT: Can we reference where on the exhibit we are looking?

THE DEFENDANT BALL: 21:00 on the SPRINT report.

MR. GIBBONS: The top of the second bucket of numbers.

Q So just because I'm not an officer, but just for some reason --

THE COURT: Mr. Ball?

Q Can you help me out?

THE COURT: Just ask questions.

Q Does that indicate that there was another officer at that crime scene or responded to that at that time?

A Yes.

Q Okay. So you mean you weren't the first officer?

A Well, responding on scene are two different scenes you can respond from the other side of the precinct. It doesn't mean that you are on scene.

Q Now, I just want --

THE COURT: You have no idea who two four two is?

THE DEFENDANT BALL: That's what I wanted to ask.

THE COURT: You have no idea where that car was do you?

THE WITNESS: No, I do not.

Q You don't know where -- all right, well, you know --

A I think I know.

THE COURT: If you know, say so but don't guess.

A It's a guess.

THE COURT: Don't guess.

Q Well, I mean --

THE COURT: But that indicates that somebody in car two four two stated that they were going to respond to this scene from somewhere in the precinct?

THE WITNESS: Yes, correct.

THE DEFENDANT BALL: You know, your Honor, I have with me a CD. I would like to just mark it as well because

you know it's a what you call CD of the actual SPRINT report and I think that you know the SPRINT report itself will not be helpful to the jury in the case that they don't have the other what do you call the audio in order to get a better understanding of how to interpret --

THE COURT: The CD is --

THE DEFENDANT BALL: It's the same thing, your Honor.

THE COURT: I don't see the relevance of this frankly. I am trying to help you out. If you want it in evidence, the SPRINT report I let it in.

THE DEFENDANT BALL: Thank you, your Honor. So they can have an opportunity to listen --

THE COURT: Come on, Mr. Ball.

THE DEFENDANT BALL: Other than that I don't have anymore questions, but I would like to put the CD in.

THE COURT: Thank you very much. You have a question?

MR. GIBBONS: I do.

THE COURT: Based on what he put in?

MR. GIBBONS: I'm not sure of the logistics, but I have a couple more questions on my cross.

THE COURT: Based on his cross?

MR. GIBBONS: No, separate of that, but he raised an issue I wanted to bring out.

THE COURT: All right. Be brief.

MR. GIBBONS: Yes, very quick.

RECROSS EXAMINATION

BY MR. GIBBONS:

Q Detective Lanning, you did not witness the robbery?

A No.

Q So you don't know exactly what happened, correct?

A Other than --

Q What you were told?

A Correct.

Q Okay.

MR. GIBBONS: Can I have this marked as Defendant's Exhibit C, please. It's two pages. It's stapled.

THE COURT: Are you marking it for identification?

MR. GIBBONS: Yes.

THE COURT: Mr. Shortt, you know what that is?

MR. SHORTT: Yes.

THE COURT: Mr. Ball, you have seen that?

THE DEFENDANT BALL: Yes.

(Defendants' Exhibit C, marked for identification, two documents).

THE COURT OFFICER: Being shown to the witness.

Q Detective Lanning, could you look at Defendant's Exhibit C, it's two pages?

A Yes.
Q Do you recognize that?
A Yes, I do.
Q What is that?
A This is a mugshot of Mr. Brooks.
Q Was that taken the night of the arrest?
A Yes, it was.
Q Okay. Do you recall is that the way that Mr. Brooks looked at the time that you stopped him and placed him under arrest more or less?
A Yes.
Q Those are the clothes he was wearing?
A Yes.
Q Without the hat though, correct?
A Correct.
Q Is that a fair and accurate representation of how he looked the night that you stopped him and arrested him?
A It is, yes.
MR. GIBBONS: At this time I would like to have that marked as Defendants' Exhibit C in evidence.
THE COURT: Any objection?
MR. SHORTT: No.
THE COURT: Mr. Ball?
THE DEFENDANT BALL: No, sir.
MR. SHORTT: Brief voir dire?

THE COURT: Yes.

VOIR DIRE EXAMINATION

BY MR. SHORTT:

Q Officer, when are these pictures typically taken?

A A little later on after the arrest.

Q Taken at the Central Booking facility?

A Yes.

Q After the defendant has already been transported from the precinct?

A Yes.

Q Ready for court?

A Yes.

Q And undergone any medical treatment?

A Yes.

MR. SHORTT: No objection.

THE COURT: All right. Mark it in evidence Defendant's Exhibit C.

(Defendants' Exhibit C, marked and received, in evidence).

BY MR. GIBBONS:

Q Detective, while this was taken at Central Booking after he was arrested, this is the way he looked when you stopped him and placed him under arrest, correct?

A More or less, yes.

Q More or less I mean without the hat but those are the

clothes he was wearing, correct?

A Yes.

Q Looking at Defendant's Exhibit B, the second page if I could direct your attention to 21:26 hours that's 9:26, correct?

A Okay.

Q There is three of them there the third one that refers to 9:26 P.M. in layman time?

A Yes.

Q It says off of FIO crime unit taking under as of 21:13 hours, what does that mean?

A That means the person that I had been driving with is a sergeant, they usually okay the arrest that the officer can bring it in so on authority of my supervisor Sergeant Rosenberg he is allowing Officer Pampena to take the arrest.

THE DEFENDANT BALL: Objection to him testifying.

THE COURT: Overruled.

Q And that's what we were talking about even though you said you arrested Mr. Brooks the arrest was given to Officer Pampena, correct?

A Correct.

MR. GIBBONS: Thank you. Nothing further.

THE COURT: Mr. Shortt, any redirect?

MR. SHORTT: Yes, Judge.

REDIRECT EXAMINATION

BY MR. SHORTT:

Q Detective, the other individual that was stopped with the defendant Brooks, what happened to that person?

A He was set free because Mr. El Turkey had said that wasn't him.

Q What do you mean said it wasn't him?

A He said it was Mr. Brooks, not that guy.

Q And what did he indicate Mr. Brooks did to him?

A That he was the individual that robbed him.

Q Officer, there has been a lot of talk about what on scene means, is that a police term?

A Yes.

Q What does on scene mean?

A On scene means that you are physically at that location.

Q At every point of it or at any time?

A I'm sorry?

Q Is that for the whole time that the incident is going on, or could it also be for a portion of the time?

A It could be for a portion of the time as well.

MR. SHORTT: No further questions, Judge.

THE COURT: Anything else?

MR. GIBBONS: No, your Honor.

THE DEFENDANT BALL: I do have one. Is it all right?

THE COURT: Ask it.

RECROSS EXAMINATION

BY THE DEFENDANT BALL:

Q While you were at the crime scene, you said you were there for about 15 minutes; is that correct?

THE COURT: We are going over old ground here, sir.

Q Were you there when I was identified?

THE COURT: Sustained. He testified he didn't know.

THE DEFENDANT BALL: Thank you. That's all, your Honor.

THE COURT: Thank you. You may step down.

(Witness excused.)

THE COURT: Ladies and gentlemen, we are going to break for the weekend. I am going to advise you that we are going to work Monday morning, but not Monday afternoon, so you can make your personal plans accordingly.

In the meantime, do not discuss this case amongst yourselves, do not speak to the attorneys, the parties the witnesses. Do not go to the scene of the alleged incidents. Do not research this case in any way. Should anybody speak to you about the case, report it to me immediately. I thank you for your service today. Have a good weekend. 10:00 Monday morning.

(Jurors exit the courtroom.)

THE COURT: 10:00.

(Defendants exit the courtroom.)

THE DEFENDANT BALL: Your Honor, I still never got a chance to mark this into evidence.

THE COURT: Do you object to that?

MR. SHORTT: No, Judge, fine.

THE COURT: Good. Mark it.

(Defendants Exhibit D, CD, marked and received into evidence.)

(Defendants exit the courtroom.)

(Trial adjourned to January 26, 2015.)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS: CRIMINAL TERM: PART K14

---------------------------------------x Indictment No.

THE PEOPLE OF THE STATE OF NEW YORK 2228/12

-against-

ELIJAH BROOKS and RAYMOND BALL,

Defendants.

---------------------------------------x

125-01 Queens Boulevard
Kew Gardens, New York
January 26, 2015

THE COURT CLERK: Number two, case on trial, indictment 2228 of 2012, Raymond Ball and Elijah Brooks. The defendants are incarcerated produced and being brought before the Court.

Appearances, please.

MR. SHORTT: For the People, Assistant District Attorney Timothy Shortt. Good morning.

THE COURT: Good morning.

MS. POVMAN: On behalf of Mr. Ball, Linda Povman, 123-35 82 Road, Kew Gardens, New York.

MR. GIBBONS: For Mr. Brooks, Wyatt Gibbons.

THE COURT: Good morning.

(Defendant enters the courtroom.)

THE COURT CLERK: Let the record reflect the

defendant Brooks is present before the Court. Let the record reflect the defendant Ball is present before the Court.

THE COURT: Yes, sir.

THE DEFENDANT BALL: Yeah, good morning. Judge Schwartz, I apologize. We requested the daily read backs so that we can use them for cross-examination, and it wasn't provided.

THE COURT: I never ruled on it.

THE DEFENDANT BALL: Is there any reason? Because that's like -- I thought we agreed that you would do everything you can to keep this trial proceeding fair for me, you know, and how can I go forward with what you call the cross-examination of witnesses without the prior daily read back?

THE COURT: Well, I don't see the daily copy in this case of one witness really bears a hell of a --

THE DEFENDANT BALL: Your Honor, I'm the lawyer here so I needed that so that I can rely back to the testimony of the previous people, and it was two witnesses by the way. It was the, what you call, the victim witness and as well as the police officer witness.

THE COURT: All right. It's in my discretion, and I'm not going to do it.

MS. POVMAN: Judge, the other thing is that

Mr. Ball still wants the EMS worker to be called, and we would -- I know it's our obligation, we will attempt to subpoena him for Wednesday, but if the DA could also perhaps assist.

MR. SHORTT: I will do my best, Judge. I have him subpoenaed actually for tomorrow to hopefully move things along here. That was obviously before the snowstorm. I will see what I can do about Wednesday just to keep things moving.

THE COURT: All right.

MS. POVMAN: Thank you very much.

THE COURT: It's my intention to advise the jury that we are not going to work tomorrow. Everybody has cell phone numbers that have been given to my clerk. We will work Wednesday. If we are not working Wednesday, everyone will be notified on their cell phone as quickly as that decision can be made, but on the assumption that we are going to work Wednesday, if you can get that EMS guy in on Wednesday that would be a good thing.

What about your witness, Mr. Gibbons?

MR. GIBBONS: I'm not calling anyone, your Honor.

THE COURT: All right. Have you made a decision about testifying yourself?

THE DEFENDANT BALL: No, I don't have to.

THE COURT: So the answer is no?

THE DEFENDANT BALL: No.

THE COURT: Okay. Maybe we can get this to the jury on Wednesday. Let's do the witness today, and we will talk a little about the charge, and get rid of the jury as fast as we can.

MR. SHORTT: I don't know if we made a record Friday, but the SPRINT radio runs is now in evidence as Defendants' Exhibit D. It's my intention to have that played for the officer during his testimony so I have the laptop ready.

THE COURT: I think Mr. Ball offered -- after the jury left, Mr. Ball offered the disk into evidence, right?

THE DEFENDANT BALL: The only thing with that I never got an opportunity to listen to it, your Honor.

MS. POVMAN: Judge, I have listened to the original. I am assuming that the copy that the DA provided is an accurate copy.

THE COURT:` All right. Well, you have read the SPRINT report?

THE DEFENDANT BALL: Yes.

THE COURT: Okay. Ready for the jury?

MR. GIBBONS: Yes.

MR. SHORTT: Yes.

THE COURT: Mr. Ball, do you want to offer the disk itself into evidence in front of the jury?

THE DEFENDANT BALL: Yes.

THE COURT: You did not have that opportunity to do that Friday.

THE DEFENDANT BALL: So they can listen.

THE COURT: He will play it on the cop's direct testimony, but you are the one that offered it into evidence so you should have the opportunity to offer it in front of the jury if you want this morning.

THE DEFENDANT BALL: Okay.

MS. POVMAN: So the record is clear.

THE COURT: So the jury knows that you are the one that wanted to play it.

THE DEFENDANT BALL: Thank you very much.

MR. SHORTT: It is also my intention to introduce this, these have all been previously turned over to the defense.

THE COURT: What is it?

MR. SHORTT: The photograph of the money and the injuries. We have already provided --

THE DEFENDANT BALL: Objection, your Honor, he never provided that to the defense.

MS. POVMAN: He never provided it.

MR. SHORTT: The money, no.

THE COURT: Take a look at it.

THE DEFENDANT BALL: Your Honor, no, I can't

accept this into evidence, photographs of money.

THE COURT: If you are declining to look at it, then you are declining to look at it.

MS. POVMAN: May I have a moment to consult with my client?

THE COURT: Sure.

(Defendant and counsel confer.)

THE DEFENDANT BALL: That's what I am saying, your Honor. I move to preclude that. Your Honor, I also move to preclude the testimony of Officer Pampena because of the fact that he never, what you call, provided for us during the suppression hearings he never provided the aided report in the suppression hearing, do you understand?

And I also would like because at this time there should have been a preclusion set on the fact that he failed to turn that over, and he testified that he did do it, so I'm asking also for you to preclude his testimony.

THE COURT: Mr. Shortt?

MR. SHORTT: First of all, as to discovery it was noted on the demand for discovery that this property was listed, it was clear in the suppression hearing that this money --

THE DEFENDANT BALL: I have the --

THE COURT: Mr. Ball, one at a time.

MR. SHORTT: This money was recovered, it was

listed under the bill and demand that counsel --

THE COURT: We are talking about the aided report.

MR. SHORTT: No, the money. I will address the discovery money issue first.

THE COURT: All right.

MR. SHORTT: This was in the People's custody, it was made clear at the suppression hearing what was recovered that we intended to introduce it at trial. Counsel and defense never made a request to ever see it, it's here if he wants to inspect it. I can't take it out of the protective cover right now unless the Court allows me to, I will have the officer do it.

In terms of the aided report the officer was very clear, and he corrected himself no matter what Mr. Ball says, I filled it out, he was asked specifically by Judge Hollie, do you remember filling it out or is it just out of habit that --

THE DEFENDANT BALL: Your Honor, please --

MR. SHORTT: The officer immediately clarified it out of habit. We have done an exhaustive search, it is clear he did not fill it out. He misspoke at the hearing. There was never an aided report filled out.

THE COURT: Never one at all in this case?

MR. SHORTT: Yes, the officer neglected to do it.

THE DEFENDANT BALL: Can I read it back because we

have it here exactly.

THE COURT: All right.

THE DEFENDANT BALL: 36, 37 and 38. Here it is so Miss Povman asked the Court says Miss Povman -- officer did you -- I'm reading from page 38 of which one is this? I apologize. January 8, 2014 page 36, at 20:

(Reading:) Miss Povman, officer, did you prepare an aided report in connection with this case?

(Reading:) Yes:

(Reading:) Do you have a copy of that report with you today?

(Reading:) I can look to see if I can have it.

Continues onto 37.

(Reading:) I don't have it with me. I don't have it with me, judge.

(Reading:) Miss Povman, can the DA be directed to provide us with a copy of that aided report? I don't have the original Rosario with me.

(Reading:) Mr. Ball: I said I have it.

(Reading:) Miss Povman said excuse me.

(Reading:) Whereupon, there was a pause in the proceeding.

(Reading:) I don't have it with me.

(Reading:) This is from page 37, two: Miss Povman, the judge, can the DA be directed to provide us

with the copy of that aided report? I don't have the original Rosario list with me.

(Reading:) Mr. Ball: I have it.

(Reading:) Miss Povman: Excuse me.

(Reading:) The Court says sure.

(Reading:) Whereupon, there was a pause.

(Reading:) Okay. Officer, you just testified that you prepared an aided report in connection with this case.

(Reading:) Yes.

(Reading:) Is that based on your memory or your practice or what is the basis for that based on practice?

(Reading:) We are supposed to fill out an aided card if somebody is injured.

(Reading:) Right, and is there anything in your memobook to indicate that you filled out an aided card in this case?

(Reading:) Let me check.

(Reading:) Whereupon, there was a pause.

(Reading:) No, there is no reference to an aided card being filled out in my memobook.

(Reading:) So that your testimony is based on your practice what you usually do?

(Reading:) Correct, yes.

38. (Reading:) And is there something at the precinct that you could refer to, to find out whether you

actually did an aided report in this case or not? Is there any record kept at the precinct?

(Reading:) I'm not sure. And you know just to be clear just so I'm clear as to what you meant by the answer you just gave your testimony is based on your practice as opposed to you just described having arrived at the ambulance, gotten in the ambulance, was literally sitting next to the complainant and the observation you made sitting next to the complainant is that observation based on practice or based on your actual recollection of what happened in this case?

(Reading:) Answer: Based on actual recollection of me sitting there shoulder to shoulder next to the complainant is what I observed.

THE COURT: Okay.

THE DEFENDANT BALL: There is no misunderstanding is that the fact that he filled it out and it was never turned over. When we go forward, the judge ordered --

THE COURT: That is not how I construe what you just read.

THE DEFENDANT BALL: Can I go on, please, because the judge ordered him to turn it over to the Court? Okay?

It says here on page 49 at 13:

(Reading:) And you know counsel just to rest on the record or do you wish to make an argument? As far as

I'm concerned you can rest on the record.

16, (Reading:) Miss Povman: Judge, I'm going to rest on the record subject to the production of the aided report if it exists but that aided report should have been turned over as part of the original Rosario material prior to the hearing. The officer testified he prepared one, it doesn't look like there is one in the Rosario list, and I think we should have a definite answer. He says, yes, one way or the other. And so he goes on and he directs the District Attorney to provide it for us.

He says page 51 he says it says here -- page 50 at the bottom 24 the judge says:

(Reading:) That's fine. The only thing that I need to make, I want to make sure the defense have in their possession if it exists is a copy of that aided report so since he is on duty today he is working today he will leave here to go back to the precinct. I need him to make a diligent search of his records to see if there is an aided there or police department forms. There are places that they keep copies. He has to make a search of all those places areas today and make a statement to you as to whether or not it exists. If it exists get a copy of that to you, you know, hopefully today but certainly by the adjourn date. And he goes onto adjourn the date and he says in page 52, your Honor, that the matter is adjourned

Tuesday morning for the production of that report if it exists and if it doesn't an affirmative statement from the People that does not exist. We never received a copy of the report nor an affirmative answer.

THE COURT: I understand that, but Mr. Shortt just gave an affirmative answer today.

THE DEFENDANT BALL: Okay. Now I'm saying it was already established he filled it out, there is no misunderstanding about that.

THE COURT: I disagree with you.

THE DEFENDANT BALL: It's not whether you disagree. The judge already made a decision that it existed.

THE COURT: I disagree that the judge made such determination.

THE DEFENDANT BALL: I'm saying to you this is already decided in another court.

THE COURT: I understand.

THE DEFENDANT BALL: I am asking you at this time to make a preclusion based upon the fact that he failed to turn over the Rosario.

THE COURT: Very good. I have listened to your argument and your reading of the minutes, and it is quite clear to me that everything that Judge Hollie said during the course of the suppression hearing and everything that

the police officer said amending his testimony, makes it clear to me, A, that the officer testified that it was merely his practice to make out an aided report, and that he had no memory one way or another as to whether he had actually done so.

THE DEFENDANT BALL: I object, your Honor.

THE COURT: And, B, that Judge Hollie's directives were all couched --

THE DEFENDANT BALL: Objection, your Honor.

THE COURT: You are objecting to me making a ruling on the record?

THE DEFENDANT BALL: Yes, sir.

THE COURT: Quiet.

THE DEFENDANT BALL: Yes, sir.

THE COURT: Everything that Judge Hollie said was phrased with the proviso if it exists. Mr. Shortt has I think twice now during the course of this trial made it clear that he has made an investigation as to the existence of this document and has not found such a document, and I'm prepared to conclude based on what I have heard that no such document exists. And therefore, I am going to deny your application to preclude the testimony in this case.

THE DEFENDANT BALL: Okay, your Honor --

THE COURT: That's it.

THE DEFENDANT BALL: Your Honor --

THE COURT: That's it.

THE DEFENDANT BALL: I want to say something with respect to me reading it to the jury.

THE COURT: You cross examine him the way you want.

THE DEFENDANT BALL: Let the jury decide.

THE COURT: That's your business. Bring in the jury.

THE DEFENDANT BALL: Let the jury decide.

THE COURT OFFICER: Jury entering.

(Jurors enter the courtroom.)

THE COURT CLERK: Do both sides stipulate to the presence and proper seating of the jury?

MR. SHORTT: Yes.

MR. GIBBONS: Yes.

THE COURT CLERK: Mr Ball?

THE DEFENDANT BALL: Good morning, everyone.

THE COURT CLERK: Do you stipulate to the presence and proper seating of the jury?

THE DEFENDANT BALL: Yes.

THE COURT: Good morning, ladies and gentlemen of the jury. First things first, we are not working tomorrow. The officers have gathered up everybody's cell phones and when I say everybody I mean of course all of the jurors and the lawyers and everybody involved in this case. I expect

to work on Wednesday morning. If I change my mind, and only if I change my mind, everybody will be contacted. So plan on being here Wednesday, but if Mother Nature tells me I'm wrong, then you will be told as quickly as that decision is made. All right.

Mr. Shortt?

MR. SHORTT: Your Honor, the People call Police Officer Angelo Pampena.

THE COURT: The officer will be the first and last witness today after which we will dismiss you until Wednesday morning, and good luck to everybody.

(Whereupon, there was a brief pause in the proceedings.)

THE COURT OFFICER: Are you ready, Judge?

THE COURT: Ready.

P.O. A N G E L O P A M P E N A, having been duly sworn, was examined and testified as follows:

THE COURT OFFICER: The People call Police Officer Angelo Pampena, shield 19220 of the Queens gang unit, NYPD.

THE COURT: Mr. Shortt, you may inquire.

MR. SHORTT: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. SHORTT:

Q Good morning, officer.

A Good morning.

Q When did you join the New York City Police Department?

A Beginning of 2007.

Q During that time, where have you been assigned in the New York City Police Department?

A I was assigned to the 115 Precinct, I did impact which is foot patrol for new officers, then I did anti-crime which is a plainclothes unit not going to radio runs more like pick up felonies, certain dangerous jobs like that. Then about 13 or 14 months ago I was assigned to the gang unit.

Q Officer, I want to talk to you specifically about July of 2012. What command were you assigned to work for during that time?

A The 115.

Q And where is the 115 located?

A 92 and Northern Boulevard that covers Jackson Heights, Corona and East Elmhurst.

Q In July of 2012 what was your assignment within the 115 police precinct?

A I was in the anti-crime unit.

Q What does that mean to be an anti-crime officer?

A You are a plainclothes officer, it showed that you were make to make good arrests, everything that I did was above and beyond just a normal police officer, so it's maybe like an inside promotion precinct level wise, and you are in

plainclothes and unmarked vehicle driving around looking for crimes happening in progress before a victim could call 9-1-1.

Q Officer, I would like to talk to you about specifically the date of July 3 of 2012, were you working on that day?

A Yes.

Q What time did you report to the precinct?

A 6:00 P.M.

Q What hours were you going to work that day?

A From 6:00 P.M. until 2:00 A.M.

Q What was your assignment within the precinct that day?

A I was in the robbery unit.

Q What does that mean?

A We were in uniform for the day because it was a holiday weekend, and we had to respond to all robberies that were either happening or robberies in the past so we had to respond to all those jobs.

Q Officer, you were working in the plainclothes units?

A Yes.

Q Why were you in uniform for that day?

A For police officer safety usually around holidays they put everybody in uniform for the safety of us, and we know there are a lot of tourists out and people touring New York City so just as a precedent for all of us so, it's just a higher

presence of police force.

Q Did you stay at the precinct or go out on patrol?

A We were on patrol.

Q You said we were you with officers that day?

A Yes.

Q What other officers were you working with that day?

A Officer Troisey and Officer Torres.

Q Had you worked with them before?

A Yes.

Q Were you on foot or in a vehicle?

A In a vehicle.

Q What type of vehicle did you go out in that day?

A Unmarked silver Crown Victoria.

Q When you left, were you equipped with a police radio?

A Yes.

Q Prior to you leaving the precinct -- do you know Detective Daniel Lanning?

A Yes.

Q How do you know him?

A We are friends through the police department, he works in the 115.

Q Prior to leaving the day of July 3 of 2012 to go out on the street, did you have any conversations with Officer Lanning?

A Excuse me?

Q Did you speak to Officer Lanning before you went out on the street that day?

A No.

Q Officer, I want to direct your attention to approximately 8:55 P.M. that day, do you recall where you were at that time?

A Yes.

Q Where were you around that time?

A 108 Street and Astoria Boulevard in Queens.

Q What -- is that within the 115 Precinct?

A Yes.

Q What were you doing around that time?

A We were patrolling.

Q Were you in your police vehicle?

A Yes.

Q Who was driving that vehicle?

A Officer Torres was driving, and I was in the front in the front passenger seat.

Q Where was Officer Troisey?

A In the rear passenger seat.

Q Are you familiar with the term radio run?

A Yes.

Q What is a radio run?

A When somebody calls 9-1-1, and it's deemed fit for an officer to respond. Our central which is a person over the

radio dispatches the job over the air, and somebody has to pick up the radio run.

Q Did you pick up any radio runs at around that time?

A Yes.

Q What type of radio run did you pick up?

A It was a 30 which is a robbery in progress.

Q You used the word 30, what is that?

A Police code, short term for us so we could get more information over the radio quicker.

Q The robbery location, was that given over the radio?

A Yes.

Q Where was that location?

A The cross streets were 105 and Northern Boulevard.

Q Are you familiar with that location?

A Yes.

Q Have you patrolled in that area before?

A Yes.

Q Can you describe the area around 105 Street and Northern Boulevard?

A It's a business location, there is a lot of store fronts, and well lit. Northern Boulevard which is a major boulevard for Queens, I believe it's Route 25 so it's a well lit active place.

Q How far away from that place were you when you received the radio run of the robbery?

A Approximately three or four blocks.

Q What direction were you facing?

A I was facing eastbound on 108 Street -- excuse me, on Astoria Boulevard at 108 Street.

Q So were you facing towards or away from the crime scene?

A I was horizontal with it.

Q What happened when you received that radio call?

A Officer Torres, we did a U-turn on 108 Street and Astoria Boulevard, and then we hopped over the center barrier and went southbound on 105 Street which is against traffic heading towards Northern Boulevard.

Q So is Astoria Boulevard north or south of Northern Boulevard?

A It's north.

Q And how long were you traveling for?

A Approximately 30 seconds.

Q What happened as you approached the intersection -- what happened on the route to Northern Boulevard and 105 Street?

A As we were driving southbound on 105 Street as we were coming to 32 Avenue which is the avenue right before Northern Boulevard I seen a male fitting the description, a male black, white T-shirt, black jeans running away from the crime scene.

Q Officer, when did you receive a description in this

case?

A When the radio run came over our central, the radio person told the description of the males that were involved in the attack.

Q What was the description that you were looking for at that time?

A Three male blacks, one was wearing white T-shirt and black jeans.

Q And could you describe the person that you observed -- what was the location?

A 105 Street and 32 Avenue.

Q What did the person look like that you just talked about?

A It was a male black wearing white T-shirt and black jeans.

Q What direction was that person heading?

A He was running northbound on 105 Street coming to the intersection of 32 as I was heading southbound on 105.

Q So was that person facing you?

A Yes.

Q How far away was this person the first time that you saw them?

A About two or three car lengths right in front of us.

Q How close to the intersection was this person?

A About a car length from the intersection.

Q Officer, I'm going to ask you to take a look around the room and see whether or not you recognize the person that you saw that day?

A Yes.

Q I'm going to ask you to point that person out and identify an article of clothing that person is wearing?

A A black button up dress shirt.

THE COURT: Indicating the defendant -- who are you pointing out?

THE WITNESS: The one with the glasses.

THE COURT: Indicating the defendant Ball.

Q Officer, what did you do when you observed the defendant Ball that day?

A We stopped our vehicle right at the intersection of 105 Street and 32 Avenue, and Mr. Ball stopped right in front of our vehicle. As I proceeded to get out from the passenger's side door, he put his hands up and just said that he bought a phone at 105 and Northern Boulevard while holding a black iPhone in his right hand.

Q Officer, how far away from the defendant Ball were you when he made this statement?

A Half a car length, he was standing directly in front of our vehicle.

Q Was he on the sidewalk or on the street?

A On the street.

Q Where were the other officers at this time?

A Officer Torres was on the driver's side of the car, and Officer Troisey was right behind me.

Q Officer, I'm going to ask you to take a look at the defendant Ball today. Does he appear the same he did on the day of July 3 of 2012?

A No.

Q How does he appear differently?

A His hair is a little more grown out, he is a little heavier today, and he was clean cut at the time.

Q What do you mean heavier today?

A He gained some weight. He was thinner when I first seen him.

Q Officer, what happened after you got out of your police car?

A We went to Mr. Ball, I grabbed the phone from him, put it in our vehicle for safekeeping, and we placed him in handcuffs, patted him down to be sure there were no weapons on him, and he also had money in his front right pocket of his pants.

MR. SHORTT: I ask that this be shown to the witness and marked as People's Exhibits 3 and 4 for identification. Show the defense.

THE COURT: Have you seen this, Mr. Gibbons?

THE DEFENDANT BALL: No.

MR. GIBBONS: Yes.

THE COURT: Show it to Mr. Ball.

THE DEFENDANT BALL: I have never seen it, your Honor.

THE COURT: Look at it now.

THE DEFENDANT BALL: He is putting into evidence something I never had the opportunity --

THE COURT: All right. Make your application.

THE DEFENDANT BALL: I object to him putting it in, your Honor.

THE COURT: Mark it for identification.

(People's Exhibits 3 and 4, photographs, marked for identification.)

MR. SHORTT: Can we show the witness, please?

(Handing.)

Q Officer, I'm going to ask you to look at the left-hand side of the exhibit. Do you recognize that?

A Yes.

Q What is that?

A It's a photo of 105 Street and 32 Avenue facing southbound.

Q Does that fairly and accurately depict what the streets and the buildings looked like on July 3 of 2012?

A Yes.

Q Officer, I ask you to look at what's on the

right-hand side. Do you recognize that?

A Yes.

Q What is that?

A That looks like a Google Maps picture of the scene, the area.

Q Officer, are you familiar with the streets of that location?

A Yes.

Q How long have you been a police officer around that location?

A Approximately seven years.

Q Do you patrol those streets?

A Yes.

Q Are the streets as drawn on that map do they fairly and accurately depict the layout of the streets and the area?

A Yes.

MR. SHORTT: With those foundations I move those into evidence as People's Exhibits 3 and 4 into evidence.

THE COURT: Mr. Gibbons?

MR. GIBBONS: Just one peek at the map. I don't think I have any objections, your Honor.

(Handing.)

MR. GIBBONS: No objection, your Honor.

THE COURT: Mr. Ball?

THE DEFENDANT BALL: I already put in my

objection, your Honor.

THE COURT: All right. The objection is overruled. Mark them 3 and 4 now in evidence.

(People's Exhibits 3 and 4, marked and received into evidence.)

THE COURT OFFICER: So marked into evidence.

THE COURT: Mr. Shortt?

MR. SHORTT: Can we have that displayed to the jury, and I will ask the officer further questions.

THE COURT: You want the jurors to look at it first?

MR. SHORTT: Yes, sorry.

THE COURT: Please show it to the jurors.

(Exhibits shown to the jurors.)

THE COURT: All right. The exhibits have been shown to the jury. Mr. Shortt, you may continue.

MR. SHORTT: Thank you. Can we hold that up?

THE COURT: Hold it in a way that the witness and the jurors can see, particularly Mr. Eversly.

Q Officer, do you see the place where you first observed the defendant Ball on July 3 of 2012 displayed on the left hand exhibit number three?

A Yes.

Q Could you point to that, please?

A Right here.

THE COURT: Can you see, Mr. Eversly?

JUROR: Yes, sir.

Q What direction was the defendant Ball running when you first observed him in that photograph?

A Northbound. He was down the street running towards me, and I was in a vehicle driving southbound, and we stopped right here in this intersection.

THE COURT: When you say northbound, was that away from Northern Boulevard?

A He was running away from Northern Boulevard, and I was driving towards Northern Boulevard.

Q The intersection displayed in the left hand side photograph is that displayed at all on the right-hand side?

A Yes.

Q I ask you to circle on the map where that location is with this pen?

A (Witness complies.)

THE COURT: Did it work?

THE WITNESS: Yes.

THE COURT: Show the markings to the jurors.

Q We can put that down for now. You testified that you recovered things from Mr. Ball?

A Yes.

Q What specifically did you recover at that time?

A In his right hand he had a black iPhone, and in his

front right pants pocket he had U.S. currency, it was a 100 dollar bill, seven 20 dollar bills and a 10 dollar bill.

Q What did you do with this property?

A I took it, and I placed it in our vehicle for safekeeping.

Q What did you do with Mr. Ball?

A Placed him in handcuffs and put him in the rear of the vehicle.

Q How long were you at that intersection for?

A Approximately a minute or two.

Q After you placed the defendant in the vehicle, what happened next?

A We continued to drive southbound on 105 Street towards Northern Boulevard, and there was an ambulance that was already at the scene that was parked on the south southeast corner of 105 Street and Northern Boulevard and I proceeded to -- well, my partner Officer Torres drove the vehicle behind the ambulance.

Q Officer, how long did it take you to go from the intersection where you stopped the defendant Ball to where -- to 105 Street and Northern Boulevard?

A Approximately ten seconds.

Q How far is that?

A It's one New York City block.

Q When you got to the scene, were there other police

officers present?

A No.

Q Who was present?

A Mr. El Turkey was present, the victim, and there was two EMS workers that were in the ambulance.

Q When you got to the scene what happened?

A I got out the vehicle, out of our police car, and I walked to the ambulance. The back doors are like barn doors, were both open, so I proceeded to go into the ambulance and have a conversation with the victim.

Q Is that Mr. Tarek El Turkey you are referring to?

A Yes, the victim.

Q What did Mr. El Turkey look like at that time?

A He had blood all over face, large lacerations to his head, his eyes were swollen, his ears bleeding, his mouth busted up, and his clothes were ripped and torn up and very disheveled and very messy looking.

Q Without saying what was said, were you able to communicate with Mr. El Turkey?

A Yes.

Q Was he able to articulate to you what happened to him?

A Yes.

Q Did he have -- did you have any trouble understanding him?

A No.

Q Where was the defendant Ball while you were speaking to Mr. El Turkey?

A He was placed at the front of our police car.

Q Where was that in reference to Mr. El Turkey?

A Directly in front of him.

Q How far away was Mr. El Turkey from the defendant at that time?

A Approximately two car lengths.

Q And did you have a conversation with him at this point?

A Yes.

Q What did you ask him?

A I asked him if he recognized the property that I had, and he said, yes, and I asked him if he could tell me the denomination or the amount of money that was stolen from him, and he told me the exact denominations and the exact currency of what he had.

Q Did you ask him any questions about Mr. Ball?

A Yes.

Q What did you ask him?

A I asked him what his part was in the robbery.

Q Did you ask Mr. El Turkey whether or not he recognized the defendant Ball?

A Yes.

Q When did you do that?

A Whenever I was in the ambulance with Mr. El Turkey.

Q Was that before or after you showed him the property?

A That was before.

Q Before you showed him the property, what conversation did you have with Mr. El Turkey?

A I asked him if he knew who that was, I pointed to Mr. Ball that was standing in front of our vehicle.

Q What did he say to you?

A Yes, he was the one that started to assault him, and then he was the one that took his pocket, he rifled through his pockets and took out the phone and the money from the victim, Mr. El Turkey.

Q And who was he indicating did this?

A Mr. Raymond Ball.

Q Where was Mr. Ball when this conversation was taking place?

A Right in front of our police right behind the ambulance.

Q After having this conversation, what did you do next?

A I asked him what was taken, he told me the phone and the money, and the phone was locked, and I was able to unlock the phone, and there was pictures of Mr. El Turkey and his family on the phone.

Q What happened after you were able to unlock the

phone?

A I went through it to be sure it was his, and once I was satisfied, I returned the phone back to Mr. El Turkey.

Q Was that at the scene or later at the precinct?

A That was at the scene at the time.

Q Officer, what occurred with the money that was recovered from the defendant Ball?

A I had it in safekeeping. I asked Mr. El Turkey how much money was taken from him. He told me. I asked him if he knew how much, the exact denominations, and he did because he just came from a check cashing place so he told me a 100 dollar bill, seven twenties and one ten dollar bill. When I was all satisfied, I was back at the precinct, I xeroxed the money, and then I vouchered that picture as evidence.

Q Officer, you have used the word voucher. What does that mean?

A When a crime happens, you voucher something for safekeeping or arrest evidence. It's where you take it, you put it into a usually like a plastic envelope with security markings and seals on it, and you seal it so nobody can put or subtract anything from that, and you usually you do it on the date the crime happens.

Q Was anything vouchered in this case?

A Yes.

Q What was vouchered?

A I vouchered a screen shot of the cell phone, and I vouchered a copy of all the money that was taken, and the pictures I took of Mr. El Turkey that was at the scene.

MR. SHORTT: I will have this marked as People's Exhibit 5 through 13, previously shown to defense counsel, showing it again.

(Handing.)

THE DEFENDANT BALL: Your Honor, I object to the introduction of the money. We never received any of this.

THE COURT: Take a look at it now.

THE DEFENDANT BALL: There is nothing to look at.

THE COURT: All right. They have not been offered yet.

MR. SHORTT: I ask that this be shown to the witness.

(Handing).

THE COURT: Do you want to mark it as one exhibit?

MR. SHORTT: That's fine.

(People's Exhibit 5, envelope with contents, marked for identification.)

(Handing.)

Q Officer, do you recognize what is in front of you right now?

A Yes.

Q What is that?

A This is the pictures I took at the scene of the victim's injuries, also a picture of the money and the cell phone.

Q When were those photographs and photocopies taken?

A That day.

Q What did you do with those photographs and photocopies after you made them?

A I placed them in this envelope, I sealed it, I put my mark on it, and I vouchered it for safekeeping for arrest evidence.

Q What do you mean you sealed it?

A There is a very, very sticky strip across the top, once it's sealed it can't be opened or closed. If you try to open it, all the seals get busted, and you would know it's been tampered with.

Q Do you recall sealing that envelope?

A Yes.

Q Is it still intact?

A Yes.

Q After you sealed that envelope, what did you do with it?

A I placed it in the property clerk and it's driven down to Long Island City, and it stays there until we go to trial.

Q After the date of July 3 of 2012, when is the next

time you saw that exhibit?

A I picked it up this Tuesday.

Q What did you do with it?

A I brought it here.

Q Where did you put it?

A Property clerk in Long Island City, I drove it here, and I dropped it off to you.

Q Was the seal intact when you picked it up?

A Yes.

Q Is the seal from that date still intact?

A Yes.

MR. SHORTT: Your Honor, I would like to have the officer open up the seal?

THE COURT: You may open it.

(Witness opens exhibit.)

Q I would like you to take a look at everything that's in that envelope right now.

A This is a picture of the victim's head --

THE COURT: Don't show it to the jury yet. It has not been produced into evidence.

Q Flip through and take a look at everything.

A Yes.

Q Officer, do those photographs fairly and accurately depict what Mr. El Turkey's injuries, his cell phone and the money that you recovered, do those fairly and accurately depict

what those items looked like on July 3 of 2012?

A Yes.

MR. SHORTT: Your Honor, I move those into evidence as People's Exhibit 5.

THE COURT: Mr. Gibbons?

MR. GIBBONS: I don't think he mentioned the picture of the cell phone. Is that included in that?

THE WITNESS: Yes.

MR. SHORTT: Yes.

MR. GIBBONS: No objection.

THE COURT: So we have a series of pictures of the victim; is that correct?

THE WITNESS: Yes.

THE COURT: And pictures of the money?

THE WITNESS: Yes.

THE COURT: And a picture of the cell phone?

THE WITNESS: Yes.

THE COURT: Anything else in there?

THE WITNESS: No.

THE COURT: Mr. Gibbons?

MR. GIBBONS: No objection.

THE COURT: Mr. Ball?

THE DEFENDANT BALL: The only thing that's missing is proof of the chain of custody. He testified that this was put into evidence somewhere, and I would like to know

just so for my reference, you know, so I could understand before it's introduced.

THE COURT: Do you want to ask him some questions?

THE DEFENDANT BALL: No, sir. There was a chain of custody.

THE COURT: Do you want to ask him questions?

THE DEFENDANT BALL: The officer?

THE COURT: Yes.

THE DEFENDANT BALL: Is there a chain of custody, do you have any paperwork which would corroborate your testimony right now as to the fact that you put into evidence, had it sealed? I don't see a seal on it.

THE COURT: When you say put in evidence?

THE DEFENDANT BALL: There is no official seal on it. You see he just opened, it but there is no seal, and there is no paperwork to accommodate the paperwork.

THE COURT: Is that your objection?

THE DEFENDANT BALL: Do you have anything to corroborate that?

THE WITNESS: This is the seal right here.

THE DEFENDANT BALL: Do you have any paperwork to show that you put it into evidence?

THE WITNESS: When I picked it up --

THE DEFENDANT BALL: I'm not asking about that.

THE COURT: Don't interrupt him.

THE WITNESS: When I picked it up from the property clerk, I signed it out on the computer.

THE DEFENDANT BALL: Did you fill anything out to put it in?

THE WITNESS: Yes.

THE DEFENDANT BALL: Do you have it with you?

THE WITNESS: Yes.

THE DEFENDANT BALL: Do you have it with you?

THE WITNESS: Yes, the voucher.

THE DEFENDANT BALL: Do you have the voucher with you?

THE WITNESS: Yes.

THE DEFENDANT BALL: Is it for the precinct or the voucher that you put into evidence?

THE COURT: Is that the property clerk?

THE DEFENDANT BALL: Yes.

THE COURT: Officer, you say you picked that up from the property clerk?

THE WITNESS: Yes.

THE COURT: Do you have the voucher with you?

THE WITNESS: Yes.

THE DEFENDANT BALL: Did we have a copy of the voucher?

THE COURT: Take a look at it and show it to Mr. Ball.

MR. SHORTT: For the record, a copy of the voucher was turned over to the defense on April 17 of 2013.

THE DEFENDANT BALL: We don't have that. I don't have it.

MR. SHORTT: Receipt acknowledged by the defense on that date.

THE DEFENDANT BALL: If he has it, can I see it?

THE COURT: The record will reflect that it was turned over, but you can show it to him again.

THE DEFENDANT BALL: Thank you.

THE COURT: This voucher, Mr. Shortt, was previously turned over to defense counsel?

MR. SHORTT: Yes, your Honor.

THE COURT: All right.

(Handing.)

THE DEFENDANT BALL: Yeah, but your Honor I apologize, but this doesn't list anything about money. It says assorted color, victim injuries, property recovered and it says red hat, your Honor. That's it, no money. This doesn't indicate --

MR. SHORTT: It actually does not say anything about a red hat.

THE DEFENDANT BALL: That's what it says.

MR. SHORTT: Recovered. Judge, I have no objection to the document coming into evidence.

THE DEFENDANT BALL: Assorted colors.

MR. SHORTT: I have no objection to it coming into evidence.

THE COURT: The voucher itself?

MR. SHORTT: Yes.

THE DEFENDANT BALL: Because it doesn't say anything. Yes.

THE COURT: What do you want to do?

THE DEFENDANT BALL: Have it marked, please, because it doesn't say anything about money.

THE COURT: Do you want that document in evidence?

THE DEFENDANT BALL: Yes, sir. It doesn't say anything about money.

THE COURT: Mr. Gibbons, any objection?

MR. GIBBONS: I have no objection your Honor.

THE COURT: Mr. Shortt, what are we up to for the defense? E?

MR. GIBBONS: Yes, E.

THE COURT: Mark it in evidence as Defendant's Exhibit E. Do you have any objection to the material that was in the sealed envelope being produced into evidence?

THE DEFENDANT BALL: No, as long as the voucher is there.

THE COURT: All right. Without objection, People's 5 will be marked in evidence now.

MR. GIBBONS: Is that all the items, not just the voucher?

THE COURT: Correct.

THE WITNESS: I can clarify --

THE COURT: No.

(People's Exhibit 5, mark and received into evidence.)

(Defendants' Exhibit E, marked and received into evidence.)

MR. GIBBONS: Can I see it real quick?

(Handing.)

MR. GIBBONS: Thank you.

THE COURT: Mr. Shortt, you may proceed.

BY MR. SHORTT:

Q Can we have -- officer, the voucher form itself, when is that filled out?

A That night.

Q What type of information is recorded on it?

A Very basic information of what was recovered.

Q What does that form indicate was recovered in this case?

A Assorted pictures, there was no money vouchered, it was just pictures.

Q Could you read specifically what you vouchered?

A On here on the actual voucher, it says eight

photographs was vouchered. There was no money that was vouchered, and it says for color, assorted colors and in a brief description of the articles, there is only so much you are able to type, it's a very small box type, photos of victim's injuries and property recovered.

Q Does it say how many photographs?

A It says eight.

Q Does that match what is actually inside the envelope?

A Eight, yes, eight photographs.

Q Thank you, Officer.

MR. SHORTT: Can we display the photographs to the jury, please?

THE COURT: Show them to the jury.

(Photographs shown to the jury.)

THE COURT OFFICER: Published to the jury.

THE COURT: You may proceed.

Q Officer, specifically the phone and the money that's depicted in People's Exhibit 5, what ended up happening to the originals of those, the original money and the phone itself?

A It was released to back to the victim.

Q When did you do that?

A When he came back to the precinct that night.

Q Officer, what was Mr. Ball wearing that night?

A He was wearing a white T-shirt and black jeans.

MR. SHORTT: I ask that this be marked as People's Exhibits 6A and 6B.

(People's Exhibits 6A and 6B, photographs, marked for identification).

Q Do you recognize those?

A Yes.

Q What are those?

A Pictures of Mr. Ball from that night.

Q Do those pictures fairly and accurately depict how Raymond Ball appeared on July 3 of 2012?

A Yes.

Q Does it fairly and accurately depict the clothing Mr. Ball was wearing that night?

A Yes.

MR. SHORTT: With those foundations I move those into evidence as People's Exhibits 6A and B in evidence.

MR. GIBBONS: No objection.

THE COURT: Mr. Ball?

THE DEFENDANT BALL: No objection.

THE COURT: Mark it in evidence.

(People's Exhibits 6A and 6B, marked and received into evidence.)

MR. SHORTT: Judge, if we can pass those to the jury as well as the pictures of Mr. Brooks which were marked as Defendant's Exhibit C, please.

THE COURT: Publish them both to the jury.

(Exhibits published to the jury.)

THE COURT OFFICER: People's Exhibits 6A and 6B and Defendant's Exhibit C have been published to the jury.

THE COURT: Ladies and gentlemen, we will take a five-minute break. Do not discuss this case amongst yourselves. We will reconvene in a few minutes.

Take charge of the jurors.

(Jurors exit the courtroom.)

THE COURT: Officer, you can step down. Do not discuss the case with the witness.

MR. SHORTT: Yes, Judge.

(Witness exits the courtroom.)

THE COURT: All right. Five minutes.

(Whereupon, a brief recess was taken.)

(Defendants enter the courtroom.)

THE COURT CLERK: Let the record reflect the defendant Brooks is present before the Court.

THE COURT: Officer, you can step up.

(Witness resumes the witness stand.

(Defendant enters the courtroom).

THE COURT CLERK: Let the record reflect the defendant Ball is present in court.

THE COURT: Bring in the jury.

MR. SHORTT: Judge, housekeeping matter, what's

been marked as exhibit D which was given over to defense, I set it up to play it before the jury is brought in and I'm noticing it's actually incomplete. It has the 9-1-1 calls but not the radio runs. We made it quickly over the lunch break because defense asked for an additional copy. It looks like the 9-1-1 burned onto it no problem, the radio runs did not make it on there.

THE COURT: So we have no CD here that have the radio runs?

MR. SHORTT: I do have a spare.

THE COURT: Mr. Gibbons?

MR. GIBBONS: I think we have to swap it because the injury has not heard it.

MR. SHORTT: The jury has not heard it.

MR. GIBBONS: I know that I have everything here, there are three files on this.

THE COURT: All right.

MR. SHORTT: And actually, I transferred it to my computer so I have it with me. We can play it but I will check to be sure the one that I have here is complete because I have unlimited copies saved on my computer. If defense counsel Mr. Gibbons and Mr. Ball are okay with it, since the jury has not seen or heard the exhibit yet, I don't think there will be any problems switching it out because this one is actually fully complete.

THE COURT: You want to play it on your direct examination?

MR. SHORTT: Yes.

THE COURT: The radio runs.

MR. SHORTT: Yes, they are in evidence now.

THE COURT: Do you have any objection?

THE DEFENDANT BALL: I don't know whether the radio runs, was that part of the original discovery?

MS. POVMAN: The SPRINT report is the summary of the radio runs.

THE DEFENDANT BALL: It says 9-1-1 and radio runs, yes, okay, but there is not a read out of that radio run.

MS. POVMAN: The SPRINT report is the read out.

THE COURT: The SPRINT report is a read out.

THE DEFENDANT BALL: So I have in front of me the actually reading of the SPRINT report, the radio run?

THE COURT: Right. So it's okay with you to proceed in that fashion?

THE DEFENDANT BALL: Yes, not a problem, as long as I will be to --

MR. SHORTT: We can return this to the defense. They can have that. I guess we will mark this as exhibit D now.

THE COURT: Do you want to mark it now?

MS. POVMAN: What are we going to mark it? E or

F?

MR. SHORTT: As long as everyone agrees, we can mark this as the true exhibit D because that was the intended copy.

THE COURT: I don't want to speak for Mr. Ball, but I know his intent was to put in the SPRINT calls that does not have them. This one certainly does. All right. Let's do that.

THE DEFENDANT BALL: I apologize. Can someone please indicate what is the difference between the SPRINT, is there a difference, is there two different communications? Do I have in my possession all of the different means of communication that was used by the police that night?

MS. POVMAN: Yes.

MR. GIBBONS: Yes.

THE DEFENDANT BALL: What is the different type of communications that was used that night?

MR. SHORTT: There were two 9-1-1 calls from not the victim but from a person who called 9-1-1, then there is the recorded radio transmissions of all police officers working within the confines of the 115 Precinct.

THE DEFENDANT BALL: That is all within the SPRINT report?

MR. GIBBONS: Just the radio runs, the 9-1-1 calls

aren't.

THE DEFENDANT BALL: Okay.

MS. POVMAN: Yes, it's in there.

MR. GIBBONS: Okay.

THE COURT: Everything is properly marked now.

(Defendants' Exhibit D, marked and received in evidence)

THE COURT: Bring in the jury.

(Whereupon, there was a brief pause in the proceedings.)

(Jurors enter the courtroom.)

THE COURT CLERK: Do both sides stipulate to the presence and proper seating of the jury?

MR. SHORTT: Yes.

MR. GIBBONS: So stipulated.

THE DEFENDANT BALL: Yes.

THE COURT: Thank you.

Mr. Shortt.

THE COURT CLERK: Sir, you are reminded you are still under oath.

THE WITNESS: Yes.

BY MR. SHORTT:

Q Officer, are you familiar with the term SPRINT report?

A Yes.

Q For the members of the jury, what is a SPRINT report?
A It's a man made report that our central, the radio when she receives 9-1-1 calls, she does a shorthand typed version it's called a SPRINT report. There is a lot of codes and short phrases on it.
Q How is that produced?
A By a person that answers the radio, that puts out the calls.
Q How do they record this?
A They type.
Q Is that as the things are happening?
A Yes.
Q Officer, are you familiar with who the dispatchers are in the 115 Precinct?
A No.
Q Are you familiar with what their responsibilities are?
A Yes.
Q What are their responsibilities?
A The 115 Precinct there is two precincts, the 115 and 110 and their responsibility is everybody that calls the 9-1-1 in the confines of the precinct, they transmit it over to the radio to us so they are sitting there typing everything that comes over the phone and everything that we go over the radio with.

Q So the dispatcher is actually responsible for two precincts?

A Yes.

Q Officer, we know where the 115 Precinct is. Where is the 110 precinct?

A I believe it's located on 43 Avenue, I don't know the exact address of the 110 Precinct.

Q How large of an area does the 110 cover?

A Just as large as the 115.

Q What neighborhoods is that?

A Parts of Corona, Elmhurst, and I'm not sure of the other neighborhood.

MR. SHORTT: Can we show the witness Defendant's Exhibit B in evidence?

(Handing.)

Q Officer, dc you recognize that?

A Yes.

Q What is that?

A This is the SPRINT report.

Q For what date?

A 7/7/2012.

Q Have you previously seen a copy of that report?

A Yes.

Q I want to talk to you about some of the terminology that you referred to. First of all, is there any indication of

your unit on that SPRINT report?

A Yes.

Q What unit were you on that SPRINT report that night?

A RMP 242.

Q How do you recall that?

A RMP stands for radio meter patrol vehicle which is any police vehicle whether it's marked or unmarked and 242 is the last three digits of the license plate, so when you are assigned a vehicle the supervisor tells you, officer, you are assigned to 242, and you know which vehicle that is.

Q Officer, when was the first indication that you were involved in this case on that SPRINT report?

A I believe it's 21:00 which is 9:00 P.M.

Q Does it indicate where you were at that time?

A No, no.

Q Does it indicate what you were doing at that time?

A No.

Q Is there a reference to a 9-1-1 call on that?

A Yes.

Q Where is that?

A Line two it's at 20:59 which is 8:59 P.M. -- should I read what it states?

Q Yes.

A A 10-30 which is a robbery in progress just happened at knife point with injuries. Perps are three males, one

Case 1:19-cv-05310-ERK-LB Document 9-2 Filed 12/13/19 Page 681 of 907 PageID #: 1044

wearing one wearing white shirt and black pants. That's all it states.

MR. GIBBONS: Your Honor, he is reading from the SPRINT, but he said three males. I believe it's different in the SPRINT report that he is referring to.

THE COURT: Do you want to reread it?

A MBS, male blacks, three males blacks.

THE COURT: All right.

Q Continuing down to 21:00 is there a subsequent communication on the 9-1-1 call?

A Yes.

Q What is that?

A At 21:00 9:00 it says Tarek which is the victim in grocery store now states police are there, hung up, and --

Q Officer, there is an indication of Annie alley?

A Yes.

Q What is does Annie alley mean?

A I don't know what the exact term Annie alley comes from or what it means, but when you ask central or radio Annie alley, it tells the number and where the call is being generated from, almost like a GPS.

Q There appears to be a blanked out part of the form, would that be the phone number?

A Yes.

Q How long after that communication are -- is your RMP

242 on this report?

A The same exact time.

Q Below there is another notation?

A Arrive alive.

Q What does that mean?

A Any time a serious job comes over or anything dealing with weapons, it's our central reminding us to arrive alive, drive safely, get there in one piece.

Q Does that indicate to you that you are en route at that time?

A Yes.

Q I would like to go further down, officer. There is an indication of 10-84; is that correct?

A Yes.

Q Speaking specifically about the second indication at 21:03 what does ten eight four mean?

A Eight four is that somebody arrived on scene.

Q What does on scene mean?

A Whatever address was given, you are telling central that you are at that address at that exact time.

Q Officer, were you eight four at that time?

A Yes.

Q According to that?

A Yes.

Q Officer, do you know whether or not these are --

whether or not police communications are recorded?

A I know they are recorded, yes.

Q Were the ones that you were on that night record?

A Yes.

MR. SHORTT: I'm going to play Defendant's Exhibit CD which is already marked into evidence.

(Recording played.)

Q Officer, we just heard -- I'm stopping at eleven did you hear the reference to a five two?

A Yes.

Q What is a 52?

A That is a dispute.

Q Is that anywhere indicated on this SPRINT report?

A No.

Q Was that 52 at all related to this incident?

A No.

(Recording played.)

Q I'm stopping the tape at 40 seconds. Officer, do you recognize anybody's voice in that last bit?

A Yes.

THE DEFENDANT BALL: Objection.

THE COURT: Overruled. You can answer.

A That's mine.

Q What voice was yours?

A Saying 242.

Q That was actually after the words arrived alive were spoken?

A Yes, it's the same time on the SPRINT, yes.

(Recording played.)

THE DEFENDANT BALL: Excuse me, your Honor.

THE COURT: You want to stop it? Yes, Mr. Ball?

THE DEFENDANT BALL: I just noticed that there is another voice of 242 again at that interval we just heard it. Can you play that back?

THE COURT: You will have a chance to cross examine on this.

THE DEFENDANT BALL: It's not that. I would like for someone to indicate --

THE COURT: Well, you can ask him on cross-examination.

You can continue playing.

MR. SHORTT: Thank you, Judge.

(Recording played.)

Q Officer, I'm stopping at 4 minutes 20 seconds, there is a mention of five Charlie. Do you know what that means?

A 115 sector Charlie.

Q They are asking for a client ID. What is that?

A A motor vehicle accident where two individuals died so they were running I.D.s to get identification for them.

Q When did that occur that night?

A Right before the robbery happened.

Q Do you recall where in the 115?

A It was Astoria Boulevard, but I know it was in the eighties. I can't be exact.

Q How many of the police officers were deployed to that scene?

A The majority.

THE DEFENDANT BALL: He was not there.

THE COURT: Were you on the scene as well?

THE WITNESS: Right before, yes.

THE COURT: Affirmative answer. I will allow it.

(Recording played.)

THE DEFENDANT BALL: Your Honor, I apologize. It's just that we don't have any of that reading here on this sheet.

(Defendant and counsel confer.)

THE COURT: It's not the same job, it's a different job.

THE DEFENDANT BALL: Yeah but --

(Defendant and counsel confer.)

THE COURT: Continue.

THE DEFENDANT BALL: Thank you.

(Recording played.)

Q Officer, there is an indication of five FIO. Do you know who that was that night?

A Yes.

Q Who was that?

A Detective Lanning and his sergeant.

MR. SHORTT: That was at moment 6:15.

(Tape played.)

Q Officer, we are stopping at moment 6:30. Did you recognize those voices?

A Yes, that was myself and my partners.

Q What was that in reference to?

A We had one person in the vehicle, we were going to the scene for a showup.

Q You are already in the vehicle at that point?

A Yes.

(Tape played.)

MR. SHORTT: I'm stopping now at the moment of 9:21. That's the relevant portion I wanted to talk about with this witness.

Q Officer, did you hear reference to the vehicular crime on that tape, the vehicular incident?

A Yes.

Q Did you hear evidence that what was called a narco job?

A Yes.

Q What does that mean?

A Any --

THE DEFENDANT BALL: Nothing to do with our case, objection.

THE COURT: Sustained.

Q Any other incidents reflected in this SPRINT report?

A Yes.

Q Why is that?

A Doesn't relate to this job.

Q Do dispatchers prepare one of these for each and every one of the jobs?

A Yes.

Q Do they flip back and forth between each job?

A Yes.

Q Officer, did that fairly and accurately record all of the radio communications as well as the timings in between them during that night?

A Yes.

Q The recording, not the SPRINT report, officer, correct?

A Yes.

Q Officer, I want to ask you at what time, what is the arrest time for these two defendants?

A It is 21:13 which is 9:13.

Q When was that assigned?

A Whenever they were both back at the precinct.

THE DEFENDANT BALL: Objection, your Honor.

THE COURT: Overruled.

Q Officer, does an arrest time reflect when somebody is placed in handcuffs?

A No.

Q What does it reflect?

A Whenever you have sufficient evidence that the person committed the crime, then you look at either the watch or phone when it's convenient, then you get what's called an under time from central.

Q Is that an exact time or approximation?

A It's an approximate time.

MR. SHORTT: Judge, no further questions for this witness.

THE COURT: Mr. Gibbons?

MR. GIBBONS: Yes, your Honor.

CROSS EXAMINATION

BY MR. GIBBONS:

Q Good afternoon, Officer.

A Good afternoon.

Q My name is Wyatt Gibbons. I represent Elijah Brooks.

Officer, the radio run came over as a knife point robbery by three male blacks, correct?

A Yes.

Q One of them wearing white shirt and black pants, correct?

A Yes.

Q When you responded on the way to the scene, you spotted someone that fit the description?

A Yes.

Q That was Mr. Ball, correct?

A Yes.

Q And he was traveling northbound away from the crime scene, correct?

A Yes.

Q Running?

A Yes.

Q Wearing a white shirt and black pants, correct?

A Yes.

Q His clothes were disheveled when you saw him?

A Yes.

Q What's an aided card, officer?

A Whenever a victim or a perpetrator is injured, it's a card that you write down a brief synopsis of the injuries that you observed.

Q Are you required to fill out a card like that out in a situation such as this?

A Yes.

Q But you didn't, correct?

A Correct.

Q When you arrived at the crime scene neither -- my

client Mr. Brooks wasn't there, correct?

A Correct.

Q Was Detective Lanning there?

A No.

Q So you never saw Mr. Brooks and Mr. Ball together, correct?

A Correct.

Q And you never witnessed the crime itself, correct?

A Correct.

Q And when you went back to the 115 Precinct, it was then that it was decided that the arrest would be given to you, correct?

A Correct.

Q All right. That was after conferring with the field intelligence officer and his sergeant?

A Yes.

Q Okay. So that arrest is really just a technical reference for when you and the suspected perpetrators were back at the precinct, correct?

A Correct.

Q It's not -- you had nothing to do with the detention of Mr. Brooks, correct?

A Correct.

Q And that detention was that you are not going anywhere kind of moment, where his liberty was curtailed and he

was no longer free to leave, is that correct? That's separate from the actual technical arrest, right?

A Yes.

Q And to the best of your knowledge that detention that you are not going anywhere moment, that was handled by Detective Lanning, correct?

A Correct.

Q Now, you drew up the complaint and arrest report for both Mr. Brooks and Mr. Ball, correct?

A Correct.

Q And on the arrest report for Elijah Brooks you noted that he was wearing black shorts, correct?

A Correct.

Q And he also was wearing a red hat, correct?

A Correct.

Q And you noted that he had unusual teeth, correct?

A If I was to look, I don't remember.

Q Okay. Is there something that might refresh your recollection?

A Sure.

Q Arrest report?

A Yes.

MR. GIBBONS: Can I have this shown to Officer Pampena, please.

THE COURT: Show it to the officer.

(Handing.)

A Yes, I see it.

Q Okay. I ask you again you noted in the arrest report that he had unusual teeth?

A Yes.

Q Do you remember what was unusual about the teeth?

A No.

Q If you take a look at Mr. Brooks' face now, do you see his teeth?

A Yes.

Q Does it look similar now as it did then, does that refresh your recollection?

A Yes.

Q So he was missing a bunch of teeth when you arrested him?

A It was not normal for me, yes.

Q Okay. And there was nothing in the radio run of one of the perpetrators with black shorts red hat or missing teeth, correct?

A Correct.

Q That red hat wasn't vouchered, correct?

A I don't believe so, no.

Q Do you recall if it was given to Mr. Brooks's wife Lisa Fernandez; do you recall that?

A I don't recall.

Q When you were doing the paperwork for Mr. Brooks, did you notice any blood on him at all?

A Not that I recall, no.

Q Did you notice any damage to his hands at all?

A Not that I recall.

Q And no proceeds from the robbery were recovered from Mr. Brooks, correct?

A Correct.

MR. GIBBONS: Can I please have him shown defense Exhibit C, please?

(Handing.)

Q Officer, can you take a look at that, please?

A Yes.

Q Do you recognize that?

A Yes.

Q What is that?

A That's Mr. Brooks.

Q That's the arrest photo that was taken that evening, correct?

A Yes.

Q And in that photograph it shows that he is wearing a white shirt and black shorts, correct?

A Yes, very long black shorts, yes.

Q Okay. And in that photograph it shows that his head is shaved, correct?

A Yes.

Q He didn't have access to a razor blade to shave his head after he was arrested, correct?

A No.

Q He didn't change his clothes from the time that he was detained to the time that that photograph was taken, correct?

A Correct.

Q Okay. So apart from Mr. Brooks being pointed out by the complainant as one of the assailants, there was no other evidence --

MR. SHORTT: Objection.

THE COURT: Sustained.

MR. GIBBONS: Nothing further. Thank you.

THE COURT: Mr. Ball?

THE DEFENDANT BALL: Yes, sir.

CROSS EXAMINATION

BY THE DEFENDANT BALL:

Q Hello, Mr. Lanning. How are you doing?

A Pampena.

Q I apologize. Officer Pampena, you know, I want to ask you a question, were you my arresting officer the night of 2012 July 3? Were you my arresting officer? Were you the one who stopped me and arrested me?

A What date?

Q July 3, 2012?

A Yes.

Q Yes.

THE COURT: I'm sorry? Is the question were you the arresting officer?

THE DEFENDANT BALL: Yes, did he arrest me.

THE COURT: Then you said are you the one that detained me?

THE DEFENDANT BALL: Arrested me.

THE COURT: The answer to both of those is yes?

THE WITNESS: Yes.

Q Yes, okay. So where is it -- can you just -- somebody show that photo because you indicated with the photo, can someone help us out with there is in evidence the big picture?

MS. POVMAN: Three and four.

Q Three and four?

THE COURT: Show it to the witness.

THE DEFENDANT BALL: I want to see the exhibit. Right. Perfect.

THE COURT: Do you want to show it to the witness?

THE DEFENDANT BALL: No, I just need to look at it so I can see because the officer indicated something very important here.

THE COURT: Show it to Mr. Ball.

(Handing).

Q Okay. Okay. This is 32 Avenue?

THE COURT: Mr. Ball, if you are going to ask questions about it, show the jury what you are asking about.

Q This is what I'm asking, you said that you arrested me somewhere in here and this is going between 32 Avenue and Northern Boulevard, you arrested me down in the middle of this block; is that correct?

A No.

Q Where is it that you arrested me?

A 105 Street and Northern Boulevard.

Q And Northern Boulevard?

A Yes.

Q So you never arrested me on 32 Avenue?

A I placed you in handcuffs and put you in my vehicle at 105 Street and 32 Avenue.

Q So you did put me in handcuffs on 32 Avenue and 105 Street?

A You were detained and put in handcuffs on 105 Street and 32 Avenue.

Q On 32 Avenue on the avenue, is that correct, at this intersection?

A Yes.

Q Not further down in the block; is that correct?

A Correct.

Q Okay. Do you remember that you testified previously that you stopped me in the middle of the block between Northern Boulevard and 32 Avenue?

MR. SHORTT: Objection.

THE COURT: Sustained. When you say previously you have to be more specific.

THE DEFENDANT BALL: Okay. Well I can read it back in the suppression minutes.

THE COURT: Is that what you are going to use?

THE DEFENDANT BALL: Yes, sir.

THE COURT: Do you recall testifying at a suppression hearing in this case?

THE WITNESS: Yes.

Q Okay. So my next point is you said that you arrested me in the process of me running away from the crime scene?

A Yes.

Q Now, why did you stop your car?

A Because you fit the description that came over the radio of a male black, white T-shirt, black pants that just robbed somebody at knife point, and you were running away from the crime scene, you were a block away.

Q Now, when you stopped your car, you got out, did you say or do anything to me at that time?

A No.

Q So I fit the description of the person, but when you stopped your car you didn't do anything, you did not say anything, nothing?

A When we stopped the vehicle, when I got the out the vehicle, that's when you stopped in front of my vehicle.

Q I didn't ask you what I did. I asked you what you did.

THE COURT: Don't interrupt him. Finish the answer.

A You stopped in front of my vehicle with your hands up with the phone saying I just bought the phone at 105 Street and Northern Boulevard.

Q So you didn't say anything?

A No.

Q And you don't do anything?

A No.

Q So I just voluntarily ran up to you and gave you this information; is that correct?

A Yes.

Q Okay. Now, according to your testimony after that you put me in handcuffs, took me back down to Northern Boulevard; is that correct?

A Yes.

Q Okay. How long did it take you between the time that you stopped me allegedly on 105 Street and 32 Avenue and take me

back to Northern Boulevard?

A You are asking for the entire duration of when you were stopped and brought back to Northern Boulevard?

Q Yes, sir.

A A couple of minutes.

Q Can you be more specific?

A Two to three minutes.

Q Two to three minutes. Okay. Okay.

Do you remember in the suppression hearings you were asked did you ever see Mr. Ball --

THE COURT: Give the District Attorney the page, the date.

MR. GIBBONS: Which hearing?

THE COURT: And the line.

Q Well, I will come back to that question.

So you took me back to the crime scene; is that correct?

A Yes.

Q And you said that the victim was inside the EMS truck being treated; is that correct?

A Correct.

Q Okay. And you got inside the EMS truck; is that correct?

A Yes.

Q And you was dealing with the victim while he was in

the EMS truck; is that correct?

A Yes.

Q And while you was in the EMS truck with the victim, he was being treated; is that correct?

A Yes.

Q And his wounds was being cleaned?

A Yes.

Q Very good, right, they cleaned him up good?

A I would assume so yes.

Q No blood on him, cleaned it all off?

A No, there was still blood on him.

Q In the EMS truck, Officer Pampena, while you was inside the EMS truck with the victim, yes?

A Yes.

Q They were cleaning him up; is that correct?

A Yes.

Q Okay. So when you was in the EMS truck with him cleaning him up, what happens is between the time that you got in the truck with him, and you got out of the truck with him, assuming at some point you did get out truck with him; is that correct?

A Yes.

Q Okay. Now, between the time that you got to the truck with him, while he was there being treated cleaned up and the time that he was out of the truck, all of the blood was

taken off of him; is that correct?

A No.

Q No.

So you are telling me that while you were in that EMS truck, and the EMS technicians is treating the victim, they didn't clean the blood off of him?

A They tried to clean as much --

Q They tried --

THE COURT: He has to finish the answer. Officer, finish your answer.

A They tried to clean the blood off of him, but due to the release, he refused medical attention so there was still a lot of blood on him.

Q Wow. Incredible.

MR. SHORTT: Objection.

THE COURT: Sustained. The jury will ignore that remark.

Q Okay. So this is the deal, now, you said you identified me -- he identified me while he was in the truck; is that correct?

A Yes.

Q Okay. Now, you said then, just give me a second, I apologize.

Now, this is what I want to ask you: Do you know this picture right here?

THE COURT: Can you see it from where you are?

THE DEFENDANT BALL: Can we please pass this up?

THE COURT: Is that a document that you want marked for identification?

THE DEFENDANT BALL: Excuse me, your Honor. I need the jury to see this.

MR. GIBBONS: I think it's in evidence, your Honor.

THE DEFENDANT BALL: It's in evidence.

THE COURT: Do we know what that is?

THE DEFENDANT BALL: Yes, sir, People's Exhibit 5. Can we let the jury look at this please?

THE COURT: I believe the jury already seen it.

THE DEFENDANT BALL: I need them to look at it again.

THE COURT: All right. Officer, can you display it to the jury?

THE DEFENDANT BALL: Your Honor, when you hold it up --

THE COURT: Don't make a speech. You want them to see it?

THE DEFENDANT BALL: Yes.

THE COURT: We will show it to the jury.

THE DEFENDANT BALL: Okay. That's good, too.

THE COURT: That's what's in evidence.

THE DEFENDANT BALL: Okay, you can see that too. That's great.

THE COURT: Show it to the jury. Slow down. Let them look at it.

(Exhibit shown to the jury.)

THE COURT: Mr. Gibbons, have you taken care of that?

MR. GIBBONS: I'm sorry, your Honor. I didn't mean to usurp your position.

THE COURT: Okay.

THE DEFENDANT BALL:

Q Officer Pampena, this picture here, you took this picture; is that correct?

A Yes.

Q Was this picture taken before or after he got out of the EMS truck?

A It was while he was in the EMS truck.

Q This was taken while, can the ladies and gentlemen of the jury --

THE COURT: No, no.

Q Do you notice there is a window in this picture?

A No.

Q It is.

MR. SHORTT: Objection.

THE COURT: No.

Q There is a window in this picture?

THE COURT: No, that is for the jury to decide.

THE DEFENDANT BALL: Can you let them look at it again?

THE COURT: If you want to make that a point of your closing statement, you may, but that's not how you do it here now.

THE DEFENDANT BALL: Okay. I apologize. On to the next question.

Q Now, once you gave -- you talked to the victim allegedly in the EMS truck, right?

A Yes.

Q Okay. He identified me while he was out -- inside the EMS truck; is that correct?

A When he was inside, yes.

Q Okay. What was you doing?

A Sitting next to him listening to him.

Q Were you also outside standing next to me?

A No.

Q Okay. Do you remember you testified to that in the suppression hearing?

MR. SHORTT: Objection.

THE COURT: Again, do it right.

THE DEFENDANT BALL: Yes, sir.

Q I can even go on because it's not really relevant.

My concern is this you said you took a phone off me when you arrested me; is that correct?

A Yes.

Q Okay.

Now, when you got me back to the crime scene, did you ever tell the victim that the person who had his property had already been arrested?

A No.

Q You never told him that?

A No.

Q Did any other police officers tell him that?

A No.

Q No other police officers told him that. You said that what you call recovered an iPhone and money from me; is that correct?

A Yes.

Q Did you recover anything else from me?

A No.

Q Nothing else?

A No.

Q Are you sure?

A Yes.

Q Okay. When you got back to the crime scene and you -- eventually you showed the victim, right, the property you got off me; is that correct?

A After I asked him what was taken, yes.

Q You showed it to him; is that correct?

A Yes.

Q Did you ever show him a Blackberry?

A No.

Q Okay. Thank you.

So you never showed him a Blackberry?

A No.

Q Okay. Right.

So did another officer show him a Blackberry phone?

MR. SHORTT: Objection.

THE COURT: Did you ever see another officer show him a Blackberry phone?

A No, I did not.

Q Very good.

Officer Pampena, okay, did you ever see Officer Lanning at the crime scene?

A No.

Q While you were there?

A No.

Q So you never seen Officer Lanning there with you?

A No.

Q Okay. I just want to say something --

THE COURT: No, you want to ask questions.

THE DEFENDANT BALL: I want to ask questions.

Okay.

Q It says here --

THE DEFENDANT BALL: Please forgive me, ladies and gentlemen of the jury, I'm working on it. Okay.

Q How long -- you said it was a couple of minutes, so when you got back to the crime scene with me allegedly, from the time of 9:00, right, Officer Lanning, you said --

A Officer Pampena, sir.

Q Officer Pampena, I apologize.

A That's all right.

Q Officer Pampena, you said that when you arrested me on 105 Street and 32 Avenue and put the handcuffs on me, it took say two to three minutes to get me back to Northern Boulevard; is that correct, after 9:00?

A I don't understand your question.

Q Okay.

THE COURT: Between the time that you actually placed the handcuffs on Mr. Ball, and the time you got to where the ambulance was, how much time elapsed?

A Approximately ten seconds.

Q So you arrested me at 104 Street?

A No.

Q 105 Street and 32 Avenue, transported me back to 105 Street and Northern Boulevard for the showup at the ambulance within ten seconds?

A No. I placed you in handcuffs at 105 Street and 32 Avenue --

Q Took me back --

THE COURT: Whoa. Finish the answer.

A I placed you in my vehicle, it took me about ten seconds to go from 105 and 32 Avenue to 105 Street and Northern Boulevard behind the ambulance.

Q So the total elapsed time would be one minute after 9:00; is that correct?

A No, I still don't understand.

Q Officer Pampena, I will say this again. You immediately arrived --

THE COURT: What time did you place him under in handcuffs?

Q At 9:00 242 --

MR. SHORTT: Objection.

THE DEFENDANT BALL: I haven't asked anything.

THE COURT: Okay. Not only do you interrupt the witness, but now you are interrupting me.

THE DEFENDANT BALL: I apologize.

THE COURT: Do you know what time you actually placed handcuffs on Mr. Ball?

THE WITNESS: Within a minute after we arrived at the scene, within a minute.

THE COURT: Okay.

Q So one minute to arrive after 9:00 the original call went out at nine, and ten seconds to get me from 105 Street and 32 Avenue back to 105 Street; is that correct?

A Yes.

Q Total two minutes; is that correct?

A Correct, yes.

Q Good. Okay. Now, you said when you got there that the EMS truck was there treating Mr. El Turkey; is that correct?

A Yes.

THE DEFENDANT BALL: Your Honor, I would like to put into evidence the radio run sheet of the EMS truck we did not hear, but we have a radio run of their actual activity, and I would like to reflect that the EMS truck never arrived --

THE COURT: Don't read it.

THE DEFENDANT BALL: I apologize.

THE COURT: Mr. Shortt, do you have any objection?

MR. SHORTT: Well, since he already announced what it is, no objection. Put it in, Judge.

THE COURT: All right. Without objection. We have to mark it so stop.

Mark it in evidence without objection from Mr. Shortt or Mr. Gibbons.

MR. GIBBONS: No objection.

(Defendants Exhibit F, marked and received into

evidence).

THE COURT: Do you want the witness to look at this?

THE DEFENDANT BALL: The jury, please.

THE COURT: You want the jury to do what?

THE DEFENDANT BALL: Just to look at it.

THE COURT: To read the document?

THE DEFENDANT BALL: To recognize the time, particularly the arrival of EMS.

THE COURT: Why don't you ask the witness to read it now that it's in evidence?

Q Right. If you can tell us what time do you see that the EMS truck arrived, according to that, if you go down it should be, it will say arrival time. It says en route on scene give disposition ten nine eight and close. And it says here on scene at 21:11, that means eleven minutes after?

THE COURT: Is that what it says?

THE WITNESS: Yes.

THE COURT: On scene 21:11? That's eleven minutes after nine; is that correct?

THE WITNESS: Yes.

THE COURT: Okay.

THE DEFENDANT BALL: Thank you. Can you let the jury look at that, please?

THE COURT: Well, I mean they read it.

THE DEFENDANT BALL: No, let them look for themself.

THE COURT: They can have it when they deliberate on this case if they want it.

Q That was on 106 Street not 105 Street?

MR. GIBBONS: Is that Defendant's Exhibit F?

THE COURT: Yes.

Q If you will be mindful that's at 106 Street not 105 Street they arrived on 106 street --

MR. SHORTT: Is Mr. Ball testifying, your Honor?

THE COURT: Well, he is not testifying, but the document he is reading from is in evidence so I will let him do it.

THE DEFENDANT BALL: Thank you very much, your Honor. Is everybody ready?

THE COURT: Yes, it's on you.

Q Okay. So, Officer Pampena, after you showed the victim the alleged property, you showed him -- what did you show him at the crime scene, can you be specific and tell us what you showed him?

A After I asked him what was taken from him, he described the black iPhone, and he described the exact currency that was taken. I showed him the phone, he said that was his so there was a code in order to access the phone. Once I was given the code, I unlocked the phone, and I went through the phone,

and it was actual pictures of Mr. El Turkey and his family in the phone, and the exact denominations that Mr. El Turkey said was the exact denominations that you had in your pocket.

Q Is there anything else that you showed him at the crime scene other than the phone?

A No, and the money, no.

Q You never showed him the money?

A Afterwards, yes.

Q You showed him the money?

A Yes.

Q Now.

At the time that you showed him this evidence, where was Mr. Ball, where was I in with respect to Mr. El Turkey?

A You were in front of the police vehicle.

Q Where was Mr. El Turkey?

A He was in the ambulance at 105 Street and Northern Boulevard.

Q So you showed him the phone and the money as well inside the ambulance?

A Yes.

Q Great. Officer Pampena, do you understand that perjury is a crime?

MR. SHORTT: Objection.

Q I'm asking you a question.

THE COURT: I will allow it. Are you aware of

that?

A Absolutely.

Q Officer Pampena, let me take my time because there is a very important issue that hasn't been addressed as of yet so just be patient with me.

(Whereupon, there was a brief pause in the proceedings.)

Q We are reading from the first suppression hearing, May 21, 2013. Referring to page 29 line 24 -- or 23, 23 down. It reads:

(Reading:) And you also said that there was someone else there, someone I think that you said was Mr. Brooks. Did you actually see Mr. Brooks at the scene?

And your response was:

(Reading:) No, he was already in the vehicle being transported away as I was arriving at the scene.

So I would like to ask you when you arrived at 105 Street and Northern Boulevard with me in tow two minutes after nine, Mr. Brooks was being transported away according to your testimony, okay, in the vehicle --

MR. SHORTT: Objection, improper impeachment.

THE COURT: Let him finish the question.

Q And I would like you to help us with this, when you arrived at the crime scene two minutes after, no other officer was present; is that correct?

A Correct.

Q Officer Lanning wasn't there?

A Correct.

Q Okay. You know, I want to ask you a couple of things in respect to the pictures that were shown earlier with the exhibit with the money.

You took pictures of that money; is that correct?

A No, I scanned it on a Xerox machine at the precinct.

Q You scanned it?

A Yes.

Q Okay. At the precinct?

A Yes.

Q Okay. Was there any blood or anything on that money?

A Not that I recall, no.

Q No blood on the money, okay. Was there any blood on me?

A No.

Q Was there any dirt on me?

A Your clothes were disheveled when we stopped you.

Q I didn't ask you disheveled. Were there dirt, anything dirty?

A Not that I recall.

Q And I had on a white shirt; is that correct?

A Yes.

Q Would you not have taken notice --

MR. SHORTT: Objection.

Q I'm asking whether or not you would have taken notice of the fact that my shirt would have been dirty, scuffed, blood on it in the case that it was white?

A No.

Q You wouldn't have took notice of that as a police officer?

MR. SHORTT: Objection. Compound question.

THE COURT: He is asking you, officer, had there been blood had there been dirt on his T-shirt at the time you apprehended him, would you have noticed it?

THE WITNESS: Yes.

Q Of course you would have. But you didn't notice?

A I did not notice.

Q Did you not notice because you didn't notice or it was none there?

MR. SHORTT: Objection.

Q I'm asking?

A I did not notice.

Q Because you did not notice or it just wasn't there?

A I did not notice anything on your shirt.

Q And I'm asking you what was the reason that you didn't notice?

MR. SHORTT: Objection.

Q Did you notice out of negligence, out of just sheer

as an officer, negligence, or did you not notice it because it wasn't there?

THE COURT: I think what he is trying ask you is do you recall that his shirt was clean?

THE WITNESS: No, I do not recall.

THE COURT: You don't recall one way or the another?

A Correct.

Q Okay.

However, your recollection to other things concerning this case and that day is fresh in your mind; is that correct?

A Say that again.

Q The things that took place that night, you see, that you recalling now for us and the jurors, you are able to recall them for sure; is that correct?

A Yes.

Q Of course you are. You know, Officer Pampena, you have been a lot of help. I would like to continue asking you more questions, but it's not -- there is no need. Thank you very much.

THE COURT: Thank you very much. Any redirect?

MR. SHORTT: Yes, Judge. Can we show the witness People's Exhibits three and four in evidence, please.

REDIRECT EXAMINATION

BY MR. SHORTT:

Q Officer, could you indicate where you spoke to Mr. El Turkey on People's Exhibit -- point to it and please mark where that location is?

THE COURT: Make sure the jury sees it. Now display it. You can't see it?

THE DEFENDANT BALL: I just want to understand what was his question because I'm not sure what was the question.

THE COURT: Do you want to rephrase?

MR. SHORTT: Yes, I will clarify it.

Q I will ask the officer to specifically, draw an X at the location where he spoke to Mr. El Turkey for the first time.

THE DEFENDANT BALL: Is that inside the ambulance?

THE COURT: You mean the ambulance?

THE DEFENDANT BALL: Yes, that was the first time he spoke with him.

MR. SHORTT: Yes.

THE COURT: All right.

(Witness complies.)

Q Officer, how close to that location that you have now marked with an X was the location where Mr. El Turkey got robbed?

A It was right across the street at the corner of 105. The ambulance was at the southeast corner, and the location that it happened was the southwest corner.

Q Could you mark on there with the letter D where the first time you saw the defendant Ball and also draw an arrow indicating the direction where he was running.

A (Witness complies.)

Q Now, Officer, you remember Mr. Ball asking you what property was shown to the complainant?

A Yes.

Q When did you show that property to the complainant?

A It was in the ambulance after I asked him what was taken from him.

Q Was that before or after he pointed out Mr. Ball as the person that took that property?

A That was before.

Q I'm sorry. What was that?

THE DEFENDANT BALL: He said before.

Q I'm sorry, officer. To be clear, did you show the property to Mr. El Turkey before or after he identified Mr. Ball?

A I'm sorry. It was after.

Q How soon after?

A As soon as he said that was him that took the stuff out of my pockets, I asked him what was taken, he told me and it was directly after that.

Q Officer, was there any other property recovered from the scene that day?

A Yes.

Q What else was recovered?

A The victim, Mr. El Turkey's wallet and his I.D. and Social Security card were on the sewer grate at 105 and Northern Boulevard.

MR. SHORTT: Can we show the witness People's Exhibits 1 and 2.

(Handing.)

Q Officer, do you see the place where you found the victim's wallet and paperwork?

A Yes.

Q I ask you to take the marker and draw a circle around the place where you recovered the victim's other property.

A (Witness complies.)

MR. SHORTT: Can we show that to the jury where the officer circled.

Q Officer, when was that property recovered?

MR. GIBBONS: Can I see that?

(Handing.)

THE DEFENDANT BALL: Can I see it?

(Handing).

Q When did you find Mr. El Turkey's wallet and identification?

A After I was done speaking with him, he told me where he was assaulted at so we just canvassed the area just to see if

there was anymore evidence or anything else that would be beneficial to the case.

Q Eventually was that on or under the sewer grate?

A It was right on top.

Q What did you do with that property?

A I picked it up. Once I seen that it belonged to Mr. El Turkey, it was all his important information like Social Security cards and I.D. I returned it back to Mr. El Turkey.

Q Was that on scene or back at the precinct?

A On scene.

Q So there were multiple times that you showed Mr. El Turkey property?

A Yes.

Q And this was already after he had already identified the defendant?

A Yes.

Q Officer, how long were you on scene at 105 and Northern Boulevard for?

A Approximately five to seven minutes.

Q Officer, the term on scene, is that a police terminology?

A Yes.

Q What does it mean?

A Whenever we arrive on a scene and it's safe for us to take a breath, and say all right central we are on scene does

not necessarily mean that's the exact time we got there, it can range from seconds to minutes to the time that we tell central that we are on scene because there may be a more pressing matter on hands.

Q Do you regularly work with the fire department?

A Yes.

Q Would the same be true for the New York City Fire Department?

A Yes.

Q Officer, after Mr. El Turkey identified Mr. Ball as the person that took his property, did you have another conversation with Mr. Ball at that time?

A Yes.

Q Could you tell the members of the jury about that conversation?

A As we were driving back to the 115 Precinct, Mr. Ball asked what he was being charged with, I told him he was being charged with robbery. Then he stated to me, well, if he says it's his, I guess it's his.

MR. SHORTT: Nothing further.

THE COURT: Mr. Gibbons?

MR. GIBBONS: I don't believe when Officer Pampena identified my client's unusual teeth that I put it into the record a description of what the teeth looked like.

THE COURT: Go ahead.

Case 1:19-cv-05310-ERK-LB Document 9-2 Filed 12/13/19 Page 722 of 907 PageID #: 1085

MR. GIBBONS: Missing it looks like on the left-hand side almost all of the front teeth and two or three of the bottom teeth directly in front of his mouth.

THE COURT: The record will reflect.

RECROSS EXAMINATION

BY MR. GIBBONS:

Q Is that a fair representation of what the teeth looked like?

A Yes.

MR. GIBBONS: The jurors saw that? All right. Thank you, your Honor.

THE COURT: Mr. Ball, anything else?

THE DEFENDANT BALL: Yes, sir.

RECROSS EXAMINATION

BY THE DEFENDANT BALL:

Q Officer Pampena, you just said that you filled out two complaints, two what is called felony complaint reports?

MR. SHORTT: Objection, beyond the scope.

THE COURT: Sustained. Beyond the scope of redirect.

THE DEFENDANT BALL: Well, I have in my presence, your Honor, a copy of the complaint that was filed by --

THE COURT: I understand that, but I'm sustaining his objection on the grounds that it's beyond the scope of his redirect examination.

At this stage you are limited to cross examining on those matters that Mr. Shortt brought out on redirect, and the felony complaints were not part of his redirect.

Q Officer Pampena, in respect to the description that was given of me, did the victim ever give you a description of me?

MR. SHORTT: Objection.

THE COURT: I will allow it.

A Yes.

Q Yes?

A Yes.

Q Can you tell us what that description was?

A Male black with white T-shirt, black pants.

Q Now, let's be specific because what happens is --

THE DEFENDANT BALL: Your Honor.

THE COURT: Ask the question.

Q There is two people that were arrested that night?

THE COURT: All right.

Q There was two people, Mr. Brooks and myself fit that same description?

THE COURT: No, no, no.

Q Okay. Well, can you specifically --

THE COURT: The description that you just described --

Q Of me --

THE COURT: Hang on. The description that you just stated that the complainant gave you, did the complainant tell you which of the two individuals that description reflected?

THE WITNESS: Yes, at the scene he described Mr. Ball as the shorter smaller one --

THE COURT: Okay.

THE WITNESS: -- was the one that started assaulting him, but then as the other individual was assaulting him, Mr. Ball took the property from his pockets.

THE COURT: And the description you just gave us?

THE WITNESS: Male black --

THE COURT: Was the individual who took the wallet, is that what you are saying?

THE WITNESS: Yes, the wallet and the cell phone.

Q Okay. But now you never recovered a wallet from me; is that correct?

A Correct.

Q Okay.

Now, did the victim ever indicate to you that the person who did this to him was gay?

MR. SHORTT: Objection.

THE COURT: Sustained.

Q Did he give you any description as to the

individual's preference?

MR. SHORTT: Objection.

THE COURT: Sexual preference?

THE DEFENDANT BALL: No, as you know.

Q In anything other than -- because short is a vague description?

THE COURT: No, he did not say short. He said the shorter of the two men.

Q Okay, but that's very vague. Did he give you anything else other than shorter of the two men because that's very vague?

A No.

Q So you didn't have any other description other than shorter?

A Yes.

Q Is that correct?

A Yes.

Q Okay. Did you ever take Mr. Brooks to the precinct and put him in a cell?

A No.

Q Never did. Thank you, Officer, you have been a help.

THE COURT: Anything else?

MR. SHORTT: One question.

REDIRECT EXAMINATION

BY MR. SHORTT:

Q Did Mr. El Turkey ever indicate whether or not he had seen Mr. Ball before?

A Yes.

Q Could you tell us about that?

A Mr. El Turkey told me that he had seen him before. Mr. El Turkey frequents the area that's where he cashes his checks at, and he always sees the defendant Mr. Raymond Ball around 105 Street and Northern Boulevard.

THE DEFENDANT BALL: I would like to stop him at that point because you see what happens is --

THE COURT: No. Are you finished with your questioning?

MR. SHORTT: Yes.

THE COURT: Do you want to ask him another question about what the officer just testified to?

THE DEFENDANT BALL: Yes, because what happened under sixty twenty five --

THE COURT: Do you have any questions about what the witness just testified to?

RECROSS EXAMINATION

BY THE DEFENDANT BALL:

Q Did you write it down?

A No.

Q You never wrote it down?

A No.

Q You didn't write anything down while he was at the crime scene?

A I wrote down the victim's --

Q Throughout this whole ordeal did you write anything down?

A Yes.

Q What did you write down?

A The description of the area where it was at, the address.

THE COURT: Now we are going beyond. You are on re-recross, sir.

MR. GIBBONS: I do have one issue.

RECROSS EXAMINATION

BY MR. GIBBONS:

Q You just testified I think just a second ago and earlier that the complainant told you that Mr. Ball started the assault?

A He was one of the ones that started the assault.

MR. GIBBONS: Okay.

THE DEFENDANT BALL: Your Honor --

THE COURT: We are not going to keep doing this.

RECROSS EXAMINATION

BY THE DEFENDANT BALL:

Q Where did this alleged crime, where did it start?

MR. SHORTT: Objection.

THE COURT: No, we are not going there. Sustained. Anything else?

MR. SHORTT: No, Judge.

THE COURT: Mr. Gibbons, anything else?

MR. GIBBONS: No, your Honor.

THE COURT: Mr. Ball, anything else?

THE DEFENDANT BALL: Thank you very much.

THE COURT: Thank you, Officer. You may step down.

(Witness excused.)

THE COURT: Mr. Shortt?

MR. SHORTT: Your Honor, the People rest.

THE COURT: All right. Ladies and gentlemen, that concludes what we are going to do today. As I indicated to you when we first met this morning, we are not going to work on Tuesday, I expect that we will work on Wednesday at 10 A.M., and if that turns out to be impossible because of the storm conditions that we anticipate happening, we will call you. But if you don't hear from us, then I expect you to be here at 10:00 on Wednesday. And if the weather changes my mind, we will contact all of you so that you don't have to come in for nothing. In the meantime, do not discuss this case amongst yourselves. Do not go to the scene of the alleged incident, and when I say that, I mean all of the scenes that have been testified to in the case.

Do not speak to the attorneys, the parties, the witnesses. Do not research this case in any way. Should anybody speak to you about this case, report it to the officer immediately. I thank you for your service and your attention today. We will reconvene on Wednesday at 10 A.M. weather permitting.

Officer, take charge. Everybody safe home. Good luck.

(Jurors exit the courtroom.)

THE COURT: Mr. Gibbons, do you have a motion?

MR. GIBBONS: Your Honor, at this time I move to have the charges dismissed based on the fact that the People have failed to make out a prima facie case. There was no evidence at all tying my client to the crime other than the complainant's identification of him, and I submit the identification did not match the description Mr. El Turkey gave. My client was dressed differently, hair was different, he was wearing a hat, he was at the crime scene missing teeth, none of these things mentioned by Mr. El Turkey. The only evidence connecting my client to this is that quick point out from a person clearly in a compromised position because of the vicious assault he had just undergone. I ask the Court to dismiss the charges against my client.

THE COURT: Mr. Shortt?

MR. SHORTT: Viewing the evidence in the light most favorable to the People Mr. El Turkey made an on scene identification. Those are all factual points to be argued the summation.

THE COURT: The motion is denied. Mr. Ball?

THE DEFENDANT BALL: I would like to move to have the case dismissed based on insufficient evidence, perjury, what do you call, fraud, your Honor. What happens is we have had already an opportunity to cross examine the victim and Officer Lanning. They both testified to the fact that Mr. Pampena, the one who said he wasn't at the crime scene that he was at the crime scene, that the identification of me took place outside of the ambulance. Officer Pampena testified that the identification took place inside. Everything that he testified to today, your Honor, was contradicted not only by the victim but his officer.

Your Honor, you have been making very good judgment calls and I would ask you, use your good judgment, your Honor, in assessing what you seen so far, and I would ask to you make a decision and have this case dismissed immediately and please have it referred immediately to IAD internal affairs division that we can get a better understanding of the things that have not been brought forth to this Court. Mr. Brooks here he was taken into custody, we still haven't established who was the officers

that took him to the precinct. I was arrested on 104 Street and 32 Avenue, your Honor, and it still hasn't been established. It showed today that Mr. Lanning couldn't have been there because he was at the crime scene with Officer Lanning who testified that Pampena was there yesterday with him, and there is no way that he could have made it to the crime scene with me in tow and the person was there at the crime scene being treated two minutes after the incident and the EMS truck never even arrived at the crime scene until eleven minutes after. Everything here shows that this case thus far has been a farce.

Your Honor, all due respect, you know, you know, you talk about everybody's experience, you know. I understand and now I want to just reflect on your experience as a judge, and the many years that you have sat on this bench, your Honor, the description that was given of me by the victim, your Honor. Specifically I said the victim that the officers told him that the property was taken by the dude and they already had him prior to his even seeing the person. Everything about this case, your Honor, there is a lot of what you call illegal things, crimes being committed against me and Mr. Brooks. They said the victim said that when he went to the precinct that he seen me in handcuffs. Your Honor, everything about this case not me, but I'm asking you to use your judgment call.

You know with all due respect, you have been here on this bench for many years. You make a judgment call as to the assessment in the beginning, from the beginning to right now all this man has ever put into evidence is a nice laminated picture, that's it. That's the only evidence that has been brought by the District Attorney. It is not enough in comparison to all the things that we have shown that shows our innocence and the impossibilities of what is called what I been saying from the beginning. Sequence of events, your Honor, sequence of events, timing, evidence that what you call corroborate the allegations being made against us, your Honor. The victim said they brought him a Blackberry that wasn't his, and he testified that the officers were finding stuff inside the grate while he was there, he seen them.

Your Honor, we been locked up two and a half years based on this. I throw myself at the mercy of the Court today. Please do not send us back. Colluding and suborn is a serious violation, man, to conspire, one or more persons to conspire against individuals to prevent them from being able to enjoy the simple rights of our constitution, your Honor, is a serious crime, and that is not what our country represents. That's the reason I'm here, your Honor, contrary to popular belief representing myself because I truly love our country and, your Honor,

I'm innocent, and I couldn't wait for today, your Honor, to have my day in court please use your good judgment and not have us go back.

THE COURT: Thank you. Mr. Shortt?

MR. SHORTT: Your Honor, I will rely on the same record.

THE COURT: All right. Some of the arguments you are making Mr. Ball --

THE DEFENDANT BALL: If not, your Honor, dismissal, at least allow us to be released on our own recognizance.

THE COURT: I'm not going to do that, Mr. Ball. Many of the arguments that you have advanced you can and I'm sure will use as part of your closing statements, but at this point my power to pass on this motion is limited to whether or not in a light most favorable to the People the evidence has established a prima facie case. I do find that it has established a prima facie case and, accordingly, your motion is denied.

Mr. Gibbons, is it your intention to rest on Wednesday?

MR. GIBBONS: It is.

THE COURT: Mr. Ball, what are your intentions with respect to a defense?

THE DEFENDANT BALL: Your Honor, I would like to

make one more request because there was a reading today of the 9-1-1 report and the reading came from the police officer, and I would like to have an independent reading done by one of the persons independent from the defense as well as --

THE COURT: That I will not do. The evidence itself is in evidence. I let it in evidence. The District Attorney let it in without objection, and it speaks for itself. The jury, should they desire to look at that SPRINT report when they are deliberating, they will have it in the jury room. You can ask them on your closing statement to look at it, you can invite them to look at that document and if they ask for it, I will give it to them, but there is no necessity to reread the document at this time. So the question becomes I am still trying to figure out scheduling.

THE DEFENDANT BALL: I would still like to have the EMS come in and testify because it will clarify that Officer Lanning and the victim were never inside the EMS, and I think that would weigh heavily.

THE COURT: Do we know that? Do we have any evidence that's what the EMS officer is going to testify?

THE DEFENDANT BALL: Yes, I have it here. I can indicate to you here it's simple. In every EMS report in order for them when they fill out the EMS report which I

have here it indicates here at the bottom it says removed to vehicle by and it has chair, walk, carry, scooped, fleet, stretcher or met at ambulance.

THE COURT: Now you are just reading to me what the boxes are that they check off.

THE DEFENDANT BALL: Yes.

THE COURT: So my question is has anybody spoken to this EMS officer, or is there any indication that he is going to testify the way you say?

THE DEFENDANT BALL: We have the investigator doing everything he can.

THE COURT: Has he spoken to the EMS?

THE DEFENDANT BALL: I think what happened is there was an issue of being able to write up the paper, the subpoena that he needed. Miss Povman did not do it, and I don't have access to the law library.

THE COURT: Mr. Shortt already indicated he is going to make an effort to bring him in. Has anybody spoken to this person?

MR. GIBBONS: I have not.

THE DEFENDANT BALL: Yes so --

MR. SHORTT: I have.

THE COURT: Okay. Have you asked him that specific question whether or not --

THE DEFENDANT BALL: Your Honor, we need to have

them in. We can't rely on him so they can testify.

THE COURT: I know but I am asking you for what we call an offer of proof that this officer --

THE DEFENDANT BALL: Your Honor, this is blank.

THE COURT: I understand that, whether or not this officer is going to say that the police officer was never in the --

THE DEFENDANT BALL: We won't know until we get him here, that's the point of us giving him the opportunity to come here and us cross examining him, your Honor.

THE COURT: You have spoken to him?

MR. SHORTT: Yes.

THE COURT: Have you broached this subject with him?

MR. SHORTT: Yes.

THE COURT: What did he say?

MR. SHORTT: He has absolutely no recollection of the events whatsoever. He acknowledges his signature on the form, but he has treated a lot of sick people, Judge, this is one of thousands.

THE COURT: So the question becomes the reason I am raising this with you, Mr. Ball, is as I'm sure you know, we are about to have potentially one of the greatest historic blizzards in the history of this city.

THE DEFENDANT BALL: Your Honor --

THE COURT: Let me finish. If that in fact comes to pass, this gentleman is an emergency medical technician, it may be extremely difficult to actually get him into this court rather than have him be out saving lives.

THE DEFENDANT BALL: Your Honor, we had the police officers here, he could have been out saving lives.

THE COURT: But it's only snowing lightly out now I think.

THE DEFENDANT BALL: Your Honor, I will not accept that as an excuse. Our lives are on the line here.

THE COURT: Mr. Shortt, try and get him in for Wednesday.

MR. SHORTT: I will do my best.

THE DEFENDANT BALL: Can you sign a subpoena?

THE COURT: Of course.

THE DEFENDANT BALL: He said he has to get it wrote up.

MS. POVMAN: I have to go to my office.

THE DEFENDANT BALL: You had time.

THE COURT: The District Attorney has more muscle than your investigator. If anybody can get him in, it will be the DA but understand the city --

THE DEFENDANT BALL: He hasn't made a commitment.

THE COURT: All he can do is make a commitment to do his best, but the city is potentially going to be under

siege from the weather, and it may be that he will not be able to come in Wednesday. If that happens, we will reconvene Wednesday and make a judgment about what we will do.

THE DEFENDANT BALL: We need him, your Honor. He is the final link, your Honor, that puts this whole thing together.

THE COURT: Apparently what he is going to say is he has no memory.

THE DEFENDANT BALL: We are not asking that. We will do the same thing as everything else, present him with the evidence to recollect his memory because this document so he can let us know from this what it says or doesn't say what happened.

THE COURT: Mr. Shortt, did you try and refresh his recollection about this?

MR. SHORTT: I did, Judge. He has no -- I showed him a photograph of Mr. El Turkey. He has no recollection of this event. He acknowledges that's his form, but he remembers the location but in terms of anything else about the job, absolutely no recollection whatsoever.

THE DEFENDANT BALL: Did you ask him whether or not he treated Mr. El Turkey?

MR. SHORTT: He says I remember filling out this form --

THE DEFENDANT BALL: Did you ask him --

MR. SHORTT: Excuse me. Do not it cut me off. Enough of the circus today.

THE DEFENDANT BALL: Circus, did he --

THE COURT: Stop. Don't talk to each other. Talk to me.

THE DEFENDANT BALL: Did he ask him whether or not he treated Mr. El Turkey in the ambulance and if so --

MR. SHORTT: I did.

THE COURT: What did he say?

MR. SHORTT: He has no recollection other than that's my signature on the form. He says --

THE DEFENDANT BALL: Can we have him in so we can question him?

THE COURT: I cannot promise you that will happen for the reasons I explained.

THE DEFENDANT BALL: I ask the Court to be patient with the investigator because I can't rely on him to bring it into court.

THE COURT: The investigator will be facing a blizzard also.

THE DEFENDANT BALL: But I can't rely on the District Attorney to bring into court evidence that will go against him.

THE COURT: The question that I am trying to work

myself up to here is that can we come to an agreement in some fashion between the two parties or the three parties between you and Mr. Shortt really, as to what this officer, this EMT officer would say were he called to the witness stand. That's the question, can you come to an agreement with Mr. Shortt about that?

THE DEFENDANT BALL: Yes, you know how if I'm given the information how I can contact the EMS worker and speak to himself, that's how we can come to an understanding if I can have an opportunity to question him at some other time if he can make him available to me.

THE COURT: How about if your investigator or Miss Povman does that?

THE DEFENDANT BALL: I would --

THE COURT: Your circumstances would make it a little difficult.

THE DEFENDANT BALL: Your Honor, I can always call him on the phone.

THE COURT: I'm not sure to turn over the telephone number.

THE DEFENDANT BALL: If it's okay with him the EMS worker --

THE COURT: How about if you have Miss Povman and you have the investigator who can do it?

THE DEFENDANT BALL: That's fine.

THE COURT: Is there a way that they can communicate?

MR. SHORTT: Judge, I don't have the guy's number.

THE DEFENDANT BALL: Would you, your Honor? He said he just had contact with him. How can he not have the information to get the guy now.

THE COURT: Because that's not how they get the cops in.

THE DEFENDANT BALL: We are not talking about cops.

THE COURT: That's not how they get EMT people in, that's the procedure, and it's not by calling private numbers.

THE DEFENDANT BALL: I'm not asking him to. He obviously had contact with the EMS worker, and however it was that he contacted him --

THE COURT: Do you have Miss Povman's number?

MR. SHORTT: Yes.

THE COURT: Do you have the investigator's number?

MR. SHORTT: I don't, but I'm sure I can get it from Miss Povman.

THE DEFENDANT BALL: Make that information available.

THE COURT: If we can make that marriage --

MR. SHORTT: He will be subpoenaed for tomorrow.

If he shows up I will put him on the phone with Miss Povman.

THE DEFENDANT BALL: I can't have him to talk to Miss Povman or the investigator. I would like to have the opportunity to ask questions.

THE COURT: I can't promise you that.

THE DEFENDANT BALL: Look, your Honor, I'm representing myself for you not to all me to ask him questions would be a violation of my constitutional rights representing myself.

THE COURT: The question that I was trying to broach --

THE DEFENDANT BALL: I understand what you are saying.

THE COURT: Merely if there can be an agreement.

THE DEFENDANT BALL: Yes, I will tell you what if he makes the person available to the investigator, the investigator I can call him and we can do a three way, that's easy. As long as it's not an objection to the EMS worker, I don't see where it should be an objection to anybody.

MR. SHORTT: Let's see what happens Wednesday, your Honor. I'm not making any commitments to phone calls with defendants on Rikers Island. Let's see what happens on Wednesday.

THE COURT: Anybody who has any requests to charge in case we go to the jury Wednesday?

MR. SHORTT: This is a unique case, if we want to do I.D. charge Wednesday or witness plus as to Mr. Ball it's witness plus, as to Mr. Brooks obviously it is just a one witness I.D. case. I don't know if you want to treat them separately or independently. The charges are not too different as to each. I don't know if you want to differentiate specifically as to Mr. Ball or Brooks.

THE COURT: I don't know what you mean by differentiate. They are both showup cases.

THE DEFENDANT BALL: That's it.

MR. SHORTT: Well, one is just a one witness I.D. case as to Mr. Brooks. As to Mr. Ball it is not there is evidence that the property was recovered from him.

THE DEFENDANT BALL: That was not established.

THE COURT: You know what --

MR. SHORTT: Also Galbo recent and exclusive possession.

THE COURT: Well, sure. Anything else?

THE DEFENDANT BALL: Yes, your Honor. Earlier I didn't get the chance to put the application in of the District Attorney making identification giving an identification of the witness under 60.25 prior recognition by witnesses exception to hearsay rule People versus

Trowbridge, you know --

THE COURT: What is your application?

THE DEFENDANT BALL: That we not allow that to be presented to the jury, any description, you know, prior recognition by witnesses for it not to be allowed because it doesn't apply to us in this case.

THE COURT: Well, your request is way late all the evidence has come in.

THE DEFENDANT BALL: Yeah, I know, but I mean --

THE COURT: Frankly --

THE DEFENDANT BALL: I rather make the application late than never.

THE COURT: Okay. Do you want to be? Heard.

MR. SHORTT: First of all, for the preserve of the record the objection is not timely nor do I believe it is sufficiently preserved. Second of all the People have made out the requirements of 60.25 for the identification to come in. Mr. El Turkey specifically said it's been too long for me to remember. On that basis I believe of 60.25 applies and his prior I.D. comes in.

THE DEFENDANT BALL: Your Honor --

THE COURT: I agree with that. It is untimely, and in any event, the complaining witness' testimony laid a proper foundation for the admission of the testimony of police officers so that application is denied.

Everybody safe home.

MR. SHORTT: Thank you, your Honor.

THE COURT: 10:00 Wednesday.

(Trial adjourned to January 28, 2015.)

(Defendants exit the courtroom.)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS: CRIMINAL TERM: PART K14
-----------------------------------------x Indictment No.
THE PEOPLE OF THE STATE OF NEW YORK 2228/12

-against-

ELIJAH BROOKS and RAYMOND BALL,

Defendants.
-----------------------------------------x

125-01 Queens Boulevard
Kew Gardens, New York
January 28, 2015

THE COURT CLERK: Case on trial, indictment 2228 of 2012, Raymond Ball and Elijah Brooks. The defendants are incarcerated and produced being brought before Court.

MR. SHORTT: For the People, Assistant District Attorney Timothy Shortt.

THE COURT: Good morning.

MS. POVMAN: On behalf of Mr. Ball, Linda Povman.

MR. GIBBONS: For Mr. Brooks, Wyatt Gibbons, 125-10 Queens Boulevard, Kew Gardens.

THE COURT: Good morning.

(Defendant enters the courtroom.)

THE COURT CLERK: Let the record reflect the defendants are present before the Court.

THE DEFENDANT BALL: Good morning, everyone.

THE COURT: Good morning. Where are we here? The People have rested. You are going to rest?

MR. GIBBONS: I plan to rest, yes, your Honor.

MS. POVMAN: Judge, Mr. Ball still wants the EMS worker to be called. I had a conversation with him and advised him that the DA has spoken to him and the worker doesn't have any specific recollection of this incident, but he still feels that he is necessary to his defense.

THE COURT: Why is that, if the guy has nothing to say?

THE DEFENDANT BALL: Well, actually, your Honor, what it is I'm not asking him about whether he recollects anything that took place, it's the information that's contained in the EMS report, you know, that he can validate certain things that's written inside the report.

THE COURT: But the EMS report is already in evidence.

MS. POVMAN: No.

THE DEFENDANT BALL: Just that he can validate.

THE COURT: Wasn't it put into evidence?

MR. SHORTT: There are two SPRINTS, one is the NYPD, the other is the FDNY, who was called at what time.

THE COURT: In addition to that there is another report?

THE DEFENDANT BALL: Yes, sir.

THE COURT: Do we have that report? Can I take a look at it?

THE DEFENDANT BALL: We have it, your Honor.

THE COURT: Can I take a look at it?

THE DEFENDANT BALL: Thank you so much, Miss Povman.

(Handing.)

THE COURT: So I gather, Mr. Ball, that the pertinent part of this is the handwritten portion?

THE DEFENDANT BALL: No, sir. He can validate from this report, he can tell us whether or not there was ever someone inside the EMS truck and whether or not they were treated, you understand? This EMS report he can validate the information that's either in it or not in it.

THE COURT: There is a spot on here that indicates who is in the back of the ambulance and who is not?

THE DEFENDANT BALL: Yeah, actually there is a spot if you go to the back, it says whether or not a person was removed to the vehicle, and is it says walked, stretcher, so and on, so forth.

THE COURT: On page 2?

THE DEFENDANT BALL: Yes, sir, at the bottom.

THE COURT: Okay. Those are blank.

THE DEFENDANT BALL: Yes, exactly.

THE COURT: I see. And you want to ask him what

the significance of --

THE DEFENDANT BALL: No, sir, your Honor, see what happens is my whole case is surrounded by the victim being inside the EMS, the identification, the police officer, that man he can tell us whether or not someone in there. He said that he was treated, that he got out of the vehicle. That EMS technician he can tell us whether or not that is the truth pertaining to that report.

THE COURT: Well, he might be able to.

THE DEFENDANT BALL: No, he can for sure, without a doubt he can do that.

THE COURT: Well, there is nothing certain in life.

THE DEFENDANT BALL: Your Honor, this is his business, he can tell us. That's like you me telling you can you tell me the law. You know the law, your Honor.

THE COURT: All right.

THE DEFENDANT BALL: Thank you.

THE COURT: His status at the moment is what?

THE DEFENDANT BALL: Available.

MS. POVMAN: He will be available tomorrow morning.

THE COURT: He will be here tomorrow morning?

MR. SHORTT: I came to the courthouse yesterday. Nobody was answering at the FDNY court desk.

THE COURT: I heard you were the chief assistant.

MR. SHORTT: Bureau chief, I will not be greedy. I couldn't get anybody on the phone yesterday. This morning I finally got the coordinator on the phone. She is going to honor the subpoena. I was able to locate the witness' cell phone number. I spoke to him this morning. He is actually in an EMS bus right now and could not get here today. I tried to get him this afternoon. It was just impossible, but he is available and willing to come in tomorrow.

THE COURT: Very good. All right. Then we will put this over until tomorrow. We have the jury.

Do you want to rest today, Mr. Gibbons?

MR. GIBBONS: No, I will rest tomorrow, Judge.

THE COURT: I am bringing the jury out to explain to them that we are putting this over to tomorrow. The question is whether or not you want to --

MR. GIBBONS: Like you said, you never know what could happen so I don't want to rest yet if nothing happens in the interim, I will rest tomorrow. I do have one application.

THE COURT: All right.

MR. GIBBONS: It harkens back to the application we made regarding the defectiveness of the indictment in that my client's name does not appear, and it was

determined that though it didn't appear in the language of it, the court ruled it was in the body because when the charges were listed the names appeared to the right of each charge on the cover page of the indictment. However, my client's case was originally dismissed pursuant to 190.50 and his charges were re-presented to a Grand Jury under indictment number 338 of 2013 which was ultimately consolidated with 2228 of 2012 which is the case on trial. However, that indictment 338 the re-presentment, while it does have my client's name in the caption, People of the State of New York against Elijah Brooks, when it lists the charges on the face on the cover sheet, his name does not appear, and then in the body of the indictment again, it states that it accuses the defendant, but it doesn't actually name him, and that is the same for all of the counts, four in total.

So I renew the application on my client's behalf. He feels though it was consolidated, you can't consolidate a defective indictment with a valid indictment and get a fully valid indictment, so he is renewing his application and asking that the charges against him be dismissed.

THE COURT: Do you want to be heard?

MR. SHORTT: Judge, the indictment has been renewed by Judge Hollie, not once, but twice and found sufficient. I don't think your Honor has the authority to

dismiss the indictment at this point. Second of all, the effect of the motion to consolidate was that that indictment number was dismissed and 2228 superseded. The face of 2228 which your Honor has already ruled includes the names of the defendants on the face of the indictment not just the caption.

MR. GIBBONS: For the record, I point the Court to people versus Lopez 4 NY3d 686 which says without the name in the body of the indictment, it's defective.

THE COURT: Very good. The application is denied.

MR. GIBBONS: Note my exception, your Honor.

MS. POVMAN: Thank you, Judge.

THE DEFENDANT BALL: Thank you, Judge.

THE COURT: Line up the jurors.

(Whereupon, there was a brief pause in the proceedings.)

THE COURT OFFICER: Ready for the jury?

THE COURT: Ready.

(Jurors enter the courtroom.)

THE COURT CLERK: Do both sides stipulate to the presence and proper seating of the jury?

MR. SHORTT: Yes.

MR. GIBBONS: Yes.

THE DEFENDANT BALL: Yes.

THE COURT: Good morning, ladies and gentlemen.

We are at the stage of the trial the District Attorney has rested, and we are now turning to the defense to see whether or not they wish to put in a defense. There is one witness who is not available today, but will be available tomorrow morning who the defense wishes to call, and so he is an EMS worker, and as you may imagine, those folks are probably pretty busy today as a result of the storm yesterday, but he will be available to us tomorrow morning to testify.

On the assumption that is the one and only witness for tomorrow, then it is my intention to proceed directly to closing statements, my final instructions to you on the law, and then the case will be yours to deliberate on and render a verdict, but as for today, we cannot proceed in the absence of this witness, so we are going to adjourn until tomorrow morning at 10 A.M.

I thank you for making the effort to come in, but these things happen sometimes during the course of a trial. Once again, do not discuss this case amongst yourselves. Do not go to any of the scenes that have been testified to in connection with this case. Do not talk to the attorneys, the parties, the witnesses or anybody connected to this case, and do not research this case in any way. Again I thank you for your efforts and sacrifice. 10:00 tomorrow morning.

Officer, take charge.

(Jurors exit the courtroom.)

THE COURT: Before we break, is there anything in connection to the charge that anybody wants to add or anything like that?

MR. SHORTT: I don't think so.

THE COURT: Mr. Ball?

THE DEFENDANT BALL: Yes, sir.

THE COURT: Is there anything else that you want to raise in connection with the charge at this point?

THE DEFENDANT BALL: Other than immediate release, no.

THE COURT: That's not happening at the moment.

THE DEFENDANT BALL: You asked, I mean, you know.

THE COURT: Thank you very much.

MR. GIBBONS: Thank you, your Honor.

(Defendants exit the courtroom.)

(Trial adjourned to January 29, 2015.)

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF QUEENS: CRIMINAL TERM: PART K14

----------------------------------------x Indictment No.

THE PEOPLE OF THE STATE OF NEW YORK 2228/12

-against-

ELIJAH BROOKS and RAYMOND BALL,

Defendants.

----------------------------------------x

125-01 Queens Boulevard

Kew Gardens, New York

January 29, 2012

THE COURT CLERK: Case on trial, indictment 2228 of 2012, Raymond Ball and Elijah Brooks. The defendants are produced and being brought before the Court.

Appearances, please.

(Defendant enters the courtroom)

THE COURT CLERK: Let the record reflect the defendant Brooks is present before the Court.

(Whereupon, there was a brief pause in the proceedings.)

THE COURT CLERK: Let the record reflect the defendant Ball is present before the Court.

THE DEFENDANT BALL: Good morning, your Honor.

THE COURT: Good morning. Before we bring the jury out, in the course of my preparing my charge, when I

got to the possession of stolen property part of this case, I noticed that on my copy of the indictment, both defendants were charged, and upon exploring all of this, apparently one defendant was charged the first time around and then both defendants were charged the second time around and then it was pencilled into the existing indictment, but more importantly, as I see the evidence in this case, I don't really see the stolen property charge with respect to Mr. Brooks.

MR. SHORTT: I would agree with your Honor.

THE COURT: I think frankly it complicates the situation. Do you have an application perhaps?

MR. SHORTT: Yes, Judge. The People would dismiss the count of criminal possession of stolen property as charged to the defendant Brooks only. As to Mr. Ball we intend to go forward on that charge.

THE COURT: Any objection?

MR. GIBBONS: I join that application, your Honor.

THE COURT: All right. I will initial the indictment for my trusted clerk. All right. Why don't we get rolling.

Do you have a witness, Mr. Ball?

THE DEFENDANT BALL: Yes, your Honor, I have the EMT worker, Adi Gonzalez.

THE COURT: Before we do that, we will bring the

jury out. You intend to rest, Mr. Gibbons?

MR. GIBBONS: Well, I want to hear what his witness says before I do -- well, I guess we could rest. I'm not going to ask any questions of anyone, I don't think so --

THE COURT: All right. I mean, because I'm going in order, I will turn to you and say do you have a defense, and you can say yeah or nay.

MR. GIBBONS: Yes, your Honor, I will rest.

THE COURT: Ready for the jury?

MR. GIBBONS: Yes, your Honor.

THE COURT: Bring them in.

(Whereupon, there was a brief pause in the proceedings.)

THE COURT OFFICER: Ready for the jurors, your Honor?

THE COURT: Ready.

THE COURT OFFICER: Jury entering.

(Whereupon, the sworn jury enters the courtroom.)

THE COURT CLERK: Do both sides stipulate to the presence and proper seating of the jury.

MR. SHORTT: Yes.

MR. GIBBONS: So stipulated.

THE COURT CLERK: Mr. Ball?

THE DEFENDANT BALL: Yes.

THE COURT CLERK: Thank you.

THE COURT: Good morning, ladies and gentlemen. As I indicated earlier, the District Attorney has rested his case.

We now turn to the defense. Mr. Gibbons, do you wish to put in a defense?

MR. GIBBONS: No, your Honor, the defense rests.

THE COURT: On behalf of Mr. Brooks.

MR. GIBBONS: On behalf of Mr. Brooks, of course, your Honor.

THE COURT: Mr. Ball, do you wish to put in a defense?

THE DEFENDANT BALL: Yes, I do, your Honor. I have a witness I would like to call.

THE COURT: Call him.

THE DEFENDANT BALL: EMT Adi Gonzalez.

(Whereupon, there was a brief pause in the proceedings.)

A D I G O N Z A L E Z, having been duly sworn, was examined and testified as follows:

THE COURT OFFICER: The defense for Mr. Ball calls Adi, A-D-I, usual spelling, shield 2101, FDNY, EMS.

THE COURT: Mr. Ball, you may inquire.

THE DEFENDANT BALL: Your Honor, I just need Exhibit F.

MS. POVMAN: Never mind.

THE COURT: Do you have a copy of it?

MS. POVMAN: We have it, thank you.

THE COURT: Okay.

DIRECT EXAMINATION

BY THE DEFENDANT BALL:

Q Good morning.

A Good morning.

Q How are you doing today, Mr. Adi?

A Good.

Q My name is Raymond Ball, and you know, I'm here representing myself in this case, and I just need to ask you some few questions, you know. And I know that you are not going to be able to answer the questions pertaining to anything that you remember --

MR. SHORTT: Objection.

THE COURT: Don't make a speech.

Q The questions that I'm going to ask you is related to --

THE COURT: Why don't you ask him who he is so the jury knows.

Q Can you state for name for the jury, please?

A EMT Gonzalez. I'm called here to testify on a call.

THE COURT: Just tell us who you are, that's all. You are Mr. Gonzalez, and you are an EMT.

Q What it is that I'm asking you here today did you work on July 3 of 2012?

A I did.

Q Okay. What hours?

A The evening shift, 4 P.M. to midnight.

Q And in the course of that night, did you have an opportunity to go to 105 Street and Northern Boulevard?

A I responded to a call there, yes.

Q To 105 Street?

A It was about -- I don't have the paper in front of me but --

Q I have it. Can I pass it up to you?

A Yes.

THE COURT: Would it help you to refresh your recollection if you saw the paperwork on this case?

THE WITNESS: Yes, absolutely.

THE COURT: All right.

(Handing.)

A All right.

Q Is that your report?

A 106 Street and Northern Boulevard.

Q Not 105 Street?

A Right.

Q Is that your report?

A This is it, yes.

Q Okay. I appreciate it.

So you're saying already before we even start that according to that report that you have in front of you it being yours that you never responded to 105 Street and Northern Boulevard; is that correct?

MR. SHORTT: Objection, leading.

Q I'm asking you.

THE COURT: I will allow it.

Q Is that what your report says?

A The report indicates it was 106 Street.

Q Okay.

THE COURT: Do you have an independent recollection of this event?

THE WITNESS: Vaguely going by the report I read before, yeah.

THE COURT: Okay.

Q Okay. You know, actually it brings me to the reason that I'm asking you to come here today is because I want to know whether or not you can testify to the validity of the information that's inside this report, you know, for myself and the jurors, you know, because we are not EMT workers and we really don't know.

THE COURT: Okay. So why don't you ask him questions about who prepares the report, how he prepares it and things like that.

Q Okay. So would you say, Mr. Gonzalez, that the information that's in this report is accurate?

A Yes, I would.

Q Well, can you give me, you know, just explain to us how is it that you can, you know, ensure us that the information here is accurate, please?

A You can start with the times, the call number, all of those --

Q I apologize, Mr. Gonzalez --

THE COURT: Don't interrupt the witness when he is answering. You may continue.

A Starting with the call numbers and the times, those are all computer generated and also backed up by myself because I have to write them on time. The patient's demographic or his personal information was also recorded, and in the back the commentary of the events I was pretty specific, and that's why I was able to or -- or I'm able to remember who he was more or less.

Q You know, what is it, is that my reason for calling you is because I need to know, like, the accuracy of the information. In other words, when I say to you the accuracy, I will give you an example: Is it possible since you mentioned the time, according to the run it says on scene, can you just look -- it's on here too, it says on scene 21:11?

A Um-hum.

Q Okay.

A Yes.

Q Okay. Now, my question to you what is 21:11?

A 9 is 11 P.M.

Q 9:11. Now, Mr. Gonzalez, you know, to the accuracy of this information, is it anyway possible that the ambulance might have been at 106 Street as you said at two minutes after, and it's just inaccurate this information here, is it possible?

A There is no indication of that because when we pull up to the scene, that's when we put the on scene, hit the button so if it says 21:11 --

Q That's exactly the time?

THE COURT: So when you get to the scene, you just push a button and the computer generates the time; is that what you are saying?

THE WITNESS: Correct.

THE COURT: Okay.

Q So that means that this time is accurate beyond any reasonable doubt; is that correct?

A As much as anything human made could be, yes.

Q That's what I'm asking?

THE COURT: It's accurate as to it tells you exactly when you pushed the button, right?

THE WITNESS: Right.

THE COURT: Okay.

Q Just to be clear this is something that you do as protocol every time you arrive at a crime scene?

A At any call whether it's crime or not.

Q Right. So do you remember specifically that night pressing that button at that time when you arrived at the crime scene?

A Either my partner or myself, I don't remember, I can't tell you that I hit it or he hit, I can't say.

Q But you can say that it was hit at the proper time?

A Right.

Q Okay.

A And it does show it was about four minutes response time which is appropriate to my area.

Q Can you explain that to us because, see what happens, we don't know?

A We got the call at 21:07 hours, and it took us four minutes.

Q 21:07?

A 9:07 P.M. and it took us four minutes to get there. I sit on 103 and Roosevelt and if we would have got the call from there, that's exactly how long it would take us to get to Northern Boulevard from my location.

Q Okay. Thank you.

I will be finished with you shortly. I just have a few questions, all right, Mr. Gonzalez?

A Yup.

Q Okay. All right. Okay. So thus far what we have ascertained is that 106 Street is where you arrived at and you pushed a button at eleven minutes after; is that correct?

A Yes, 9:11, yes.

Q Okay.

Now, what does it mean it says here, can you explain like the patient information you just spoke about, you know, the patient information in the boxes, what does it mean, you know, when these particular boxes are signed rather than the other boxes?

A Are you speaking about his name, the one where his name is patient info.

Q That's right?

A I have his name, date of birth, age and his sex.

Q You also have on the --

THE COURT: That's handwritten by you.

THE WITNESS: Yes. I can't see the patient's address, personal information, that's blurted out her.

THE COURT: Is that your handwriting?

THE WITNESS: Yes, this is my handwriting.

Q Okay. Mr. Gonzalez, I apologize, please forgive me, because I should have directed you to the second page.

A Okay.

Q Where it also has patient information, that's

particularly where I was asking on the second page where it says patient information. And you know it says transportation to hospital refused?

A Um-hum.

Q To the left-hand side of the page. Then it says patient unable to sign, patient refused to sign, and at the top it says information release patient authorization?

A Yes.

Q Now, I really don't know what that means.

THE COURT: Tell us what that means.

Q Can you tell us?

A The patient information disclosure is the first signature where he signed, that's the one you are referring to this is basically HIPAA or patient privacy act, and everyone signs that regardless whether they want to go to the hospital or not because we hold their personal information, and we have to keep it private, and they are acknowledging that as well as responsibilities for billing purposes. Then the release or refusal of medical assistance, the RMA, his signature is on it so he signed the refusing transports to the hospital.

Q Okay. So RMA refused medical attention does that mean that he refused medical attention at the hospital --

A He refused transport to the hospital.

THE COURT: It doesn't mean you did not treat him yourself?

THE WITNESS: In the end this one is RMA all which he also refused treatment on the scene for the majority.

Q Okay. So that means in other words because it says all the patient never received any treatment from you guys; is that correct?

A Right, pretty much.

Q Right, but now this is a very important question since we are getting right at the heart of the matter. I would like to ask you, Mr. Gonzalez, because you really went right to the heart of the matter, the patient never received treatments from you, right, but is it possible that the patient was ever inside the ambulance if he never received treatment?

A It is, yes, usually especially on a street call we bring the patient into the ambulance, privacy, get their information, you know, we can't do that on the street. Also we have to make an attempt to provide any type of medical care, we can't just be like, you know, especially if he is injured.

Q Right.

A So yeah, everything would be inside the ambulance.

Q Okay. Now, you have here on this EMS report now you said that these are very accurate?

A Um-hum.

Q You have where you see removed to vehicle by?

A Um-hum.

Q Can you explain to us what that represents?

A All right. So there is a few options there, I could select whether I -- we took him in a chair, whether he walked, whether he was on the stretcher flat or if he met at the ambulance.

Q Right. Now you said sometimes when street issues occur that you can bring them in?

A Correct.

Q But you said this man refused all so this was a different kind of situation. Now, in the case that he was brought into the ambulance, would you be required to check one of these boxes?

A Technically, yes.

Q Well, when you say technically, can you explain to us because, you know, I would think that the information in here is accurate, that you do a good job and that you --

A I would say I don't see it selected and the reason would be because usually you sign that off when you do transport the patient because that's when it would matter whether he was able to ambulate whether you put him on the chair for certain type of medical conditions, or if he was flat like with a C collar on his neck for neck or back injuries. So I would have to say I left that out because there was no treatment given so it didn't really pertain.

Q Okay. So he was never treated?

A Right.

Q Okay. Now, this is very important, you are saying that there is a possibility that he could have gotten put into the ambulance, or are you saying that he definitely was put into the ambulance?

A I can't recall to any detail, but usually our inclination would be to convince him to go to the hospital or to give him some type of care, and that would be done in the ambulance.

Q But because of this being a certain situation where he refused all, you cannot testify to any certainty that he was inside the ambulance; is that correct?

A That's correct.

Q Okay. So onto my next question, if you look at the box where it says body matrix?

A Okay.

Q I notice that you have in the body matrix you have the parts of the body?

A Yes.

Q Such as the head, face, eyes, so and so forth.

A Yes.

Q Then you have what do you call also in conjunction with that you have another list that says burn --

A To the left off --

Q Yes -- to the right actually is the body parts --

A Okay, yes.

Q To the right you see it says pain and then swelling and things of that nature?

A Um-hum.

Q Okay. Can you just help me out with this because what happens is I notice that you have it marked off, and from what it appears to me it reads head pain, swelling and soft tissue injury; is that correct?

A Not head, face is pain, and the swelling and soft tissue injury is forehead.

Q Okay. Right. So now I want to ask you a question. With this information that's marked off, is that indicating observation of the patient, or is it indicating treatment of the patient?

A This is a check off of what I see what I assess the physical assessment.

Q So it's an observation?

A Um-hum.

Q Not treatment?

A Correct.

Q So now, I notice that you marked off pain, swelling, soft tissue injury like you said for the head it was swelling and soft tissue. For the face it was pain?

A And soft tissue and swelling.

Q And soft tissue and swelling. Thank you. I apologize. Well, you know, Mr. Gonzalez, I don't see anywhere

here along the boxes that reads bleeding.

A That's correct, I did not mark it.

Q There is no boxes checked forehead, face and so on and so forth?

A Um-hum.

Q Now, you know, we need, what do you call to be able to convince the jury that the information that's in this report is accurate. When you observed like you said the person at that crime scene and you did this report, obviously you did not observe any bleeding; is that correct?

A I did not document bleeding or any significant bleeding on my patient care report.

Q Okay. Let me ask you a question, hypothetical, in the case that you come to a call and I'm the victim, I'm injured, and you, you know, you try to convince me to get into the ambulance to get help, in the case that I do get in, what would be the protocol, what would be the first thing that you would do to treat that person inside the ambulance? You know like, would you take the temperature, you know, what would be the first thing that you would do?

A My first thing that I would do by using body substance isolation so I would have to wear some type of gloves or if necessary additional --

Q I mean as far as treatment to the patient what would be the first thing that you would do?

A In this case I would have to --

Q Not this case, I'm just saying what is the protocol?

MR. SHORTT: Objection, your Honor, the question is this case.

THE COURT: I will allow for this case.

MR. SHORTT: I would like the witness to answer that then.

THE COURT: In this case?

THE DEFENDANT BALL: I'm asking protocol.

THE COURT: I am sustaining the objection to protocol, but you can ask what he would do if faced with the kind of injuries that he was faced with in this case.

Q Okay. You can answer both.

THE DEFENDANT BALL: Is that all right?

THE COURT: No, you can ask the second one about this case.

A This case would be trauma type call so the first thing I would have to do is assess the patient's base line mental status so I would introduce myself to him, ask him if he would like my help because I would not force myself upon him. Then once I determine his mental status, then I would proceed from there.

Second thing would be most important to check for any head neck or spinal injury because from there would determine whether I could let this guy walk around or if I have to

immobilize his neck to prevent any paralysis, etcetera and see what mechanism of injury has occurred.

Then from there if none of those are present, he could still remain seated, and I would try to get vital signs, and then probably treat these injuries that are documented which are face and head injuries.

Q Okay. So just so that I am clear, Mr. Gonzalez, because I'm a little confused as to what you just said --

A Okay.

Q Let's say hypothetically that you arrive at a crime scene like this case particular one. You are saying to me that you would wait until the victim is inside the ambulance before you check as to his alertness, if he is out on the street, you would not check his alertness on the street, you would not check to see whether or not there was any hazards to you moving him on the street where you find him, you would wait until he get into the ambulance; is that correct?

A Negative. That would be done upon patient contact.

Q So, in other words, you come to this scene particularly, you would have done those assessments outside wherever you contacted that person; is that correct?

A That is correct.

Q So did you do that in this case?

A There is no actual documentation detailing that, but that's something that I could do in seconds time just observing

and seeing how the person is interacting. If he is conscious, awake and interactive, that shows a lot of stuff.

Q So for all purposes you do that assessment while the person was outside; is that correct?

A I would do that upon patient contact. I wouldn't know whether it was outside, inside, whether he was brought to my ambulance, I wouldn't be able to tell you that.

Q You wouldn't be able to tell me whether he --

A With certainty, no.

Q Okay. Now, you wouldn't be able to tell us whether or not he was brought to the ambulance, however, you did say that there is a protocol that you go through such as vital signs.

Now, when we go to the front sheet where it deals with vital signs, can you just show us the jury and every one of us here, can you explain to us how that would work, you know, in respect to what these vital signs are?

Like I notice in other words that there is different vital signs. There is the vital signs where you have 13 and two owe one such as like the pulse that you use when you have the finger on contact; is that correct?

A The 13 is the elapsed time from when we came on the scene, 13 would mean 13 minutes after 9:11 P.M. is when I attempted to get some type of vital sign, and the two owe one is actually a 20, the respirations are 20 which is normal

respiratory rights rate and the one is the pain scale that was described.

Q Okay. Interesting. So these numbers don't indicate you having taken any vital signs from the patient inside the ambulance; is that correct?

A Correct, I did not take normal vital signs because he was a refusal.

Q My point is if you had the victim inside the EMS truck whether he refused it or not, you would have taken the vital signs; is that correct?

A Not without his consent or his permission.

Q So you allow a person to go into the ambulance, but you don't treat him if they refuse all, is that what you are saying to me?

A It could be, it's a possibility.

Q No --

MR. SHORTT: Objection, that's the witness' answer.

THE DEFENDANT BALL: No, because he is using --

THE COURT: The answer stands. You can follow up.

Q Because you are saying what the problem is Mr. Gonzalez is that you see here --

THE COURT: No, no, don't make a speech. Ask questions.

Q You are not giving us an accurate answer.

THE COURT: No, no, no.

MR. SHORTT: Objection, Judge.

THE COURT: No, the jury will disregard that statement.

Mr. Ball.

Q Can you give us an accurate answer?

THE COURT: Sustained. Ask a question. Elicit information with your question.

THE DEFENDANT BALL: I apologize.

Q So because of the fact, Mr. Gonzalez, that there is no vital signs that you marked for the patient being treated, is it okay for me to assume that the patient was never inside of the ambulance?

MR. SHORTT: Objection.

THE COURT: I will allow that.

A It's not definitive. It doesn't indicate whether they were or not.

Q No, I apologize. I'm just assuming because we understand that you give accurate details in this report.

A Um-hum.

Q So in the case that it's not available, I'm asking you for me would it be all right for me to assume that the person was never inside the ambulance?

A I can't even answer that.

Q Okay. Can you answer this, Mr. Gonzalez: Is there

anywhere on this report that you can show me that it guarantees that the person was in the ambulance?

A A guarantee, anything definitive that they were inside the ambulance?

Q Yes, that the person was inside the ambulance, anything on this report that you can show us that indicates that he was definitely in there?

A No.

Q So you have me at a stand still. You're saying that this report is accurate, but you are not gonna allow me to assume that the person was not in the ambulance --

THE COURT: Sustained.

MR. SHORTT: Thank you, Judge.

Q You are not able to --

THE COURT: Sustained.

THE DEFENDANT BALL: I heard you, your Honor. Is it all right that I continue?

THE COURT: Ask a question.

Q Mr. Gonzalez, you never wrote or you cannot indicate here for where you can show that he was definitely in the ambulance; is that correct?

A I already said no.

Q Okay. So is it safe for me to assume because of that --

THE COURT: I'm going to sustain that. You are

not going to ask those kind of questions.

Q Mr. Gonzalez, let's say that you came to the crime scene, would you be able to indicate that you said you wouldn't -- there is no indication that the person was in the ambulance, we understand that. But let's say that the person did get in and was not treated, you know, he had injuries and decided to immediately get out, would that be indicated on this?

A In the commentary, yes.

Q Of course it would.

A And I did so.

Q You did what?

A I did so document that he had his friend present with him if you want me to read it.

Q Yeah, by all means.

(Defendant and counsel confer.)

THE DEFENDANT BALL: Can we offer this into evidence as G, please?

THE COURT: Mr. Gibbons?

MR. GIBBONS: No objection, your Honor.

THE COURT: Mr. Shortt?

MR. SHORTT: Without objection, your Honor.

THE COURT: Mark it Defendants' Exhibit G.

(Defendants' Exhibit G, two-page document, marked and received into evidence.)

THE COURT OFFICER: So marked in evidence.

Q You can continue, please, Mr. Gonzalez.

THE COURT: Continue what?

THE DEFENDANT BALL: Reading.

THE COURT: What do you want him to read?

THE DEFENDANT BALL: He said he was going to bring out something, I have no idea.

THE COURT: Do you want him to read the commentary portion?

Q Well, was there something in particular that you were trying to indicate that you said something about that would tell us that the person was in the ambulance?

A Right, yes. Well, you told me whether he was in the ambulance that it wouldn't be a refuse all, but it could be a refuse all whether he was in the ambulance or not, he could refuse.

Q Yeah, but now we already understand that. There is no indication that he was in it and you can't tell us that he wasn't so we are not going to continue to go onto that, okay?

A Okay.

THE COURT: That was a question?

THE DEFENDANT BALL: No.

Q The question is --

THE COURT: I told you I want nothing from you but questions.

THE DEFENDANT BALL: I'm getting to ready to ask

the questions.

THE COURT: That was after your speech. No speeches. You will have an opportunity to make a speech about what you think the evidence shows. Right now you are eliciting evidence, facts. Do it.

THE DEFENDANT BALL: Yes, sir.

Q Concerning the commentary it has here patient was robbed by a group of males, okay. You know, is that information accurate?

THE COURT: Sustained.

Q Did you write that?

A Yes.

Q What's the reason you wrote it?

A This must have been, like I said before, you find out what the mechanism of injury is, so if the police told me this is what happened or the patient told me this is what happened, then I could probably put allegedly in front of where I put assaulted by a group of males, but that is to me my mechanism of injury would indicate if there were weapons or what happened to him.

Q We are just asking you only, Mr. Gonzalez, as to what it says here, you see, and it says here not allegedly it says patient was robbed by group of males?

A Um-hum.

Q And that is the information you got either from the

police or from the patient; is that correct?

A Correct.

Q Okay. Now, it goes down, right, it talks about the injuries, and then it goes into how the crime took place. Then it says here to hospital, he has religious belief in my country we believe in God whatever happens, happens. Okay. You said that this is where it indicates about the friend, okay. So there was a friend obviously there who was trying to convince him; is that correct?

A Yes, in my efforts to get him to seek medical attention, I would use his friend, family, to try to convey him to seek medical attention.

Q So --

A And it says that we were unable to convince him, he was adamant even with the friend's help.

Q Right, so in other words what you are saying -- because now it appears to me that your recollection of that night is starting to come back to you?

A I recall --

THE WITNESS: If I may speak?

THE COURT: Sure.

A The only reason I could recall this patient is because of his demeanor and exactly what he said in quote was in my country -- he was Arabic and that -- he doesn't belong in that area ethnicity wise so that's a little different, but then

he says: In my country we believe in God whatever happens, happens. That was his adamant reason for refusal to go to the hospital, and I found that to be a little bit -- I had a little admiration towards that because usually people no matter how small something IS, they usually want to go seek medical attention, and I documented that because it's important to my refuse all, because if something happens to him later, say he had a brain bleed or he dies at home as a result of the injuries, I did all I could to get him to seek medical attention, and he was explained the risks, and he understood them and still continued to refuse.

Q Now, my point to you is this, Mr. Gonzalez, that you appear to have a very good recollection of what happened.

A Of this part, yes, because it's different. I do so many calls a day.

Q So you have a good recollection of this part but not maybe others?

A The other things are specific as to like what someone was wearing or where they were exactly standing I, can't remember.

Q But I would like to ask you about the friend and this ordeal. You said there was a friend present; is that correct?

A According to this, I tried to use a friend to convince him to go, that's all I know about the friend.

Q But I'm asking you specifically remember him having a

friend present at that time to help you convince him?

A That's what's documented there so I'm going by that.

Q So you have to say yes, there was a friend present?

A Correct.

THE COURT: No, he is saying that's what the documentation says.

Q So then that means we could assume there was a friend there; is that correct?

A Correct.

Q Okay.

Now, during this time, would that have been taking place outside or in the ambulance?

A Without certainty I can't say, it could be either or 50/50.

Q So the friend could have been inside the ambulance trying to convince him?

A I have no recollection.

Q Mr. Gonzalez, you know, you have been a lot of help to me, and you know, I would think that --

THE COURT: Is there a question coming?

Q You know, this report is virtually blank. Can you explain to us in the case that there was, you know, any kind of treatment, what would be the reason that it would be totally blank?

A The boxes I haven't marked are basically not marked

because there wasn't any reason to mark them so, yes, it doesn't indicate any treatment.

Q Okay. You know, thank you, Mr. Gonzalez. I think you have satisfied my -- very good.

THE COURT: Mr. Gibbons, any questions?

MR. GIBBONS: No questions.

THE COURT: Mr. Shortt?

MR. SHORTT: A few questions, Judge.

CROSS EXAMINATION

BY MR. SHORTT:

Q Mr. Gonzalez, Mr. Ball asked you a lot of hypotheticals about what is protocol, correct?

A Yes.

Q I'm asking specifically what do you remember about this incident?

A When reading over the paperwork you did let me read it and I did -- little by little, all I remember is the patient at the time. That's really all I could remember.

Q Do you recall where you were when you were speaking to him?

THE COURT: Do you mean in or out of the ambulance?

A I can't, with 100 percent certainty I can't. I would assume it was in the ambulance, that's what a vague memory would say, but I don't want to say with certainty unless I'm sure.

Q So you think it may have been in the ambulance?

THE DEFENDANT BALL: Asked and answered, your Honor. He just explained that.

THE COURT: This is cross-examination, I will allow it.

Q Where do you interview patients, the majority of your patients?

A For street calls usually inside the ambulance for privacy reasons.

Q What do you remember --

MR. SHORTT: Can I see People's Exhibit 5 in evidence?

(Handing.)

Q I will hold up a few photographs. I will show them to defense counsel and the defense and the jury. I'm asking you specifically about this person, looking at him, do you remember him?

A Yes.

Q Was that the person that you treated?

A Yes, that's the person referred to in my patient care report.

Q Do you recall seeing this injury?

A Now that I see the picture, I want to say I do, but I didn't until now.

(Handing.)

A Vaguely.

Q Do you recall cleaning any wounds on Mr. El Turkey?

A I don't recall doing so, but if that -- I would have, but maybe not because he was a refuse all so maybe not.

Q But your inclination if you saw something like that would have been to clean those wounds?

A At least, yes.

THE DEFENDANT BALL: Objection.

THE COURT: I will allow it.

Q Where would that have taken place?

A Inside the ambulance.

Q Do you recall these injuries?

A No.

Q I'm going to ask you a take a look at the comments you wrote. Mr. Ball selectively read some of it.

THE COURT: Sustained to that.

THE DEFENDANT BALL: Thank you.

Q Can you actually read the full comments that you wrote that day about Mr. El Turkey?

A The whole narrative?

Q Yes.

A From patient was?

Q Yes.

A Patient was robbed by a group of males unarmed punched left eye hematoma left cheek, tooth loose, pain mild

right parietal region has laceration which would be here, superficial and swelling while supine on ground held down thrusting head on floor. Negative L O C which is loss of consciousness, patient alert and oriented times three, Arabic, refuses medical attention transport to hospital. He states it is his religious belief and I wrote in my country we believe in God whatever happens , happens unquote. Advised risk of brain bleed, friend to witness RMA also couldn't convince him, refuse all signed to be left alone RMA.

Q Mr. Gonzalez, what do you remember about Mr. El Turkey's mental state that day?

A I think he was of strong character and probably a little bit upset.

Q Was he alert and aware to what was going on around him?

A Yeah, absolutely.

Q What do you mean by that?

A He did have a strong accent, that's probably why I put Arabic, but I was able to understand him. And say again, I'm sorry?

Q Sir, I will ask you, Mr. Ball asked you about the things that Mr. El Turkey signed on page 2?

A Oh --

Q What do those signatures indicate to you?

A Okay, from the front page when I first made contact

he is alert. The second page I demonstrated that he did show he had mental capacity to sign the legal document to refuse medical attention and that he did sign.

Q If he wasn't alert and aware to a situation, would you have allowed him to leave your care?

A No.

Q You mentioned something on page 1, what do you mean by page 1?

A Page 1 the first vitals box, the A checked off being alert that's one of the first things you check or look for to assess.

Q Do you recall him at any point having trouble communicating with you?

A No.

Q At any point did he black out in your presence to your recollection?

A No, that would have been a sure transport to the hospital.

Q So your recollection is aware of his surroundings?

A Correct.

Q He had no trouble perceiving things as you laid them out?

A Yes.

Q What exactly did you explain as to the consequence?

A The head injury could underline brain bleed

especially with his age, and this could be risk of death later on so that's what I explained to him, and he understood and signed.

Q Did he have any trouble understanding you?

A No.

Q If he did, would you have allowed him to leave your care?

A No, because we have to make sure the patient is explained the risk and that he acknowledges and accepts the risks, that's what he is signing a waiver for. So if he cannot accept and sign a refusal waiver, then he wouldn't be able to RMA.

Q After you met Mr. El Turkey, do you recall whether or not you had any blood on you?

A No.

Q Would there be any indication of that in the report?

A I wouldn't put it.

MR. SHORTT: Can we show him the FDNY SPRINT report? I believe Defendants' Exhibit F.

(Handing).

Q Mr. Gonzalez, after you left this call, first of all, how long were you dealing with Mr. El Turkey for?

A About -- it could be somewhere around 14 minutes or less.

Q What did you do after that call?

A I wouldn't know.

Q I will ask you to take a look at the SPRINT report for the FDNY. Is that the call report for this incidents?

A Yes.

Q On the second to last line ten nine eight, what does that indicate?

A I went available, so at 98 -- at 21:36 I went available, I transmitted my refuse all disposition and went available and the job is closed.

Q Had you been covered in blood would you have gone ten nine eight?

A No, we would have gone out of service.

Q Did that happen in this case?

A No.

MR. SHORTT: Nothing further, your Honor.

THE COURT: Mr. Ball?

THE DEFENDANT BALL: Yes, sir.

REDIRECT EXAMINATION

BY THE DEFENDANT BALL:

Q Mr. Gonzalez, you know, I'm not going to go back and forth with the issue --

THE COURT: No, you are not.

Q On the time, you know, it says you just said about ten nine eight, and you have give the disposition at 9:36; is that correct?

A Yes.

Q And you said that it was 14 minutes; is that correct?

A Of total patient contact time, yes.

Q Can you indicate to us because from what time to what time is the 14 minutes indicating?

A It would be from 21:21 hours, which is 9:21.

Q So from 9:21 is the time you first came in contact with the victim and at 9:36?

A I went available.

Q So for the first time that you came in contact with the victim was at 9:21; is that correct?

A Correct.

Q For sure?

A That's what the time --

Q No, I'm not asking you what time. Is that for sure according to what you know?

MR. SHORTT: Objection.

THE COURT: According to the report.

Q Yes, sir?

A If that's what the report says, that's what happened.

Q Thank you.

THE DEFENDANT BALL: No further questions, your Honor.

THE COURT: Thank you. Mr. Gonzalez, you may step down.

(Witness excused.)

THE COURT: Mr. Ball, anything else?

THE DEFENDANT BALL: I'm ready, to rest, your Honor.

THE COURT: The defendant rests?

THE DEFENDANT BALL: Yes.

THE COURT: All sides rest?

MR. GIBBONS: Yes.

MR. SHORTT: Yes.

THE COURT: Very good. We will take ten minutes. Take charge of the jury. Do not discuss the case amongst yourselves.

(Jurors exit the courtroom.)

THE COURT: Motions?

MR. GIBBONS: At this time I renew my application for trial order of dismissal based on the fact that the District Attorney has failed to prove a prima facie case based on the same reasons I gave earlier.

THE COURT: Mr. Shortt?

MR. SHORTT: Nothing has changed as the result of the defense case, I rely on the record.

THE COURT: The motion is denied. Mr. Ball?

THE DEFENDANT BALL: You know, I have a whole litany of reasons that I propose this case be dismissed at this time because, your Honor, I have shown a clear showing

that perjured testimony is being brought before the Court in the prosecution of me. Of the, what do you call, the EMS worker just testified that it was not until 21 minutes after nine that he first came in contact with the victim at the crime scene, your Honor, at 21 minutes after nine I was already in the precinct, your Honor. It's impossible for this to be right. I was in the precinct at 21 minutes after. If you look at the SPRINT report which is in evidence, I was arrested at six minutes after nine. At 21 minutes after, I was already in the precinct, and I demand, your Honor, that I be released immediately because I have shown beyond a reasonable doubt, your Honor, that this Court has been put a -- a blanket has been put on this Court and a fraud, your Honor. I ask you with your judicial powers, you know, you are not a stupid man, your Honor, you have been in this business a long time, you cannot stand there and tell me that I have not proven that.

THE COURT: Mr. Shortt?

MR. SHORTT: Rely on the record, your Honor.

THE COURT: All right. Motion denied. I have verdict sheets for Mr. Ball.

THE DEFENDANT BALL: I don't want verdict sheets because we are not going to use verdict sheets in this case.

THE COURT: Yes, we are.

THE DEFENDANT BALL: Your Honor, I don't want to use verdict sheets. I would rather the jury to go and deliberate and come back with a vote.

THE COURT: That's what they are going to do.

THE DEFENDANT BALL: They don't do that with a verdict sheet.

THE COURT: They do in my courtroom. Do you want to review the verdict sheets?

MR. SHORTT: Yes, your Honor.

MS. POVMAN: It doesn't have a degree.

THE COURT: We will fix that.

THE COURT CLERK: Is it on both?

MS POVMAN: Yes.

MR. SHORTT: On all of them it says in the degree.

THE DEFENDANT BALL: We object to that.

THE COURT: All right. We will fix it.

MR. SHORTT: I'm going to step out for a moment to use the restroom.

THE COURT: Okay.

(Whereupon, a brief recess was taken.)

THE COURT CLERK: Both attorneys and DA have signed for the defendant Brooks, and the DA has signed Mr. Ball's verdict sheet. Mr. Ball will not sign.

THE COURT: For the record, Mr. Ball, you are objecting to the use of a verdict sheet altogether?

THE DEFENDANT BALL: Yes, sir.

THE COURT: Noted and overruled. Ready to go?

MR. SHORTT: Judge, I think we have to pro forma have a charge conference.

THE COURT: We have had two.

MR. SHORTT: At the close of the defense case.

THE DEFENDANT BALL: Objection, your Honor. I think we have held off this trial long enough.

THE COURT: Yes, we have had two charge conferences.

MR. SHORTT: Both Mr. Ball and Mr. Gibbons are fine with this?

MR. GIBBONS: No problem.

THE COURT: All right. Bring in the jury.

(Whereupon, there was a brief pause in the proceedings.)

THE COURT OFFICER: Jurors entering.

(Sworn jury enters the courtroom.)

THE COURT CLERK: Do all sides stipulate to the presence and proper seating of the jury?

MR. SHORTT: Yes.

MR. GIBBONS: So stipulated.

THE COURT CLERK: Mr. Ball?

THE DEFENDANT BALL: Yes.

THE COURT CLERK: Thank you.

THE COURT: Ladies and gentlemen, we are now at the stage where the attorneys will make their closing arguments to you. I remind you that what is said in these closing arguments is not evidence. You have heard all of the evidence that you will hear in this case. The summations or closing statements do provide the attorneys an opportunity to review the evidence presented and submit for your consideration the facts, the inferences and the conclusions which they contend may be properly drawn from the evidence that has been presented. For closing statements we go in reverse order so we will begin with Mr. Ball.

Mr. Ball, you may proceed.

THE DEFENDANT BALL: Good morning, ladies and gentlemen of the jury. How is everyone doing today? Fine? I don't hear you guys. Everybody is fine? Okay. Good.

You know, earlier during this trial when it first started, I don't know if you guys remember, but I made a statement and the statement was that I'm going to show you even though that it's not my job to show you that I was innocent, and that I would show you that it was impossible for me to have committed this crime. You know, I'm glad that I get a chance to go first today because you guys just got an opportunity to hear the EMS worker tell you that he

first came in contact with the defendant at 9:21.

MR. SHORTT: Objection, your Honor.

THE DEFENDANT BALL: The victim, I apologize. And that his last contact was at 9:36, and that all of this stuff that you heard today as far as interacting with him took place within 14 minutes between the time of 9:21 and 9:36. Okay. Now, I have to say to you, ladies and gentlemen, that early when this first incident whole trial started, which you can go back to the minutes and you can check it out, the officers testified that at 9:13 was the call time from central that indicated that both me and Mr. Brooks were already arrested and at the precinct. This was considered a check time -- arrest time. An arrest time that was established from when everything was wrapped up and both the defendants were arrested and at the precinct.

Now, in the case that the victim came in contact with the EMS worker at 9:21 through 9:36 that would mean that I missed the time of being available to be identified while he was in the ambulance even though there is no indication that he was ever in the ambulance, and I think that I would like for you guys to keep that in mind that it was impossible for me to have underwent the identification at that time if I was already at the precinct, it would be impossible.

I will now go on and read my opening statement --

closing, I apologize.

Ladies and gentlemen of the jury, before I start my actual closing, this is just something I wanted to read. I would like to say thank you to each and every one of you as well as reflect on one very important issue which is the night of July 3, 2012. Mr. El Turkey was a target of an assault whether by two guys or a group of guys, Mr. El Turkey was targeted as an easy mark and was, I'm sure, the victim of a brutal attack. My heart goes out to him and everyone who is or has been targets of petty crimes, black on black violence or violence of any kind.

Ladies and gentlemen, I repeat what Judge Schwartz brought up earlier in the trial. He says he brought to our attention that during the outset of the trial, out of many thousands of police in New York, you will find many that are good, however, you will find some that are not so good.

That night, ladies and gentlemen, a lot of things went down some of which may never be uncovered. However, on July 3, 2012, being targeted -- excuse me, on July 3 of 2012, Mr. El Turkey was not the only victim being targeted. I too was being targeted as an easy mark by Officer Pampena who recognized me as having a substance abuse problem, someone who was weak and vulnerable, a crack head, who no one would ever believe over a cop, a person who more than likely is uneducated and unable to fend for himself within

our blind system of justice. Simply put: Who would ever care?

Well, I did, ladies and gentlemen of the jury, I did, because contrary to popular belief, people with substance abuse problems are still human beings, and though many of them, and I will say again, though many of them are bad and steal to support their habit, there are some that do not. I am 50 years old and since 2005 have been receiving SSI, and I have a direct deposit account at the same PLS check cashing place mentioned on this case.

MR. SHORTT: Objection, your Honor. He is testifying. If wanted to testify --

THE COURT: The objection is sustained.

Mr. Ball, limit your summation to what facts have been brought out at this trial as evidence.

THE DEFENDANT BALL: Ladies and gentlemen of the jury, the greatest dangers to liberty lurk in insidious encroachment by men of zeal well-meaning but without understanding. This was quoted by Justice Louis Brandeis who lived from 1856 to 1941. And it is established that the United States wins its points whenever justice is done as citizens in this courts however the pattern is unmistakable over and over again the government has been caught in false representations and otherwise failing to perform its duties under the constitution and the rules.

Over and over again when caught the government has claimed that it has simply made good faith mistakes. Repeated instances of deliberate and flagrant misconduct justifies dismissal of this case. Court decisions emphasize the unifying premise in all of the supervisory power cases that although the doctrine vindicates the defendant's rights in individual cases it is designed to invoke primarily to preserve the integrity of the judicial system. The court has particularly stressed the need to use supervisory powers to especially prevent courts to become accomplices to such misconduct. It is simply wrong. This type of conduct cannot and must not be condoned. In fact it must be strongly condemned. Prosecutors play a special role in our system of justice and by necessity courts and defendants rely on the government fulfilling this responsibility with integrity.

Officer Pampena gave a fictitious account of the events surrounding this case from the imaginary arrest of me defendant Ball running away from the crime scene. At no time did he consult with the victim inside the EMS truck to identify the defendant Ball as part of an investigation as stated by Officer Pampena because the victim refused all and any treatment from the EMS technician on that night of July 3, 2012.

The government's obligation to govern impartially

is as compelling its obligation to govern at all and interest therefore in criminal prosecution is not that it shall win a case, but that it shall see justice done.

Sadly that did not happen here in this case the court and the public can have no confidence in the integrity of this proceeding because it can have no confidence in the integrity of the government's conduct in this case. The case should be dismissed. I call to account those whose power has been vested that is you, ladies and gentlemen of the jury. The government has an affirmative duty to disclose evidence that may be the tip of the iceberg of other misconduct even if the government has not investigated whether or not that is the case. Government has an affirmative duty to disclose mere indications of improper conduct by witnesses, government personnel so as to enable defense counsel to undertake the inquiry which the government deliberately avoided.

In the Boston Globe on April 9 of 2009, your job as Assistant District Attorney is not to convict people, said Attorney General Holder. Your job is to do justice, your job is in every case, every decision that you make to do the right thing, and anybody who asks you to do something other than that, is to be ignored. Any policy that is in issue with that is to be questioned and brought to my attention and I mean that, emphasis added.

The American Bar Association, ladies and gentlemen of the jury, has standards regarding the prosecution's function and more often than any other professional standards are -- and honored in their breach rather than in their observance. Moreover, it is rare that any judicial disciplinary body attempts to enforce the violations that they might commit. The standards are more illustrative in the ideal of barometer of justice in how far the prosecutors, Prosecutor Shortt's demeanor is from that ideally. It is not reassuring that the standards asserted that the prosecutor should not knowingly offer false evidence or the false document tangible or testimony of witnesses. The National District Attorney's Association very first standards states that it is the primary responsibility of the prosecutor to see that justice is done. Another standard demands that whenever the prosecution has knowledge of misconduct or incompetency in another entity of prosecution, it is his responsibility to reports that information to supervisory authorities and take such actions necessary to sanction the misconduct and remedy the incompetence. In most cases the government falls its obligation to turn evidence over or they commit perjury concerning particular portions of events.

Today we have before us of a case of a magnitude which shows total disregard for the judicial system as to

qualify as criminal. When District Attorney short and Officer Pampena in their seal to prosecute the defendants Ball and Brooks brought a presentment before the Grand Jury proceeding that was beyond totally flawed. However, Pampena testified to a transaction, a matter or thing of which he had no connection and his testimony was not real and/or of some substantiality, however, merely trifling and imaginary and at best speculative.

Ladies and gentlemen of the jury, to hold otherwise would to allow indeed encourage witnesses to invent encounters with real people in the hope that the mention of actual objects and real persons would shield them from prosecution. Ladies and gentlemen of the jury, District Attorney Shortt has checked his ethical responsibilities at the door.

MR. SHORTT: Objection, Judge.

THE DEFENDANT BALL: This trial has revealed itself as a dark bloom, a terrible flower.

THE COURT: Sustained.

THE DEFENDANT BALL: The root cause of the dark bloom is the case has been fundamentally poorly prosecuted from the outset. Mr. Shortt, as an officer of the court, set out to prosecutes Mr. Brooks and I on perjured testimony and presented witnesses trained to say what he wanted them to say. The purpose of the trial was to get

factual information to you, ladies and gentlemen of the jury, and Mr. Shortt has been playing games. It is a touch stone of our criminal justice system that a prosecutor's interest in a particular case is not necessarily to win but to do justice. It is the sworn duty of the prosecutor to assure that the defendants have a fair and impartial trial.

Ladies and gentlemen of the jury, I know that it is not my responsibility to prove my innocence. However, my right sense of justice obligates me to give you all a clear showing as to it would be impossible the words I used at the beginning of this trial for the District Attorney to prove a lie. A lie, ladies and gentlemen, let alone that I Raymond Ball was the person that committed this crime beyond a reasonable doubt. Let me please remind you all. I said, ladies and gentlemen, I will show you it would be impossible for the District Attorney to prove that I was the man who attacked Mr. El Turkey or that Officer Pampena arrested me running away from the crime scene and being in possession of any of his property.

I never said, ladies and gentlemen, I will prove that I did not have a substance abuse problem because I would have been lying, and the evidence that you have in front of you would qualify as enough evidence to prove beyond a reasonable doubt that I smoke crack. A picture is worth a thousand words, however, that is not what I am here

on trial for today. And my being a certain way does not make me guilty of this heinous crime.

I have been totally straight with you all because I voted for you all because a part of this panel -- excuse me. I have been totally straight with you all because I picked and I voted for you all to be a part of this panel to decide my fate and my confidence in each and every one of you and your ability to uncover the truth and to stand by it. Not once did I allow your differences in color, in ethnicity or preference or anything else to stop me from giving you all the benefit of the doubt as being a good person. I beg you all, ladies and gentlemen of the jury, to give me the benefit of the doubt as being a good person.

As to my guilt or innocence, I am satisfied that I have lived up to my showing you, the jurors, it is impossible for Officer Pampena to do what he said by the facts of the victim's testimony as well as the testimony of Officer Lanning, by the EMS report and radio run or the EMS time of arrival.

Because Officer Pampena is the one who was my arresting officer, it is important that we take a good look at his testimony. Officer Lanning testified that he was the first officer to arrive at the crime scene within seconds after 9:00 where he met the victim on the street who pointed out Mr. Brooks, and Officer Lanning testified

that Officer Pampena was at the crime scene that he saw him there, and that is how Pampena was able to fill out Mr. Brooks' felony report. Quote: He had to be there on scene to fill out the report.

Officer Lanning made it very clear that it took several minutes between the time he arrived at the crime scene and when Mr. Brooks was transported away and then quote: I stayed at the crime scene for another 15 minutes. Mr. El Turkey, the victim himself, testified that there were one undercover patrol car and two regular cars at the crime scene and that after Mr. Brooks was taken away, he was about to be questioned by one undercover officer who told him that they caught the guy with his stuff, and they had brought him a phone that was not his, a Blackberry, all of this happened while outside at the crime scene. Quote: And then they brought the guy, he was far away, he had my stuff. The police told me it must have been him. If the police say it, you understand.

I asked Mr. El Turkey several times did you conduct the showup, the person when you were outside, yes was his answer, emphatically yes. Pampena testified that he arrested me on 105 Street and 32 Avenue and brought me back to the crime scene within two minutes, ladies and gentlemen of the jury, two minutes.

One, when Pampena arrived at the crime scene, no

one was there, no other officers. Impossible. Lanning said I stuck around for another 15 minutes.

Two, that when Pampena arrived at the crime scene within two minutes, Mr. El Turkey was already inside the ambulance being treated. Impossible. Because the time EMS arrival which we now have available, 9:21, ladies and gentlemen, through 9:36 is impossible. And Mr. El Turkey testified that it was not until later that he got into the ambulance for 15 minutes of being treated at which time I turned my head and closed my eyes while they cleaned off the blood.

Three, Officer Pampena also testified that two minutes after returning to the crime scene he conducted a showup of me to Mr. El Turkey while he was inside the EMS truck. Impossible because the EMS truck was not there until 9:21, and the testimony given by the victim, Mr. El Turkey, he was outside when the police bought the guy who was far, far away for a showup. I asked Mr. El Turkey several times was you inside or outside when you did the showup. Each time with certainty he gave the same answer, I was outside.

Four, Officer Pampena testified that he recovered an iPhone only, an iPhone only from me. Officer Pampena also testified that he never gave the victim a Blackberry. Impossible because Mr. El Turkey made it very clear that he

was given a Blackberry phone that did not belong to him first, and then he saw the officer leave off and come back with the phone that turned out to be his the second time. Did you see where he got it from, I asked him. From out of the sewer grate was his response.

Five, Officer Pampena testified that he took the pictures while Mr. El Turkey was in the ambulance. Impossible because in the upper right happened corner of the picture you can see the lighted window of someone's apartment.

Six, Officer Pampena testified that Mr. El Turkey stopped in the middle of being treated inside of the EMS truck and got out of the EMS truck because of his religion. Impossible because Mr. El Turkey testified that he underwent treatment inside the EMS truck for 15 minutes. He never mentioned religion which I'm sure was the same religion he had before he got into the ambulance. That he found a religion in the 15 minutes of being treated inside the EMS truck, a religious that prohibits being treated borders, ladies and gentlemen on impossible. The blank EMS report all of this treatment is being done to the victim, and the EMS report is blank and the EMS workers never wrote anything down. Impossible, ladies and gentlemen, of the jury. Officer Lanning of eight years of service arrived at a knife point robbery where the victim was seriously

injured and never wrote anything down nor provided any help, medical assistance or treatment for Mr. El Turkey. Impossible because our better judgments tell us it is not acceptable behavior from any officer of any branch of civil service to do such a thing.

Nine, Officer Pampena, ten years of service, arrived at a crime scene where a man stops and voluntarily gives himself to the police having a phone he got from a guy on 105 Street recovered from me, Mr. El Turkey's phone and money, took me back to Northern Boulevard for a showup where Mr. El Turkey was inside the EMS truck being treated where Pampena took pictures and returned property to me -- to Mr. El Turkey and never wrote anything down. Impossible because we have to be downright stupid to believe such a story.

And last but not least, the photographs put into evidence by District Attorney Shortt of the money, phone, victim's injuries, etcetera, are of no substantiality at all and to consider it as facts to convict a person of committing a crime where there has been -- there has not been established a connection, it is indeed impossible because such evidence is not legally sufficient when corroboration that would be required as a matter of law to sustain a conviction for such an offense is absent.

MR. SHORTT: Objection, Judge, Mr. Ball is quoting

law.

THE COURT: I will allow it.

THE DEFENDANT BALL: Competent -- thank you, your Honor.

Competent and admissible evidence before you provides beyond a reasonable doubt that such person committed such offense, emphasis added, ladies and gentlemen, on the word competent and reliable. Has the evidence before you guys that was presented along with the facts shown my guilt? Has it been competent and reliable, the information obtained thus far?

Mr. El Turkey, who knew his assailant over a long period of time who he seen several times a day was not able to say it was I who he described as the perpetrator. His description, ladies and gentlemen was a male black, gay, who sometimes wear women's clothes. I will not respond to that.

Despite my chance or my change over a period of time, Mr. El Turkey's last words on the stand was he had hair like yours and he was big like you are. Ladies and gentlemen of the jury, you have my picture available. I weighed only 148 pounds the night I was arrested. Do you believe that each witness showed you that they were competent and reliable? That question, ladies and gentlemen, is what needs to be answered along with the

facts if any exists.

You know, when I first started this trial, I felt upset for being pegged as an accomplice to a crime I didn't commit. I refused to give into the forces that be. However, today my anger is toward the courts for admitting to make you for attempting -- excuse me, to make you the jurors accomplices in a crime to convict a man of a crime he didn't commit.

Ladies and gentlemen of the jury, to me, freedom is not being afraid to die for the truth or justice, and all we have to do is look back at the history of our beautiful America or our ancestors or respective country men and women. And always remember, please, united we stand divided we fall, and today I stand on the square of truth, and I invite all who desire freedom and justice for all to stand with me. Thank you very much.

THE COURT: Thank you, Mr. Ball.

Mr. Gibbons?

MR. GIBBONS: Your Honor, before I start, could I have a few of the exhibits, please? I would like People's Exhibit 1 and 4 and Defendants' Exhibit A1 and A2. Thank you.

(Handing.)

MR. GIBBONS: May I, your Honor?

THE COURT: You may.

MR. GIBBONS: May it please the Court, Assistant District Attorney Shortt, Miss Povman, Mr. Ball, ladies and gentlemen of the jury: On behalf of my client, Elijah Brooks, I would like to thank you for taking your time and giving attention to this very important task that's been assigned to you. I don't mean to insult your intelligence as I'm sure it's clear as it is to me, but I have a job to do and I can assume nothing. Not only is your task an important one, it is oftentimes a difficult one as well. Standing in judgment, making a decision that will impact human lives.

I want to make that easier for you by giving you reasonable doubts that you will need where you will hardly have a choice but to find Mr. Brooks not guilty. All you need is one reasonable doubt, but I'm going to provide a laundry list of reasonable doubts which I submit is all supported by the evidence presented by the District Attorney's office.

Now, this is my only opportunity to address you. Mr. Shortt has the privilege of going last with the summations so I will ask for your help. The after I'm done and sit done and Mr. Ball gets up --

THE COURT: Mr. Shortt.

MR. GIBBONS: I'm sorry. Mr. Shortt gets up, a very seasoned attorney, he may raise questions about what I

brought up, and I want you to think to yourselves what would Mr. Gibbons say to that. Mr. El Turkey could not identify Mr. Brooks in court despite given two attempts and, yes, time could have been a factor but so could the fact that the wrong man was initially accused. The acting in concert charge there was absolutely no proof given, no proof given apart from the word of Mr. El Turkey that these two men had anything to do with each other on that night or any other night. Do not presume just because they were both arrested that night and sat here together through this trial that they know each other, are connected in any way, shape or form. There has been no proof of this beyond Mr. El Turkey's word. Nothing has connected them. Remember they were not arrested together. Mr. Brooks was arrested either walking towards the crime scene or through the crime scene or at the crime scene, and Mr. Ball was arrested about a block and a half to two blocks away running from the crime scene.

There is a saying that there is no honor among thieves, but if these two were acting together, there certainly did not seem to be any rushing on Mr. Brooks' part to meet up and split the proceeds. He was found casually chatting with another individual at the crime scene. When Mr. Brooks was pointed out, he doesn't match the description apart from being a male black, that's it.

Mr. El Turkey said that the heavy guy was wearing a red shirt and black pants with short black hair. You can have that testimony read back to you, red shirt, black pants, short black hair. The arrest photos of my client is in evidence as Defendants' Exhibit C. It shows him wearing a white shirt, not a red shirt, shorts admittedly long shorts, but short pants with completely shaved head. The officers testified no opportunity to get a razor blade in the prison in the precinct and shave his head, no opportunity to change his clothes. White shirt shorts, shaved head.

Detective Lanning also told you that Mr. Brooks had a red hat on and even laughed at the memory of it. There was no mention of any hat anywhere in any of the descriptions given by Mr. El Turkey. The arrest report prepared by Police Officer Pampena also lists a red hat and it lists unusual teeth. You all saw the teeth, and Officer Pampena testified to them, and again no mention of that anywhere in the description.

Now, if you had never seen me before, and I'm suddenly on top of you about two feet in front of you, and I'm screaming I will kill you, motherfucker, then you see me again maybe two minutes later and I snarl the same threat, I will kill you, motherfucker, wouldn't my missing the teeth be the kind of descriptor that jumps out?

Wouldn't that be something you see and remember this guy had no teeth? They were even described by Police Officer Pampena as unusual, as unusual. Isn't that what you look for in a good description, what was unusual, what set someone apart from the ordinary, from the vague description, male black? Nowhere in any of the descriptions of this heavy guy were his unusual teeth mentioned by Mr. El Turkey.

Look at the arrest photo again. It shows my client with a goatee, again no mention of any facial hair anywhere in any description by Mr. El Turkey. He certainly didn't grow that in the couple of hours between his arrest and the arrest photo. When he is pointed out to Detective Lanning, he testified there was no blood on his white shirt, no injuries to his hands which you would expect after numerous violent punches to a hard bony skull and face, no injuries to his hands. This is telling he was not disheveled, he wasn't disheveled.

You remember Mr. El Turkey testified from the time of the assault to the time he saw the heavy assailant again was maybe 90 seconds, then the time from the second phone call saying he is back, he is back, and then pointing Mr. Brooks out as the heavy guy was maybe 15 seconds, so a total of less than two minutes. Let's say it took a little longer, maybe Mr. El Turkey's adrenaline is pumping. It

happened faster maybe two or three or four or five minutes.

According to Mr. El Turkey, the heavy guy proceeded southbound on 105 Street towards 34 Avenue. So you don't see all of it, but he is going down 105 Street southbound and he testifies about 90 seconds later while he is in the deli, he sees the heavy guy coming from his left in the area of 104 Street, so presumably he ran down 105 where he saw him go last, along 34 Avenue which you can't see here, back up 104 Street and back up to the deli where he encountered him again. Then after he sees him he goes back around 105 Street where he is pointed out within 15 seconds he testified. That would mean if Mr. Brooks is the actual perpetrator who would have just committed a violent, physically demanding assault run about three and a half city blocks around a corner, confront Mr. El Turkey again, continue around the corner another half a block to the point of the assault, and he is not disheveled? Shirt not pulled out not sweating like a pig on a summer night in New York City? Common sense, ladies and gentlemen, tells you they got the wrong guy, but there is more.

Remember we talked about the opportunity to observe, and I submit that Mr. El Turkey's opportunity to observe was hindered by the quickness and violence of the assault itself. He testified that he never fully turned around to view the heavy guy until just before the assault

which was sudden and a violent push that propelled Mr. El Turkey backwards and to the ground. Once he is on the ground, he testifies that the heavy guy is on top of him, and he is fighting back, the heavy finally grabs his head and slams it to the pavement twice and then starts punching him violently in the head and face.

I submit when a person is pushed over violently, they instinctually close their eyes at the impact, and when they are falling they kind of close their eyes and hit the ground. When you are fighting unless you are trained and punches being rained on you, you are instinctually closing your eyes, certainly when his head is bashed to the pavement and punched in the face certainly closing his eyes.

Then after this violent beating, I submit he must have been stunned, maybe perception fuzzy, eye swelling and damaged his head bleeding from having been bashed to the ground repeatedly, how well could he have actually seen this heavy guy? Now the second encounter, I submit it was the same guy and why? Because the language that Mr. El Turkey testified this heavy guy used was exactly the same unless there was an echo, it was the same guy who said the same words I will kill you motherfucker. He remembered those words, that's why it must have been the same heavy guy with the red shirt, black pants and short hair.

Again, nothing about missing teeth, nothing about a goatee, nothing about a red hat from Mr. El Turkey. So Mr. El Turkey quickly closes the door to the deli after the second encounter and tells his friend to call the police again.

Now, you have to look at the photos of the deli. Mr. El Turkey testified if you walk into the door of the deli the counter where his friend was, was to the left. If you look at the photographs here, the windows are obscured. If you look at the photograph here, there is an ice machine and the window there is obscured. I submit when he is scared and runs in immediately to tell his friend that he is back, that he can't tell, he wouldn't have been able to tell where the person fled. He was not out looking. He was talking to his friend with his vision obscured so is it possible that this heavy guy went down 105 Street? Possible that he went any other place? That's also possible.

I submit to you that he couldn't have seen it, probably mistaken, but even if he was correct, that guy that went down 105 Street, this heavy guy was long gone before the cops showed up, and Mr. El Turkey got in that car.

Now, when they got in the car and they went up the block, Mr. Brooks is the first black guy. He says -- the

testimony is he is standing next to a tall, skinny other black guy, and if Mr. El Turkey remembers this person is heavy, that would certainly set one guy apart next to a skin guy. Mr. Brooks is a big guy.

So now Mr. Brooks is arrested solely on the word of Mr. El Turkey, that I submit as likeable a guy as Mr. El Turkey was, his word was unreliable. Detective Lanning was of no help in ascertaining the truth either. He relied solely on Mr. El Turkey's point out. Now, in his defense one of the three male blacks described was said to have been wearing a white shirt and black shorts. Mr. Brooks -- I'm sorry, white shirt and black pants. Mr. Brooks had on white shirt and black shorts close enough but nothing else matched, then you heard another male black who matched the description of white shirt and black pants was also arrested almost simultaneously running away from the crime scene found with all of Mr. El Turkey's stuff.

We later learned that Mr. El Turkey said the guy was wearing a red shirt, black pants, now they had two guys wearing a white shirt, one had jeans and the proceeds, running away from the screen, disheveled making incriminating statements, and the other Mr. Brooks had shorts, no proceeds, red hat, goatee, shaved head, missing teeth not disheveled just standing at or walking through the crime scene.

Knowing this new information, is anything done to further investigate this crime? No, nothing is done. Are the local businesses asked about videotapes? No. Lanning testified this is a commercial strip, there is a check cashing a place that appears to have been the catalyst for all of this, there is a deli on the corner, no one interviewed, any workers or anyone asked if there was video surveillance. The guy standing next to Mr. Brooks not interviewed, he was not asked any questions about how long they were standing there, whether they were talking or walking, where they came from, nothing, not one shred of information about him is taken down so he can be tracked down later and interviewed.

I submit that even Mr. Brook's initial response to Detective Lanning is telling of his innocence. While Mr. Ball blurts out he bought the phone on the boulevard immediately and unprompted when Mr. Brooks is rushed by the cops, guns drawn, in order to lie down on a fill any New York City sidewalk, his response is go fuck yourself. I submit that's a perfectly reasonable response to being unjustly and incorrectly accused of a crime.

How do you think that request to get on the ground was made? Do you think that it was a polite softly spoken request to please lie down on the ground? Or was it a threatening command by two plainclothes officers with guns

drawn, confronting what they believe was a knife-wielding robber? Something along the lines of: Get on the fucking ground. I don't think I would have the nerve to respond the way Mr. Brooks did, but you can certainly understand his indignation at the violent intrusion, accusation and command to lie on the sidewalk, especially if you are just standing there minding your own business.

So, common sense, ladies and gentlemen. Reasonable doubt, ladies and gentlemen. Mr. Brooks arrested and charged solely on the word of Mr. El Turkey which was unreliable. Opportunity to observe the heavy guy, very limited. Nothing connecting Mr. Ball and Mr. Brooks. The description doesn't match. No blood or damage to his hands. Not fleeing the scene, not disheveled in any way, no proceeds, no investigative police work done, and Mr. Brooks was not identified by Mr. El Turkey in this court despite being given two attempts.

July 3, 2012 to January 29, 2015, over two and a half years, 941 days Mr. Brooks has been fighting these charges. Make today the last day he has to fight these charges, and come back with the only possible verdict the evidence has given you, which is not guilty of all charges.

Thank you.

THE COURT: Thank you, Mr. Gibbons. We will now hear from the Assistant District Attorney, Mr. Shortt. You

may proceed.

MR. SHORTT: Before I begin, may I have all of the exhibits, please?

(Handing.)

MR. SHORTT: Good morning, ladies and gentlemen. I want to confront one issue right up front. Mr. El Turkey, as he sat here in this courtroom, was unsure, was not able to tell you for sure that he remembered that these were the men as they sit here today are the ones that robbed him. If the law required that or if you needed that as jurors, I may as well just stop right now because there is nothing that I could do to change that, that was said. That happened. As I told you in the beginning of this case, that was not brought before the Grand Jury, that is not what the Grand Jury is based upon. It is the facts of July 3.

MR. GIBBONS: Objection.

THE COURT: Overruled.

MR. SHORTT: July 3, 2012 upon which you will render a verdict, the facts of that day that came out during the evidence at this trial that you will ultimately make a decision on. Mr. El Turkey, two and a half years later having never seen these men since was not able, was not sure enough to say that they are the ones that did it, but on that night, 20 minutes after the crime having just

seen them and had them just rob him was sure and he told you that night I was sure.

It's not in doubt in this case that Mr. El Turkey was robbed that night by two men acting together, acting together to throw him between two parked cars to beat him. This was Mr. El Turkey after these defendants were done with him, ladies and gentlemen, bleeding from the head after they rained below after below after below down upon him, literally ripping his wallet and cell phone from his pockets. These crimes happened. These are facts.

I want to talk to you about a few more of the facts of that night and what the evidence shows you what happened on that street that night when he was robbed and in the few minutes afterwards when these men were caught blocks from the scene wearing exactly what Mr. El Turkey said they would be wearing before the police ever got involved, and most importantly in the case of Mr. Ball carrying his cell phone and his money in his pockets.

At the beginning of the trial I told you that you would meet and get to know Tarek El Turkey, and I think over the course of the several hours that you watched him being questioned by me and by the defense you got a fairly accurate snapshot of who he is. He is the New York story, ladies and gentlemen. He came from somewhere less prosperous, less free, looking for the opportunity to live

in peace and work for a living, he does that six days a week, twelve hours a day doing the exact -- stereotypical New York job driving a cab on the New York City streets. His job is to be aware of his surroundings. We all see how sharp they are. Is he a little quirky? Yes, but again he is the typical New Yorker, ladies and gentlemen.

When we started this case, we told you that witnesses are one of three things, either lying, mistaken or telling the truth. Nobody here believes that Mr. El Turkey is lying. I submit to you, you should understand that too. That is not an option. Nothing in this case suggested that he had any ill will or ax to grind against these men before, and subsequently we all know where defendants sit in a courtroom. Mr. El Turkey knows, too. He watches Law and Order, 48 Hours, he knows where the defendants sit, the men he is accusing. He still said I'm not sure, under oath, I can't be sure and that's to his credit, ladies and gentlemen. This is a man that every moment when he was on the stand being questioned by me and cross examined by Mr. Gibbons and cross examined even by Mr. Ball strove to be accurate and honest. He sat there hunched over focused on every single question that was asked of him. He corrected not only me, but the defense, specifically Mr. Gibbons when Mr. Gibbons says isn't it true that you were asked this question and said that yes,

Mr. Gibbons, I said that. But then it took me and Mr. El Turkey to tell you I also explained myself for about 13 more sentences. Mr. El Turkey remembered that. He strove to be accurate in everything that he told you, ladies and gentlemen. Specifically he remembers, ladies and gentlemen, using the defense's own exhibit, the picture that night, no ice cooler was there, but it was a little to the left, they moved it a couple of weeks after that incident. He strove to be accurate every moment of his testimony, ladies and gentlemen, that is the man who Mr. El Turkey is.

When you were selected as jurors and during my opening statement, I reminded you constantly you do not change as people when you walk into this courtroom. The fact that you bear the titles of juror does not change anything about you, you were picked because of that. I submit nothing changed about Tarek El Turkey when he walked into this courtroom. That is evidence of who he was the night of July 3 2012, the man you met in this courtroom who strove to be honest and accurate is the man who was robbed that night. That was Tarek El Turkey that night, the same man who was on the witness stand who swore to tell the truth and do the best he could. Mr. El Turkey was not phased by the questioning, just like he was not phased that night.

With the calmness and coolness, he told me the next day I took a pair of pliers and ripped out my own tooth, I went to work the next day. I didn't feel that bad. He was subjected to cross-examination and thought nothing of it because he knew he was certain because he tried to be accurate. He had no problem telling you I don't know certain things. I don't know when the other police arrived. If I had my back turned, I don't know, how long I'm not sure.

But what he was sure about was the fact that the men he saw were wearing a white shirt and black pants, that the men he identified that night just minutes after the crime are the ones who did this. Mr. El Turkey you heard is not afraid to speak his mind. He has no shame about what happened that night or what his thoughts are about that night. We know he had no ax to grind against these men, but he sat here wanting to be clear and accurate about everything he told you.

Let's talk about the events of that night, ladies and gentlemen. We talked in jury selection about some the of the things you should consider in determining whether or not you think Mr. El Turkey will be accurate. You should consider where the crime happened. He told you for the past four years this intersection was home, this happened within sight of his house he told you. He had been to that

deli, ten, twelve times a day for the past four years to see his friends. This was not some dark alleyway. I showed you the lighting conditions that night. You could see every detail of what's going on, on that street corner in this picture, and Mr. El Turkey told you this is how well lit the street corner was that night. The officers told you every one of the lights that was on in this photograph was on that night. The street lights were on, the bar lights were on, the restaurant lights were on, the dancing club lights were on. We know that was not some dark alleyway. It was in front of his home where he was more comfortable and aware of his surroundings than anywhere else.

We know how close these defendants got to Mr. El Turkey that night. He said I saw a group of guys when I walked out and went down to the check cashing place. The choice of the location was theirs, ladies and gentlemen, not his. They chose to follow him down that well lit street, and they got closer than I am to you, close enough to reach out and touch him. You heard Mr. El Turkey tell you he grabbed me, he put both hands into my chest and shoved me between that car as I was facing him and then down on the ground I spent one to two minutes with the man I thought was going to kill me. Suppose probably, I'm sure he did close his eyes as the defense wants you to believe,

Mr. El Turkey told you under oath I was watching the man I thought was going to kill me, I was watching his face. Now, when you are watching the man who is about to kill you, ladies and gentlemen, I submit you are looking at his eyes, not deciding whether or not he has a pretty smile. You are watching and studying his face because it is the last thing that you will see. That's what Tarek told you. He saw the man that shoved him and pummeled blow after blow after blow upon him.

He told you that he saw Mr. Ball that night standing on the street corner where he had seen him multiple times before, had seen him begging for money. These were not friends, ladies and gentlemen. The fact that he does not remember him now is of no consequence I submit to you. These were not guys that played cards together, watched 48 hours together. This was the guy at the end of the street, he said I have seen him all, I do is throw him a buck or two to be rid of him so I don't have to look at him, but he still knew him.

Look at where Mr. El Turkey's attention was focused during the crime, ladies and gentlemen. I submit to you the same focus he showed here on the witness stand is the focus that he showed the men that he was going to kill him. He focused on exactly who was doing what. He never wavered in the fact that Mr. Brooks was the only one

that punched him, Mr. Brooks threw him to the ground Mr. Brooks is the one that slammed his head against the sidewalk. He never wavered in his focus that Mr. Ball was the one that ripped open my pockets and stole my cell phone and my wallet.

We talked about in jury selection when you are going through an event like that, when the adrenaline is flowing, when you are the victim of a crime or a car accident, the adrenaline heightens your awareness and perception -- glass of water?

JUROR: Yes, that probably would help. Thank you.

THE COURT: Sure.

(Whereupon, there was a brief pause in the proceedings.)

MR. SHORTT: Ladies and gentlemen, we talked about in jury selection those moments in your lives that you will never forget when the adrenaline is flowing when you are confronted with a life and death situation, you are aware, you are watching what's happening, things go in slow motion and for Tarek El Turkey I'm sure it was exactly the same as your own experiences. Think back to that when considering whether Mr. El Turkey had the ability to focus on those events just like you did when you had those experiences.

Look at Mr. El Turkey's ability to describe his attackers. He said black male wearing -- at least one of

them wearing white shirt and black pants. We know what the defendants were wearing that night, ladies and gentlemen. We know that Mr. Ball was wearing exactly that, a white shirt and black pants. We know what Mr. Brooks was wearing, Mr. Brooks was wearing a white shirt and black pants.

Now, Mr. Gibbons said, well, they are shorts. Ladies and gentlemen, if a man is pummeling you, following you on the street, ask yourselves are those shorts, short pants or shorts, does it really matter? No. That is consistent with exactly what Tarek El Turkey told you is what the person looked like that day.

The defense talked about the idea that there was a red shirt. Mr. El Turkey said that on the stand but you never once heard it in the 20 minutes. Two and a half years later for the first time Mr. El Turkey said maybe somebody was wearing red, there was a red shirt. Nowhere did you hear anywhere in this testimony that night, and let's remember what matters in this case is not the fact that he didn't remember here or what he remembered here or what we know happened that night, nowhere did you hear anywhere during any of the testimony in this case that Mr. El Turkey said that night anyone was wearing red.

Memories fade, memories can get mixed up. We know Mr. Brooks was wearing some sort of red. We know Mr. Ball

was wearing some sort of red but, ladies and gentlemen, what Mr. El Turkey did was say for sure that night because the call went out and before the police ever became involved Mr. El Turkey knew who attacked him and he knew what they were wearing: White shirts and black pants.

The defense told you that Mr. El Turkey's injuries probably stopped him from being able to see. We know that's not true. The EMS officer told you he was struck by how calm and composed Mr. El Turkey was. We know he was there within minutes of Mr. El Turkey suffering this assault, and he said that's him, that's the man I treated, I remember that. Without having seen this before, you saw the look of the EMS officer when he saw this photograph for the first time, yeah, now that you show that me that to me, yes, I remember those injuries, he was sure about that, and he was also sure that Mr. El Turkey was alert aware, understood all the questions, despite the fact that he was a foreigner and the medical terminology that EMS officer felt comfortable enough for his own protection to allow Mr. El Turkey to go home that night. He would not have let him go in the world of lawsuits where everybody sues the city for everything under sun, do you think if he was at all hesitant or confused, not able to perceive what was going on at that time, he would let him go? No, of course not. We know Mr. El Turkey that day had his faculties,

before, during and after the crime. The man that was here in this courtroom is the same man on that street that had his faculties, a man who strove to be accurate and honest.

I want to talk to you about after the crime what happened to both these defendants. Ladies and gentlemen, the 15 or 20 minutes after that crime are what is critical to this case. We know that Mr. Ball was caught just feet from the crime scene just minutes after the attack. Officer Lanning told you he pulled up to the scene --

MR. GIBBONS: Objection, your Honor, he said Ball.

THE COURT: Are you talking about Ball?

MR. SHORTT: Mr. Brooks, I apologize. Thank you, sorry. You called me Mr. Ball.

MR. GIBBONS: I apologize, too.

MR. SHORTT: That's okay.

Ladies and gentlemen, Officer Lanning told you he pulled up on the scene, and they drove just for a few feet down the street, you can see from here up the road to where Mr. Brooks was stopped. He was walking with another man. This is so, so important, ladies and gentlemen, to this case, ladies and gentlemen. Within minutes of the assault as Mr. El Turkey is still disheveled and bleeding he drove down this street and saw two men, he saw two men, one absolutely matching the description he gave, the other the officer said was unclear, kind of matching the description,

coming down the street. He didn't say those are the men that robbed me, he said that is the man that robbed me.

Officer Lanning jumped out of his car and drew his weapon and stopped both of them. You heard Officer Lanning said he stopped both men at gunpoint, and Mr. El Turkey said no, that man closer to me, closer to the street is not the one that did this. That's the man that did this, that's the one that fits the description, that's the man that rained blow after blow on my face and that slammed my head against the sidewalk. Mr. El Turkey, ladies and gentlemen, strove to be accurate and honest. Officer, that man did nothing wrong, let him go. That man is the one you should be arresting, and that is exactly what Officer Lanning did just feet from the crime scene within minutes of the assault.

Where he was going, ladies and gentlemen, I imagine he was going to get his cut because we know he didn't have the property, he never took it. At no point did Mr. El Turkey ever tell you anything else. The only person that ever put their hands on his property was Mr. Ball. We know that because the one that ended up with it, and where was Elijah Brooks heading? Up 105 Street, up towards Raymond Ball was heading in the same direction.

Ladies and gentlemen, Mr. El Turkey I told you at the beginning of this trial, Mr. El Turkey was picked for a

very specific reason. We all know there is a tale of two cities in this city, ladies and gentlemen, that some people just don't want to call or won't call the police. He was targeted because he had just gone to a check cashing place and he looked like the kind of guy that would not call the police. That is exactly what these defendants were counting on, but he did and just because those officers happened to be in that area, and they told you they were not out looking for a job, that night, the only reason was because they both called it a heavy job, they responded within minutes of that call and stopped these men.

Raymond Bail stuck around the crime scene I submit for that very reason, he did not think Mr. El Turkey was going to cause any trouble. That's why he had no problem threatening him the second time, I will kill you, motherfucker, once at the crime scene when he left him there bleeding and again when he passed him by the deli.

Mr. Gibbons was right when he said the man that went from this side to this side was the man that robbed Mr. El Turkey, then he went around the corner, and then he was stopped by Officer Lanning and Mr. El Turkey just within minutes of that event. That is entirely consist consistent with what Mr. El Turkey told you. We know that as it was going on as Mr. El Turkey was hopping in the car with Officer Lanning that he was identifying the defendant

Brooks.

Officer Pampena was up on Astoria Boulevard on his routine patrol. He told you that he came down 105 Street heading to the crime scene, and came upon a man fitting the description, male black with a white shirt and black pants, the defendant Raymond Ball. The defendant Raymond Ball running from exactly where Mr. El Turkey was waiting for the police arrive. Running exactly away from the crime scene. Still within just minutes within about five minutes of when Mr. El Turkey was still laying on the ground, we know where Raymond Ball was, running up 105 Street away from Northern Boulevard.

Mr. El Turkey told you where he got robbed, somewhere down here about mid-block on 105 Street south of Northern Boulevard. Officer Pampena told you where he recovered property and where he stopped the defendant preponderance Raymond Ball. Mr. El Turkey was robbed down this street, and then his wallet with the Social Security card was found here on the drain pipe on 105 Street and Northern Boulevard. He marked it that corner down here.

Then Mr. Ball is caught up here on 105 Street, literally a trail of bread crumbs from where Mr. El Turkey was robbed to where his property was found to where Mr. Ball was seen running up 105 Street only to run into Officer Pampena. Officer Pampena told you he stopped the

defendant and his first words were this: I bought this from a guy on Northern boulevard. Not I got this, not I stole or not I robbed this. I bought this from a man on Northern Boulevard. That's how big of a liar Officer Pampena is, he gave this guy an out he, gave him a legitimate excuse to have that phone, but we know that's not true, ladies and gentlemen. When you are in exclusive possession of something that was stolen five minutes before during a robbery, it's because, ladies and gentlemen, you are the one that stole it. That is the evidence against Raymond Ball. On that alone you should be able to convict him.

Ladies and gentlemen, it's not just that. We know for a fact that Officer Pampena brought the defendant back to the crime scene. Mr. El Turkey told you that. The ambulance was there, and after Mr. Brooks had already been arrested, there were officers there, there was an ambulance there, and Mr. Ball was there. Where exactly he was standing on the ambulance, in the ambulance, next to the ambulance I submit does not matters. We know Mr. El Turkey is not lying, ladies and gentlemen. He does not have that in him. He told you they brought the man that robbed me. And before anything else, before they showed him any phone, before they showed him his money, he said that's the man, Raymond Ball, even though he did not know his name, he is

the one who took my phone, who took my money.

We know exactly how much money Tarek El Turkey had on him that night, $250 to pay the rent. $260 taken out not ten minutes before from the cash machine at the check cashing place minus $10 for a pack of cigarettes and we know exactly what was in the pockets of Raymond Ball. Mr. El Turkey recognized this, and more importantly recognized his own cell phone that he had on him for weeks before, the cell phone that had pictures of him and his family. Mr. El Turkey's cell phone from the pockets of that man.

Ladies and gentlemen, there are inconsistencies in this case, and I told you there would be in the opening, I told you during jury selection. I ask you to consider each and every one of them, weigh them, but do not just throw your hands up. Ask yourselves were those the whole sum sort of grand conspiracy or the natural side effect of multiple people experiencing something that in all from the time that Mr. El Turkey was robbed to about through when everybody is leaving the scene, when the EMS worker what does not know anybody, Mr. Ball and Brooks were in the precinct, all of this took approximately 25 to 30 minutes.

You had multiple people who the officers told you they responded expecting to face an armed robbery. Mr. El Turkey you know what he had just been through, ask

yourselves is this some grand conspiracy? They are not John Dilinger and Al Capone? Mr. El Turkey and the officers and certainly the EMS had no ax to grind against them.

We talked about this during jury selection. Weigh them for what they are. Minor differences do not change the fact of who Mr. El Turkey is. He is the same man that strove to be accurate on the stand who strove to be honest. It does not change the fact that on that night five minutes after the robbery Raymond Ball was carrying without permission or authority the cell phone of a man who had just been robbed.

Ladies and gentlemen, the Court will instruct you that you must consider the charges of this case separately as to each defendant. We talked about this, ladies and gentlemen, that there is not just an identification of each and every defendant in this case. Consider the identifications in the light of all of the evidence. Use the evidence of one and understand and appreciate the evidence against the other.

We know that Tarek El Turkey got it right once. He picked out the man who had his cell phone who fit the description. I submit to you when we have that answer key. We know he got it right once he picked out the guy before even knowing it that's the guy that took my phone and lo

and behold, he got it right once, he got it right twice. He correctly identified Elijah Brooks as the man who beat him entirely consistent with everything he said that night and consistent with everything he said on the stand and consistent with all the physical evidence in this case.

Mr. Ball wants you to believe the only reason I was picked out someone told him he had the property on him. We know that's not in the character of Mr. El Turkey. He does not want an innocent man in jail. We know that because he let an innocent man go that night. He told Officer Lanning that's not the man that robbed me, let him go. They did not plant evidence on that guy, and they did not plant evidence on Raymond Ball. Mr. El Turkey got it right three times that night, ladies and gentlemen. The man walking with Elijah Brooks did nothing wrong and these men robbed me.

A lot of has been said about 911 reports, about vouchers, about EMS reports, there is a reason we don't bring in, ladies and gentlemen, we don't give you a stack of papers. I can give you this and ask you to go home and write a book report and come with back with a verdict. We don't do that. We bring in flesh and blood, living breathing witnesses to judge for yourself and judge what they told you. Judge the facts that they have established, ladies and gentlemen. What these are, the EMS reports, the

SPRINT reports which we know from the officers, ladies and gentlemen, more or less are approximations and based on the same human fallibility. There is no attempt to find some sort of mystery to draw your focus away from the facts, no mystery to be developed. Your job is to come up with a verdict based upon facts, not hypotheticals, not what ifs, what do you usually do, not well this could mean this or that. Focus in on the facts, the facts established by the witnesses called by the people based upon the evidence placed in front of you come back with a verdict that is fair and just, and when you do, ladies and gentlemen, you can do only one thing, hold the defendants accountable for what they did that night, find them guilty of the robbery of Tarek El Turkey for assaulting him, and in the case of Mr. Ball for possessing his stolen property and his phone, not based on any words of mine but based on the evidence in this case is what you should render your verdict on and that verdict must be guilty. Thank you.

THE COURT: Thank you, Mr. Shortt.

Members of the jury, I will now instruct you on the law. You are the judges of the facts, and you are responsible for deciding whether a defendant is guilty or not guilty. To render a verdict you must decide what the facts are and apply those facts to the law that I give to you. Do not speculate about matters of sentence or

punishment. If there is a verdict of guilty, it will be my responsibility to impose an appropriate sentence.

Now, throughout these proceedings the defendants are presumed to be innocent. Therefore, you must find the defendants not guilty, unless on the evidence presented in this trial, you conclude that the People have proven the defendants guilty beyond a reasonable doubt. Consider all the evidence presented whether by the People or by a defendant.

Remember, however, that even though the defendant -- the defendant Ball introduced evidence, the burden of proof remains on the People. The fact that the defendants did not testify is not a factor from which any inference unfavorable to either of them may be drawn. A defendant is not required to prove that he is not guilty. A defendant is not required to prove or disprove anything. It is the People who have the burden of proving beyond a reasonable doubt every element of the crimes charged.

If the People fail to satisfy their burden of proof, you must find the defendant not guilty, either defendant. If the People satisfy their burden of proof, you must find the defendant guilty.

Now, the law uses the term proof beyond a reasonable doubt to tell you how convincing the evidence of guilt must be to permit a verdict of guilty. In life there

are very few things in this world that we know with absolute certainty. Therefore, the law does not require the People to prove a defendant guilty beyond all possible doubt.

On the other hand, it is not sufficient to prove that a defendant is probably guilty.

In a criminal case, proof of guilt must be stronger than that, it must be beyond a reasonable doubt. A reasonable doubt is an honest doubt of the defendant's guilt for which a reason exists based upon the nature and quality of the evidence or lack of evidence in the case. It is an actual doubt, not an imaginary doubt. It is a doubt that a reasonable person acting in a matter of this importance would be likely to entertain because of the evidence or lack of evidence.

Proof of guilt beyond a reasonable doubt is proof that leaves you so firmly convinced of a defendant's guilt that you have no idea of the existence of any element of the crime. After carefully evaluating the evidence, each of you must decide whether or not that evidence convinces you beyond a reasonable doubt of a defendant's guilt. Your verdict must not rest upon baseless speculations, nor may it be influenced in any way by bias, prejudice, sympathy or by a desire to bring an end to your deliberations or to avoid an unpleasant duty. If you are not convinced beyond

a reasonable doubt that a defendant is guilty of a charged crime, you must find the defendant not guilty of that crime. If you are convinced beyond a reasonable doubt that a defendant is guilty of a charged crime, you must find the defendant guilty of that crime.

As judges of the facts, you must decide whether a witness told the truth and was accurate or testified falsely or was mistaken. You must also decide what importance to give to the testimony you accept as truthful and accurate. It is the quality of the testimony that is controlling, not the number of witnesses who testified.

If you find that any witness has intentionally testified falsely as to any material fact, you may disregard that witness' entire testimony, or you may disregard so much of it as you find was untruthful, and accept so much of it as you find to have been truthful and accurate.

There is no magic formula for evaluating the truthfulness and accuracy of a witness' testimony. You all bring to this process your varied experiences in life. In life you frequently decide the truthfulness and accuracy of statements made to you by other people. These same factors used to make those decisions should be used in this case when evaluating the testimony, for example, did the witness have an opportunity to see or hear the events about which

he testified? Did the witness recall those events accurately? Was the testimony plausible, the manner of the witness, the background of the witness, whether the witness was biased or hostile, whether the witness had a motive to lie. Was the testimony of the witness consistent or consistent with other evidence in the case? Was it consistent or inconsistent with what the witness said before the trial, and were these inconsistencies important or were they trivial?

Now, the contents of a prior inconsistent statement are not proof of what happened. You may use evidence of a prior inconsistent statement only to evaluate the truthfulness or accuracy of a witness' testimony here at trial. You may also consider whether a witness has any interest in the outcome of a case or whether instead the witness had no such interest.

You are not required to reject the testimony of an interested witness or to accept the testimony of a witness who has no interest in the outcome of the case. You may, however, consider whether an interest in the outcome or lack of evidence affected the truthfulness of the witness' testimony.

You are to evaluate the testimony of the police officers in the same way you evaluate the testimony of the officer witnesses.

Now, as you know, an issue in this case is whether the defendants have been correctly identified as the persons who committed the charged crimes. The People have the burden of proving beyond a reasonable doubt not only that a charged crime was committed, but that the defendants are the persons who committed that crime.

In examining the testimony of any witness who identified the defendants as those persons, you should determine whether that testimony is both truthful and accurate.

With respect to whether the identification is truthful, that is not deliberately false, you must evaluate the believability of the witness who made the identification. In doing so, you may consider the various factors for evaluating the believability of a witness' testimony that I spoke about a few minutes ago.

Now, with respect to whether or not identification is accurate, that is not an honest mistake, you must evaluate the witness' intelligence, capacity for observation, reasoning and memory and determine whether you are satisfied that the witness is a reliable witness.

Further, the accuracy of a witness' testimony identifying a person also depends on the opportunity a witness had to observe and remember that person.

Thus, in evaluating the accuracy or identification

testimony, you should also consider such factors as the lighting conditions, the distance between the witness and the perpetrators. Did the witness have an unobstructed view of the perpetrators? Did the witness have an opportunity to see and remember facial features, body size, hair, skin color, clothing of the perpetrators? For what period of time did the witness actually observe the perpetrators? During that time, in which direction were the witness or the perpetrators facing, and where was the witness' attention directed? Did the perpetrators have distinctive features that a witness would be likely to notice and remember? What was the mental and physical and emotional state of the witness before, during and after the observation? To what extent, if any, did that condition affect the witness' ability to observe and accurately remember the perpetrators. When and under what circumstances, did the witness' identify the defendants? Were the identifications of the defendants as the persons in question suggested in some way to the witness before the witness identified the defendants or were the identifications free of any suggestion?

Now, in this case although the witness was unable to identify the defendants as the perpetrators here in court, both Mr. El Turkey and the police officers testified that moments after the crime, he identified both defendants

as the men who robbed him. These prior identifications may be considered by you together with any other relevant evidence in determining whether either or both defendants committed these crimes. The defendants contend that they did not. You should consider the prior identification testimony with great care taking all of the factors I have previously discussed into consideration.

There was also testimony concerning the statements made by the defendant Ball to a police officer. If a defendant whether or not in custody spontaneously volunteers a statement, that statement may be considered by the jury regardless of whether or not the defendant was advised of his rights or waived them.

For a statement to be spontaneously volunteered, the spontaneity must be genuine and not the result of any questioning, inducement, provocation or encouragement by the police. Under our law, questioning includes words or actions by the police which they should know are likely to elicit an incriminating statement.

If you find that the People have proven beyond a reasonable doubt that the statement was spontaneously volunteered, you have a right to consider that statement as evidence and evaluate it along with all the other evidence.

If you find the People have not proven beyond a reasonable doubt that the statement was spontaneously

volunteered, then you must disregard the statement.

You have heard reference by the defense that certain investigative techniques were used by the police, certain other investigative techniques were not used. You may consider these arguments during your deliberations. However, there is no legal requirement that the People must investigate or prove its case through any particular means.

Law enforcement techniques are not the concern of the jury. Your concern is to determine whether or not based on the evidence or lack of evidence, the defendants' guilt have been proven beyond a reasonable doubt.

You have heard testimony about the lawyers speaking to witnesses about the case before the witness testified at this trial. The law permits the attorneys to speak to a witness about a case before the witness testifies, review with a witness the questions that will be asked of him, and to review material including prior testimony. That is a normal part of trial preparation.

Now, there are two defendants before you. It is your obligation to evaluate the evidence as it applies or fails to apply to each defendant separately. Each instruction on the law that I have given and will give must be considered by you as referring to each defendant separately. You must return a separate verdict for each defendant, and those verdicts may be but need not be the

same.

Now, the People contend that both defendants are guilty of acting in concert with each other under counts one, two, and three. Our law recognizes that two or more individuals can act jointly to commit a crime, and in certain circumstances each can be held criminally liable for the acts of the other. In that situation we call that acting in concert with each other.

Our law defines the circumstances under which one person may be criminally liable for the conduct of another, and that definition is as follows: When one person engages in conduct which constitutes a crime another is criminally liable for such conduct when acting with the state of mind required for the commission of that crime, he intentionally aids such person to engage in such conduct.

Mere presence at the scene of a crime even with knowledge that a crime is taking place or mere association with a perpetrator of a crime does not by itself make a defendant criminally liable for that crime.

In order for a defendant to be held criminally liable for the conduct of another which constitutes an offense, you must find beyond a reasonable doubt: One, that he intentionally aided that person to engage in that conduct, and, two, that he did so with the state of mind required for the commission of the offense.

If it is proven beyond a reasonable doubt that a defendant is criminally liable for the conduct of the other, the extent or degree of the defendant's participation in the crime does not matter. A defendant proven beyond a reasonable doubt to be criminally liable for the conduct of another in the commission of a crime is as guilty of the crime as if the defendant personally had committed every act constituting the crime.

The People have the burden of proving beyond a reasonable doubt that a defendant acted with the state of mind required for the commission of the crime and either personally or by acting in concert with another person committed each of the remaining elements of the crime.

Your verdict, whether guilty or not guilty, must be unanimous. In order to find the defendants guilty, however, you need not be unanimous on whether either of the defendants committed the crime personally or by acting in concert with another or both.

Now, I would like to talk to you about the specific charges in this case. Each charge will be on a verdict sheet which you will have during your deliberations. You will have a verdict sheet for each defendant, and I remind you, you must render separate verdicts for the two defendants.

Counts one and two charge a degree of robbery.

Under our law robbery is defined as forcible stealing. A person steals property and commits larceny when with the intent to deprive another of property or to appropriate the property to himself or to a third person, such person wrongfully takes property from the owner of the property.

A person forcibly steals property and commits robbery when in the course of committing a larceny, such person uses or threatens the immediate use of physical force upon another person for the purpose of compelling the owner of such property to give up the property, for the purpose of preventing or overcoming resistance to the taking of property.

I will now define for you the two counts of robbery in the second degree that are charged in this case. The first count is robbery in the second degree. Under our law, a person is guilty of robbery in the second degree, when that person forcibly steals property, and when that person is aided by another person who is actually present.

A person is actually present when such person is in a position to render immediate assistance to the person participating in the robbery and is ready, willing and able to do so.

For you to find the defendants guilty of this crime, the People are required to prove from all the evidence in the case beyond a reasonable doubt both of the

following two elements: One, that on or about July 3 of 2012 in the County of Queens, the defendants Elijah Brooks and Raymond Ball, each acting in concert with each other, forcibly stole property from Tarek El Turkey; and two, that each aided was aided in doing so by the other actually present.

If you find that the People have prove beyond a reasonable doubt both of those elements, you must find the defendants guilty of the crime of robbery in the second degree as charged in the first count.

If you find the People have not proven beyond a reasonable doubt either one or both of those elements, you must find the defendants not guilty of the crime of robbery in the second degree as charged in the first count.

The second count is also robbery in the second degree. Under this count, a person is guilty of robbery in the second degree when that person forcibly steals property, and in the course of the commission of the crime or the immediate flight therefrom, that person or another participant in the crime causes physical injury to any person who is not a participant in the crime.

Physical injury means impairment of physical condition or substantial pain. In order for you to find the defendants guilty of this crime, the People are required to prove from all the evidence in the case beyond

a reasonable doubt both of the following two elements:

One, that on or about July 3 of 2012 in the County of Queens, the defendants Elijah Brooks and Raymond Ball each acting in concert with each other forcibly stole property from Tarek El Turkey; and, two, that in the course of the commission of the crime or in the immediate flight therefrom, the defendants caused physical injury to Tarek El Turkey, and that Tarek El Turkey was not himself a participant in the crime.

If you find that the People have proven beyond a reasonable doubt both of those elements, you must find the defendants guilty of the crime of robbery in the second degree.

If you find the People have not proven beyond a reasonable doubt either one or both of those elements, you must find the defendants not guilty of the crime of robbery in the second degree under the second count.

The third count is assault in the third degree. A person is guilty of assault in the third degree when with intent to cause physical injury to another person, he causes such injury to that person. We have defined physical injury for you already. Intent means conscious objective or purpose. A person acts with intent to cause physical injury to another when that person's conscious objective or purpose is to cause physical injury to

another.

In order for you to find the defendants guilty of this crime, the People are required to prove from all the evidence in the case beyond a reasonable doubt both of the following two elements: One, on or about July 3 of 2012 in the County of Queens, the defendant Elijah Brooks and Raymond Ball each acting in concert with each other, caused physical injury to Tarek El Turkey; and, two, that the defendants did so with intent to cause physical injury to Tarek El Turkey.

Again, if you find the People have proven beyond a reasonable doubt both of those elements, you must find the defendants guilty of the crime of assaults in the third degree as charged in the third count.

If you find the People have not proven beyond a reasonable doubt either one or both of those elements, you must find the defendants not guilty of the crime of assault in the third degree.

The fourth count, and this counts only applies to the defendant Raymond Ball, the fourth count is criminal possession of stolen property in the fifth degree.

A person is guilty of criminal possession of stolen property in the fifth degree when that person knowingly possesses stolen property with intent to benefit himself or a person other than the owner thereof or to

impede the recovery by an owner. We have already talked about what intent means.

A person knowingly possesses stolen property when that person is aware that he is in possession of property and he is aware that the possession -- that the property was stolen.

Possess means to have physical possession or to otherwise exercise dominion and control over property. Property is any money, any personal property or anything of value. Stolen property is property that has been wrongfully taken from an owner by a person who did so with intent to deprive that person of such property whether appropriated to himself or someone else.

Under our law, a person who knowingly possesses stolen property is presumed to possess it with the intent to benefit himself or a person other than the owner thereof or to impede its recovery by the owner. This means if the People have proven beyond a reasonable doubt that the defendant knowingly possessed stolen property, you may, but you are not required to infer from that fact that the defendant possessed it with the intent to benefit himself or a person other than the owner.

An owner is any person who has a right of possession to the property superior to that of the person who possessed it. It is not a defense to this charge that

the defendant stole or participated in the theft of the property.

If you find a defendant guilty of this crime, the People are required to prove from all the evidence in the case beyond a reasonable doubt, both of the following two elements: One, on or about July 3, 2012 in the County of Queens, the defendant, Raymond Ball, knowingly possessed stolen property, and, two, that he did so with the intent to benefit himself or a person other than the owner.

Again, if you find that the People have proven beyond a reasonable doubt both of those elements, you must find the defendant Ball guilty of the crime of criminal possession of stolen property in the fifth degree.

If you find the People have not proven beyond a reasonable doubt either or both of those elements, you must find the defendant not guilty of the crime of criminal possession of stolen property in the fifth degree.

One more thing about this crime: If the People have proven to you beyond a reasonable doubt that the defendant was in exclusive possession of property recently stolen during a robbery, and that there is no innocent explanation for that possession, then you may, but you are not required to infer that the possession was guilty possession.

If you draw that inference, you must then decide

whether or not the defendant Raymond Ball's guilty possession was a result of his participation during which the property was stolen.

Now, whether property has been recently stolen depends on such factors as the nature of the property, whether it was stolen for retention or disposal, whether it was readily disposable and the time period between the theft of the property and the finding in the possession of the person. For example, the longer the period between the time and the time the person was in possession of the property, the less likely it is any inference may be reasonably drawn from the possession.

On the other hand, the briefer the period between the crime and the possession, the more likely it is that the inference may be reasonably drawn.

We have talked about what property is, and we know what stolen property is.

Now, your verdict whether guilty or not guilty must be unanimous, that is each and every juror must agree to it. To reach a unanimous verdict, you must deliberate with the other jurors. You must discuss the evidence with each other, listen to each other, give each other's views careful consideration and reason together when considering the evidence, and when you deliberate, you should do so with a view toward reaching an agreement if that can be

done without surrendering individual judgment. Each of you must decide this case for yourselves but only after a fair and impartial consideration of the evidence with the other jurors.

You should not surrender an honest view of the evidence simply because you want the trial to end or you are outvoted. At the same time you should not hesitate to re-examine your views and change your minds if you become convinced that your verdict was not correct. You may deliberate only when all twelve of you are together in the jury room. No one else may participate, not me, not the officer, no one from the outside, and for this reason, you must surrender all electronic equipment, cell phones, computers, etcetera, to the officer in charge.

If you wish to see an exhibit, write me a note. If you wish to hear any portion of the testimony read back to you, write me a note detailing which part of the testimony you wish to hear. If you have a question on the law, write me a note specifying what you want me to explain.

Now, under our law, the first juror selected is known as the foreperson. Now, during deliberations the foreperson's opinion and vote are not entitled to anymore importance than that of any other juror. The foreperson may chair the deliberations and should sign any note you

wish to send. He will also announce the verdict.

As I indicated earlier, I will give you a form or in this case two forms known as a verdict sheet for each defendant. The verdict sheet lists each count submitted for your consideration and the possible verdict. Use these forms to record your verdict with an X or check mark in the appropriate place for each count you consider in accordance with my instructions.

Ladies and gentlemen, that concludes my instructions to you on the law. You may retire to the jury room and begin your deliberations.

Officer, take charge. Please segregate the alternate jurors.

(Jurors exit the courtroom at 1:42 P.M.)

THE COURT: Any exceptions or further requests to charge?

MR. SHORTT: No, judge.

MR. GIBBONS: No, Judge.

THE DEFENDANT BALL: Thank you very much.

THE COURT: You are welcome. I don't know if we have smokers on the jury, but if we do, does anybody have any objection for the officer to direct that deliberations cease and take the smoker outside of the building to have a smoke?

THE DEFENDANT BALL: I object that they get a

chance and I don't. That's it, your Honor.

THE COURT: Other than that, sir?

THE DEFENDANT BALL: Other than that, no objection.

MR. GIBBONS: No objection.

MR. SHORTT: As a former smoker, no objection.

THE COURT: Any objection should the jurors ask for any physical evidence, to give it to them without the necessity of reconvening in the courtroom?

MR. GIBBONS: Yes.

THE DEFENDANT BALL: Yes, your Honor.

THE COURT: You are okay with that?

THE DEFENDANT BALL: Yes.

MR. GIBBONS: No objection.

THE DEFENDANT BALL: Your Honor, I wanted to ask you, like, you know --

THE COURT: Let's address what I am doing. Are you okay with that?

THE DEFENDANT BALL: Yes, sir.

MR. SHORTT: No objection except for the 9-1-1. Obviously we can play that.

THE COURT: Right. If they ask for the actual CD, then we will bring them out to have them hear it in the courtroom.

Gentlemen, what do you want to do with the

alternates?

MR. GIBBONS: I think we can cut them loose.

MR. SHORTT: I'm fine.

THE DEFENDANT BALL: I'm fine with that.

THE COURT: I will hear you now, Mr. Ball.

THE DEFENDANT BALL: I have a question in respect to like, you know, when the jurors maybe they call down to get a note or something, will I be informed?

MS. POVMAN: Yes.

THE COURT: If they send me a note, I will show the note to all of the attorneys, you being one of them.

THE DEFENDANT BALL: Thank you.

THE COURT: You can read it, you can contribute to my formulating a response to them, and if you don't like my conclusion, you can object. Okay?

THE DEFENDANT BALL: Thank you, your Honor.

MR. SHORTT: Just so the record is clear, if a note comes out that reads we would like the exhibits, he will not see that note right away.

THE DEFENDANT BALL: I understand that.

THE COURT: Okay. I want the alternates back.

(Whereupon, there was a brief pause in the proceedings.)

(Alternates enter the courtroom.)

THE COURT: Gentlemen, one of my jobs as a judge

is to pay attention to the jurors to make sure they are paying attention, and I have done that, and you have done that. I do appreciate that you have heard up to this point everything that has gone on during the course of this trial, and I say up to this point because at this point the other twelve people who are in the box are talking to each other, discussing the evidence, making their views known, etcetera, they are deliberating.

You two gentlemen are not participating in that so you are not hearing what's going on, so you are missing an important part of the trial. We can't have that so at this point with the consent of Mr. Ball, the attorneys and Mr. Brooks, we have all agreed to discharge you at this point because it would be unjust to substitute you in the middle of the deliberations. It's really almost impossible to do that.

I want to thank you. Believe me, a lot of times alternate jurors wind up deliberating, so I hope you don't think that this was a waste of time. It is vital -- we have had delays in this case, and the reason we have delays is we can't do anything until everybody is here, so it's important that everybody, including the alternates, are a full participant in what's going on.

The last thing I want to say to you before I thank you is I have given you instructions until you are blue in

the face about not case discussing this case, not talking to the lawyers, not going to the scene, not researching this case. Now that your part of this case is completed, I am withdrawing all of those instructions. You can talk to whoever you want about this case. You can tell them what you think.

Sometimes the lawyers like to talk to the alternates, evaluate how they did, or how they might be doing, or you can go home. It's completely up to you. Again, I thank you for your efforts and service. You are discharged.

Officers, take charge.

THE JURORS: Thank you.

MR. SHORTT: Thank you.

MR. GIBBONS: Thank you.

THE DEFENDANT BALL: I appreciate it. God bless you guys.

A F T E R N O O N  S E S S I O N.

THE COURT CLERK: Case on trial, number five, 2228 of 2012, Raymond Ball and Elijah Brooks. The defendants are incarcerated and produced, present before the Court. Appearances are the same.

THE COURT: All right. I have two notes from the jury, both of which all of have seen; is that correct?

THE DEFENDANT BALL: Yes.

MR. SHORTT: Yes.

(Court Exhibits I and II, jury notes.)

THE COURT: They have been marked as Court Exhibits I and II respectively. One asks may we have all the exhibits and the second ask can we have Mr. El Turkey's testimony. They are both signed by the foreperson.

We have complied with the request with respect to the exhibits. We will address the question of whether or not they want to hear the CD after we complete the compliance with the second note which we are ready to do.

Is that satisfactory to all counsel?

MR. SHORTT: Yes.

THE DEFENDANT BALL: Yes.

MR. GIBBONS: Yes.

MR. SHORTT: Because of recent decisions, we had an off-the-record discussion where Mr. Ball was brought out and ask that be put on the record. O'Rama, the jury note

cases. They send us new stuff on that everyday. O-R-A-M-A.

THE COURT OFFICER: Ready, Judge?

THE COURT: Ready.

(Jurors enter the courtroom at 3:50 P.M.)

THE COURT CLERK: Do both sides stipulate to the presence and proper seating of the jury?

THE DEFENDANT BALL: Yes.

MR. GIBBONS: So stipulated.

MR. SHORTT: Yes.

THE COURT: Good afternoon, ladies and gentlemen. I have two notes from you which I will read into the record. One says: May we have all exhibits. The second one says: Can we have Mr. El Turkey's testimony. They are both signed by the foreperson. We have shown these to the attorneys in this case, and we will proceed at this point.

You have seen all of the physical exhibits with the exception of the CD which we will discuss after we comply with the second note with which is: Can we have Mr. El Turkey's testimony.

The court reporter will read that back now. The floor is yours.

(Whereupon, the record was read.)

THE FOREPERSON: I think we are satisfied, Judge.

THE COURT: Why don't you go in the back and talk

it over because you have not heard the cross-examination. Go in the back and make a decision and send me a note and tell me what you want to do.

(Jurors exit the courtroom at 4:39 P.M.)

(Whereupon, there was a brief pause in the proceedings.)

(Defendants exit the courtroom.)

THE COURT CLERK: Case on trial, all parties are present. The jury is not present, your Honor.

(Court Exhibit III, jury note.)

THE COURT: I have a note which we have marked as Court Exhibit III which I have displayed to all of the attorneys including Mr. Ball. It reads: We are satisfied with the portion of the testimony. It is signed by the foreperson. I think we are all in agreement that that disposes of the issue of the testimony Mr. El Turkey.

Is that correct, Mr. Ball?

THE DEFENDANT BALL: If they are satisfied, I'm satisfied.

MR. GIBBONS: Yes.

MR. SHORTT: Yes, your Honor.

THE COURT: Which leaves us with the question about the CD. I will bring out the jury and ask them about it, if they want it, I will send them home, and we will do that first thing tomorrow morning. If not, I will still

send them home, and they will deliberate first thing tomorrow morning. Bring them in.

(Jurors enter the courtroom at 4:59 A.M.)

THE COURT CLERK: Your Honor, the jury is present and properly seated.

THE COURT: Thank you. Good afternoon again, ladies and gentlemen. I have your note which reads: We are satisfied with the portion of the testimony. Signed by your foreperson. So we are all in agreement that we will abort the remaining reading of Mr. El Turkey's testimony.

Going back to the other note, may we have all the exhibits. As I indicated earlier, we did furnish you with all of the exhibits, but we did not furnish you with the CD of the 9-1-1 tape, and radio runs, I guess it's one CD that contains both of those things. Is that something that you want to hear or not?

THE JURORS: No.

THE COURT: All right. Very good. All of these notes have been complied with. We are approaching the witching hour. It's been a long day so I am going to break for the day. Once again particularly now since as I have instructed you, no deliberations can take place unless all twelve of you are in the room together so when I say as I have said throughout the trial, do not discuss this case amongst yourselves or with anybody else, I mean that if

three of you walk out of the building together, don't be talking about the case because you would be violating my directive that only when all twelve of you are together that you should discuss this case, so do not discuss this case amongst yourselves or with anybody else.

Do not go to the scene of any of the incidents involved in this case. Do not research this case in any way. Do not speak to the attorneys, the parties, the witnesses or anybody else involved in this case. Once again should anybody contact you about this case, notify the officer immediately. I thank you for your service today, and we will reconvene tomorrow at 10 A.M.

Officer, take charge.

(Jurors exit the courtroom at 5:02 P.M.)

THE COURT CLERK: The jury has exited the courtroom.

THE COURT: 10:00.

MR. SHORTT: Do you want us to show up or --

THE COURT: As soon as they show up, I will send them in to deliberate.

THE DEFENDANT BALL: We will see you tomorrow after the deliberations comes in.

THE COURT: If there is a note, we will bring you out and if there is a verdict, we will bring you out.

THE DEFENDANT BALL: Just wanted to know what to

expect, your Honor. Thank you.

THE COURT: Good night.

(Defendants exit the courtroom.)

(Trial adjourned to January 30, 2015.)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS: CRIMINAL TERM: PART K14
-----------------------------------------x Indictment No.
THE PEOPLE OF THE STATE OF NEW YORK 2228/12

-against-

ELIJAH BROOKS and RAYMOND BALL,

Defendant.
-----------------------------------------x

125-01 Queens Boulevard
Kew Gardens, New York
January 30, 2015

THE COURT CLERK: Number three on the calendar, indictment 2228 of 2012, Raymond Ball and Elijah Brooks.

The defendants are incarcerated and produced being brought before the Court.

Appearances, please.

MR. SHORTT: For the People, Assistant District Attorney Timothy Shortt. Good morning, your Honor.

THE COURT: Good morning, sir.

MS. POVMAN: On behalf of Mr. Ball, Linda Povman, 123-35 82 Road, Kew Gardens, New York.

MR. GIBBONS: For Elijah Brooks, Wyatt Gibbons, 125-10 Queens Boulevard, Kew Gardens. Good morning.

THE COURT: Good morning, everyone.

(Defendants enter the courtroom.)

THE COURT CLERK: Let the record reflect defendant Brooks is present before the Court and the defendant ball is present before the Court.

THE DEFENDANT BALL: Good morning, everyone.

THE COURT: Good morning. Has everyone seen the note?

MR. GIBBONS: Yes, your Honor.

THE DEFENDANT BALL: Okay.

THE COURT: We have a note from the jury which has been signed by the foreperson marked as Court Exhibit IV. It reads: We have reached a verdict. Everybody has seen the note?

MR. GIBBONS: Yes, sir.

MR. SHORTT: Yes.

THE DEFENDANT BALL: Yes, sir.

MS. POVMAN: Yes.

THE COURT: Very good. Line up the jury, please.

(Whereupon, there was a brief pause in the proceedings.)

THE COURT OFFICER: Ready, Judge?

THE COURT: Ready.

THE COURT OFFICER: Jury entering.

THE COURT CLERK: Do both sides stipulate to the presence and proper seating of the jury?

MR. SHORTT: Yes.

THE DEFENDANT BALL: Yes.

MR. GIBBONS: So stipulated.

THE COURT: Good morning, ladies and gentlemen. I have your note which indicates that you have reached a verdict; is that correct?

THE JURORS: Yes.

THE COURT: The clerk will take the verdict.

THE COURT CLERK: Will the foreperson please rise. Mr. Foreperson, has the jury reached a unanimous verdict?

THE FOREPERSON: Yes.

THE COURT CLERK: As to indictment 2228 of 2012 for the defendant ball, how does the jury find in count one, robbery in the second degree?

THE FOREPERSON: Guilty.

THE COURT CLERK: Count two, robbery in the second degree?

THE FOREPERSON: Guilty.

THE COURT CLERK: Count three, assault in the first degree?

THE FOREPERSON: Guilty.

THE COURT CLERK: Assault in the third degree?

THE FOREPERSON: Guilty.

THE COURT CLERK: Count four, criminal possession of stolen property in the fifth degree?

THE FOREPERSON: Guilty.

THE COURT CLERK: As to Elijah Brooks, how does the jury find as to count one, robbery in the second degree?

THE FOREPERSON: Guilty.

THE COURT CLERK: Robbery in the second degree, count two?

THE FOREPERSON: Guilty.

THE COURT CLERK: Assault in the third degree, count three?

THE FOREPERSON: Guilty.

THE COURT CLERK: Members of the jury, listen to your verdict as it stands recorded. You say through your foreperson that you and each of you find the defendants as announced so say you all?

THE JURORS: Yes.

THE COURT CLERK: Does either side wish for a polling of the jury?

MR. GIBBONS: Yes, please.

THE COURT: Juror Number One, is that your verdict?

JUROR NUMBER ONE: Yes.

THE COURT CLERK: Juror Number Two, is that your verdict?

JUROR NUMBER TWO: Yes.

THE COURT CLERK: Juror Number Three, is that your verdict?

JUROR NUMBER THREE: Yes.

THE COURT CLERK: Juror Number Four, is that your verdict?

JUROR NUMBER FOUR: Yes.

THE COURT CLERK: Juror Number Five, is that your verdict?

JUROR NUMBER FIVE: Yes.

THE COURT CLERK: Juror Number Six, is that your verdict?

JUROR NUMBER SIX: Yes.

THE COURT CLERK: Juror Number Seven, is that your verdict?

JUROR NUMBER SEVEN: Yes.

THE COURT CLERK: Juror Number Eight, is that your verdict?

JUROR NUMBER EIGHT: Yes.

THE COURT CLERK: Juror Number Nine, is that your verdict?

JUROR NUMBER NINE: Yes.

THE COURT CLERK: Juror Number Ten, is that your verdict?

JUROR NUMBER TEN: Yes.

THE COURT CLERK: Juror Number Eleven, is that your verdict?

JUROR NUMBER ELEVEN: Yes.

THE COURT CLERK: Juror Number Twelve, is that your verdict?

JUROR NUMBER TWELVE: Yes.

THE COURT CLERK: The jury has been polled, and the verdict has been confirmed, Judge.

THE COURT: All right. The verdict has been confirmed, and with the rendering of the verdict, the trial is now complete, and your service as jurors is complete. I want to thank all of you again for the sacrifice of time that you have made and the attention that you have all paid to the task at hand.

I want to thank the staff and the attorneys, and Mr. Ball for the professional job that they did trying this case. As I said to you in the beginning of this trial, we have a system of justice that I think is greater than anyplace in the world, and the centerpiece of our criminal justice system is that in America, judges don't make these decisions, cops and DAs don't make these decisions, men and women, citizens of Queens County make these decisions, and I think that that is a wonderful and important component of our democracy.

Now, during the course of this trial, I have instructed you not to discuss this case with anybody, not to go to the scene, not to research this case, not to talk to anybody about this case, the lawyers, the defendants or

anybody like that. These orders are hereby withdrawn. You can talk to anybody you want about this case, you can talk to the lawyers if you want, you can talk to your wives or girlfriend about this case and your experience as a juror, it's completely up to you, or you can talk to nobody about this case and just go on your merry way. It is entirely up to you. Again, I thank you for your service, and you are hereby discharged.

Officer, take charge.

(Jury excused.)

THE COURT: Date for sentence, folks?

THE DEFENDANT BALL: Your Honor, I would like to put in application to put in a motion for a 440 -- 330, I would like to put in a motion at this time. You know, maybe I could have it forwarded, I don't have it with me.

MS. POVMAN: Judge, he is reserving his right to make a motion to set aside the verdict for the date of sentence.

THE COURT: Very good.

MR. GIBBONS: I join, your Honor, I'm going to do the same.

THE COURT: Very good. Pick a date, folks.

THE DEFENDANT BALL: We will need sometime. I need to be able to put it together.

(Defendant and counsel confer.)

THE COURT CLERK: February 19.

MS. POVMAN: That's fine.

MR. GIBBONS: That's fine.

MR. SHORTT: Judge, I do have an application at this time that the defendants be remanded.

THE COURT: Do you want to be heard? There is a motion for remand.

MR. GIBBONS: No, your Honor. He has been in jail. He hasn't been able to make $50,000 bail, I think that would be sufficient, but I will leave that to the Court's discretion.

THE COURT: Do you want to be heard?

THE DEFENDANT BALL: I mean, like he said, no.

THE COURT: Both defendants are remanded.

(Defendants exit the courtroom.)

* * * * * * * *

The foregoing is certified to be a true and accurate transcript of the original stenographic minutes taken of this proceeding.

Nancy Samms

Nancy Samms, SCR

INDEX

T-A-R-E-K E-L T-U-R-K-E-Y 336

DIRECT EXAMINATION 336
BY MR. SHORTT

389

CROSS EXAMINATION 390
BY MR. GIBBONS

CROSS EXAMINATION 414
BY THE DEFENDANT BALL

RECROSS EXAMINATION. 430
BY MR. GIBBONS

REDIRECT EXAMINATION 430
BY MR. SHORTT

RECROSS EXAMINATION 432
BY THE DEFENDANT BALL

D E T. D A N I E L L A N N I N G 433

DIRECT EXAMINATION 433
BY MR. SHORTT

CROSS EXAMINATION 449
BY MR. GIBBONS

CROSS EXAMINATION 461
BY THE DEFENDANT BALL

RECROSS EXAMINATION 476
BY MR. GIBBONS

REDIRECT EXAMINATION 479

NS

INDEX

BY MR. SHORTT
RECROSS EXAMINATION 481
BY THE DEFENDANT BALL
P.O. A N G E L O P A M P E N A 497
DIRECT EXAMINATION 497
BY MR. SHORTT
CROSS EXAMINATION 542
BY MR. GIBBONS
CROSS EXAMINATION 548
BY THE DEFENDANT BALL
REDIRECT EXAMINATION 570
BY MR. SHORTT:
RECROSS EXAMINATION 576
BY MR. GIBBONS
RECROSS EXAMINATION 576
BY THE DEFENDANT BALL
REDIRECT EXAMINATION 579
BY MR. SHORTT
RECROSS EXAMINATION 580
BY THE DEFENDANT BALL
RECROSS EXAMINATION 581
BY MR. GIBBONS
A D I G O N Z A L E Z 612
DIRECT EXAMINATION 613
BY THE DEFENDANT BALL

INDEX

CROSS EXAMINATION 638
BY MR. SHORTT

REDIRECT EXAMINATION 644
BY THE DEFENDANT BALL

people's Exhibits 1 and 2, photographs, marked for identification 355

People's Exhibits 1 and 2, marked and received into evidence 356

People's Exhibits 3 and 4, photographs, marked for identification 507

People's Exhibits 3 and 4, marked and received into evidence 509

People's Exhibit 5, envelope with contents, marked for identification 516

People's Exhibit 5, mark and received into evidence 524

People's Exhibits 6A and 6B, photographs, marked for identification 526

People's Exhibits 6A and 6B, marked and received into evidence 526

Defendants' Exhibits A-1, A-2, photographs, marked for identification 407

INDEX

Defendants' Exhibits A1 and A2, marked and received into evidence 407

Defendants' Exhibits A-1 and A-2, marked and received into evidence 408

Defendants' Exhibit B, SPRINT report, marked for identification 471

defendants' Exhibit B, marked and received into evidence. 471

Defendants' Exhibit C, marked for identification, two documents 476

Defendants' Exhibit C, marked and received, in evidence 478

Defendants' Exhibit D, CD, marked and received into evidence 482

Defendants' Exhibit E, marked and received into evidence 524

Defendants' Exhibit D, marked and received in evidence 531

Defendants' Exhibit F, marked and received into evidence 563

Defendants' Exhibit G, two-page document, marked and received into evidence 632

COPY

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF QUEENS: CRIMINAL TERM: PART: K-14

-------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

Ind. Number 2228-12
CA # 14-15

-against-

SENTENCE

RAYMOND BALL and ELIJAH BROOKS,

Defendants.

-------------------------------------X

March 4, 2015

125-01 Queens Boulevard
Kew Gardens, New York 11415

B E F O R E:

THE HONORABLE BARRY SCHWARTZ,
Justice, Supreme Court

A P P E A R A N C E S :

For the People:
THE HONORABLE RICHARD A. BROWN
District Attorney, Queens County
BY: TIMOTHY SHORT, ESQ,
Assistant District Attorney

DEFENDANT RAYMOND BALL, Pro Se
LEGAL ADVISOR FOR MR. BALL: LINDA POVMAN, ESQ. (18-B)

FOR DEFENDANT: BROOKS:
WYATT GIBBONS, ESQ. (18-B)
125-10 Queens Boulevard
Kew Gardens, New York 11415

MICHAEL BERMAN, RPR
Official Court Reporter

(In open court:)

COURT CLERK: Calendars one and three, Raymond Ball and Elijah Brooks. Defendants incarcerated and produced and being brought before the Court.

Appearances, please.

MR. SHORT: For the People, Assistant District Attorney Timothy Short.

MR. GIBBONS: Wyatt Gibbons, 125-10 Queens Boulevard, Kew Gardens.

MS. POVMAN: On behalf of Mr. Ball, Linda Povman, Kew Gardens, New York. Afternoon, your Honor.

COURT OFFICER: Coming out.

Let the record reflect that the defendant Brooks is present before the Court.

DEFENDANT BALL: Good afternoon.

COURT CLERK: Let the record reflect that defendant Ball is present before the Court.

DEFENDANT BALL: How are you doing today?

THE COURT: I'm doing well.

DEFENDANT BALL: I apologize.

THE COURT: All right.

Why don't we begin by arraigning these defendants on the respective predicate felon. Could you do that?

COURT CLERK: Mr. Ball, District Attorney's office has filed a statement, a predicate felony

conviction. The statement alleges that on October 14, 2006 you were convicted of burglary in the third degree in the county of New York and on December 12, 2006 you were sentenced to 9 months incarceration.

Do you wish to controvert or raise the issue of the constitutionality of any allegation in this statement? If so, you must specify each and every one. All uncontroverted allegations in this statement shall be deemed to have been admitted by you.

You may admit or you may deny that you are the same person mentioned in this statement. In the event that you deny or wish to controvert any of the allegations set forth in this statement, it may be your right to be tried thereon by a hearing before the Court without a jury.

You are further advised that under existing law prior felony convictions may serve to increase the punishment for the felony of which you now stand convicted.

Having been advised of your rights, how say you, are you the same person mentioned in the statement?

THE DEFENDANT: Yes.

COURT CLERK: And do you wish to further admit your one prior felony conviction?

THE DEFENDANT: Yes.

COURT CLERK: Do you raise the constitutionality of that conviction?

THE DEFENDANT: No.

COURT CLERK: The defendant admits.

THE COURT: Court finds that the defendant Ball is a second felony offender now convicted of his first violent felony.

COURT CLERK: Mr. Brooks, the District Attorney's office of Queens County has filed a statement of predicate felony conviction. The statement alleges that on December 13, 2004 you were convicted of VTL 1192.3 and on January 31st of 2005 you were sentenced to one year incarceration.

Do you wish to controvert or raise the issue of the constitutionality of any allegation in this statement? If so, you must specify each and every one. All uncontroverted allegations in this statement shall be deemed to have been admitted by you.

You may admit or you may deny that you are the same person mentioned in this statement. In the event that you deny or wish to controvert any of the allegations set forth in this statement, it may be your right to be tried thereon by a hearing before the Court without a jury.

You are further advised that under existing law prior felony convictions may serve to increase the punishment for the felony of which you now stand convicted.

Having been advised of your rights, how say you, are you the same person mentioned in the statement?

DEFENDANT BROOKS: Yes.

COURT CLERK: Wish to challenge the constitutionality of the statement?

DEFENDANT BROOKS: No.

COURT CLERK: Defendant Brooks admits.

THE COURT: All right. Court finds that defendant Brooks is a second felony offender and now convicted of a violent felony offense.

We have an open motion pursuant to -- well, a motion to vacate the conviction which has been filed by Mr. Ball.

Mr. Short, I have no written reply.

MR. SHORT: I'll respond orally, if it's okay with the Court?

THE COURT: All right.

Do you want to be heard on the motion, Mr. Ball?

DEFENDANT BALL: With respect to?

THE COURT: You filed a motion, do you want to argue it or addressed on papers?

THE DEFENDANT: I would like to have the DA respond to it in writing rather than --

THE COURT: That's a choice that he could make.

DEFENDANT BALL: So, I could be able to understand.

THE COURT: I can't force him to do that. If he

chooses not to do it then he chooses not to do it.

DEFENDANT BALL: Well, okay. That would be the only thing other than the fact that, um --

THE COURT: You want to rest on the papers, I guess, is what I'm asking, or you want to argue?

DEFENDANT BALL: Are you going to be able to give me an answer? Are you going to be going over the motion and --

THE COURT: No, I read the motion. Sure.

DEFENDANT BALL: Are you going to decide on the motion today?

THE COURT: Quite frankly, I think, yeah.

DEFENDANT BALL: Yes. You asked me if I was -- anything I have to say?

THE COURT: You mean at sentence? We are not at that point yet. I'm just addressing myself to your motion, if you want to rest on the papers?

DEFENDANT BALL: What happened is, there's one particular issue I want to raise, I'm not sure you're aware of. I reference to 210.20 motion I had put in previously and the District Attorney never answered the motion and so, you know, I'm very concerned about that. I brought that up prior to us going to trial. It was an issue we would put off for later and I still never got the response.

That would be my only argument at this time, that

I think I would be, you know, I -- legally I have a right to have had the time to get the response, if not, you would dismiss the case. It would mean that the District Attorney conceded to the notion by not responding, which was it was turned over.

THE COURT: All right. I understand. Thank you sir. Mr. Short.

MR. SHORT: I have read defendant's pro se motions filed pursuant to 330.30. The grounds for the motion, your Honor, are all things that have been previously litigated in this case but, with one or two exceptions. I refer your Honor to the decision by Judge Hollie, including everything which covers everything the alleged Rosario violation, the sufficiency of the grand jury presentment, the evidence presented to the grand jury -- that was evidence presented to the grand jury and all these other matters that were raised during the hearing. These matters were decided by Judge Hollie when he reviewed the grand jury minutes on the only decision and subsequent motion filed after the hearings about the Rosario violations and any discrepancy in the grand jury minutes. So is the law of the case as controlled by Judge Hollie's decision on these matters. Everything else in defendant's motion makes very little reference to the conduct of this trial. Other than to restate his defense.

The paperwork didn't line-up with the testimony which was ultimately resolved by this jury, that the defendant was either irrelevant or unfounded and they had found this defendant guilty.

I ask you to deny this decision. There's no legal basis to disturb the jury's verdict. The material contained in 6A, B, C, D, E all appear to be unsupported by any allegations in his own motion papers as to the following ones with Rosario violation, no probable cause, defective grand jury presentment, prosecutorial misconduct, perjury, right to confrontation and counsel, I would say, all have been decided by Judge Hollie's motion, his decision.

As to the weight of the evidence and the right to present all statements of the trial, there's no allegation or proof that the defendant was not present. He was present the entire time of the trial, and that's as to the weight of the evidence.

I rest on the record established during the trial and I don't see any new information in the defendant's motion papers that would cause the Court to disturb the verdict in this case.

THE COURT: Thank you, Mr. Short.

I have, as I indicated earlier, reviewed this motion and I have considered the arguments of both sides.

I do find that all of the contentions have either been considered and rejected either by Judge Hollie, or by myself, or are unpreserved and, therefore, unviewable in a 330 application, which is what this is.

And, accordingly, I am denying your motion.

Have both sides had an opportunity to read the probation report in this case?

MR. GIBBONS: Yes. I have a 330 application. It would be brief.

THE COURT: I'll hear you.

MR. GIBBONS: Your Honor, I'll ask that the Court set aside the verdict as the evidence was legally insufficient to maintain a conviction. The testimony before the Court showed there was no identification of my client in the courtroom when he was arrested. He was -- his description was completely different -- I'm sorry, the description of the complainant was completely different than my client's accounts when he was stopped a few minutes after this incident allegedly occurred.

The complaining witness testified that the assailant had black hair. My client had a shaved head. He said that assailant was wearing a red T-shirt. He had on a white T-shirt. The description said nothing about facial hair which my client had or missing teeth or wearing a baseball cap, all which were testified to by the police

officer who arrested him and borne out by his arrest photo and his demonstration of his missing teeth here in open Court.

As the Court notes witness ID is inherently unreliable. Plus no proceeds were found on my client and the person matching the description of a male black wearing a white shirt and black pants was found on Mr. Ball who was found with the proceeds. So, that would be the first leg of my argument.

Secondly, your Honor, in all due deference to your Honor's ruling, I understand while we were forced to be seated during the entirety of the trial, but I made the argument before, and as the trial progressed I think I made it again. I feel that that ruling prejudiced my client in that I was unable to move about the courtroom. I wasn't able to make both eye contact with the jurors. My body language was obstructed because of that. I felt --

THE COURT: Can I just jump in here and just state for the record because, you know, I'm sure that this case will go up on appeal. That we are in a courtroom where you are now standing but you were seated right where you were standing and you are physically, I would say, between ten or twelve feet away from the jury. So, seated or standing in this small courtroom I think is really of little consequence. But, more importantly, I just wanted

the record to reflect we are not in the ceremonial courtroom.

MR. GIBBONS: I understand it's not a cavernous courtroom. It's a personal issue with me because my style has been to always move around, to look directly at the jurors, to get up close to them at the rail. And I also felt that there may have been an air of lack of professionalism or disrespect to the jurors although everyone was seated.

THE COURT: Including me.

MR. GIBBONS: I understand. The reason I fact that Mr. Ball was also seated. I believe impacted negatively on my client and there may have been something that carried over to the jury where they felt there was some issue of disrespect or professionalism. And because of that I ask that the verdict be set aside.

THE COURT: Want to be heard?

MR. SHORT: As to the I.D. The witness I.D. is not inherently unreliable. Mr. El Turkey was not able to identify the defendant in the courtroom. Pursuant to 60.25 his identification of him on scene that night was placed before this jury. The description he gave was of a male black wearing a white T-shirt and black pants, that is what the defendant was wearing at that time. The description of the red, your Honor, only came out during this trial.

I submit to the Court, because of the passage of time, that there was red worn by the co-defendant and the red hat of Mr. Brooks. Regardless, Judge, I see no reason to disturb the jury's verdict. On that basis alone I believe the evidence was sufficient to sustain the conviction. As to defense counsel's second point I was seated, too. If he would be guilty of unprofessionalism I'm sure the jury had the same thought of me. We all sat during this entire trial, from the very moment the jury walked into the courtroom. I don't believe they thought anything of it and I see no reason to disturb the verdict.

THE COURT: With respect to, essentially, the factual arguments, frankly, a trial Court has limited authority in that area, much more limited than the authority that the Appellate Division has, to review facts and a motion to vacate before a trial Court. The trial Court is limited to legal issues, they are not factual issues, and I believe all of the arguments that you have advanced are essentially factual in nature, more appropriately made before a higher Court.

So, I'm going to deny that portion of the motion and I will also deny the motion as it pertains to the fact that everyone was seated during the course of this trial. In deference to the fact that Mr. Ball was proceeding pro se on this case, whether the lawyers stand or sit down in a

courtroom, really, I think is of minimal consequence. The important thing is your ability to advocate and, you know, frankly, this is the second trial you've had in front of me in the last two months or so and your ability to make your points made known to the jury I, frankly, respected and admire.

MR. GIBBONS: Thank you.

THE COURT: You're a good trial advocate and I think you gave your client a good run for his money, seated or standing.

MR. GIBBONS: Thank you.

THE COURT: So, the motion is denied.

Now, as to the sentence:

Have both sides the read the probation?

MR. SHORT: Yes.

MR. GIBBONS: Yes.

THE COURT: We may proceed. Mr. Brooks first.

Any reason why this sentence can't be imposed?

MR. GIBBONS: No, your Honor.

MR. SHORT: No, your Honor.

THE COURT: Want to move to sentence?

MR. SHORT: Yes, your Honor.

THE COURT: Want to be heard?

MR. SHORT: Yes, your Honor.

Your Honor, the People -- I won't go too much to

the defendant's history, we went through that during the Sandoval; however, Mr. Brooks stands before the Court as a predicate, granted, only on a VTL violation of unlicensed aggravated unlicensed operation; however, he has a long criminal history in this county, convicted of three other felonies and eight other misdemeanors. It's also important to remember several events that happened in the time and when this case occurred. The defendant was charged with two robberies at or near the location, specifically, I want to make reference to the date of November 17, 2010 -- I'm sorry, I apologize -- I'm sorry, I apologize -- September 13, 2008 where the defendant robbed a patron of the very same store. The patron of the store reported that the he recognized the defendant as someone who routinely robs late night customers directly outside of that store. This defendant, along with his co-defendant, specifically targeted Mr. El Turkey as someone weak and vulnerable and of someone who would not call the police. This defendant and the co-defendant specifically targeted the complainant as a person was coming ou of the store at the late night --

THE COURT: That case you referred to, what's the status of it?

MR. SHORT: He pled guilty to disorderly conduct. That was brought out during the Sandoval.

THE COURT: All right.

MR. SHORT: But it shows, your Honor, the level -- this was a pre-planned attack of someone that this defendant saw as a week person coming out of that store.

While he has a less record, less severe record than Mr. Ball, Mr. Brooks, your Honor, is the one who precipitated in this attack. He's the one that pushed the defendant through the two cars and repeatedly smashed his face on the curb against the sidewalk causing him to loose a tooth. Based on his record the severity and the nature of this attack I believe calls for the maximum and I ask you to sentence the defendant to 15 years, five years post-release and issue an order of protection in favor the named complainant, Mr. El Turkey.

THE COURT: I'll hear you.

MR. GIBBONS: Your Honor, first, I object to the utilization of that, -- of the arrest that the District Attorney referred to. What the complaining witness may have said is purely hearsay. If the case was that strong and the evidence that sure my client wouldn't have gotten a disorderly conduct.

My client has a history; however, he hasn't had any serious arrests in the last few years. And, as Mr. Short said, the predicate basis is based on an E felony and aggravated unlicensed operation. There wasn't any crime of violation. This wasn't any type of moral

turpitude.

It was the luck of the drawer. He got an E felony, it could have been an A misdemeanor, and he wouldn't be facing 5 to 15. My client is a family man, two children with the same woman for, I think, thirty five years now.

Again, the description of the perpetrator was so far from what my client looked like on that night that I believe that that needs to be taken into account. My client had a bald head, missing teeth wearing a white shirt. The complainant said that the person had on a red T-shirt, short black hair. Didn't mention missing teeth or facial hair.

While the DA said that the red T-shirt only came up at this trial, that is incorrect. The complainant testified in the grand jury that the assailant, who he referred to as Mr. Brooks, was wearing a red T-shirt then as well. I was unable to bring it out because he didn't show any confusion about that issue when he testified at trial. If had he shown any confusion, obviously, I would have reminded him of his testimony back in the grand jury.

So, it wasn't a mistake due to the passage of time, your Honor. He said that that person had a red shirt on. My client was arrested minutes after this incident occurred wearing a white shirt, bald head, no hair on his

head. A hat, missing teeth, facial hair, no proceeds. The person that he described as having a white shirt and black pants was arrested and the complainant has no idea when that person was being stopped, when he was stopped. It matched the description perfectly. He had the proceeds. I still believe that the I.D. was incorrect and because of those factors I ask that the Court sentence him to the minimum of five years.

THE COURT: Sir, want to be heard on your own behalf?

DEFENDANT BROOKS: Me? No, I'm good.

THE COURT: All right.

I have had an opportunity to read the probation report. I have considered the statements made by both Mr. Short and Mr. Gibbons. This defendant was convicted after trial of the crimes of robbery in the second degree, two counts and assault in the third degree and I am familiar with the facts having presided over this trial.

This is a bad crime. This is just a classic street mugging. It's hard not to believe that Mr. El Turkey was not specifically targeted by you and your co-defendant perhaps because he had just come out of an ATM place and obviously, had some cash on him and perhaps because his immigrant status emboldened you to think that Mr. El Turkey might choose to let the crime pass and not

respond to the police, call the police, because of what you might have perceived as his immigrant status.

I, frankly, found the witness credible almost to the point of honorableness and the fact that he chose or stated honestly that he was not able to identify either you or Mr. Ball some two years later would have been easy for him just to say it and say it was Mr. Ball, but he didn't. And, to me, I found that impressively honest on his part.

Under count one of the indictment the Court sentences you to a determinate term of imprisonment of ten years plus 5 years post-release supervision.

Under the second count, robbery in the second degree, th Court sentences you to the term of imprisonment of ten years to run concurrently with the first count and the assault in the third degree I sentence you to one year imprisonment. That count will obviously merge.

The defendant is ordered to pay all mandatory surcharges and fees. These monies should be deducted from inmates funds. The defendant is remanded.

COURT CLERK: One moment.

Mr. Brooks, you have the right to appeal to the Appellate Division, Second Department, within thirty days. In addition, upon proof of your financial inability to retain counsel and to pay the cost and expenses of appeal, you have the right to apply to the Appellate Division for

the assignment of counsel and leave to prosecute the appeal a poor person and to dispense with printing.

The Appellate Division, Second Department, is located at 45 Monroe Place, Brooklyn, New York 11201.

Mr. Brooks. Defendant being handed a copy of the notice in writing.

MR. GIBBONS: I'll file a notice of appeal after this is over.

THE COURT: Thank you.

MR. GIBBONS: Thank you, your Honor.

THE COURT: Mr. Short, you received the probation report for Mr. Ball?

MR. SHORT: Yes, your Honor.

THE COURT: Have you had an opportunity to read the probation report?

DEFENDANT BALL: Um, I have it in front of me. Yeah, we can proceed.

THE COURT: All right.

Any reason why we can't proceed?

MR. SHORT: No, your Honor.

DEFENDANT BALL: Not that I --

THE COURT: Want to move to sentence?

MR. SHORT: Yes.

THE COURT: Want to be heard?

MR. SHORT: Yes, your Honor.

Your Honor, far more than defendant Brooks, Mr. Ball has demonstrated, through his life, a wanton disregard for the law. He's a career criminal with numerous convictions.

I won't go over the Sandoval ruling. I just ask the Court to keep that in mind in what we talked about during the Sandoval as to what this defendant has committed in the past, convicted of prior felonies and twenty two misdemeanors over his life.

The last felony, your Honor, was a burglary that Mr. Ball talked about in New York County breaking into a store late at night opening the gate and stealing property inside and later being caught with it; convicted of coercion for an incident where he lured a woman inside an abandoned building for the purpose committing a sexual assault.

Mr. Ball's role in this case was just as heinous as Mr. Brooks', I believe. He took advantage of the complainant's trust. I misuse the word "trust." The fact that they knew each other.

The complainant was very clear he had known him, spoken to him, given him dollars here and there. And it was Mr. Ball that followed him initially down that street. And as Mr. Brooks was raining blows after blow on the complainant Mr. Brooks helped himself toward opening his

pockets where the complainant's head was being bashed against the sidewalk.

His part is no less heinous as Mr. Brooks' and I ask that he be sentenced to the maximum.

THE COURT: Mr. Ball, do you want to say anything on your own behalf?

DEFENDANT BALL: Sure.

THE DEFENDANT: First of all, your Honor, I have to -- I have to ask -- I'm listening to what you said previously when you sentenced Mr. Brooks and now I want to say thank you for how it is that you kept up your promise, as far as being impartial. I want to thank with respect to that. And I also want to say to you that, like, I've been explaining from the beginning, I'm innocent of this crime and I've shown throughout the trial that, you know, it was impossible for me to have been able to commit this crime.

The District Attorney never put forth any evidence that showed that I was the one who he keeps saying I was caught with some of the proceeds. And it was never established throughout the trial that I was ever caught with any of the proceeds, you know, the allegation, that's been pushed against me is all based on purgery testimony.

And I have shown that throughout the trial, as far as my history is concerned -- and I don't have a violent history because I'm not a silent man and I'm not

the type, I'm not the criminal that the District Attorney is making me out to be, in lieu at my history.

My history pertains to what I raised, the issue as far as me having a drug problem. I had possessions of drugs in the past. If you look at my record that's what it basically pertains to.

As far as the incident, I spent nine months in jail for, I told you honestly, because that's, you know, what I prefer to deal with. In this circumstances, to keep it honest with you, you know, so, I did tell you, that, um, I did do the crime and in respect to I was dealing with a drug issue at the time and the door was open. So, you know, I didn't deny that, what it is that I did wrong.

In the case, that the other issue, that I was arrested for, other than the drugs, were, you know, trespassing, you know, minor offenses. So, this is what the bulk of the history of my crime.

As far as where the District Attorney is making it out to seem like I'm a person who is a criminal, you know, but that's not the case. And I would like for to you keep that in mind in you passing sentence on me, along with the fact that you allowed me to, you know, go continue to appeal so I can hopefully, you know, prove my innocence somewhere along -- down the line.

That's basically what it is what I wanted to say.

THE COURT: Thank you, Mr. Ball.

Much of what I have to say to you I've already said, but I will repeat it just for the record.

I really -- this is a bad crime. This is, as I said, a bad street mugging where both defendants had no problem hurting the victim in order to take his money. It's fortunate that the victim was not more seriously injured considering the assault that was rained on him by both defendants.

And I do share the District Attorney's view of this case, now having heard it myself, that the defendants are surely equally responsible and involved in this mugging. And, as I indicated earlier, Mr. El Turkey seems, in my view, to have been targeted carefully by both defendants, perhaps because of his having gone to an ATM machine almost immediately before the mugging and perhaps though thought someone who was an immigrant would not report this to the police.

I would reiterate my comments with respect to the honorable manner in which the complainant did not just identify Mr. Ball, because he obviously couldn't do it two years later. It doesn't shade my belief in the accuracy and justice of the jury's verdict.

You've been convicted of two counts of robbery in the second degree, assault in the third degree and criminal

possession of stolen property in the fifth degree.

I'm going to sentence you to a determinate term of imprisonment of ten years plus five years post-release supervision under count one. Ten years, plus five years post-release supervision under count two.

Those counts to run concurrently with each other.

One year for the assault in the third degree and 1 year for the criminal possession of stolen property in the fifth degree. Those sentences will merge as a matter of law.

Defendant is ordered to pay all mandatory surcharges and fees. These monies shall be deducted from inmate funds. The defendant is remanded.

Miss Povman, I thank you once again for your assistance in this matter and your own professionalism in this matter.

COURT CLERK: I'm extending the orders of protection.

MR. SHORT: They were prepared.

DEFENDANT BALL: Judge --

COURT CLERK: Five years past the maximum release date?

MR. SHORT: Yes.

DEFENDANT BALL: Can you waive the surcharge?

THE COURT: I will not defendant.

DEFENDANT BALL: Thank you.

COURT CLERK: It will be taken out of inmate funds.

You have the right to appeal to the Appellate Division, Second Department, within thirty days.

In addition, upon proof of your financial inability to retain counsel and to pay the cost and expenses of appeal, you have the right to apply to the Appellate Division for the assignment of counsel and leave to prosecute the appeal a poor person and to dispense with printing.

The Appellate Division, Second Department, is located at 45 Monroe Place, Brooklyn, New York 11201.

The defendant is being handed a copy in writing and the defendant is being asked to sign the order of protection.

DEFENDANT BALL: I would like to make an application for a 440 at this time?

THE COURT: You can do it in writing.

COURT OFFICER: Sign here. Keep your hands behind your back.

COURT CLERK: Defendant Ball signed the order of protection.

THE COURT: Thank very much.

DEFENDANT BALL: Thank you.

THE COURT: Thank you.

* * *

CERTIFIED THAT THE FOREGOING IS A TRUE AND ACCURATE TRANSCRIPT OF THE ORIGINAL STENOGRAPHIC MINUTES IN THIS CASE.

MICHAEL BERMAN, RPR
Official Court Reporter