ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★    APR 0 7 2020    ★

BROOKLYN OFFICE

---

RAYMOND BALL,

      Petitioner,

           v.

ANGELENE STEVENSON,

      Respondent.

No. 19 Civ. 5310 (RRM)(LB)



---

MEMORANDUM OF LAW IN OPPOSITION TO
PETITION FOR A WRIT OF HABEAS CORPUS

RAYMOND BALL 15A1060
PRO SE LITIGATE
OTISVILLE CORRECTIONAL FACILITY
P.O.BOX 8
OTISVILLE, NEW YORK 10963
DATED: APRIL 3, 2020

Exhibit A


911 Report


Exhibit B


EMS Report And Call Sheet


Exhibit C


Felony Complaint


ExhgibitD


Motion Decisions

## FACTUAL AND LEGAL BACKGROUND

**A.  Indictment and pretrial proceedings**   By Queens County Indlictment 22281/12, petitioner and codefendant Elijah Brooks were charged with two counts of second-degree robbery (Penal Law § 160.10(1) (aided by another) and (2)(a) (causes physical injury) and one count of third-degree aslsault(Penal Law § 120.00(1)(intentional physicall injury).Petitioner was charged additionally with one count of fifth-degree criminal possession of stolen property (Penal Law § 165.40).

### 1.   Motion to Supress

May 2013, the trial court conducted a pretrial Dunaway/Huntely/ Mapp/ wade hearing. At the hearing, New York Police Department ("NYPD") officer Daniel Lanning testified that, at approximately 9:00 p.m on July 3, 2012, he received a report of a robbery on Northern Boulevard in Queens. The suspects were reported to be black men, one of whom was wearing a white shirt and black pants. (H. 4-7, 11-12.) Lanning drove to the scene where he found the robbery victim, Tereek Elturkey, bleeding from the head and mouth. (H.7.) Elturkey told Lanning that he had been robbed and that the perpetrators had fled southbound on 105th Street. (H.7.) Elturkey and Lanning drove that direction and, after driving for "about sixty seconds" Elturkey pointed at codefendant Brooks and identified him as one of two perpetrators. (H. 8-9) Lanning did not take Brooks into custody. Detective Lanning was one of four officers who participated in Brooks arrest. Detective Lanning only put the cuffs on Brooks while Sergeant, Rosenberg, along with Officer Pampena, Officer Torres, and Officer Troisey were present they all arrived at the crime scene within seconds of oneanother.  Police Officer Pampena approached Mr. Elturkey while sitting in Detective Lanning's car and asked Mr. Elturkey what happened that Mr. El

1

Turkey got out of the car and identified Brooks.

According to Detective Lanning Police Officer Pampena was present during Brooks arrest, however after Brooks was transported to the precinct he stayed at the scene for about fifteen minutes. at which point he and Sergeant Rosenberg left the crime scene and called in the arrest at 9.13 p.m..

Allegedly "NYPD" Officer Pampena also responded to the robbery report. (H.23-25.) Approximately one and a half blocks from the robbery location, Pampena observed petitioner-a black male wearing a white shirt and black pants -running away from the scene.(H. 25-26.) As Pampena exited his marked vehicle, petitioner gestured to an iphone he was holding and stated spontaneously:"I bought this phone from 105th street and northern boulevard." Officer Pampena Handcuffed petitioner and, during a search for weapons, found $250 in cash consisting of one $100 bill, seven $20 bills and a $10 bill. (H. 26-27.) Officer Pampena placed petitioner in the vehicle and drove to the scene. (H. 27.)

At the scene, Pampena encountered Elturkey who was seated in the rear of an ambulance receiving treatment for a large laceration on his head and a swollen and bruised eye. (H. 28-29.) Elturkey told Pampena that he had been attacked by two men and that, while one of the men beat him, the other had taken Elturkey's iphone and wallet, which contained $250. (H. 27-30.) Because Elturkey had just obtained the cash that had been stolen, he was able to report to Pampena the denominations: one $100 bill, seven $20 bills and one $10 bill. (H. 27.)

With petitioner standing in front of Pampenla's vehicle approximately three car lengths from the ambulance, Elturkey identified petitioner as the

2

a person who took his iphone and wallet. (H. 28,31-32, 46-47.) Elturkey provided the correct password to unlock the iphone Pampena had recovered from petitioner. (H. 32.) Back in Pampena's vehicle, petitioner asked Pampena what he was being charged with. When Pampena told him he was being charged with robbery petitioner replied: "if the guy said it was his then I guess it was his." (H. 33)

The court denied petitioner's motion to suppress. (SR50-51.) There was probable cause to arrest petitioner, the court concluded, based on the description Pampena received over the radio prior to encountering petitioner, as well as petitioner's spontaneous admission that he was coming from the scene of the robbery and Elturkey's description and knowledge of the stolen property recovered from petitioner. The court further concluded that the showup was not unduly suggestive because it happened close in time and location to the crime.

In January 2014, the court reopened the suppression hearing for futher questioning of Officer Lanning and Pampena on the subject of an EMS report that had been unavailable at the initial hearing. (1/8/14 Tr. at 1-14.) Officer Lanning testified that Elturkey was bleeding from his mouth and the top of his face, but he was not squinting or wiping his eyes when he identified co-defendant Brooks.

Officer Pampena testified that, after arresting petitioner, they had arrived at the scene at approximately 9:05 p.m. Elturkey was sitting in the back of an ambulance with a swollen black eye and a laceration on his head and his clothes were ripped and covered with blood. As Officer Pampena spoke to Elturkey, the EMTs were cleaning blood off his head. However, Pampena did

not see the EMTs wipe blood from around Elturkey's eyes.

Following the reopened hearing, the court again denied the suppression motion on January 14/2014 was not informed before, during or after that Ms Povman waived my right to be present. During a combined Wade,Mapp,Dunaway,Hunteley hearing were Officer Pampena was to appear and give testimony as to the veracity of his prior testimony "of filling out an Aided Report" which also goes to the hart of Probable cause,Impeach him about the identification procedure as well as being in possession of said property.

## 2. Waiver of Counsel

At a May 21, 2013 appearance, petitioner explained to the court that he had been aware of Ms Povman conspiring with the District Attorney to gloss over evidence that pointed to Officer Pampena's perjury. After many attempts to have another assigned counsel appointed for defense. During the January j8/2014 re-opened hearing petitioner specifically put on record that if the court allowed Ms Povman to continue representing me that it would be done without my consent. After the court denied the application "to relieve" attorney Povma, petitioner explained that he was in fact asking to represent himself, judge Hollie decided to allow petitioner to defend himself during the January 8/2014 suppression hearing. On February 20/2014 Petitioner moved to re-open the suppression hearing because of his not being present, and to re-new his application "to relieve" Ms Povman. On January 5/2015 judge Hollie made a ruling to allow petitioner to go Pro-Se and to represent himself during trial. During the Pre-Trial Conference petitioner re-newed original Wade/Mapp/Dunaway/Huntely hearing. On January 20/2015 immediately prior to jury selection, the court asked petitioner whether he still wanted to proceed pro se and petitioner

4

responded in the affirmative. The court asked if anyone had threatened, coerced, or influenced petitioner to represent himself against his will, and petitioner responded that "No, no one threatened or coerced me in that way, but...you know, under the circumstances, your honor, it's hard for a black man to get the proper representation here in the judicial system, you know, what is it that it provides for, it really puts us in, how do you say, awkward position. Sometimes we really don't have a choice in the matter in the case that we want to be represented. The court confirmed that petitioner had discussed his decision to waive counsel with Ms Povman "numerous times". The court asked attorney Povman to remain "in an advisory capacity" during the pre-trial conference petitioner did object to Ms Povman to remain in an advisory capacity However those transcripts were never turned over to defense.

B.   the trial

The trial began on January 22/2015 and the jury rendered its verdict on January 30. The people presented the testimony of the victim and Officer Lanning and Pampena. Petitioner presented the testimony of Emergency Medical Technician Adi Gonzales.

1.   The People's Case

Mr. Elturkey was a cab driver who worked twelve-hour shifts, six or seven days a week. (T. 338.) He testified that, on July 3/2012, at 8:30p.m. he left his apartment on 105th Street in Queens to buy some cigarettes, stopping first at an ATM. (T.341-42.) He took $260 from the ATM, in $20 denominations. (T.357.) He then proceeded to the deli on the corner of 105th Street and Northern Boulevard. (T.342-43.) As he approached, Elturkey saw a man who regularly panhandled outside of the deli.(T.344-45.) In the past, Elturkey had given the man a dollar or a cup of coffee when he had seen him. (T.344.) On this night,

the man-who Elturkey referred to as the"homeless man"-was with a "bunch" of other men outside the store. (T.345.) When asked whether he saw the homeless man in the courtroom, Elturkey answered in the negative. (T.345-46.)

Elturkey could not identify the larger man "Brooks" The person that have told us that was following you was the same guy as the homeless guy? No. Would you recognize that person if you saw "them" again? Yeah, maybe, yeah. I ask you to look around the courtroom and see if you recognize that "Person"? Okay, been a long time. No. You said it's been a long time, what do you mean by that? Elturkey went on to explain how he was unable to recognize people " It was like you know, I'm not..I mean, I didn't give attention, I'm a person like

if see the person 20 times, I don't know what he was wearing. I mean like I always look for basic things, but I'm not remember faces or...Okay. You said it was a long time, what do you mean by that specifically? It was like three years ago. Are you having difficulty remembering? Yes.(T.353-54.)

after the robbery, Elturkey went back to the deli and asked the owner to call 911. (T.371.) As the police drove up 105th Street Elturkey saw the larger man who attacked him, and the police arrested that man. Elturkey was sure the man the police arrested was the man who had hit him and slammed his face against the ground. However, when asked again if he saw that person in the courtroom, Elturkey answered in the negative. When you walked out of the store, what did you see? I saw police car or not marked car stopped in the middle of the street. When you got out of the store, could you describe the police car that you saw? Yeah, it was Chevy beige.. I guess the color or Gray. How did you know they were police officers? I know from the Chevy and because he going opposite way 105 is going east, and he is going west so I thought he is undercover car. When the car approached you, could you describe what the people inside the car looked like? Yeah, two white guys one wearing shorts.(T.373-74.) What did you do when you saw the guy that punched you on the street? The police told me stay in the car so i told him this guy, so the police got out and they arrested him. Did you eventually get out of the police car? Yeah. When did that happen? I went to the police car. Yes. from the intersection I went to the car. The Court: No, when did you get out of the police car? When the other the "Uniform Police" coming and they asked me what happened.(T.374-75.) Mr Elturkey, were any other police officers brought to the scene? Yes. Could you described what those police officers looked like?

7

Two Police officers, one little tall and one normal. And .. One Hispanic, one white american. were they in uniform or also in plainclothes? No. Uniform. It was like three, two police cars and undercover car police. how long after the undercover car came did the other police officer come? Seconds. How soon after your officer got out of the car? Maybe 20, 25 seconds. So quick, instantaneous? Yes. (T.378-79,413-14.) Officer Pampena: Why were you in uniform for that day? For police officers safety usually around holidays they put everybody in uniform for the safety of us, and we know there are a lot of tourist out and people touring New York City so just as a precedent for all us, it's just a higher presence of police force. When you got to the scene, were there other police officers present? No. Who was present? Mr Elturkey was present, the victim, and there was two EMS workers that were in the ambulance. When you got to the scene what happened? I got out the vehicle, out of our police car, and I walked to the ambulance. The back doors are like barn doors, were both open, so I proceeded to go into the ambulance and have a conversation with the victim. When you arrived at the crime scene neither.. my client Mr Brooks wasn,t there, correct? Was Detective Lanning there? No. So you never saw Mr. Brooks and Mr. Ball together, correct? Correct.(543-44.) Now you drew up the complaint and arrest report for both Mr. Brooks and Mr. Ball, correct? Correct. Okay. I ask you again you noted in the arrest report that he had unusual teeth? Yes. Do you remember what was unusual about his teeth? No. If you take a look at Mr Brooks' face now, do you see his teeth. Yes. Does it look similar now as it did then, does that refresh your recollection? Yes So he was missing a bunch of teeth when you arrested him. It was not normal for me, yes. When you were doing the paper work for Mr Brooks, did you notice any blood on him at all? Not that I recall. And no proceeds from the robbery were recovered from Mr. Brooks, correct? Correct.(T.543-46.)

Officer Pampena, okay, did you ever see Officer Lanning at the crime scene? No. While you were there? No. So you never seen Officer Lanning there with you? No.(560.) Great. Officer Pampena, do you understand that perjury is a crime? Absolutely. We are reading from the first suppression hearing, May 21,2013. Referring to page 29 line 24..or 23 down. It reads: You also said that there was someone else there, someone I think that you said was Mr. Brooks. Did you actually see Mr. Brooks at the scene? And your response was: No, he was already in the vehicle being transported away as I was arriving at the icrime scene. So I would like to ask you when you arrived at 105 Street and Northern Boulevard with me in tow two minutes after nine, Mr Brooks was being transported away according to your testimony, okay, in the vehicle..I would like you to help us with this, when you arrived at the crime scene two minutes after, no other officer was present; is that correct? Correct. Offi.

Wasn't there? Correct.(566-68.) Okay. ⸻ yo

precinct and put him in a cell? No.(579.) Police Officer Pampena, according to Mr Adi Gonzalez (EMT) When asked: On the second to last line ten nine eight, what does that indicate I went available, so at 98,, at 21:36 I went available and the job is closed. And you said that it was 14 minutes; is that correct? Of total patient contact time, yes. Can you indicate to us because from what time to what time is the 14 minutes indicating? It would be from 21:21 hours, which is 9:21. So from 9:21 is the time you first came in contact with the victim and at 9:36? I went available. So the first time you came in contact with the victim was at 9:21; is that correct? Correct. For sure? That's what the time.. No, I'm not asking you what time. Is that for sure according to what you know? The Court: According to the report. Yes, sir? If that's what the report says, that's what happened.(T.644-45.) Police Officer Pampena's

9

testimony that after arresting petitioner on 105th Street and 32nd avenue recovered property, and statements, that he transported petitioner back to crime scene, where h. was able to find Mr. Elturkey in the ambulance being treated,and then conducted a showup of petitioner, filling out an Aided Report and Taking Pictures of Mr, Ekturkey's injuries, was inconsistent with testimony of Detective Lanning (T.455-56,459-60,462-63,465,468,472-74.) Or the testimony of Adi Gonzalez testimony (T.643-45.) And the EMT, Call-Sheet, And the EMS Report.Nor Elturkey's testimony (T.375-78.)

### 2.   The Defense Case

On the night of July 3,2012 approximately 9:00 p.m. Petitioner left from a gathering he had attended with the Cohen family who lived on 106th Street and 32nd avenue. Petitioner walked down 32nd avenue toward 105th Sreet and while approaching mid-way between 105th Street and 104th Street an unmarked lllundercover police car pulled up in front of petitioner, and four or five Detectives jumped out and immediately handcuffed and searched petitioner then they put him into their car to transport him back to the crime scene. When petitioner arrived at 105th and Northern Boulevard he was taken out of the car and thrown immediately back inside. Mr. Elturkey describes the showup identification procedure as: When the other officers came, did they bring anybody with them? He told me he going to bring the guy they find the money with him and from far away, and I can recognize him I say yes or no so he bring him like this table so I tell him, yes, this guy.(T.379.) That was going to be my next question, Mr. Elturkey. Yeah. You know, your description is, what do you call, only of a black guy, gay guy, homeless guy? Yeah. And you also said, right, that the police officer said they caught the guy?(T.418.) Okay

. I'm asking you did you know that they had caught the guy the homeless guy with your property before they brought him back to the crime scene, tats what I'm asking. Because you testified .. The Court: Did the cops tell you that they caught the guy with your cell phone? Yes, they saw him throw something in the floor, the paper, social, the license, even bring to the precinct. That when the officers did what you call, bring the person to you, is that before or after they bring the Blackberry to you before the homeless guy? No, they got the guy first from far away and said yes and then start to bring my stuff. Your stuff? Yes. But you just testified that they brought you a Blackberry that didn't belong to you? Yes, after I said the guy. Okay, after you said the guy? Yeah. Okay now, you said hear, right, that you knew the that it was the homeless guy who robbed you because e had your money and your I.D.; is that correct? Not me, the police knows, when the police find my wallet with someone so it's logic it's him.(T.419-20.) Now you have the homeless guy at crime scene, the officers bring you the Blackberry; is that correct? They bring me the phone, that's yours, I said no, so they bring me another phone. How long before they went and found the other phone and brought it back to you; do you know? Yes, just the way he go and come back. How long, where did he go? Where? I'm not looking because I'm still talking to the other cop to explain what happened because like two cops with me and the other cop bring the homeless , he bring the phone,I said, yes mine. Did he tell you or did anybody tell you that they had gotten that phone off the homeless guy? They told me they think they catch he guy because he asked me how much money I said, yes, 250, they said they find 250 exactly. They asked me what kind of phone, iphone, they said they find iphone, they find the social security and my license so I'm not going to say nothing. I just need to know specifically whether or not you were informed, that's it, is that the fact that the **cops caught him**

11

they say they caughtguy. And that they found the property with him, yes. That's what I'm asking. Yeah. (T.427.) Petitioner did every thing humanly possible to build a defense around his innocence; Your Honor, we been locked

Up Two and a half years based on this I throw myself at the mercy of the court today. Please do not send us back. Colluding and suborn is a serious violation, man, to conspire, one or more person to conspire against individuals to prevent them from being able to enjoy the simple rights of our constitution, your Honor, is a serious crime, and that's the reason I'm here, your Honor, contrary to popular belief representing I'm innocent, and I couldn't wait for today, your Honor, to have my day in court please use your good judgment and not have us go back. I would like to move to have the case dismissed based on insufficient evidence, perjury, what do you call, fraud, your Honor. What happened is we have had already an opportunity to cross examine the victim and Officer Lanning. They both testified to the fact that Mr. Pampena, the one who said he wasn't at the crime scene that he was at the crime scene, that the identification of me took outside the ambulance. Officer Pampena testified that the identification of me took place inside. Every thing that he testified to today, your Honor, was contradicted not only by the victim but his fellow officer. Your Honor, You have been making very good judgment, calls and I would ask you, use your good judgment, your Honor, assessing what you seen so far, and I ask to you make a decision and have this case dismissed immediately and please have it referred immediately to IAD internal affairs division that we can get a better understanding of the things that have not been brought forth to this court. Mr. Brooks here he was taken into custod, we still haven't established who was the officer that took him to the precinct. I was arrested on 104th Street and 32nd avenue, your Honolr, and it still hasn't been established. It showed today that Mr. Pampena couln't have been there because he was at the crime scene with officer Lanning who testified that Pampena was there yesterday with him, and there is no way that he could have made it to the crime scene with me in tow and the person was there at the crime scene being treated two

13

minutes after the incident and EMS truck never even arrived at the crime scene until eleven minutes after. Everything here shows that this case thus far has been a farce. Your Honor, all due respect, you know, you know, you talk about everybody's experience, you know. I understand and now I want to just reflect on your experience as a judge, and the many years that you have sat on this bench, your Honor, the description that was given of me by the victim, your Honor. Specifically I said the victim that the officers told him that the property was taken by the dude and they already had him prior to his even seeing the person . Everything about this case, your Honor, there is a lot of what you call illegal things, crimes being committed against me and Mr. Brooks(T.584-85.) Prior to trial the Court made a summary judgment, to allow testimony to be submitted that petitioner was known to Mr. Elturkey without notice. Despite Mr. Elturkey's not testifying in the Wade suppression hearing. Mr. Elturkey during trial made it very clear that his inability to identify the petitioner as the perpetrator was not do to the passage of time, but because he was not the person of interest. However, Mr. Elturkey recognized petitioner as a Lawyer: I know your job. (T.426.) You said someone in the courtroom has similar(Emphasis)style hair, could you point to that person? Yes. It is that. Similar hair like this guy "like The Lawyer"(Emphasis) Mr. Elturkey no doubt as to his ability to recognize "The Homeless" guy: Mr. Elturkey, as you sit here today you remember what these two individuals looked like, if you close your eyes, do you know what they look like? I know it is I know the homeless guy because I saw him three,four, five times, I always see him, but the other guy I'm not recognize him. (T.430.) Before you walked into the deli, did you see anybody that you had seen before? Yeah, I saw one guy. who was that? He is a black guy, homeless, I always give him dollar or coffee or something. How often had you seen that person before? I see him like three

14

or four times. And when was the last time before that day that you had seen him? Maybe like three or four days. What happened three or four days before, how did you see him? What was he doing at that time? He always begging for dollar. where does he do that? In the same, in the corner 105 and Northern Boulevard. Okay. What time of day did you see him that first time? It's after I finish work I always when I got off from the Bus, sometimes I always seen him in the corner of 105 and Northern Boulevard. For how long had you been seeing him there, weeks, months, how long? Yeah maybe like months, month and a half. Where was he the first time that you saw him on the night of July 3rd, 2012? It was in the corner of 105, outside the deli. where outside the deli? Corner of 105 and Northern Boulevard. what was he doing? He was standing with a bunch of guys. I'm going to ask you to take a look around the courtroom and see if you recognize the person that you have talked about just now. He is not here(T.34446.) Who did the police officers bring to show you? He bring the homeless. Did you recognize that person? He bring the homeless.. The Court: They brought the homeless guy to you? Yes. The Court: Okay. Who was that person, what did he do to you? The homeless? Yes. He was the one behind me and the one he took the money and the phone. That was the person the police had in custody? Yes. I'm going to ask you to take a look around the courtroom and see if you recognize the person they had in custody? The Court: You can look around. You mean the homeless guy? Yes. The Court: See if you see the homeless guy. "No. I know him very well. No.(Emphasis) Are you sure the person the police arrested was the person that your property? Yes. Can you remember what that person looked like today? The homeless guy or the heavy guy? The Court: What did he look like? Sometimes he acted gay, act like a woman sometimes, this is the homeless guy(T.384-86.) When pressed Mr. Elturkey decided to give a description of the homeless man in court: I have here, right, you was asked,

15

okay, by the officer that came to the crime scene how did the person look? Who assaulted you? The Court: I will allow it. And he asked you how did the other guy look, and as far as your testimony... The Court: Did the police ask you what the person who assaulted you look like? Did he ask you for a description? The police? The Court: Yes. That was going to be my next question, Mr. Eturkey. Yeah. You know your description is, what do you call, only of a black guy, gay guy, homeless guy? Yeah(T.417-18.) Okay. Now I would like to ask you speaking of not being blind, can you give us a description of the homeless guy? Yeah. Today? Today, yeah. Can you give us a description of him? Yes. Can you please tell us a description of him? Yeah., a black guy, same tall, skinny. How tall? Same tall like me, You want me to stand up? The Court: How tall are you? Do you know how tall you are? Yes like fife six. But he is maybe a little shorter to me and curly hair. Curl hair? The Court: Curl. Yeah, like the always black guys hair. Curl? Yes. Is it dredlocks? Yes. Is it like dreds, like jamaican or like a girl? Like a jamaican but short, same like you hair. The Court: Do you mean like tight curls? Yes. You mentioned earlier that the guy is gay; is that correct? He act gay, I'm not.. Did you ever see him dress differently than a man? Sometimes Yeah. Sometimes he dressed like a woman? Yes(T.420-21.) The District Attorney in his opening statement declares: He went back to 105 Street to pick up coffee and have a cigarette with his friend. When Tarek got to the corner of 105 and Northern boulevard, he saw an all to familiar face, the defendant Raymond Ball. During the trial, you will hear that he is a fixture in the neighborhood. You will almost always find him in front that deli on that corner. Tarek will tell you he has seen him a dozen, hundreds(Emphasis)of time, can you help me out, give me something, dollar, $5. Most of time he pays him no mind. Some days he may throw him a buck or two to be rid of him(T.321.) Petitioner during trial argued that officer Pampena

16

was "Brooks" arresting officer, and that he had lied about apprehending petitioner.

### 3.    Verdict and Sentence

The jury found petitioner guilty as charged of two counts of second-degree robbery (Penal Law § 160.10(1) and (2) (a), third-degree assault (Penal Law § 165.40) (T.728-29) On March 4, 2015, the court sentenced petitioner as a second felony offender to concurrent ten-year prison terms plus five years post release supervision on the robbery conviction, which merged with the one year sentence for the assault and stolen property convictions. (S.24.)

### C.    Direct Appeal

Petitioner filed a counseled brief to the Appellate Division, Second Department, raising four claims: (1) the trial court improperly denied petitioners pretrial motion to suppress (SR15-21); (2) the trial court improperly admitted Officer Pampena's testimony regarding Elturkey's out of court identification of petitioner (SR21-28); (3) the trial court improperly permitted petitioner to represent himself (SR29-34); and (4) the sentence was excessive (SR35-37). Petitioner filed a pro se supplemental brief arguing that (10 the motion to suppress should have been granted because Officer Pampena testimony was Perjured (2) the people failed t disclose Aided Report; (3) petitioner was deprived of his right to be present, at proceedings on January 14,2014, and (4) petitioner was not provided with all the transcripts of the pretrial hearing on 1/14/2015, and 1/14/2014, which was needed to adequately prepare for trial and Appeal. Appellate counsel ineffectively briefed the

17

Appeal.( SR105-61) The people filed opposing briefs. (SR41-104, 162-84) On November 21, 2016, Defendant filed a pro se, request to file a supplemental brief and for missing trial and suppression hearing transcripts. The people took no position on defendants application. By decision and order Appellate Division: Second Department on January 13, 2017 granted motion by the appellant pro se for leave to serve and file a supplemental brief on an appeal from judgment of the Supreme Court, Queens County, rendered March 4, 2015, and to be furnished with copies of the missing pretrial Conference and January 14,2014 suppression hearing transcript.

**ARGUMENT**

Point I: The Perjury Testimony Claim Committed By Police Officer Pampena, as to being Petitioners Arresting Officer.

Petitioner proffered at trial testimony from Police Officer Pampena responded to the robbery report (H.23-25) Approximately one and a half blocks from the robbery location, Pampena observed petitioner a black male wearing a white shirt and black pants

18

-running away from the scene.(H.25-26.) As Pampena exited his marked vehicle, petitioner gestured to an iphone he was holding and stated spontaneously: I brought this phone from 105th Street and Northern Boulevard. Officer Pampena handcuffed petitioner and during a search for weapons, found $250 in cash consisting of $100 bill, seven $20 bills, and a $10 bill. (H.26-27.) Officer Pampena Placed petitioner in the vehicle and drove to the scene . (H.27.) District Courts can reject the testimony of witness credited by the triers of the fact when the testimony is inherently improbable. For Officer Pampena to have been able to arrive at the crime scene with petitioner to find Mr. Elturkey inside the ambulance being treated is a physical impossibility, because the EMS Technician Adi Gonzales indicated exactly when he came in contact with Mr. Elturkey in the EMS Call Sheet. (See exhibit 1.) According to Mr. Adi Gonzales(EMT) When asked: Can you indicate to us because from what time to what time is the fourteen minutes indicating? It would be from 21:21 hours, which is 9?21. So from 9:21 is the time you first came in contact with the victim and at 9:36? I went available.(T.644-45.) Besides Officer Pampena, did arrive at the crime scene at approximately between 9:02 and 9:05p.m. The Court: How long did you spend on the street with Ball before you placed Ball in your car to then go back to 105th? Approximately two minutes? The Court: Okay. so in total, from the time you received the radio transmission, began the process of responding to 105th and Northern, inclusive of the time that you had stopped Ball, how long approximately four, four minutes. If I look at my notes it would tell me exactly when I got.. The Court: Sure, sure. So if there's anything in your records that would refresh your memory, please look at those. On the sprint sheet (See Exhibit 2.)which is what Central has, the job came over at 2059, which is 8:59. And it shows myself going there at.. I was on scene at 2103, 9:03. So all in all, it was five minutes from when the transmission came over of a robbery in progress to actually got on the scene at 105th Street and Northern Boulvard. (H. hb 33-34) And so the 911 report and Officer Pampena's testimony makes it physically impossible to

corroborate Officer Pampena to arrive at that time to find Mr. Elturkey there being treated by Adi Gonzales Because the ambulance did not arrive until 21:11, 9:11p.m. (See Exhibit 1) and according to Mr. Adi Gonzales when asked: You know, what is it, that my reason for calling you is because I need to know, like, the accuracy, I will give you an example: Is it possible since you mentioned the time, according to the run it says on scene, can you just look.. it's on here too, it says on scene 21:11? Um-hum. Okay. Yes. Okay. Now, Mr. Gonzales, you know, to the accuracy of this information, is it anyway possible that the ambulance might have been at 106th Street as you said at two minutes after, and it's just inaccurate this information here, is it possible? There is no indication of that because when we pull up to the scene, hit the button so if it says 21:11.. Thats exactly the time? The Court: So when you get to the scene, you just push a button and the computer generates the time; is that what you are saying? Correct. The Court: Okay. So that means that this time is accurate beyond any reasonable doubt; is that correct? As much as anything human made could be, yes. That's what I'm asking? The Court: It's accurate as to it tells you exactly when you pushed the button, right? Right. The Court: Okay. (T.615-16.) Despite Petitioner disclosing powerful evidence of written records, they refused to agree that Officer Pampena committed perjury. Officer Pampena's perjured testimony was the center piece of the governments case, and "If the state through its law enforcement agents suborns perjury for use at the trial, a constitutional due process claim would not be defeated merely because the prosecuting attorney was not personally aware of this prosecutorial activity" Schneider v. Estelle, 552 F2d 593, U.S. v. Sanchez 813 F. Supp. 241. Where a Drug Enforcement Agency agent failed to correct a witness false testimony that no promises or agreements existed between the witness and the government, and then while testifying himself affirmatively misrepresented that no promises or agreements existed a new trial on the grounds of prosecutorial misconduct was ordered. That knowing perjury by a federal agent who is involved in the prosecution can

constitute "knowing use by the prosecution" is supported by case law in the second circuit regarding Brady disclosure requirements. In United States v. Morell 524 F.2d 550(2d cir.1975) In a subsequent case, the Second Circuit distinguishes government officials who may be as an arm of the prosecutor from those who may not. The Pina court let stand the district judges findings that a police officer who did testify in the trial and was the investigating officer 586 F.Supp. 1457(E.D.N.Y.1984) Was an arm of the prosecution whose knowledge was to be attributed to the prosecution 752 F.2d 50.

The are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure. If the police allow the State's Attorney to produce evidence pointing to the guilt without informing him of other evidence in their possession which contradicts this inference, state officers are practicing deception not only on the State's Attorney but on the court and the defendant. "The cruelest lies are often told in silence". Officer Pampena filled out a felony complaint stating that when he placed the defendant into the cell at 115 police precinct, In Queens County and uncuffed the defendant, the defendant started swinging his arms, and kicking his feet towards police officers and a police sergeant who were right next to him. However Officer Pampena was asked Okay. Did you ever take Mr. Brooks to the precinct and put him in a cell? Responded in the negative.(T.579.)  Yet; Officer Lanning clarified: When he was asked; Well, is it common that even though you might stop somebody and detain them, credit for the arrest would be given to somebody else, does that happen? If there is other officers on scene, I don't necessarily have to take the arrest. If someone else another fellow officer is there, they can take the arrest as long as they are there on scene (Emphasis)(T.456.) Officer Lanning continues when asked: Were you still at the scene when Officer Pampena showed up with the other arrestee? I was there when officer pampena showed up. I could't tell you if the other arestee was there.(T.459-60.) Officer Lanning continues to confirm Pampena's presents: Are you sure? I'm not sure if I recall if I wrote it or Officer Pampena. His pedigree was written down on a piece of paper. I believe Officer Pampena wrote it. So that means that Officer Pampena was on the scene when Mr. Brooks was arrested; is that correct? He was there , yes. He was on the scene? Yeah.(T.463.) We put him in the vehicle, we did a canvass for the defendant, and he was pointed out. As far as I'm concerned

22

thats the assistance that I provided to him. As far as medical assistance, other officers had provided that for him. But can you give us the names of the officer that provided that? Sure Officer Pampena and Sergeant Rosenberg. So your saying to us that while you were at the crime scene, Officer Pampena provided help, assistance for the victim..(T.464-65.) Officer Lanning leaves no doubt as to being able to confirm Officer Pampena's presence using the sprint report: Is there anything on the Sprint report that reflects your response? Yes. The Court: The answer is yes. Okay. Can for the Court can you tell let us know, indicate where is it? Do you want to read it? Please. The Court: Read it. At 21:03, FIO on scene. The Court: You are the FIO, correct? That is correct. Okay. Do you see here that on the Sprint report it says that 21:00 RMP 242 responded on that Sprint sheet? The Court: Is that correct? Is that what it says? Yes. Yes. "It is established that due process has been denied if a conviction is obtained through use of false evidence, known to be such by representatives of the prosecution" More important, however, those charged with enforcing our laws must act in full compliance with the Constitution and the laws of the United States whether they agree with them or not. The balance in between the need for efficient law enforcement and "The right of the people to be secure in their persons, houses, papers and effects..." will not always be struck in a manner that will fully satisfy those "engaged in the often competitive enterprise of ferreting out crime" Johnson v. United States 333 US 10. But the protection of our constitutional liberties must rest on more detached and studied judgment. The Supreme Court has indicated that perjured testimony coerced by local law enforcement authorities is so reprehensible as to establish a due process violation. Pyle v. Kansas, 317 US 213. Mooney v. Holohan, 294 US 103. During Officer Pampen's testimony, represented that he Apprehended petitioner "running from crime scene" withholding "that he was

at the crime scene assisting Officer Lanning, who put the handcuffs on Brooks while Officer Pampena " According to Officer Lanning's Memo Book; Okay. Its the officers memo book so he will clear it up. What does that entry mean? It says that the two males were stooped and then it says, if you look at it, 92 Charley by 115 anti crime, PO Pampena, meaning I stopped them in the corner but the arrest was taken by Pampena at that time. It was not taken by myself. (See Officer Lanning's Memo Book Entry)(H. January,8, 2014) Officer Pampena withheld the fact that he was not Petitioners arresting officer, or that petitioner was not apprehended in the way he testified to or the identification procedure and his recovery of victims property never took place. The reasoning of the Brady cases: "It makes no difference if the withholding is by officials other than the prosecutor. The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney were guilty of the nondisclosure. Barbee v. Warden 331 F2d 842, And where cases involve both nondisclosure and perjury, courts consider them jointly under the rubric of prosecutorial misconduct, see United States v. Butler, 567 F2d 885. Perjury by a government agent can only be a knowing, intentional decision to lie by a member of the institution which is charged to uphold the law and seek just convictions. There for it is a short step indeed to apply case law regarding Brady obligations to instances of perjury. Thus Officer Pampena was clearly a member of "the prosecution team" Schneider,552 F2d 595. And his testimony is knowing use of perjury by the prosecution, even though the Assistance District Attorney was unaware of the perjury. Officer Pampena describes having received a radio call: The Court: Also, Officer, just to make sure that I am clear as to what you were saying that you heard on the radio, when you said male Blacks, was there an indication as to a number of male blacks? I don't recall. The Court: And when you also mentioned white shirt,

24

Did they have any weight? I don't recall. (May, 21, 2013.(p35-37) Okay. and you told us that you responded in about 9:03pm that you had arrived at the scene of the robbery; is that correct that you stopped Mr. Ball approximately three minutes later, at 9:06pm? The Court: Again if you know the exact time. No. I stopped him before I went to 105th Street. (H. May, 21, 2013(p39) Officer Pampena tells a tale that not only defies physical impossibility, his story also defies time. (See Exhibit 2.) Sprint Report, clearly shows petitioner being stopped on 104th Street at 2106 or 9:06, and being transported back to show-up at 2108, or 9:08. For Officer Pampena to have stopped petitioner before arriving at 105th Street at 9:03pm, would have given him only from 8:59 to 9:03 to have received radio run on 108th Street travel the distance to 105th Street, stopped petitioner, and arrived at the crime scene at 9:03. But then if for some reason Pampena's testimony is true that would mean that the "Sprint Report" is wrong, Officer Lanning's testimony as to Pampena, being with him during Mr. Brooks arrest is wrong, that someone called in the a stop and transportation of someone is wrong, and that Mr. Adi Gonzales testimony is wrong as to the accuracy of the EMT Response Time System and last but not least the victims testimony as to Officer Pampena being the one who "asked Mr. Elturkey, what happened" Prompting Mr. Elturkey to get out of the Officer Lanning's cruiser in order to identify Mr. Brooks (T. 373-75, 378-79, 413-14)


**Point Two:  The Fourth AmendmentCliam, Barred By Stone Is Defeated By Townsend**

While Townsend held that ordinarily the complete State Court Record including the transcripts of testimony or if unavailable some adequate substitute such as a narrative record, the pleadings, Court Opinions, and other pertinent documents is indispensible to determine whether the Habeas applicant received a Full and Fair State Court Evidentiary Hearing resulting in reliable findings. Mayer v. City Of Chicago 404 U.S. 189. Also When a State Court made a procedural error or made an erroneous decision on the merits, the record shows that such a full and fair determination It was set down in Sain, the circumstances under which a Federal Court must review constitutional claims (Illegal Search and Seizure ) presented by State Prisoners if (1) The merits of the factual dispute were not resolved in the State hearing (2) The State factual determination is not fairly supported by the record as a whole (3) The State Court was not adequate to afford Full and Fair hearing (4) There is a substantial allegation of newly discovered evidence (5) The material facts were not adequately developed at the State Court hearing, or (6) For any reason it appears that the State trier of facts did not afford the habeas applicant a Full and Fair Fact Hearing. Conventional notions of finality have no place where life or liberty is at stake and infringe of constitutional rights is alleged. Thus collateral relief contributes to the present vitality of all constitutional rights whether or not they bear on the integrity of the fact finding process.

The Stone Bar, is not honored in Federal Court unless the State Courts consider the claims Fully and Fairly (Dokes v. Dugger 911 F2d 508 ) Where there are facts in dispute, full and fair consideration by the fact finding Court, and at least the availability of meaningful Appellate review by a higher State Court. Where however the facts are undisputed, and there is nothing to be served by ordering a new evidentiary hearing. The Full and Fair consideration requirement is satisfied where the State Appellate Court, presented with an undisputed factual record, gives Full Consideration to defendants Fourth Amendment Claims ( Morgan v. Estell 588 F2d 941, Quoting, Oberry 546 F2d 1213 ) The Trial Courts failure to make explicit findings on matters essential to the Fourth Amendment Issue ( Officer Pampena's Perjury ) combined with the fact that the State Appellate Court issued only a summary affirmance, precludes a conclusion in this case that the State provided the meaningful Appellate Review necessary to erect a Ston, Bar to the District Courts review of the claim ( Agee 809 F2d 1487 )  A criminal defendant is entitled to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings ( Tankleff 135 F3d 235, Quoting Farretta 422 US 806, and citing Illinois v. Allen 397 US 337,) The Constitutional right of a criminal defendant to be present at all material stages of a trial, is rooted in the Six Amendment, but is protected by the Due Process Clause of the Constitution in situations where the defendant is not actually confronting witnesses or evidence, ( See Gagnon 470 US 522 ). In Snyder 291 US 97 ) The Supreme Court explained that a criminal defendant has a Due Process Right to be present at a proceeding " Whenever his presence has a relation, Reasonably Substantial, To the Fullness of his opportunity to depend against the charge. A defendants physical presence " Is a condition of Due Process to the extent that a Fair and Just Hearing would be thwarted by his absence, and to that extent only. Stone Dose Not Extend Past The Six Amendment; During the January 14, 2014, Combined Wade, Mapp, Dunaway, huntely, hearing petitioners Lawyer ( according to the DA ) waived

27

Petitioners right to appear. despite petitioner not being present at the
January, 14, 2014, hearing and specifically calling to the Courts
attention: I apologize. I want to go on the record and let the record
reflect that, you know, last time I was in front of you I asked you to
allow me to go pro se or have another lawyer represent me in the case. i
don't feel Miss Poman will properly represent me. And she has been
negligent, you know, in her duties in defending me. So, you know, I just
wanted to let the record reflect that, your Honor, we are going forward
today with this hearing against, you know, my wishes, you know, of
having her represent me and let the Court know I have submitted.. I
don't know if you had an opportunity, I submitted a motion for dismissal
which reflects, you know a lot of information, your Honor, that pertains
to the perjury testimony of Officer Pampena against me in this case. (
H. January 8, 2014(p2-3). The Federal Rules Of Criminal Procedure 43
(C)(3) States that: " If fact issues are presented however, as they
often will be on a pretrial motion to suppress evidence or the on some
motion for new trial, It would seem that defendant has a right to be
present" The Second Circuit held that a petitioners presence at a
pretrial Wade, hearing clearly falls within the scope of that right, In
determining whether a defendant has a right to be present during a
particular proceeding involving factual matters about which defendant
might have particular knowledge that would be useful in advancing the
defendants or countering the People's position. Petitioner was denied
the right to be present at a combined Wade, Huntely, Mapp, Dunaway
hearing, and with such fundamental Constitutional Rights at stake, and
particularly in view of the fact that the Suppression Hearing in this
case served as a Trial on the Merits, it cannot exclude " Any Reasonable
Possibility of Prejudice from defendants absence ( Peterson v. U.S. 411
F2d 1047 ) It is well settled that a defendant has a right to be during
all stages of his and her trial and that right can only be waived by the
defendant counsel if the waiver is made in the defendants presents, or
with defendants express authority, or if the defendant subsequently
acquiesce to the waiver made by counsel. When counsel told the Judge
that it would not be necessary for petitioner to speak, and then waived
his right to be present, Petitioners silence in absentia could certainly
not be said to have amounted to " An Intentional Relinguishment or

Abandonment of a Known Right " ( Johnson v. Zerbst 304 U.S. 458 ) The trial focuses on the issue of guilt or innocence. While the suppression Hearing centers upon the validity of Officer Pampen's testimony which the government planed to use later on inseeking to prove guilt. Defendants participation in his defense as a Pro Se litigant took on different forms at each stage ( Simmons v. U.S. 390 U.S. 377 ) By the time of trial the judge had already denied motion to suppress. While the Court might conceivably have reversed itself upon development of additional proof. It is most unlikely petitioner would have been permitted to reopen the issue and for that purpose to examine witness outside the presence of the jury. Such suppression hearings should be concluded prior to trial, U.S. v. Birrell 470 F2d 113. Petitioner had taken charge of his defence due to his being apprehensive as to Miss, Povman,s collusion with the District Attorney. Therefore petitioners right to be at the January, 14, 2014, hearing during argument of counsel is unquestioned; Certainly petitioner had the right to be present while witnesses testified against him. Even if that testimony was ostensibly in the nature of a proffer. That does not transform those proceedings into a conference. The presence of the accused during actual testimony is crucial: He may identify inconsistency or other problems in a witnesses testimony which are unknown his attorney and may guide his attorney in effective cross-examination. In People v. Walsh the Court said that where a witness in a criminal case testifies to having made a statement to the District Attorney and the statement is in court and inspection by the judge reveals contradictory matter " It's use for cross-examination on the question of credibility may and usually should be permitted ". The Courts have determined that the right to scrutinize prior inconsistent statements which cannot be cut off by mere admission by the witness that he has been guilty of perjury . Especially as in this case where petitioners conviction stands or falls on the truthfulness of Officer Pampena. In sum without the hearing, no Court could know or decide what evidence may have been available for the suppression hearing yet withheld as unnecessary at trial ( People v. Millan 69 NY 2d 514, People v. James 67 NY 2d 662, People v. Gonzalez 55 NY 2d 720 ). Petitioner argues that there was no justification for judge Hollie to rule that petitioner must except Miss Povman's incompetence

assistance over petitioners protest. Petitioner being Sui Juris and mentally competent, had a right to rely on his own skill and ability to conduct his defence in person without the assistance of Counsel. On page 34, Randall Unger's brief for petitioner states: In attempting to defend himself, the petioner displayed a remarkable degree of courtesy and respect for Judicial Process. At no time during the trial did he behave in a contemptuous manner. On the contrary he accepted the Trial Courts adverse ruling with more grace than some attorney's show on occasion. Petitioner argues that Judge Hollie allowed Miss Povman to waive his right to be present without an effective waiver, when the settled Rule Of Felony Trials is that in the absence of an effective waiver defendants presence is indispensable ( Maur v. People 43 NY 1, People v. Winchell 7 Cow 525 ) Fundamental fairness to a person accused of crime requires that when It became apparent that Miss Povman was not protecting petitioners, Due Process Rights. The Judge should have stepped in to protect him, ( Mackenna v. Ellis 280 F 2d 592 ) Petitioner argues that Miss Povman's undivided loyalty to him as appointed counsel was considered as essential to the right of the accused to require the prosecutions case to survive the crucible of meaningful adversarial testing. " The Transcripts from January 14, 2014, will show how Miss Povmans's performance as petitioner's representative during the hearing lost it's character as a confrontation between adversaries, the Constitution Guarantee was violated. As Judge Wyzanski has written " While a Criminal Trial is not a Game in which the participants are expected to enter the ring with a near Match in Skills, Neither is it a Sacrifice of unarmed Prisoners to Gladiators ( United States Ex Rel Williams v. Twomey 510 F2d 634, Sielaff v. Williams 423 US 876 ) Petitioner was denied his right to Effective Assistance Of Counsel which is rooted in the tradition and cnsceince of our people as to be of the very essence of a scheme of ordered liberty. Appellant argues that whether a man is innocent cannot be determined from a hearing in which as here, denial of counsel has made it impossible to conclude with any satisfactory degree of certainty that petitioner case was adequately presented ( Betts v. Brady 316 US 455 ). Petitioner argues that during the January 14, 2014, hearing Miss Povman's professional judgement was not exercised within the bounds of the law, to soley benefit Petitioner because Miss Povman was influenced by the District Attorney to compromise

her loyalties and permitted her personal interest and the interest of the people to dilute her loyal service to petitioner. In order to satisfy the Constitutional counsel must function as an advocate for the defendant as opposed to a friend of the Court. Ferri v. Akerman 442 US 193, United States v. Anonymous 215 F Supp 111, John v. Smyth 176 F Supp 949 ). Petitioner argues too, how then can it be determined with any satisfactory degree of certainty that his case was adequately presented on appeal when Randall Unger submitted a brief in appellants defence without having the January 14, 2014, transcripts available for review.

**Point Three: Petitioner's Right To Be Present Was Denied, Violating His Right To A Fair Trial**

The State Court Unreasonably applied clearly-established Supreme Court Law to reject petitioners's claim that he was denied his right to be present at a pretrial Suppression Hearing, on January 14, 2014. Petitioner raised this claim in his pro se supplemental brief on direct appeal ( SR149 ) and the Appellate Division summarily denied it. Ball, 162 A.D. 3d 681. Accordingly, this Court reviews this claim pursuant to the " Limited " authority granted by AEDPA. Srimo, 935 F 3d 111. Rule 10 of the Federal Rules of Appellate Procedure places the burden on appellants to ensure that the record on appeal is properly prepared and forwarded to the Court of Appeals. However in this case it appears that the problems with the record are not due to any lack of diligence on the part of petitioner. Petitioner on February 14, 2014, moved to reopen, the January 14, 2014 hearing, and to have the transcripts turned over to defense (See Exhibit 3,) and on November 21, 2016, petitioner filed a pro se, requests permission to file a pro se supplemental brief and to have missing transcripts of the January 14, 2014 hearing and the missing transcripts of January 14, 2015, Pretrial Conference, in order to perfect my appeal. The People took no position, and on January 13, 2017, The Appellate Division; Second Department granted the motion and ordered the People to turn over missing transcripts, and through no fault of petitioner it was not done. And instead the government used them as part of their response to petitioners supplemental brief, and in the Assistant Attorney General's Memorandum of Law, p-23, stating: Here, the January 14, pretrial conference was neither critical to the trial's outcome, nor would petitioner's presence have contributed to the fairness of the proceedings. The sole purpose of the January 14, proceeding-the minutes of which occupy all of two pages-was not as described in their brief " To resolve whether Officer Pampena had filled out an Aided Report, documenting the medical treatment received by Elturkey and if so, to disclose that report to petitioner ". However the January 14, 2014, Transcripts Goes to the heart of Officer Pampena's perjured testimony that was given during the January 8,2014, hearing: So you stopped Mr. Ball at 9:00 p.m. I assume you frisked him on the scene, right? You frisked him before putting him in

the car? Yes Then you took him by car to 105th and Northern, right? Yes and that's approximately one block ? Yes. So my question is just what time did you arrive approximately at 105th and Northern from the time you stopped Mr. Ball until the time you arrived at 105th and northern?, Officer Pampena goes on to describe his arriving at the crime scene, find Mr. Elturkey inside the ambulance being treated, while sitting right next to him in the ambulance. The Court: Right. So at the time you are sitting next to him and making these observations, do you have.. what part of his are you able to see as you are sitting next to him? Officer did you prepare an Aided Report in connection with this case? Yes. Do you have a copy of that report with you today? I can look to see if I have it. The Court: Okay, Officer, you just testified that you prepared an Aided Report in connection with this case? Yes. Is that based on your memory or your practice or on.. what is the basis for that? Based on practice. We are supposed to fill out an Aided Report if someone is injured. So that your testimony is based on your practice, what you usually do, correct? Yes. The Court: And, you know, just to be clear, just so I'm clear as to what you meant by the answer you just gave, your testimony is based on your practice as opposed to.. you just described having arrived at the ambulance, gotten in the ambulance, was literally sitting next to the complainant, and the observations based on practice or **based on your actual recollection of what happened in this case?** The Witness: **Based on actual recollection of me sitting there shoulder to shoulder next the complainant is what I observed.** The Court: **Sure. And when you were next to the complainant when he made his identification, right? Yes.** The petitioner made  a timely request to the Appellate Court;s Clerk's Office, that the entire record be included in the record on appeal. Through no fault of his own, that was not done. Surely petitioner was prejudiced because the transcripts were needed for impeachment of Pampena's perjured testimony as to the Identification, and to the identification procedure, at trial was not only unduly suggestive, the Trial Court made a summery decision to allow the people to present testimony of prior familiarity of the antagonist, which falls under the exception to Wade. Without ever conducting a Rodreqez Hearing, and the complainant was unable to make an in court identification of petitioner. The right of criminal defendant to be  present  at  pretrial  suppression  hearing  has  three  bases:  the

33

confrontation clause of of the sixth amendment, the Due Process Clause of the Fifth Amendment and Federal Rule of Criminal Procedure 43. United States v. Brantley, 68 F3d 1283. The right to be present pursuant to the Confrontation Clause has been referred to as a "trial right" and is less broad than the right afforded by the Due Process Clause of Rule 43. United States v. Boyed 131 F3d 951. thus this clause has the "functional purpose of ensuring a defendant an opportunity for cross-examination" The Due Process Clause, on the other hand, offers a criminal defendant a somewhat broader right to be present. The Supreme Court described this right as follows: The court has assumed that, even in situations where the defendant is not actually confronting witnesses or evidence against him he has a due process right "to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge" Stincer, 482 U.S. 745, quoting Snyder v. Massachusetts, 291 U.S. 97, Proffitt V. Wainright, 685 F2d 1227. Consequently petitioner had a clear right to be present during the combined Wade, Mapp, Dunaway, Huntely hearing that were unquestionably "Stages" subject to Rule 43's directive. Consequently petitioner had a clear right to be present during the portions of the trial that was conducted over his protest in his absence and the court committed a constitutional and statutorial error by denying him that right.

**Point ˙Four:    Victim's Out Of Court Identification Violated Petitioners Due Process And Was Not Reliable**

Petitioner argued, that the People failed to satisfy the requirement of CPL 60.25(1)(a)(ii), that the corporeal identification of the defendant after the commission of the crime be made " under circumstances consistent with such rights as an accused person may derive under the constitution of this state or of the United States " is the reliability that permits such past identification to be received as evidence in chief connecting the defendant with the commission of the crime ( people v. Jackson 541 N.Y.S. 2d 226 ) Clearly if the subsequent corporeal viewing was unduly suggestive or otherwise violative of the defendants rights, the substitute identification procedure of CPL 60.25 may not be invoked.  Petitioner was denied full and fair litigation, where at his Wade hearing the state judge did not use either analytical frame work of Biggers or make detailed factual findings with respect to suggestiveness or reliability, and because the state court did not consider those factors at all in adjudicating petitioners Federal Due process Rights, it unreasonably applied " Clearly established Federal law, as determined by the Supreme Court of the United States "§2254(d)(1). The Supreme Court has held that an identification procedure is suggestive where it "in effect says to the witness 'this is the man' Foster v. California 394 U.S. 404  Mr. Elturkey during trial testified to the following: I'm asking you did you know that they had caught the guy the homeless guy with your property before they brought him back to the crime scene, that's what I'm asking. The Court: Did the cops tell you that they caught the guy with your cell phone? Yes, they saw him throw something in the floor, the paper, social, the license, even bring to the precinct. (T.419.) Did he tell you or did anybody tell you that they had gotten that that phone off the homeless guy? They told me they think they catch the guy because he asked me how much money I said, yes, 250, they said they find 250 exactly. They asked me what kind of phone, iphone, they said they find iphone, they find the Social Security and my license so I'm not going to say nothing. I just need to know specifically whether or not you were informed, that's it, is that the

Fact that the cops caught him? Yes they say they got the guy. And that they found the property with him yes. That's what I'm asking(T.426) Okay. Now, you said here, right, that you knew that it was the homeless guy who robbed you because he had your money and your I.D.; is that correct? Not me, the police knows, when the police find my wallet with someone so it's logic it's him(T.420).

**The Proper Foundation Was Not Laid For The Admission Of The Police Officer's Testimony As To The Complainants Out Of Court Identification Of Defendant**

Although it was there burden to do so, the people did not establish the reason why the complainant could not make an in court identification. **"In Order To Lay A Proper Foundation Under CPL 60.25, There Must Be Testimony From The Witness Which Establishes A Lack Of Present Recollection Of The Defendant As The Perpetrator"** In Point Two Of The Peoples Brief, they argued that, "Elturkey Testified that he had no recollection of the incident and had trouble remembering the **"Co-Defendant's Face Due To The Passage Of Time"**. Mr. Elturkey left no doubt as to his ability to Presently identify the "homeless guy" as independent from his inability to recognize Brooks: The person that you have told us that was following you was the same guy as the homeless guy? No. Would you recognize that person if you saw "them" again? Yeah. maybe, yeah. I ask you to look around the courtroom and see if you recognize that "person"? Okay, been a long time. No. You said its been a long time, what do you mean by that? Elturkey went on to explain how he was unable to recognize people "It was like you know, I'm not..I mean, I didn't give attention, I'm a person like if I see the person 20 times, I don't know what he was wearing. I mean like I always look for basic things, but I'm not remember faces or...Okay. You said it was a long time, what do you mean by that specifically? It was like three years ago. Are you having difficulty remembering? Yes(T.353-54.)

Mr. Elturkey was asked directly: As you sit here today you remember what these two individuals looked like, if you close your eyes, do you know what they look like? **I know it is I know the homeless guy because I saw him three, four, five times, I always see him, but(Emphasis Add)**the other guy I'm not recognize him(T.430). I'm Going to ask you to look around the courtroom and see if you recognize the person they had in custody? The Court: See if you see the homeless guy. **No I know him very well. No.(Emphasis)(T.417-18)**

Although of firmly established and regularly followed state rules ordinarily bar federal review- there are exceptions, Davis v. Wechsler 263 U.S. 22. **The General Principle That An Objection Ample And Timely To Bring An Alleged Federal Error To The Attention Of The Trial Court, Enabling It To Take Appropriate Corrective Action, Satisfies Legitimate State Interest, And Therefore Suffices To Preserve The Claim For Federal Review,** Osborn v. Ohio 495 U.S. 103. Petitioner argues that the court ruled "no objections was made, where record clearly shows objection was made" Vega v. Walsh 2010WL168519. During Redirect Examination: Petitioner was asked by the court; Do you want to ask him a another question about what the officer just testified to? Defendant Ball: Yes, because what happened under sixty twenty five.. (Petitioner was cutoff by the judge) The Court: Do you have any questions about what the witness just testified to? (T.580.) Directly after Officer Pampena testified during the proceedings, petitioner made a motion to dismiss specifically because the officer told him that the property was taken by petitioner and that they had already arrested him before Mr. Elturkey ever even seen petitioner(T.585). Then once again the renewed his objection: Yes, your Honor. Earlier I didn't get the chance to put the application in of the District Attorney making identification of the witness under 60.25 prior recognition by a witness exception to the hearsay rule people v. Trowbridge... The Court: What is your application? That we not allow that be presented to the jury, any description, you know, prior recognition by witnesses for it not to be allowed because it doesn't apply to us in this case. The Court: Well your request is way late all the evidence has come in (Adi Gonzalesz still had not testified)

I rather make the application late than never. It is clear from the record that the petitioner complied with timely objection- which the judge ruled on-during proceedings, The Court; Do you want to be heard. Mr. Short: First of all, for the preserve of the record the objection is not timely nor do I believe it is sufficiently preserved. Second of all the people have made out the requirements of CPL 60.25 for the identification to come in. Mr. Elturkey specifically said it's been too long for me to remember. On the basis I believe of 60.25 applies and his prior I.D. comes in. The Court: I agree with that. It is untimely, and in any event, **"The complaining witness' testimony laid a proper foundation for the admission of the testimony of police officer"** so that application is denied. Under New York Criminal Procedure Law CPL 470.05 " An objection is preserved if the objecting party (1) Made his or her position regarding the ruling known to the Trial Court(2) Made a protest, and the Trial Court " expressly decided the question raised on appeal " or (3) Without success...either expressly or implied sought or requested a particular ruling(T.597-98.) In People v. Diaz, The Trial Court, must be vigilant in weighing a defendants constitutional rights " against the resulting prejudice to the people from the belated notice " Trial Courts enjoy wide discretion in considering late notice. Diaz is read as a recommendation that courts employ preclusion sparingly given the constitutional rights at stake, and also that prosecutors need to demonstrate that their cases are actually hindered by a defendants late notice, rather than simply like in this case "simply assert that prejudice flows automatically from a tardy assertion of the defence. Here the trial court simply agreed with the prosecution, that it was to late and did not give no real consideration to granting argument, Smith 722 F Supp 2d 356, Vasquez 2018WL3193205, Diaz v. Greiner 110 F Supp 2d 225. In determining whether particular statements of a Trial Court constituted a ruling on an issue not raised by parties, It is essential to look to the context in which those statements are made. In People v. Ball 162 A.D.3d 680 The Appellate Division used the same exact wording in their ruling. In Cotto 331 F3d 217, The Guidepost are, a question of whether the failure was actually relied on  by the trial court, is not relevant because a party's failure to raise an issue "would not, almost6 by definition, be mentioned by the trial court". In this case it is clear, that the alleged procedural violation was relied on by the

trial court, where it was first raised, trial judge ruled on the belated objection, which was noted by trial judge. First, the Cotto Guidepost has no bearing where a party has failed to raise an issue. Second, a court must determine whether State Case Law, indicates that compliance with the rule was demanded, in the specific circumstances presented. Three, Substantial Compliance, The record in this case clearly shows petitioners objection on more than one occasion, and the New York Courts held that "failure to object during summation is a procedural bar. The State Court's findings of procedural default rests on an inadequate procedural ground, where the record demonstrates that counsel did, in fact, comply with the Contemporaneous Objection Rule. A defendants attempt to secure a ruling during a proceeding held contemporaneous with the trial is deemed to have thereby protested the courts ultimate disposition or failure to rule accordingly and sufficiently to raise a question of law with respect to such failure, regardless of whether any actual protest thereto was registered(Fong v. Poole 522 FSupp2d 642).

The legislature recognition of the importance of testing the reliability of identification testimony before trial is codified in CPL article 710, People v. Newball 76 N.Y.2d 898, People v. Gissendanner 48 N.Y.2d 543. Under CPL 710.20(6), a defendant may move to suppress identification testimony on the ground that it is tainted by "an improperly made previous identification" 710.30 requires the people to inform defendant that they intend to offer identification testimony at trial, putting defendant on notice of the potential to make a motion to suppress. And CPL710.60 governs the procedure for initiating the motion specifying when the court may summarily dispose of such a motion without a hearing. In response to petitioners Omnibus motion, the people never notified petitioner of their intent to present testimony of the protagonist having known one another, hence CPL 710.30 would not have come into play(People v. Tas 434 NYS2d 978. Therefore petitioner was granted a Wade hearing. The general rule is that the holding of a suggestive showup is violative of a defendants due process rights. Any resulting in-court in court identification must be suppressed unless it is demonstrated -at a hearing-that the latter identification has an independent source (Manson v. Brathwaite 432 U.S. 98) Mr. Elturkey did not testify at the Wade

hearing. Therefore the trial court erred in making a summarily decision under 710.60 initiating when a court may invoke the exception to the rule circumstances without holding a hearing. The courts invocation of the "confirmatory Identification" exception is thus tantamount to a conclusion that, as a matter of law, the witness is so familiar with the defendant that there is "little or no risk" that police suggestion could lead to a misidentification. This is so because as a consequence of applying the exception, the defendant will be denied a Wade hearing to explore suggestiveness. In effect, it is a ruling that however suggestive or unfair the identification procedure might be, there is virtually no possibility that the witness could misidentify the defendant. In this single witness identification case, the preclusion of an adequate opportunity to cross examine on that key issue which eliminated any supportable basis upon which to find that the showup identification was the product of prior familiarity and therefore, merely confirmatory. Contrary to the people's argument, prior familiarity should not be resolved at trial in the first instance. The Legislator mandates pretrial resolution of the admissibility of identification testimony where it is alleged that an improper procedure occurred, CPL 710.20(6), 710.60. Moreover, when the defendant's theory at trial is mistaken identity, the exploration of prior familiarity on cross-examination may actually bolster the people's case(Dodt, 474 NYS2d 441), a summary denial is permitted only if no legal basis for suppression is presented or if the factual predicate for the motion is insufficient as a matter of law(CPL 710.60-(3);People v. Weaver 429 NYS2d 399,See People v. Rodriguez 583 NYS2d 814, Watkins v. Donald E...,1980 WL 339952.

# EXHIBIT A

```
*******************TUES.07/03/12********************
INCIDENT RECORD I QNS 16  115I    T94F  2059 D34 2100 T14452  S
10-30Q2 ML ROBBED                       P2        HOSP|RMVD
ROUTING.D B       V   S     I CCD       UF61        CC
104-22 NORTHERN BLVD
104 ST - 105 ST
MC TARAK NCB
DUPLICATE JOB NUMBER  T14566
02  T94F  2059 @DBLTNVEHSBSQTRN   EXT MU*--JUST HAPPENED---AT KNI
          FE PT---W INJS-----RMA----PERPS R 3 MBS----ONE WRNG WHT SHRT
          N, BLK PNTS----OPER 1509 CP94
OA  D59C  2059 @DEF*
05  D34C  2059 @*---XMXMXM
05  D59C  2059 @D*
05  D41C  2059 @*--XMITD OVER SOD
0B  D41C  2059 @B*
0B  D34C  2059 @*
05  D59C  2059 @TRN*
11  D34C  2100 115SP4 10-98   2102 @*
05  T94F  2100 @B*---SMC TARAK---INS GROCERY STORE NOW----NCB---
          STS POLICE R THERE N HU----ANI-ALI*          SADEK ALBARATH
          I 104-22 NORTHERN BLVDFLR BSM CORONA COS.BUSN LAT.LON.OPER J
          AMES, KEISHA-C-MTCOP094 OPER 1509
05  D34C  2100 @*--RMP 242----
05  T94F  2100 @D*
05  D34C  2100 @*---ARRIVE ALIVE-------
0D  T94F  2100 @*
05  D43C  2100 @*XMITTED OVER COMMAND A--AA MESSAGE---CW1118
0A  D43C  2100 @DEF*
0B  D34C  2100 @*
05  D34C  2101 @*--CB CKD-----FOR FURTHER---
05  D34C  2101 @*--DIRECTION OF FLIGHT---
05  D34C  2101 @D*
0B  D42C  2101 @*....... XMITD.... OVER SOD... CW 1529
05  D34C  2101 @*--CB CKD--BUSY SIGNAL---
11  D34C  2102 115S0242 10-98   2317 @*
13  D34C  2102 115SP4 10-98   2102 @*
05  T40F  2102 @B*...ANOTHER CALL ...MC STS HE WAS JUST ATTACKED
          ...105 ST-NORTHERN BLVD ...STS " THEY'RE HERE " AND HU ....
          . ANI ALI THE SAME AS PREVIOUS ....
05  T40F  2102 @B*ANI-ALI         SADEK ALBARATHI 104-22 NORT
          HERN BLVD FLR BSM CORONA COS.BUSN LAT.LON.OPER BELLE, TIFFAN
          Y-C-MTCCP040
05  T40F  2102 @D*
05  D34C  2102 @*------AUTH---106-NORTHERN------
0B  D34C  2102 @*
05  D34C  2103 @D*
12  D34C  2103 115S0242 10-84   2103 @*
11  D34C  2103 115SP4 10-98   2127 @*
05  D34C  2103 @*----FIO ON SCENE---
0B  D43C  2104 @*
05  D45C  2105 @*XMTD SPEC COMM B CW1689
0B  D45C  2105 @*
12  D34C  2105 115SP4 10-84   2105 @*
05  D34C  2105 @D*
05  D34C  2106 @*---104 ST-32 AVE--STOPPED BY 242C
0B  D59C  2107 @*
91  D34C  2108 115A 10-98   2126 @*
12  D34C  2108 115A 10-89   2108 @*TRANP 1 BACK TO SH
0B  B12C  2110 @*
0A  B36   2111 @DEF*
0B  B12C  2112 @*
12  D34C  2113 115SP4 10-82   2113 @*
05  D34C  2114 @*------FIO HAS 1 UNDER----AS OF 2113 HRS------D20
```

80

86'

| 05 | D44C | 2120 | @*--XMTD OVR CW 2 & 3--CW1723 |
| OB | D44C | 2120 | @* |
| 11 | D34C | 2125 | 115SP8 10-92C 0036 @* |
| 12 | D34C | 2125 | 115SP8 10-82  2125 @* |
| 12 | D34C | 2126 | 115SP8 10-82  2126 @* |
| 13 | D34C | 2126 | 115A 10-98  2126 @* |
| 05 | D34C | 2126 | @*---AUTH OF FIO-------CRIME UNIT TAKING UNDER AS |
|    |      |      | OF 2113 HRS------D2086 |
| 13 | D34C | 2127 | 115SP4 10-98  2127 @* |
| OB | B05C | 2132 | @* |
| 14 | D34C | 2133 | 115S0242 @* |
| OB | B12C | 2135 | @B* |
| 14 | D34C | 2206 | 115SP8 @* |
| 14 | D34C | 2209 | 115S0242 @* |
| 14 | D34C | 2313 | 115SP8 @*A R R E S T |
| 13 | D34C | 2317 | 115S0242 10-98  2317 @* |
| 13 | D34C | 0036 | 115SP8 10-92C  0036 @* |

78

# EXHIBIT B

Date: 07/03/12   Call: 3682   PDJob#: P121851456          NYFDJob#: ....
Initial type: UNKNOW          Final Type: UNKNOW     --- CALLER HAS NO PT MEDICAL INFO
CRO:#8765 (AR00)   Disp:#0883 (QN1P)   Held 7:NO   Relay:  Segment: 4   Area:Q6   Atom:110T
Location: 106 ST/NORTHERN BL ,QN

| | | |
|---|---|---|
| 21:05:39 | PDCOMP | (D34C) --REQ BUS TO LOC+ (8765) |
| 21:05:39 | PDADR-NOTVER | (8765)106 ST/NORTHERN BL,QN |
| 21:06:21 | PDADR-VIEWED | (8765) AR00 F (8765) |
| 21:06:29 | ENTRY-INIT | (8765) INITIAL CALL ENTRY |
| 21:06:32 | ENTRY-AVOK | (8765) ADDRESS VERIFICATION COMPLETE |
| 21:06:32 | ADDR-CHANGED | (8765) 106 ST/NORTHERN BL ,QN |
| 21:06:32 | ENTRY | (8765) PDT |
| 21:06:32 | FTNAL | (8765)ACK SENT TO PD  - JOB FIRST SENT TO RELAY |
| 21:07:15 | SUGG-UNITS1 | (0883) %46A3 >46B3 %49F3 %46E3 .Dual %49C3 |
| 21:07:15 | SUGG-UNITS2 | (0883) >46V3 %50S3 %46Y3 %52X3 .Dual *46Z3 |
| 21:07:15 | SUGG-UNITS3 | (0883) %46A3 >46V3 >46B3 %49F3 %46E3 %50S3 |
| 21:07:15 | ASSIGNED | (0883) 46A3 #1019 MEJIA EMT, JOSE STA 46 #2101 GONZALEZ EMT, ADI STA-46 89 |
| 21:07:15 | ETA-88 | (0883) 46A3=211114 110T  110T |
| 21:07:20 | * DMSG-RECEIVED | (1019) 46A3 |
| 21:07:23 | * ENROUTE | (1019) 46A3 |
| 21:11:27 | * ONSCENE | (1019) 46A3 |
| 21:36:29 | * GIVE-DISPO | (1019) 46A3 93 , REFUSED ALL |
| 21:36:29 | * 10-98 | (1019) 46A3 , Automatic 98/GD while 88 |
| 21:36:29 | * CLOSED | |

FIRE DEPARTMENT – CITY OF NEW YORK

I hereby certify pursuant to CPLR 2306 and 2307 that this document is a true and accurate copy of a Fire Department record kept in the regular course of Fire Department business.

Signature: _____ Date: 5.7.13

_____  Unit: ODLS

**Prehospital Care Report**   5 2 3 6 8 2   4 6 A 3   ☐ BLS ☑ ALS   75799337

Incident Date: 07 / 03 / 17 — 2 07 2 07 2 1 1 10 — Unit: 2 1 7 6

**Incident Address**
1 0 6 ST - N o r t h e r n LL   Apt Number: — Driver's Shield # C1 1 0 1 9 / C2 1 0 1 9
Tech / Documentation Shield # 2 1 0 1

Prior Treatment(s) / by whom: — Responded From: 1043t - Roosevelt

**Patient Name**
Last Name: E L T U R V E Y   First Name: T A R E K   MI: —
☑ Male ☐ Female   Weight: 

Age: 5 2 ☐ Days ☐ Months ☑ Years

**Medical**

Cause of Injury / Illness — ☑ 99 No Medical Prob.

Body Matrix (Mark all that apply): Head, Face, Eye, Neck, Chest, Back (Upper), Back (Lower), Shoulder/Up Arm, Elbow / Forearm, Wrist, Hands / Fingers, Abdomen (Upper), Abdomen (Lower), Pelvis, Genitals, Upper Leg, Knee, Lower Leg, Ankle / Foot

Elapsed Time: Systolic B/P 1 3 / Diastolic — Pulse — Resp — Pain (0-10) 2 0 1

**Breathing** — Quality: ☑ Normal ☐ Labored ☐ Shallow ☐ Irregular
Lung Sounds: ☐ Clear ☐ Rales ☐ Wheeze ☐ Rhonchi ☐ Diminish ☐ Absent

FIRE DEPARTMENT – CITY OF NEW YORK

SH9001 (1 of 2), Rev 3G, 0510   © 2010 Sansio   (Page 1)

3682 — 75799337

## NARRATIVE HISTORY (Key Additional Process, Quality Indicator, Severity, Position, Onset, Complaint De-Scalar, Medications)

**Past:** ☐ Asthma ☐ Chronic Renal Failure ☐ Cardiac ☐ Diabetes ☐ Febr / Diseased ☐ Hypertension ☐ IV Drug Use ☐ Seizure Disorder ☐ Tracheostomy
☐ Amputee ☐ Cancer ☐ COPD ☐ CVA / Stroke ☐ Dialysis ☐ HIV / AIDS ☐ Incontinent ☐ Psychiatric Hx. ☐ Substance Abuse ☐ Tuberculosis

**Special Conditions:** ☐ Bed Confined ☐ Non-Ambulatory ☐ Requires Stretcher ☐ Valid DNR

**Obvious Death:** ☐ Decomposition ☐ Dependent Lividity ☐ Dependent Lividity ☐ Rigor Mortis ☐ Mortal Injury

**Allergies:** ☒ No known allergies

**Allergies:** ☒ No known allergies

**Medications:** ☒ Unknown

### Cardiac Arrest Information
Witnessed By: / ROSC:
CPR was ___ Minutes Since ___ AED was
started by: ___ Arrest ___ used by:

Pt was robbed by group of males, unarmed. punched ® eye
hematoma. ↓ cheek - tooth loose - pain mild.
® Parietal region has laceration. superficial and
swelling. While supine on ground held down
thrusting head on floor Ø Loc. Pt A+O×3. ABADK
refuses medical attn. Txt to hospital. he sts it his religious belief
"In my country we believe in god - whatever happens happens".
Advised risk of "brain bleed". friend & witness here - a/6o
couldn't convince him. Refused all, signed to be off @/one RMA -

**Chief Complaint:** They punch me and bang my head. I'm ok.

Have the patient's symptoms appeared ☒ Yes or gotten worse in the last 72 hours? ☐ No

**Presumptive Diagnosis:**                                                                   Continuation Form ☐

---

Time of Contact | OLMC Physician | Reason For Contact: ☐ FMA ☐ Consult ☐ Orders ☐ Transport Decision ☐ Onscene Triage | OLMC Termination Time | ED Chart Number

Crew # | C.S. Administered By / Signature | Witness Signature / Title | Amount Wasted | # Vials Used | OLMC Physician | URN

---

**Insurance Company Name**

**Policy Number** | **Group Number**

**Insurance Related Information** | Medicare # | Medicaid #
☐ Auto Insurance ☐ Self Pay | | Work related? ☐
☐ Private Insurance

(1) PATIENT INFORMATION DISCLOSURE AND ASSIGNMENT OF CLAIM: I acknowledge that I have been given the Notice of Privacy Practices and Patient Information Release/Assignment of Claim, as set forth on the Patient Copy of this Prehospital Care Report and have read or been informed of their contents, including the purposes for which my protected health care information will be shared, and my responsibility for any charges for services not covered by my insurance or found to be medically unnecessary.
I hereby authorize, for myself or my dependent(s), the release of medical and other information for the purposes specified, including treatment and billing. I further authorize and assign payment of Medicare and any other authorized benefits to the NYC Fire Department. ☐ Patient Unable to Sign ☐ Patient Refused to Sign (Reason Documented)

Information Release Patient / Auth. Rep. Signature
O.T.C.

(2) OUT OF AREA TRANSPORT / DIVERSION: I request to be transported to a hospital that is more than 10 minutes from the closest appropriate hospital, or that is on diversion status. I have been advised and I understand that I may experience delays in my care that may imperil my health or result in death. ☐ Patient Unable to Sign ☐ Patient Refused to Sign Hospital Requested:

Out of Area Transport Patient Signature

(3) RELEASE/REFUSAL OF MEDICAL ASSISTANCE (RMA): I have been advised and I understand that I require medical assistance, and will be transported to a hospital of my choice, and that my refusal to accept such medical assistance may imperil my health or result in death, but I nonetheless refuse to accept the medical assistance. I agree to assume all risks, consequences and costs of my decision not to accept such care, and I release the provider of ambulance service, and its employees, agents and independent contractors, from any liability arising from my decision.
☐ Pre-hospital care refused: ☐ Transportation to hospital refused: ☐ Patient Unable to Sign ☐ Patient Refused to Sign
I list care refused:

O.T.C.

---

### SAFETY
**Lights / Siren** ☒ To Scene (63) ☐ To Destination (82)

**Conditions Causing Delay**

**Seat Belt Use** ☐ Lap Belt ☐ Shoulder Belt
Car Seat: ☐ Front Facing ☐ Side Facing ☐ Rear Facing

**Airbags Deployed** ☐ Steering Wheel ☐ Passenger Dash ☐ Driver Door ☐ Passenger Door ☐ Other

**Patient Safety Equip.** ☐ Eye Protection ☐ Helmet ☐ Personal Flotation ☐ Protective Clothing ☐ Protective Gear

**To Scene** / **To Patient** / **To Hospital**

---

### RESCUE
**Removed to Vehicle By:** ☐ Chair ☐ Walked ☐ Carried ☐ Scoop Stretcher ☐ Flat ☐ Stretcher ☐ Met at Ambulance

**Transport From** ☐ Residence (Home) ☐ Scene of Accident or Acute Event ☐ Residential, Custodial Facility ☐ Skilled Nursing Facility (SNF)
Transport From Code: ☐ Inter-facility

**Transport Position** ☐ Supine ☐ Sitting ☐ Shock ☐ Semi / Full Fowlers ☐ Left Lateral Recumbent ☐ Restrained

**Pt Transported in Vehicle** Not Present Transported Transport Miles
Hospital Destination

**Hospital Selection** ☐ Nearest Facility ☐ Patient / Family Choice ☐ Specialty Referral ☐ Hospital Diversion
Diverted From code:

**Pt Not Transported in This Vehicle** ☐ Assisted in Transport ☒ RMA With Unit # ☐ Pronounced, NOT Transported ☐ Onscene Triage ☐ Transferred Care ☐ Other To Unit #

---

### ADMIN
Hospital Receiving Agent Signature | FDNY Code | Qty | Supply Code | Qty | Supply Code | Technician Signature

© 2010 Sansio
(Page 2)

# EXHIBIT C

THE PEOPLE OF THE STATE OF NEW YORK,  STATE OF NEW YORK

v.  COUNTY OF QUEENS

RAYMOND BALL (46Y)
DEFENDANT

---

POLICE OFFICER ANGELO PAMPENA OF 115TH PRECINCT, TAX REG#: ▓▓▓▓▓
BEING DULY SWORN, DEPOSES AND SAYS THAT ON OR ABOUT JULY 3 2012
BETWEEN 8:50PM AND 9:00PM, AT THE SW INTERSECTION OF 105 STREET AND
NORTHERN BOULEVARD, COUNTY OF QUEENS, STATE OF NEW YORK

THE DEFENDANT COMMITTED THE OFFENSES OF:
PL 160.10-1 ROBBERY IN THE SECOND DEGREE
PL 160.10-2A ROBBERY IN THE SECOND DEGREE
PL 120.00-1 ASSAULT IN THE THIRD DEGREE - DNA SAMPLE REQUIRED UPON
               CONVICTION
PL 165.40 CRIMINAL POSSESSION OF STOLEN PROPERTY IN THE FIFTH DEGREE

IN THAT THE DEFENDANT, ACTING IN CONCERT, DID:  FORCIBLY STEAL
PROPERTY AND WAS AIDED BY ANOTHER PERSON ACTUALLY PRESENT;FORCIBLY STEAL
PROPERTY AND IN THE COURSE OF COMMITTING THE CRIME OR OF IMMEDIATE
FLIGHT THEREFROM, HE OR ANOTHER PARTICIPANT IN THE CRIME DID CAUSE
PHYSICAL INJURY TO A PERSON WHO WAS NOT A PARTICIPANT IN THE CRIME;
WITH INTENT TO CAUSE PHYSICAL INJURY TO ANOTHER PERSON, CAUSE SUCH
INJURY TO SUCH PERSON OR A THIRD PERSON;KNOWINGLY POSSESS STOLEN
PROPERTY WITH INTENT TO BENEFIT HIMSELF OR A PERSON OTHER THAN THE OWNER
THEREOF, OR TO IMPEDE THE RECOVERY BY AN OWNER THEREOF

THE SOURCE OF DEPONENT'S INFORMATION AND THE GROUNDS FOR DEPONENT'S
BELIEF ARE AS FOLLOWS:

DEPONENT STATES THAT HE IS INFORMED BY THE COMPLAINANT, TAREK ELTURKY,
THAT ON THE ABOVE MENTIONED DATE, TIME, AND PLACE OF OCCURRENCE, THE
DEFENDANT, RAYMOND BALL, AND APPREHENDED OTHER, ELIJAH BROOKS, ARREST
NUMBER Q12638443, APPROACHED HIM.

DEPONENT IS FURTHER INFORMED BY THE COMPLAINANT THAT THE APPREHENDED
OTHER PUNCHED AND KICKED THE COMPLAINANT IN THE FACE, AND SMACKED HIS
HEAD ON THE PAVEMENT SEVERAL TIMES, WHILE THE DEFENDANT HELD HIS HANDS
BEHIND HIS BACK.

DEPONENT IS FURTHER INFORMED BY THE COMPLAINANT THAT THE DEFENDANT
TOOK HIS WALLET AND IPHONE FROM HIS POCKET.

07/04/2012  3:35PM (GMT-

50

AND SUBSTANTIAL PAIN.

DEPONENT FURTHER STATES THAT HE RECOVERED A IPHONE FROM THE DEFENDANT,
WHICH THE COMPLAINANT IDENTIFIED AS THE IPHONE STOLEN FROM HIM.

DEPONENT FURTHER STATES THAT HE RECOVERED $250 IN CASH FROM THE
DEFENDANTS POCKET AND HE IS INFORMED BY THE COMPLAINANT THAT THERE
WAS $250 IN THE ABOVE MENTIONED WALLET AT THE TIME WHEN IT WAS TAKEN.

DEPONENT FURTHER STATES THAT HE RECOVERED CREDIT CARDS AND A SOCIAL
SECURITY CARD IN THE COMPLAINANT'S NAME FROM THE GROUND NEAR WHERE THE
DEFENDANT AND APPREHENDED OTHER WERE APPREHENDED.

DEPONENT IS FURTHER INFORMED BY THE COMPLAINANT THAT HE IS THE LAWFUL
OWNER OF THE ABOVE MENTIONED IPHONE, WALLET, AND CONTENTS OF SAID
WALLET, AND THE DEFENDANT OR APPREHENDED OTHER DID NOT HAVE ANY
PERMISSION OR AUTHORITY TO TAKE, USE, OR EXERCISE ANY CONTROL OVER
SAID IPHONE, WALLET, OR CONTENTS IN SAID WALLET.

FALSE STATEMENTS MADE IN THIS DOCUMENT ARE
PUNISHABLE AS A CLASS A MISDEMEANOR PURSUANT
TO SECTION 210.45 OF THE PENAL LAW

7-4-12
DATE        SIGNATURE

SWORN TO BEFORE ME ON THE
DAY OF

DATE        SIGNATURE

07/04/2012

51

| THE PEOPLE OF THE STATE OF NEW YORK | STATE OF NEW YORK |
| | COUNTY OF QUEENS |
| v. | |
| ELIJAH BROOKS (49Y) DEFENDANT | |

POLICE OFFICER ANGELO PAMPENA OF 115TH PRECINCT, TAX REG#: ~~_____~~, BEING DULY SWORN, DEPOSES AND SAYS THAT ON OR ABOUT JULY 3 2012 BETWEEN 8:50PM AND 9:00PM, AT THE SW INTERSECTION OF 105 STREET AND NORTHERN BOULEVARD, COUNTY OF QUEENS, STATE OF NEW YORK

THE DEFENDANT COMMITTED THE OFFENSES OF:
PL 160.10-1 ROBBERY IN THE SECOND DEGREE
PL 160.10-2A ROBBERY IN THE SECOND DEGREE
PL 120.00-1 ASSAULT IN THE THIRD DEGREE - DNA SAMPLE REQUIRED UPON
        CONVICTION
PL 165.40 CRIMINAL POSSESSION OF STOLEN PROPERTY IN THE FIFTH DEGREE
PL 195.05 OBSTRUCTING GOVERNMENTAL ADMINISTRATION IN THE SECOND DEGREE
PL 110/120.00-1 ATTEMPTED ASSAULT IN THE THIRD DEGREE

IN THAT THE DEFENDANT, ACTING IN CONCERT, DID: FORCIBLY STEAL PROPERTY AND WAS AIDED BY ANOTHER PERSON ACTUALLY PRESENT;FORCIBLY STEAL PROPERTY AND IN THE COURSE OF COMMITTING THE CRIME OR OF IMMEDIATE FLIGHT THEREFROM, HE OR ANOTHER PARTICIPANT IN THE CRIME DID CAUSE PHYSICAL INJURY TO A PERSON WHO WAS NOT A PARTICIPANT IN THE CRIME; WITH INTENT TO CAUSE PHYSICAL INJURY TO ANOTHER PERSON, CAUSE SUCH INJURY TO SUCH PERSON OR A THIRD PERSON;KNOWINGLY POSSESS STOLEN PROPERTY WITH INTENT TO BENEFIT HIMSELF OR A PERSON OTHER THAN THE OWNER THEREOF, OR TO IMPEDE THE RECOVERY BY AN OWNER THEREOF;A PERSON IS GUILTY OF OBSTRUCTING GOVERNMENTAL ADMINISTRATION WHEN HE INTENTIONALLY OBSTRUCTS, IMPAIRS, OR PERVERTS THE ADMINISTRATION OF LAW OR OTHER GOVERNMENTAL FUNCTION OR PREVENTS OR ATTEMPTS TO PREVENT A PUBLIC SERVENT FROM PERFORMING AN OFFICIAL FUNCTION, BY MEANS OF INTIMIDATION, PHYSICAL FORCE OR INTERFERENCE, OR BY MEANS OF ANY INDEPENDENTLY UNLAWFUL ACT, OR BY MEANS OF INTERFERING, WHETHER OR NOT PHYSICAL FORCE IS INVOLVED, WITH RADIO; TELEPHONE, TELEVISION OR OTHER TELECOMMUNICATIONS SYSTEMS OWNED OR OPERATED BY THE STATE, OR A COUNTY, CITY, TOWN, VILLAGE, FIRE DISTRICT OR EMERGENCY MEDICAL SERVICE OR BY MEANS OF RELEASING A DANGEROUS ANIMAL UNDER CIRCUMSTANCES EVINCING THE ACTOR'S INTENT THAT THE ANIMAL OBSTRUCT GOVERNMENTAL ADMINISTRATION.;WITH INTENT TO CAUSE PHYSICAL INJURY TO ANOTHER PERSON, DID ATTEMPT TO CAUSE PHYSICAL INJURY TO SUCH PERSON OR A THIRD PERSON.

52

DEPONENT STATES THAT HE IS INFORMED BY THE COMPLAINANT THAT ON THE ABOVE MENTIONED DATE, TIME, AND PLACE OF OCCURRENCE, THE DEFENDANT, ELIJAH BROOKS, AND APPREHENDED OTHER, RAYMOND BALL, ARREST NUMBER Q12638438, APPROACHED HIM.

DEPONENT IS FURTHER INFORMED BY THE COMPLAINANT THAT THE DEFENDANT PUNCHED AND KICKED THE COMPLAINANT IN THE FACE, AND SMACKED HIS HEAD ON THE PAVEMENT SEVERAL TIMES, WHILE THE APPREHENDED OTHER, WAS HOLDING HIS HANDS BEHIND HIS BACK.

DEPONENT IS FURTHER INFORMED BY THE COMPLAINANT THAT THE APPREHENDED OTHER TOOK HIS WALLET AND IPHONE FROM HIS POCKET.

DEPONENT IS FURTHER INFORMED BY THE COMPLAINANT THAT THE ABOVE MENTIONED ACTIONS OF THE DEFENDANT AND APPREHENDED OTHER CAUSED HIM A LACERATION ON THE SIDE OF HIS FOREHEAD, A LOOSE TOOTH, BLEEDING ON HIS HEAD AND FROM INSIDE HIS MOUTH, A SWOLLEN EYE, SCRATCHES ON HIS BACK, AND SUBSTANTIAL PAIN.

DEPONENT FURTHER STATES THAT HE RECOVERED A IPHONE FROM THE APPREHENDED OTHER, WHICH THE COMPLAINANT IDENTIFIED AS THE IPHONE STOLEN FROM HIM.

DEPONENT FURTHER STATES THAT HE RECOVERED $250 IN CASH FROM THE APPREHENDED OTHER'S POCKET, AND HE IS INFORMED BY THE COMPLAINANT THAT THERE WAS $250 IN THE ABOVE MENTIONED WALLET AT THE TIME WHEN IT WAS TAKEN.

DEPONENT FURTHER STATES THAT HE RECOVERED CREDIT CARDS AND A SOCIAL SECURITY CARD IN THE COMPLAINANT'S NAME FROM THE GROUND NEAR WHERE THE DEFENDANT AND APPREHENDED OTHER WERE APPREHENDED.

DEPONENT IS FURTHER INFORMED BY THE COMPLAINANT THAT HE IS THE LAWFUL OWNER OF THE ABOVE MENTIONED IPHONE, WALLET, AND CONTENTS OF SAID WALLET, AND THE DEFENDANT OR APPREHENDED OTHER DID NOT HAVE ANY PERMISSION OR AUTHORITY TO TAKE, USE, OR EXERCISE ANY CONTROL OVER SAID IPHONE, WALLET, OR CONTENTS IN SAID WALLET.

DEPONENT FURTHER STATES THAT WHEN HE PLACED THE DEFENDANT INTO THE CELL AT THE 115 POLICE PRECINCT, IN QUEENS COUNTY, AND UNCUFFED THE DEFENDANT, THE DEFENDANT STARTED SWINGING HIS ARMS, AND KICKING HIS FEET TOWARDS POLICE OFFICERS AND A POLICE SERGEANT WHO WERE RIGHT NEXT TO HIM.

07/04/2012 3:22PM (GMT-04:00)

AFPL452103142491

BROOKS,ELIJAH Q12638443

FALSE STATEMENTS MADE IN THIS DOCUMENT ARE
PUNISHABLE AS A CLASS A MISDEMEANOR PURSUANT
TO SECTION 210.45 OF THE PENAL LAW

7-4-12
DATE          SIGNATURE

SWORN TO BEFORE ME ON THE
DAY OF

DATE          SIGNATURE

# EXHIBIT D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS: PART K-20
-------------------------------------------------------------------x
**THE PEOPLE OF THE STATE OF NEW YORK**

                                           **Indict.2228-2012**

                                           <u>**AFFIRMATION**</u>

    -against-

**RAYMOND BALL**

          Defendant
-------------------------------------------------------------------x
STATE OF NEW YORK)
COUNTY OF QUEENS ) ss.:

      **LINDA S. POVMAN,** an attorney duly admitted to practice law in the State of New York, affirms under penalty of perjury as follows:

    1. I am the attorney for the above named defendant.

    2. That on February 20, 2014 the defendant appeared in Part Tap A.

    3. That on that date the defendant, Raymond Ball, was served with a copy of this court's decision dated January 14, 2014 wherein the court on the reopened hearing concerning the introduction of a EMS report denied the defendant motion to suppress. A copy of the decision is annexed hereto as Exhibit A.

    4. That the defendant is seeking to reopen the hearing once again to make inquiry concerning the failure of the arresting officer to prepare an aided report.

    5. That on February 20, 2014 the defendant made an oral request of Justice Kron for the relief requested and advised counsel to file the application.

    Wherefore the defendant respectfully requests that this court reopen the suppression hearing previously conducted to allow the defendant to inquire of the arresting officer concerning his failure to prepare an aided report and such other and

SUPREME COURT: STATE OF NEW YORK
COUNTY OF QUEENS: CRIMINAL TERM PART K20

                                                      :    Indictment No.:02228/12

PEOPLE OF THE STATE OF NEW YORK

              -against-                                :       DECISION/ORDER

RAYMOND BALL,                                              January 14, 2014

HOLLIE, RONALD D., Justice

    This court conducted a hearing on May 21, 2013, pursuant to *Dunaway v. New York, 442 U.S. 200* and *United States v. Wade, 388 U.S. 218,* and rendered a decision which denied the defendant's motion to suppress. The co defendant by motion sought a new hearing for the court to consider discovery material, specifically the EMS Report, which was provided to the defense by the People subsequent to the hearing. The codefendant's motion for a new hearing was deemed to be a motion to vacate the decision of this court dated May 22, 2013 and by order dated October 7, 2013 the court granted the motion to reopen the hearing for the introduction of the EMS Report.

    On 1/4/14 the re-opened hearing was concluded and the defendant's motion to suppress pursuant to *Dunaway v. New York, 442 U.S. 200* and *United States v. Wade, 388 U.S. 218,* was again denied

_____
RONALD D. HOLLIE J.S.C.

## Supreme Court of the State of New York
## Appellate Division: Second Judicial Department

M224206
E/sl

JOHN M. LEVENTHAL, J.P.
SANDRA L. SGROI
HECTOR D. LASALLE
BETSY BARROS, JJ.

———————————————

2015-01907

The People, etc., respondent,                    DECISION & ORDER ON MOTION
v Raymond Ball, appellant.

(Ind. No. 2228/12)

———————————————

Motion by the appellant pro se for leave to serve and file a supplemental brief on an appeal from a judgment of the Supreme Court, Queens County, rendered March 4, 2015, and to be furnished with copies of the typewritten transcripts of the proceedings, if any.

Upon the papers filed in support of the motion and the papers filed in relation thereto, it is

ORDERED that the motion is granted; and it is further,

ORDERED that the District Attorney shall file the transcripts of the proceedings, if any, and the Clerk of this Court shall deliver those transcripts to the person in charge of the institution wherein the appellant is incarcerated for examination by the appellant; the transcripts shall be returned to this Court when the appellant files the supplemental brief or informs this Court that no supplemental brief will be filed; and it is further,

ORDERED that the appellant shall file nine copies of the supplemental brief and serve one copy on the District Attorney.

Upon delivering the transcripts to the institution, the Clerk of this Court shall advise the appellant of the date by which the transcripts are to be returned and the supplemental brief filed.

LEVENTHAL, J.P., SGROI, LASALLE and BARROS, JJ., concur.

ENTER:

Aprilanne Agostino
Clerk of the Court

January 13, 2017

PEOPLE v BALL, RAYMOND



**Appellate Division**
**Supreme Court of the State of New York**
**Second Judicial Department**
**45 Monroe Place**
**Brooklyn, N.Y. 11201**
**(718) 875-1300**

MEL E. HARRIS
KAREN HOCHBERG TOMMER
MARIA T. FASULO
DEPUTY CLERKS

RANDALL T. ENG
PRESIDING JUSTICE

APRILANNE AGOSTINO
CLERK OF THE COURT

DARRELL M. JOSEPH
KENNETH BAND
ASSOCIATE DEPUTY CLERKS

January 24, 2017

15A1060

Mid-State Correctional Facility
Inmate Records Coördinator
9005 Old River road
Marcy, NY  13403-0216

Re:  People v Ball, Raymond
App. Div. Docket No.: 2015-01907, Queens County Ind. No. 2228/12 94/15

Dear Sir:

Forwarded herewith are the following minutes for your use in the preparation of his *pro se* supplemental brief:

| Hearing | 5/21/13 | pp. | 1 - 67 |
|---------|---------|-----|--------|
| Hearing | 1/8/14 | pp. | 1 - 53 |
| Jury Trial | 1/20, 21, 22, 23, 26, 28, 29, 30,  2015 | pp. | 1 - 735 |
| Sentence | 3/4/15 | pp. | 1 - 26 |

Nine copies of the *pro se* supplemental brief must be filed in this court on or before **April 25, 2017.**  One additional copy must be served on the District Attorney.

If at this time you no longer wish to file the supplemental brief, you should send a signed letter to the court indicating that you no longer wish to file.

Very truly yours,
PRO SE CLERK

Encl.
Received By: _____

_____          _____
Location                                    Date

cc:   District Attorney, Queens County
Randall D. Unger, Esq.

RAYMOND BALL
15A1060
Otisville Correctional Facility
P.O. Box 8
Otisville, New York 10963

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 07 2020 ★

BROOKLYN OFFICE

RECEIVED
APR 0 7 2020
PRO SE OFFICE

Douglas C. Palmer-Clerk of the Court
CLERK OF THE U.S. DISTRICT COURT
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201



04/02/2020
US POSTAGE $003.00⁰
ZIP 10963
041M11459157