CLERK OF U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
225 CADMAN PLAZA EAST
BROOKLYN, NY 11201

OFFICIAL BUSINESS

LEGAL MAIL

Raymond Ball

52-09 99th ST.
Corona N.Y. 11368

*RETURNED*







neopost
01/19/2021
US POSTAGE $001.80⁰

FIRST-CLASS MAIL

ZIP 11201
041M11271726

USMS

## Orders on Motions
1:19-cv-05310-ERK-LB Ball v. Stevenson

HABEAS,PROSE



**U.S. District Court**

**Eastern District of New York**

### Notice of Electronic Filing

The following transaction was entered on 1/8/2021 at 2:08 PM EST and filed on 1/8/2021

**Case Name:**      Ball v. Stevenson
**Case Number:**   1:19-cv-05310-ERK-LB
**Filer:**
**Document Number:** 12

**Docket Text:**
**ORDER denying [1] Petition for Writ of Habeas Corpus, and granting [2] Motion for Leave to
Proceed in Forma Pauperis. Ordered by Judge Edward R. Korman on 1/8/2021. (Adams, Casey)**



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

RAYMOND BALL,

Petitioner,

– against –

**MEMORANDUM & ORDER**

ANGELENE STEVENSON,

19-cv-5310 (ERK)

Respondent.

KORMAN, *J.*:

On July 3, 2012, cab driver Tareek Elturkey left his apartment on 105th Street between Northern Boulevard and 32nd Avenue in Corona, Queens to withdraw cash from a nearby ATM. ECF No. 9-2 at 487. Mr. Elturkey took out $260 in cash in preparation for his shift. *Id.* at 503. He then walked to a deli that he went to "all the time, maybe ten times a day." *Id.* at 489. Mr. Elturkey often visited the deli to buy coffee and cigarettes and chat with the owner who, like Mr. Elturkey, immigrated to the United States from the Middle East. *Id.* at 489. On the way in, Mr. Elturkey passed "a black guy, homeless" whom Mr. Elturkey knew because he was "always begging for [a] dollar" in that spot. *Id.* at 490–91. Indeed, Mr. Elturkey would "always give him [a] dollar or coffee or something" when he saw the man. *Id.* at 490.

Mr. Elturkey spent three or four minutes buying cigarettes at the deli, and then went outside to smoke and make a phone call around 8:30 PM. *Id.* at 492, 505. After lighting his cigarette and dialing his phone, Mr. Elturkey began walking down 105th Street toward 34th Avenue. *Id.* at 493. Mr. Elturkey soon noticed he was being followed by a man he did not recognize, a "black guy wearing [a] white shirt and dark jeans," whom Mr. Elturkey described as "heavy," perhaps

1

weighing 250–300 pounds. *Id.* at 495. Mr. Elturkey became nervous and walked between two cars toward the street, intending to loop back and return to the deli on the corner of Northern Boulevard. *Id.* at 498–99. The heavy man who had been following Mr. Elturkey told someone to "attack him, punch him" and then pushed Mr. Elturkey to the ground. *Id.* at 509–10. Mr. Elturkey fell into the "homeless guy," who had been around "five feet behind" him. *Id.* The heavy man punched Mr. Elturkey in the face twice and pushed his head into the sidewalk three times while the homeless man searched his pockets. *Id.* at 512–14. The heavy man hit Mr. Elturkey hard enough that the following day he had to pull out a tooth that had come loose in the attack. *Id.* at 515–16. The homeless man then cut Mr. Elturkey's pants pocket open and took his cash and iPhone. *Id.* at 513. The heavy man threatened Mr. Elturkey before leaving the scene. *Id.* at 514. Mr. Elturkey did not see in what direction the homeless man departed. *Id.* at 516. About a minute after his assailants left, Mr. Elturkey got up and returned to the deli. *Id.* at 517. The deli's owner called the police to report the incident. *Id.* The heavy man saw Mr. Elturkey from outside the store and again threatened him before walking back down 105th Street. *Id.*

Mr. Elturkey flagged down what he correctly surmised to be an unmarked police car. *Id.* at 519–20. The officers in the car, NYPD Sergeant Jeff Rosenberg and Officer Daniel Lanning, were responding to a radio run reporting that a man had been robbed at the corner of 105th Street and Northern Boulevard. ECF No. 9-2 at 584–85. The radio run described "two male blacks, one wearing white shirt and black pants" as the suspects. *Id.* at 585. When Officer Lanning's car pulled over, he observed that Mr. Elturkey had blood on his face and mouth. *Id.* at 588. Mr. Elturkey told the officers that he had been robbed and that his assailant had gone south on 105th Street. *Id.* The officers took Mr. Elturkey into their vehicle and proceeded down 105th Street. *Id.* About a quarter of the way down the block, Mr. Elturkey pointed to a man and told the officers

"that's him." *Id.* at 589–90. The officers stopped the car and placed the man Mr. Elturkey had identified, Elijah Brooks, in handcuffs. *Id.* at 591–92.

Officer Angelo Pampena and two other officers were patrolling in a car "approximately three or four blocks" away from the scene when they received the radio run. *Id.* at 648–49. The officers headed south on 105th Street for approximately thirty seconds. *Id.* at 649. Just before Officer Pampena's car reached the intersection of 32nd Avenue and 105th Street, he saw "a male black, white T-shirt, black jeans running away from the crime scene." *Id.* The officers pulled their car over at the intersection and the running man, petitioner, stopped "right in front" of the vehicle. *Id.* at 651. Petitioner "put his hands up and just said that he bought a phone at 105[th Street] and Northern Boulevard while holding a black iPhone in his right hand." *Id.* The officers put petitioner in handcuffs and placed him in the patrol vehicle. *Id.* Officer Pampena recovered the iPhone as well as a $100 bill, seven $20 bills, and a $10 bill from petitioner. *Id.* at 657.

Officer Pampena transported petitioner south on 105th Street until they reached the crime scene, where an ambulance was now parked. *Id.* Mr. Elturkey was in the back of the ambulance and Officer Pampena noted that "[h]e had blood all over [his] face, large lacerations to his head, his eyes were swollen, his ears bleeding, his mouth busted up, and his clothes were ripped and torn up and very disheveled and very messy looking." *Id.* at 658. Petitioner was standing in front of Officer Pampena's police car, which was parked opposite Mr. Elturkey about two car lengths away. *Id.* at 659. Officer Pampena asked Mr. Elturkey if he recognized petitioner, and Mr. Elturkey identified him as the person who had taken his iPhone and cash. *Id.* at 660. Mr. Elturkey identified the iPhone and described the denominations of the bills that had been stolen from his pocket, which matched those recovered from petitioner. *Id.* at 659. Officer Pampena unlocked the iPhone with a passcode supplied by Mr. Elturkey and discovered photos of Mr. Elturkey and his family on the device. *Id.* at 660–61. Petitioner later asked Officer Pampena what he was being charged with.

3

*Id.* at 54. When Officer Pampena responded that he would be charged for robbery because Mr. Elturkey had identified the phone and cash as his stolen property, petitioner responded that if "[h]e says it's his, then it must be his." *Id.* at 54–55.

## PROCEDURAL HISTORY

A. *Pre-Trial Hearings*

Petitioner and co-defendant Brooks were charged by indictment with two counts of robbery in the second degree, one count of assault in the third degree, and one count of criminal possession of stolen property in the fifth degree. *Id.* at 460–61. Before trial, the court held a *Mapp/Huntley/Wade/Dunaway* hearing to examine various challenges to evidence the state planned to introduce. *Id.* at 7–8. Officers Lanning and Pampena testified at the hearing. *Id.* at 9, 27.

Petitioner was represented by counsel at the hearing. *Id.* at 2, 7. At the conclusion of the hearing, Petitioner's counsel moved to suppress his arrest and all physical evidence seized from him after the stop by Officer Pampena. *Id.* at 62. Counsel argued that Officer Pampena lacked probable cause to arrest petitioner because the radio run did not provide "sufficient specific information" about the robbery suspects. *Id.* Counsel also moved to exclude Mr. Elturkey's identification of petitioner because the circumstances — with petitioner "handcuffed and in the presence of one or two uniformed officers" — were suggestive. *Id.* In addition, counsel argued that the identification was unreliable because Mr. Elturkey viewed petitioner "at nighttime from three car lengths away" and "never even got out of the ambulance to look closely" at him before making an identification. *Id.*

The court denied the motions to suppress. The court reasoned that Officer Pampena had probable cause to stop petitioner because he matched the description of suspects from the radio run, was discovered running from the area where officers had reason to believe a crime had been

4

committed, and volunteered that he had gotten the phone in his hand from that area. *Id.* at 66–67. Accordingly, the court found that the money and phone were recovered by a search incident to a lawful arrest. *Id.* at 68. The court also concluded that the circumstances of identification "lacked suggestiveness" because the identification "happened a very short time after this robbery, a very short distance from this robbery." *Id.* Finally, the court declined to suppress petitioner's statements to police because they were "voluntarily made" and were "not in response to any question asked of [petitioner] by the officer." *Id.* at 69.

At the next hearing date, petitioner's counsel informed the court that petitioner had requested a new lawyer. *Id.* at 79. Petitioner claimed that his counsel had told him that she could not defend him because there was "perjured testimony being used to prosecute" him. *Id.* The court treated the request as an application to relieve counsel and denied it. *Id.* at 80. Petitioner then explained that he wanted the court to "consider allowing me to go pro se . . . I prepared my legal defense for myself thus far since I've been arrested." *Id.* The court declined to change counsel or allow petitioner to begin representing himself while the case was in a hearing posture and denied the application. *Id.*

The court later re-opened the hearing based on defense counsel's receipt of an EMS report from the paramedic who treated Mr. Elturkey. *Id.* at 110–11. The re-opened hearing was intended to allow defense counsel to examine issues around the condition of Mr. Elturkey's eyes after the attack and the potential impact any injury had on his ability to identify petitioner and his co-defendant. *Id.* at 86. As soon as the hearing began, petitioner reminded the court that he had "asked you to allow me to go pro se or have another lawyer represent me" and stated that he did not "feel [counsel] will properly represent me . . . [because] she has been negligent, you know, in her duties in defending me." *Id.* at 83. Petitioner informed the court that it was "going forward

today with this hearing against . . . my wishes" by not relieving or replacing counsel. *Id.* The court again denied the application to change counsel. *Id* at 84.

After counsel examined Officer Pampena, the court allowed petitioner to ask his own questions. *Id.* at 120–21. The questions appeared intended to substantiate petitioner's claim that Officer Pampena was lying about his actions and observations on the night of the incident. Petitioner appeared to construe the EMS report's notation that Mr. Elturkey had refused all medical treatment as proof that Mr. Elturkey had never actually entered the ambulance, which was inconsistent with Officer Pampena's testimony. *Id.* at 122. Petitioner also claimed that discrepancies between the times recorded on the EMS report and those given by Officer Pampena established that it was "impossible" for Officer Pampena to have been at the crime scene at the time he said he was. *Id.* at 125. The court adjourned the hearing to allow Officer Pampena to search for a report on the aid he rendered to Mr. Elturkey — appropriately referred to as an "aided report" — which he testified he had prepared but which had not been turned over to the defense. *Id.* at 131.

At the following hearing, the state informed the court that Officer Pampena had been unable to locate an aided report. *Id.* at 136. The state told the court that "there was never an aided report prepared for this case, so [Officer Pampena] was mistaken when he first said that." *Id.* The court finalized its denial of the motions to suppress evidence and adjourned the case for trial. *Id.* at 137. Petitioner's counsel waived his appearance. *Id.*

Petitioner renewed his request to represent himself at his next appearance. He reminded the court that he had "been asking for pro se for over three years" and had brought the request to the court's attention "time and time again." *Id.* at 140. When questioned, petitioner claimed to have represented himself at a previous criminal trial where he "went through the process of questioning witnesses [and] presenting evidence." *Id.* at 141–42. He acknowledged understanding

6

that his prior felony conviction meant that he would be subjected to a mandatory minimum sentence of five years' incarceration if convicted. *Id.* at 142. Petitioner informed the court that he had completed most coursework for his liberal arts degree, but had not graduated. *Id.* at 142–43. The court warned petitioner that his counsel had "decades of experience" and that "it is generally a much better idea to simply consult with your lawyer and let them use their formal training and experience and expertise in representing you th[a]n having you present this yourself." *Id.* at 143. After giving petitioner these warnings, the court asked whether petitioner still believed that it would be in his best interest to represent himself. *Id.* at 144. Petitioner said that he did. *Id.* The court granted petitioner's motion to represent himself and assigned his former counsel to act as stand-by counsel. *Id.* at 144–45.

B. *The Trial*

Petitioner was tried jointly with co-defendant Brooks. In his first pro se appearance, petitioner acknowledged that he had had time to reflect on his decision to represent himself and re-affirmed that choice after extensive questioning by the court. *Id.* at 149–62.

The state called Mr. Elturkey as its first witness. Mr. Elturkey recounted the events of July 3, including his identifications of petitioner and his co-defendant. However, when asked whether he recognized anyone in the courtroom as the heavy man, he said no and explained that it had "been [a] long time" and that he was having difficulty remembering. *Id.* at 499–500. When prompted a second time, Mr. Elturkey again declined to identify anyone and said that he was having trouble remembering. *Id.* at 523–24. The prosecutor later asked Mr. Elturkey if he recognized anyone in the courtroom as the homeless man, to which he responded: "No. I know him very well. No." *Id.* at 531. Mr. Elturkey affirmed that he was "sure" that the person the police arrested and showed to him on the night of the incident was the homeless man who had taken his

7

property. *Id.* at 531. Mr. Elturkey said that the homeless man "[s]ometimes [] acted like a gay, [he] act[ed] like a woman sometime[s]." *Id.*

On cross-examination by petitioner, Mr. Elturkey insisted that he had seen the homeless man take his property and identified him after police made the arrest. Mr. Elturkey explained that "I saw him, I tried to get up from the heavy guy and the homeless guy, I'm not blind, he is the one who took, the other one he came push and took the money at the same time." *Id.* at 566. Mr. Elturkey described the homeless man as a "black guy, [] tall, skinny" with tight curly hair "same like [petitioner's] hair." *Id.* at 567. Contrary to Officer Pampena's testimony, Mr. Elturkey asserted that he was not in the ambulance at the time he made his identification of the homeless man. *Id.* at 569. Mr. Elturkey also claimed that officers first showed him a Blackberry that did not belong to him before showing him his iPhone. *Id.* at 572. When asked on redirect if he could picture what the men who assaulted him looked like, Mr. Elturkey claimed that "I know the homeless guy because I saw him three, four, five times, I always see him, but the other guy I'm not [sic] recognize him." *Id.* at 576.

Officers Lanning and Pampena both testified at trial and gave their accounts of apprehending petitioner and his co-defendant. Officer Pampena testified that petitioner's "hair is a little more grown out, he is a little heavier today" and that petitioner had been more "clean cut" on the night of the incident. *Id.* at 652. Officer Pampena testified that Mr. Elturkey had identified petitioner from "[a]pproximately two car lengths" away while the officer and Mr. Elturkey were together in the back of the ambulance. *Id.* at 659–60. Officer Pampena also testified that the "arrest time" for both defendants was 9:13 PM, and explained that this reflected "an approximate time" when officers "have sufficient evidence that the person committed the crime and call in for "what's called an under time from central." *Id.* at 687–88.

8

Petitioner cross-examined Officer Pampena on a number of subjects. He first attempted to point out inconsistencies between the officer's testimony in pre-trial hearings and at trial, for example whether he arrested petitioner halfway down the block between Northern Boulevard and 32nd Avenue or at the intersection of 105th Street and 32nd Avenue. *Id.* at 696–97. When asked why he stopped his car after seeing petitioner, Officer Pampena explained that "you fit the description that came over the radio of a male black, white T-shirt, black pants that just robbed somebody at knife point, and you were running away from the crime scene, you were a block away." *Id.* at 697.

After the officers testified, petitioner moved to exclude Officer Pampena's testimony about Mr. Elturkey's prior identification as inadmissible hearsay not subject to the exception established by N.Y. Crim. Proc. Law § 60.25. *Id.* at 743–44. The court denied the application, finding that petitioner's objection was untimely and, regardless, Mr. Elturkey's testimony laid a proper foundation for admission of the officer's testimony. *Id.* at 744.

Petitioner then called EMS worker Adi Gonzalez, who tended to Mr. Elturkey on the night of the incident. Petitioner explained to the judge that "my whole case is surrounded by the victim being inside the [ambulance], the identification, the police officer" and that the EMS worker could "tell us whether or not there was ever someone inside the [ambulance]." *Id.* at 748–49. Gonzalez testified that the SPRINT[1] report indicated he had first come into contact with Mr. Elturkey at 9:21 PM, that he refused transportation to the hospital, and that Gonzalez had transmitted the refusal and marked himself available to respond to new calls at 9:36 PM. *Id.* at 788–91. Petitioner asked Gonzalez "[Mr. Elturkey] never received treatments from you, right, but is it possible that [Mr. Elturkey] was ever inside the ambulance if he never received treatment?" *Id.* at 767. Gonzalez

---

[1] A SPRINT report is a "shorthand typed version" of a 911 call and the resulting actions, prepared by the dispatcher. ECF No. 9-2 at 678.

responded: "It is, yes, usually especially on a street call we bring the patient into the ambulance, privacy, get their information, you know, we can't do that on the street . . . everything would be inside the ambulance." *Id.* After this exchange, petitioner repeatedly attempted to elicit testimony that Mr. Elturkey might have remained outside the ambulance during his interactions with Gonzalez, and at one point accused Gonzalez of "not giving us an accurate answer." *Id.* at 775. Petitioner remarked that "you have me at a stand still . . . you are not gonna allow me to assume that [Mr. Elturkey] was not in the ambulance." *Id.* at 777. On cross-examination by the state, Gonzalez explained that "I would assume it was in the ambulance, that's what a vague memory would say, but I don't want to say with certainty unless I'm sure," and clarified that his practice was to interview street call patients "inside the ambulance for privacy reasons." *Id.* at 784–85.

In his summation, petitioner accused Officer Pampena of giving "a fictitious account of the events surrounding this case," including recounting an "imaginary arrest." *Id.* at 800. Petitioner contended that the evidence showed that Mr. Elturkey had never been inside an ambulance on July 3 because he "refused all and any treatment" and therefore could not have made the identification described by Officer Pampena. *Id.* at 800. Petitioner pointed out inconsistencies between Officer Pampena's testimony and testimony offered by other witnesses, arguing that these differences made the officer's version of events "impossible." *Id.* at 807–09. Petitioner told the jury that "District Attorney Shortt [] checked his ethical responsibilities at the door" by relying on "perjured testimony and . . . witnesses trained to say what he wanted them to say." *Id.* at 803.

In response, the prosecutor told the jury that the fact that Officer Pampena recovered Mr. Elturkey's property from petitioner shortly after it was stolen was enough to convict, even without the identification. He argued that "[w]hen you are in exclusive possession of something that was stolen five minutes before during a robbery, it's because, ladies and gentlemen, you are the one that stole it." *Id.* at 836. The prosecutor acknowledged inconsistencies between some of the

10

accounts but urged the jury to consider them as "[m]inor differences" that were "the natural side effect of multiple people experiencing something." *Id.* at 837–38. The prosecutor also argued that Mr. Elturkey's identification should be considered "in light of all the evidence," including that Mr. Elturkey had correctly described the denominations of bills recovered from petitioner and that Mr. Elturkey's passcode had unlocked the phone petitioner was carrying. *Id.* at 838.

The jury convicted petitioner and his co-defendant Brooks on all counts. *Id.* at 872. The court denied petitioner's motion to set aside the verdict because his "contentions have either been considered and rejected . . . or are unpreserved and, therefore, unvieweable in a[n N.Y. Crim. Proc. Law §] 330 application." *Id.* at 890. The court sentenced petitioner to two determinate terms of ten years of imprisonment and five years of supervised release on the robbery counts, to run concurrently, and one year of imprisonment on the assault and possession of stolen property counts, to merge as a matter of law. *Id.* at 905.

C. *Direct Appeal*

Petitioner accepted the assistance of counsel for his direct appeal. As relevant to this habeas proceeding, petitioner's counsel argued that the trial court erred by (1) denying his motion to suppress physical evidence, statements, and the prior identification on the ground that they were the products of an arrest that violated N.Y. Crim. Proc. Law § 140.10(1)(b) because officers lacked probable cause, (2) allowing the prosecutor to elicit testimony about the prior identification from Officer Pampena absent a sufficient foundation under N.Y. Crim. Proc. Law § 60.25, and (3) allowing petitioner to waive his right to counsel and proceed *pro se*. ECF No. 9-1 at 15, 21, 29. The Appellate Division granted petitioner leave to file a supplemental brief *pro se*, in which he challenged the admissibility of Mr. Elturkey's on-the-scene identification on several grounds, including that the procedure used was impermissibly suggestive. Petitioner also faulted his trial counsel for waiving his appearance at the close of the suppression hearing. *Id.* at 157.

11

The Appellate Division affirmed petitioner's conviction. *People v. Ball*, 162 A.D.3d 680 (2d Dep't 2018). The Appellate Division agreed with the hearing court "that there was probable cause for [petitioner's] arrest, and accordingly, to deny suppression of physical evidence, identification testimony, and [petitioner's] statements to law enforcement officials." *Id.* at 681. It held that petitioner's objection to admission of testimony about Mr. Elturkey's prior identification pursuant to N.Y. Crim. Proc. Law § 60.25 was both unpreserved and meritless. *Id.* The Appellate Division also held that "the record, as a whole, demonstrates that [petitioner's] decision to waive his right to counsel and to proceed pro se was unequivocal, knowing, voluntary, and intelligent. The trial court's extensive inquiry established [petitioner's] ability to represent himself and emphasized the dangers and disadvantages of proceeding without counsel." *Id.* Finally, the Appellate Division rejected the contentions raised in petitioner's supplemental brief as "without merit." *Id.* The Court of Appeals denied petitioner's application for leave to appeal. *People v. Ball*, 32 N.Y.3d 1002 (2018).

## DISCUSSION

In this proceeding petitioner argues that (1) his conviction was procured by the perjured testimony of Officer Pampena, (2) Officer Pampena lacked probable cause to stop and search him and the evidence resulting from that search should have been suppressed, (3) trial counsel's waiver of his appearance at the conclusion of the suppression hearing violated his "right to be present at a full and fair hearing," and (4) evidence of Mr. Elturkey's post-arrest identification should not have been admitted. ECF No. 1 at 1–10.

### A. *Standard of Review*

The Antiterrorism and Effective Death Penalty Act ("AEDPA") allows a federal court to grant habeas relief to a state prisoner only if a state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 409–10 (2000). A decision "involves an unreasonable application" of federal law where it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams*, 529 U.S. at 407–08. A petitioner must therefore demonstrate that the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). This is a "highly deferential standard," requiring that state courts "be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation omitted). However, "[i]t preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington*, 562 U.S. at 102.

Where a state court denies a claim on the merits without explaining its reasons, a petitioner still bears the burden to show "there was no reasonable basis for the state court to deny relief." *Id.* at 98. In those cases, "a habeas court must determine what arguments or theories . . . could have supported[] the state court's decision," and then accord deference if "it is possible [that] fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* at 102; *see also Shinn v. Kayer*, 592 US. __, 2020 WL 7327827, at *5 (2020) (per curiam) ("[W]e must determine what arguments or theories . . . could have supported the state court's determination. . . . Then, we must assess whether fairminded jurists could disagree on the correctness of the state court's decision if based on one of those arguments or theories.") (internal quotation marks omitted).

13

B. *Testimony of Officer Pampena*

Petitioner argues, as he did in state court, that Officer Pampena lied at trial. ECF No. 1 at 19. Petitioner exhaustively explored this claim both at trial and in his supplemental brief on direct appeal, where the Appellate Division rejected it on the merits. *Ball*, 162 A.D.3d at 680. Petitioner relies on minor inconsistencies to argue that it would have been "physically impossible" for Officer Pampena to do what he testified he did on the night of the incident. ECF No. 1 at 19. In substance if not in form, petitioner argues that his due process rights were violated because no rational trier of fact could have credited Officer Pampena's testimony to find him guilty beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 317 (1979).

Both the jury and the Appellate Division rejected petitioner's assertion that Officer Pampena offered perjured testimony to convict him. "[I]t is the responsibility of the jury — not the court — to decide what conclusions should be drawn from evidence admitted at trial," including by "resolv[ing] conflicts in the testimony." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011); *Jackson*, 443 U.S. at 319. Petitioner must therefore overcome deferential review of the trier of fact's conclusions, followed by deferential review of the Appellate Division's rejection of his challenge to those conclusions.

Petitioner fails to clear either hurdle. None of the inconsistencies relied upon by petitioner call into question the essential facts attested by Officer Pampena — that he apprehended petitioner running away from the crime scene, recovered a phone and money, and transported petitioner back to the scene, where Mr. Elturkey identified both petitioner and the stolen property. Petitioner now argues that Officer Pampena in fact arrested Brooks, which would have required the jury to believe that Officer Lanning *also* lied on the stand when he testified that he was the one who arrested Brooks. ECF No. 9-2 at 591–92. Petitioner does not come close to establishing that "no rational trier of fact" could have believed Officer Pampena's testimony. *Jackson*, 443 U.S. at 324. Even

14

if petitioner could somehow make this showing and require the exclusion of Officer Pampena's testimony, there was ample other evidence in the record to allow the jury to find him guilty beyond a reasonable doubt. *See id.* ("[T]he applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilty beyond a reasonable doubt.").

### C. *Probable Cause*

Petitioner argues that even if Officer Pampena did stop him and seize evidence during an incidental search, the officer lacked probable cause for those actions and the resulting evidence should have been suppressed. ECF No. 1 at 6. This claim was raised and rejected on the merits in the direct appeal. *Ball*, 162 A.D.3d at 680. The petition does not elaborate on petitioner's basis for this argument, nor does it identify clearly established federal law that the Appellate Division unreasonably applied in rejecting it. In any event, this claim arises under the exclusionary rule grounded in the Fourth Amendment and is not cognizable on habeas review where, as here, state courts have "provided an opportunity for full and fair litigation" of the claim. *Stone v. Powell*, 428 U.S. 465, 494–95 (1976). Indeed, the claim would fail on the merits even if reviewed de novo because the record clearly establishes that the officers had probable cause to stop petitioner. He matched the description of suspect from the radio run, was discovered running from the area where officers had reason to believe a crime had been committed, and volunteered that he had gotten the phone in his hand from that area.

### D. *Right to Be Present*

Petitioner argues that the trial court violated his "right to be present at a full and fair hearing." ECF No. 1 at 8. The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant's right to be present "at any stage of the criminal proceeding that is critical to

its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). The right does not extend to situations "when presence would be useless, or the benefit but a shadow." *Id.* (internal quotation omitted). The test is "whether, in light of the record as a whole . . . the defendant's presence at the proceeding in question would have contributed to his opportunity to defend himself against the charges." *Contreras v. Artus*, 778 F.3d 97, 113 (2d Cir. 2015) (internal citation omitted). Where defendant "could have done nothing had he been at the proceeding, nor would he have gained anything by attending, no constitutional violation will be found on the basis of his absence." *Id.* (internal quotation omitted).

Petitioner has not shown that his rights were violated here. Petitioner complains of trial counsel's "constant waiver of [his] presence at proceedings." ECF No. 1 at 26. Based on his description of the claim, it appears petitioner's complaint is principally aimed at trial counsel's waiver of his appearance during the pre-trial hearing that took place on January 14, 2014. *Id.* at 26–27. The record indicates that this hearing was held to resolve whether Officer Pampena had prepared an aided report and, if he had, to ensure that the report was turned over to petitioner's trial counsel. *See* ECF No. 9-2 at 136–37. The prosecutor informed the court that Officer Pampena was mistaken about preparing a report, and consequently there was no document to turn over. *Id.*

Even if the waiver of petitioner's presence at the January 14 were somehow invalid — which petitioner has not shown — the proceeding in question was a brief, pro forma affair and "a fair and just hearing" was not "thwarted" by petitioner's absence. *Contreras*, 778 F.3d at 113. Petitioner was present for the main suppression hearing, where the court took extensive testimony from Officers Lanning and Pampena and petitioner's own trial counsel conducted cross-examination and urged the court to suppress evidence against him. *See* ECF No. 9-2 at 6–134. Indeed, it was at these appearances that petitioner first began to press the trial court to allow him to proceed pro se. *Id.* at 79, 84, 140. The Appellate Division did not unreasonably apply clearly

16

established federal law by finding that the trial court did not violate petitioner's due process right to be present at the critical stages of his prosecution.

E. *Ineffective Assistance of Counsel*

Although the petition does not enumerate it as a separate ground for relief, petitioner's accompanying memorandum argues that he was denied effective assistance of counsel because of trial counsel's "refusal to investigate my alibi witnesses . . . [and] lack of interest in my defen[s]e." ECF No. 1 at 26. Petitioner complains that trial counsel "kept trying to get me to cop out," which caused him to seek to proceed pro se. *Id.* Petitioner validly waived his right to counsel after trial counsel represented him at the suppression hearing, but before trial.[2] Petitioner's ineffective assistance claim must therefore be aimed at trial counsel's conduct before he dismissed her. This claim was never presented to the state courts and is unexhausted. Regardless, the claim is meritless and is denied for that reason. *See* 28 U.S.C. § 2254(b)(2).

Under *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant claiming ineffective assistance of counsel must show both deficient performance and prejudice. Counsel's performance is deficient under *Strickland* where it falls "below an objective standard of reasonableness." *Id.* at 688. Petitioner has failed to make this showing, so I need not reach the prejudice element. The suppression hearing record shows that trial counsel vigorously cross-examined officers Lanning and Pampena. ECF No. 9-2 at 22–26, 40–54. Trial counsel effectively, though unsuccessfully, urged the trial court to suppress both the identification testimony and the physical evidence recovered from petitioner. *Id.* at 62–63. Trial counsel also called Officer Pampena back to examine him on the contents of the EMS report after it was turned over. *Id.* at 110–25. Petitioner

---

[2] Petitioner did present a claim that his waiver of his right to counsel was not knowingly and voluntarily made, which the Appellate Division rejected on the merits. *Ball*, 162 A.D.3d at 680. Petitioner does not renew that claim in his habeas petition.

has not explained what alibi witnesses trial counsel allegedly failed to investigate. Indeed, since petitioner was apprehended by police running from the direction of the crime scene minutes after the crime took place with Mr. Elturkey's phone and cash in his possession, it is not clear what alibi he could credibly have presented. Similarly, petitioner fails to explain how trial counsel's alleged lack of interest in his defense manifested in conduct that fell below an objective standard of reasonableness. Nor has petitioner shown that it was unreasonable for trial counsel to encourage him to consider accepting a plea offer by the DA, something the judge also encouraged him to consider. ECF No. 9-2 at 70. In light of the overwhelming evidence against petitioner and the fact that he had a predicate felony conviction on his record, trial counsel may have reasonably concluded that obtaining a favorable plea deal was in petitioner's best interest. Indeed, petitioner was ultimately convicted and sentenced to ten years' imprisonment after rejecting a pre-hearing plea offer by the state. *Id.* Petitioner has failed to show that trial counsel's performance was deficient and his unexhausted ineffective assistance claim is denied as meritless.

### F. *Identification Evidence*

Petitioner raises two challenges to the trial court's admission of testimony about Mr. Elturkey's identification of him as the homeless man. First, petitioner argues that the trial court erred by allowing Officer Pampena to testify about Mr. Elturkey's prior identification after Mr. Elturkey failed to identify petitioner at trial. ECF No. 1 at 18. Petitioner contends that the state failed to lay a proper foundation for admission of prior identification testimony pursuant to N.Y. Crim. Proc. Law § 60.25. *Id.* Petitioner presented his state-law argument against the introduction of prior identification testimony in his direct appeal and the Appellate Division rejected it as both procedurally barred because unpreserved and "without merit." *Ball*, 162 A.D.3d at 681. Second, petitioner argues that the identification itself was "tainted" because "police prep[p]ed Mr. Elturkey" on his guilt and showed petitioner to Mr. Elturkey "from far away." ECF No. 1 at 18.

18

1. *State Law Foundation*

It is "not the province of a federal habeas court to reexamine state-court determinations on state-law questions," including those related to admissibility of evidence. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). "[T]o establish that an erroneous application of state rules of evidence violates the federal guarantee of due process, [petitioner] must also demonstrate that the state court's erroneous conclusions about New York evidence law were so egregious as to implicate the Fourteenth Amendment's guarantee of due process" by rendering the trial "fundamentally unfair." *Evans v. Fischer*, 712 F.3d 125, 133, 135 (2d Cir. 2013). Even if an erroneous state law evidentiary ruling does rise to the level of constitutional error, it may still be found harmless unless the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

New York Criminal Procedure Law § 60.25 permits third-party testimony of a prior identification where a witness is "unable at the proceeding to state, on the basis of present recollection, whether or not the defendant is the person in question." Petitioner failed to object to admission of this evidence until after it was already admitted. ECF No. 9-2 at 744. The prosecutor opposed the application to suppress, arguing that petitioner's objection was untimely and that "Mr. Elturkey specifically said [']it's been too long for me to remember[']." *Id.* The trial court denied the application. *Id.* But the testimony relied on by the state referred to Mr. Elturkey's ability to identify *Brooks*, not petitioner, at trial. *Id.* at 499. When prompted whether he saw the homeless man — which the state argued was petitioner — Mr. Elturkey responded: "He is not here." *Id.* at 492. The prosecutor asked Mr. Elturkey to look around "the whole courtroom," after which Mr. Elturkey confirmed "No, not here." *Id.* Later, Mr. Elturkey was asked again if he saw the homeless man and he responded: "No. I know him very well. No." *Id.* at 531. The prosecutor and trial

19

court appeared to conflate Mr. Elturkey's repeated assertions that the homeless man he knew "very well" was not in the courtroom with the statement that he would have trouble recognizing the heavy man. These were separate identifications of people with whom the witness testified he had very different levels of familiarity. That the state courts appeared to gloss over these critical distinctions is concerning.

Nevertheless, petitioner's claim fails for other reasons. First, petitioner's claim is barred from federal review as procedurally defaulted because the Appellate Division denied it on the "independent and adequate" state law ground of failure to preserve. *Walker v. Martin*, 562 U.S. 307, 316 (2011) (internal quotation omitted). Second, petitioner has provided no federal cases clearly establishing that admission of this type of testimony on erroneous state law grounds fits into the "very narrow[]" category of actions that implicate the federal due process guarantee by violating "fundamental conceptions of justice" in a way that undermines the "fundamental fairness" of a trial. *Dowling v. United* States, 493 U.S. 342, 352 (1990); *Evans*, 712 F.3d at 133.[3] Indeed, it would be hard to make this showing because third party testimony about a prior identification made by another witness who testifies and is subject to cross-examination is not considered hearsay under the Federal Rules of Evidence and is generally admissible in a federal trial. Fed. R. Evid. 801(d)(1)(C); *United States v. Lewis*, 565 F.2d 1248, 1251–52 (2d Cir. 1977); *Linton v. Bradt*, 775 F. Supp. 2d 574, 579 (E.D.N.Y. 2011). Finally, the other evidence against petitioner — stolen property recovered by Officer Pampena and identified by Mr. Elturkey and petitioner's own statements about that property — was overwhelming. *See Brecht*, 507 U.S. at

---

[3] Petitioner's rights under the Confrontation Clause are not implicated here because the hearsay declarant — Mr. Elturkey — testified at trial and was cross-examined by petitioner himself. *See Evans*, 712 F.3d at 135 n.6; *Crawford v. Washington*, 541 U.S. 36, 51–54 (2004).

639. Any potential constitutional violation did not have a "substantial and injurious effect or influence in determining the jury's verdict" and was therefore harmless. *Id.* at 623.

### 2. *Identification Procedure*

Petitioner argues that the Mr. Elturkey's identification was "tainted" because the police "prep[p]ed" Mr. Elturkey by placing him in suggestive circumstances that encouraged him to identify petitioner. ECF No. 1 at 18, 24. This objection was raised at the suppression hearing and the trial court denied it because the identification "happened a very short time after this robbery, a very short distance from this robbery." ECF No. 9-2 at 68. Petitioner's counseled brief on direct appeal did not raise this ground, instead arguing for exclusion of identification testimony because it was the fruit of an unlawful arrest. ECF No. 9-1 at 16. Petitioner's pro se supplemental brief did discuss the issue. *See id.* at 128–29, 158. Indeed, he concluded his supplemental brief by arguing "[i]f the witness is unable to identify the defendant at trial the defendant's conviction . . . should not rest solely upon evidence of a pretrial identification made under circumstances which were likely to produce an unreliable result." *Id.* at 159. The Appellate Division denied the claims raised in that brief as meritless without further explanation. *Ball*, 162 A.D.3d at 681. Because the Appellate Division did not articulate its reasons, it is necessary to examine what grounds "could have supported" that court's rejection of petitioner's tainted identification claim, and then "assess whether fairminded jurists could disagree on the correctness of the court's decision if based on one of those arguments or theories." *Harrington*, 562 U.S. at 102; *Shinn*, 2020 WL 7327827, at *5.

Due process concerns requiring suppression of a tainted identification arise only when "officers use an identification procedure that is both suggestive and unnecessary." *Perry v. New Hampshire*, 565 U.S. 228, 239 (2012). "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Neil v. Biggers*,

21

409 U.S. 188, 198 (1972). An impermissibly suggestive procedure is one that, considering the totality of the circumstances, "give[s] rise to a very substantial likelihood of irreparable misidentification." *Perry*, 565 U.S. at 232 (internal quotation omitted). "While the phrase was coined as a standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification, with the deletion of 'irreparable' it serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself." *Biggers*, 409 U.S. at 198.

Use of impermissibly suggestive procedures will not result in automatic exclusion of identification evidence. *Perry*, 565 U.S. at 239. Instead, courts assess each case on its facts to determine whether the "indicators of a witness' ability to make an accurate identification are outweighed by the corrupting effect of law enforcement suggestion." *Id.* (internal quotation omitted). "[R]eliability is the linchpin in determining the admissibility of identification testimony," *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977), and independent indicia of the reliability of identification evidence may justify admission despite the use of an impermissibly suggestive identification procedure. *Perry*, 565 U.S. at 240. This analysis, drawn from the Supreme Court's decision in *Brathwaite*, is guided by a set of factors, including five laid out in that case. These include: (1) "opportunity of the witness to view the criminal at the time of the crime"; (2) "the witness' degree of attention"; (3) "the accuracy of his prior description of the criminal"; (4) "the level of certainty demonstrated at the confrontation"; and (5) "the time between the crime and the confrontation." 432 U.S. at 114. These factors do not exhaust all the possible ways in which identification evidence may prove to be reliable or unreliable. Indeed, the Supreme Court was careful to say that the factors to be considered "include" the ones named. *Brathwaite*, 432 U.S. at 114.

Petitioner has not shown that the procedure used by police was unnecessarily suggestive. The type of "showup" procedure used here — where only one suspect is shown to the witness — is generally considered inherently suggestive. *Brisco v. Ercole*, 565 F.3d 80, 88 (2d Cir. 2009). However, "a showup procedure may be necessary in [exigent] circumstances to quickly confirm the identity of a suspect, or to ensure the release of an innocent suspect." *Id.* at 88–89. Indeed, "identification evidence from showups held in close temporal and geographic proximity to the crime scene may be admitted" as evidence in federal criminal trials. *Id.*; *see also United States v. Bautista*, 23 F.3d 726, 729–30 (2d Cir. 1994); *United States v. Pickar*, 616 F.3d 821, 828 (8th Cir. 2010) ("[N]ecessary incidents of on-the-scene identifications, such as the suspect[] being handcuffed and in police custody, do not render the identification procedure impermissibly suggestive.") (citation omitted). In those circumstances, a procedure may be "suggestive" without crossing the line to become "*unnecessarily* suggestive." *Brisco*, 565 F.3d at 91 (emphasis in original).

The presence of law enforcement officers at the showup and the fact that petitioner was presented to Mr. Elturkey in handcuffs were no doubt suggestive, but not unnecessarily so given the circumstances here. The police apprehended petitioner running from the direction of the crime scene, the identification took place steps away from where Mr. Elturkey was attacked minutes after the attack took place, and petitioner was previously known to Mr. Elturkey. The Appellate Division could reasonably have concluded that petitioner's tainted identification claim failed because he did not establish that the procedure used was unnecessarily suggestive.

Moreover, there was ample "corroborative evidence of [petitioner's] guilt," including evidence that he was apprehended fleeing from the direction of the crime scene with the proceeds of the crime in his possession. Under these circumstances, it would have been reasonable for the Appellate Division to rely on this evidence as a factor in "determining the independent reliability

23

of an eyewitness identification." *Brisco*, 565 F.3d at 95 (quoting *Kennaugh v. Miller*, 289 F.3d 36, 47–48 (2d Cir. 2002)). *Brisco* itself explained that "it seems likely that under [] AEDPA, a state court that used a 'sixth factor' analysis [considering corroborative evidence of guilt] would be applying the [*Brathwaite*] requirements in a perfectly reasonable way." *Id.* The Second Circuit previously adhered to the rule on direct appeal that "other evidence connecting a defendant with the crime may be considered on the issue whether there was a substantial likelihood of misidentification," *United States v. Reid*, 517 F.2d 953, 967 (2d Cir. 1975) (Friendly, J.), and several other circuits continue to apply that rule both on direct appeal and habeas review. *See, e.g.*, *United States v. Wilkerson*, 84 F.3d 692, 695 (4th Cir. 1996); *United States v. Lau*, 828 F.2d 871, 875 (1st Cir. 1987) (Breyer, J.); *United States v. Bell*, 812 F.2d 188, 193 (5th Cir. 1987); *United States ex rel. Kosik v. Napoli*, 814 F.2d 1151, 1156 (7th Cir. 1987); *Graham v. Solem*, 728 F.2d 1533, 154 (8th Cir. 1984) (en banc); *see also United States v. Dortch*, 342 F. Supp. 3d 810, 818 (N.D. Ill. 2018) (applying the *Kosik* rule that "an evaluation of the reliability of an identification may also take account of independent corroborating evidence").

Indeed, in *Abdur-Raheem v. Kelly*, 98 F. Supp. 2d 295 (E.D.N.Y. 2000), I wrote a comprehensive opinion explaining why independent corroborative evidence of guilt should be considered not just as a sixth factor, but perhaps the most important factor to address the overriding concern that a suggestive identification could result in a misidentification and the conviction of an innocent person. This concern, which permeates this area of law, was most recently articulated by Justice Sotomayor. *See Perry*, 565 U.S. 228, 250–51 (Sotomayor, J., dissenting) ("We have pointed to the 'formidable' number of 'miscarriage[s] of justice from mistaken identification' in the annals of criminal law.").

Notwithstanding the importance of corroborative evidence in determining whether an identification is reliable, the Second Circuit held to the contrary and reversed. *See Raheem v.*

24

*Kelly*, 257 F.3d 122 (2d Cir. 2001). Relying on an ambiguous observation in *Brathwaite* and a lone concurring opinion in that case, it held that independent corroborative evidence could not count as a sixth factor in the *Brathwaite* analysis. *Id.* at 140 (quoting *Brathwaite*, 432 U.S. at 118 (Stevens, J., concurring)). The basis for this holding was *sub silentio* undermined in *Kennaugh* and *Brisco*, leaving *Raheem* an island in the ocean of the law because it cannot be reconciled with either prior or subsequent Second Circuit decisions. *See, e.g., Reid*, 517 F.2d at 967; *United States ex rel. Gonzalez v. Zelker*, 477 F.2d 797, 803–04 (2d Cir. 1973); *United States v. Bynum*, 485 F.2d 490, 503–04 (2d Cir. 1973), *vacated on other grounds*, 417 U.S. 903 (1974).[4] Regardless of what remains of *Raheem* after *Kennaugh* and *Brisco*, those latter cases have already held that fairminded jurists could conclude that the sixth factor analysis is not ruled out by Supreme Court precedent. *Brisco*, 565 F.3d at 95; *Kennaugh*, 289 F.3d at 47–48. Under these circumstances, petitioner cannot meet his burden to refute this ground under AEDPA by showing "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 102–03.

In sum, the Appellate Division could reasonably have found either that the procedure used was not unnecessarily suggestive, or that the reliability of the eyewitness identification was established by corroborative evidence of petitioner's guilt. Petitioner has therefore failed to show that the Appellate Division's decision rejecting his tainted identification claim on the merits was contrary to, or involved an unreasonable application of, clearly established federal law.

---

[4]In its acceptance of the sixth factor, *Kennaugh* distinguished *Raheem* on the ground that the latter's rationale could survive for direct appellate review of the admissibility of eyewitness identification. But *Raheem* did not draw this distinction at all. Indeed, neither *Raheem* nor *Kennaugh* involved a direct appeal. Rather, the Second Circuit law on direct appeal, as stated in *Reid*, permits the consideration of corroborative evidence and that precedent has never been overruled.

## CONCLUSION

Because "the record refutes [petitioner's] factual allegations [and] otherwise precludes habeas relief" an evidentiary hearing is unnecessary. *Schriro v. Ladrigan*, 550 U.S. 465, 474 (2007). The petition for relief pursuant to 28 U.S.C. § 2254 is denied. A certificate of appealability is denied. Petitioner's motion to proceed in forma pauperis, ECF No. 2, is granted.

**SO ORDERED.**

*Edward R. Korman*

Brooklyn, New York
January 8, 2021

Edward R. Korman
United States District Judge